1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                   - - -

4      LG ELECTRONICS U.S.A., INC.,     :    Civil Action
       and LG ELECTRONICS, INC.,        :
5                                        :
                      Plaintiffs,        :
6                                        :
             v.                          :
7                                        :
       WHIRLPOOL CORPORATION,            :
8                                        :
                      Defendant.         :       08-234(GMS)
9      ─────────────────────────────────

10     WHIRLPOOL CORPORATION,            :
       WHIRLPOOL PATENTS COMPANY,        :
11     WHIRLPOOL MANUFACTURING           :
       CORPORATION, and MAYTAG           :
12     CORPORATION,                      :
                                         :
13                    Counterclaim       :
                      Plaintiffs,        :
14                                       :
             v.                          :
15                                       :
       LG ELECTRONICS U.S.A., INC.,      :
16     LG ELECTRONICS, INC., and LG      :
       ELECTRONICS MONTERREY MEXICO,     :
17     S.A., DE, CV,                     :
                                         :
18                    Counterclaim       :
                      Defendants.        :
19
                                    - - -
20
                           Wilmington, Delaware
21                      Thursday, January 7, 2010
                              10:00 a.m.
22                         Pretrial Conference

23                                  - - -

24     BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge

25

1    **APPEARANCES:**

2         RICHARD K. HERRMANN, ESQ.
          Morris James LLP
3                   -and-
          PATRICK J. COYNE, ESQ., and
4         ANDREW C. SONU, ESQ.
          Finnegan, Henderson, Farabow,
5         Garrett & Dunner, L.L.P
          (Washington, D.C.)
6
                         Counsel for Plaintiffs and
7                        Counterclaim Defendant

8         FREDERICK L. COTTRELL, III, ESQ.
          Richards, Layton & Finger, P.A.
9                   -and-
          SCOTT F. PARTRIDGE, ESQ.,
10        AMANDA WOODALL, ESQ.,
          PAUL R. MORICO, ESQ., and
11        IONA KAISER, ESQ.
          Baker Botts L.L.P.
12        (Houston, TX)

13                       Counsel for Defendant and
                         Counterclaim Plaintiffs
14
                         -  -  -
15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Please take your seats.  This is an

 2    office conference, counsel.

 3              Counsel, let's start out on the record with

 4    introductions.

 5              MR. HERRMANN:  Thank you, Your Honor.

 6              THE COURT:  Mr. Herrmann.

 7              MR. HERRMANN:  Good morning.  I have Patrick

 8    Coyne and Andrew Sonu, from the Finnegan firm.

 9              THE COURT:  Okay.

10              MR. COTTRELL:  Good morning, Your Honor.

11              THE COURT:  Mr. Cottrell.

12              MR. COTTRELL:  Fred Cottrell for Whirlpool.

13    With me at counsel table, of course, Scott Partridge, Paul

14    Morico, Amanda Woodall, and Iona Kaiser, all from Baker

15    Botts.

16              THE COURT:  Ms. Woodall, when you are being

17    introduced, it is customary to stop writing and acknowledge

18    the introduction.

19              MR. PARTRIDGE:  Your Honor, I have that same

20    problem.

21              (Laughter.)

22              MR. COTTRELL:  Your Honor, lastly, in the back,

23    from Whirlpool, in-house counsel is Kirk Goodwin and Tom

24    Schwyn.

25              THE COURT:  Good morning.  Happy new year to
```

1    all.

2              Counsel, here is the way we are going proceed.

3    Some of you have been with me before and done this and will

4    have an idea.  We are going to first talk about the motions

5    in limine.  I will begin with the plaintiffs.  I believe, as

6    a housekeeping point, that Whirlpool has withdrawn, I have

7    numbered it 4, and substituted -- did you substitute

8    anything?  I have substituted, because you filed this motion

9    for an adverse inference that I actually considered to be a

10   motion in limine.  So I was going to make you make a choice.

11   You have made your choice.  I will add it to the fifth

12   motion in limine.

13              Then, after we have that discussion, and I am

14   hopefully able to rule on all of the motions, to the extent

15   that I don't, or feel I need additional time, I will

16   reserve, and get back to you on those matters that I reserve

17   upon.

18              Then we will more or less go through the

19   pretrial order.  We won't discuss objections to exhibits.

20   There are too many.  I think you all are familiar with my

21   general practice of denying all objections to exhibits

22   without prejudice to your ability to raise them again at

23   some time that we will talk about, either in realtime during

24   the trial of the case or before or after the jury sits.

25              We will talk about your proposed interrogatories

1    for the jury, voir dire.  There is not a lot of difference

2    between the two submissions.  We will go through that.

3           I am going to defer discussion of a meaningful

4    nature on the jury instructions, both preliminary and final

5    proposed.  That will give you an opportunity to consolidate

6    the two -- I think there are two submissions on both.  I

7    will add the verdict form submission.

8           Mr. Partridge.

9           MR. PARTRIDGE:  The preliminary instructions,

10   Your Honor, we are in substantial agreement.  I think there

11   is one correction based on some resolutions that we achieved

12   over the last couple weeks.

13          THE COURT:  Maybe we can take a look at that and

14   maybe put those to bed.  On the finals, as one would expect,

15   and on the verdict form, in a patent case, as one would

16   expect, there is a contest.  To the extent that you really

17   haven't turned your attention, and you probably haven't as

18   fully to the instructions and the verdict form, I am going

19   to require that you do, and consolidate those submissions to

20   the extent that you can't agree after further

21   meet-and-confers or whatever you do about that, so that it

22   eases my ability to review them, and not have to shuffle

23   back and forth between two documents.

24          I will then discuss just sort of my general

25   nudges and do's and don'ts in the courtroom.  Then I will

turn to plaintiff and defendants for your agenda items.  And
we will conclude.

Hopefully, we can get this done, I should think,
by lunchtime, lunchtime being in the neighborhood of
12:30-1:00, if not before.  Before would be good.

So let's get started.

I have at Docket Item 290, I called it
Plaintiff's Motion in Limine No. 1.  It's LG's Motion In
Limine To Exclude Alleged Damages Prior To 'Notice Of
Infringement.'"

Let me just take a quick look.

Mr. Partridge, I don't know who you have
designated to handle this.  Was it Whirlpool who made the
point that you viewed this as a motion for summary judgment?

MR. PARTRIDGE:  Correct, Your Honor.

THE COURT:  I sort of do as well.

So who is going to handle this for LG?

MR. COYNE:  I am, Your Honor.

THE COURT:  So you are swimming upstream,
counsel.  You can keep your seats or not.  It is up to you.

MR. COYNE:  I am more comfortable standing.

The statute is very clear, Your Honor.  287
requires that the focus -- and the Federal Circuit has
actually ruled on this very recently in the Amstead case.
The focus is on the patentee's behavior, not the notice, not

1    knowledge, not even actual knowledge by the defendant.  It's

2    on whether or not the patentee gave notice of the

3    infringement.  Not notice of the patent, not an offer to

4    license years earlier or in some vague, unsubstantiated

5    form.  It's got to be notice of the infringement.  There is

6    no marking here.  That's undisputed.  And there was no

7    notice of the infringement.

8            And it's as simple as that.  That is why we are

9    asking that evidence not come in and confuse the jury.

10    Whirlpool has got a very substantial damages claim.  The

11    jury is already going to have a very difficult time dealing

12    with it.  If they are added on with this factor, is it in,

13    is it out, it becomes much more confusing.

14            That is really our point, Your Honor.

15            THE COURT:  How is going to handle this?

16            MR. PARTRIDGE:  Ms. Woodall will, Your Honor.

17            MS. WOODALL:  Yes, Your Honor.

18            As Your Honor has ably pointed out, we believe

19    this is a motion for summary judgment.  There is a time and

20    place for raising this issue with the Court, and the

21    plaintiff did not do that.  In fact, they appear to use that

22    ruling in defense when we raised the issue in our opening

23    letter to the Court on proposed motions for summary

24    judgment.

25            We believe the motion in limine briefing raises

1    fact issues, where LG has taken contrary positions as to

2    which date might apply with respect to notice in this case

3    and a date for damages to take effect.  We are well familiar

4    with the Federal Circuit's interpretation of this statute as

5    to what actual notice is.  We are not disagreeing with LG's

6    counsel's statement of fact.  We do believe there are facts

7    in this case that are distinguishable.  We believe that

8    there is evidence that puts at issue circumstances that have

9    never before been dealt with by the Federal Circuit.

10             The documentary evidence is going to show a

11   pattern of knowledge and a pattern of conduct that

12   highlights the dichotomy in the law between willfulness

13   notice and actual notice for damages that has not yet been

14   addressed.  So we believe this is actually an open issue

15   before the Federal Circuit.  And we believe that that should

16   be left for the jury to decide by the end of the day.

17             If this had been something for summary judgment,

18   they should have raised it then.  There is plenty of

19   evidence before this jury upon which a jury can find that we

20   are entitled to damages going back prior to filing the

21   lawsuit.

22             THE COURT:  Your reply?

23             MR. COYNE:  Your Honor, at the end of the day,

24   the only two facts that matter was these were never marked,

25   the products were never marked.  That is undisputed.  And

1    there has been no notice letter to LG of any kind.  They are

2    relying on other types of things, which Amstead says is

3    irrelevant.  What matters is whether they gave us actual

4    notice of the infringement, namely, a product is on the

5    market, they accused it of infringement.  It never happened,

6    and there is no dispute that it never happened.

7              THE COURT:  Well, it may or may not be as open

8    and shut as you suggest.  There will be another opportunity,

9    it seems to me, prior to the submission of the case to the

10   jury, to raise this.  In anticipation of that, counsel might

11   want to watch how the record develops, if you are inclined,

12   if you have the time, prepare additional submissions,

13   written submissions, for my consideration at the JMOL

14   juncture, so that if I feel able and am inclined to rule and

15   don't reserve on it, do so; in that way, avoid any

16   possibility of confusing the jury, though our juries do

17   wrestle with oftentimes very complicated matters.

18             MR. PARTRIDGE:  Your Honor, I would just add, we

19   are also cognizant of doing this in a way that we don't

20   create error with respect to damages in terms of how the

21   verdict form is submitted and the like.  And as we go

22   forward during the course of the trial, we don't want the

23   case to come back, and we will be cognizant of the need to

24   address it in that manner.

25             THE COURT:  That is good to note.  Frankly, I

1    feel that I will be in a better position, after having heard

2    the evidence, at least to the extent that I have heard it

3    from the defendant, counter- -- what is your position?

4              MR. PARTRIDGE:  We are the counterclaim

5    plaintiffs.  We are counter-plaintiffs, I guess.

6              THE COURT:  -- Whirlpool's position, evidentiary

7    position has, at least in terms of your case-in-chief, been

8    made manifest.

9              We will do it that way.

10             I am going to deny the motion.

11             MR. COYNE:  Thank you, Your Honor.

12             THE COURT:  So plaintiffs', LG's No. 2 I think

13   is related to Whirlpool's No. 2.  Is that correct?

14             MR. PARTRIDGE:  There is a relationship, Your

15   Honor.

16             THE COURT:  I think there is a relationship, so

17   we might discuss them together, it seemed to me, after I

18   read the papers.  Let's see.

19             So LG, in its motion docketed at 292, has filed

20   a motion in limine to Preclude Whirlpool From Offering

21   Collateral Evidence of Alleged Bad Acts That Are Unrelated

22   to the Issues in This Case.

23             I think these alleged bad acts have to do with

24   claims that I believe I recall Whirlpool asserts have been

25   dismissed from the case, unfair competition and false

| | |
|---|---|
| 1 | advertising claims.  That's why I thought there was a |
| 2 | relation. |
| 3 | MR. COYNE:  No, Your Honor.  If I may. |
| 4 | THE COURT:  Sure. |
| 5 | MR. COYNE:  The concern that we have is |
| 6 | basically something that happened at the ITC trial a year |
| 7 | ago, which didn't involve any of those issues, either.  And |
| 8 | Whirlpool then proceeded to try to move into evidence at the |
| 9 | ITC, for example, a consent order against LG Display, which |
| 10 | is not a party to this case.  It is an affiliated company, |
| 11 | but business operations have nothing to do with the |
| 12 | operations of these companies that are the plaintiffs and |
| 13 | counter-defendants here. |
| 14 | There was a situation in Australia where there |
| 15 | was an agreement with the Australian Government on some |
| 16 | refrigeration products.  There have been dumping duties |
| 17 | applied in Europe. |
| 18 | These are all very tangential and unrelated |
| 19 | matters.  For example, there is an alleged price-fixing |
| 20 | conspiracy with LG Display.  There is this alleged illegal |
| 21 | contributions to a Korean politician by an LG employee. |
| 22 | THE COURT:  When I said related, I am reading, I |
| 23 | believe, from -- this is where I came up with this notion of |
| 24 | relation.  Counsel, if you would look at Whirlpool's |
| 25 | response, in Paragraph I, at Page 2, where it says, |

1    "However, to the extent that the Court does not grant

2    Whirlpool's motion," I think they are talking about Motion

3    No. 2, their Motion in Limine No. 2.

4              I am not saying it was LG who called out a

5    relationship, but somebody did, it was Whirlpool in this

6    case.  You see none.

7              MR. COYNE:  Yes, Your Honor.  I think they are

8    calling out a relationship.  I am not sure it exists.  I

9    think it's a little bit of misdirection.  The focus of our

10   motion was not the ITC case.  There is a separate set of

11   issues.  That proceeding clearly has some relevance to this

12   case, because it involved the same patent.  Obviously, it is

13   up to Your Honor whether or not you are going to permit this

14   jury to hear about it.  But there are reasons why we think

15   certain factors should come in.

16             But these facts that we are relying on in In

17   Limine No. 2 are completely different.  These are things

18   like this alleged price fixing -- I think there is a list on

19   the first page of the motion, Your Honor.  It's this alleged

20   price fixing with the LCD display company.  It is the

21   anti-dumping duties being applied in Europe.  It is these

22   campaign contributions, the agreement with the Australian LG

23   entity, which again is not a party to this case, with the

24   Australian Government, allegations that LG employees broke

25   into Whirlpool's space at a trade show and took unauthorized

1   photos.

2          None of these facts relate to any of the issues

3   on this patent infringement case.  They are all highly

4   prejudicial.  And that's what we are asking to be excluded.

5   I appreciate Whirlpool is trying to make the relationship.

6   Quite frankly, the focus of this motion is not the ITC.  We

7   would like to treat that as a separate matter.

8          There is another issue that I think is also

9   related, Your Honor, with respect to our misuse claim.  We

10  had argued that Whirlpool has brought serial litigation

11  against us that has been unsuccessful and we think, frankly,

12  not well founded.  That is not the focus of this motion.  I

13  think there are other issues of relevance on each of those

14  other matters that we will need to address separately.

15          What we are really talking about here is just

16  these purely unrelated bad acts.  You have an affiliate that

17  was allegedly price fixing.  An employee paid illegal

18  campaign contributions.  You broke into our booth and took

19  pictures, when, frankly, everybody has taken pictures of

20  everybody's product at all these trade shows.

21          The focus of this is that is unduly prejudicial.

22  It is not relevant at all to this case.  It is attempting to

23  try LG's character, in fact, a different LG entity's

24  character on this, rather than the issues of patent

25  infringement.

1              **THE COURT:  LG responds that they have no**

2     **intention of doing that which you suggest they want to do.**

3              **MR. COYNE:  No, Your Honor.  I actually am the**

4     **one who adduced the testimony they are complaining of in**

5     **their opposition in the ITC case.  I don't intend to adduce**

6     **that testimony in this Court.**

7              **If I do, frankly, I think no matter what Your**

8     **Honor's in limine ruling, it is only a tentative ruling.  If**

9     **I open the door to something like that, I fully expect that**

10    **Your Honor is going to let them respond in appropriate**

11    **fashion.  But I have no intention of getting up there and**

12    **saying, We are great, we are wonderful, we are**

13    **self-righteous, we are perfect.  If I did that, sure, I**

14    **would freely agree I am opening the door, and you would be**

15    **well within your rights, Your Honor, to let them have at me.**

16             **But this is an in limine on things that are**

17    **totally irrelevant.  If that is the issue, there is no**

18    **relevance at this point to any of these other things except**

19    **to try to trash our reputation on unrelated matters.  That**

20    **is why we are moving to exclude it.**

21             **MR. PARTRIDGE:  Your Honor, a little background**

22    **first -- maybe even before I do the background...**

23             **I would note, to simplify this thing a little**

24    **bit, that with respect to the price-fixing issue addressed**

25    **in the first page of their motion in the alleged illegal**

```
 1    campaign contribution, we are not going to attempt to

 2    introduce evidence with respect to those two categories.  So

 3    with respect to those two categories, it's my representation

 4    that we won't introduce that evidence, and it moots that

 5    part of the motion.

 6              With respect to the rest of the motion, I would

 7    like to address the relationship that does, in fact, exist,

 8    between their motion in limine and what is at issue in the

 9    case and why the motion is improper.

10              I would note that the fifth of the five things

11    that they identify in their motion concerns unauthorized

12    photos taken at trade shows.  So it's not just all

13    governmental actions.  That brings me to my first point.

14              The motion addresses two categories of evidence.

15    The first category concerns government actions.  And I have

16    removed the first two of the four government actions that

17    they point out in their motion.

18              THE COURT:  That's price fixing and?

19              MR. PARTRIDGE:  And the illegal campaign

20    contribution.

21              The second category of evidence that is

22    addressed by their motion is the improper activity at trade

23    shows involving refrigerators and washing machines.  These

24    two categories of evidence relate to two sets of legal

25    issues that are still in the case.  Except the fact that we
```

1    have finally disposed of the Lanham Act claim, the question

2    becomes what's still in this case as to which this evidence

3    might relate.

4         Here is what is still in the case:  first of

5    all, affirmative claims or causes still asserted by LG, and

6    second of all, affirmative claims or causes still asserted

7    by Whirlpool.  With respect to the first of those two,

8    affirmative causes asserted by LG, there are two, an unclean

9    hands defense, in which they claim Whirlpool's Honest Energy

10   Program is inequitable.  They have that claim in the case as

11   a defense.

12        The second claim, affirmative claim that they

13   have is the one that Mr. Coyne mentioned, patent misuse.  As

14   to patent misuse -- and I am using the characterizations of

15   these defenses from their trial brief.  If we were to go

16   into their contentions, it gets far more complicated than

17   even this.  But let's focus on what they said in their trial

18   brief.

19        As to patent misuse, they say the misuse

20   occurred because of Whirlpool's use of serial litigation.

21   And the serial litigation that they have in mind involves

22   not just refrigerators but washing machines.  They are

23   throwing in the kitchen sink, Your Honor.

24        So those are their affirmative causes of action

25   that are still in the case.

1            With respect to Whirlpool's affirmative claims

2    still in the case, we assert copying by LG which relates to

3    both our willfulness claim and our defense of their

4    invalidity claim.  And there is, and you can readily see it

5    with respect to the trade shows, a relationship between our

6    assertion of willfulness and copying to the trade show

7    activity.

8            As to both sets of evidence, and these causes of

9    action, I think LG has already opened the door.

10           First, as to LG's affirmative claims, here is

11   the real confusion I have, and maybe they can address this

12   and solve a big part of the problem.  Looking at their

13   pretrial submissions, I can't tell whether they think that

14   the unclean hands and patent misuse case is going to the

15   Bench or to the jury.

16           Page 14 of their pretrial brief says that these

17   issues -- and I will just quote it, Your Honor, I am not

18   going to read much of it.  I will give you a couple of

19   quotes from their brief and tell you where it is.  Page 14

20   of their brief, they say, "Both of these defenses and

21   inequitable conduct," which still remains in the case with

22   respect to one of our remaining three patents, "require an

23   equitable determination by the Court."

24           Then on Page 15 of their brief they say, "The

25   Court can deal most efficiently with these equitable issues,

1    freeing additional time for issues that must be resolved by

2    the jury."

3              Then they submit in the pretrial submission in

4    exhibit J-1 their proposed findings and conclusions of law

5    for a Bench trial, which include these issues.

6              So on the one hand, it looks like this is all a

7    Bench trial.  And if this is all a Bench trial with respect

8    to LG's affirmative causes of action and the exhibits that

9    relate to those, we can deal with those later, as long as

10   they don't try to put any of that evidence before the jury.

11             With respect to our causes of action, it's a

12   little more complicated.  Inconsistent with this Bench trial

13   notion in their papers is the fact that when you look at

14   their proposed jury instructions, they include inequitable

15   conduct, patent misuse, unclean hands.  And you look at

16   their verdict form, they include them.  If you look at their

17   statement of contested issues, they include these defenses.

18             So, which is it?  Is this a Bench trial or a

19   jury trial?  If it's a Bench trial, our situation is more

20   easily solved with respect to many of these documents.

21             Now, if it is a jury trial --

22             THE COURT:  Should we talk about that first

23   issue?

24             MR. PARTRIDGE:  Get an answer to that question.

25   Yes, Your Honor.

1          MR. COYNE:  I would be happy to talk about it,

2     Your Honor.

3          Your Honor, there should be no confusion.  Mr.

4     Partridge just rattled off three places in our papers where

5     we said very clearly and unequivocally that it is an issue

6     ultimately for Your Honor to decide and not for the jury to

7     decide.

8          In opposition to the In Limine Motion No. 2

9     where they raised this point, their In Limine Motion No. 2,

10     we said at Page 5, "The two equitable defenses of unclean

11     hands and patent misuse will be heard by the Court and not

12     the jury."

13          I don't know how to be any more clear than that.

14          The reason that we left those jury instructions

15     in is because we have a deadline to present jury

16     instructions.  If the Court decides in terms of management

17     of the case to ask for an advisory verdict on any of the

18     underlying facts from the jury or an advisory verdict on the

19     ultimate question from the jury, we wanted to have that in

20     so we aren't being precluded from saying later, Well, you

21     can't get an advisory verdict, you never put your

22     instructions in.

23          So we have made, at least by my count, three

24     unequivocal statements that Mr. Partridge rattled off.  The

25     one unequivocal statement here, that is in the jury

1    instructions simply to reserve the point in the event that

2    Your Honor decides that what makes the most sense is to

3    submit some or all of these for an advisory verdict.  It is

4    not an attempt to say these issues are going to be tried by

5    the jury.  We have no intention of trying to try these

6    issues to the jury.  But some of the underlying facts are

7    going to show up in the patent infringement case.  And I

8    don't know at this point, it's hard for me to see at this

9    point the way the evidence is going to look, and I may come

10   back to Your Honor at the end of the case.

11            THE COURT:  Those objections can be dealt in

12   realtime.

13            MR. COYNE:  Absolutely.

14            THE COURT:  Those issues.

15            Counsel.

16            MR. PARTRIDGE:  The problem I had with the

17   unequivocal statement is the use of the word "ultimately" in

18   describing it.  What I don't want to have happen is to have

19   counsel try to put before the jury this evidence of patent

20   misuse and serial litigation and the inequitable conduct

21   issues to taint the jury from our point of view with respect

22   to issues that the jury is going to be asked to rule upon.

23            THE COURT:  Would it make sense, Mr. Partridge,

24   counsel, from both of your perspectives, for the Court to

25   entertain as fact-finder and arbiter of the law those

1    matters that we know the Federal Circuit has entrusted to

2    the Court and not use -- I have done it all three ways --

3    not use an advisory jury on those matters?

4              MR. COYNE:  As a former appellate clerk, I think

5    it makes an easier record if the Court deals with them.

6              But there are some facts that are going to come

7    in on both sides.  I will give you one example.  This is not

8    all of them.

9              But, for example, one of the things that

10   Whirlpool relies on very heavily in its expert reports is

11   its expert relies on a statement in one of our engineering

12   reports summarizing a project where we conclude we have

13   designed around the technology.  And there is a statement in

14   it that says, Nonetheless, we expect Whirlpool is going to

15   sue us anyway.

16             They rely on that saying, aha, you knew you

17   failed to design around because Whirlpool is going to sue

18   you anyway.  No.  We knew Whirlpool was going to sue us

19   anyway because they have already done it five times.

20             That is one of these facts that the jury is

21   going to be exposed to when they introduce it.

22             THE COURT:  The jury may or may not be exposed

23   to it.  Again, this gets back to the Court's ability to

24   react as we go through the evidence.

25             MR. COYNE:  Yes, Your Honor.

1          THE COURT:  For purposes of managing the case

2     and these motions, these two motions, my question is, is it

3     the preference of the parties to bifurcate those issues out

4     or separate those issues out that the Court can deal with,

5     those equitable issues, those issues of equity, and others

6     that the circuit has given District Judges discretion to

7     deal with in a Bench context, and do that?

8          MR. COYNE:  Your Honor, I am fine with that.

9          MR. PARTRIDGE:  We are as well, Your Honor.  I

10    would say that these issues, I think, can be dealt with in

11    realtime.  I would note the example counsel gave, which

12    would be part of our realtime discussion, is that the

13    document he references predates the washing machine case and

14    any of these other cases anyway.  So it is not possible for

15    a witness to say the reason they said that was because of

16    other litigation.

17          That is something we can deal with in realtime.

18          I think if we have a separate Bench trial on

19    these issues, it solves a lot of these problems.

20          THE COURT:  For purposes of your planning on how

21    you want to raise these issues and the best utilization of

22    the jury's time, those matters that can be anticipated

23    should be teed up so that we can meet about them in the

24    morning or at the end of the day, the day before they become

25    ripe for consideration.

1              To the extent that something happens that you

2    didn't anticipate, that's what trials are for and that's

3    what judges are for.  Supposedly, we are able, I think I am

4    able to react in realtime.

5              MR. COYNE:  Your Honor, I think these issues are

6    known to both of us well enough that we can probably take

7    five minutes before we bring the jury in and raise it with

8    Your Honor.

9              THE COURT:  It will probably be more than five

10   minutes.  On those days we will meet at 8:30 and give

11   ourselves a half an hour before the 9:00 opening of court.

12             I would think that it would be prudent for you

13   to enter a stipulation as to the process we have just agreed

14   upon and what issues are going to be addressed, so that

15   there is no question about what we have done here.  And I

16   will execute a stipulation.

17             My question for you is, now, this resolution,

18   how will it impact the trial time that we need with the

19   jury?

20             MR. PARTRIDGE:  Before you get there, Your

21   Honor, if I may.  This doesn't complete the resolution of

22   the motion.

23             THE COURT:  Okay.

24             MR. PARTRIDGE:  There are really two caveats to

25   all of that.

1            THE COURT:  We are with your motion now?

2            MR. PARTRIDGE:  No, no.  With respect to his

3    motion, with respect to LG's motion.

4            This, I think, resolves the issue as to the

5    first four items on Page 1 of their motion.  I have already

6    indicated I am not going to pursue the first two items.  The

7    third and fourth items, this resolves the issue as to those

8    items.  That brings us to the fifth item, which concerns

9    unauthorized photos at trade shows.

10            I said there were two caveats.  The second is if

11   they open the door by asserting the reputation and good

12   will, et cetera, of LG -- which is what they did in the ITC,

13   where they submitted witness statements that talked about LG

14   being an honorable company with righteous management, and it

15   went on and on, and that was the reason these documents came

16   up as an issue in the ITC proceeding.

17            I understand from Mr. Coyne's explanation of his

18   position for purposes of this trial that he doesn't intend

19   to do that sort of thing, and if he does he acknowledges

20   that he has opened the door to some of these documents

21   coming in.

22            So apart from that, the question remains, as to

23   Whirlpool's affirmative causes of action in this case,

24   what's the relevance of the trade show documentation.

25            We have a copying claim that relates to both

willfulness and invalidity.  There are a number of instances
in which photographs were taken at trade shows.  There is a
course of conduct with respect to that that's reflected in
the deposition transcript of their corporate representative,
Mr. Noh, N-o-h.

          And I believe, Your Honor, with respect to the
trade show issue, and our claim of willfulness, and copying,
that these documents are relevant.

          Now, they have evidentiary objections they would
like to make with respect to those.  They argue hearsay with
respect to statements made by their corporate representative
about investigations he conducted for purposes of being
prepared for his deposition.  They have other types of
evidentiary objections they want to make.  I would suggest
that with respect to all of that, it's inappropriate for a
motion in limine, but very much appropriate for realtime
consideration when we get to trial.

          THE COURT:  I believe I agree with that.

          MR. COYNE:  Your Honor, I can make this very
easy.  We withdraw the request on that specific set of facts
because Whirlpool's files are filled with comments and
e-mails about here's the photographs we took at the trade
show at LG's booth.  So it is fine.  We are happy to deal
with it in cross at trial, and the jury can hear that they
are doing the same thing.

1    THE COURT:  I will deny the motion as moot

2    pursuant to the discussion we have just had.

3            As far as, Mr. Partridge, your No. 2.

4            MR. PARTRIDGE:  The prior litigation motion, Ms.

5    Woodall was going to address, Your Honor.  But with the

6    resolution that the issues of patent misuse are going to be

7    Bench trial issues, I think it resolves it except for a

8    point that Ms. Woodall apparently would like to make.

9            MS. WOODALL:  Yes, Your Honor.  It resolves the

10   majority of that motion in limine.

11           One part that has not yet been addressed,

12   though, is LG's proposed use and introduction of the

13   decisions of the Administrative Law Judge in the ITC action.

14           THE COURT:  Introduction of --

15           MS. WOODALL:  Of Judge Essex's opinions in this

16   case.

17           THE COURT:  What place do those have, would

18   those have in this trial?

19           MR. COYNE:  Your Honor, if I might.

20           THE COURT:  Yes.

21           MR. COYNE:  They have a very direct place.

22           THE COURT:  Let me tell you, Mr. Coyne, that I,

23   generally speaking, frown upon jurors being told about

24   official proceedings that occurred somewhere else, because

25   that can be prejudicial.

```
 1                    MR. COYNE:  Yes, Your Honor.

 2                    THE COURT:  With that in mind...

 3                    MR. COYNE:  It is also relevant in this

 4      situation.

 5                    THE COURT:  It may be relevant, but the

 6      prejudice may outweigh the relevance.

 7                    Go ahead.

 8                    MR. COYNE:  Okay, Your Honor.

 9                    THE COURT:  The probative value.

10                    MR. COYNE:  Yes, Your Honor.

11                    The relevance of it is that whether Whirlpool

12      believes it or not, LG believed that it had designed around

13      this technology by doing several things, including moving

14      the ice maker to the door.  We appreciate now that with Your

15      Honor's claim construction that is not a valid distinction.

16      But there were other distinctions to get around other of the

17      claims of not moving the ice pieces through the bottom

18      opening but rather taking out a side opening.  And whether

19      LG was right or wrong, LG believed in good faith, going

20      forward with launching the product, that those were valid

21      distinctions.  Judge Essex has endorsed that.

22                    So at least as of through Your Honor's claim

23      construction ruling on August 4th and Judge Essex's initial

24      determination, we had no input from a judicial body that our

25      thinking on this issue was wrong.  And at that point, when
```

1    we got Your Honor's ruling on August 4, and we got the ITC

2    review petition ruling, changing some of his constructions,

3    we promptly redesigned to make another difference.

4             So this goes decree to willfulness.  We do not

5    need to introduce to the jury the entirety of the ITC

6    proceeding.  All we are trying to use is that we may have

7    been wrong, but we certainly weren't idiots about it or,

8    more specifically, objectively reckless.  We had at least an

9    Administrative Law Judge who at least agreed with that

10   construction.  We appreciate that construction is

11   inconsistent --

12            THE COURT:  You can see -- and I will let

13   counsel address this -- but you can see, can't you, Mr.

14   Coyne, the possible influence that just those three words,

15   an "Administrative Law Judge," might have on a lay jury?

16            MR. COYNE:  Your Honor, I do.  Here is the

17   problem that I have got with this.  Whirlpool has

18   instantaneously, at every time the ITC has burped in this

19   proceeding, filed a letter off to Your Honor saying, See,

20   here is what the ITC is doing.

21            THE COURT:  That may be.  I can tell you, I

22   haven't read those letters.  That may be.  That is not this

23   jury.

24            MR. COYNE:  Now that it may not turn out the way

25   they want, they are running head long from it.  I am sure if

1   the shoe were on the other foot we would be switching

2   places.  I am confident of that.

3           Is there a way?  I believe there might be a way

4   to at least show that that is evidence that we weren't

5   objectively reckless, at least somebody else in a position

6   to make a decision on an issue like that, that has some

7   level of authority has confirmed our thinking.  It is wrong.

8   I concede under the Court's claim construction that thinking

9   is incorrect, at least as far as the location of the ice

10  maker.  However, it wasn't objectively reckless.  And we

11  promptly changed as soon as we found Your Honor's ruling and

12  the ITC review ruling that changed that construction.

13          THE COURT:  Counsel may want to argue, that is

14  too little, too late.  But we will see.  Go ahead.

15          MS. WOODALL:  Your Honor, I think you have hit

16  the nail on the head with the Rule 403 problem here.  We are

17  not dealing with just one opinion by Judge Essex.  At this

18  point we have two opinions by Judge Essex.  They are

19  internally inconsistent.  They flip-flop on a number of

20  issues.  It would be our position --

21          THE COURT:  I hate to see other judges getting

22  trashed like that, because I know what you guys do to me in

23  the Federal Circuit.

24          (Laughter.)

25          THE COURT:  It's okay.  Go ahead.

1          MS. WOODARD:  For the point of jury confusion,

2    we would have a mini-trial, Your Honor, on trying to explain

3    to the jury the flip-flopping, why it wasn't even reasonable

4    for LG to have relied upon these opinions.

5          THE COURT:  You have appealed those rulings.

6          MS. WOODARD:  Yes.  In fact, the ITC is fully

7    reviewing that second decision again.

8          THE COURT:  I don't mean to cut you off, but

9    that is part of the problem.  These aren't even final

10   determinations by the ITC.

11         I am going to end this discussion.

12         I am going to find that the prejudice, potential

13   prejudice outweighs the probative value of that offering.

14         If, counsel, you can agree, as you suggest, on

15   another way that does not place the imprimatur of some

16   official body on that evidence, I am willing to hear you.

17   Or if you agree on it, I don't need to hear you.

18         MR. COYNE:  Your Honor, we can certainly do

19   this -- the only thing that I would seek to use out of this

20   is that it doesn't have to be that it was an Administrative

21   Law Judge.  What we are looking for is that LG did, in fact,

22   take heart when it got that initial determination.

23         THE COURT:  How do you want to couch the

24   evidentiary presentation?  What do you want to say to the

25   jury?

1          MR. COYNE:  Your Honor, the only thing I can

2    think of is that, have it be some unidentified

3    administrative agency made a determination and leave it at

4    that and leave it vague.

5          THE COURT:  That is not very vague.  That's an

6    administrative agency, an official body.  It's one of the

7    problems that, depending upon which hat you guys are wearing

8    on any given day, that you have with the presumption, the

9    PTO issues, it's presumed.

10         That doesn't seem to me to address the problem,

11   quite frankly, Mr. Coyne.  If you can think of another way

12   that you want to raise with counsel, or if counsel doesn't

13   agree with you, later raise with me, I will entertain that.

14         MR. COYNE:  We would like time to do that, Your

15   Honor.

16         THE COURT:  You haven't gone far enough for me.

17         MR. COYNE:  I understand, Your Honor.

18         THE COURT:  To the extent that Whirlpool's

19   Motion No. 2 was not otherwise resolved by our prior

20   conversation, and therefore those portions of the motion

21   moot, I will grant that portion of Whirlpool's Motion No. 2

22   that seeks to exclude reference to administrative law bodies

23   or administrative bodies and ALJs.  I think the point is

24   made.

25         MS. WOODALL:  Thank you, Your Honor.

1                          THE COURT:  I will say granted in part and moot.

2                          So No. 3, and the final LG motion, Mr. Coyne,

3       are you going to handle this at one?

4                          MR. COYNE:  Yes, Your Honor.

5                          THE COURT:  Let me tell you the note I made to

6       myself.  I said, "Deny.  This is a weight issue."

7                          Why do you want to tell me I am wrong about

8       that?

9                          MR. COYNE:  Your Honor, with that in mind, if I

10      may limit my request, then, to two very specific factors.

11      They are two factors that Whirlpool has not responded to.

12                          I can understand Your Honor's position, and we

13      accept that with respect to the other issues, except for

14      these two.

15                          On Page 4, we identified two specific things

16      that are going on in some of the expert testimony.

17                          THE COURT:  Page 4 of your motion?

18                          MR. COYNE:  Yes, Your Honor.  I don't have the

19      docket number, Your Honor, I am sorry.

20                          THE COURT:  I have got it.  Go ahead.

21                          MR. COYNE:  It is the top of Page 4.  There are

22      two paragraphs that begin "Second" and "Third."

23      what Dr. Calligury, their technical expert does, is he goes

24      through some of the prior art, and he proportions and

25      measures the features of the drawings, and says, oh, well,

1    that prior art isn't effective or it wouldn't work based on

2    my proportioning and measuring of dimensions off the

3    drawings.

4              Your Honor, I had the displeasure of being on

5    the receiving end of that issue in this Nystrom case and was

6    reversed for doing exactly the same thing.  We got a

7    judgment of invalidity based on that type analysis.  And the

8    Federal Circuit said very distinctly, you cannot measure or

9    proportion patent drawings, they are not scale drawings.

10   They are impressionistic.  They are illustrations.  They

11   show features, not proportions and dimensions of things

12   relative to each other.  That is exactly what Dr. Calligury

13   is trying to do in distinguishing some of this art.

14             This is an issue that I think does threaten, at

15   least we feel it does threaten some measure of jury

16   confusion and disruption of the trial.  If he starts doing

17   that, I am going to be objecting.  It looks like I am hiding

18   something.  It's going to get really confusing very fast.

19   And we would like Dr. Calligury not to be doing something

20   that the Federal Circuit has said he can't do anyway.

21             Secondly, with respect to the paragraph that

22   starts "Third, alleging copying," he does make this

23   allegation of copying, and we will deal with that on the

24   merits.  But one of the ways he says we are copying is the

25   two ice storage bins are both plastic bins, they are both

1    clear plastic and white plastic and they both use blue ink.

2    So this is kind of a trade dress argument he is making.  And

3    we call it an ice bin.  So he uses the fact that they are

4    both called ice bins for the fact that we are copying.  Of

5    course.  They are ice bins.  All ice bins look like that.

6          It is very misleading to the jury to start

7    making that kind of a trade dress type of argument.  First,

8    he doesn't have any expertise in trade dress.  Second, there

9    is no trade dress protection for this ice bin, and even if

10   there were, it is not in this case.

11         He has got plenty of evidence that he can rely

12   on from the technical documents without trying to confuse or

13   mislead the jury by making this kind of a trade dress

14   argument that because both bins are white and clear plastic

15   and have blue ink on them and say ice bin on them, we must

16   have copied their ice bin.  This is all very descriptive,

17   plainly accessible stuff to everyone.  There is no

18   proprietary rights, and he is certainly not the right one to

19   be talking about it.

20         Thank you, Your Honor.

21         THE COURT:  Ms. Woodall.  So it is two very

22   specific and narrow points.

23         MS. WOODALL:  Yes, Your Honor.

24         Your Honor, with respect to the first, Dr.

25   Calligury did refer to dimensions and proportions with

 1    respect to some drawings, but his analysis was not so

 2    limited as counsel for LG has posited it.

 3          He also considered the disclosures, the

 4    descriptions, all of those things he gathered for his

 5    dimensions.  His analysis was not limited to this drawing

 6    shows this, therefore the proportions would not have

 7    disclosed X.  He looks at references in toto.  He looks at

 8    descriptions, specifications, uses all of those things --

 9          THE COURT:  But the scale issue, Ms. Woodall,

10    that Mr. Coyne addresses, and the spectacle that he

11    envisions of having to object when you offer that, attempt

12    to offer Dr. Calligury to the jury for making a

13    demonstrative or something in realtime.  His points about

14    scale are rather well taken by me.

15          Go ahead.

16          MS. WOODALL:  Your Honor, we believe that those

17    can be addressed in realtime.  We are not proposing to have

18    them get up and --

19          THE COURT:  I think his point can be addressed

20    right now.

21          MS. WOODALL:  Yes.  Your Honor, I think that we

22    would be able to limit the presentation of his material so

23    that he is not drawing specific proportional, to-scale

24    demonstratives for the jury.

25          MR. PARTRIDGE:  Here is a compromise that would

1    be acceptable I think to us, which is he won't do the

2    two-scale presentation, but he ought to be able to express

3    his impression from the drawings and everything else.  And

4    as Mr. Coyne stated the law, the witness' impression is

5    okay.  It's the actual measurements that are the problem.

6              We would be fine with that.

7              MR. COYNE:  Your Honor, with all due respect,

8    the Nystrom case and the progeny of this line, I can't

9    remember the, Hockerson -- I can get the Court the cite.

10   There are three or four cases that say this.  It's not just

11   the dimension.  It's proportioning the drawing.  That is

12   exactly what he purports to do.  He says, the slope that's

13   shown in one of the references is not steep enough to drain

14   the ice cubes out of the tray.  Therefore, it's ineffective.

15   It's inoperable.

16             THE COURT:  So he is painting a word picture,

17   essentially, that is equally as impermissible.

18             MR. COYNE:  Yes.  Based on the dimensionality

19   and the proportioning.  And those are the two things the

20   Federal Circuit has now said three times you can't do.

21             MS. WOODALL:  I believe he also looks at the

22   descriptions of those references and puts those together.

23             THE COURT:  I don't think Mr. Coyne has a

24   difficulty with that.

25             MR. COYNE:  No problem.  If he wants to talk

1     about it's his impression based on the written description

2     that it doesn't work, that's fine.  I am happy to cross him

3     on it.  What I don't want to do is have him sitting there

4     saying, Oh, sethee,  slope of this is this and I am in a

5     legal argument.

6               THE COURT:  I think,  Ms. Woodall, Mr. Coyne has

7     the better position on the law on this with regard to

8     impressions and actual attempts at scaling by way of some

9     kind of demonstrative drawing.

10              MS. WOODALL:  So that we understand Your Honor's

11    position on this point, I think we would offer that Dr.

12    Calligury could describe his understanding of the art based

13    on the descriptions, specifications where they are

14    applicable, and maybe use the drawing as a reference but

15    without going so far as to say the proportions are this or

16    the size is X.

17              THE COURT:  Using a drawing he has created?

18              MS. WOODALL:  No, but he would need --

19              THE COURT:  Are we talking about a figure in a

20    patent?

21              MS. WOODALL:  A figure in a patent.  Otherwise,

22    he can't explain.

23              THE COURT:  Absolutely.

24              You don't have any difficulty with that?

25              MR. COYNE:  I don't have a problem with that.

1    The point is still going to be, though, when he says,

2    looking at this it doesn't work.  Fine, I don't have a

3    problem with that.  But when he says looking at this sit it

4    doesn't work because the slope on the bin isn't strong

5    enough, I have a problem with that.

6                    MR. COYNE:  Yes, Your Honor.

7                    THE COURT:  No, he cannot do that.  I am trying

8    to be clear, that's not permissible.

9                    MR. COYNE:  Thank you, Your Honor.

10                   MS. WOODALL:  That's all we will do, Your Honor.

11                   THE COURT:  Talk about the second point.

12                   MS. WOODALL:  The second point, Your Honor, this

13   is not limited to just the coloring.  There were actually

14   notes and descriptive legends on those drawings.

15                   I think that given Dr. Calligury's expertise in

16   the area of refrigerator design and development, he should

17   be able to speak to what the implications of those notes and

18   highlighting and colorings are.

19                   THE COURT:  Let me ask you this:  Given your

20   opponent's assertions with regard to the, I guess this is a

21   term of art, trade dress, two things I think he says, that

22   these aren't proprietary to Whirlpool, and that this isn't

23   the witness who would have the expertise to talk about them

24   in the first place.  What is your response?  I think I have

25   correctly --

```
 1                    MR. COYNE:  Yes, sir.

 2                    MS. WOODALL:  It is not just trade dress, Your

 3     Honor.  It is that there are internal LG documents with

 4     notes and descriptions of component parts for a refrigerator

 5     that indicate copying of similar features --

 6                    THE COURT:  Is it so generic, is this alleged

 7     copying of such a generic type that one might reasonably

 8     conclude you would have a difficult time concluding anything

 9     about whether it was copying or not?

10                    MS. WOODALL:  Actually, Your Honor, it's clear

11     from the documents that they were specifically taking

12     elements out of Whirlpool's patents and appropriating them

13     into their own.

14                    THE COURT:  You are saying there are LG

15     documents that connect, as we have heard a lot these days,

16     the dots.

17                    MS. WOODARD:  Yes, Your Honor.

18                    THE COURT:  I thought we would never hear that

19     again after 9/11, but...

20                    MR. COYNE:  Your Honor, if I might.  What she is

21     talking about is in some of the internal drawings there are

22     some drawings that look like portions of them are taken

23     frompatent drawings, which are public domain, of some

24     Whirlpool patents during the development stage.  That is not

25     the subject of this motion.  The subject of this motion is
```

1   Dr. Callurgy should not be standing up and saying, You

2   infringe the patent because you are copying the patented

3   features because your bin looks alike in terms of its form

4   and configuration and it's got blue ink on it.  That is the

5   focus of this motion.

6              THE COURT:  That is the very specific objection.

7              MS. WOODALL:  Your Honor, Dr. Calligury has

8   looked at a number of documents in collection, collectively,

9   from LG.  It's not just one document that would go to this

10  issue of whether or not they have copied or you can infer

11  copying.  He is not going to stand up and say here is this

12  one document that shows blues on an ice bin.  Therefore,

13  they copied.  It is a chain of evidence that establishes

14  copying.  It is the selection of features out of your

15  patent.

16            It is specific comments by their engineers about

17  trying to catch up and taking this element and that element.

18  And it is the progression of their development and their

19  intent to design around that they failed to do.  So they

20  just copied.

21            This is just a piece of that evidence.  He is

22  not going to get up and say, this one document that shows

23  blue on an ice bin shows copying.  He is going to say, look

24  at this and look at this and look at where they said take

25  from here and look at where they said take from here, and

1    here's where they ended up, and all of this along the way

2    shows copying.

3                    It's out of context.

4                    THE COURT:  Let's get a response from Mr. Coyne.

5                    MR. COYNE:  Your Honor, we don't have any

6    problem if they want to stick with the issues in the case.

7    If there is technical drawings that show we were copying

8    proprietary features, if it is not a proprietary feature,

9    like these, if it's not something he should be talking about

10   anyway, my fear is it's confusing to the jury, it's

11   prejudicial, and then I am left fighting a trade dress case

12   on cross-examination.  It's not right.

13                   We will talk about the technical drawings.  That

14   is not a problem.  It's this particular set of facts.

15                   MS. WOODALL:  Your Honor we are happy to have

16   Dr. Calligury refrain from mentioning the color.

17                   MR. COYNE:  I am sorry?

18                   THE COURT:  Refrain from mentioning the color,

19   Ms. Woodall indicates that Whirlpool is happy to have Dr.

20   Calligury refrain from mentioning the color of the bin.

21                   MR. COYNE:  He does a whole analysis of, the top

22   is clear, the bottom is white, it's got -- they are both

23   called ice bins, it has blue ink.  That's the package of

24   stuff we are talking about.  If they want to talk about the

25   fact that some of the drawings --

1              THE COURT:  Your point is that all of those

2      features you have just mentioned are not proprietary --

3              MR. COYNE:  There is no they are not

4      proprietary.  There is no exclusive rights on it.  And he is

5      not the guy to talk on it.

6              THE COURT:  Mr. Partridge, your mouth was

7      halfway open.  But I will let Ms. Woodall handle this.

8              MR. PARTRIDGE:  I will try to stay out of it,

9      Your Honor.

10             MS. WOODALL:  I think Mr. Coyne's point more or

11     less highlights that this is a realtime issue for trial,

12     because we are not prepared here to tell you exactly every

13     little piece of evidence that Dr. Calligury is going to use

14     on the stand.

15             We are not claiming that they copied trade

16     dress.  But it is very artificial to remove from the jury's

17     consideration the overall look, feel of their icebin, their

18     entire system that is alleged to infringe, and just pull

19     that from consideration, and make this very hyper-technical,

20     when they can't even derive what the completed design looked

21     like and think about that for themselves and how it --

22             THE COURT:  Except as to this, I will call it

23     this third -- or second issue, it's called third on Page 4,

24     that we have been discussing, I will call it the trade dress

25     issue for ease of reference, I think we have achieved

1    agreement on what Mr. Coyne identified as the first issue at

2    the top of Page 4.  That is moot.

3              I am going to reserve judgment for trial.

4              Why don't I do this for ease of the record.

5              I don't think it matters whether I grant or

6    deny.  I am going to deny without prejudice that part of the

7    motion, understanding that it's likely we are going to hear

8    about this again, or maybe not, in realtime.

9              For ease of everyone's recording, I will deny

10   the motion without prejudice.

11             Let's go to, we have resolved Whirlpool's No. 2.

12   Let's go to Whirlpool's No. 1, Docket Item 288.  Let me see

13   what I have here.  This is a discovery dispute.  Okay.  This

14   is styled Whirlpool's Motion in Limine 1 to Exclude Untimely

15   Evidence Relied Upon By LG.  I made a few notes.

16             One of the principal complaints in response that

17   LG has raised is that Whirlpool in LG's view does not

18   identify which claims and defenses these allegedly late

19   produced documents apply and has no idea additionally what

20   some witnesses would say when deposed.

21             Who is going to handle this?

22             MR. PARTRIDGE:  Mr. Morico, Your Honor.

23             MR. MORICO:  Yes, Your Honor, good morning.

24   Good to see you again.

25             THE COURT:  Good morning.  Good to see you

1    again.

2                    MR. MORICO:   There are two categories of

3    information.

4                    THE COURT:   Also prejudice, LG contends, you

5    haven't demonstrated what the prejudice would be.   Go ahead.

6                    MR. MORICO:   Your Honor, first off, as the Court

7    has correctly identified, there are two categories of

8    information.   One is documents that were produced late,

9    after the close of fact discovery, after even expert

10   discovery.   We have had something on the order of 20

11   productions since the close of fact discovery.   And a large

12   number of those documents, a large percentage of those

13   documents, have appeared on their trial exhibit list.

14                   The other category of information relates to

15   witness testimony in connection with witnesses who were for

16   the first time identified only on their preliminary trial

17   witness list.

18                   THE COURT:   Was this the one with two witnesses

19   who were named?

20                   MR. MORINO:   Correct, Your Honor, it is.

21                   Let me address the document issue first.

22                   First off, when we got LG's initial exhibit

23   list, it had 2400 exhibits on it.   Of those, approximately

24   500 of those documents were produced after fact discovery

25   had closed.   A handful, maybe ten percent of that 500, had

1   been produced on the last day of discovery, although we

2   didn't actually receive it until the following Monday, long

3   after depositions in the case had already taken place, long

4   after very expensive depositions in Korea of some ten

5   witnesses, most of their technical witnesses, had taken

6   place.

7           So we were denied the opportunity to depose

8   their witnesses in connection with that large collection of

9   documents.

10          THE COURT:  Was this John Taylor and Timothy

11  McGrady?

12          MR. MORINO:  No.  They were not part of those

13  depositions, Your Honor.  They were the technical witnesses,

14  not these corporate witnesses.

15          Now, since the preliminary exchange of exhibit

16  lists, LG has reduced its exhibits considerably, from 2400

17  down to about 770, Your Honor.  And admittedly, a number,

18  quite a few of those 500 exhibits no longer appear on their

19  exhibit list.  Some of them dealt with the false advertising

20  claim.

21          However, Your Honor, there is still quite a few

22  exhibits.  There are approximately 43 exhibits out of the

23  770 which weren't produced until after the close of

24  discovery, 30 of them were produced on the last day, again,

25  we hadn't received them until the Monday after, long after

1    we had time to take depositions.  And then there is another

2    74.

3             So approximately -- another 74, excuse me, Your

4    Honor, that have no Bates numbers at all, that have been

5    produced over the course of the last several months, one of

6    which is a redesign video, which is yet another redesign

7    after the redesign they had provided us with in September

8    after the close of discovery when we had taken a deposition.

9             We understand, obviously, that these are

10   documents that counsel and LG is going to rely on at trial.

11   They are on their exhibit list.  And it's not just one or

12   two categories of information where we could say, well, we

13   could bring back one witness and depose this one witness and

14   it will dispense with all of these documents.

15            These documents cut across a wide range of parts

16   of the case.  They involve LG design documents, LG redesign

17   documents, technical schematics, which we have been after

18   them for and had been after them for from the beginning of

19   the case, as well as prior art materials.  These are prior

20   art materials that include brochures and other information

21   with respect to refrigerators that date back 20 years ago.

22   And they are refrigerators that only LG has had possession

23   of.  These are documents that have all appeared after the

24   fact.  For us to be able to find out what evidence they are

25   going to provide to the jury in connection with these

```
1    documents, we would have to depose a whole host of witnesses

2    all over again.

3              That's your prejudice, Your Honor, with respect

4    to the documents.

5              With respect to the witnesses, as I mentioned,

6    the first time these witnesses appeared on their trial

7    exhibit list --

8              THE COURT:  Now you are talking about Taylor and

9    McGrady.

10             MR. MORINO:  Taylor and McGrady.

11             The first time we had any notice of them being a

12   witness that might appear in this case was on November 3rd,

13   when when he got their trial exhibit list.  They were never

14   on their initial disclosures.  Their initial disclosures

15   were supplemented twice, most recently this summer, in July,

16   at or around the time the depositions were taking place.

17   During those two supplements to the initial disclosures,

18   neither witness was identified on the initial disclosures.

19   And we have also propounded interrogatories that date back

20   to 2008 that standard interrogatories asked in connection

21   with all of the different issues the interrogatories touched

22   on, which were most of the issues in the case, we asked for

23   identification of witnesses with relevant knowledge.  And

24   neither one of those witnesses appeared on their responses

25   to interrogatories, which were supplemented, Your Honor,
```

1    nine times, most recently October 23rd, a week before we got

2    their preliminary trial exhibit list.

3              So they have had more than ample opportunity to

4    provide us with the information about these witnesses.  And

5    they have been sprung upon us only for the first time.

6              Their response to that, Your Honor, has been

7    that, well, those names appear in a hundred or so documents.

8    Your Honor, we have had 67,323 documents produced by LG in

9    this case.  Over 1.4 million pages of documents.

10             How is that appropriate notice that these are

11   witnesses that have -- that we could have identified as

12   having relevant information?  There are hundreds, if not

13   thousands of witnesses identified in their millions of pages

14   of documents.

15             I think it's just unfair for them to be able to

16   rely on these witnesses at this late juncture of the case,

17   Your Honor.

18             THE COURT:  LG?  Mr. Coyne.  Let me address one

19   issue first that's raised in your responsive brief.  At

20   least I see it here at Page 2, at the bottom, "Moreover, the

21   parties have previously agreed that if an individual appears

22   on the witness list and was not previously deposed, the

23   other side would be given a chance to depose that individual

24   before trial.  The agreement therefore removes any potential

25   prejudice."

1          Further down, in the paragraph beginning with

2    "Whirlpool simply cannot identify,"  midway through the

3    sentence, "...LG promptly produced them in compliance with

4    its duty to supplement " -- that is a separate issue -- "and

5    the parties agreements to produce certain documents after

6    the close of fact discovery."

7          The parties don't get to do that in district

8    courts, certainly not in this one.  There is an order, there

9    is a Court order that I could reasonably conclude the

10   parties, if that was the parties' agreement, that you are in

11   contempt of the Court's order.  This case, this Judge,

12   Actively, this Court, as you all know, all three of its

13   judges actively manage their cases.

14          That is not the practice in the District of

15   Delaware.

16          So to write that in a brief and to offer it as

17   support for conduct that would seem to be outside of this

18   Court's orders doesn't fly very well.  That duck sort of

19   doesn't quack here.

20          Go ahead, Mr. Coyne.

21          MR. COYNE:  Thank you, Your Honor.

22          Well, Your Honor, I apologize for any offense I

23   have given the Court.

24          THE COURT:  I am not offended.  It's been 11

25   years, Mr. Coyne.  I have long since stopped taking these

1    things personally.

2              MR. COYNE:  Your Honor, this is somewhat of an

3    ironic motion, because, as Mr. Morino has pointed out, there

4    was a volume of material that was produced late.  The volume

5    of material that was produced late by Whirlpool was even

6    more substantial, and therein lies the problem.

7              I think it would be exquisitely unfair to

8    exclude LG from using all of that when Whirlpool is doing

9    precisely the same thing.  I do not have numbers.  We did

10   not file an in limine motion on those grounds.  But there

11   are numerous exhibits on Whirlpool's exhibit list --

12             THE COURT:  Address for me this.  Why don't he

13   we talk about -- what concerns me most is when I hear a

14   party raise the red flag of prejudice, because what we

15   strive to do is afford the parties an equal and level

16   playing field.  If one party has behaved in a way to the

17   detriment of another party, within the rules, then I need to

18   try to fashion relief that can address that.

19             MR. COYNE:  Let me address that very

20   specifically, then, Your Honor.

21             I know Mr. Morino rattled off five different

22   categories.  But in my mind, there is really three.  There

23   is our original design documents.  Namely, the designs that

24   were accused of infringement throughout the case.  Number

25   two, there would be the redesign documents, namely, the

redesign that we began in August, after we received Your

Honor's claim construction order, which was obviously at

variance as to what we had argued and the client had

understood, as well as we had then begun at that point doing

a redesign of the ice storage bin to avoid the loss of that

one distinction that we had been relying on.

The third category is prior art references.  I

would like to address all three very briefly but separately

because there are different factors that relate to each of

the three.

THE COURT:  As the issue of prejudice is

concerned.

MR. COYNE:  It goes directly to prejudice.

With respect to the LG-designed documents,

almost all of those were produced -- most of them were

produced during the discovery period.  But we had continuing

discussions during the end towards the end of the discovery

period where Whirlpool was continuing to ask for certain

things.  For example, there was an issue about whether they

wanted specifications for the dies that were used to cast

the liners, these types of things.  We gathered those as

quickly as we could and we produced those pursuant to to Mr.

Murico's request for that additional information.  Yes, we

produced it after August 7.  But we produced it as timely as

we could get it together and in response to their direct

1    request for it.

2              So that's not prejudicial.  And it was done very

3    promptly.  That was typically done during August, for almost

4    all of those records.  And, yes, some of those are on our

5    exhibit list.

6              Secondly, the redesign documents, we did not

7    even begin the redesign effort, the company didn't make a

8    decision to do the redesign until after we received Your

9    Honor's claim construction order, which, as I said, removed

10   one of the distinctions that we were relying on, and the

11   ITC's review order, which removed one of the distinctions we

12   were relying on, and we then promptly made a corporate

13   decision whether or not to proceed with the redesign.

14             That decision was made on August 20th.  And we

15   proceeded promptly, I informed Mr. Murino, I think within it

16   was within a week, and we offered to him, we will produce

17   you any additional documents relating to this redesign.  We

18   will make a witness available.  And we did all of that.

19             We produced the technical information as it

20   existed at that time.  It had gone through the design

21   concept stage.  We immediately gave them those records.  We

22   made a witness available.  I think the witness testified --

23   I can't remember, it was about two or three after that

24   mid-to late-August date.  So it was late August to early

25   September sometime.  I don't remember the exact date.

1                We have continued to supplement that production

2       because the project has now moved from the conceptual design

3       at our laboratory in Barone, in Seoul, to the plant at

4       Chawon, where it is now being done, it is being made into

5       something can be mass-produced.  So there is quality

6       assurance, there is testing, there is prototyping.  And we

7       have continued to feed them those documents as they are

8       generated in batches.  So, yes, we have made several

9       productions on that ground starting immediately after the

10      redesign effort began, and we plan to continue to supplement

11      that production as we go through trial, because that is the

12      redesign that we have implemented and we are implementing

13      for the product.

14                The third is the prior art material.

15                So with respect to both of those, Your Honor, in

16      terms of prejudice, yes, those are fact discovery.  Yes, we

17      produced them after the close of fact discovery, for which I

18      apologize.  But in terms of the prejudice to Whirlpool,

19      there is none.  Some of it is things they asked for,

20      including information on the redesign after we told them

21      there was one.  And we have been very forthcoming in

22      providing that information to them.

23                The third category --

24                THE COURT:  Are you saying two things there?

25      One, some of these prior art references pertain to redesign

1    efforts?

2              MR. COYNE:  I am sorry.  If I have misspoke if I

3    said prior art.  I am talking about the first two

4    categories.  The design documents for the older designs is

5    the first category.  The second is the redesign of the ice

6    storage bin.

7              THE COURT:  I got that.

8              Say what you just said again about the prior

9    art, the late production of the prior art.

10             MR. COYNE:  I was getting ready to address that

11   third topic.  I am sorry if I misspoke.

12             The prior art is really a separate category.  We

13   did produce a number of references that our experts were

14   relying on during the expert discovery period.  And the

15   Court has a specific deadline for expert discovery.

16             THE COURT:  Yes.

17             MR. COYNE:  What he is complaining about now is,

18   we have produced to him expert discovery during the expert

19   discovery period.

20             THE COURT:  And this has to do with prior art.

21             MR. COYNE:  Yes, Your Honor.  There are a number

22   of patents.  We have done searches for patents relating to

23   automatic ice makers, for various other features that were

24   in commercially sold products.

25             The brochures that he is referring to, we were

1    able to secure finally better copies of some of the product

2    manuals for old GE products, which we have been looking for.

3              THE COURT:  Nevertheless, those were timely

4    productions.

5              MR. COYNE:  Absolutely, Your Honor.  Our view is

6    that those prior art materials for the expert reports were

7    absolutely timely produced.  They are within the expert

8    discovery period.  And we produced them when we got a hold

9    of them.

10             We had been looking for some of these materials

11   for months, namely, better brochures of products that were

12   sold overseas, better brochures of GE models that haven't

13   existed for 20 years.  It took took quite some doing to find

14   some of these catalogs and service manuals and user manuals.

15   And we have produced them during the expert discovery

16   period, as we were supposed to.  So there is no prejudice.

17   In fact, all of that was done timely.

18             We do have a duty to supplement, Your Honor.  I

19   appreciate the Court's deadlines.  We do take it seriously.

20             THE COURT:  It uses the word timely.

21             What I would like you to do for a moment is just

22   go back to the original design docs.

23             You have indicated, I believe, that most of all

24   of those were produced within the period.

25             MR. COYNE:  We produced hundreds of thousands of

1    pages worth of original design documents during the

2    discovery period.   There is no issue about that.

3            What had happened is, Mr. Morico, particularly

4    with respect to these tool die liners, they are very

5    detailed engineering drawings that show the steel tools.

6    They are basically metal castings.   I don't know if you

7    remember, you remember from your childhood, Your Honor,

8    there was a toy called the Vaccuform that you used to heat

9    up a little metal plate and put a piece of plastic over it

10   and made a little plastic toy.   It's the same kind of thing.

11           What we use is these metal dies.   He has asked

12   us for liners.   The liners go into the refrigerators.   We

13   don't keep a stock of liners.   So he asked us ultimately at

14   the end of the discovery period for these tool die

15   specifications so they could get the dimensions of the

16   plaques on the liners.   And we found those and produced

17   those.   But it's a very minor number of documents, very

18   small number of documents.   And it was things that were done

19   in specific response to requests as we were trying to finish

20   up the discovery.

21           There is no prejudice from that.   We gave

22   them -- the impression that was created by Mr. Murino is

23   that we have withheld vast amounts of technical

24   documentation.   It's just not true.   We gave it in a timely

25   fashion.

1          THE COURT:  You would reject his assertion, Mr.

2     Murino's assertion, that there would be a need for

3     additional depositions.

4          MR. COYNE:  Yes, Your Honor.

5          There is an issue that happened last night.

6          THE COURT:  Before you get into that, let me get

7     you to talk about McGrady and Taylor.

8          MR. COYNE:  Your Honor, at this point, yes,

9     McGrady and Taylor, Taylor is a corporate representative

10    witness for LG.  He is in the PR Department.  What we were

11    proposing to have him talk about is basically general

12    corporate history.  As far as I am aware, there was no

13    specific interrogatory request asking for a witness on that

14    issue.

15         We don't intend to have him get up and talk

16    about anything other than that.  We did timely identify him

17    on the witness list.

18         THE COURT:  This is McGrady.

19         MR. COYNE:  No, this is John Taylor.

20         THE COURT:  The general history of the

21    corporation?

22         MR. COYNE:  The general history of the

23    corporation, activities in the U.S.  It's general background

24    information.

25         THE COURT:  What about McGrady?

```
 1                    MR. COYNE:  McGrady we had put on because of
 2       this issue on the energy efficiency claims.
 3                    THE COURT:  I am going to let Taylor testify.
 4       If that is all he is going to talk about, I don't see that
 5       that is a problem.  You can talk about it.  Right now,
 6       that's my thinking on that.
 7                    MR. COYNE:  We are prepared to withdraw McGrady
 8       at this point.  You had dismissed the Lanham Act claim.
 9       That is the only thing he was going to talk about.
10                    THE COURT:  You only need talk about Taylor if
11       you want.
12                    Let me get you to address each of the points as
13       designated or outlined by Mr. Coyne, that is the original
14       design documents, the redesign documents and issues related
15       to that and the prior art.
16                    MR. MORICO:  Yes, Your Honor.
17                    With respect to the original design documents,
18       our interrogatories and document requests back in November
19       of 2008 requested those documents.  It wasn't apparent until
20       we started preparing for the depositions in June that a
21       number of those documents were still missing.
22                    THE COURT:  How many documents are we talking
23       about, of the original -- Mr. Coyne, as you have just heard,
24       says they are really limited to these tool die liners.
25                    MR. COYNE:  There is about 20 tool die specs,
```

1    and each spec may have two or three sheets showing the tool

2    in a different configuration.  I don't want to misrepresent

3    the number.  My impression is it's about 60 or 70 pages that

4    maybe comprise 15 to 20 exhibits on our exhibit list.

5              THE COURT:  How many witnesses are we talking

6    about that discussed these?

7              MR. COYNE:  A witness to identify what these

8    things are, and maybe the experts will talk about what the

9    implications of that fact is.

10             THE COURT:  Have the experts been deposed on

11   these?

12             MR. COYNE:  The experts have been deposed, not

13   on the tool die specs.  They have been deposed on the

14   plaques that are made using those tool dies.

15             MR. MORICO:  That is part of the problem, Your

16   Honor.  The specs came too late in order for the experts to

17   fully consider those specifications and take them into

18   account in their reports and ultimately their depositions.

19             THE COURT:  Do you agree with Mr. Coyne's

20   characterization as to the number of documents and the

21   apparently limited area, focus of these documents?

22             MR. MORICO:  I do agree, Your Honor, it is a

23   discrete set of documents.

24             THE COURT:  How long will it take you to get an

25   expert?  How much additional deposition time would you need?

1          MR. MORICO:  We wouldn't know until we actually

2     took the fact deposition of the fact witness who is familiar

3     with their design of those documents to know what expert

4     discovery may needed to be supplemented in connection with

5     it.  So it would be a fact deposition, potentially an expert

6     report, and then expert deposition on top of that.

7          MR. COYNE:  Your Honor, I am a little stunned by

8     this request, because as we closed out this discovery, what

9     we ended up doing was agreeing to one of the stipulations

10    that we filed with Your Honor.  Part of the concern and the

11    reason they were asking for the tool die specs is so we

12    didn't argue, well, this liner is different than the other

13    liners.  And what we agreed is that all of these models that

14    are accused of infringement with these various part numbers,

15    these model numbers, would be treated together for purposes

16    of trial, so they don't have to put in and go through

17    seriatim each particular design.

18          They can simply rely on the fact that we have

19    given them an answer to Topic 53 that says here's a list of

20    all the refrigerators, that you can treat any one of them as

21    representative of the entire group.

22          My understanding is that's what resolved this

23    issue back in August, when we were making this production.

24          We had already, at the time Mr. Morico and I had

25    that discussion and reached that stipulation, I think it was

```
 1      one of the ones that was filed on September 9 or that Your

 2      Honor signed on September 9, we had already had LG preparing

 3      all these things and shipping them over.  It was a couple of

 4      days, and we finally got them after Mr. Morico and I had

 5      reached this resolution, and I produced them anyway because

 6      the client had already taken the effort to gather them.

 7               There is just no prejudice.  We resolved this

 8      issue.

 9               MR. MORICO:  What I would respond to that, Your

10      Honor, then, is are do they need them on their exhibit list?

11      If we have the stipulation in place, I don't see why he

12      should need them.  And therefore, we can remove them -- this

13      issue should be removed from us.

14               MR. COYNE:  I don't know what they are going to

15      ask our witnesses about the configuration of our plaques,

16      Your Honor.  The patent says very specifically that the

17      plaques have to have a certain dimension in some of the

18      non-asserted claims, and then there is other claims that

19      don't have those dimensions.  There is a good possibility

20      that we won't need them.  But I don't want to be left with a

21      situation where I do need to correct a witness' testimony or

22      cross-examine them, and then they are arguing I can only use

23      them for impeachment because it wasn't on my exhibit list.

24      They aren't their documents.  And the witness is just going

25      to say,  well, I never saw them before.
```

1          MR. MORICO:  Therein would be the reason we

2     would need this additional discovery.

3          THE COURT:  In light of Mr. Coyne's response,

4     why do you need a fact witness for an additional deposition?

5          MR. MORICO:  Well, because, Your Honor, it's

6     their engineers who are going to be familiar with these

7     documents.  These are the design documents that are used to

8     actually make these plaques.  We need to figure out what the

9     schematics mean, what the documents show, and details about

10    the design of those specifications.  And their expert is not

11    going to know that.

12         MR. COYNE:  Your Honor, with all due respect,

13    none of those dimensions that this witness is identifying,

14    the depth of the plaques -- those are unasserted claims.  I

15    want them on there just so I am not met with an argument

16    that there is something that I could use to clarify the

17    record, and then I am left with only being able to use it

18    for impeachment because I haven't put it on my exhibit list.

19         I don't know that we will necessarily use them.

20    But there is no mystery here.  He has already got what he

21    needs.

22         THE COURT:  As to this category of documents, I

23    am going to deny your motion.  Redesign, it seems to me if a

24    redesign was done in response to this Court's ruling and

25    further rulings, and it's just a timing thing, as opposed to

1    a party being dilatory.

2              MR. MORICO:  There is more history behind that,

3    Your Honor.

4              THE COURT:  All right.

5              MR. MORICO:  The design documents actually go

6    back, those collection of design documents that were

7    provided to us actually show dates as early as April of

8    2009, which, incidentally, coincides with the ITC

9    determination, changing the claim construction from the ALJ,

10   which is when that took place.

11             We had sought discovery in connection with

12   redesigns during the summertime and asked about redesigns,

13   and were blocked on the basis of privilege.  It was only

14   later when they decided to provide these redesigns that all

15   of a sudden they came up and it was after the close of fact

16   discovery, and it was much later.

17             And there has since been, since September of

18   this year, when we actually took the deposition in

19   connection with those documents that were produced late,

20   there has since been another video that was provided to us

21   in November of this past year, just a couple of months ago,

22   that shows yet a different iteration of that redesign.

23             This has to stop at some point.

24             THE COURT:  So these circumstances -- go ahead.

25             MR. MORICO:  I am sorry, Your Honor.  It is our

1    view that these should not be in the case.

2              THE COURT:  Your position is as a result of this

3    late production -- go ahead.  Take a look at your note.

4              MR. MORICO:  Here is the testimony, Your Honor.

5    Mr. Noh, on August 27th, this was actually after the close

6    of fact discovery:

7              "Has there be any redesign of LG's indoor ice

8    storage component from 2008 through today?

9                "Answer:  No."

10             This was a deposition that actually was agreed

11   to be taken after the close of fact discovery, a month later

12   and then only shortly thereafter do we end up getting these

13   redesign documents.

14             THE COURT:  When was that?

15             MR. MORICO:  August 27, 2009, 20 days after the

16   close of fact discovery.

17             THE COURT:  Okay.

18             MR. COYNE:  If I may put some clarity to that,

19   Your Honor.

20             THE COURT:  I am sure Mr. Morico thinks it's

21   very clear.  But go ahead.

22             MR. COYNE:  First off, Mr. Noh is a sales

23   corporate representative.  He has no knowledge or

24   involvement in the redesign efforts.

25             Prior to the August 27 date, I sent Mr. Morico a

1    letter, explaining that we had been working on this and did

2    he want to take discovery on it.

3              This witness does not have knowledge of that

4    subject.  And I had informed them in August that we were

5    looking at this.

6              Now, with respect to the earlier document, we

7    have some thresholds to get across here.  It can't just be a

8    twin ankle in our eye.  We are not entitled to a declaratory

9    judgment just because we are thinking about something.  I

10   don't remember any of the documents being dated that early.

11   But I am not going to represent to the Court that there

12   weren't any.

13             Were we thinking about changing once we got the

14   ITC's ruling?  Sure, we were thinking about it.  But in

15   order to get jurisdiction for a DJ, we have got to make

16   concrete steps.  And we didn't even make the decision -- and

17   he has had a witness on this -- to even make the decision to

18   go ahead and undertake a design project until August 20.

19   And we did that.  We gave him the production promptly.

20             Basically, the trigger of this is a combination

21   of, yes, the ITC's review petition, but also, frankly, more

22   importantly, Your Honor's claim construction.  At that

23   point, we realized we were not going to be able to sustain

24   one of the differences that we wanted.  And we went forward

25   and promptly produced this stuff as soon as we had done it.

1    We couldn't get a DJ by simply saying, Gee, Your Honor, we

2    are thinking about changing to this or that or the other

3    thing, how does that sound?  We have to take concrete steps.

4    And we didn't take those until August.  And we promptly told

5    them about it.  And we went forward, and we have been

6    producing it.

7              In terms of the video being different, this is

8    an engineering design process.  Not every detail of every

9    iteration as you go through quality control is identical.

10   But what is identical is the configuration of this

11   redesigned icebin.  It doesn't have an auger.  And the one

12   in the video doesn't have an auger, either.  And that is the

13   whole point, is that we eliminated this claimed part and

14   that is the design that we are proceeding with.

15             So the implication that we have been hiding the

16   ball on this is not true.  Were we thinking about doing a

17   redesign before August 20?  Sure.  We were thinking about

18   it, but we didn't take any concrete steps to do it until

19   after we got your claim construction order, we sat down and

20   considered the issues, could we had this, does it make sense

21   to do it and we did it.  And we promptly gave them the

22   information once we did.

23             MR. MORICO:  I would respond to that, Your

24   Honor.

25             While Mr. Noh may be a marketing specialist, he

1    was designated on this topic as their corporate

2    representative with respect to the redesign.

3           THE COURT:  That doesn't really address the

4    larger point Mr. Coyne is making.  That is, within the

5    commercial context of this company's business, and their

6    reasonable response to this litigation, a portion of this

7    litigation, they did certain things with regard to a

8    redesign.  And according to this officer of the Court, they

9    have made affirmative efforts within reason to be responsive

10   to the requirements of this litigation.

11          I don't see how I can sanction them at this

12   point, albeit documents produced after the close of the

13   relevant period, for doing that, given, especially, their

14   opportunity -- not opportunity, the requirement that they

15   seasonally supplement.  The rules contemplate this kind of

16   situation.

17          Go ahead.

18          MR. MORICO:  Your Honor, we have had a

19   willfulness claim in the case from the beginning with

20   respect to the '130 patent.  If part of their defense is

21   that they were going to redesign this product, and there is

22   documents showing that the redesign started back in April of

23   this year, they seasonally should have been providing those

24   documents to us in time for us to have taken these

25   depositions.

1          THE COURT:  I understand.  This isn't going to

2     please you.  But my job is to enable both parties to fully

3     prosecute and defend your claims and defenses in this

4     courtroom, to the extent that I have the opportunity to do

5     that without prejudice, without unnecessary expense that

6     might result from one side or the other's inappropriate

7     behavior -- and I don't detect that here, I am going to

8     require, to the extent that you need additional discovery,

9     that there be a meet-and-confer and that LG make available

10    to you whatever witness or witnesses need to be made

11    available within the rules that we have been playing by thus

12    far in terms of the number of hours of deposition.  I think

13    we have been using the Federal Rules.

14         I mean, I don't think there was a treaty outside

15    of those.  If there was, that is fine.

16         MR. PARTRIDGE:  We did it by agreement to avoid

17    complications, Your Honor.

18         THE COURT:  Then I am going to insist that you

19    do that again.  To the extent the Federal Rules aren't

20    adequate, get back in touch with me.  But you should figure

21    out -- you have some time.  I know you don't want to be

22    spending the time doing this.  I get that.

23         MR. PARTRIDGE:  Your Honor, if I may.  There is

24    an issue that goes beyond the limine and restricted to the

25    limine I would stay in my chair.

1                    Here is the --

2                    THE COURT:  Because you are tall, Mr. Partridge.

3      So you get an advantage from your height.

4                    MR. PARTRIDGE:  I sort of like this approach.

5                    The problem becomes a jurisdictional one.  They

6      do have a DJ counterclaim of noninfringement.  What they are

7      attempting to do is take a product that is inchoate and put

8      it before the jury to feel us out, try to get a ruling that

9      is favorable to them on noninfringement.

10                    You heard Mr. Coyne say in his presentation that

11     they didn't begin the redesign until after the Markman order

12     and the ITC order, and if I recall correctly he said the

13     date was August 20th of 2009.  Then he talked about how they

14     moved from conception to prototyping and that they are

15     continuing to do that work.  They moved from one facility in

16     Korea to another facility in Korea.  And you never heard him

17     say that they have introduced any product into the United

18     States in that process.

19                    What we have here is a party seeking to use the

20     fact that they have a DJ counterclaim for noninfringement

21     trying to get an advisory opinion from the Court.

22                    On top of that, Your Honor, what we have --

23                    THE COURT:  You did raise this in the briefs, I

24     think.

25                    MR. PARTRIDGE:  Yes.  What we have is a video

1    they produced just recently that is different than -- at

2    least by our observation of it -- than what they told us the

3    redesign was back in September.  And will it be different a

4    month from now?  Will it be different by the time we go to

5    trial?  Will there even be an actual product?

6         Ironically, my client is sitting here today, has

7    heard more about this redesign than I have been able to

8    share with them because they have marked all of these

9    documents confidential, new product development, which

10   precludes my even showing them to my client.  Yet they want

11   to put this on at trial and I can't even have a discussion

12   with my client about what our position is with respect to

13   these documents.

14        This is not a justiciable issue at this point.

15        And the whole issue about, you know, were they

16   bad guys, I am not saying Mr. Coyne is a bad guy because he

17   has produced these additional documents.  What we are saying

18   is, this is not ripe for a jury at this stage of the game.

19        If down the road we think, when they finally get

20   to the point of having some product they introduce, there is

21   some issue with respect to that product, we can deal with it

22   then.  I don't think we can deal with that, given the state

23   of discovery and the state of the product development at a

24   trial that begins March 1st.

25        THE COURT:  I am reminded that this issue was

1   raised by Whirlpool.  Go ahead.

2           MR. COYNE:  Your Honor, the law does require

3   concrete steps.  It does not require that we be selling a

4   product in commerce in order to get a declaratory judgment.

5           April, this didn't exist.  This was a twinkling

6   in your in our eye, perhaps.  I don't know the exact date

7   when the serious thinking started.  But I but I do know,

8   because we did produce a corporate representative, that it

9   was August when we decided to proceed with the project and

10  fund it and to go forward with the development work.  And we

11  did produce that information promptly.

12          We have now taken concrete steps.  What we gave

13  them in the discovery we provided them on this was a

14  prototype.  We have gotten to that stage.  They have seen

15  the prototype.  They have pictures of it.  They have got

16  schematics of it.  They have got the engineering drawings of

17  it.

18          I appreciate the confidentiality order issues.

19  And if Mr. Partridge cares to share something with Mr.

20  Schwinn, I am happy to discuss with him what information

21  might be useful in order to lubricate this and make it all

22  easier for everyone to understand precisely what the issue

23  is.

24          But we have a specific design, and we are

25  proceeding with it.  It has gone from development.  The

1    design has been finalized.  It's been prototyped.  That has

2    been transferred to the Chawon facility, where it is under

3    quality review right now and is being tested and evaluated.

4    And it's the same design that they saw in August and

5    September.  And we will continue to update it.  If for some

6    reason we change and it's fundamentally different by the

7    time we get to trial, I appreciate that there is a problem.

8             But there is no problem now.  This is the design

9    that we intend to launch.  We are down the development

10   pathway.  It is scheduled for release first or second

11   quarter, right on the cusp of the end of the first quarter

12   or second quarter for U.S. production release.  So it is

13   being done.

14            We are taking concrete steps.  And it is not an

15   advisory opinion in Mr. Partridge's view.  His people have

16   seen the prototype.  It is no longer advisory.  It is a

17   concept that is being concretely implemented.

18            THE COURT:  Where is the cutoff, temporally,

19   where is the cutoff?

20            MR. COYNE:  In terms of the product hitting the

21   market for sales?

22            THE COURT:  I didn't mean that so much.  Mr.

23   PARJT is, to use a colloquial term, that he is shooting at a

24   moving target and wants to pin you down.

25            MR. COYNE:  Your Honor, there is no movement of

1    the target.

2              The video is a video.  It's a marketing piece.

3    The product hasn't been built yet.  It doesn't show the

4    product.  We are giving him everything we are generating.

5    That's the point.  But the design hasn't changed.  The

6    design we gave them in August and September --

7              THE COURT:  Both without auger.

8              MR. COYNE:  It's the augerless design and we are

9    still proceeding with it.

10             MR. PARTRIDGE:  Well, whether it is augurless or

11   not is an issue for claim construction, Your Honor, as to

12   what the word augur in conjunction with the other words in

13   the claim means, as opposed to taking what they are now

14   using to move the ice through the bin and saying, gee, that

15   is not an auger.  Well, in the eye of the beholder I would

16   suggest, Your Honor...

17             This probably raise a claim construction issue

18   for Your Honor.

19             The one deposition we were able to take, which

20   was taken late because we were concerned that they would try

21   to push this issue, September 22nd, Dr. Lee, LG's corporate

22   representative on this -- and this is, I don't have the

23   pages, Your Honor, unfortunately, I don't think anyone has

24   submitted this to you, because this didn't come up, this

25   part of the pretrial paper process, but we can get you the

1    transcript.

2              He admitted following at that deposition:

3              "The shape and size of the bin itself and of the

4    blades and shutter that are intended to dispense ice from

5    the bin have not yet been finalized.  The electrical control

6    functions necessary for the redesigned ice bin to operate in

7    the refrigerators have not yet been designed."

8              Next thing:

9              "Additional prototypes are planned, but LG does

10   not yet know how the new prototypes will differ from

11   existing ones."

12             Next statement:

13             "A new bin design could necessitate other

14   changes to the refrigerator, including changes to the motor,

15   the coupling between the motor and the bin, and the chute

16   below the bin."

17             Next point:

18             "No part numbers have been assigned to any

19   parts."

20             Next point:

21             "No suppliers have been told about any details

22   of this design."

23             As one would suspect, when one goes through the

24   process of original design to prototyping to coming up with

25   a manufacturing prototype to final manufacturing design,

1   changes get made to take into account production issues,

2   functionality issues, safety issues, which, from my

3   observation of the redesign thus far, are substantial.

4            When they go through quality control and safety

5   checks and all of that, will this design look like the video

6   they just provided provided us?  I would be surprised.  But

7   maybe Mr. Coyne is right.  But sitting here today, on

8   January 7th, less than two months before our trial, we don't

9   know.

10           I would suggest, Your Honor, it's too late in

11  the day to put before the jury a question about a design at

12  this stage and one as to which may or may not make it into

13  the marketplace, and one as to which we may or may not, when

14  I am finally able to talk to Mr. Schwyn and Mr. Goodwin

15  about it, assert infringes.  I just don't know at this

16  point.

17           THE COURT:  It seems to me this point that we

18  are discussing goes beyond the motion.

19           MR. PARTRIDGE:  It does.

20           THE COURT:  It's a much more interesting point

21  than the one raised in the motion, and one that I wonder --

22  please believe me, I am not inviting more paper -- that I

23  might nonetheless benefit from an additional, a submission

24  on this subject.

25           MR. PARTRIDGE:  We would be happy to do that,

 1    Your Honor.  Whatever guidelines you would like for how to

 2    do that.

 3                 THE COURT:  How many pages do you think you will

 4    need to address it?

 5                 MR. PARTRIDGE:  Ten?

 6                 MR. COYNE:  Your Honor, that is fine with us.

 7                 THE COURT:  I will take an opening and an answer

 8    of ten pages.

 9                 MR. PARTRIDGE:  The opening should be I guess

10    theirs.

11                 THE COURT:  Yeah, I guess so.

12                 MR. COYNE:  In other words, we would be briefing

13    why this is ripe for a declaratory judgment, why we have

14    taken sufficient concrete steps to meet the statutory

15    standards?

16                 THE COURT:  Yes, because I think this is

17    obviously within the authority that you have that might

18    address this specific kind of circumstance that confronts

19    the Court.

20                 MR. PARTRIDGE:  Your Honor, I won't say this as

21    a matter of tactics in my response to this motion.  But I

22    wouldn't be surprised if it turns out to be the case when we

23    see what they assert with respect to this design if the

24    dilemma we are in is one in which we need discovery to test

25    what it is they are saying about the state of the design.

1            I am reluctant, with all due respect to Mr.

2    Coyne and the Finnegan firm, who I know well and have many

3    friends at that firm, I am reluctant on behalf of my client

4    to depend upon attorney representations with respect to the

5    state of this development.

6            THE COURT:  As would be I, the Court, reluctant

7    to depend upon attorney argument.  So, it's certainly a

8    benefit from the guidance and the interpretation that you

9    advocates give to the facts, but it's the facts at the end

10   of the day that need to guide my determination.

11           I understand your point.

12           MR. PARTRIDGE:  Very well.

13           THE COURT:  It may be, I don't know, that this

14   matter is just not capable of being resolved ultimately,

15   finally.  If it should come to pass, for instance, Mr.

16   Coyne, that I agree with Mr. Partridge that additional

17   discovery is necessary -- I don't know whether or not there

18   is time for that.  I don't know what burdens that would, the

19   Court would be placing upon the parties by making such an

20   order.  We will have to see.

21           Let's discuss a timeline for the submission of

22   these briefs.  Mr. Coyne?

23           MR. COYNE:  When would Your Honor like to

24   receive them?

25           THE COURT:  As soon as possible.

1              MR. COYNE:  A week.  Ten days?

2              THE COURT:  Too long.

3              MR. COYNE:  Too long.

4              THE COURT:  I will give you five business days.

5              MR. COYNE:  A week, that is fine.

6              THE COURT:  I will give a --

7              MR. PARTRIDGE:  Five business days for a

8  response also, that is fine, Your Honor.

9              THE COURT:  From today, yes.

10             I am not going to permit a reply.

11             MR. COYNE:  So next Thursday, Your Honor?

12             THE COURT:  Whatever five days is.  Ms. McDavid?

13             CASE MANAGER McDAVID:  From today it is going to

14  be Friday.

15             THE COURT:  Friday, from today.  Five full

16  business days would be Friday.

17             MR. COYNE:  Thank you, Your Honor.

18             MR. PARTRIDGE:  Why don't we say next Thursday

19  for them, the following Thursday for us.

20             THE COURT:  Let's do that.  Close of business?

21             MR. COYNE:  That is fine, Your Honor.

22             THE COURT:  We will do that.

23             MR. PARTRIDGE:  There is one issue that is kind

24  of --

25             THE COURT:  I haven't forgotten that.  The prior

1     art issue.

2             MR. PARTRIDGE:  There is that, and just one

3     clean-up.  And I think you meant this when you indicated

4     that we would get together and talk about discovery.  But I

5     would assume we could get a deposition of Mr. Taylor.

6             THE COURT:  Oh, yes.  Absolutely.

7             MR. COYNE:  Absolutely, Your Honor.  That is

8     what my understanding of the agreement was, that if anybody

9     was going to.

10             THE COURT:  Mr. Partridge, I reacted so quickly

11     on that, hopefully not too hastily, because of the subject

12     matter that was suggested.

13             MR. PARTRIDGE:  I understand, Your Honor.  That

14     is fair.  We will deal with it.  I wasn't involved in all

15     the day-to-day stuff in this case.  But we don't have a

16     similar understanding that there was an agreement about

17     deposing a witness post discovery period.

18             THE COURT:  You heard what I have had to say.

19             MR. PARTRIDGE:  There is no point in arguing

20     that I think this morning.  That was not our understanding.

21             THE COURT:  Then let's talk about prior art,

22     which Mr. Coyne asserts was the relevant discovery, he says,

23     was produced in time.

24             MR. MORICO:  Your Honor, it was produced during

25     the expert discovery period, not before.

1          THE COURT:  That's what he said.

2          MR. MORICO:  Some of this, a fair number of

3    these documents involve manuals and other material in

4    connection with prior art refrigerators, foreign prior art

5    refrigerators for which we have not had an opportunity to

6    take any discovery in connection with the manuals

7    themselves.  Now, the prior art refrigerators were made

8    available for inspection during expert discovery.  However,

9    the manuals, we may need to take some depositions or other

10   discovery in connection with those manuals in order to

11   determine their date, whether those manuals actually relate

12   to particular models, and the like.

13          These are not just prior art patents.  Prior art

14   patents would be one issue.  There is an issue of chain of

15   custody and there is an issue in connection with whether

16   these models, in fact, qualify as prior art in connection

17   with the validity issues that are at issue in this case.

18          So there are fact issues in the depositions that

19   may need to be taken.

20          THE COURT:  What's the extent of the written

21   discovery you think you would need, in terms of requests for

22   production?

23          MR. MORICO:  We could probably do some requests

24   for admissions, and maybe if we had some latitude -- we are

25   outside the number of interrogatories at this point in this

1    case -- I would suggest perhaps we start at that and then,

2    depending upon where we end up , we may need to take a

3    deposition or two.  Given the short time frame, I would ask

4    for a compressed schedule in connection with responses to

5    those.

6               THE COURT:  Do you have difficulty with that,

7    Mr. Coyne?

8               MR. COYNE:  Yes, Your Honor.  I don't feel any

9    of that is justified at this point.

10              We did produce this during the appropriate time

11   in the case.  They have taken the depositions of the

12   experts.  In fact, we offered -- we have collected a number

13   of refrigerators, and we have been offering for months that

14   they come and look at them and for whatever reasons,

15   Whirlpool delayed until the expert period before they came

16   to even look at the refrigerators.  But they have had full

17   discovery and opportunity to inspect the units.

18              We gave them these additional user manuals,

19   product brochures, as we found them during the expert

20   discovery period, and they have deposed the experts on them,

21   which is the witnesses who will be using this information.

22              So they have taken full discovery on it.  We

23   don't see any justification for additional discovery on it

24   at this point.

25              There just is no issue on these prior art

1    materials.  They were timely produced and they had the

2    deposition.

3            MR. MORICO:  I would respond to which saying,

4    Your Honor, there are requests for production in November of

5    2008 asking for all prior art information.  So to say that

6    these were produced during the expert discovery period time

7    as being timely is not completely correct.

8            We have had requests out for eight months,

9    during which we could have actually done the fact discovery.

10   In fact, Mr. Coyne even admitted that these were manuals

11   that were just found.

12           MR. COYNE:  That is why we did not produce them

13   during the discovery period.  We produced them as soon as we

14   located them.

15           THE COURT:  That is in part why I am going to

16   give them the relief they requested.

17           MR. COYNE:  Thank you, Your Honor.

18           THE COURT:  Counsel, you need to get together

19   and agree upon a compressed schedule, an exceptionally

20   compressed schedule, to get the discovery request out,

21   answer, and the witnesses identified and deposed.

22           MR. MORICO:  Thank you, Your Honor.

23           I believe with the deposition of Mr. Taylor --

24           THE COURT:  I think that resolves this.

25           MR. MORICO:  It resolves this motion in limine.

```
 1              THE COURT:  Mr. Coyne, you made during a portion
 2     of your argument, reference to something that occurred last
 3     night with reference to this?
 4              MR. COYNE:  Yes, Your Honor.  Last night we
 5     received from Whirlpool a supplemental rebuttal exhibit
 6     list, listing yet an additional witness --
 7              THE COURT:  That is not happening.
 8              MR. PARTRIDGE:  Your Honor, if I may.
 9              THE COURT:  Go ahead.
10              MR. PARTRIDGE:  It really --
11              THE COURT:  I will tell you, that was my
12     in-chambers response with my clerk, when my law clerk
13     brought this to my attention, I said, "Are you kidding me?"
14     Just so you know how the sausage gets made, Mr. Partridge.
15              MR. PARTRIDGE:  Absolutely.  And I appreciated
16     that.  The fact of the matter is it's a moot issue now
17     because we are having a Bench trial on those issues as to
18     which they pertain.
19              This is documentation from the Department of
20     Energy, within the last month, addressing the failure of LG
21     to comply with an agreement on energy efficiency under the
22     Energy Star Program from 2008.  They will disagree with my
23     characterization.  There is litigation between the
24     Department of Energy and LG over this now.
25              But there is a detailed affidavit from the
```

Department of Energy about energy comparisons which goes to

the heart of the issue they have raised as to unclean hands,

which is all about Whirlpool's Honest Energy Program Energy

Program.

          And the only reason we submitted those to you,

Your Honor, was because if this was going to go to the jury,

we needed to tell the full story, because what we said in

our Honest Energy Program is entirely consistent with what

the Department of Energy has now reported about LG's

reporting of its energy efficiency.

          THE COURT:  Your position today is that it's now

a moot point.

          MR. PARTRIDGE:  It's now a moot point.  It's a

Bench trial issue.

          THE COURT:  We are not going to clutter this

record with a response to that.  We are not going to go tit

for tat here.

          MR. COYNE:  Your Honor, the documents, the

exhibit list as well as the witnesses.  Correct?

          THE COURT:  I am sorry?

          MR. COYNE:  There was a witness identified as

well as a series of about 20 exhibits.

          MR. PARTRIDGE:  That's correct.  We don't intend

to try to call Mr. Katania during the jury trial.  It is

related to the Bench trial.  And the exhibits.  That's

 1    correct.

 2            THE COURT:  No. 3 by Whirlpool is its motion to

 3    exclude evidence and argument comparing the accused products

 4    to the prior art, which all of us in this room know would be

 5    inappropriate.  Whirlpool contends that LG intends to

 6    introduce evidence comparing the accused product to the

 7    prior art on the issue of literal infringement.  LG

 8    responds, as I understand it, that its evidence is relevant

 9    to DOE and invalidty.  Whirlpool says that the evidence re

10    history estoppel is not relevant because that's an issue for

11    the Court.

12            I am not clear, at least at the time I wasn't

13    clear, and probably still am not, clear on Whirlpool's

14    position on the relevancy of the evidence as to invalidity,

15    I think.  There was also an invalidity discussion.

16            MR. MORICO:  Your Honor, I am here to address

17    that issue.

18            With respect to the issue of invalidity, it is

19    appropriate.  The issue really comes down to the issue of

20    infringement.

21            THE COURT:  Did LG really resist that?

22            MR. MORICO:  It's not clear from their papers.

23            THE COURT:  I don't think so.  Mr. Coyne is

24    shaking his head negatively.  I think he agrees.

25            MR. COYNE:  Yes, Your Honor.  This goes to

1    validity, that basically if the claim gets construed the way

2    they are trying to construing it, it covers us, it also

3    covers the prior art.  It's an invalidity argument.

4              THE COURT:  I think we have an agreement.

5              MR. MORICO:  We do, Your Honor.

6              THE COURT:  This is moot, then.

7              Mr. Partridge, do you agree he as the leader of

8    the team?

9              MR. PARTRIDGE:  I think we can deal with any

10   problems that arise realtime, Your Honor.

11             THE COURT:  Good enough.

12             No. 4 has been withdrawn by Whirlpool.

13             The last motion -- the second-to-last motion in

14   limine, because I am treating the motion for sanctions as a

15   motion in limine, is Whirlpool's No. 5 at Docket 302 to

16   exclude improper opinion testimony from fact witnesses

17   regarding prior art.

18             From LG's perspective, you read, obviously, and

19   responded to --

20             MR. COYNE:  Yes, Your Honor.

21             THE COURT:  Do we have a real contest?  Let me

22   let you speak.

23             MR. MORICO:  Yes, Your Honor, I believe we do.

24   There needs to be a little bit of context and history behind

25   this testimony.

1               All of this testimony was testimony taken in the

2     ITC case of our inventors of the '130 patent, which is the

3     indoor ice maker.  And it was testimony in connection

4     with -- all of the issues that concern us involve testimony

5     where a prior art patent was placed in front of the inventor

6     and the inventor was asked, would it be obvious to include

7     an automatic maker with this reference.

8               THE COURT:  The inventor has not been identified

9     here as an expert.

10              MR. MORICO:  He has not, that is exactly right,

11    Your Honor.  It was purely trying to get opinion testimony

12    from the inventors on the cuff.

13              THE COURT:  That is a nonstarter.

14              MR. PARTRIDGE:  We felt we could deal with the

15    appropriateness of that evidence before the ALJ if they

16    attempted to use it.  Therefore, we didn't instruct them not

17    to answer in those depositions because we had a Bench trial.

18    Now to use that testimony before a jury, where we would have

19    treated it differently, those questions differently in this

20    case, we think, is inappropriate.

21              MR. COYNE:  That is not the entirety of their

22    motion, Your Honor.

23              THE COURT:  Go ahead.

24              MR. COYNE:  Number one, we agreed earlier in

25    this case and under the scheduling order, the depositions

```
1    that were taken previously in the ITC case were usable in

2    this case.  And frankly, that is the reason why we did not

3    seek to re-depose some of these individuals.

4              That is one topic.

5              Now they are raising this well after discovery

6    has ended.  It would be prejudicial to preclude us from

7    using the testimony entirely.

8              THE COURT:  I take it the testimony is of one of

9    the inventors has to do -- it's opinion testimony?

10             MR. COYNE:  No, Your Honor, we do not agree with

11   that characterization.  Some of the questions are opinions.

12   In fact, a limited number of the questions were that, where

13   the witness is shown the exhibit, would it would have been

14   obvious to combine this?

15             That is not my problem with this motion.  My

16   problem with this motion, they are seeking to exclude all of

17   the testimony -- they have identified sections of these

18   depositions.  Much of that is what was in the prior art.

19   What is the scope and content of the prior art, what are the

20   disclosures and the teachings of the prior art, coming out

21   of the mouths of their own inventors, and they are seeking

22   to exclude that testimony.

23             That is improper.  We can deal with the issue

24   about whether a particular question is -- we would like

25   these witnesses here if they aren't going to be made
```

1    available.  They are their witnesses.  If they are not going

2    to make them available, we would like to use the deposition

3    testimony.  But we can certainly confer further and focus on

4    which of the opinions that, frankly, they are admissions

5    against interest.

6                    THE COURT:  Are the witnesses going to be here?

7                    MR. MORICO:  Your Honor, in the case of two of

8    the witnesses, they no longer work for Whirlpool, so it is

9    not possible.

10                   With respect to the other witnesses, we would

11   only be bringing them for purposes of responding to this,

12   which would appear to be defensive to the jury, Your Honor,

13   in our view, as opposed to bringing them affirmatively.

14                   THE COURT:  Mr. Coyne.

15                   MR. COYNE:  Your Honor, we would like to call

16   some of these Whirlpool witnesses, the inventor witnesses,

17   in our case-in-chief or at least in our rebuttal case on

18   validity as to their patents.  There is a lot of this

19   testimony that they specifically cite in this motion which

20   is testimony about whether -- Mr. Harmon, for example,

21   whether automatic icemakers existed.  That is not an

22   opinion.  That is a fact.

23                   The bulk of what is in this motion is just that

24   type of testimony.  Yes, there is also questions that were

25   asked, you know, here is is a patent for an automatic ice

1    maker.  Would it be have been obvious to combine that?  We

2    can deal with that in a more limited fashion at the

3    appropriate time at trial.  Given the overbreadth of this

4    motion, I don't think it's appropriate to grossly exclude

5    all of this when, frankly, I think all of it is proper, but

6    even if the Court finds that some of it is not, it is a very

7    limited portion of it that's not.

8              MR. MORICO:  Your Honor, I believe I might have

9    a solution to this.

10             I think what we might be able to do if Mr. Coyne

11   is agreeable to this is in advance of playing those

12   deposition excerpts, that we get them in advance, so that we

13   know what they are going to play at trial, and we can bring

14   this issue up to the Court before the issue goes to the

15   jury.

16             In terms of dealing with it realtime, it's sort

17   of the issue of having the toothpaste out of the tube.  Once

18   it's out of the tube, you can't get it back in.

19             Once the question has been asked and shown to

20   the jury, it's too late.

21             MR. PARTRIDGE:  We could even start working on

22   that now, going through the transcripts with them and seeing

23   if we can agree on what is acceptable from our point of view

24   and what is not.

25             MR. COYNE:  We are absolutely amenable to that,

1    Your Honor.  We have given them the designations.  We have

2    their objections.  I think it is inappropriate for all of us

3    to sit down, rather than burdening Your Honor with that at

4    this point.

5              THE COURT:  So I will deny the motion at this

6    point.

7              MR. PARTRIDGE:  Thank you.

8              THE COURT:  I am hoping to make rather short

9    work of this motion that's been filed by Whirlpool seeking

10   an adverse inference sanction due to what is alleged to have

11   been LG's knowing destruction.  It's a specific individual I

12   think we are talking about, I have forgotten his name, Mr.

13   Harrod, the destruction of relevant information.

14             I think that this matter, as I understand the

15   briefs and affidavits, declarations, is better left to

16   permit Whirlpool to explore fully with the witness on the

17   stand.

18             MR. PARTRIDGE:  We are happy to do that, Your

19   Honor.

20             THE COURT:  That is my ruling.

21             Technically, I am going to deny the motion, with

22   the understanding that this is going to be a matter that I

23   am not going to entertain an objection -- you can object,

24   preserve the issue.  But I am going to overrule that

25   objection.

1           MR. PARTRIDGE:  The one additional point I would

2   like to make beyond what I just said, Your Honor, in

3   response to your question, is that when you hear the

4   testimony at trial with respect to this series of events, it

5   may be that at that point in time you might think that in

6   order for the jury to put this in perspective --

7           THE COURT:  An instruction of some type.

8           MR. PARTRIDGE:  -- some sort of instruction

9   would be necessary that obviously isn't in the instructions

10  we have proposed today.

11          THE COURT:  If you want to propose an

12  instruction, pass it by your opponent, whether they agree

13  with it or not, you can submit, take whatever position you

14  want to take.  That would make sense.

15          MR. PARTRIDGE:  Understood.

16          THE COURT:  Let's take a quick stretch.

17          (Recess taken.)

18          THE COURT:  Okay.  I am in Volume I of the final

19  pretrial order.  I have tabbed some pages.  If I skip

20  something, please call my attention, when I say something, I

21  am the point of controversy, let me know.

22          At Page 4 in Paragraph E, there is a request

23  that the Court permit each party to qualify its own experts,

24  that is fine, rather than relying on some kind of

25  stipulation.

1          I see at Page 6, Paragraph J 2, Whirlpool

2   disagrees with inclusion of any findings of fact.  I guess

3   that's now a moot point.

4          MR. PARTRIDGE:  Correct, Your Honor.  I think we

5   can deal with that later.

6          THE COURT:  We are going to have to talk about

7   how we are going to handle the transition from the Bench

8   trial -- from the jury trial to the Bench trial and time and

9   that kind of thing, what we still think we need in terms of

10   jury time in a few moments.

11          We are going to do eight jurors, not nine.  All

12   will deliberate.  I don't elect alternatives.

13          Anything else in that section of the actual

14   final pretrial order?

15          MR. PARTRIDGE:  Not from here, Your Honor.

16          THE COURT:  I am moving ahead to Exhibit C1.

17   Exhibit C1 and C-2 A, I have already alluded to this

18   earlier, that is your objections to various exhibits are

19   overruled without prejudice.

20          By the way, that means that all exhibits are

21   admitted by operation of -- it doesn't require that you move

22   the admission of each exhibit, to the extent that there has

23   not been an objection that has been renewed that has

24   resulted in a favorable ruling.

25          MR. PARTRIDGE:  The one question I have about

1    that, Your Honor, and I have gone through a pretrial with

2    you, but we ended up not going to trial, I am sure you don't

3    want the record filled with exhibits that were never

4    sponsored or presented during trial.  So I would assume what

5    becomes the record in the case, ultimately, are are the

6    exhibits that are sponsored by a witness and actually

7    discussed before the jury, as opposed to everything that is

8    pre admitted.

9                    THE COURT:  Well, this has been a subject of

10   some controversy over time.  I would prefer that.

11                   MR. PARTRIDGE:  As do I.

12                   THE COURT:  Do you have a view?

13                   MR. COYNE:  I would definitely prefer it.  The

14   problem I see in a case like this, this is not heavy

15   technology, but there is a lot of references.  To have them

16   going back and read GE user manuals that nobody has talked

17   about, it seems like we could be a lot of time waiting for

18   the jury to come back.

19                   THE COURT:  And that is the operating rule.

20                   MR. PARTRIDGE:  Good.

21                   THE COURT:  Let me detour to jury books for a

22   moment, because it's an appropriate time, because we are

23   talking about exhibits.  My suggestion to you is, I know you

24   are going to have presentation equipment in here, but jurors

25   are very tactile.  They like to be able to refer and

| | |
|---|---|
| 1 | re-refer to things.  So to just flash something up on the |
| 2 | screen that's important in your case, and I have had jurors |
| 3 | communicate during the jurors of trials, jurors, when |
| 4 | parties have elected not to provide juror books -- and I |
| 5 | have since discouraged that strongly to the point of |
| 6 | actually ordering -- I don't feel it appropriate for me to |
| 7 | order you to spend money that you may not want to spend. |
| 8 | But I don't think that's probably a real problem here, even |
| 9 | in these days and times.  I recommend and will hereby |
| 10 | require you to have the jury books. |
| 11 |                     How many do we need? |
| 12 |                     THE COURT:  We are going to have eight jurors. |
| 13 | My Chief Deputy is not here today. |
| 14 |                     It's like 13. |
| 15 |                     MR. PARTRIDGE:  May I make an inquiry about |
| 16 | this, Your Honor? |
| 17 |                     THE COURT:  Yes. |
| 18 |                     MR. PARTRIDGE:  I prefer having juror notebooks, |
| 19 | especially pictures of the witnesses and a very brief |
| 20 | synopsis of the witness' background.  I don't know that I |
| 21 | would like a synopsis of the testimony that we may end up |
| 22 | not agreeing on.  Whereas we can deal with that through |
| 23 | short transition statements and the like during the course |
| 24 | of trial. |
| 25 |                     THE COURT:  I welcome transition statements that |

1    are not pieces of advocacy.

2         MR. PARTRIDGE:  The one thing that I don't like

3    putting in jury notebooks, I know this practice varies, but

4    I don't like having all the demonstratives in a notebook,

5    because I think it games the demonstratives.

6         THE COURT:  I don't want demonstratives in the

7    juror notebooks, none.  They are not exhibits.

8         MR. PARTRIDGE:  That's my problem.

9         MR. COYNE:  I certainly agree with that.  The

10   problem I have with the photos and the synopsis is it gets a

11   little problematic.

12        THE COURT:  I think, Mr. Partridge, we have had

13   an expression of concern about it, I won't permit it.

14        MR. PARTRIDGE:  I think Mr. Coyne and I can work

15   this out.  My guess is you and I will end up on the same

16   page, agreeing on giving them at least a picture, Tuesday

17   when we insert them in the notebook and that sort of thing.

18   I would be surprised if we couldn't work that out.

19        THE COURT:  I am I am pleased to hear that.  I

20   think pictures can be helpful, quite frankly.  There are

21   going to be a lot of witnesses and it can be helpful to a

22   jury's recollection.

23        MR. PARTRIDGE:  It gives them a page to take

24   their notes and that sort of thing.

25        THE COURT:  As you know, I do permit note-taking

1    by my jurors.

2              As an aside, I just used the term my jurors, it

3    is my jury.  You should be very clear on that.  Be very

4    careful about how you deal with my juror.  They are going to

5    take their guidance from me.  As you all know, you are all

6    seasoned trial lawyers.  This is the one place I get to

7    really be God, in a manner of speaking.

8              In that regard, make sure you maintain a

9    respectful distance from the jury when you are addressing

10   them.  The center post of that conference table is probably

11   a good distance.

12             Jurors have told me in the past, they don't like

13   being hovered over.  They really don't like, as the kids

14   say, their space being invaded.  You are not pinned to the

15   podium which will be returned to the middle of the

16   courtroom.  It moves.  We have got a new mike system in

17   there.  It works really well.  I would suggest you take

18   advantage of it.  The courtroom's acoustics are are

19   terrible, but it's what we have.

20             You must conduct your examinations from the

21   podium.  My practice is you don't examine from counsel

22   table.

23             On the witness list, I am looking at LG's, I am

24   at Exhibit D-1, at the end of LG's witness list, I have LG's

25   objections to Whirlpool's witness list.  I was looking for

 1    Whirlpool's objections to LG's.  Mr. Partridge, where are

 2    your objections to the witnesses here?  Do you have any

 3    objections to any of the LG's?

 4                MR. PARTRIDGE:  We have the objections that we

 5    discussed in the limine arguments, Your Honor.  I don't

 6    believe we had other objections to their witness list.

 7                THE COURT:  I think your colleague in the back

 8    might be trying to signal you.

 9                MR. PARTRIDGE:  Page 2 of our witness list, our

10    objections are listed.

11                THE COURT:  I knew I had seen something.  Go

12    ahead.  Who is going to address these?

13                MR. PARTRIDGE:  This really involves Mr. McGrady

14    and Mr. Taylor.  We have already addressed:  Mr. McGrady is

15    out, Mr. Taylor you have allowed.

16                And we have preserved our objection if witnesses

17    go beyond the scope of what they have been identified for

18    during the course of discovery.  But I think the rest of

19    this can be dealt with realtime.

20                THE COURT:  I think so, yes.

21                Let's go to LG's objections.  You both preserve

22    the same objection to calling any witness under its employ

23    or otherwise under its control by deposition.  You have both

24    preserved that.

25                Mr. Coyne, anything else?

1           MR. COYNE:  That is our principal objection,

2    Your Honor.

3           MR. HERRMANN:  Your Honor, with regard to

4    witnesses, would Your Honor briefly go over Your Honor's

5    preference with regard to when you are not allowed to talk

6    to the witness during breaks?  Is it after he has been

7    submitted for cross?

8           THE COURT:  Mr. Herrmann, you should know, my

9    rule is more strict than my colleagues.  You don't talk to

10   the witness when the witness is on the stand.  You just

11   don't talk to the witness, not when they are -- that's the

12   rule.  I think that's been memorialized in an order

13   somewhere.  I should make it a standing order, actually.

14          MR. COYNE:  Your Honor, one point much

15   clarification on that.  There may be a possibility that some

16   of the witnesses will be in the direct case, may also be

17   recalled on rebuttal.  Does that apply --

18          THE COURT:  No.  Any questions about that, Mr.

19   Partridge?

20          MR. PARTRIDGE:  No.  I am glad Mr. Coyne raised

21   that.

22          THE COURT:  It's a good point.

23          On witnesses, again, typically, in cases of this

24   magnitude, of this type, of this degree of complexity, I

25   think it wise for counsel to have books for the individual

1   witnesses.  You should have two copies for me.  One for me

2   and one foe my clerk.

3            MR. PARTRIDGE:  In that regard, Your Honor, Mr.

4   Coyne and I haven't talked about this, my intention is over

5   the next few days he and I begin this conversation about

6   specific times for exchanging demonstratives and objections

7   and when we identify the order of witnesses and who will be

8   called on what days and what exhibits will be used with the

9   witnesses.

10           I am hopeful that we can provide with you

11   stipulated agreement as to how all those matters are going

12   to be handled.  They are discussed very generally in the

13   pretrial order we submitted to Your Honor.

14           THE COURT:  It is a good thing to memorialize

15   it, Mr. Partridge.  Beyond that, I don't care, quite

16   frankly, because I expect professional lawyers, very

17   experienced lawyers that we have, of the type we have here,

18   to be able to manage that.

19           MR. PARTRIDGE:  The one way it may affect you is

20   if we can't resolve all the objections, then either the

21   evening or the next morning we deal with that.

22           THE COURT:  I agree.

23           MR. PARTRIDGE:  I think we can get it down to a

24   relatively small number of issues.

25           THE COURT:  I agree.  It's good to memorialize

1    it to the extent you need to give it to me or argue about it

2    later and threaten get involved.  But I would like to stay

3    out of that level of micromanagement, I would like to avoid

4    that.

5            I don't do deposition designations.  You will

6    have to work those out.

7            Anything else in Volume 1?

8            Okay.  Let me see if there is anything in Volume

9    2.

10           MR. HERRMANN:  Your Honor, Judge Robinson has

11   developed a practice of preferring not showing video clips

12   for purposes of impeaching a witness.

13           THE COURT:  That's not my practice, Mr.

14   Herrmann.

15           MR. HERRMANN:  Thank you.

16           MR. PARTRIDGE:  A clarification for my purposes,

17   then.  So we should use the hard copy transcript for

18   impeachment purposes?

19           THE COURT:  You can use either.

20           MR. PARTRIDGE:  We can use the video or the

21   paper?

22           THE COURT:  Yes.

23           Yes.  I am are on the same page there.

24           MR. PARTRIDGE:  Thank you.

25           THE COURT:  I think it's unfair that if you are

1    going to impeach a witness that you provide a copy of the

2    impeaching document or whatever it is so they can respond.

3              MR. PARTRIDGE:  So if we are going to use video

4    we give him the transcript so he can follow along while the

5    video is playing.

6              THE COURT:  Any difficulty with that, Mr. Coyne?

7              MR. COYNE:  That is fine, Your Honor.

8              THE COURT:  As an aside, again, with regard to

9    witnesses, counsel, there are going to be many occasions

10   that you need to approach the witness box.  With each

11   witness, you must request permission to do it, but only

12   ones, please, don't continuously ask, Your Honor, may I

13   approach, Your Honor, may I approach, just the first time,

14   then you have free leave to approach the witnesses and hand

15   them documents.

16             MR. PARTRIDGE:  You put the gun away after the

17   first time.

18             THE COURT:  Yes.

19             (Laughter.)

20             THE COURT:  We have dealt with designations of

21   depositions.  I am pleased to hear that there is, in large

22   measure, agreement on the preliminary instructions.  I

23   haven't looked at them.  Do you want to try to resolve --

24             MR. PARTRIDGE:  There are really three points

25   that I think are relatively simply.  We may in fact be in

1    agreement.

2              When we submitted the preliminary instructions

3    we addressed inducement and contributory infringement and I

4    believe those are out of the case now so it would be a

5    matter of having to fix this because the claim that involved

6    inducement and contributory infringement I believe have been

7    dropped.  Mr. Coyne and I can discuss that here after, Your

8    Honor.

9              There was a second issue on Page 5.

10             THE COURT:  Mr. Partridge, which exhibit are the

11   film instructions?

12             MR. PARTRIDGE:  It is Exhibit I Romanesque (ii).

13             THE COURT:  That is how you refer to the two

14   little i's?

15             MR. PARTRIDGE:  Romanesque.  I don't know who

16   taught me that.  But my mother was with an English teacher.

17   Maybe it was her.

18             On Page 5, this is very minor, and LG is correct

19   that they seek a declaratory judgment.  So do we.  I don't

20   think juries understand what that means.  I found that

21   confusing.  I leave it to Your Honor whether to have that in

22   or not.

23             THE COURT:  It should come out.  It's legalese.

24   There is no reason for it.

25             MR. PARTRIDGE:  We both did this on the next

1    page, Page 6.  Maybe it's in your standard set, where we

2    talk about defenses as affirmative defenses.  It may be

3    better for the jury to just say defenses.

4              THE COURT:  You are going to see, I have

5    rewritten your proposed description of the case, I am going

6    to give you each a copy and ask whoever is doing the word

7    processing if I can find it, wherein I remove words like

8    counterclaimant, counterclaimant is different -- you know

9    what I mean talking about.

10             MR. PARTRIDGE:  Counterclaim plaintiff I guess

11   it is.

12             My last point about the preliminaries, I

13   apologize, Mr. Coyne, to you, because I haven't raised this

14   with you to date, is that on Pages 13 and 14 and part of 15,

15   with the exception of the paragraph on the bottom of Page

16   13, if we play the patent video, I think we don't need some

17   of those instructions.  We certainly think it's more

18   comprehensible to look at that video than it is to hear

19   instructions about it.

20             THE COURT:  I thoroughly agree with that.

21             MR. COYNE:  I am fine with the AO video.  It is

22   a very good piece.

23             THE COURT:  I think so, too.  I use it in class.

24   I think it's a very good piece.

25             MR. PARTRIDGE:  That is all I have.

1          THE COURT:  You will remove all footnotes and

2     sourcing.  The caption should just be final -- preliminary

3     instructions and the date, whatever that date is, again,

4     sufficient copies, I guess it's 13 or whatever the number

5     is.

6          I am going to leave the final jury instructions

7     for another day.  Again, what I need is another iteration,

8     so that we can, at an appropriate time, deal with them, a

9     combined joint iteration, as well as the verdict form, to

10    the extent that is possible.  That may not be possible.

11         MR. PARTRIDGE:  What is the most convenient

12    format for you -- assuming we have some differences and I am

13    sure we will, what is the best format for you?  I would

14    think a single document in which the differences are

15    identified within the document.

16         THE COURT:  That's fine.  I have been

17    inarticulate.  That is exactly what I mean, Mr. Partridge.

18         MR. COYNE:  If we have competing instructions or

19    verdicts, would it be helpful just to put a table that has

20    ours, theirs --

21         THE COURT:  I don't need a table.  In the

22    contents, you can signal one after the other, then the

23    objections can appear, the substantive objections can appear

24    in the actual proposed instructions at the end.  It's

25    probably not different from what you have done in other

1    Court's.

2         MR. PARTRIDGE:  The verdict form, maybe we can

3    simplify this, we have a long ways to go.  The verdict form

4    is way too complicated.  I think we all agree on that.  I am

5    concerned whether a single document might end up being more

6    confusing than two documents.

7         THE COURT:  I tried to except out the verdict

8    form.  I think that's probably right.

9         Let's then go, unless I have not covered

10   something you want to talk about, I am prepared to go to

11   Exhibits one Romanesque Ii) and (ii).

12        These are the proposed voir dire by each side.

13        I am going to work principally from LG's, just

14   for ease of our discussion today.  The first, and I have

15   just asked for an additional copy so I can pass them out in

16   a moment, I have rewritten the description of the case.  I

17   am going to pass it by you in a minute for your comment.

18   While we are waiting on that, let's go to Question No. 6.,

19   because up to that point I think the questions are identical

20   that are proposed by both sides.

21        What I have done is simply added the following

22   language at the end -- is that Re-ho, R-e-h-a-u?

23        MR. MORICO:  Re-hau.

24        THE COURT:  Industries is the word I added,

25   industries or Smith-Dalper Associates.

1          MR. MORICO:  That's correct, Your Honor.

2          THE COURT:  That comes from Whirlpool's

3    proposal.  Other than that, there is no difference that I

4    could detect.

5          No. 9 in LG's proposal, I am going to ask that

6    this language be added.  After the word experiences, in the

7    middle of the page there, the middle of the question, good

8    or bad, comma.

9          I think people might default to bad.

10         I am going to give this out to you.  Just pass

11   it out.

12         THE COURT:  Here is what I have done for the

13   description, we will read this into the record, I will give

14   you a chance to offer recommendations as to other language.

15         There are several corporate entities involved in

16   this civil action.  To simplify things a bit, I will tell

17   you that back in April of 2008 the corporate entities I will

18   call LG filed this lawsuit for patent infringement against

19   the corporate entities I will call Whirlpool.  In its

20   complaint LG accuses Whirlpool of infringing various of its

21   patents and seeks damages for the claimed infringement.

22   Whirlpool has responded to LG's complaint by denying that it

23   infringes LG's patents.  Whirlpool has further responded

24   with a claim of its own that LG infringes various of its

25   patents and, like LG, seeks damages for the claimed

infringement.  LG denies that it infringes Whirlpool's

patents.  In addition, both sides claim the other's patents

are invalid and unenforceable.  Those of you selected to

serve as jurors, I will give you more detailed instructions

regarding the meaning of the word infringement once you are

sworn in as jurors and again at the conclusion of the trial.

MR. PARTRIDGE:  Two comments, Your Honor.

Unenforceable, I think, can now come out, so I think it's a

Bench trial issue.

I think I would say in your last sentence is,

instructions with regard to the meaning of the word

infringement and maybe invalidity as part of that, too,

because you will somebody instructing on that, obviously, as

well.

THE COURT:  Those points are well taken, Mr.

Coyne, any objection to those changes?

MR. COYNE:  Adding validity to infringement.

THE COURT:  Yes.

MR. COYNE:  That's fine,  Your Honor.  And it's

fine taking out the --

THE COURT:  As to the words infringement and

invalidity.

Why don't I charge plaintiff with preparing this

amendment in the final voir dire, get me a copy of that.

Great.  Okay.  Let's go to 13 of LG's proposal.

1   My note here is to use defendants 16 -- actually, this is as

2   to 13 and 14.  Let's go to Whirlpool's 16 and see.

3                  Both of -- I think what I was impressed with and

4   the reason I made this change was that I think Whirlpool

5   covers both of these questions in one, having to do with the

6   fact that LG is a foreign-based, that is a company based in

7   solely, and that there are other corporations outside of the

8   U.S.

9                  MR. COYNE:  That is the only reason, Your Honor,

10  we split them out is as I started becoming a little

11  concerned these days with the amount of press coming out of

12  Mexico that somebody might have an issue with Mexico that

13  might not have an issue with Korea.

14                 THE COURT:  You talking about what's going on

15  down on the boarder?

16                 MR. COYNE:  The drug war down there.  That's the

17  only reason I split them out.

18                 THE COURT:  I am aware of what's going on.  But

19  I don't see that as --

20                 MR. PARTRIDGE:  I think if we got a positive

21  response we can deal with that.

22                 THE COURT:  We sure can.  The issue at hand is

23  that we have a South Korean company in contest with a

24  domestic, a U.S.-based company.  Those are the entities

25  involved.

1               By the way, counsel, you will have the

2     opportunity at sidebar after I go through the general

3     questions, we will call up individually those who have

4     responded affirmatively to further questioning on the

5     record.  The mechanics of this is that I will go through

6     these, record, all of us will record, and I do rely upon us

7     to act as checks on one, make sure we have recorded

8     accurately who has responded to what, and we go over here on

9     the record and discuss, bring them up individually, I will

10    alternate, each side will get a chance to begin the

11    questioning of the putative juror.

12               I will then ask the juror back to the well of

13    the court and ask for the parties' positions as to whether

14    there is a request for cause motion, and rule then,

15    generally, I will rule right there.

16               I might reserve, it may depend on numbers.

17               I may sua sponte, in all likelihood will, sua

18    sponte, dismiss some jurors.  A child care issue, a health

19    issue, that kind of thing.  I will give you a chance to

20    raise an objection to it so you can preserve the objection.

21    Then I will dismiss them.

22               At the end of that process, after we have gone

23    through all of the prospective jurors, after we have gone

24    through the venire, after I have ruled on all of the various

25    cause motions, then we will just recapitulate to make sure

1    that we have covered accurately the jury in every ruling.

2              Then we will exercise the preempts.  You will

3    each get that number provided by the rules, three a side.

4    And that's how we pick the jury.

5              Any questions about that?

6              MR. COYNE:  No, Your Honor.  One observation

7    that I think we may have missed, both of us may have missed

8    this.  Willful also has Mekila Dora Productions out of

9    Mexico.  The question is only targeted to LG.  That's a

10   pretty neutral factor.  Both companies are using production

11   in Mexico.  14, 13, 14, and we substituted their 16 for it.

12   It's my understanding both companies have production

13   facilities in Mexico.

14             THE COURT:  The way LG phrases, the way

15   Whirlpool proposes the question, I believe, is one of LG's

16   companies is a -- I see what you are saying.

17             MR. COYNE:  Both have facilities in Mexico.

18             THE COURT:  Mr. Partridge?

19             MR. PARTRIDGE:  I have to confer a moment, Your

20   Honor.  Because I am not sure that facility -- what the

21   relationship is there.

22             Your Honor, I don't want to belabor this, but I

23   would like to further confer about this.

24             MR. COYNE:  We will talk.

25             MR. PARTRIDGE:  Should we get back to you at

1    some later point.

2              THE COURT:  Not unless you need me to resolve a

3    controversy.  If it is a faculty.

4              MR. PARTRIDGE:  There is a facility in Mexico.

5    I am not sure the extent to which that facility is related

6    to anything that is in this case at this point.

7              THE COURT:  That is fine.

8              MR. COYNE:  We will talk and submit an

9    appropriate revision to Your Honor.

10             THE COURT:  If necessary we can get on the phone

11   and discuss this.

12             MR. PARTRIDGE:  That does raise an interesting

13   question, Your Honor.  I understand this would be a rare

14   thing for you to do.  But we have had some unusual issues

15   here.  I was going to ask you if it makes any sense for us,

16   given we are so far in advance of trial and there are so

17   many issues floating around, to have a second conference a

18   little closer to trial to deal with remaining issues.  If it

19   becomes unnecessary, we can drop it.

20             THE COURT:  I have no objection to that.  Ms.

21   McDavid, do you want to get the book.

22             This will be a teleconference.

23             I am going to add Whirlpool's No. 18, look

24   around the other potential juror members, do you know each

25   other or have you had any relationship with any of the other

1    jurors before today.  Any objection to that from LG?

2              MR. COYNE:  No, Your Honor.

3              THE COURT:  I rather prefer, there is note a big

4    difference, instead of LG's 15 and 16, I think I prefer 19

5    and 20 from Whirlpool.  Have you ever worked in the field of

6    consumer appliance or refrigerator design, No. 19, do you

7    have any experience with design, rare, or upkeep of

8    electronic or mechanical devices such as refrigerators.

9              MR. COYNE:  That is fine, Your Honor.

10             THE COURT:  I thought it was a little more

11   encompassing.  By the way, those that I don't address are

12   fine in LG's proposal.

13             Moving on to LG's 18, I have a note to

14   substitute Whirlpool's 26.  Let me see what Whirlpool's 26

15   is.

16             Whirlpool's 26 reads, have you or any member of

17   your immediate family or anyone close to you ever been

18   employed by the United States Patent and Trademark Office,

19   the USP T O.  I see the difference.  I eliminated the ITC,

20   and any other governmental agency, state -- I just don't see

21   the need to inquire into those organizations or agencies.

22             As to No. 19, I said see 27 of Whirlpool.

23             Yes.  Again, I think the difference is the trade

24   commission or governmental agency issue.  In other words, do

25   you hold any opinions about the U.S. PTO is what we are

1    going to limit it to.

2           LG's 21, I really, frankly, it reads as follows:

3    Do you believe that because a patent has issued by the U.S.

4    Government it must be valid.  Well it is presumed to be

5    valid, issued by the PTO.  I don't understand the need for

6    this question.

7           MR. COYNE:  I it must be, that someone is going

8    to be resistance to even accepting evidence and considering

9    evidence of invalidity.

10          MR. PARTRIDGE:  Your Honor, I am not sure how

11   that's helpful in selecting a jury.

12          THE COURT:  I don't, either.

13          MR. PARTRIDGE:  As opposed to it being part of

14   the an instruction to the jury at the end of the case.

15          THE COURT:  That was the end of my little note

16   here.  I am going instruct the jury on this subject.  I

17   won't make that inquiry.

18          The only other two that I have are 25 and 26.  I

19   am substituting 31 from LG from Whirlpool.  Whirlpool's 31

20   reads would a fact that a witness appearing on behalf of one

21   party or the other was not born here in the U.S. or that a

22   witness testifies through a translator keep you from being a

23   fair and impartial juror?

24          I think that does in one question what both 25

25   and 26 seek to do in two separate questions.

1        MR. PARTRIDGE:  The one problem with our

2   statement of this is that we are in the process of agreeing

3   on an interpreter to use during the course of trial.  We

4   both have known this interpreter for a long time.  He does

5   not like the word translator, because they are interpreters,

6   we really should call them him him an interpreter.

7        THE COURT:  You should change that language,

8   yes.

9        Are you going to be using a check interpreter?

10        MR. PARTRIDGE:  We are not.  We think we are

11   going to agree on Mr. Albert Kim.  If we due, we are both

12   comfortable with using a single interpreter.  I think he is

13   fair and balanced, as they say, and appropriate.  I think,

14   Mr. Coyne, we he agree with that.

15        MR. COYNE:  Yes.

16        THE COURT:  Counsel, when do you want to

17   recommend we get on the phone.

18        MR. PARTRIDGE:  I would think latter half of

19   February, Your Honor.  Because we have these -- tissue that

20   is going to be briefed and we have a couple of discovery

21   things that are outstanding.  So we probably ought to have

22   some time to deal with that in case there is some issues

23   that we would want to discuss with you before trial.

24        THE COURT:  How about Wednesday, February the

25   17th.  Is that all right?

1                    MR. COYNE:  That is fine.

2                    MR. PARTRIDGE:  We will make it all right.

3                    THE COURT:  Let's do this at 10:00.  Counsel for

4      plaintiff, will you initiate the call, please?

5                    MR. HERRMANN:  Certainly, sir.

6                    THE COURT:  One or two more from me.  Then I

7      will certainly hear from you.

8                    Objections.  When you want to enterprise an

9      objection, simply rise from the table, object, I object,

10     relevancy, I object.  Don't start spouting off rule numbers,

11     please.  I just don't think it's helpful in making the

12     record.

13                   Don't argue the objection.  Normally, I will

14     rule promptly.  If I need to bring you to sidebar, I will.

15     But that does not preclude you from asking for a sidebar or

16     even respectfully demanding a sidebar, if you use the word

17     demand you are going to get in trouble.  But my point is

18     that it's your job as thick-skinned advocates to deal with

19     an Rome and Haas believe judge from time to time.  And we do

20     get Rome and Haas believe from time to time or difficult to

21     convince that we should hear anything further from you

22     because we have got in our minds that we have the right

23     answer.

24                   I recognize that I am not infallible.  But I

25     also recognize that I am going to attempt to place limits on

1    you.  It's my job.  We have to manage the time that we have

2    allotted for this case.  Within limits, I am going to let

3    you can to sidebar.  But don't abuse the privilege.

4              It's always help, if you anticipated an area of

5    inquiry that is going to raise an objection, for you to have

6    authority when we go to sidebar.  It's always help for a

7    judge to have that opportunity with you.

8              F I feel the issue is of enough significance, I

9    will adjourn the jury for a short period of time and I and

10   my law clerk will adjourn to chambers and do our own

11   research and contemplate the authority that you have

12   provided.

13             Opening statements are not arguments.  They are

14   statements.  They are designed to outline your view of what

15   the evidence will show.  Not to advocate what you will later

16   be given the opportunity to do, during your final, your

17   closing speeches.

18             I guess we could talk about, perhaps should, in

19   terms of your burdens, how you feel we should handle

20   opening, rebuttal -- closing arguments, in terms of the

21   number of times you get to address the jury.

22             MR. COYNE:  Your Honor, that raises a larger

23   issue that we wanted to discuss with you today in terms of

24   the order of proof at the trial.

25             We are both working hard to try to reduce the

1    number of issues, hopefully as reflected by the stipulation

2    we were able to file yesterday and we are going to continue

3    working on that.

4            But there is an issue that that come up.  There

5    is one redesign that we are talking about and we will submit

6    supplemental brief on, the did this.  There is another

7    redesign that is in the case that we provided discovery

8    during the discovery period, all of it on the on a redesign

9    of the mounting bracket, their '526 patent, Whirlpool's '526

10   patent.  And again Whirlpool has not put in any evidence

11   through its experts that that product infringes.  And we

12   have got a situation where I just wants to be clear, with

13   the scenario I fear is that we put on our affirmative case

14   on infringement of LG's patents, then Whirlpool puts on its

15   affirmative case responding to that, and then puts on its

16   infringement case against LG, then we get up and put on our

17   noninfringement case, and I want to put in evidence on the

18   new redesign for the '526 patent and I get met with an

19   objection that I am beyond the scope of direct.  And I am

20   faced with a situation where I am asking what might be

21   perceived as opening up a whole new set of infringement

22   issues on the day before trial ends.

23           THE COURT:  I think if counsel discuss this

24   matter you can arrive at a protocol for this.

25           MR. PARTRIDGE:  Your Honor, as to the redesign

1   on the '526 patent, this is an issue that I think, if we

2   have a conversation about what we need in order to validate

3   a few additional things, we may be able to come to an

4   agreement as to whether that is in or out of the case.  I

5   don't think that redesign is a big issue.  And it's not one

6   of the major patents in the case.  We ought to be able to

7   work that out.

8            I think that leaves us with the order of proof

9   being their case-in-chief on their patents, our response to

10  their patents, our case in chief on our patents, their

11  rebuttal with respect to their patents and their

12  case-in-chief as to our patents, and then our rebuttal with

13  respect to our patents.

14           That seems like the logical way to do it when

15  you have patents on both sides.  It is not my intention at

16  this point as I see the issues, and we have the redesign as

17  to the '130 patent to still deal with, but to use some

18  procedural gimmick to forestall the presentation of, an

19  orderly presentation of the proof.

20           MR. COYNE:  Your Honor, we are fine with that,

21  for example, the two redesigns will come in anyway on

22  damages.  I just don't want to be in a position where we are

23  perceived as opening up a whole raft of allegations in

24  rebuttal.

25           THE COURT:  I think Mr. Partridge's point should

1    be well taken by you.  That would be a cheap shot.

2              MR. PARTRIDGE:  Mr. Coyne made a statement about

3    their redesign comes in on damages.  That is a contested

4    issue between the parties.  Not one that needs to be dealt

5    with now but in realtime.  But I don't want the absence of

6    response by me on this record that we have agreed.

7              THE COURT:  Okay.  I think my last issue, unless

8    something pops into my head before I open the floor is a

9    discussion of time, maybe the last two issues, and what we

10   are going to do -- what time we are going to need to provide

11   for your presentations to the jury before we transition and

12   if we do, in fact, transition directly into a Bench or

13   schedule a Bench trial at some later time.

14              Unless there is a disagreement, I think time

15   should be shared evenly.

16              MR. PARTRIDGE:  Agreed, Your Honor.

17              MR. COYNE:  Agreed, Your Honor.

18              THE COURT:  Here is your multiplier.  It's five

19   and a half hours per day.  I strive for six.  But experience

20   has taught that we really end up more in the area of five

21   and a half.  So split that.  You will keep time on one

22   another.  That's the best way.  My staff will back that up.

23   But, please, we will do time checks to the extent we need to

24   if I have a sense -- I have generally with developed a

25   fairly decent sense of how things are going.

1          MR. HERRMANN:  Your Honor began talking about

2    openings and closings and then we went off indoor orders of

3    proof.

4          Does Your Honor intend that we have LG open and

5    Whirlpool open, and that's it, and then LG close, Whirlpool

6    close, LG reply and then Whirlpool reply?

7          THE COURT:  Let's talk about that.  As to the

8    first part, it would be, on the openings, yes, LG opens,

9    Whirlpool opens, in that succession, in that order.  Let's

10   talk about the other.

11         MR. PARTRIDGE:  We are fine with the way you

12   described the openings.

13         MR. COYNE:  We are fine with that as well, Your

14   Honor.

15         THE COURT:  Is there an issue on the closings?

16         MR. PARTRIDGE:  Your Honor, I am reiterate sent

17   to agree to Mr. Herrmann's proposal of the two rebuttals.

18   But I must say at this juncture, I am not sure I have enough

19   information to make an informed judgment about whether that

20   is what makes sense.  It may well be, if, as we get to

21   trial, if we allotted an amount of time for closings and as

22   we get in the middle of trial we could discuss with whether

23   or not we do it all at once, Mr. Coyne goes all at once, I

24   go all at once and that's it or whether we have some

25   rebuttal allowed.

1          MR. COYNE:  My preference generally, Your Honor,

2     is what you had suggested.  We are going to be submitting

3     your jury to be drinking from a fire hose with this much

4     evidence coming in.  If we can break it up so that they are

5     dealing with infringement, then noninfringement, and

6     validity, then validity, then validity, it enables them to,

7     I think, organize the evidence Moore clearly in their minds.

8          THE COURT:  You have to be more clear.  What do

9     you mean, dealing with?  Are you saying send the jury out to

10    deliberate on infringement?

11         MR. COYNE:  No, Your Honor.  I am talking about

12    the order of closings.  If we can break the closings up as

13    you suggested where LG closes then Whirlpool closes and then

14    LG rebuts and Whirlpool rebuts, it does give Whirlpool the

15    last word as well.  But it ends up breaking up the evidence

16    into smaller bites that makes it easier for the jury to

17    digest, I think.

18         MR. PARTRIDGE:  I am willing for that to be the

19    default position.

20         THE COURT:  Let me have the two of you talk

21    about this.

22         MR. PARTRIDGE:  I am just not informed enough.

23         THE COURT:  Let me let you ladies and gentlemen

24    think about it a little bit.  I am flexible in this.

25         MR. PARTRIDGE:  How much time?

1          THE COURT:  Typically what I do is, the openings

2     and closings are part of your time.  I don't limit, place

3     limits on openings and closings.  I prefer that lawyers act

4     like lawyers and use some degree of discretion and common

5     sense.  You by now know how much time you can expect an

6     injury to attend what you are saying, or not.  Okay?  I

7     leave that to you.

8          MR. PARTRIDGE:  We could do a little juggling in

9     the middle or something?

10          THE COURT:  You can do that.

11          MR. COYNE:  I just had a question:  If there is

12     an issue that comes up that Your Honor decides to exclude

13     evidence and we want to make a proffer, would you prefer a

14     written proffer, doing it at the end of the day, what is

15     your preference?

16          THE COURT:  We will take it as it comes, Mr.

17     Coyne.

18          THE COURT:  All right.  Before I open the floor,

19     given the rulings to this point, it would seem to me that we

20     probably won't need as much time with the jury.  What is

21     your guesstimate?  How many days will we he need with the

22     jury now.

23          MR. COYNE:  I will risk going first, Your Honor.

24     I think we are mightily striving to get eight patents tried

25     in the 12 days already.  Now six.  I think we are still at a

1   point where we need to try to compress the number of patents

2   more rather than the number of days more.

3           THE COURT:  12 days was all you were going to

4   get.  Regardless of what happened here today.  Now we know

5   that you don't have a need to present as much evidence to

6   the jury.  So I am expecting that we are going to be able to

7   reduce the number of days.  Because I am not going beyond 12

8   days.  I don't have it to give you during this period.

9           If you want to come back, if you still want to

10  use 12 days with the jury, okay.  I think that would be

11  imprudent.

12          MR. PARTRIDGE:  I am at ten, Your Honor.

13          THE COURT:  That's what makes sense to me.

14          MR. PARTRIDGE:  I don't want to be the one who

15  keeps them here for the third week.  I worry about keeping

16  them through the second week.  But we are willing to get

17  what we need to get done with a ten-day trial.  That means

18  you can do the Bench trial, if we even do a Bench trial, on

19  the following two days.

20          THE COURT:  I think that is the approach, that

21  resonates with me the most.  We will plan on ten days for

22  the jury, potentially two days for the Court.

23          Mr. Coyne, other issues?

24          MR. COYNE:  I think that covers all of the

25  issues I had on my list, Your Honor.

1          THE COURT:  Mr. Partridge.

2          MR. PARTRIDGE:  We have covered everything

3    except for one from my three-page list.  I think we will

4    probably both do our best to avoid having to close the

5    courtroom at any point.  But the issue could arise and I

6    just wants to inquire of the Court as to how you are

7    currently dealing with that issue?

8          THE COURT:  It doesn't happen very frequently at

9    all.  So I don't know that I necessarily have a set method

10   for doing it.  As many patent trials as we have had here, I

11   just haven't seen it a lot.

12         MR. PARTRIDGE:  Here is what I would say on the

13   record at this juncture.  In the event -- what we would

14   offer to do that in the event there is a possibility that

15   something has to remain confidential, what we would try to

16   do is put that piece of evidence in sort of one package,

17   even if that means it's sort of a little disjointed in the

18   process so that we don't have to get up and down or in and

19   out.

20         THE COURT:  You might even want to consider me

21   giving an instruction to the jury on that point, to help

22   guide them.  Now, ladies and gentlemen, we are at a point,

23   we are going to take some of the evidence out of order and

24   the reason is that there are proprietary matters that are

25   going to be discussed during the testimony.  Words to that

```
 1    effect.
 2              Anything else, counsel.
 3              MR. PARTRIDGE:  Nothing here.
 4              THE COURT:  Settlement.  Are there ongoing
 5    discussions?
 6              MR. COYNE:  We have had discussions.  I don't
 7    know that there has been discussions since the mediation
 8    session right before Thanksgiving.
 9              MR. PARTRIDGE:  The Magistrate Judge, who I
10    thought did a fine job as she always does in our
11    discussions, she moved us in the direction of trying to
12    narrow the conveys when she realized we weren't going to be
13    able to settle that day.  I think both of our clients have
14    periodically had conversations.  I understand they may have
15    some further conversations soon.  If the need arises in the
16    next week or two, if there is some benefit to asking Judge
17    Thynge to help us again, we are certainly open to that.
18              THE COURT:  Good.  I am sure she has made
19    herself available for that.
20              MR. PARTRIDGE:  She did.
21              THE COURT:  She is wonderful in that regard.
22              Please, if you really feel that settlement is
23    getting a lot of traction, let me know, because I have got
24    other things I could do.  There are other cases that I
25    could -- we probably -- are we booked on those days or have
```

1    those cases moved.  Let me see.

2              That is your time.  But there might be other

3    matters I could move in there.

4              Even if not, there are other opinions that need

5    to be written and things of that nature and we are still

6    down a judge.

7              Counsel, thanks for your time.

8              (Counsel respond "Thank you.")

9                        -   -   -

10   Reporter:  Kevin Maurer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25