<pre>
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3                             -   -   -

 4    LG ELECTRONICS U.S.A., INC.,    :Civil Action
      and LG ELECTRONICS, INC.,       :
 5                                     :
                  Plaintiffs,          :
 6                                     :
          v.                           :
 7                                     :
      WHIRLPOOL CORPORATION,           :
 8                                     :
                  Defendant.           :08-234(GMS)
 9    _____

10    WHIRLPOOL CORPORATION,           :
      WHIRLPOOL PATENTS COMPANY,       :
11    WHIRLPOOL MANUFACTURING          :
      CORPORATION, and MAYTAG          :
12    CORPORATION,                     :
                                       :
13                  Counterclaim       :
                    Plaintiffs,        :
14                                     :
          v.                           :
15                                     :
      LG ELECTRONICS U.S.A., INC.,     :
16    LG ELECTRONICS, INC., and LG     :
      ELECTRONICS MONTERREY MEXICO,    :
17    S.A., DE, CV,                    :
                                       :
18                  Counterclaim       :
                    Defendants.        :
19
                             -   -   -
20
                        Wilmington, Delaware
21                   Wednesday, February 17, 2010
                            10:00 a.m.
22                      Telephone Conference

23                             -   -   -

24    BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

25
</pre>

1    **APPEARANCES:**

2            RICHARD K. HERRMANN, ESQ.
             Morris James
3                      -and-
             PATRICK J. COYNE, ESQ., and
4            ANDREW CHANHO SONU, ESQ.
             Finnegan, Henderson, Farabow,
5            Garrett & Dunner, L.L.P
             (Washington, D.C.)

6
                            Counsel for Plaintiffs and
7                            Counterclaim Defendant

8            FREDERICK L. COTTRELL, III, ESQ., and
             ANNE SHEA GAZA, ESQ.
9            Richards, Layton & Finger, P.A.
                       -and-
10           SCOTT F. PARTRIDGE, ESQ.,
             PAUL R. MORICO, ESQ., and
11           AMANDA WOODALL, ESQ.
             Baker Botts L.L.P.
12           (Houston, TX)

13                           Counsel for Defendant and
                             Counterclaim Plaintiffs

14                       -  -  -

15

16

17

18

19

20

21

22

23

24

25

```
 1                   THE COURT:  Good morning.

 2                   (Counsel respond "Good morning, Your Honor.")

 3                   THE COURT:  Mr. Coyne, who is on the line for LG

 4      today?

 5                   MR. HERRMANN:  Good morning, Your Honor.

 6      Richard Herrmann.  I have with me Patrick Coyne and Andy

 7      Sonu.

 8                   THE COURT:  Good morning.

 9                   UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

10                   THE COURT:  For Whirlpool?

11                   MR. COTTRELL:  Good morning, Your Honor.  In

12      Wilmington, Fred Cottrell and Anne Gaza.  My co-counsel from

13      Baker Botts, Scott Partridge, Paul Morico, and Amanda

14      Woodall.

15                   THE COURT:  Good morning.

16                   I gather this is a status conference to address

17      any issues that we know about at this time in the leadup to

18      trial in March.

19                   I guess one of them -- I did, by the way -- I am

20      in receipt of the letter of yesterday over Mr. Herrmann's

21      signature.  Let's address that first.  Does everybody have

22      that letter?

23                   MR. PARTRIDGE:  Yes, Your Honor.

24                   THE COURT:  Mr. Partridge, I gather you haven't

25      had a chance to respond?  Or are you in accord with what is
```

1   written in the letter?

2           MR. PARTRIDGE:  Isn't this the letter that just

3   informs you that the ITC Commission had entered a decision?

4           THE COURT:  Yes.  But it seems to do more than

5   that.  If you look at the last paragraph, you will find this

6   sentence:  "In the event that the Court desires anything

7   further in connection with its consideration of LGE's

8   request to file a summary judgment motion on the invalidity

9   of the '130 patent, counsel for LGE remain available at the

10  Court's convenience."

11          I am not quite sure what to make of that

12  sentence.

13          MR. PARTRIDGE:  Neither were we, Your Honor.

14  Our view is that the exclusive and original jurisdiction for

15  determining the validity of patents rests with you and not

16  with an administrative agency.

17          And the manner in which evidence is taken in the

18  ITC is different than it is with respect to a jury case.  I

19  think we are a week and a half away from trial.  I don't see

20  a reason at this juncture to go through some summary

21  judgment exercise between now and the start of trial.

22          THE COURT:  Yes.  There is really some practical

23  impediments as well.

24          Let me give LG a chance to tell me what you mean

25  in that sentence?

1          MR. COYNE:  Your Honor, I apologize first off

2     for saying summary judgment.  I should have said judgment as

3     a matter of law.

4          THE COURT:  Okay.

5          MR. COYNE:  I apologize to the Court for the

6     confusion.

7          THE COURT:  Terms of art are just that, counsel:

8     terms of art.

9          MR. COYNE:  I am sorry, Your Honor.  We all

10    running a little fast these days.

11         THE COURT:  All right.

12         MR. COYNE:  The concern we had -- we are not

13    trying to say that this is dispositive of the Court's

14    rulings on infringement.  Absolutely.  The District Court

15    and your jury has a primary jurisdiction over this.

16         But what we are alluding to is that under the

17    Professional Real Estate Investors decision, which,

18    unfortunately, I know all too well, having lost it at the

19    Supreme Court, we can't be held objectively reckless, having

20    received a judgment in our favor.  We may be wrong at the

21    the end of the day depending on what the jury decides.  But

22    we can't be acting in a way that is objectively baseless.

23    That is really the concern.  When we were in front of you on

24    January 7th, we had an interim decision.  Now it is a final

25    determination, and the investigation has been terminated.

1    It's over.

2             THE COURT:  So you believe that the results of

3    the investigation are dispositive of the issue of

4    willfulness?

5             MR. COYNE:  Yes, Your Honor.  We believe that it

6    should be dispositive.  I will admit to Your Honor, there is

7    no Federal Circuit case directly on point.  The Court has

8    not had this particular situation come up on appeal where

9    they have dismissed post-Seagate -- there is prior cases to

10   Seagate -- but the Seagate analysis is a game-changer.

11   There are just two recent -- there are a couple of cases,

12   which we would be happy to share with the Court, on related

13   issues, things like an antitrust or unfair competition

14   claim, where somebody said, dismiss it because it's sham,

15   and the Court has held on appeal, no, it can't have been

16   sham if the ITC let you proceed.  At least it's reasonable,

17   it's not a sham.

18             That is a comparable standard to what we have

19   here with this objectively reckless standard post-Seagate.

20             Our view is this issue of willfulness, at least,

21   is disposed of by the ITC finding, even if it gets reversed.

22             THE COURT:  What is your view, Mr. Partridge?

23             MR. PARTRIDGE:  Totally to the contrary.  I

24   don't think you will be surprised by that.

25             THE COURT:  No, I am not.

```
 1              MR. PARTRIDGE:  I would start, you ruled at the

 2    first pretrial conference, basically under 403, that the ITC

 3    shouldn't come into this case.  Then you gave Mr. Coyne sort

 4    of the option to try to come up with something that would

 5    convince you otherwise.  And the various proposals that he

 6    has made have ranged from having us drop our right to a jury

 7    trial to dropping willfulness entirely.  And obviously, we

 8    are entitled to a jury trial.  Actually, if you look at

 9    Seagate, the focus of Seagate is on pre-litigation conduct,

10    not on some opinion that occurs years after the objectively

11    reckless conduct of which we complain.

12              It is clear from Seagate that the focus is on

13    pre-litigation conduct.

14              It would be I think of interest to you to know

15    that the Federal Circuit has affirmed other judges who have

16    made 403 rulings with respect to the admissibility of other

17    litigation in connection with a jury trial.  And, in fact,

18    just two weeks ago, Judge Robinson agreed with you and your

19    previous 403 ruling in the Cordis case.

20              I think, while I am not suggesting, Your Honor,

21    that this is the law of Delaware or any such thing, I do

22    think, though, the way she described the issue is exactly

23    what we said to you previously when you made your previous

24    decision.

25              THE COURT:  Mr. Partridge, it never can be a bad
```

thing for you to refer to a fellow District Judge, although

I agree with you that there is no law of the District of

Delaware.  Certainly, Judge Robinson, it should be

understood by all, her views would be persuasive.

MR. PARTRIDGE:  Yes.  And, Judge, if you look at

Cordis Corporation versus Boston Scientific Corporation,

January 28, 2010, I only have the Westlaw cite, it is 2010

Westlaw 331792.  The issue post-Seagate was the

admissibility of her preliminary injunction ruling at trial.

And she focused on the fact that Seagate addresses

pre-litigation conduct, and, in fact, expressly stated that

from her point of view the real inquiry is pre-litigation

conduct and not post-litigation rulings of the Court.

It was interesting, as she made her 403 ruling

as well as her ruling as to the relevance under Rule 402 of

a post-litigation decision, she said the following.  In

fact, the lawyers in that case had agreed to allow the

ruling admitted, and even with that she denied its

admission.  And she said:

Counsel's interpretation of what this record

encompasses is as imaginative as it is variable.

Indeed, it has become the new mantra for

requests to admit such 'objective evidence as expert

opinions in court decisions.  It cannot be emphasized

enough that the litigation process is a complicated one,

1  comprising multiple steps and moves forward by multiple

2  decisions, ranging from resolving a discovery dispute to a

3  case-dispositive motion.

4          "Consequently, I am very uncomfortable with

5  characterizing administrative and Court decisions as

6  'objective evidence' for presentation to a jury.  As

7  recognized by counsel, a jury is going to give such evidence

8  great weight even when the procedural and substantive basis

9  for most such decisions will not be apparent to the jury."

10         Then she goes on to say almost exactly what you

11  said at the pretrial conference, which is that the use of

12  the words a Judge said or an Administrative Law Judge said

13  has a profound effect on a jury, which is why you, Judge

14  Robinson, and other courts who have been affirmed by the

15  Federal Circuit have applied Rule 403.

16         This changes the willful infringement landscape

17  here not one iota.  The willful conduct, the reckless

18  conduct that occurred here occurred years ago.  And

19  ironically, the ITC has found that when LG said it was

20  designing around our patent, the ITC actually rejected that

21  and found infringement by the side-by-side refrigerators,

22  which were the refrigerators LG was originally designing.

23  Ironically, the very prior art that the ITC now relies upon

24  and that LG relies on upon LG actually had at the time in

25  its own documents described, and there isn't one word of

1  belief on the part of LG that the patent is invalid over

2  that prior art.  And, indeed, they tried to copy that prior

3  art in order to do a design-around and it didn't work, and

4  instead they did a new design and never obtained advice of

5  outside counsel with respect to any of this.

6            So the willful infringement evidence here is, in

7  our view, overwhelmingly in favor of our position.

8            THE COURT:  Mr. Coyne, I am constrained to agree

9  with your opponent and with my esteemed colleague's view,

10 and that which mine has been as well.

11           Your answer to my question earlier, the question

12 being success along the lines of whether the ITC

13 determination was dispositive and therefore willfulness

14 should come out, was yes.  That can't be right.  So I guess

15 you are asking -- is this an oral motion of some type?  What

16 is it that you are exactly asking me to do?

17           MR. COYNE:  We are trying to resolve this issue

18 that we were talking about on the 7th and continue to

19 discuss it with Whirlpool.  I understand Your Honor's

20 ruling.  We would like to reserve that issue, obviously, if

21 we have to take an appeal.

22           We proposed to Whirlpool going forward on this.

23 As Mr. Partridge pointed out, we have asked them to drop

24 willfulness.  They have said no.  And we have come up with

25 two other alternatives to avoid the prejudice.  What Your

1    Honor was discussing with us on the 7th --

2                THE COURT:   What prejudice is that you are

3    trying to avoid?

4                MR. COYNE:   When we were talking about this on

5    the 7th of January, I thought we were all on the

6    understanding that the evidence is at least relevant.  It is

7    just that its prejudicial value outweighs the relevance.

8    Mr. Partridge was just arguing that it is totally

9    irrelevant.  We continue to believe it is highly relevant.

10               THE COURT:   The outcome in the tribunal, in the

11   ITC?

12               MR. COYNE:   Yes, Your Honor.

13               THE COURT:   That's another issue as to whether

14   it's dispositive versus whether it is relevant.

15               MR. COYNE:   I am retreating to that.  I accede

16   to Your Honor's ruling.  I accept it.  Like I said, we

17   reserve whatever appeal we need to.  We need to move forward

18   and figure out what we are going to do two weeks from now.

19   With accepting Your Honor's ruling that it is relevant -- I

20   am sorry, something that we are not going to keep it out or

21   get it in necessarily straight up as the ITC, we have made

22   two other proposals to Whirlpool to try to enable us to use

23   what we consider this highly relevant evidence, with at

24   least mitigating or avoiding what Your Honor indicated was

25   the undue prejudice of that evidence.

1      We have asked them to agree to try this to the

2  Bench.  In our view they don't have a right to a jury trial

3  on this.  They have not agreed with that.  We have also

4  asked them to bifurcate this.  In other words, if they feel

5  they are entitled to a jury trial, we disagree, but one way

6  to do this would be to limit its admissibility as well as

7  the admissibility of any other evidence on the issue of

8  willfulness, such as their arguments about Harrington, to a

9  second stage of the trial, which we are going to have,

10  anyway, and while Your Honor is hearing the Bench issues or

11  sometime around then, have the jury come back, if they

12  render a verdict of infringement, and deal with the

13  willfulness issue in a very short proceeding, when they can

14  address only that issue and have that evidence that is

15  relevant to that issue before them.  That would eliminate

16  the undue prejudice to us of not being able to use it.

17      I understand Your Honor's ruling that it is not

18  dispositive.  But we still feel it is highly relevant.  It

19  does show we aren't out in left field by thinking what we

20  did.

21      THE COURT:  You show that with great certitude.

22  In contrast Mr. Partridge says what he says with equal

23  force, that the focus is on pre-litigation, should be on

24  pre-litigation activity, even insofar as this particular

25  question we are addressing now is concerned.  I guess you

1    would agree with that characterization, right?

2                MR. COYNE:  Yes, I would agree that the focus is

3    on pre-litigation activity.  I understand we are fighting

4    about whether --

5                THE COURT:  That's exactly right.  If you take

6    Judge Robinson's thoughts and words into account, which I

7    think are well put and artfully articulate, one I think can

8    raise reasonably the question as to whether it is objective

9    evidence.

10                MR. COYNE:  I understand, Your Honor.  We

11    believe that it is.

12                THE COURT:  I know you do.  Mr. Partridge

13    says -- what do you say Mr. Partridge?

14                MR. PARTRIDGE:  I say, Your Honor, we ought to

15    have one trial and not have to recall the witnesses.  And,

16    in fact, your 403 ruling would be equally applicable to a

17    stand-alone willfulness trial, as well as a 402 argument

18    that I think is a viable one and which is consistent with

19    what Judge Robinson recently said in her opinion.

20                THE COURT:  And I agree.  Therefore, what

21    happened in the ITC will not be considered by this Court or

22    the jury that this Court ultimately empanels.  All right?

23                So then, there is another issue.  Mr. Coyne, I

24    am afraid you are in deep water here today.

25                MR. COYNE:  I am prepared to try to swim.

1    THE COURT:  This is on the DJ question issue

2    that is still extant.  For a number of reasons.  I am going

3    to allow brief argument on this request that the redesign,

4    ice bin, I think it is, be included in these proceedings.

5    Why don't you go ahead.  We have seen your briefs.  I have

6    had a chance to consider them.

7    MR. COYNE:  Your Honor, let me start with the

8    proposition that under Georgia-Pacific, the ability of --

9    you look at what the alleged infringer's best available

10   alternative is.  This is one of the best available

11   alternatives.  Whether it is treated as a DJ or not, we

12   would like to put in evidence, we think we are entitled to

13   put in evidence, we are asking your Court to put in

14   evidence, on the fact that we could have redesigned around

15   this for about $700,000 and, in fact, have.  So those

16   numbers are real.

17   Totally apart from the DJ issues, we would

18   submit this comes in on the damages side of the case as to

19   what the value of the technology is versus a noninfringing

20   alternative.  The reason I raised this on the 7th is what I

21   don't want to have happen is us put that in in our damages

22   opposition to Whirlpool's case, and then Whirlpool start an

23   infringement case saying, well, it's not a noninfringing

24   alternative at that time.

25   So totally apart from the DJ issues, this is

1    evidence that we feel should come in on the damages for the

2    existing case.

3         If it's going to come in on that, it makes

4    little sense to require us to file a separate lawsuit, joint

5    issue, and start a whole other proceeding going down this

6    parallel path on that design, when it is going to be

7    involved in this case and the jury will hopefully hear about

8    it anyway.

9         THE COURT:  I will let you continue, and Mr.

10   Partridge is obviously able to speak for himself.  You say

11   it's going to be in the case anyway.  But after, perhaps,

12   assuming I were willing to permit this, what might be a

13   considerable amount of additional work, I am just wondering,

14   are we going to need to engage in additional claim

15   construction?

16        MR. COYNE:  Your Honor, we certainly don't feel

17   additional claim construction is needed.  The term augur is

18   in the claim.  It is in the patent.  Whirlpool didn't ask

19   for a construction of it before.  The term ice-crushing

20   blade is in the patent.

21        THE COURT:  Is there possibly a good reason for

22   why Whirlpool did not ask the Court to construe auger before

23   because the redesign bend was not an issue at the time?

24   Could that be the case?

25        MR. COYNE:  Your Honor, I don't know what their

1   position is going to be.  It's been in the case all along.

2   The bottom line is, it has a very well-accepted engineering

3   meaning.

4                  THE COURT:  Auger?

5                  MR. COYNE:  Yes, Your Honor.

6                  THE COURT:  Well accepted, okay.

7                  MR. COYNE:  Okay, Your Honor.

8                  A machine for moving material in an apfield

9   (phonetic) direction.

10                  THE COURT:  Are you talking about plain and

11   ordinary meaning there, counsel?

12                  MR. COYNE:  I actually am.  But at the end of

13   the day, if we are precluded from putting in the

14   noninfringing alternative, Your Honor, that ends up being

15   extremely prejudicial to LG.  The bottom line is any

16   licensee facing these issues would be entitled to come up

17   with a noninfringing alternative.  We feel that we have.

18   What I don't want to do is start a whole separate trial on

19   infringement in Stage 4 or 5 of this case.

20                  THE COURT:  Isn't that just the question?  Have

21   you actually come up with a noninfringing alternative?

22   Because if you have, then perhaps there wouldn't be a

23   question as to your entitlement to have the bin included,

24   the redesign.

25                  MR. COYNE:  Your Honor, we feel that we have.

1      The terms auger and ice-crushing blade are two separate

2      structural limitations of this patent.  And we went back,

3      after Your Honor's claim construction, after the ITC's

4      review decision, and we have designed this anew and we have

5      eliminated that part.  We have actually taken out about 19

6      parts from the bin.  It saves about $80 in cost, and

7      improves the reliability of the product tremendously.

8                The bottom line is, this design, as Your Honor

9      asked about in January, when is this finalized?  Well, it

10     was finalized in December.  And it is the same design that

11     we showed them back in September.  We are, in fact, engaging

12     in production of that design.  The units have been shipped

13     to Sears in the United States for tests.  Units have been

14     shipped to my office.  Is there alleged active infringement?

15     Yes, importation has been made of these products.

16                And it is a product that we are now in

17     production.  We are getting ready to start production, and

18     the product will be released to market.  The best estimate I

19     have right now from the client is March-April of this year.

20                So it is real, and it is happening.  And it

21     would be, we feel, very highly prejudicial to us to preclude

22     us from showing that the cost of a noninfringing alternative

23     is very low.

24                THE COURT:  Go ahead, Mr. Partridge.

25                MR. PARTRIDGE:  Yes, Your Honor.  I actually had

1   asked Ms. Woodall to argue this.  Let me say a few things up

2   front.  It actually may end the argument.

3          First of all, we don't agree that it's a

4   noninfringing alternative, that, in fact, had we had notice

5   of this prior to the claim construction process, we would

6   have requested a construction of the term auger because we

7   think that that would be relevant to applying the claims to

8   this particular device.

9          But they waited until the end of discovery and,

10  in fact, any discovery we really had of this thing didn't

11  occur until a couple of months after close of fact

12  discovery.  This has been a changing situation over time.

13  And we are still at the point where they are running tests

14  on this.

15         What we have is de minimis importation, which

16  apparently has occurred very recently.  And indeed, the fact

17  that we would accuse this of infringement based -- actually,

18  at this point, Your Honor, I don't know that there has been

19  infringing activity, meaning to what extent there has been

20  actual importation, offers for sale, and the like.  But

21  apart from whether there is infringing activity, and if you

22  just look at here are the claims, do they describe this

23  design which they have provided to us?  Our answer to that

24  question is yes, in our view, the claims do describe that

25  design.

1              And what that then means is that their damages

2      expert has to assume, one of the assumptions a damage expert

3      has to make is to assume that the party's contention as to

4      what infringes does, in fact, infringe, which thereby

5      eliminates it as a noninfringing alternative.  So this is a

6      very circular argument by Mr. Coyne, using damages as an

7      avenue to try to get a redesign into the case, which they

8      came up with too late and for which there has been an

9      inadequate amount of discovery.  We are just not in a

10     position to go forward with trying this issue at this

11     juncture.

12              THE COURT:  Did you want your colleague to weigh

13     in on this as well, Mr. Partridge?

14              MR. PARTRIDGE:  Amanda, did I misstate or

15     incompletely argue the issue?

16              MS. WOODALL:  No.  That is precisely the issue.

17     There is a great deal of circularity with respect to LG's

18     position on this.  Implicit in any jury determination

19     finding, the noninfringing, alleged noninfringing

20     alternative to be viable and therefore a limitation on

21     damages would be a pronouncement on infringement.  And it

22     would open up a can of worms and a sideshow where we would

23     need the opportunity to say, yes, it does infringe for these

24     reasons, which brings it into the case fully .

25              I would note, as we raised in a footnote in our

briefing, Your Honor, that there are other issues that LG

has not yet are addressed regarding the admission of the

alleged design-around.  These do not necessarily deal with

the DG claim that is at issue now, but they are real.  There

are evidentiary requirements to getting a redesign in, a

noninfringing alternative.  It's not just three or four

years of after the hypothetical negotiation, what can you

do.  That is not permissible under binding case law.

They have a number of hurdles other than whether

or not this is an actual redesign that we would accuse or

not to getting it into the case as a redesign.

Acceptability in the marketplace, they have to

put on evidence of that.  They have to show that they would

have been able to do this at the time of the hypothetical

negotiation, not in 2010.  Those are just two of the issues

that are still outstanding, apart from the justiciability

and putting at issue infringement of something that has not

been accused and for which there has not been a claim

construction, really, on auger.

THE COURT:  Thank you, counsel.

Mr. Partridge and your co-counsel there, did you

want to comment at all, you will recall -- and I will give,

of course, LG a chance to respond -- I believe I expressed

some concern at the pretrial conference that the request

that we are considering right now was based in large measure

1    on attorney argument and I didn't have any declarations or

2    sworn testimony or anything like that to support the

3    underlying contentions by the lawyers.  And I think I have a

4    deposition that has been offered by LG.  Did you want to

5    talk about that tall?  Mr. Partridge?

6             MR. PARTRIDGE:  Your Honor, that is a

7    deposition -- here is what happened.

8             You know, at the hearing, there was discussion

9    about making a witness available.  I expressed concern about

10   the fact that there had been attorney argument on this.  And

11   the response was, well, we would make a witness available.

12   What happened then is that they filed a response, a timely

13   response, in accordance with the order you entered at the

14   pretrial conference, but they ended up including no

15   declaration.

16            So the response they submitted to you was all

17   attorney argument.  And we expected they were going to give

18   us a declaration so we knew what their position was.  They

19   gave us no evidence.  And thereafter we said, well, gee, we

20   are not going to go take a deposition after the fact, to

21   allow them somehow to try to introduce evidence after they

22   had filed their paper when they had not introduced any

23   evidence before.

24            So we told them we don't need the deposition

25   because you apparently have decided to rely on attorney

1     argument again.

2             So we told them we don't.  We don't need the

3     deposition.

4             What they do is take a self-serving deposition

5     of their own, in which they asked a few questions and the

6     witness went on for pages in a narrative, which they have

7     now provided to you as so-called evidence in support of

8     their position.

9             THE COURT:  Okay.  Thank you.

10           Mr. Coyne.

11           MR. COYNE:  Yes, Your Honor.

12           I would respectfully disagree with Mr.

13     Partridge's characterization.  We provided the Court a

14     number of exhibits attached to our brief.  What happened

15     after Your Honor's conference is they demanded a deponent.

16     And we brought one over from Korea, prepared to tell them

17     exactly what the status of the development work was.  He

18     arrived here on Friday morning.  And we received notice from

19     Whirlpool Friday midday after the gentleman had already come

20     to the United States for the deposition that the they

21     requested, that they had decided to cancel it.

22           We did in our papers provide evidence.  Mr.

23     Partridge is simply incorrect.  We gave the Court a number

24     of exhibits.  Frankly, Your Honor, most of the those

25     exhibits are also on the exhibit list, detailing what has

1  been done.

2  There is evidence in the record at this point of

3  what LG has been doing and that those documents reflect that

4  that design was finalized in December.

5  Whirlpool, sensing that this was not going to be

6  helpful to their cause, decided to cancel the deposition

7  anyway.  The gentleman was here, he was prepared to testify,

8  so the court reporter was brought in and we simply had him

9  make a statement.

10  We did provide in the brief that we provided

11  Your Honor evidence.  It is not just attorney argument.

12  Whirlpool is simply trying to play games and

13  evade this by canceling a deposition that they knew was

14  going to hurt them.

15  The design is finalized.  It is proceeding.  It

16  has been transferred down to the plant at Chawon back in

17  December, and LG is going forward with it.

18  So in terms of the issue about is it ripe,

19  absolutely.  That is the product design that we are making.

20  THE COURT:  You have to keep in mind, Mr. Coyne,

21  let's assume all that is correct, and I take you at your

22  word as an officer of this Court, both of you, there is a

23  process in which LG was engaged and it's called litigation

24  in front of a Federal Judge.

25  There was a well-ordered process put in place to

1    lead us up to a trial.  Now, you correct me if I am wrong.

2    It wouldn't be the first time I was, Mr. Coyne.  My

3    recollection is the first time I heard of this design-around

4    issue was at the final pretrial conference.  Is that

5    correct?

6              MR. COYNE:  Your Honor, I don't know if that is

7    the first time the Court heard.

8              THE COURT:  Obviously, I am not asking you to

9    get inside my head.  Would that not have been the first time

10   that I would have been able to understand that there was

11   that issue?

12             MR. COYNE:  I don't know whether we filed

13   anything with the Court with respect to the depositions back

14   in September or not.

15             THE COURT:  You know I am not going to read

16   those filings.  You know that.  Right?  You are talking

17   about deposition notices?

18             Mr. Partridge, do you have a recollection?

19             MR. PARTRIDGE:  Your Honor, I think that the

20   discovery that was taken in the fall that Mr. Coyne is

21   referencing was done by agreement of the parties.  I don't

22   remember the couple of discovery calls we had with you well

23   enough to say that this issue absolutely didn't come up --

24             THE COURT:  Mr. Partridge, that would have been

25   after discovery had concluded.  Right?

1           MR. PARTRIDGE:  That's correct.  I believe the

2    answer is that the first time this was brought to your

3    attention in a way in which you would have been alert to the

4    issues that we are really discussing here today would have

5    been the pretrial conference.

6           You know, Judge, in looking at their responsive

7    papers, what they gave us was an argument, and attached

8    Korean language exhibits, and that was it.  There might have

9    been a couple other drawings and things that we could

10   decipher from that.

11          And I think a day or two later they gave us

12   translations of the Korean exhibits and I think filed a

13   supplement with you.  This happened on a Thursday.  I

14   remember this well, because on Friday we looked at their

15   paper and said, why on earth should we take a deposition on

16   Monday when they haven't even, other than attorney argument,

17   established that there has been any infringing activity in

18   the United States?

19          So we immediately contacted them and said, we

20   don't need the deposition for purposes of this motion.  Then

21   the following Monday, they went ahead and did this narrative

22   with the witness and then submitted another paper to you.

23   There was supposed to be one submission.  That was very

24   clear:  You have one shot at this, submit a ten-page brief

25   and that was it.  We would do a response, ten pages, and

1    that was it.  There was to be no reply.

2            So we looked on Friday morning at what they had

3    submitted, and there was no evidence of any infringing

4    activity.  So that even if at that point in time we had

5    decided as the holder of the patent that we wanted to sue

6    them for something, we had no basis, no reasonable belief

7    that there was infringing activity other than inferring,

8    perhaps, some de minimis test or something that might have

9    been done on this thing.  That is the position we were in.

10   I guess it was about a week and a half after the pretrial

11   conference.

12           THE COURT:  Okay.  Mr. Coyne, I am going to deny

13   the request.  It seems to me that I am still at sea to a

14   large degree as to the minimum requirements of sufficient

15   immediacy and reality and whether there has, in fact, been

16   meaningful time to conduct potentially meaningful activity

17   and activity is ongoing.  In spite of your well taken -- you

18   are an officer of the Court and I accept your word, but this

19   is a Court of law, but the evidence does not persuade me

20   that in point of fact you are right.

21           Moreover, there is a process issue here, Mr.

22   Coyne.  This Court is going to vindicate and protect its

23   process.  As far as I am concerned -- this is not intended

24   to be critical or unfair, Mr. Coyne.  But I believe that LG

25   has violated this Court's process.  And I am going to

1    exercise my discretion to protect it.

2                This is way late in the game, the litigation

3    process for this matter to be raised in the manner in which

4    it has been.

5                I agree with the characterization by Whirlpool

6    that the deposition is at best suspect.  And therefore I am

7    rejecting your spin on it, if you will, and the reasons that

8    Whirlpool did not participate in it.

9                So for those and other reasons that have been

10   articulated already, I am going to deny your request that

11   the redesign be included in this case as a declaratory

12   judgment issue.  All right?

13               Are there other issues we need to talk about?

14               MR. COYNE:  Your Honor, just clarification.  Is

15   Your Honor also excluding it with respect to the damages

16   issue issues?

17               THE COURT:  It is out entirely, Mr. Coyne.

18               MR. PARTRIDGE:  Your Honor, we have a couple of

19   very brief issues I would like to raise with you.

20               THE COURT:  Mr. Coyne, in part, you might view

21   it as a sanction, I am not going to reward this kind of

22   conduct -- I do agree with Mr. Partridge's characterization

23   that it's an attempt at an end run, essentially.  But also I

24   am not going to avoid this kind of conduct in my Court.

25               Okay?  Anything further you want to ask me on

1    that?

2              MR. COYNE:  No, Your Honor.  Thank you.

3              THE COURT:  Go ahead, Mr. Partridge.

4              MR. PARTRIDGE:  I think these are simple issues,

5    Your Honor.

6              We have three refrigerators we would like to

7    bring into the courtroom at various times.

8              THE COURT:  Sure.

9              MR. PARTRIDGE:  Not all at once.  We are going

10   to try to stage this, because they are big.  Is that going

11   to be permissible for us to do that?  Obviously, it's like

12   the refrigerator in your kitchen, it's that size.

13             THE COURT:  I have had jet engines in the

14   courtroom, Mr. Partridge, if you can believe it.

15             If you can, if you would be kind enough to be in

16   touch with Ms. Walker, she is out today, but you will need

17   to make arrangements to -- I am assuming there is no

18   objection from LG on this.

19             MR. COYNE:  Your Honor, we would actually ask

20   for leave to bring the same type of evidence in the

21   courtroom.

22             THE COURT:  Then the parties will need to

23   coordinate between yourselves and with the Court.  Ms.

24   Walker is your touchstone there.  And you will have to make

25   arrangements to get them over the bar, which can be done, I

1    have seen it done with jet engines, as I said.

2            MR. PARTRIDGE:  Your Honor, a couple of

3    procedural matters.  Mr. Coyne and I have reached a

4    substantial agreement on protocols for identifying

5    witnesses, exhibits, demonstratives and the like.  We have

6    agreed pretty much on the order of proof and the like and

7    will probably reduce all that to writing shortly.  But there

8    are a couple of things that are still hanging out there.

9    The first of which is that I am concerned about the scope of

10   rebuttal, and want to make sure that we have true rebuttal,

11   and that, in fact -- initially I proposed to Mr. Coyne that

12   there ought not to be rebuttal except for good cause shown.

13   I am not pushing the envelope that far.  But I would just

14   ask that you tell us what your expectations are with respect

15   to rebuttal and whatever you say we will live with.  What I

16   don't want is for evidence to be held back and used on

17   rebuttal.

18           THE COURT:  Yes.  You know, Mr. Partridge, you

19   may know reputationally or from actual experience with me, I

20   usually don't micromanage that issue.  If I, however, am

21   confronted with a claim by an opposing party that things are

22   being done improperly for tactical reasons or strategic

23   reasons, as a litigation tactic, that is, I do mean that in

24   a pejorative sense, then I will respond to an appropriate

25   request for exclusion.  I hesitate to try to address this at

1 this time because I am not exactly sure what I am

2 addressing, being asked to do.

3   MR. PARTRIDGE:  I understand, Your Honor.  I

4 think that provides us with enough guidance at this

5 juncture.  I appreciate that.

6   Another issue concerns demonstratives.  We have

7 worked out an arrangement for demonstratives, an exchange of

8 demonstratives, to be used on direct and for openings.

9 That's all going to be worked out I think just fine.

10   The one issue that we haven't reached agreement

11 on concerns demonstratives that might be used for cross.  My

12 experience with demonstratives for cross is that they rarely

13 raise evidentiary objections because most of the time your

14 witnesses, they mostly involve experts, but most of the time

15 your witnesses are prepared to deal with most anything by

16 the time they take the stand.

17   To the extent that there are any minor issues

18 that arise in connection with cross-demonstratives, they can

19 be handled in realtime.  I don't want to have to exchange

20 cross-demonstratives, thereby laying out what the cross is

21 in a case.  Just as I wouldn't want to have to give the

22 other side my cross outline, I wouldn't want to give the

23 other side my cross-demonstrative.  And Mr. Coyne and I

24 haven't reached agreement on that.

25   THE COURT:  Let me help you.  I agree with you.

1    Neither party will have to share its cross-demonstratives in

2    advance.   To the extent there are issues that they raise, if

3    we need to, we will dismiss the jury and deal with it at

4    sidebar.

5              MR. PARTRIDGE:   Great.   Two other issues, Your

6    Honor, briefly.   One concerns trial time.   We filed, Mr.

7    Coyne and I have worked out an agreement as of yesterday to

8    drop two more patents, one on each side.

9              THE COURT:   I think I saw that stipulation.

10             MR. PARTRIDGE:   This morning Mr. Coyne

11   proposed -- Patrick, is it okay if I reveal this?   I don't

12   want to reveal something that you communicated to me

13   prematurely.   I am talking about the '922.

14             MR. COYNE:   I would be happy to reveal it.

15             Your Honor, we have one stipulation that is

16   awaiting your signature from yesterday.   We are also trying

17   to narrow our case to get this into a condition where it can

18   be more readily tried.

19             We are willing to drop two more claims of the

20   '121 patent, leaving us with three claims of the '121.   And

21   we are willing to unilaterally drop, I have offered to Mr.

22   Partridge the same type of stipulation we have done on the

23   other four patents for one additional patent that LG is

24   willing to drop.   And we are not asking for anything in

25   return.

<pre>
 1              MR. PARTRIDGE:  Your Honor, I haven't had an

 2     opportunity to discuss that with my clients this morning.

 3     But we could be in a situation where we have one LG patent

 4     and two Whirlpool patents.  If, in fact, that is the case,

 5     and I would say that is likely the case, I think my client

 6     is likely to agree to Mr. Coyne's proposal this morning.  We

 7     are at a ten-day time for trial.  I have been very concerned

 8     about having the jury have to wait over a weekend before

 9     being able to deliberate.  My view would be we could

10     probably do this in eight days at the most.

11              THE COURT:  At the most.  Given this

12     considerable reduction in the number of patents and asserted

13     claims, yes.

14              Mr. Coyne, what is your view?

15              MR. COYNE:  We were going to suggest, Your Honor

16     took off two days for dropping off the other two patents, I

17     guess my assumption would be we are down to a seven-day

18     trial.

19              THE COURT:  I am equally comfortable with that,

20     quite frankly.

21              MR. PARTRIDGE:  We can make that work, Your

22     Honor.

23              THE COURT:  Let's doing seven.

24              MR. COYNE:  Your Honor, one other issue.  In

25     terms of the timing of the trial, what would Your Honor want
</pre>

1    to do if we are shortening this up and freeing up some more

2    of the Court's time?  Do you want to still start on the 1st?

3    What was Your Honor's preference in terms of the staging?

4                   MR. PARTRIDGE:  We would like to start out on

5    the 1st.  We made lots of arrangements with witnesses.  It

6    would be very difficult for us to start shuffling the deck.

7                   THE COURT:  If the parties have planned for a

8    start date of the first of the month, let's just keep it

9    there.

10                   MR. PARTRIDGE:  Thank you, Your Honor.

11                   THE COURT:  Let's plan on, counsel, meeting in

12   the morning on the first day of trial at 8:30.

13                   I am going to -- unless you tell us otherwise,

14   and that will be fine with us, I am going to assume there

15   may be some issues we may need to address.  If that is not

16   the case, would you just let us know by leaving -- we are

17   starting on a Monday or Tuesday?

18                   MR. PARTRIDGE:  On a Monday, Your Honor.

19                   THE COURT:  Just leaves a voice mail on the main

20   number -- better yet, leave a voice meal for Ms. Walker on

21   the 573-6471 exchange and let her know whether we need an

22   8:30 meeting or whether we can convene at 9:00.  On the

23   first day, the venire won't be brought up until about 9:30.

24   It takes them that long to receive their instructions and

25   get organized and get up here.  By your coming over at 9:00,

1    unless we need to convene earlier, you will have the chance

2    to meet with Ms. Walker and Ms. McDavid and get the last or

3    most recent iteration of the jury list and report as to who

4    has not appeared, because as you know, you can get the list

5    three days before that Monday, probably Wednesday, the week

6    before, from Mr. Trickey.  But that won't be the final list.

7                    MR. PARTRIDGE:  Okay.  I think that will work,

8    Your Honor.  It's possible there could be some exhibits and

9    issues that we will want to discuss for openings that arise

10   over the weekend.  Mr. Coyne and I have agreed that I think

11   it's on Saturday evening we are going to identify exhibits

12   and demonstratives and the like.

13                    So hopefully that's more than sufficient time on

14   Monday morning to address any issues that we are unable to

15   resolve.

16                    THE COURT:  You mean the 8:30 hour.

17                    MR. PARTRIDGE:  Yes.

18                    THE COURT:  Again, if you don't need us, let us

19   know.

20                    MR. PARTRIDGE:  Will do.

21                    THE COURT:  All right.  Other issues?

22                    MR. COYNE:  Yes, Your Honor.  There is another

23   issue.  We have an issue of subpoenas.  We talked about the

24   deposition designations on the 7th of January.  I had

25   indicated that we would like to get these witnesses here

1  live.  Whirlpool has subpoenaed two of LG's witnesses,

2  frankly, people we are bringing anyway.  But they are

3  outside the subpoena power of the Court.  One hasn't even

4  been served yet.  But we have also subpoenaed Whirlpool's

5  witnesses, including its corporate representative witnesses,

6  and several of -- at least one of its officers.

7            We served those subpoenas on local counsel

8  because Whirlpool has told us all along, contact their

9  witnesses through Whirlpool's counsel.

10            Whirlpool is now objecting to all of those.

11            We would like some guidance on, we would feel it

12  appropriate that Whirlpool needs to bring its corporate

13  representatives and officers at a minimum.  They are people

14  that are under their control.  They have testified in the

15  case as corporate representatives before.  And we would like

16  to do that testimony live rather than read deposition

17  transcripts or play videotapes.

18            THE COURT:  Yes.  Very experienced trial lawyers

19  on this line on both sides.  You got to know the jury hates

20  deposition readings.  I loathe them.

21            MR. COTTRELL:  Your Honor, maybe I can cut

22  through this.  I will address this issue.  I think the

23  answer lies with Your Honor's practice in other trials that

24  I have had before the Court, and consistent with Rule 45.

25  They sent over seven or eight trial subpoenas for current

1    non-officer employees of Whirlpool and they want those folks

2    to appear live in their case of in chief.  We objected and

3    said, look, you have options A or B.  A would be, if they

4    are called in Whirlpool's case, because they are Whirlpool

5    employees, you can ask your questions at that time, or

6    Option B would be if they don't show up at trial you can

7    play the videotape of their deposition.

8            We thought that was consistent with Rule 45's

9    hundred-mile rule and also other cases we have with the

10   Court.

11           THE COURT:  It is.

12           Who wants to respond to this from the other

13   side?

14           MR. HERRMANN:  Your Honor, I suppose I should

15   respond, because Mr. Cottrell and I had some discussion on

16   this before we filed the subpoenas, or served the subpoenas.

17           We were trying to work out an arrangement where

18   we wouldn't have to serve people individually, after

19   Whirlpool had served one of our people outside the 130-mile

20   radius individually.  And we sent them over a list.  They

21   told us that since they are not officers, even though they

22   are high-level employees, that they would object, so we

23   served them.

24           It truly does not make any sense for the jury to

25   have to hear the depositions.  The only other alternative we

1    have would be to serve them in their particular district and

2    have them appear at a video teleconference facility, and

3    then the jury to have to hear video teleconferences, which

4    we think will add time to the trial and not be nearly as

5    good as having these people live.

6            It is within the discretion of the Court.  They

7    are Whirlpool employees.  As a matter of fact, the

8    objections were pro forma objections that were filed by

9    Whirlpool, to the extent they are outside the radius, to the

10   extent they are not officers.  And there weren't any

11   specific objections that were brought to our attention as to

12   any particular one, whether it be inconvenience, except for

13   one.  And one is an officer, Mr. Marcey (phonetic), who

14   happens, coincidentally, to, we were told after we

15   subpoenaed Whirlpool, that he was no longer going to be an

16   officer or an employee of Whirlpool the day before trial.

17   And we would like him as well as the others, Your Honor.

18           THE COURT:  I am sort of feeling there are two

19   ships passing by one another in the night here.  Is it not,

20   Mr. Herrmann, is Mr. Cottrell's proposal unacceptable?

21           MR. HERRMANN:  It is, Your Honor.  We don't know

22   whether those people will be live.

23           THE COURT:  I thought he said they would be.

24           Mr. Cottrell?

25           MR. COTTRELL:  Your Honor, to the extent that

1       Whirlpool calls them live, then Mr. Herrmann and Mr. Coyne

2       can ask them the questions they have.

3                    To the extent they are not called live, then

4       they have the depositions they can read in.  And we think

5       it's certainly consistent with what Your Honor has done

6       before.

7                    I suppose if they have a concern about, well, we

8       don't want to close our case until we can ask the questions,

9       live, then we can keep the case open, if we do call that

10      witness, and they can ask their questions live.

11                   THE COURT:  Mr. Herrmann.

12                   MR. HERRMANN:  Consequently, Judge, since they

13      are not telling us whether they are calling these people, we

14      run --

15                   THE COURT:  I got you.  Hold on a second.

16                   Mr. Cottrell, are you not able to tell.

17                   MR. COTTRELL:  I am going to have to ask for a

18      little help from Mr. Partridge, Your Honor, about these

19      seven or eight folks, whether they are -- I don't have the

20      pretrial with me -- whether they are on the may-call or

21      will-call list.

22                   THE COURT:  Mr. Partridge.

23                   MR. PARTRIDGE:  Your Honor, this may end up

24      changing as a consequence of the dropping of the patents

25      that have occurred in the last day and again this morning.

1    But there are two or three of them.  I don't have that list

2    right in front of me at the moment, those that we are going

3    to call live.  There are some that we aren't.

4                These are all engineers.  None of them are

5    officers.  They live in Iowa.  They live in Michigan.  They

6    are in various places.  They have all been deposed.

7                Mr. Marcy, who was the only one in the group who

8    is an officer, and we had told them we would accept the

9    trial subpoena for him because he was an officer.

10                A week later we found out that he was leaving

11   the company, and that his departure date would be the last

12   day of the month of February.  And they did depose him, so

13   they have the deposition there.

14                I am not sure how I can actually be authorized

15   to accept a subpoena for somebody who won't even be employed

16   by us at the time of trial, who was a former, as of that

17   point in time will have been a former officer.  But I don't

18   think I have even the authority to do that on his behalf.

19                So I am willing to tell them which ones we

20   intend to bring to trial, and can give them a list of those.

21                I think it's three out of the group of six or

22   seven, whatever the number was.

23                But I would have to revisit that in light of the

24   dropping of the patents that occurred today and yesterday.

25                THE COURT:  Messrs. Cottrell and Herrmann, is

1    this a matter that I can safely leave for the guidance of

2    Delaware counsel to work out?

3            MR. COTTRELL:  Your Honor, I would be happy to

4    consult with Mr. Herrmann man on this.  After Mr. Partridge

5    and I discuss these witnesses in light of the claims, we can

6    get back to Mr. Herrmann.

7            THE COURT:  Mr. Herrmann.

8            MR. HERRMANN:  Your Honor, in light of the fact

9    that we were unable to deal with it before this conference,

10   I am not hopeful that we will be able to resolve the issue

11   after the conference.

12           If Your Honor does not require Whirlpool to

13   provide these people live at trial, may LG have permission

14   to set up video teleconferencing equipment in the courtroom

15   so we can subpoena them within a hundred miles of their

16   district and have them live through video teleconferencing?

17           THE COURT:  Sure, you can, Mr. Herrmann, if that

18   is the only way to resolve the issue.  I hope that it can be

19   resolved otherwise.  But at least that would provide some

20   measure of relief.

21           MR. HERRMANN:  Thank you, Your Honor.

22           THE COURT:  Anything else, counsel?

23           MR. PARTRIDGE:  Nothing from us, Your Honor.

24           THE COURT:  Mr. Coyne?

25           MR. COYNE:  No, Your Honor.  I think that covers

1    everything we had.

2                   THE COURT:   We will see you along the way.

3                   (Counsel respond "Thank you.")

4                   (Conference concluded at 10:57 a.m.)

5

6                              -  -  -

7    Reporter:   Kevin Maurer

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25