1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              -   -   -

4       LG ELECTRONICS U.S.A., INC.,      :    Civil Action
        and LG ELECTRONICS, INC.,         :
5                                         :
                    Plaintiffs,           :
6                                         :
             v.                           :
7                                         :
        WHIRLPOOL CORPORATION,            :
8                                         :
                    Defendant.            :      08-234(GMS)
9       ─────────────────────────────────

10      WHIRLPOOL CORPORATION,            :
        WHIRLPOOL PATENTS COMPANY,        :
11      WHIRLPOOL MANUFACTURING           :
        CORPORATION, and MAYTAG           :
12      CORPORATION,                      :
                                          :
13                  Counterclaim          :
                    Plaintiffs,           :
14                                        :
             v.                           :
15                                        :
        LG ELECTRONICS U.S.A., INC.,      :
16      LG ELECTRONICS, INC., and LG      :
        ELECTRONICS MONTERREY MEXICO,     :
17      S.A., DE, CV,                     :
                                          :
18                  Counterclaim          :
                    Defendants.           :
19                             -   -   -

20                         Wilmington, Delaware
21                        Monday, March 1, 2010
                               8:45 a.m.
22                          Trial - Day One

23                             -   -   -

24      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
                                          and a Jury
25

```
 1    APPEARANCES:

 2             RICHARD K. HERRMANN, ESQ.
               Morris James
 3                      -and-
               PATRICK J. COYNE, ESQ.,
 4             ANAND K. SHARMA, ESQ.,
               JEFFREY W. ABRAHAM, ESQ., and
 5             WALTER D. DAVIS, JR., ESQ.
               Finnegan, Henderson, Farabow,
 6             Garrett & Dunner, L.L.P
               (Washington, D.C.)
 7
                          Counsel for Plaintiffs and
 8                        Counterclaim Defendant

 9             FREDERICK L. COTTRELL, III, ESQ., and
               ANNE SHEA GAZA, ESQ.
10             Richards, Layton & Finger, P.A.
                        -and-
11             SCOTT F. PARTRIDGE, ESQ.,
               PAUL R. MORICO, ESQ.,
12             AMANDA M. WOODALL, ESQ.,
               GENE SPEARS, ESQ.
13             Baker Botts L.L.P.
               (Houston, TX)
14
                          Counsel for Defendant and
15                        Counterclaim Plaintiffs

16                        -   -   -

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  Good morning, counsel.

 2              (Counsel respond "Good morning, Your Honor.")

 3              THE COURT:  Let's start out with a round of

 4    reintroductions, if we could, with Delaware counsel.  Mr.

 5    Herrmann.

 6              MR. HERRMANN:  Good morning.  Your Honor, on

 7    behalf of plaintiff, I would like to reintroduce Patrick

 8    Coyne and Anand Sharma.

 9              THE COURT:  Is there anyone else?

10              MR. HERRMANN:  Jeff Abrams and Wally Davis.

11              THE COURT:  Good morning, Mr. Davis.

12              All right, Mr. Cottrell.

13              MR. COTTRELL:  Good morning, Your Honor.  Fred

14    Cottrell for Whirlpool.  Of course with me at counsel table

15    is Mr. Scott Partridge and Mr. Rob Conklin, who is going to

16    assist us with the jury selection.

17              THE COURT:  Okay.  Who wants to go first?  I

18    understand we have some issues.

19              MR. COYNE:  Yes, Your Honor.  We have a couple

20    of issues that we need guidance on, and we have a couple of

21    issues that we are still trying to work through.  We want to

22    give you a fair warning we may be bothering you during the

23    trial with them.

24              THE COURT:  That's what I get paid for, to be

25    bothered.
```

```
 1                  MR. COYNE:  Hopefully it won't be too much of a

 2     bother.  I don't think we talked about on the 7th the

 3     sequestration of fact witnesses.  And we have discussed it

 4     and we have agreed to sequester the fact witnesses.

 5                  THE COURT:  I would probably order it if you

 6     didn't.  So ordered.

 7                  MR. COYNE:  We would like the experts to hear

 8     the testimony.  Just more efficient.

 9                  THE COURT:  I don't see how they would not be

10     able to.  Do you agree with that, Mr. Partridge?

11                  MR. PARTRIDGE:  Yes, Your Honor.  There is one

12     exception that Mr. Coyne and I have agreed to with respect

13     to our associate general counsel, who will briefly be a

14     witness.  And Mr. Coyne has agreed that he may remain in the

15     courtroom.

16                  THE COURT:  That is fine with the Court.

17                  MR. COYNE:  That is Mr. Schwyn.  We do not have

18     a problem.  He is an attorney, Your Honor, and that's

19     certainly fine.

20                  The second issue, Your Honor, is this whole

21     Energy Star certification.  We have dropped -- Your Honor

22     dismissed the claim, actually, and we have made it clear

23     that we are not relying on that, anything at this point in

24     the jury trial.  If it comes up at all, it will come up only

25     before Your Honor in the Bench stage of the trial.
```

1              We have had issues, we have agreed to a protocol

2       that Your Honor had suggested.  I think, Your Honor, we have

3       submitted that, too, to the Court.

4              THE COURT:  I think I signed the stipulation.

5              MR. COYNE:  I must admit, Your Honor, I think

6       you did, but I have lost track.

7              In any event, we have been exchanging the

8       exhibits and the demonstratives pursuant to that protocol.

9              One of the issues I wanted to flag for you,

10      because it may come up is whether -- if any of the documents

11      that are being used with the witnesses have Energy Star in

12      it or discussions of Energy Star, both companies' products,

13      both companies have products that are certified.  An issue

14      may come up about whether that opens the door.  I will

15      freely agree, if we come up and put a witness on the stand

16      and he says rah, rah, we are Energy Star-certified and it's

17      a big deal in their false advertising, I have opened the

18      door, no question.  That's not the issue.  The issue is

19      whether, if we use with a fact witness on another topic a

20      document that happens to have Energy Star logos or

21      discussions of the Energy Star Program in the document, and

22      we are not emphasizing that, we may not even be pointing the

23      witness to the same page, whether that is going to open the

24      door for Whirlpool to come in and make arguments continuing

25      with the issues that we feel are out of the case.  We are

1     still talking about it.  We have made some progress on it

2     last night and this morning.  But I expect this may be an

3     issue that we will require Your Honor's guidance on and it

4     may require a sidebar.  I wanted to lay that out.  I don't

5     know if Mr. Partridge has anything to add on that point.

6                    MR. PARTRIDGE:  I do, Your Honor, briefly.  I do

7     think it is an issue we can pretty much deal with in

8     realtime.

9                    For example, one of the demonstratives that Mr.

10    Coyne wants to use today, I think it's with his first

11    witness, had some Energy Star logos at the bottom of the

12    document.  We kicked that around, and we decided that since

13    they aren't going to emphasize that issue with that

14    particular witness and the logos just happen to appear, we

15    said okay with that one.  I think we should deal with these

16    documents, demonstratives and exhibits as they come up.

17    Hopefully, we can resolve the issues.

18                    The issue really is, as you know, the unclean

19    hands issue they have raised, the defense to which has to do

20    with our argument that ███████████████████████████

21    ████████████████████████  There is a dispute about all

22    of that.  This has to do with LG 's Energy Star issues.

23                    THE COURT:  Thank you.

24                    MR. COYNE:  Your Honor, I don't think it is

25    going to come up until Young Ho Noh's testimony, even if

1    then.  We can get through the opening and get through Mr.

2    Taylor's testimony before the issue will likely arise.

3                    THE COURT:  All right.

4                    MR. COYNE:  Your Honor, Your Honor ruled on the

5    17th that we may not use the ITC rulings in the case.  And

6    we would like to submit to the Court a proffer of the

7    evidence that we would use on that issue, so that we can

8    make a record.

9                    MR. HERRMANN:  We can e-file it with the Court.

10                   THE COURT:  Can we do that?

11                   MR. COYNE:  Absolutely, Your Honor.

12                   MR. PARTRIDGE:  That is fine, Your Honor.  I

13   would like to make one brief comment on a specific point

14   when Mr. Coyne is addressing that issue.

15                   MR. COYNE:  Your Honor, we will be e-filing it.

16   I am finished addressing the issue.

17                   MR. PARTRIDGE:  One of the concerns I have

18   had -- and I think Mr. Coyne and I are in agreement on this

19   following our previous two pretrial conferences, is that I

20   have instructed my team to be very careful about and not

21   mention ITC in anything that we do here.  And even, if, for

22   example, in cross-examining a witness we use for impeachment

23   purposes a deposition that happened to be taken in the ITC

24   proceeding, we are simply going to say, in another matter,

25   is it correct that you testified, you were asked this

1    question and you said so-and-so?

2            So on our side, we are going to do everything we

3    can to not confuse the jury about there being some other

4    action called the ITC action.  I assume, Mr. Coyne, you will

5    be doing the same on your side?

6            MR. COYNE:  Yes, Your Honor.  We understand the

7    ruling, and what I have instructed our team is that you can

8    refer to it, in a deposition that was taken from you on

9    October 19th of 2008, you said X, without identifying the

10   proceeding.

11           THE COURT:  Let me understand what is being

12   e-filed.  Are these documents -- or exhibits?

13           MR. COYNE:  These are the ITC papers that, if

14   Your Honor had permitted, we would have used during the

15   case.

16           THE COURT:  Thank you.  Okay.

17           MR. COYNE:  Thank you, Your Honor.

18           We do have another issue.  That is, a witness

19   was identified, a Mr. Catania.  Your Honor, this issue came

20   up most recently.  On February 12th we received a letter

21   from Whirlpool's counsel, indicating that they wanted to put

22   Mr. Catania back in as a witness.

23           We had this issue come up on January 7 as well.

24   I don't know if Your Honor recalls.

25           THE COURT:  Mr. Coyne, how am I going to recall

1    that?

2                MR. COYNE:  I am sorry, Your Honor.  On the

3    evening of January 6th, we had a supplemental disclosure

4    from Whirlpool, where they attempted to add Mr. Catania.  He

5    was not listed on their pretrial submissions.  And we

6    objected.  And Your Honor ruled at that time that he would

7    not be permitted.

8                Mr. Partridge responded, saying that they do not

9    intend to put Mr. Catania on during the jury trial stage of

10   the case and that perhaps they would use him on the Bench

11   trial stage.  And we left the issue at that.  That our

12   understanding, at least, that he was excluded from the jury

13   trial stage of the case, and if at all, he would be

14   permitted to testify only in the Bench trial stage.

15               On February 12 we received another letter just

16   last week from -- I guess it's two weeks ago now from

17   Whirlpool, indicating that they wanted to substitute Mr.

18   Catania, the same individual, for another witness, Mr.

19   Marcy.

20               We have had discussions about Mr. Marcy.  The

21   reason was that Mr. Marcy was leaving the company effective

22   yesterday.

23               We had intended to call him and we have listed

24   him as a witness.  Mr. Mr. Marcy has voluntarily agreed to

25   appear in this trial.  And we have been trying to work out

the logistics of it.  Whirlpool is insisting that they put

him on in their case-in-chief and we examine him at that

time as if we had called him.

So Mr. Marcy is here.  And he is appearing

voluntarily.  But Whirlpool is bringing him.  Mr. Catania,

with all due respect, Your Honor, is a late hit.  We feel

that it is unfair that we should be forced to deal with Mr.

Catania coming into the jury trial now after Your Honor has

already ruled and after Whirlpool has represented that we

won't be seeing Mr. Catania in the jury trial.

THE COURT:  I certainly, as Mr. Partridge knows,

don't like to revisit rulings previously made without very,

very good reason.

MR. PARTRIDGE:  May I approach, Your Honor?

THE COURT:  Yes.

MR. PARTRIDGE:  This is a letter that I sent to

Mr. Coyne on February 12th or Mr. Morico sent to Mr. Coyne

on February 12th.  What we did in this letter is advise Mr.

Coyne that even though it was confidential, we had heard I

think it was the day before or the day of this letter that

Mr. Marcy, who was a vice president of global technologies

at Whirlpool, was leaving the company.

This was a witness for whom they had served us a

trial subpoena.  Remember, we had that big trial subpoena

issue that we talked about at that last pretrial conference,

1    which you asked the parties to address.  One of those issues

2    involved Mr. Marcy, because we had told them that we had no

3    control over Mr. Marcy as of the date of the subpoena, which

4    was March 1st, because he left the company, joined a company

5    called Bissell Home Products, effective today.  He is a vice

6    president at Bissell Home Products.  He was actually going

7    to be our lead witness to talk about the company corporate

8    structure, background, that sort of thing, and to put the

9    technology that's at issue here in context relative to

10   Whirlpool's innovation strategy.

11            We had no ability to force him to come, except

12   to subpoena for him and have him come to trial.

13            As soon as we were aware of that difficulty, we

14   sent this letter, advising them that in accordance with the

15   statements that actually were made in each other's witness

16   lists that were attached to the pretrial conference order,

17   we both reserved the right to substitute in the event that

18   somebody left the company or wasn't available or something

19   had happened.

20            And that's precisely what we did.  And we did

21   this days before we had our second pretrial conference, at

22   which the issue of Mr. Marcy and his unavailability came up.

23            I guess we had thought that if they had had an

24   issue with this, they would have raised it.  We are not

25   calling Mr. Catania to talk about the unclean-hands issue.

1    The Bench trial issues are the Bench trial issues.  We will

2    not get into any of those issues with him.

3                Mr. Catania is hardly a surprise.  They have

4    deposed him in this case.  He has been known to them for

5    quite some time.

6                This, in our view, is just a simple substitution

7    of a witness who will be addressing the background of the

8    company.  He is a vice president.  So we substituted another

9    vice president for the vice president we intended on

10   calling.

11               While it is true that Mr. Marcy has agreed to

12   come, what happened was that after you asked us to get

13   together and try to resolve the issue of the trial

14   subpoenas, we called Mr. Marcy.  We told him of the problem.

15   In fact, we didn't know at that time that he had another

16   job.  I talked to him.  And he said he was starting his new

17   job today, this morning, at a company that's in upstate

18   Michigan.

19               I asked him if he would be willing to come and

20   appear briefly in the case, because he was requested to come

21   by LG.  He said that he would.  I asked him if he could come

22   at the beginning of trial.  Of course, this is his first day

23   at his new company.  And he agreed to come on Friday.  He

24   will get here Thursday night.  He will appear Friday.  We

25   will still be doing our case as of that point in time.

1              So we will put him on and ask him a few

2      questions, not very much.   And they will have the

3      opportunity to examine him because they are the ones who

4      really wanted him at this trial, and had they not done that,

5      I wouldn't have even bothered him to disrupt his new job the

6      very first week that he is there.

7              So I think this is a substitution of a witness

8      for a departing executive.   We picked an equivalent

9      executive.   And we intentionally picked someone that they

10     had already deposed so that they would have already had a

11     transcript to use in connection with that witness.

12             And had they had a problem with this, I would

13     have thought they would have raised it at the second

14     pretrial conference, when this whole issue of Mr. Marcy

15     arose.

16             I apologize, Your Honor, I didn't specifically

17     raise the issue of Mr. Catania during that pretrial

18     conference, but I thought with our disclosure and the

19     discussion of Mr. Marcy, that if this was really an issue,

20     we would have heard something about it before, I think it

21     was 11:00 last night.

22             THE COURT:   Catania is not going to talk about

23     any of the substantive issues in the case?

24             MR. PARTRIDGE:   No, Your Honor.   What he will do

25     is talk about the history of Whirlpool, he will talk about

1    its approach to technology and innovation and that sort of

2    thing.  He will not be talking about the patents and trying

3    to -- he won't be talking about how the technology in the

4    patents was developed and that sort of thing.  It's a

5    general description of the operation of Whirlpool.

6                    THE COURT:  Thank you, Mr. Partridge.

7                    Mr. Coyne, is that problematic for you?

8                    MR. COYNE:  It is a little, Your Honor, because

9    the approach to technology and innovation in the case is

10   going to be a major theme of both sides and it's not a

11   substitution.  Both Mr. Marcy and Mr. Catania are now

12   appearing.  We have an extra witness.  We feel that it's not

13   appropriate --

14                    THE COURT:  Mr. Coyne, have you deposed this

15   witness, Catania?

16                    MR. COYNE:  We have deposed this witness but not

17   on these issues.  He wasn't put up on these issues at the

18   time.

19                    THE COURT:  On the issues of the background of

20   the company?

21                    MR. COYNE:  Yes, Your Honor.  We will deal with

22   it on cross-examination.  But there is a very expansive

23   story that Whirlpool is planning to tell the jury, which we

24   don't have a deposition on that.

25                    THE COURT:  I am going to permit the

1    substitution, under the circumstances.

2         Next issue.

3         MR. COYNE:  Your Honor, we still have an issue

4    with respect to -- we have tried to work through the

5    deposition subpoena -- the trial subpoena issue that we had

6    talked with you about on the 17th.  We have made good

7    progress on it.  Where we are now is that Whirlpool is going

8    to bring four of the witnesses live.  We have withdrawn the

9    rest of the subpoenas.  Mr. Marcy is, by the way, one of

10   those four witnesses.

11        The issue that we have now is that we are

12   prepared to designate that testimony as much as we are

13   loathe to have to do it by deposition.  That's our only

14   choice.  We will try to limit it and play it as briefly as

15   possible.

16        Whirlpool has agreed that those witnesses are

17   unavailable.  Yet what Whirlpool has informed us they would

18   like to do is, we designate a witness, because they are

19   unavailable, then Whirlpool wants to reserve the right to

20   bring that witness back live on rebuttal.  We think that is

21   singularly unfair.  If the witness is unavailable, forcing

22   us into the deposition route, then the witness is

23   unavailable and Whirlpool can't magically make him available

24   for their own benefit.

25        THE COURT:  It seems reasonable, Mr. Coyne.

```
 1                    Mr. Partridge.
 2                    MR. PARTRIDGE:  Thank you.  The only -- we are
 3      bringing four of the witnesses that they requested.
 4                    As to the others, they are unavailable and we
 5      don't intend to bring them to trial.  My only issue with Mr.
 6      Coyne was if -- not in anything that they say, insofar as
 7      they designate portions of the deposition to use and we
 8      counter-designate, that's it.
 9                    My concern was that what if one of their experts
10      says A, B, C, D, and he characterizes something that one of
11      these witnesses said in a way that is simply easy to rebut?
12                    I doubt we will get into this situation.
13                    THE COURT:  We will cross the bridge if
14      necessary.
15                    MR. PARTRIDGE:  I would be very surprised if I
16      am going to attempt to call any of these people, Your Honor.
17                    THE COURT:  We will deal with it in realtime,
18      Mr. Coyne, if we need to.
19                    MR. COYNE:  Thank you, Your Honor.
20                    The only other issue to flag for the Court we
21      are not asking for a decision at this point, we found
22      work --
23                    THE COURT:  If you are not going to ask for a
24      ruling, I don't need to hear about it.
25                    Mr. Partridge.
```

1          MR. PARTRIDGE:  A couple of quick points, Your

2     Honor.  We do have an interpreter available that we have

3     agreed upon.

4          I don't know to what extent interpretation will

5     be required.  But I wanted to alert you to the fact that Mr.

6     Albert Kim will be here as an interpreter this afternoon and

7     it's possible we may have a witness later today.

8          Mr. Kim is back here, Your Honor.

9          THE COURT:  Okay.

10          MR. PARTRIDGE:  The second thing, Your Honor, is

11     that when we filed the preliminary -- I think we filed a

12     couple of documents last week, one of which included the

13     preliminary instructions.

14          THE COURT:  Yes.

15          MR. PARTRIDGE:  We neglected to attach your

16     claim construction rulings.  We filed that late last night.

17     The parties have agreed on the form of that.

18          What we did, because your claim construction

19     ruling addressed patents that are no longer in the case.  We

20     couldn't attach the ruling itself, so we took the three

21     patents, the constructions from the three patents that are

22     at issue in the case and put them all on one page in a

23     simple document, which we thought you could use as the

24     attachment to the preliminary instructions.

25          THE COURT:  Counsel, it's your desire that I

1  give the definitions, the constructions to the jury this

2  morning?

3             MR. PARTRIDGE:  Yes, Your Honor.

4             MR. COYNE:  Yes, Your Honor.  We have reworked

5  your order to a mutually acceptable fashion, if it is

6  acceptable to you.

7             THE COURT:  Will you pass that up to Ms. Walker,

8  please?

9             Counsel, you physically want to just have this

10  attached to the back of the preliminary instructions?

11             MR. PARTRIDGE:  Yes, Your Honor.  In fact, the

12  way the preliminary instructions were written, it references

13  the fact that the claim constructions will be attached to

14  the preliminary instructions that you give the jury.

15             THE COURT:  We need the preliminary

16  instructions, the copies.  We don't do that.

17             You have time, as the jury is going to take a

18  little longer, maybe not much longer to get up, because we

19  have another -- we have a criminal jury going on today as

20  well.  We have people out the door of the courthouse.

21             MR. PARTRIDGE:  The last thing, Your Honor --

22  actually, two minor things.  We are in agreement that we

23  would like when we go to sidebar with any of the jurors

24  that -- in the case of Mr. Coyne, Mr. Coyne and Mr.

25  Herrmann, and in our case, myself and Mr. Cottrell, we would

1   like to come to sidebar.  We each have a jury consultant.

2                THE COURT:  I was going to ask about that.

3                MR. PARTRIDGE:  We are both agreeable to have

4   the jury consultants stand back.

5                THE COURT:  You can consult with them, but they

6   will have no speaking role.

7                MR. PARTRIDGE:  Correct, Your Honor.  I wanted

8   to get your permission for that.

9                THE COURT:  That is fine.

10                MR. PARTRIDGE:  The last thing, Your Honor, I

11   noticed as some of -- this refrigerator was being moved in

12   that people had to turn the podium in order to get through

13   here.  When we do our openings, is it okay to just turn it?

14                THE COURT:  Oh, yes.  The podium moves, unless

15   they have taped it down.

16                MR. PARTRIDGE:  No, they did not.

17                THE COURT:  No, absolutely.  If you want to

18   angle it toward the jury, witness box, that is fine.

19                Have you agreed on transitional statements?

20                MR. PARTRIDGE:  We talked about that at the

21   pretrial conference.  We both wanted them.  You said it was

22   okay.

23                THE COURT:  You are going to do them?

24                MR. PARTRIDGE:  Yes, we are going to do them.

25                THE COURT:  Mr. Coyne.

1          MR. COYNE:  Mr. Herrmann reminded me there was

2    one other issue.

3          THE COURT:  Let me ask this:  Are we using the

4    video today?

5          MR. PARTRIDGE:  Yes.

6          MR. COYNE:  Your Honor, I appreciate the

7    logistics in the well.  We will work with your courtroom

8    deputy.

9          The other issue is confidentiality.  We have a

10   lot of documents in the case marked as exhibits "For

11   Attorneys' Eyes Only."  We'll endeavor as much as possible

12   not to ask Your Honor to take any extraordinary measures

13   with respect to the public attendance at the trial.  But

14   this issue may come up as early as today.

15         We have some documents we are going to be using

16   that are marked "Whirlpool Confidential," even in the

17   opening.

18         THE COURT:  Mr. Partridge.  It really should be

19   the exception that we close the courtroom.

20         MR. PARTRIDGE:  As I looked at the list of

21   exhibits Mr. Coyne identified, I recognized the other night

22   that some of those were confidential.  But I assumed in the

23   30 to 45 minutes or so we were each going to take for our

24   openings this morning -- or this afternoon, that there

25   wouldn't be all that much that one could show from those

```
 1   documents.  So I don't have a problem with both of us today

 2   using those kinds of documents.

 3           I have the same issue, Your Honor.  I think it

 4   would be very, very awkward for us to try to close the

 5   courtroom.

 6           So I am agreeable to your suggestion, Mr. Coyne.

 7           THE COURT:  Mr. Coyne, if they are going -- if

 8   there is going to be a witness, and that witness is going to

 9   testify about a group of documents, and we can conveniently

10   and without undue interruption close the courtroom off, if

11   necessary, I think that is the better way to do it.  You

12   might want to plan accordingly, because it's not my

13   preference to, during the course of a witness' examination,

14   interrupt the examination and have the courtroom cleared.

15   As you know, the default is to the First Amendment here.

16           Other issues?

17           (No response.)

18           THE COURT:  Ms. Walker will let you know.  She

19   has been instructed by our jury coordinator that she is to

20   check downstairs at 20 minutes after 9:00 as to the status

21   of our jury.  And we will let you know that as soon as we

22   know.

23           Okay, we are in recess.

24           (Recess taken.)

25           (Jury panel enters courtroom.)
```

1          THE COURT:  Good morning, ladies and gentlemen.

2     Please be seated.

3          Ladies and gentlemen, my name is Gregory Sleet.

4     I am the Chief Judge of this Court.  And I am the jurist who

5     has been assigned to this matter, the matter being LG

6     Electronics USA, Inc., et al., versus Whirlpool Corporation.

7          Ladies and gentlemen, allow me first to

8     introduce the two ladies who are seated in front of you.  To

9     my immediate right is April Walker.  She is my chief deputy.

10    For those of you who are selected to serve as members of

11    this jury, she will be your guiding light.  She will get you

12    through this process very neatly, I predict, for you.

13          In the middle is my case manager, Marie McDavid.

14          Ms. McDavid will be here this morning mostly

15    assisting Ms. Walker.  You may see her coming in and out

16    from time to time, and she may take over Ms. Walker's duties

17    at various times.  The empty chair is for one of my law

18    clerks, who you will see coming in and out from time to

19    time.  Her name is Michelle Nerozzi.  The two most important

20    people in this room are our court reporters, quite frankly.

21    My court reporter is Kevin Maurer, and his associate, Kim

22    Hurley.

23          Those are the players that you will see coming

24    in and out of here this morning.

25          Ladies and gentlemen, I am about to ask you a

series of questions.  We call these questions in this part

of the country voir dire.  The purpose of the voir dire

examination is twofold.

It is to enable the Court, that is me, the

Judge, to determine whether any prospective juror, any one

of you, should be excused for something we call cause.  And

secondly, to enable counsel for the parties, seated directly

in front of you, to exercise their individual judgment with

respect to something we call peremptory challenges.  Those

are challenges for which counsel or the parties need not

give a reason for their exercise.

Let me first determine, has each of you been

assigned a number?  Great.  I see the affirmative nods.

That is good.  What I am going to need from you is when I

ask a question, and you recognize a need to respond

affirmatively, that is to say "yes," I am going to ask you

to stand.  Please wait until I recognize you.  Don't just

blurt out.  It becomes a little difficulty orienting for me.

When I call on you, just state your number in a nice, loud,

clear voice.  The acoustics in this room are bad and my

hearing is worse.  So if you would do that.

After I have recognized you, you have stated

your number, please just sit down quietly.  At the

conclusion of that exercise, once we have gotten through all

of the questions, which number 27, and it won't take quite

1    as long as you might think, we will adjourn to the side of

2    the Bench here, what I call sidebar, and we will discuss

3    your individual responses with you and counsel for the

4    record.

5                   (At this point the jury panel was sworn and/or

6    affirmed.)

7                   THE COURT:  Please take your seats again.  This

8    is how you will get your exercise this morning.  Please bear

9    with us.

10                   Ladies and gentlemen, this case is expected to

11    take seven days to try, including today.  Now, the schedule

12    that I expect to maintain over these next seven days will be

13    as close as I can as follows :

14                   We will normally begin the day at 9:00 sharp.

15    We will go until about 1:00, and we will break for an hour,

16    for lunch.  And then work from 2:00 to approximately 4:30.

17                   What I will try to do, to afford you at least

18    two breaks during the day, more on an as-needed basis, we

19    will break generally around 11:00 in the morning for about

20    15 minutes, let you stretch and take care of whatever needs

21    you might have.  Then again we will break roughly around

22    3:00, 3:15 in the afternoon.

23                   One exception to that may occur for those

24    selected to serve on this jury, that is when you commence

25    your deliberations.  On that day, the proceedings may last

1    beyond the 4:30 hour.  There will be a copy of this schedule

2    posted on the jury deliberation door.

3                Now, the question is:  Does the length of this

4    trial or the schedule contemplated by the Court present a

5    special problem to any member of the panel?

6                Far right.

7                JUROR NO. 28:  28.

8                JUROR NO. 56:  56.

9                JUROR NO. 41:  41.

10               JUROR NO. 21:  21.

11               THE COURT:  Yes, sir.

12               JUROR NO. 23:  23.

13               JUROR NO. 44:  44.

14               THE COURT:  Okay.  Sir?

15               JUROR NO. 20:  20.

16               JUROR NO. 35:  35.

17               JUROR NO. 15:  15.

18               JUROR NO. 53:  43.

19               JUROR NO. 31:  31.

20               JUROR NO 37:  37.

21               JUROR NO. 30:  30.

22               JUROR NO. 7:  7.

23               JUROR NO. 62:  62.

24               JUROR NO. 8:  8.

25               JUROR NO. 13:  13.

1                    JUROR NO. 17:  17.

2                    JUROR NO. 51:  51.

3                    There are several corporate entities involved in

4       this civil action.  To simplify things a bit, I will tell

5       you that back in April of 2008, the corporate entities I

6       will call LG, represented at the table to your right and my

7       left, filed this lawsuit for patent infringement against the

8       corporate entities I will call Whirlpool over on my right.

9                    In its complaint, LG accuses Whirlpool of

10      infringing one of its patents and seeks damages for the

11      claimed infringement.  Whirlpool has responded to LG's

12      complaint by denying that it infringes LG's patents.

13      Whirlpool has further responded with a claim of its own that

14      LG infringes two of its patents and, like LG, seeks damages

15      for the claimed infringement.

16                   LG denies that it infringes Whirlpool's patents.

17                   In addition, both sides claim the other's

18      patents are invalid.

19                   For those of you selected to serve as jurors, I

20      will give you more detailed instructions regarding the

21      meaning of the words "infringement" and "invalidity" once

22      you are sworn in as jurors and again at the conclusion of

23      the trial.

24                   The question is:  Has any member of the panel

25      heard or read anything about this case?

```
 1              (No response.)

 2              THE COURT:  I will now ask counsel, beginning

 3    with LG, if you would introduce yourselves to the panel.

 4              MR. COYNE:  Thank you, Your Honor.  Good

 5    morning.  I am Patrick Coyne.  I represent LG.  Next to me

 6    is Richard Herrmann, who is our local counsel in this case.

 7    And Anand Sharma, one of my colleagues.  And Walter Davis,

 8    Jeff Abraham and Andy Sonu.

 9              THE COURT:  Thank you, Mr. Coyne.

10              Mr. Partridge.

11              MR. PARTRIDGE:  Thank you, Your Honor.  My name

12    is Scott Partridge.  I represent the Whirlpool parties here.

13    I am here with Fred Cottrell and the representative from

14    Whirlpool, Thomas Catania, Mr. Morico, Paul Morico, Amanda

15    Woodall, and Gene Spears.

16              THE COURT:  Thank you, Mr. Partridge.

17              Ladies and gentlemen, does any member of the

18    panel or, as far as you know, a member of your immediate

19    family -- let me give you my definition of "immediate

20    family" would be a spouse, a child, a parent or sibling.  A

21    spouse, child, parent or sibling.  The question is:  Does

22    any member of the panel or your immediate family or anyone

23    else close to you know any of the attorneys involved in the

24    case or have you or any member of your immediate family had

25    any business dealings with or been employed by any of these
```

1    attorneys or their respective law firms?

2              By the way, I am not sure that you identified

3    your law firms, counsel.

4              MR. COYNE:  Sorry, Your Honor.

5              I am here with the firm of Finnegan, Henderson,

6    Farabow, Garrett & Dunner in Washington, D.C., and Richard

7    Herrmann is with Morris James here in Delaware.

8              THE COURT:  Mr. Partridge.

9              MR. PARTRIDGE:  Yes, my apologies.  I am with

10   the firm of Baker Botts.  And all the lawyers here are with

11   my firm, Baker Botts, except for Mr. Cottrell, who is with

12   the local law firm of Richards, Layton & Finger.

13             THE COURT:  Thank you, again.

14             Let me repeat the question one more time.  Does

15   any member of the panel, your immediate family, as I have

16   defined it, or anyone close to you know any of these lawyers

17   involved in the case?  Or have you or any member of your

18   immediate family or anyone close to you, I will add, had any

19   business dealings with or been employed by any of these

20   lawyers or their respective law firms?

21             JUROR NO. 45:  45.  Susan Ament is my lawyer.

22             THE COURT:  Your number?

23             JUROR NO. 10:  I am sorry.  10.

24             JUROR NO. 24:  24.

25             All right.  Thank you.  Have you or any member

```
1    of your immediate family or anyone close to you ever been

2    employed by LG, the plaintiff in the case?

3              (No response.)

4              THE COURT:  Have you or any member of your

5    immediate family or anyone close to you ever been employed

6    by Whirlpool, Maytag, Amana, Kitchen Aid, and/or the Jennair

7    Company?

8              (No response.)

9              THE COURT:  Have you or anyone in your immediate

10   family or anyone close ever been employed by any company

11   that does work for Smith Dahmer Associates?

12             (No response.)

13             THE COURT:  Have you or anyone in your immediate

14   family or anyone close to you ever owned stock in any of

15   these companies?

16             JUROR NO. 9:  9.

17             THE COURT:  Have you or any member of your

18   immediate family or anyone close to you ever had a business

19   relationship of any kind with any of these companies?

20             (No response.)

21             THE COURT:  Have you or, to the best of your

22   knowledge, any member of your immediate family or anyone

23   close to you had any experiences, good or bad, with any of

24   these companies that might keep you from being a fair and

25   impartial juror?
```

1          JUROR NO. 17:  17.

2          THE COURT:  Do you possess any opinions about

3    any of these companies that might keep you from being a fair

4    and impartial juror?

5          (No response.)

6          THE COURT:  Both of these companies are large

7    corporations, operating internationally.  Do you possess any

8    opinions about large corporations that might keep you from

9    being a fair and impartial juror?

10         (No response.)

11         THE COURT:  Do you possess any opinions about

12   corporations operating internationally that might keep you

13   from being a fair and impartial juror?

14         (No response.)

15         THE COURT:  I am going to ask counsel, beginning

16   with Mr. Coyne, to identify potential witnesses.  And then I

17   will ask a question about that.

18         MR. COYNE:  Yes, Your Honor.  Thank you.  If I

19   could ask that people stand as I identify them.  Dr. Donald

20   Vannoy will be appearing as one of our witnesses.  Next to

21   him is Mr. Stan Dapkunas.  Two seats down is Dr. Mohan Rao.

22   Next to him is Dr. Warren Bessler, and Dr. Gary Mellinger.

23         Two seats down from him is Dr. Myung Ryul Lee,

24   and next to him is Dr. Ching Ho Lee.

25         Mr. Ill-Shin Kim.  Next to him is Young Ho Noh,

1    and John Taylor.

2              THE COURT:  Are there any other names you wish

3    to read?

4              MR. COYNE:  I believe that's all.

5              THE COURT:  Other than those who are present in

6    the courtroom?

7              MR. COYNE:  Your Honor, yes.  We have a number

8    of people who will be appearing by deposition.

9              THE COURT:  You should identify them.

10             MR. COYNE:  John Keil, Scott Leimkuchler,

11   Gregory Silbaugh, Todd Kniffen, Gary Langbo, Kenneth Whah,

12   Daryl Harmon, Devinder Singh, Gregory Garavalia, Andrew

13   Oltman, Gregory Hortin, Kevin Willis -- excuse me, Jim

14   Lewis, David Schwartz.

15             I believe that would be all the witnesses.

16             THE COURT:  I think there may be one other.

17             MR. COYNE:  I am sorry.  John Herrington, who is

18   not here today.

19             THE COURT:  All right.  Ladies and gentlemen,

20   you have observed some potential witnesses who are

21   physically here and you have heard some names.  The question

22   is:  Does any member of the panel know or is any member of

23   the panel familiar with any of the prospective witnesses who

24   have just been identified, either in person or by name?

25   Name?

1                MR. COTTRELL:  Your Honor, I don't believe we

2        identified our witnesses.

3                THE COURT:  I am going to do that right now, Mr.

4        Cottrell.

5                MR. COTTRELL:  I am sorry.

6                THE COURT:  Your turn, Mr. Cottrell.

7                MR. COTTRELL:  Thank you, Your Honor.

8                MR. PARTRIDGE:  I will do it, Your Honor, if you

9        don't mind.

10                THE COURT:  Okay, Mr. Partridge.

11                MR. PARTRIDGE:  Unfortunately, because of the

12        lack of space in the courtroom this morning, I think our

13        witnesses are all out in the hallway.

14                THE COURT:  If you would like to have them come

15        in, we can do that.

16                MR. PARTRIDGE:  I think we can probably do it

17        with the names, Your Honor, because I don't think any of

18        them actually reside in this immediate area.

19                The first one is Dr. Bob Caligiuri, Dr. Robert

20        Caligiuri; Mr. Tom Catania, who is here.  I would ask him to

21        stand.  Seth Kaplan, Dr. Albert Karvelis, Gary Langbo, Mr.

22        Hank Marcy, Mr. Verne Myers, Mr. Jim Nawrocki, Mr. Tom

23        Schwyn, Mr. Ron Voglewede, Mr. Steve Williams, and Mr. Rich

24        Donner, who will be by deposition.

25                Your Honor, as I listened to Mr. Coyne read off

```
 1    that list, either with his witnesses or with his deposition

 2    witnesses, I believe we covered everybody.  I hope that I

 3    haven't missed anyone.  I think that covers it.

 4                 THE COURT:  Thank you, Mr. Partridge.

 5                 The same question, ladies and gentlemen:  Does

 6    any member of the panel know or is any member of the panel

 7    familiar with any of these prospective witnesses?

 8                 (No response.)

 9                 THE COURT:  Okay.  Now, please look around, and

10    recall from your gathering earlier today, this morning, at

11    the other potential jury members.  Ask yourself:  Do you

12    know each other?  Have you had any relationship with any of

13    the other jurors who are here today?

14                 JUROR NO. 28:  28.

15                 JUROR NO. 56:  56.

16                 THE COURT:  Thank you, sir.

17                 JUROR NO. 66:  66.

18                 THE COURT:  Have you ever worked in the field of

19    consumer appliance or refrigerator design?

20                 (No response.)

21                 THE COURT:  Do you have any experience with the

22    design, repair or upkeep of electronic or mechanical devices

23    such as refrigerators?

24                 JUROR NO. 17:  17.

25                 JUROR NO. 48:  48.
```

1                    THE COURT:  Do you believe companies try to

2     infringe or violate the patent rights of other companies?

3                    JUROR NO. 45:  45.

4                    THE COURT:  Have you or any member of your

5     immediate family or anyone close to you ever been employed

6     by the United States Patent and Trademark Office?

7                    (No response.)

8                    THE COURT:  Do you hold any opinions about the

9     U.S. Patent and Trademark Office that might keep you from

10    being a fair and impartial juror?

11                   (No response.)

12                   THE COURT:  Do you have any opinions about the

13    relationship between patents and the public interest that

14    might keep you from being a fair and impartial juror?

15                   (No response.)

16                   THE COURT:  Have you or anyone in your immediate

17    family or anyone close to you ever applied for or obtained a

18    patent in the United States or abroad?

19                   JUROR NO. 40:  40.

20                   JUROR NO. 57:  57.

21                   JUROR NO. 45:  45.

22                   JUROR NO. 66:  66.

23                   THE COURT:  Have you, any member of your

24    immediate family, or anyone close to you ever had an

25    experience with the patent system, other than those who have

1    just identified themselves?

2              Fair enough, counsel?

3              MR. PARTRIDGE:  Yes, Your Honor.

4              THE COURT:  Yes.

5              (No response.)

6              THE COURT:  Have you ever served as a juror in a

7    criminal or civil case or as a member of a grand jury,

8    either in federal or state court?

9              JUROR NO. 47:  47.

10             JUROR NO. 11:  11.

11             JUROR NO. 43:  43.

12             JUROR NO. 17:  17.

13             JUROR NO. 5:  5.

14             JUROR NO. 41:  41.

15             JUROR NO. 56:  56.

16             JUROR NO. 39:  39.

17             THE COURT:  Have you or anyone in your immediate

18   family or anyone close to you ever participated in a lawsuit

19   as a party, or in any other capacity, such as a plaintiff, a

20   defendant, or a witness?

21             JUROR NO. 19:  19.

22             JUROR NO. 58:  58.

23             JUROR NO. 24:  24.

24             JUROR NO. 43:  43.

25             JUROR NO. 31:  31.

1          JUROR NO 37:  37.

2          JUROR NO. 13:  13.

3          JUROR NO. 8:  8.

4          THE COURT:  Bear with me a second, ladies and

5     gentlemen.

6          Yes, ma'am?

7          JUROR NO. 9:  9.

8          JUROR NO. 23:  23.

9          JUROR NO. 33:  33.

10          JUROR NO. 41:  41.

11          JUROR NO. 28:  28.

12          THE COURT:  If you are selected to sit on this

13     case, is there any reason you would be unable to render a

14     verdict solely on the evidence presented at the trial and in

15     the context of the law as I will give it to you in my

16     instructions, disregarding any other notions, beliefs, or

17     ideas about the law you may have or that you may have

18     encountered in reaching your verdict?

19          (No response.)

20          THE COURT:  Is there any member of the panel who

21     has any special disability or problem that would make

22     serving as a member of the jury difficult or impossible?

23          JUROR NO. 9:  9.

24          JUROR NO. 10:  10.

25          JUROR NO. 13:  13.

1          THE COURT:  Finally, having heard the questions

2    put to you by the Court, does any other reason suggest

3    itself to you as to why you could not sit on this jury and

4    render a fair verdict based on the evidence presented to you

5    and in the context of the Court's instructions to you on the

6    law?

7          (No response.)

8          THE COURT:  All right.  Ladies and gentlemen, we

9    appreciate your patience.  We will ask for your indulgence a

10   little longer as we meet at sidebar.

11         (The following took place at sidebar:)

12         THE COURT:  All right.

13         CHIEF DEPUTY CLERK WALKER:  Juror No. 5, will

14   you please come forward?

15         THE COURT:  Juror No. 5, by my count, answered

16   23 -- if my count is off, you need to check me on it.

17         (Juror comes to sidebar.)

18         THE COURT:  Good morning, sir?

19         THE JUROR:  Good morning.

20         THE COURT:  You indicated, I believe, that

21   the -- this is 23.  Right?

22         THE JUROR:  No. 5.

23         THE COURT:  -- that you have been a juror before

24   on a case?

25         A JUROR:  Yes.  I believe it was a civil case.

1    It was like a hit-and-run accident.  It was a state case.

2                THE COURT:  In Delaware?

3                A JUROR:  Yes.

4                THE COURT:  Do you recall, was it in New Castle

5    County, downstate?

6                A JUROR:  New Castle County.

7                THE COURT:  Did the jury render a verdict?

8                A JUROR:  Yes, we did.

9                THE COURT:  Do you recall who your verdict was

10   given to?

11               A JUROR:  It was not guilty.  It was given to

12   the defendant.

13               THE COURT:  In other words, you found --

14               A JUROR:  The people on that side of the

15   courtroom (indicating).

16               THE COURT:  You found that there was liability?

17               A JUROR:  Yes, there was.

18               THE COURT:  Did you make a money award?

19               A JUROR:  Yes.  It was small.  $5,000 or

20   something like that.

21               THE COURT:  Anything about that experience that

22   might give you difficulty being a fair and impartial juror

23   in this case?

24               Counsel may have a question or two, I don't

25   know.

```
 1                    A JUROR:  No.

 2                    THE COURT:  Mr. Coyne?

 3                    MR. COYNE:  No, Your Honor.

 4                    THE COURT:  Mr. Partridge?  Mr. Cottrell?

 5                    MR. COTTRELL:  No, Your Honor.

 6                    THE COURT:  Thank you, sir.  You may resume your

 7     seat.

 8                    (Juror leaves sidebar.)

 9                    CHIEF DEPUTY CLERK WALKER:  Juror No. 7.

10                    THE COURT:  Answered No. 1.

11                    (Juror comes to sidebar.)

12                    THE COURT:  Good morning, sir.

13                    A JUROR:  How are you, sir?

14                    THE COURT:  All right.  You indicated that the

15     length or schedule might be a problem for you.

16                    A JUROR:  I have five children and I am the only

17     one working.

18                    THE COURT:  I am assuming that your employer

19     will not compensate you for your time off?

20                    A JUROR:  I am a commissioned salesperson.

21                    THE COURT:  Hold on a second.  Let's see if

22     there are any questions from the other side.

23                    MR. COYNE:  I don't have any, Your Honor.

24                    MR. COTTRELL:  No, Your Honor.

25                    THE COURT:  You may resume your seat.
```

```
1                    (Juror leaves sidebar.)

2                    THE COURT:  Counsel, from time to time, the

3       Court will sua sponte exercise its discretion and dismiss a

4       juror, as in this case.  Is there an objection?

5                    MR. COYNE:  No, Your Honor.

6                    MR. PARTRIDGE:  No, Your Honor.

7                    CHIEF DEPUTY CLERK WALKER:  No. 8.

8                    THE COURT:  Answered 1 and 24.

9                    (Juror comes to sidebar.)

10                   THE COURT:  Good morning, sir.  You answered two

11      of the questions.  No. 1, you indicated the length of the

12      trial and/or the schedule might be a problem.

13                   A JUROR:  Yes, sir.  I live south of Dover and

14      my wife works up here in Bear as well.  We have a

15      five-year-old in a daycare who is sick.  She is asthmatic.

16      I have nobody to pick her up.

17                   THE COURT:  If you were called to service, you

18      would have no one?

19                   A JUROR:  Yes.

20                   THE COURT:  She is down where you work?

21                   A JUROR:  We live in Camden.  But she works up

22      here in Bear, north of the canal.

23                   THE COURT:  Any questions on that?

24                   MR. COTTRELL:  No, Your Honor.

25                   MR. COYNE:  No, Your Honor.
```

```
 1                    THE COURT:  I am going to ask you to resume your
 2        seat for a moment.
 3                         (Juror leaves sidebar.)
 4                    THE COURT:  I am going to let him go.
 5                    CHIEF DEPUTY CLERK WALKER:  No. 9.
 6                    THE COURT:  I don't want to be presumptuous.
 7        She should be given the opportunity to come up and talk.
 8                         (Juror comes to sidebar.)
 9                    THE COURT:  Good morning.  You didn't know we
10        were going to set up an obstacle course for you.
11                    A JUROR:  No.  You did very well.  Good morning,
12        Your Honor.
13                    THE COURT:  Pleasure to see you.
14                    Let's start out with the question of whether you
15        might have a special problem or disability.
16                    A JUROR:  Well, I get migraine headaches.  Not
17        all the time.  The last time I got one was in October.  And
18        usually, it's just like a day, maybe two.  And it puts me
19        down for five days.
20                    And then, in October of last year, my nephew ran
21        over my foot and broke five of my toes.  So I am wearing
22        braces on both my feet now.
23                    And I have the walker.
24                    I would like to try.
25                    THE COURT:  Well, you are here today.  That
```

1    certainly simplifies that desire.

2              A JUROR:  Other than that --

3              THE COURT:  Where are you commuting from?

4              A JUROR:  Milford.

5              THE COURT:  Ma'am, I am going to ask you to

6    resume your seat.  And good day to you.

7              (Juror leaves sidebar.)

8              THE COURT:  I am going to excuse her.

9              CHIEF DEPUTY CLERK WALKER:  No. 10.

10             THE COURT:  Answered 2 and 26, No. 10.

11             MR. COTTRELL:  I have 3.

12             THE COURT:  Great.

13             (Juror comes to sidebar.)

14             THE COURT:  Good morning, ma'am.

15             A JUROR:  Good morning.

16             THE COURT:  You indicated, I will start at the

17   last question, that there might be a problem with service, a

18   special disability?

19             A JUROR:  Yes.  I have got bipolar, and I do

20   have a lot of problems with it and have to take a lot of

21   medication with it.  The second one -- the first one was

22   with Susan Ament is my lawyer, for a lawsuit.

23             THE COURT:  Ms. Ament, she is with Mr.

24   Herrmann's firm?

25             A JUROR:  Morris James.

1            THE COURT:  Your condition, you believe, might

2      interfere with your ability to focus on these proceedings?

3            A JUROR:  Very possible.  And I have this

4      problem where I want to agree with everybody here.  I want

5      everybody to like me.  And it's not going to matter who, as

6      soon as one person starts talking and they are finished, the

7      other person will start talking and I will agree with them.

8      I can't help it.  I wanted to let you know.

9            THE COURT:  I appreciate that.

10            Any questions?

11            MR. COYNE:  No, Your Honor.

12            MR. COTTRELL:  No, Your Honor.

13            THE COURT:  Thank you, ma'am.  You may resume

14      your seat.

15            (Juror leaves sidebar.)

16            THE COURT:  Again, I am going to dismiss the

17      lady.

18            MR. PARTRIDGE:  No objection.

19            CHIEF DEPUTY CLERK WALKER:  No. 11.

20            THE COURT:  Answered No. 23.

21            (Juror comes to sidebar.)

22            THE COURT:  Good morning, ma'am.

23            A JUROR:  Good morning.

24            THE COURT:  You have been on a jury before?

25            A JUROR:  Yes.

1           THE COURT:  How many times?

2           A JUROR:  Once.

3           THE COURT:  Was that here in Delaware?

4           A JUROR:  No.  It was in Washington, D.C.

5           THE COURT:  Was it in the District of Columbia

6    court, what I will call the state court?

7           A JUROR:  I think it was state.  It was a

8    medical practice case, medical malpractice.

9           THE COURT:  How long ago was that, roughly?

10          A JUROR:  I would say 15 years ago.

11          THE COURT:  Do you recall if the jury reached a

12   verdict?

13          A JUROR:  Yes.

14          THE COURT:  Do you recall what your verdict was?

15          A JUROR:  Not guilty.

16          THE COURT:  So no liability?

17          A JUROR:  No.

18          THE COURT:  So you cleared the defendant?

19          A JUROR:  Yes.

20          THE COURT:  Anything about your participation in

21   that process that might give you difficulty being fair to

22   these parties in this process?

23          A JUROR:  Not that I am aware of.

24          THE COURT:  Let's see if the lawyers have any

25   questions.  Mr. Cottrell?

1                    MR. COTTRELL:  No questions.

2                    THE COURT:  Mr. Coyne?

3                    MR. COYNE:  No, Your Honor.

4                    THE COURT:  Ma'am, you may resume your seat.

5       Thank you.

6                    (Juror leaves sidebar.)

7                    CHIEF DEPUTY CLERK WALKER:  No. 13.

8                    THE COURT:  I have 13 answering 1, 24, and 26.

9                    (Juror comes to sidebar.)

10                   THE COURT:  Good morning, ma'am.

11                   You answered three of the questions.  The first

12      one being that the length of the trial or the schedule might

13      be a problem for you.  How so?

14                   A JUROR:  I have three kids.  I am unemployed.

15      I let go my babysitter, which was -- which is my

16      brother-in-law.  He moved back to New York.  I don't have

17      anybody to take care of my kids, so I have to take them to

18      school and pick them up.

19                   MR. COTTRELL:  No questions, Your Honor.

20                   MR. COYNE:  No questions.

21                   THE COURT:  Where are your children right now?

22                   A JUROR:  They are in school.

23                   THE COURT:  So you are okay for the next few

24      minutes?

25                   A JUROR:  Yes.

```
 1                    THE COURT:  Why don't you resume your seat.

 2                    (Juror leaves sidebar.)

 3                    THE COURT:  I am going to dismiss her.

 4                    CHIEF DEPUTY CLERK WALKER:  No. 15.

 5                    THE COURT:  As you guys trot around the country,

 6      are you seeing more of this?

 7                    MR. PARTRIDGE:  Yes.

 8                    THE COURT:  We are certainly seeing it here.

 9                    (Juror comes to sidebar.)

10                    THE COURT:  Good morning.  You answered one of

11      the questions.

12                    A JUROR:  I am a nursing mom.  I just need a

13      private place to pump and refrigeration.

14                    THE COURT:  That is not a problem.  Right, Ms.

15      Walker?

16                    A JUROR:  Okay.  Thank you.

17                    THE COURT:  Counsel, any questions?

18                    MR. COTTRELL:  No, Your Honor.

19                    (Juror leaves sidebar.)

20                    CHIEF DEPUTY CLERK WALKER:  No. 17.

21                    THE COURT:  No. 17 answered 1, 9, 16, and 23, by

22      my count.

23                    MR. COTTRELL:  Right.

24                    (Juror comes to sidebar.)

25                    THE COURT:  Good morning, sir.
```

```
 1                    A JUROR:  Good morning.

 2                    THE COURT:  The first question you answered was

 3       indicating there might be a problem with the length.

 4                    A JUROR:  Length of time.  I have two medical

 5       appointments scheduled, one for later this week and one for

 6       early next week, followup on a root canal.

 7                    THE COURT:  We don't want to cause you pain of

 8       any kind.  The question is:  Can these appointments be

 9       rescheduled conveniently?

10                    A JUROR:  I would have to check with the doctor.

11                    THE COURT:  Let's go ahead with the other

12       questions.  Are you on pain meds now, if you don't mind me

13       asking?

14                    A JUROR:  No.  Just typical Tylenol and aspirin.

15                    THE COURT:  It is being well-managed?

16                    A JUROR:  Yes.

17                    THE COURT:  Then the next question you responded

18       to had to do with experiences with either of these entities

19       here today.

20                    A JUROR:  Yes.  I am an aircraft maintenance

21       technician.  I get involved mechanically with my own

22       appliances and other family member appliances and do rare on

23       my own products.  I have had some experience with one of the

24       manufacturers.

25                    THE COURT:  Which one?
```

```
1                    A JUROR:  Whirlpool.

2                    THE COURT:  Do you care to characterize those

3        experiences as good or bad?

4                    A JUROR:  Good.

5                    THE COURT:  The question then is:  Would those

6        experiences in any way impact your ability to be fair and

7        impartial to both sides?

8                    A JUROR:  They might.  Depending on what the

9        topics are.

10                   THE COURT:  Let's have counsel followup with

11       that.  Mr. Cottrell?

12                   MR. COTTRELL:  No, I don't have any questions,

13       Your Honor.

14                   MR. COYNE:  In your view, would one side or the

15       other of us be starting down or up, in your view, because of

16       your views?

17                   A JUROR:  Possibility.

18                   MR. COYNE:  Which one.

19                   A JUROR:  LG.

20                   THE COURT:  Do you have experience with LG

21       appliances?

22                   A JUROR:  I have worked on one or two.  More

23       towards the negative.

24                   THE COURT:  More toward the negative, okay.

25                   Does LG --
```

```
 1                        MR. COYNE:  Would that color your views?

 2                        A JUROR:  Yes.

 3                        THE COURT:  Anything else?

 4                        MR. COTTRELL:  No, Your Honor.

 5                        THE COURT:  I don't see a need at this point to

 6    proceed any further.  So I am going to ask you to resume

 7    your seat.

 8                        (Juror leaves sidebar.)

 9                        THE COURT:  Do we have a challenge?

10                        MR. COYNE:  Yes.

11                        THE COURT:  I will grant the challenge for

12    cause.  Any objection to that?

13                        MR. COTTRELL:  No, Your Honor.

14                        THE COURT:  Okay.

15                        CHIEF DEPUTY CLERK WALKER:  No. 19.

16                        THE COURT:  24 is what No. 19 answered.

17                        (Juror comes to sidebar.)

18                        THE COURT:  Good morning.  You have been in a

19    lawsuit before?

20                        A JUROR:  Yes.

21                        THE COURT:  Could you describe when that was?

22                        A JUROR:  It was in 2008.

23                        THE COURT:  What was the nature of the suit, do

24    you recall?

25                        A JUROR:  I took my employers to court for
```

1    nonpayment of wages.

2              THE COURT:  And did it go to trial?

3              A JUROR:  No.

4              THE COURT:  How was it resolved?

5              A JUROR:  The Judge ordered payment of wages,

6    plus an additional, like, fee on top of that.

7              THE COURT:  And do you feel you were treated

8    fairly, not by your employer, but by the judicial process?

9              A JUROR:  For the most part, yes.

10             THE COURT:  Is there anything about your

11   participation in that entire experience that might give you

12   difficulty being fair to these parties here?

13             A JUROR:  No, not that I know of.

14             THE COURT:  Counsel?

15             A JUROR:  I am sorry.  Can I add one more thing?

16             THE COURT:  Yes.

17             A JUROR:  To be fair, my wedding is in a month.

18   I may find it hard to be able to concentrate.  Just because

19   of all the things that are happening right now.  I wanted to

20   put that out.

21             THE COURT:  Okay.  I appreciate your pointing

22   that out.  We wish you well.  But this, of course, is part

23   of your civic duty.

24             A JUROR:  No, no, I understand.

25             THE COURT:  I am going to permit the lawyers to

1   follow up with that or anything else they want.

2                   MR. COYNE:  Would you feel distracted because of

3   it?

4                   A JUROR:  Yes.  I mean, I have a lot of things

5   on my mind.

6                   MR. COYNE:  Do you think you would be able to

7   pay attention to the evidence and consider it fully?

8                   A JUROR:  Honestly, no.

9                   THE COURT:  Let me say this to you, food for

10  thought:  I guarantee you, every one of your fellow

11  prospective jurors has something equally weighty on his or

12  her mind.  I think it's fair that the parties and the Court

13  demand your attention.  Do you think you are going to be

14  able to handle that?

15                  A JUROR:  Yes.

16                  THE COURT:  All right.  Mr. Cottrell?

17                  MR. COTTRELL:  Nothing, Your Honor.

18                  MR. COYNE:  Nothing further, Your Honor.

19                  THE COURT:  Thank you.

20                  (Juror leaves sidebar.)

21                  THE COURT:  If you collectively want to move me

22  to let her go, I will.  But my inclination is not to let her

23  go.

24                  CHIEF DEPUTY CLERK WALKER:  No. 20.

25                  THE COURT:  Answered No. 1.

```
 1                    (Juror comes to sidebar.)

 2                    THE COURT:  Good morning, sir.  You indicated

 3       that the length of the trial or the schedule might be a

 4       problem for you.  How is that?

 5                    A JUROR:  I am currently a full-time student at

 6       Wilmington University.  I go to school during the day, also

 7       at night.  When I am not going to school during the day, I

 8       am attending to my three-year-old daughter, who is in

 9       daycare right now.

10                    THE COURT:  Are you a single parent?

11                    A JUROR:  No.  I am married, but I am not

12       working.  My wife is working.

13                    THE COURT:  So you are the caregiver at this

14       point?

15                    A JUROR:  Yes.

16                    THE COURT:  Mr. Cottrell?

17                    MR. COTTRELL:  No questions, Your Honor.

18                    MR. COYNE:  No questions, Your Honor.

19                    THE COURT:  Thank you, sir.  You can resume your

20       seat.

21                    (Juror leaves sidebar.)

22                    THE COURT:  I am going to let him go.

23                    CHIEF DEPUTY CLERK WALKER:  No. 21.

24                    THE COURT:  Of course, any of these that I sua

25       sponte let go and you want to object to it, I am not going
```

1    to take it personally, put it on the record.

2                   (Juror comes to sidebar.)

3                   THE COURT:  You indicated a problem with the

4    length of the trial or the schedule.

5                   A JUROR:  Yes.  I am a restaurant manager in

6    Bethany Beach.  It is about two hours plus from here.  I am

7    a night manager, for the most part.  The length of seven

8    days, that would not allow the restaurant to function

9    properly.

10                  THE COURT:  Are you the only person?

11                  A JUROR:  No.  I have someone filling in for me.

12   But it's a local restaurant.  So it's not a chain.

13                  THE COURT:  Just refresh my recollection.  It

14   takes you, what, an hour and a half to get up here?

15                  A JUROR:  It took me over two hours.

16                  THE COURT:  Over two hours.

17                  Counsel?

18                  MR. COTTRELL:  No questions, Your Honor.

19                  MR. COYNE:  No questions, Your Honor.

20                  THE COURT:  I think that's the only question you

21   answered.  Why don't you resume your seat.

22                  (Juror leaves sidebar.)

23                  THE COURT:  I am going to let him go.  Any

24   objection?

25                  MR. COTTRELL:  No, Your Honor.

```
 1                  MR. COYNE:  No, Your Honor.

 2                  CHIEF DEPUTY CLERK WALKER:  No. 23.

 3                  THE COURT:  No. 23 answered 1 and 24.

 4                  (Juror comes to sidebar.)

 5                  THE COURT:  Good morning, sir.  You answered two

 6      of the questions.  The first being that the schedule might

 7      be a problem for you.  How so?

 8                  A JUROR:  Yes.  I am a hundred-percent

 9      commissioned job.  I represent clients.  My job primarily

10      operates between 9:00 to 5:00 because of its nature.

11                  THE COURT:  The second question was

12      participation in a lawsuit.

13                  A JUROR:  Last spring I was a plaintiff in the

14      Chancery Court, in a matter there, which I won.

15                  THE COURT:  Did it go to trial?

16                  A JUROR:  We weren't really there for trial.

17      But I ended up winning the case, after appeals and whatnot.

18      Last fall I was a witness in a lease dispute in a shopping

19      center between a landlord and a tenant.  And I personally

20      have been a plaintiff and a defendant in JP Court with

21      various landlord-tenant disputes.

22                  THE COURT:  Anything about your participation in

23      any of those events that might cause you difficulty being

24      fair to these parties?

25                  A JUROR:  No, because I have seen it from both
```

1   sides of the floor.

2          THE COURT:  Let me just follow up a little bit

3   with your employment.  What you are telling us, I think, is

4   that were we to take you out of commission, you would not

5   have an income or would lose income?

6          A JUROR:  Potentially, yes.

7          THE COURT:  And would have no way to substitute

8   that income?

9          A JUROR:  Correct.  And I work for Emory Hill.

10   I don't know if they are represented by any of the firms,

11   the legal firms.

12          MR. COYNE:  I don't think so.

13          THE COURT:  Thank you, sir.

14          (Juror leaves sidebar.)

15          THE COURT:  I am going to let him go.  Any

16   objection?

17          MR. COTTRELL:  No, Your Honor.

18          MR. COYNE:  No, Your Honor.

19          CHIEF DEPUTY CLERK WALKER:  No. 24.

20          THE COURT:  Answered 2 and 24, by my count.  Is

21   that right?

22          CHIEF DEPUTY CLERK WALKER:  I have 3.

23          THE COURT:  That is the second time I have done

24   that.

25          (Juror comes to sidebar.)

1                    THE COURT:  Ma'am, good morning.

2                    A JUROR:  Good morning.

3                    THE COURT:  So you answered two of the

4     questions.  The first having to do with knowledge of any of

5     the lawyers or their firms or involvement.

6                    A JUROR:  I am a professional land surveyor, so

7     we do title and so we have worked -- I have worked with both

8     of the local law firms.  But not in any --

9                    THE COURT:  Substantive way?

10                   A JUROR:  No.

11                   THE COURT:  You have been employed?

12                   A JUROR:  No.  We have worked in conjunction

13    with land transactions.

14                   THE COURT:  You have not received compensation

15    from either of the local firms?

16                   A JUROR:  No.

17                   THE COURT:  Do you believe that those

18    relationships would in any way impact your ability to be

19    fair to the parties in this case?

20                   A JUROR:  Not at all.

21                   THE COURT:  Counsel, on that question, any

22    questions?

23                   MR. COTTRELL:  Mr. Herrmann and I are the local

24    firms, but you haven't worked with us individually?

25                   A JUROR:  No.

1               THE COURT:  Mr. Coyne?

2               MR. COYNE:  No.

3               THE COURT:  You participated in a lawsuit?

4               A JUROR:  Right now I was retained as an expert

5     witness in a case against another surveyor.  It is the first

6     one I have ever done.  I have gotten to the point of doing

7     the report.  They are most likely going to settle before it

8     goes to court.

9               THE COURT:  Would that in any way --

10              A JUROR:  Not at all.

11              THE COURT:  Counsel?

12              MR. COTTRELL:  No questions.

13              MR. COYNE:  What is the subject matter of the

14    suit that you are expert in?

15              A JUROR:  It has to do with building in the

16    wrong place, a piece of property.

17              THE COURT:  Thank you, ma'am.

18              (Juror leaves sidebar.)

19              CHIEF DEPUTY CLERK WALKER:  No. 28.

20              THE COURT:  Answered 1, 14, and 24.

21              (Juror comes to sidebar.)

22              THE COURT:  Good morning, sir.  You answered

23    three of the questions.  The first being the length of this

24    trial might be a problem for you.

25              A JUROR:  Yes.  I have a dental appointment to

```
 1     fix a bad tooth, actually, next Tuesday afternoon.

 2               I am also a high school biology teacher.  And

 3     due to the snow days and the length of the trial, it would

 4     be very difficult for my students to continue with the

 5     curriculum, the way it's been.

 6               THE COURT:  Is that right?

 7               A JUROR:  Yes.

 8               THE COURT:  Would a substitute work?

 9               A JUROR:  It's a lab -- I teach three classes in

10     90-minute blocks.  So I just got a new group of students in

11     January.  And it's a lab-based course, which is difficult

12     for a substitute, to do a lab.

13               THE COURT:  I understand.  Let's see if the

14     lawyers have any questions on that.

15               MR. COYNE:  No, Your Honor.

16               MR. COTTRELL:  No, Your Honor.

17               THE COURT:  You recognize a fellow juror?

18               A JUROR:  Yes.  The gentleman I am sitting next

19     to is a former student.

20               THE COURT:  I don't have a problem.  Do you?

21               MR. COTTRELL:  No, I don't, Your Honor.

22               MR. PARTRIDGE:  May I inquire?

23               THE COURT:  Yes.

24               MR. PARTRIDGE:  If you both ended up on a jury,

25     would that relationship in any way affect your abilities to
```

1    render a verdict?

2           A JUROR:  Not from my point of view, no.

3           THE COURT:  Finally, you participated in a

4    lawsuit or a member of your immediate family?

5           A JUROR:  My father, he served as a witness for

6    his company.  He worked for AllState Insurance.  That was

7    part of his job.

8           THE COURT:  Anything about his involvement in

9    that process that might give you difficulty being fair with

10   these parties?

11          A JUROR:  No.

12          THE COURT:  Anything, counsel?

13          Sir, I will ask you to resume your seat.  We

14   will get back to you.

15          (Juror leaves sidebar.)

16          THE COURT:  My inclination is to dismiss.  What

17   is your preference, or pleasure?

18          MR. COYNE:  That is fine, Your Honor.

19          MR. PARTRIDGE:  Unfortunately, I think that is

20   the way to go.

21          THE COURT:  I think he would be a good juror,

22   but I think that is consistent.  And I think he would be

23   legitimately distracted, as opposed to our last.

24          That is a Court cause, then.

25          CHIEF DEPUTY CLERK WALKER:  No. 30.

1                    THE COURT:   Answered No. 1.

2                    (Juror comes to sidebar.)

3                    THE COURT:   You indicated the length of the

4      trial might be a problem for you.

5                    A JUROR:   Yes.   I have classes on Tuesdays and

6      it's like a six-hour lab.   If I miss that, I have to make it

7      up on Thursday of that week.   So I could miss one day, but I

8      can't miss both.

9                    THE COURT:   Where are you in school?

10                   A JUROR:   Delaware Tech, Stanton Campus.

11                   THE COURT:   There is no other way to make up

12     that lab?

13                   A JUROR:   It has to be that week because each

14     lab is in a specific region.

15                   THE COURT:   So if this extended over at least

16     the one lab and then the possible make-up if we went the

17     seven days, and could run into two, actually.

18                   A JUROR:   But, I mean, if it's next week, I

19     could miss --

20                   THE COURT:   One and then make it up.   You can't

21     make up two in one day, can you?

22                   A JUROR:   No.

23                   THE COURT:   Mr. Coyne?

24                   MR. COYNE:   No questions.

25                   MR. COTTRELL:   No questions.

```
 1                    THE COURT:  Thank you, ma'am.

 2                    (Juror leaves sidebar.)

 3                    THE COURT:  I am going to let her go.  I think

 4    that would probably blow her semester altogether.

 5                    CHIEF DEPUTY CLERK WALKER:  No. 31.

 6                    THE COURT:  That is the Court's cause.

 7                    31 answered 1 and 24, I believe.

 8                    (Juror comes to sidebar.)

 9                    THE COURT:  Good morning.  Step on in.  You

10    indicated that the length of the trial might be a problem

11    for you.

12                    A JUROR:  Yes.  My grandfather passed away on

13    Thursday.  His funeral is tomorrow.

14                    THE COURT:  All right.  Mr. Coyne?

15                    MR. COYNE:  No questions, Your Honor.

16                    MR. COTTRELL:  We are sorry.

17                    MR. PARTRIDGE:  We are sorry.

18                    A JUROR:  Thank you.

19                    THE COURT:  Why don't you have a seat back

20    there.

21                    A JUROR:  Thank you.

22                    (Juror leaves sidebar.)

23                    THE COURT:  That is the Court's cause.

24                    CHIEF DEPUTY CLERK WALKER:  33.

25                    THE COURT:  Answered 24.
```

```
1                    (Juror comes to sidebar.)

2                    THE COURT:  Good morning.

3                    A JUROR:  Good morning.

4                    THE COURT:  You have been involved in a lawsuit

5       before?

6                    A JUROR:  I have.

7                    THE COURT:  When was that?

8                    A JUROR:  Actually one is going on right now.  I

9       am a developer/builder, and I represent a homeowners

10      association that is being sued by about three individuals

11      that aren't happy.

12                   THE COURT:  Is that here in Delaware?

13                   A JUROR:  It is, in Sussex County.

14                   THE COURT:  In the general trial court down

15      there?

16                   A JUROR:  Chancery.

17                   THE COURT:  And this process, has it just

18      started?

19                   A JUROR:  Actually Judge Chandler is making a

20      ruling as we are here probably.

21                   THE COURT:  Anything about that process, your

22      involvement in it, that might give you difficulty being fair

23      to these parties?

24                   A JUROR:  No.

25                   THE COURT:  Counsel?
```

```
 1              MR. COTTRELL:  No questions.
 2              MR. COYNE:  What does the case involve?
 3              A JUROR:  Three homeowners would like to take
 4   control and turn the development over.  I am saying I am not
 5   required to turn it over and they think that we are.  That
 6   is what it is about.  DeQuilla (phonetic), a new ruling?
 7   Something like that.  Some legislature, made a new law.  It
 8   took effect in October.  They want the development turned
 9   over immediately.  And I am saying I don't have to.
10              THE COURT:  Thank you, sir.
11              (Juror leaves sidebar.)
12              CHIEF DEPUTY CLERK WALKER:  No. 35.
13              THE COURT:  Answered No. 1.
14              (Juror comes to sidebar.)
15              THE COURT:  Ma'am, you indicated the length of
16   the trial might be a problem for you.
17              A JUROR:  Just time-wise into the day.  I am
18   probably going to be staring at the clock.  I get nervous
19   picking up my kids late from daycare.  I have a two- and a
20   three-year-old.
21              THE COURT:  What time do you need to get there?
22              A JUROR:  I can leave here at 4:30.  But you
23   said there is one day that might be a little later.
24              THE COURT:  You would know in advance.  And we
25   could predict that for you.  It will be roughly the seventh
```

1    day of these proceedings -- well, not roughly, it will be,

2    that the jury, if you are selected, will get the case for

3    deliberation.

4              Now, on that day, would you be able to make

5    arrangements in the event that the jury needed to deliberate

6    beyond the 4:30 hour?

7              A JUROR:  Yes.  As long as I know in advance.

8              THE COURT:  Okay.  Any questions on that?

9              MR. COYNE:  If you were assured of getting out

10   at 4:30, would you be distracted so you couldn't pay

11   attention to all the evidence?

12             A JUROR:  No.  But if it's like at 4:30, I will

13   probably, just clock watching.

14             THE COURT:  If you don't mind, where are the

15   kids in daycare?

16             A JUROR:  Pike Creek, in Wilmington.

17             THE COURT:  Okay.  When do they start charging

18   you extra?

19             A JUROR:  They don't.  They are open until 6:30.

20   I just don't like them being there --

21             THE COURT:  I understand.  Especially with them

22   being so young.  You can be pretty well assured that -- in

23   the interest of full disclosure, 4:30 or maybe 15 minutes

24   beyond, you can deal with that?

25             A JUROR:  Yes.

```
 1                    THE COURT:  Okay.  Thank you.

 2                    (Juror leaves sidebar.)

 3                    THE COURT:  Counsel.

 4                    MR.  COYNE:  No, Your Honor.

 5                    MR. COTTRELL:  No motion, Your Honor.

 6                    CHIEF DEPUTY CLERK WALKER:  Juror No. 37.

 7                    (Juror comes to sidebar.)

 8                    THE COURT:  Good morning, ma'am.

 9                    You answered yes to two questions?

10                    A JUROR:  Yes.  I have two children that

11      require being picked up from school.

12                    THE COURT:  Where is that?

13                    A JUROR:  I have a girl that needs a ride.  But

14      that is not a problem most days, as she gets out the same

15      time.

16                    THE COURT:  You say you have another problem?

17                    A JUROR:  I have a son who plays baseball at

18      Concord High, and most days he does not get finished until

19      a little later on in the day.

20                    It would be hard for me to coordinate things to

21      the point that I could have both picked up without me being

22      there.

23                    THE COURT:  And you have no one else that can

24      support you in this regard?

25                    A JUROR:  No.
```

```
 1                    THE COURT:  Any questions?

 2                    MR. COYNE:  No, Your Honor.

 3                    MR. COTTRELL:  No, Your Honor.

 4                    THE COURT:  All right.  Thank you, ma'am.

 5                    (Juror leaves sidebar.)

 6                    THE COURT:  I am going to let her go.

 7                    CHIEF DEPUTY CLERK WALKER:  No. 39.

 8                    (Juror comes to sidebar.)

 9                    THE COURT:  Good morning, sir.  Let me ask you,

10       you answered 23, you have been on a jury?

11                    A JUROR:  Yes.

12                    THE COURT:  How many times?

13                    A JUROR:  Once.

14                    THE COURT:  How long ago was that?

15                    A JUROR:  I am going to say 46 years ago.

16                    THE COURT:  In the State of Delaware?

17                    A JUROR:  Yes.  New Castle County.

18                    THE COURT:  Criminal or civil action?

19                    A JUROR:  Criminal.

20                    THE COURT:  Do you remember the charge?

21                    A JUROR:  It was an assault charge.

22                    THE COURT:  Did the jury come up with a verdict?

23                    A JUROR:  It was a hung jury.

24                    THE COURT:  Anything about that process that

25       might give you difficulty being fair to these questions?
```

```
1              A JUROR:  No.

2              THE COURT:  Counsel?

3              MR. COTTRELL:  No, Your Honor.

4              MR. COYNE:  No questions.

5              THE COURT:  Thank you, sir.

6              (Juror leaves sidebar.)

7              CHIEF DEPUTY CLERK WALKER:  No. 40.

8              THE COURT:  Answered 21.

9              (Juror comes to sidebar.)

10             THE COURT:  Good morning.

11             A JUROR:  Good morning.

12             THE COURT:  You have applied for or obtained a

13     patent?

14             A JUROR:  My husband has.  My husband is a

15     chemist at DuPont, heavily involved in the application

16     process and research to make sure what he is developing is

17     not going to infringe on other patents.

18             THE COURT:  I assume, and perhaps incorrectly,

19     but I will make the assumption that you speak with your

20     husband about his work?

21             A JUROR:  We do.

22             THE COURT:  Based on that relationship and the

23     knowledge you have acquired over the years, do you think

24     that that would interfere with your ability to be fair to

25     these parties here?
```

```
1                    A JUROR:  I don't think so.

2                    THE COURT:  The lawyers may have some questions.

3       We will start with plaintiff.

4                    MR. COTTRELL:  Your husband's work, is it

5       primarily for the folks that hold the patents or is it --

6                    A JUROR:  He is developing a product and he

7       wants to make sure that he is not infringing.  As the

8       development process, you know, progresses, before they go to

9       market, that they are not infringing on anybody else's

10      right, anybody else's patent.

11                   MR. COTTRELL:  I understand.  Thank you.

12                   MR. COYNE:  Would you have any problem not

13      discussing the case with him in terms of patent issues and

14      just relying on the evidence?

15                   THE COURT:  The question really is, what he

16      really wants to ask is would you have any difficulty

17      following the Court's instructions that you are not to

18      discuss the case with anyone, including your significant

19      other?

20                   A JUROR:  I would not have a problem.

21      Afterwards is okay?

22                   THE COURT:  Yes, ma'am.  Yes, indeed.

23                   A JUROR:  Because it should be interesting.

24                   THE COURT:  Anything else, Mr. Coyne?

25                   MR. COYNE:  No, thank you, Your Honor.
```

1          THE COURT:  All right.

2          (Juror leaves sidebar.)

3          CHIEF DEPUTY CLERK WALKER:  41.

4          THE COURT:  Answered 1, 23, and 24.

5          (Juror comes to sidebar.)

6          THE COURT:  Good morning, sir.  The first

7    question you answered had to do with the length of the trial

8    perhaps being problematic for you.  How so?

9          A JUROR:  Well, my mother-in-law is serving a

10   five-year sentence in federal prison.  While in prison, she

11   got sick.  My wife is going to go see her, so I have to stay

12   with the kids.

13         THE COURT:  How old are your kids?

14         A JUROR:  12.  I have a 12, a 16, then I have my

15   niece -- her niece, her sister I am going to be watching,

16   too.

17         THE COURT:  This is going to seem like I am

18   prying a little bit, so you will forgive me.  The sentence

19   is being served where?

20         A JUROR:  She was in West Virginia.  But because

21   of the medical stuff, they had to move her to Fort Worth,

22   Texas.

23         THE COURT:  Your wife is leaving for Fort Worth?

24         A JUROR:  Yes.

25         THE COURT:  When is she leaving?

1          A JUROR:  Sunday, I believe Sunday, I think it

2     is.

3          THE COURT:  So it's after that that you will

4     need to be available for your children?

5          A JUROR:  Exactly.

6          THE COURT:  Mr. Coyne?

7          MR. COYNE:  No questions, sir.

8          MR. COTTRELL:  No questions.

9          THE COURT:  Sir, I am going to ask you to resume

10    your seat.

11          (Juror leaves sidebar.)

12          THE COURT:  I am going to dismiss him for cause,

13    the Court's cause.  That is 41.

14          CHIEF DEPUTY CLERK WALKER:  43.

15          THE COURT:  43 answered 1, 23, and 24.

16          (Juror comes to sidebar.)

17          THE COURT:  Good morning, ma'am.  You answered

18    three of the questions.  One having to do with the length of

19    the trial being a problem for you.  How so?

20          A JUROR:  I am a third grade teacher, and the

21    Delaware state test starts next week.  This week and next

22    week is all --

23          THE COURT:  You are getting ready, getting the

24    kids ready?

25          A JUROR:  Yes, test-ready.

1          THE COURT:  I take it a substitute would not be

2  able to do that?

3          A JUROR:  No.

4          THE COURT:  Mr. Coyne?

5          MR. COYNE:  No questions, Your Honor.

6          MR. COTTRELL:  No questions.

7          THE COURT:  Thank you, ma'am.

8          (Juror leaves sidebar.)

9          THE COURT:  I am going to let her go.

10          CHIEF DEPUTY CLERK WALKER:  No. 44.

11          THE COURT:  Answered No. 1.

12          (Juror comes to sidebar.)

13          THE COURT:  Good morning, ma'am.  You

14  indicated -- come on in.

15          You indicated that the length of the trial might

16  be a problem for you.  How is that?

17          A JUROR:  The schedule, yes.

18          THE COURT:  Could you explain?

19          A JUROR:  I won't get paid.

20          THE COURT:  Okay.  In other words, your employer

21  will not pay you?

22          A JUROR:  Yes.

23          THE COURT:  Where do you work?

24          A JUROR:  Phoenix Brothers.

25          THE COURT:  Let's see if the lawyers have any

```
1    additional questions?

2                MR. COYNE:  No questions.

3                MR. COTTRELL:  No, Your Honor.

4                THE COURT:  Thank you.  Why don't you have a

5    seat.

6                (Juror leaves sidebar.)

7                THE COURT:  I am not certain that there wouldn't

8    also be a language issue there.

9                MR. PARTRIDGE:  I think that is probably the

10   case.

11               THE COURT:  That's the Court's cause on 41.

12               CHIEF DEPUTY CLERK WALKER:  45.

13               THE COURT:  45 answered 1, 3, 17, and 22 by my

14   count.

15               (Juror comes to sidebar.)

16               THE COURT:  Good morning, sir.

17               A JUROR:  Good morning.

18               THE COURT:  Sir, you indicated, in response to

19   one of the questions, that the length of the trial might be

20   a problem for you.  How is that?

21               A JUROR:  Length of the trial?

22               THE COURT:  Was I wrong about that?

23               A JUROR:  Yes.

24               THE COURT:  I thought you responded -- the

25   question was, does the length of this trial or the schedule
```

1  contemplated by the Court present a problem to any member of

2  the panel.  It is not a problem for you?

3              A JUROR:  No, not the length.

4              THE COURT:  Then No. 3 is the next question you

5  answered.  That was whether you had any involvement with any

6  of the lawyers.

7              A JUROR:  No.  I didn't say I had any

8  involvement with the lawyers.

9              THE COURT:  Is this No. 45?

10             CHIEF DEPUTY CLERK WALKER:  Yes.

11             THE COURT:  Does counsel concur?

12             MR. HERRMANN:  Yes.

13             THE COURT:  Does any --

14             A JUROR:  Excuse me.  My wife, she had a car

15  accident and went to Morris James.

16             THE COURT:  Mr. Herrmann's firm.

17             A JUROR:  Yes.  They just settled it a few weeks

18  ago.

19             THE COURT:  So, then, my question is:  Would

20  that relationship, that representation that Morris James

21  provided to your wife, I gather successfully, in any way

22  interfere with your ability to judge the case fairly for

23  both sides?

24             A JUROR:  No.  We had two cases with Morris

25  James, with Susan Ament.  I don't know how this is, you

1    know, what I am saying is, you are asking, did I know

2    anybody?  Yes, we did.

3              THE COURT:  Okay.

4              A JUROR:  We were successful in the results.

5              THE COURT:  Okay.  Mr. Coyne?

6              MR. COYNE:  No questions.

7              MR. COTTRELL:  Sir, you were happy with the

8    results working with Morris James?

9              A JUROR:  My wife was.  She was, yes.

10             THE COURT:  Okay.  You indicated, also, in

11   response to the question, do you believe companies try to

12   infringe or violate the patent rights of other companies.

13             A JUROR:  Well, I worked for DuPont for 31

14   years.  We had a lot of patent cases, infringement and

15   stuff, because I was in analytical chemistry.  You know, I

16   worked for DuPont, so I had to side with DuPont.  I don't

17   know whether they infringed or somebody else's patents.

18   Everybody was trying to infringe on us, because our patents

19   last for 17 years or something like that.  And we had a lot

20   of other companies that we were having problems with.

21             As far as -- I could not answer that.

22             THE COURT:  Did you have occasion to get

23   involved directly or indirectly?

24             A JUROR:  I went into court once for a case we

25   had where they said the product that we sold killed a bunch

1    of products for the farmers, agriculture.

2           THE COURT:  That was not an infringement suit,

3    was it?

4           A JUROR:  Huh?

5           THE COURT:  That was not an infringement suit?

6           A JUROR:  No.  That was not an infringement

7    there.  The infringement was --

8           THE COURT:  Here is my question --

9           A JUROR:  They were trying to get our patents.

10          THE COURT:  You got to listen to me.  I have the

11   robe on.

12          The question is, in your 17 years, did you get

13   involved either directly or indirectly with any of the

14   infringement matters in which DuPont was involved?

15          A JUROR:  Not directly or indirectly.  I only

16   went to court to state that we did not infringe on their

17   thing.

18          THE COURT:  You say you went to court?

19          A JUROR:  Yes.

20          THE COURT:  In what capacity would you appear in

21   court?

22          A JUROR:  As someone that was saying that the

23   product that -- see, I was in analytical, so I was directly

24   in with -- that we did not take anything from them.

25          THE COURT:  Okay.  You also answered the

1    question, have you or anyone in your immediate family or

2    anyone close to you ever applied for or obtained a patent.

3                   A JUROR:  Yes.  My sister-in-law.  She tried to

4    get a patent for wastepaper cans that she was making, and

5    other products.  But I was not directly involved.

6                   THE COURT:  Did you talk with her about her

7    experience?

8                   A JUROR:  Oh, yes.  She wanted us to help her.

9                   THE COURT:  Was her experience a satisfactory

10   experience?

11                  A JUROR:  No.  She is still trying to get it.

12                  THE COURT:  That fact, would it in any way

13   interfere with your ability to be fair to these parties?

14                  A JUROR:  No, I do not think that it would be.

15                  THE COURT:  Let's see if counsel has any

16   questions on any of my questions.

17                  MR. COTTRELL:  No further questions than you

18   have already asked.

19                  MR. COYNE:  What kind of work did you do on

20   analytical chemistry?

21                  A JUROR:  Liquid gas chromatography.  And with

22   the computer.

23                  THE COURT:  Counsel?

24                  MR. COYNE:  Thank you.

25                  THE COURT:  Yes, sir?

```
 1                    A JUROR:  I had throat cancer.  I have dry

 2       throat and irritation.  I need water bad.  And I am

 3       freezing.

 4                    THE COURT:  He have got some now.

 5                    Thank you, sir.

 6                    (Juror leaves sidebar.)

 7                    MR. COTTRELL:  Your Honor, the relationship with

 8       Morris James, I think the other answers could go both ways,

 9       I think given the relationship with Morris James, I think we

10       would make a motion for cause.

11                    MR. COYNE:  He did answer that he could be fair.

12                    THE COURT:  He did say that.

13                    MR. COTTRELL:  He did it more than once.  There

14       were two.

15                    THE COURT:  Hold on a second.

16                    Here is what I am going to say.  I detected an

17       odor of alcohol.  And Ms. Walker has confirmed that.  I

18       don't think he followed my questions exactly.  Some of his

19       answers were, frankly, not responsive to the questions,

20       which were rather clear.  So I am going to dismiss this

21       juror.  I am going to take it out of both parties' hands.

22                    CHIEF DEPUTY CLERK WALKER:  No. 47.

23                    THE COURT:  Answered No. 23.

24                    (Juror comes to sidebar.)

25                    THE COURT:  Good morning.  How are you?
```

```
 1                    A JUROR:  Good.

 2                    THE COURT:  You have been on a jury before?

 3                    A JUROR:  I was on grand jury in Sussex County

 4     15 years ago, give or take.

 5                    THE COURT:  Anything about that experience that

 6     might give you difficulty being fair to these parties, sir?

 7                    A JUROR:  Not that I can think of.

 8                    THE COURT:  Counsel?

 9                    MR. COTTRELL:  No questions.

10                    MR. HERRMANN:  No.

11                    THE COURT:  Thank you very much, sir.  You may

12     resume your seat.

13                    (Juror leaves sidebar.)

14                    CHIEF DEPUTY CLERK WALKER:  48.

15                    THE COURT:  No. 16.  Here is someone who has

16     design experience.

17                    (Juror comes to sidebar.)

18                    THE COURT:  Good morning, sir.  You indicated

19     you might have experience in the design, repair or upkeep of

20     electronic or mechanical devices?

21                    A JUROR:  Yes, sir.  Repair.

22                    THE COURT:  Could you explain?

23                    A JUROR:  I used to do major appliance repair

24     and heating and air conditioning repair.

25                    THE COURT:  Did that involve refrigerators?
```

1                    A JUROR:  Yes.

2                    THE COURT:  Any experience with the products of

3       these companies?

4                    A JUROR:  Well, I have definitely worked on

5       Whirlpool.  When I used to do it, I don't think LG was a

6       major --

7                    THE COURT:  Player at the time?

8                    A JUROR:  At the time, right.

9                    THE COURT:  Could you describe generally your

10      experience with Whirlpool, good or bad?

11                   A JUROR:  Generally good.  They have always had

12      good products.

13                   THE COURT:  Given that statement and that view,

14      do you think you would tend to favor the other side in this

15      case?

16                   A JUROR:  I think I would go by what the law

17      says.

18                   THE COURT:  I misspoke.  I should say Whirlpool

19      in this case.  Would your response be the same?

20                   A JUROR:  Yes.

21                   THE COURT:  You would be able to follow my

22      instructions?

23                   A JUROR:  Yes, I believe so.

24                   THE COURT:  Listen to the evidence impartially?

25                   A JUROR:  Yes.

```
 1                    THE COURT:  Mr. Coyne?

 2                    MR. COYNE:  What types of refrigerator

 3      experience have you had with those products?

 4                    A JUROR:  I did basically home repair.  I would

 5      replace fan motors and control units, and different fans.  I

 6      didn't do a lot with the compressors or mostly the critical

 7      parts.

 8                    MR. COYNE:  Did you have any experience with the

 9      interior cabinetry?

10                    A JUROR:  I haven't done it for 10 or 15 years.

11      I do sheet metal, mechanic.  I do air conditioning and

12      heating more now.

13                    MR. COYNE:  Thank you.

14                    THE COURT:  Gentlemen?

15                    MR. COTTRELL:  No questions.

16                    THE COURT:  Thank you, sir.

17                    (Juror leaves sidebar.)

18                    THE COURT:  Next.

19                    CHIEF DEPUTY CLERK WALKER:  51.

20                    THE COURT:  Answered No. 1.

21                    (Juror comes to sidebar.)

22                    THE COURT:  Good morning, ma'am.

23                    A JUROR:  Good morning.

24                    THE COURT:  You indicated the length of the

25      trial or the schedule might be a problem for you.  Could you
```

1    explain?

2                    A JUROR:  There is two things.  One, my

3    grandmother was just diagnosed with cancer on Friday.  I am

4    not sure what the detail of her operation is with that.

5                    The second thing is, I travel with work, and

6    Monday I start traveling a lot.

7                    THE COURT:  If you don't mind, you do you work

8    for?

9                    A JUROR:  Allergan.  It's a pharmaceutical

10   company.

11                   THE COURT:  The question is:  Would you be able

12   to postpone that travel?

13                   A JUROR:  I can see.  I have postponed

14   everything for this week.  It's just not next week.

15                   THE COURT:  Sure.  But you are involved in the

16   immediate care of your grandmom?

17                   A JUROR:  Not immediate.  My parents are there.

18                   THE COURT:  Here is the question:  Given your

19   grandmom's diagnosis, if you were selected to serve on this

20   jury, would you be able to concentrate and keep your focus?

21                   A JUROR:  I think so.  I have a nursing

22   background.

23                   THE COURT:  All right.  Let's see if the lawyers

24   have any questions.

25                   MR. COTTRELL:  No questions, Your Honor.

1           MR. COYNE:  No questions, Your Honor.

2           THE COURT:  Thank you very much, ma'am.

3           A JUROR:  Thank you.

4           (Juror leaves sidebar.)

5           THE COURT:  Gentlemen, I will put a question

6    mark next to her and we will see.

7           If our numbers are okay, I am going to dismiss

8    her.

9           CHIEF DEPUTY CLERK WALKER:  56.

10          THE COURT:  Answered 1, 14, and 23.

11          (Juror comes to sidebar.)

12          THE COURT:  Good morning, sir.

13          A JUROR:  Good morning.

14          THE COURT:  You indicated that the length of the

15   trial might be a problem for you.

16          A JUROR:  Yes.  I am currently unemployed and I

17   have a job interview at 11:00 a.m. tomorrow morning.

18          MR. PARTRIDGE:  Good for you.

19          THE COURT:  You can resume your seat.

20          (Juror leaves sidebar.)

21          THE COURT:  I am going to let him go to try to

22   find a job.

23          CHIEF DEPUTY CLERK WALKER:  No. 57.

24          THE COURT:  That was the Court's cause.

25          57 answered 21.

```
 1                    (Juror comes to sidebar.)

 2                    THE COURT:  Good morning, ma'am.  You or a

 3     member of your immediate family has applied for or obtained

 4     a patent.  Is that correct?

 5                    A JUROR:  Yes.

 6                    THE COURT:  You?

 7                    A JUROR:  My husband.

 8                    THE COURT:  Could you tell us a little bit about

 9     that?

10                    A JUROR:  No, not really.  He works for DuPont.

11     He is a chemical engineer and consultant.  And he deals

12     mostly with pollutants, trying to reduce the particulates

13     that's going out into the atmosphere.

14                    THE COURT:  Good for him.

15                    How long ago was it?

16                    A JUROR:  That was last year.

17                    THE COURT:  Did you participate actively in the

18     process with him?

19                    A JUROR:  No.

20                    THE COURT:  Did you talk with him about the

21     process?

22                    A JUROR:  Yes.

23                    THE COURT:  Did you come to understand much

24     about the patent system and how it works?

25                    A JUROR:  Not really.
```

1          THE COURT:  Let me ask you this:  Would that

2   fact, that your husband participated in the patent process,

3   the obtaining of the patent, that process, and your

4   relationship with him, would it in any way interfere with

5   your ability to be fair to these parties?

6          A JUROR:  Probably not.

7          THE COURT:  You say "probably."  Why do you

8   hedge?

9          A JUROR:  Well, I really don't know that much

10  about probably dealing with him and what he did.  And then I

11  guess I would have to really listen to what they had to say

12  and kind of -- their dealings with their patents.

13         THE COURT:  Let me ask it this way:  Did you

14  develop, as a result of your husband's experience, any bias

15  one way or the other with regard to the patent process?

16         A JUROR:  No.

17         THE COURT:  Did you develop any views about

18  people who are attempting to -- and entities who are

19  attempting to obtain patents?

20         A JUROR:  No.

21         THE COURT:  Do you feel that your husband was

22  treated fairly by the company and counsel and the patent

23  system?

24         A JUROR:  Yes.

25         THE COURT:  Counsel?

1              MR. PARTRIDGE:  Is the patent application still

2       pending?  Or has he been awarded the patent?

3              A JUROR:  He has been awarded.

4              MR. COYNE:  No questions, Your Honor.

5              A JUROR:  I have one more question.

6              You said any businesses dealing with either one

7       of the companies.  You mean businesses, if you purchase a

8       product?

9              THE COURT:  If you want to tell us -- it

10      wouldn't be surprising that you might have purchased from

11      one of the entities I named.  The question is:  Have you had

12      any experience, good or bad, that might interfere with your

13      activity, your ability to be fair to both sides?

14             A JUROR:  Yes.

15             THE COURT:  Tell us about that, please.

16             A JUROR:  Well, I purchased a Maytag product,

17      washer machine and dryer.  I wasn't as satisfied with the

18      product as I thought I would have been.  And when I had

19      problems and had repairs done, it wasn't -- it was better

20      than it was, but it was still not good.  I am still having,

21      you know, difficulty or problems with the product.

22             THE COURT:  Do you think that might cause or

23      interfere with your ability to judge the cause of each party

24      fairly because of those problems?

25             A JUROR:  It might interfere a little bit.

1              THE COURT:  In what way?

2              A JUROR:  In that since I have I guess kind of a

3     negative experience with a product, then I may think a

4     little more negatively of that particular brand and who they

5     represent.

6              THE COURT:  Was it a refrigerator product?

7              A JUROR:  No, washing machine and dryer.

8              THE COURT:  Okay.  Let's see if counsel have any

9     questions.  Mr. Coyne?

10             MR. COYNE:  The view that you just expressed,

11    would it apply to everything Maytag makes?  This case

12    involves refrigerators.  Would it spill over to your views

13    on the evidence in this case?

14             A JUROR:  No.  Probably no, because it's a

15    different product.  I mean, you would hope -- I don't know.

16    It may.  I mean, I have been so influenced I wouldn't get

17    that product again.

18             I am thinking, anything in that line I probably

19    wouldn't get again, whether it be a refrigerator, definitely

20    not another washing machine or dryer.  So I wouldn't

21    purchase a product, a refrigerator from that person.

22             THE COURT:  Here is the question:  This case

23    involves claims of infringement back and forth, one party

24    against the other, and both parties made those assertions,

25    not the quality of the products.  So the question is:  Can

1   you judge the infringement case fairly, in your view?

2            A JUROR:  Yes.

3            THE COURT:  Mr. Coyne, did you want to follow up

4   on that?

5            MR. COYNE:  No further questions.

6            MR. COTTRELL:  It was a Maytag product?

7            A JUROR:  Yes.

8            THE COURT:  Do you still have that?

9            A JUROR:  Yes.

10           MR. COTTRELL:  How long have you had it?

11           A JUROR:  Probably like seven years.

12           MR. COTTRELL:  Do you have any Maytag or

13   Whirlpool appliances?

14           A JUROR:  No.

15           MR. COTTRELL:  You are inclined, probably

16   because of your negative experiences, not to buy another

17   Maytag product?

18           A JUROR:  No.

19           MR. PARTRIDGE:  Do you understand that Whirlpool

20   owns Maytag at the present time?

21           A JUROR:  Just from this.

22           MR. PARTRIDGE:  From what we said earlier today?

23           A JUROR:  Yes.

24           MR. PARTRIDGE:  Would we start just a little

25   further behind as a consequence, do you think?

1          A JUROR:  Yes.

2          THE COURT:  Are you saying that in your view the

3    defendant Whirlpool would start a little behind LG because

4    of the experience?

5          A JUROR:  Yes.

6          THE COURT:  Go ahead, Mr. Coyne.

7          MR. COYNE:  At the time that you indicated you

8    bought these appliances, Whirlpool didn't own Maytag yet.

9    Would that still have the same effect on you if they bought

10   Maytag after?

11         A JUROR:  No.

12         MR. COTTRELL:  Ma'am, what was the last problem

13   you had?

14         A JUROR:  Well, someone -- well, say, a down

15   blanket in the washing machine, so that messed it up and it

16   spilled over.  And I called them back in to repair, to try

17   to get everything readjusted.  So it doesn't work the same.

18         MR. COTTRELL:  That was recently?

19         A JUROR:  Yeah.  It was a couple years ago.  It

20   doesn't work the same.

21         THE COURT:  Here is what we are trying to do:

22   We are trying to empanel a fair jury that won't have a bias

23   one way or the other going on.  In other words, both parties

24   come to the party with a clean slate and not with an

25   advantage one way or the other in the minds of the jurors.

1    Would you fit that description?

2                    A JUROR:  Probably not.

3                    THE COURT:  Okay.  Thank you, ma'am.

4                    (Juror leaves sidebar.)

5                    MR. COTTRELL:  Obviously, Your Honor, we would

6    move for cause.  She has had recently negative experiences.

7                    THE COURT:  I think her last answer --

8                    MR. COYNE:  She did say she could judge the

9    evidence --

10                   THE COURT:  Mr. Coyne, you heard, the answer to

11   the last question was clear, she can't be a fair and

12   impartial juror.  I believe she would strive to follow the

13   Court's instructions, but she has been quite candid.  We

14   asked her a lot of questions.  So I am going to grant the

15   challenge.

16                   CHIEF DEPUTY CLERK WALKER:  No. 58.

17                   THE COURT:  Answered 24.

18                   (Juror comes to sidebar.)

19                   THE COURT:  Good morning, sir.  You have been a

20   party in a lawsuit.  Is that correct?

21                   A JUROR:  Yes.

22                   THE COURT:  Could you tell us a little bit about

23   that?

24                   A JUROR:  Actually, two lawsuits.  My family

25   sued for some medical malpractice.  And --

```
1              THE COURT:  How long ago was that?

2              A JUROR:  In 1994.

3              THE COURT:  Did that involve you?

4              A JUROR:  It involved my father.

5              THE COURT:  Was that here in Delaware?

6              A JUROR:  No.

7              THE COURT:  Where was that?

8              A JUROR:  New York State.

9              THE COURT:  In one of the state courts there?

10             A JUROR:  Yes.

11             THE COURT:  Roughly how long ago was that?

12             A JUROR:  Fifteen years ago.

13             THE COURT:  Was the outcome, in your view, a

14   successful one?

15             A JUROR:  It was not.

16             THE COURT:  And as a result of that experience,

17   would that in any way interfere with your ability to be fair

18   with these parties here?

19             A JUROR:  I don't think so.

20             THE COURT:  And the other experience you had?

21             A JUROR:  My family business was involved in a

22   lawsuit over some, I guess, assets that we had.

23             THE COURT:  Was that here in Delaware?

24             A JUROR:  That was not.

25             THE COURT:  That was in New York?
```

```
1              A JUROR:  Yes.

2              THE COURT:  How do you count in that?

3              A JUROR:  That was not in our favor as well.

4              THE COURT:  Anything about that experience that

5    would cause you to be unable to be fair to these parties?

6              A JUROR:  No.

7              THE COURT:  Counsel?

8              MR. COTTRELL:  No questions.

9              MR. COYNE:  What was the nature of the family

10   business, the assets that were involved?

11             A JUROR:  It was livestock.

12             MR. COYNE:  Nothing further.

13             THE COURT:  Okay.  Thank you, sir.

14             (Juror leaves sidebar.)

15             THE COURT:  Next.

16             CHIEF DEPUTY CLERK WALKER:  No. 62.

17             THE COURT:  Answered No. 1.

18             (Juror comes to sidebar.)

19             THE COURT:  Good morning, sir.  You indicated

20   that the length of the trial might be a problem for you.

21   How is that?

22             A JUROR:  Yes.  My employer sent me to work in

23   Michigan.  So I have been working in Michigan since last

24   month.  I work from Monday to Friday in Michigan.  I came

25   back for this.
```

1              THE COURT:  Thank you for doing your service.

2              A JUROR:  I have a disabled wife and a son who

3     count on my financial support.  If I don't work, I don't get

4     paid.

5              THE COURT:  You are going to be able to get back

6     on a plane and head back to Michigan?

7              A JUROR:  If I can.

8              THE COURT:  You are excused.

9              A JUROR:  Thank you.

10             (Juror leaves sidebar.)

11             THE COURT:  No. 66.

12             Answered 14 and 21.

13             (Juror comes to sidebar.)

14             THE COURT:  Good morning.  So you know one of

15    your fellow jurors?

16             A JUROR:  I do.  But he didn't stand.  He asked

17    to be dismissed, though.  Do you want me to tell you about

18    it?

19             THE COURT:  Sure.

20             A JUROR:  By number or name?

21             THE COURT:  By number.

22             A JUROR:  23.  I remembered that number for you.

23    I don't know him very well.

24             THE COURT:  Any questions on that?

25             MR. COYNE:  No.

```
 1                    THE COURT:  I think you also answered No. 21,

 2     being that you have applied or obtained a patent.

 3                    A JUROR:  No.  You said initially anybody in

 4     your family.

 5                    THE COURT:  I stand corrected.

 6                    A JUROR:  I am laughing.

 7                    THE COURT:  The member of your family?

 8                    A JUROR:  My brother.

 9                    THE COURT:  Can you tell us a little about that?

10                    A JUROR:  Sure.  My brother, he had his first

11     patent when he was 14.  He was 14 when he got his first one.

12                    THE COURT:  That is amazing.

13                    A JUROR:  I know.  He was the smart one in the

14     family.  If you want to know what it was?

15                    THE COURT:  No.

16                    A JUROR:  Basically, it's his job.  He works for

17     DuPont and he is an engineer.  And, you know, it's what they

18     do there.

19                    THE COURT:  I take it, does he have more than

20     one patent?

21                    A JUROR:  Yeah.  But, I mean, it's pretty

22     standard when you are an engineer and you work for DuPont.

23     Every time you work in engineering and development or

24     research and development and you are part of a team, it's

25     kind of what we do.
```

1          THE COURT:  But not everybody is able to do

2     that.

3          So when he was 14, what was the nature of the

4     patent?

5          A JUROR:  It was a rifle.  And he was a

6     left-handed shooter.  And that's pretty rare.  And

7     left-handed guns are expensive.  So you just convert a

8     right-handed gun into a left-handed gun.  It's a little

9     gizmo and you just convert.  It takes a long time to get a

10    patent.  It's a pain in the butt.  So my uncle, who lives in

11    Kentucky, I have never met him, but he is a patent lawyer

12    and helped him go through the steps to get a patent.

13         THE COURT:  Do you know the name of the firm

14    your uncle works for?

15         A JUROR:  No, because it's in Kentucky.  And my

16    brother is like 15 years older than I am.  So if my brother

17    was 14, I was really little, like 5.

18         THE COURT:  Did you or have you over the course

19    of time become familiar with the patent system?

20         A JUROR:  I just know it's a pain in the rear

21    end to get a patent.

22         THE COURT:  These lawyers can attest to that,

23    and this judge can attest to that.  But that's okay.

24         The question, then, ma'am, is:  Given your

25    brother's involvement in the patent system over these many

1     years, would your relationship with him and his involvement

2     in any way interfere with your ability to be fair to these

3     parties?

4                    A JUROR:  No.

5                    THE COURT:  Counsel?  Mr. Coyne?

6                    MR. COYNE:  No questions.  Thank you.

7                    MR. PARTRIDGE:  Would you mind telling us the

8     name of your uncle who is the patent lawyer?

9                    A JUROR:  His last name -- Robert Fletcher.

10                   MR. PARTRIDGE:  Okay.

11                   THE COURT:  Thank you very much, ma'am.

12                   A JUROR:  Okay.

13                   (Juror leaves sidebar.)

14                   THE COURT:  Counsel, let's recapitulate.  The

15    Court's cause on No. 7.  I sua sponte dismissed No. 8, No.

16    9, and No. 10.

17                   Court's cause No. 13.  LG's cause was granted as

18    to 17.  As to 20 and 21, the Court dismissed both jurors.

19                   23, Court's cause.  28, Court.  30, the Court.

20                   31, the Court.  37, my grant sua sponte.  41,

21    and 43, also the Court.  And 45, the Court dismissed both.

22    51 I put a question mark.  The Court is going to dismiss 51.

23    I think we are okay on the numbers.  Right?

24                   CHIEF DEPUTY CLERK WALKER:  Yes.

25                   THE COURT:  Court's cause on 56.  Whirlpool's

1    cause on 57 was granted.   62, the Court dismissed 62.

2              That is it.   Everybody agree?

3              MR. PARTRIDGE:   Yes.

4              THE COURT:   Let's do the preempts, then,

5    counsel.

6              (End of sidebar conference.)

7              THE COURT:   Ladies and gentlemen, on behalf of

8    the parties and the Court, I would like to thank you for

9    your patience and being so quiet while we were doing that.

10   We are now going to go through the peremptory challenge

11   phase, the second phase of the jury selection process.

12   Please continue to bear with us.   Thank you.

13              CHIEF DEPUTY CLERK WALKER:   Members of the jury

14   panel, when I call your number, please have a seat in the

15   first row of the jury box.

16              No. 1.   No. 48.

17              No. 24.   No. 38.   No. 25.   No. 33.

18              No. 64.

19              When I call your number, please have a seat in

20   the second row of the jury box.

21              No. 52.   No. 58.   No. 29.   No. 15.

22              No. 55.   No. 34.   And No. 66.

23              (Pause as counsel exercise peremptory

24   challenges.)

25              CHIEF DEPUTY CLERK WALKER:   When I call your

1    number, please have a seat back in the well of the court.

2              No. 48.  No. 38.  No. 33.  No. 15.  No. 55.  And

3    No. 34.

4              THE COURT:  All right.  Those of you, ladies and

5    gentlemen, who remain in the well of the court or who have

6    been asked to return to the well of the court, on behalf of

7    the parties and the Court, I wish to express our sincere

8    thanks to each and every one of you for doing your civic

9    duty, especially the gentleman who flew in here from

10   Michigan today.  You are dismissed.  And I want you to

11   return, if you would, to 3311.  That is one floor down,

12   3311.

13             Good day.

14             (Remainder of the jury panel excused.)

15             THE COURT:  Ms. Walker, will you swear our jury,

16   please ?

17             (At this point the jury was sworn and/or

18   affirmed.)

19             THE COURT:  All right, members, please keep

20   standing.

21             We are going to have Ms. Walker take you back

22   into the jury deliberation area to orient you to the space

23   that you will be occupying for the next several days.  You

24   will be given a set of preliminary instructions, then you

25   will return to the courtroom.  I will deliver those

1    instructions.

2              I will anticipate you will at least hear an

3    opening statement from one party.  We will see how time goes

4    as to whether you will hear from both.

5              Let's take our recess, then.

6              (Jury leaves courtroom at 11:55 a.m.)

7              (Recess taken.)

8              THE COURT:  Ms. Walker, would you bring in the

9    jury, please?

10             (Jury enters courtroom at 12:19 p.m.)

11             THE COURT:  Please remain standing while your

12   fellow jurors come in.

13             Please, ladies and gentlemen, take your seats.

14             Members of the jury, each of you should have a

15   copy of the preliminary instructions.

16             Everyone learns differently.  Depending upon how

17   you feel is the best way for you to learn, you can either

18   direct your attention to the Bench as I go through these

19   instructions with you, or you can read them.  But these

20   instructions will be with you throughout the entire process

21   of this trial, and you will get a copy, a set of final jury

22   instructions, which will be considerably more comprehensive.

23             Now that you have been sworn, ladies and

24   gentlemen, I am going to give you some preliminary

25   instructions to guide you in your participation in this

trial.  These instructions will give you some general rules

and guidance that might apply to any civil case.  However,

because this is a patent trial, which will deal with subject

matter that is not within the every-day experience of most

of us, I will give you some additional preliminary

instructions regarding the patents to assist you in

discharging your duties as jurors.

Before I begin, however, allow me to give you an

overview of who the parties are and what each contends.

You may recall that during the process that led

to your selection as jurors, I advised you that this is a

civil action for patent infringement arising under the

patent laws of the United States of America.

The parties in this case, as you know, are the

plaintiffs, and what we call counterclaim defendants.  Don't

worry about that.  We have the plaintiffs and the

defendants.  The plaintiff in this case is LG Electronics

USA, Inc., LG Electronics, Inc., and LG Electronics

Monterrey, Mexico.

Those are the plaintiffs.

The defendants are Whirlpool Corporation, Maytag

Corporation, Whirlpool Patents Company, and Whirlpool

Manufacturing Corporation.

I am going to refer to the plaintiffs

collectively as LG, for ease of reference, and to the

1    defendants collectively as Whirlpool.

2              The dispute between the parties relates to

3    components for refrigerators.  During the trial, the parties

4    will offer testimony to familiarize you with this

5    technology.  That refrigerator over there is not for my

6    lunch.  It is actually an exhibit in these proceedings.

7              LG owns United States patents 7,316 -- I'm

8    sorry, 7,316,121.  That is, it alleges Whirlpool -- the

9    patent, that Whirlpool infringes.

10             Now, ladies and gentlemen, because these numbers

11   are so long, as you now see, patents are usually referred to

12   by their last three numbers, their last three digits.  So

13   the patent I just called out will simply be called the '121

14   patent.  Sometimes the patents will be referred to as the LG

15   patent in suit, the Whirlpool patent in suit.  Both parties

16   have patents in suit here.

17             LG contends that Whirlpool makes, uses, sells,

18   and/or offers for sale refrigerators that infringe the '121

19   patent.  LG seeks damages for Whirlpool's alleged

20   infringement.  Now, Whirlpool owns two patents, and it

21   alleges that LG infringes these patents.  The numbers are

22   the '130 patent and the '601 patent.  Now, sometimes, again,

23   I will call these patents the Whirlpool patents in suit.

24             Whirlpool contends that LG makes, uses, sells,

25   and/or offers for sale refrigerators that infringe these two

patents.  Whirlpool also seeks damages for LG's alleged infringement.  Now, neither of the companies, LG nor Whirlpool, contends that all of the claims of each of the parties' patents are infringed by the other.  Instead, each party asserts that only certain claims of the patents in suit are infringed.  These claims are called asserted claims.  That is a term of art, "asserted claims."  I and the attorneys and the witnesses may refer to products that are accused of infringing these asserted claims as accused products.

Now, you, of course, will determine whether or not each accused product infringes the asserted claims of any of these patents that are in suit here, ladies and gentlemen.  Persons or companies sued for allegedly infringing a patent can deny, as is the case here, infringement.

They also can defend a charge of infringement by proving the asserted claims are invalid.  In this case, Whirlpool denies that it infringes LG's patent and asserts what are called defenses to the charges, or the charge of infringement.

Similarly, LG denies that it infringes Whirlpool's patents and asserts what are called defenses to the charges of infringement against it.

I will tell you more about infringement in a few

1    minutes, and even more later at the conclusion of the

2    evidence.

3              I will instruct you as to defenses to a charge

4    of infringement and possible damages resulting from a

5    finding of infringement in my instructions to you at the

6    close, again, of the evidence.

7              Let me begin with those general duties that will

8    govern the discharge of your duties and responsibilities

9    here in this case.

10             It will be your duty, ladies and gentlemen, to

11   find from the evidence what the facts are.  You and you

12   alone will be the judges of the facts.  You will then have

13   to apply the law -- I am sorry, apply those facts to the law

14   as I will give it to you, both during these preliminary

15   instructions and at the close of the evidence.  And I may

16   give you further instructions during the course of these

17   proceedings.  You will have to follow that law and those

18   instructions as well.  And you must follow the law as I have

19   described it, whether you agree with it or not.

20             In addition to instructing you about the law at

21   the close of all the evidence, I will provide you with

22   instructions as to what the claims of the patents mean.

23   Again, of course, you are bound by your oath as jurors to

24   follow these and all of the instructions that I give you,

25   even if you personally disagree with them.  All the

instructions, ladies and gentlemen, are important.  And you
should consider them together, as a whole.

Perform these duties fairly.  Do not let any
bias, sympathy or prejudice that you may feel toward one
side or the other influence your decision in any way.  Also,
do not let anything that I may say or do during the course
of the trial influence you.  Nothing that I may say or do is
intended to indicate or should be taken by you as indicating
what I think your verdict should be.

As to evidence, the evidence from which you will
find the facts will consist of the testimony of witnesses.
Now, the testimony of witnesses consists of the answers of
the witnesses to questions posed by the attorneys or me, the
Judge.  I will not permit you to ask questions during the
course of these proceedings.

Evidence will also consist of documents and
other things received into the record as exhibits, and any
facts that the lawyers agree to or stipulate to, or that I
instruct you to find.

Certain things are not evidence and must not be
considered by you.  Allow me to list them for you now.

First, statements, arguments, and questions by
lawyers are not evidence.  That bears repeating:
Statements, arguments, and questions by the lawyers are not
evidence.

1              Objections to questions are not evidence.

2    Lawyers have an obligation to their clients to make

3    objections when they believe evidence being offered is

4    improper under the rules of evidence.  You should not be

5    influenced by the objection or by my ruling on it.

6              If the objection is sustained, simply ignore the

7    question.  If it is overruled, treat the answer just like

8    any other.

9              If you are instructed that some item of evidence

10   is received for a limited purpose only, you must follow that

11   instruction.

12             Third, testimony that I have excluded or told

13   you to disregard is not evidence and you must not consider

14   it.

15             And finally, anything you may have seen or heard

16   outside the courtroom is not evidence and must be

17   disregarded.  You are to decide the case solely on the

18   evidence presented here in this courtroom.

19             Now, there are fundamentally two kinds of

20   evidence, direct and circumstantial.  Direct evidence is the

21   direct proof of a fact, such as the testimony of an

22   eyewitness.  Circumstantial evidence is proof of facts from

23   which you may infer or conclude that other facts exist.

24             As a general rule, the law makes no distinction

25   between these two types of evidence, but simply requires

1    that you find from the facts all the evidence in this case,

2    whether direct or circumstantial, or a combination of the

3    two.

4         You are the sole judges of each witness'

5    credibility.  You should consider each witness' means of

6    knowledge, strength of memory, opportunity to observe, how

7    reasonable or unreasonable the testimony is, whether it is

8    consistent or inconsistent, whether it has been

9    contradicted, the witness' biases, prejudices, or interests,

10   the witness' manner or demeanor while testifying here on the

11   witness stand, and all circumstances that according to the

12   evidence could affect the credibility of the testimony.

13        If you find the testimony to be contradictory,

14   you must try to reconcile it if reasonably possible so as to

15   make one harmonious story of it all.  But if you can't do

16   this, then it is your duty and privilege to believe the

17   testimony that in your judgment is most believable and

18   disregard any testimony, again, in your judgment, that is

19   not believable.

20        This instruction applies to the testimony of all

21   witnesses, including so-called expert or opinion witnesses.

22        Now, as I have already told you in this case, LG

23   is the owner of one patent which it contends Whirlpool

24   infringes.  For the LG patent in suit, LG has the burden of

25   proving infringement by what is called a preponderance of

1   the evidence.  That means LG has to prove, or produce,

2   evidence which, considered in light of all the facts, leads

3   you to believe that what LG alleges is more likely true than

4   not.  To put it differently, if you were to put LG's and

5   Whirlpool's evidence on opposite sides of a scale, the

6   evidence supporting LG's allegations would have to make the

7   scale tip somewhat to its side.  If LG fails to meet this

8   burden, the verdict must be for Whirlpool.  LG must also

9   prove its damages by a preponderance of the evidence.

10          Now, similarly, Whirlpool contends, as you know,

11   that LG infringes two of Whirlpool's patents.  Whirlpool has

12   the burden of proving infringement of its patents in suit

13   and damages, again, by a preponderance of the evidence.  In

14   this case Whirlpool asserts that LG's patent is infringed,

15   and LG asserts that Whirlpool's patents are infringed.

16          A patent, ladies and gentlemen, however, is

17   presumed to be valid.  Accordingly, the party challenging

18   the validity of a patent has the burden of proving by clear

19   and convincing evidence that the patent or patents, the

20   patent is or the patents are invalid.

21          Clear and convincing evidence is evidence that

22   produces an abiding conviction that the truth of a factual

23   contention is highly probable.  Proof by clear and

24   convincing evidence is, thus, a higher burden of proof than

25   proof by a preponderance of the evidence.

 1            Whirlpool also contends that LG willfully

 2     infringed the Whirlpool '130 patent.  Whirlpool must prove

 3     willful infringement by clear and convincing evidence as

 4     well.

 5            Those of you who have sat on criminal cases will

 6     have heard the term "proof beyond a reasonable doubt."  That

 7     requirement, that standard of proof, does not apply in a

 8     civil case; therefore, you must put that out of your mind.

 9            Now, I will now give you a general overview of

10     what a patent is and how one is obtained by playing for you

11     a video regarding the patent system.  The video will last

12     roughly 20 minutes or so, and has been prepared by an

13     independent organization for the use, our use in patent

14     cases to help jurors such as you better understand the

15     patent system.

16            Many of the terms used in this video are

17     contained in a glossary of patent terms, which I will give

18     you.

19            Have we agreed as to whether the patents are

20     going to be handed out?

21            MR. PARTRIDGE:  The glossary is attached to the

22     instructions, Your Honor.  We have agreed to the glossary

23     and the instructions that are attached.

24            THE COURT:  Okay.

25            So, again, the glossary will be a part of that

1    which you will have with you, with these preliminary

2    instructions.  And you should feel free to utilize this

3    glossary throughout these proceedings.

4              MR. PARTRIDGE:  Your Honor, if I may, when

5    copies were made, and I am not sure who made the copies, it

6    appears as though they inadvertently included the voir dire

7    questions as an attachment.

8              So I suspect the jury must have those.  Now,

9    they have heard all of those questions already this morning.

10              THE COURT:  During the lunch break, we will

11    collect the preliminary instructions and remove the voir

12    dire.

13              I just noticed that, Mr. Partridge.  I hadn't

14    seen it.

15              Okay.

16              MR. COYNE:  Yes, Your Honor.  We will take care

17    of that.

18              THE COURT:  Okay.  We will play the video.

19              (Video played as follows:

20              THE SPEAKER:  As you probably know by now, this

21    is a patent case.  So you may be wondering how can I sit in

22    judgment on a case like this when I'm not entirely sure what

23    a patent is?  We hope to answer that concern with this brief

24    video, which will give you some of the background needed to

25    do your job.

1           This case will involve some special issues that

2      the judge and lawyers will explain to you, but all patent

3      cases involve some basics that you will learn about.  This

4      video will discuss what patents are, why we have them, how

5      people get them, and why there are disputes that require us

6      to call in a jury like you.  We'll also show you what

7      patents look like.

8           The United States Constitution gives Congress

9      the power to pass laws relating to patents.  It allows

10     Congress to promote the progress of science and useful arts

11     by securing for limited times to authors and inventors the

12     exclusive right to their respective writings and

13     discoveries.

14          A patent then is an official grant by the United

15     States Government that gives its owner certain rights to an

16     invention.  Those include the right to keep others from

17     making, using, selling or offering for sale the invention

18     that is described in the patent.

19          A patent lasts for a specific period of time,

20     usually 20 years, and represents a bargain made between the

21     Government and the inventor.  In return for the right to

22     keep others from using the invention, the inventor must

23     enhance the public knowledge or what we sometimes call the

24     state of the art by adding something new and useful to it.

25     An example is Thomas Edison's invention of the light bulb.

During the lifetime of the patent, its

disclosure may inspire new inventions, and after it expires,

the invention is free for anyone to use.  It is this giving

of something new and valuable to the public that justifies

giving a patent to the inventor.  A patent is in many ways

like a deed to a piece of property.  It grants the owner the

right to keep people off the property or to charge them a

fee like rent for using it.  And just as a deed indicates

limitations on the rights of a landowner, a patent sets

limits on the rights of an inventor.

The patent system works because the inventor is

required to describe the invention in clear and specific

terms so that the public knows what the boundaries of the

invention are.  Once a patent is issued by the Government,

it becomes available for public inspection, and that way

anyone who learns of the patent and is interested can read

it and understand exactly what the inventor has claimed to

have invented.

Now that we understand what a patent is, let's

take a closer look at the term invention.  An invention is a

new way of solving a problem.  The patent process begins in

the mind of the inventor, and in particular when the

invention is formulated in the mind of the inventor.  Patent

lawyers call this conception.  This is when the idea occurs

to the inventor clearly enough that he or she can write it

1    down and explain it to someone.

2          To qualify for a patent, the invention needs to

3    be new and useful.  Also, it must not be obvious to one of

4    ordinary skill in the field.  If the inventor believes these

5    requirements are met, he or she will prepare an application

6    for filing with the United States Patent and Trademark

7    Office in Washington, D.C.  The Patent and Trademark

8    Office, often called the PTO, is the agency of the federal

9    government whose job it is to examine patent applications to

10   make sure they are in proper form and comply with the

11   requirements of the law.

12         The inventor can prepare the application for

13   filing with the PTO but usually it's drafted by an attorney

14   who specializes in this work or by a patent agent who is not

15   an attorney.  The attorney or agent works with the inventor

16   to be sure the invention is described and claimed in a way

17   that complies with the law and the regulations of the PTO.

18         As you can see, the application is basically a

19   typewritten document in which the inventor describes the

20   invention he or she is trying to protect.  When the PTO

21   receives the inventor's application, it assigns a patent

22   examiner, a staff person with a background in the field or

23   art the invention falls within to examine the application

24   and decide whether a patent can be granted.

25         You've been given a sample patent to refer to as

1    you watch this video, so you already have a sense of what a

2    patent looks like.  But now let's take a closer look at the

3    three main parts to a patent.  To begin with, there is some

4    basic identifying information on the first page.  This

5    material is highlighted in your handout.

6            On the upper right side of the page is the

7    number assigned to the patent by the Government.  And on the

8    left side is the title that describes the invention, the

9    names of the inventors, and sometimes the company they have

10   assigned the patent to, and the date when the patent

11   application was filed.

12           There is also more detailed information on the

13   first page, including a list of numbers following the

14   captioned field of search.  These numbers identify

15   previously issued patents the examiner looked at or searched

16   to make sure the applicant's claimed invention really is

17   something new, not obvious, and thus patentable.

18           Also listed on the first page are what we call

19   references, that is, previous patents or articles that

20   describe the technology or prior art known at the time the

21   application was filed.  It may seem strange to you we call

22   this preexisting technology prior art even though it has

23   nothing to do with artists.  We use the word art in its

24   broadest sense, to include inventions and other subject

25   matter reasonably related to the claimed invention.  We also

1   refer to the latest technology as state of the art and we

2   say of someone who can understand and apply the technology

3   that he or she is skilled in the art.

4          The second major part of the patent is what we

5   call the specification or written description.  As is the

6   case in your sample, it's usually the longest part of the

7   patent.  It includes an abstract which is a brief summary of

8   the invention, a background section that describes the

9   nature of the problem the invention is supposed to solve,

10  one or more drawings called figures that illustrate various

11  aspects of the invention and a detailed description of one

12  or more embodiments of the invention.  An embodiment is a

13  specific device or method that uses the invention, such as a

14  particular form of light bulb.

15         The third and most important part of the patent

16  is the claims.  These are the numbered paragraphs that

17  appear at the end.  The claims are what give the public

18  notice of the boundaries of the invention.  They are similar

19  to the description of property you may have seen in a deed,

20  referring to precise measurements taken on the ground.

21         Now that we've discussed the main parts of a

22  patent, let's take a look at how the PTO processes patent

23  applications.  This process which is called prosecution of

24  the patent application, begins when the inventor's

25  application arrives at the PTO mailroom.  There, it receives

1    a stamp that establishes its filing date.  Every year, the

2    PTO receives over 300,000 applications and issues more than

3    150,000 patents.  Applications go from the mailroom to the

4    Office of Initial Patent Examination, which looks them over

5    to make sure all the required parts are there.  This office

6    also decides what field of technology an application relates

7    to and assigns it to the appropriate examining group.

8         Soon, it is assigned to an individual patent

9    examiner for handling.  It then gets put in a stack to wait

10   its turn for examination.  The reason is that examiners have

11   to review the applications assigned to them in the order in

12   which they have been filed.  In time, the examiner turns to

13   our inventor's application and begins by reading it,

14   especially the specification and claims, in order to come to

15   a conclusion about whether the inventions described in the

16   claims are patentable.

17        A patent might contain one claim or many claims

18   and the examiner must make this conclusion about each

19   individual claim.  In order to make that decision, the

20   patent examiner usually looks at patents that have been

21   issued previously in the same or very closely related fields

22   of art.  In most areas of technology, the examiner also has

23   computer databases that contain limited additional

24   information.

25        Another part of the job is to decide if the

1    inventor's description of the invention is complete and

2    clear enough to meet the requirements of a patent, including

3    the requirement that the description enables someone of

4    ordinary skill in the field to actually make and use it.

5         It's important to note that the process of

6    patent examination is private; that is, the public does not

7    know that someone has applied for a patent on an invention

8    until the patent issues or in some cases until the

9    application has been pending for at least 18 months.  The

10   reason for this secrecy is to give the inventor a chance to

11   get the examiner's reaction to the application and decide

12   whether to withdraw it for whatever reason and keep the

13   invention as confidential information.

14        However, because the process occurs mostly in

15   private, and because the job of examining so many

16   applications is very challenging, the law requires the

17   applicant to tell the examiner whatever he or she knows

18   about the prior art that might be important to the

19   examiner's decision on whether to allow the patent.  We call

20   this the applicant's duty of candor.  One way the applicant

21   can satisfy this duty is by bringing certain prior art to

22   the attention of the examiner either in the original

23   application or in other submissions called information

24   disclosure statements.  In this way, the decisions of the

25   examiner are based on both the information provided by the

applicant and on the information the examiner is able to

find during the examination process.

Sometimes the examiner concludes the application

meets all the requirements we've discussed and allows the

patent to issue at this first stage, but more frequently the

examiner will reject the application as deficient in some

respect.  At that point, the applicant usually prepares a

written response, either agreeing or disagreeing with the

examiner.  An applicant who agrees with the examiner can

submit amendments to the application designed to overcome

the examiner's objection.  And an applicant who disagrees

with the examiner can explain the reasons for the

disagreement.  This exchange of office actions and responses

goes on until the examiner issues a final office action

which may reject or allow some or all of the applicant's

claims.

Once a final PTO office action has occurred and

one or more claims have been allowed, the applicant is

required to pay an issuance fee and the patent is granted.

Then, on the date shown in the upper right corner of the

first page of the patent, it is issued by the PTO and the

inventor receives all the rights of a patent.  That date is

highlighted on your sample.

By the time a patent issues and the public can

take a look at it, the record of what the examiner did is

also made public.  This is the patent's file which we call

the prosecution history.  The file history contains the

original application and all the communications between the

applicant and the patent examiner, including a record of any

rejections, the applicant's responses, and any amendments.

Once a patent has issued, the inventor or the

person or company the inventor has assigned a patent to can

enforce the patent against anyone who uses the invention

without permission.  We call such unlawful use infringement.

But the PTO and its examiners do not decide infringement

issues.  If there is a dispute about infringement, it is

brought to the court to decide.

Sometimes in a court case, you are also asked to

decide about validity, that is, whether the patent should

have been allowed at all by the PTO.  A party accused of

infringement is entitled to challenge whether the asserted

patent claims are sufficiently new or nonobvious in light of

the prior art or whether other requirements of patentability

have been met.  In other words, a defense to an infringement

lawsuit is that the patent in question is invalid.

You may wonder why it is that you would be asked

to consider such things when the patent has already been

reviewed by a Government examiner.  There are several

reasons for this.  First, there may be facts or arguments

that the examiner did not consider, such as prior art that

1    was not located by the PTO or provided by the applicant.

2    Another reason may be the failure by the applicant to

3    disclose the best way of making or using the invention,

4    which is another requirement for getting a patent.

5            In addition, there is of course the possibility

6    that mistakes were made or important information overlooked.

7    Examiners have a lot of work to do and no process is

8    perfect.  Also, unlike a court proceeding, prosecution of a

9    patent application takes place in private, without input

10   from people who might later be accused of infringement.  So

11   it is important that we provide a chance for someone who is

12   accused of infringement to challenge the patent in court.

13           In deciding issues of infringement and validity,

14   it is your job to decide the facts of the case.  The judge

15   will instruct you about the law which may include the

16   meaning of certain words or phrases contained in the patent,

17   but it is up to you, as exclusive judges of the facts, to

18   apply the facts as you find them to the law and decide the

19   questions of infringement and validity in the case before

20   you.

21           To prove infringement, the patent holder must

22   persuade you that it is more likely than not that the patent

23   has been infringed.

24           To prove that a patent is invalid, the law

25   requires a higher standard of proof, since the PTO is

1    presumed to have done its job correctly.  The parties

2    accused of infringement must persuade you that it is highly

3    probable that the patent is invalid.

4              Good luck with your task and thank you for your

5    service.

6              (Tape concluded.)

7              THE COURT:  All right ladies and gentlemen.  Let

8    me now summarize the patent issues with which you must

9    contend.

10             In this case you must decide several things

11   according to the instructions I have given you today, the

12   instructions I will give you at the end of the evidence in

13   this case.

14             Those instructions will repeat this summary and

15   will provide greater detail for you.  One thing you will

16   need not decide is the meaning of the patent claims.  That

17   is my job, to explain what the patent claims mean.  The word

18   "claims" is a term of art, and you will find a definition of

19   that term in the glossary that we have referenced earlier.

20             I have already determined the meaning of the

21   terms used in the asserted claims of the patents at issue.

22   You have been given a document reflecting those meanings.  I

23   believe it's attached at the very end of your preliminary

24   instructions.

25             For those words in the claim for which I have

not provided you a definition, you should apply what is known as their plain English meaning.  You are to apply my definitions of these terms throughout the case.  However, my interpretation of the language of the claims should not be taken as an indication that I have a view regarding issues such as infringement and invalidity.  Those issues are yours to decide.

I will provide you with more detailed instructions on the meaning of the claims before you retire to deliberate your verdict.

In essence, you must decide the following: First, whether LG has proven by a preponderance of the evidence that the Whirlpool accused products infringe any of the asserted claims of the '121 patent.

Second, whether Whirlpool has proven by clear and convincing evidence that the asserted claims of LG's patent in suit are invalid.

Next, for those LG asserted claims that are not invalid and are infringed, whether LG has proven its measure of damages for that infringement by a preponderance of the evidence.

Next, whether Whirlpool has proven by a preponderance of the evidence that the LG accused products infringe any of the asserted claims of one or more of the '130 and '601 patents.

1          Whether LG has proven by clear and convincing

2     evidence that the asserted claims of Whirlpool's patents in

3     suit are invalid.  For those Whirlpool asserted claims that

4     are not invalid and are infringed, whether Whirlpool has

5     proven its measure of damages for the infringement by a

6     preponderance of the evidence.

7          And finally, if you find that LG infringes the

8     '130 patent, whether Whirlpool has proven by clear and

9     convincing evidence that LG's infringement was willful.

10          A few words about your conduct as jurors.

11          First I instruct you that during the course of

12     this trial you are not to discuss the case with anyone or

13     permit anyone to discuss the case with you.  That is anyone,

14     including among yourselves, most especially, probably, among

15     yourselves.

16          Until you retire to the jury room at the end of

17     the case to deliberate on your verdict, you simply are not

18     to talk about this case, ladies and gentlemen.  If any

19     lawyer, party or witness does not speak to you when you pass

20     in the hall or on the elevator together, remember, it is

21     because you are not supposed to talk with you nor you with

22     them.

23          In this way, any unwarranted or unnecessary

24     suspicion about your fairness can be avoided.  If anyone

25     should try to talk to you about this matter, please, bring

1    it promptly to my attention.  Let Ms. Walker know and she

2    will bring this matter to my attention.

3           Second, do not read or listen to anything

4    touching on this case in any way.

5           Third, do not try to do any research or make any

6    investigation about this case on your own.  The Internet is

7    out there and is a mighty temptation.  You must avoid it in

8    this regard.

9           Finally, you must not form an opinion until all

10   the evidence is in.  Keep an open mind until you start your

11   deliberations at the end of the case.

12          During the trial, I will permit you to take

13   notes.  Let me offer you a word of caution.  There is I

14   think generally a tendency to attach undue importance to

15   matters that have been written down.  Some testimony that is

16   considered unimportant at the time it is presented and thus

17   not written down takes on greater importance later in the

18   trial, perhaps in light of all of the evidence presented.

19          Therefore, you are instructed that your notes

20   are only a tool to aid your own individual memory, and you

21   should not compare your notes with other jurors in

22   determining the content of any testimony or in evaluating

23   the importance of any evidence.  Your notes are not evidence

24   and certainly are not a complete outline of the proceedings

25   or a list of the highlights of the trial.

1                Above all, your memory should be your greatest

2       asset when it comes time to deliberate and render a decision

3       in this case.  So if you do take notes, in spite of what it

4       says right there, you can take them back to the jury

5       deliberating area.  That area will be locked, as will this

6       entire chambers, and please, keep in mind that your notes

7       are for your own personal use.

8                I will give you detailed instructions on the law

9       at the end of the case, and those instructions, along with

10      these and any others that I give you, will control your

11      deliberations in the case.

12               As to how this trial will proceed, this trial,

13      like most others, occurs in roughly more or less seven

14      phases.  We have been through the first phase where you have

15      been selected as jurors.  We are in the preliminary

16      instruction phase.  After I complete these instructions, you

17      will hear opening statements.  Now, these opening statements

18      are intended to explain to you what each side intends to

19      prove and are offered to help you follow the evidence.  The

20      lawyers are not required to make opening statements at this

21      time or they may defer these statements until it is their

22      turn to actually offer evidence to you.

23               The presentation of the evidence will include

24      live witnesses and may also include previously recorded

25      testimony, as well as documents and things.  I will then

1    give my final instructions to you.

2             You will then hear what are called closing

3    arguments from the lawyers.  And they will be offered to

4    help you make your determination.  And then we will give the

5    case to you to deliberate upon.  This is where you will

6    evaluate and discuss the evidence among yourselves and

7    determine the outcome of the case.

8             Please keep in mind that evidence is usually

9    introduced in trials in a somewhat piecemeal fashion.  So as

10   the evidence comes in, you as jurors will need to keep an

11   open mind.

12            I have already given you the schedule.  I am not

13   going to go through that again.

14            Is it counsel's desire that I actually read the

15   definitions?

16            MR. PARTRIDGE:  I don't think from our point of

17   view that is necessary.  And the same would be true with

18   claim constructions.  I think the jury can follow those.

19            THE COURT:  Do you agree with that, Mr. Coyne?

20            MR. COYNE:  We do, Your Honor.

21            THE COURT:  We are just at about the 1:00 hour,

22   ladies and gentlemen.  We will take our break until 2:00.

23   And at that time you will hear the opening statements from

24   counsel.

25            Let's recess.

1                    (Jury leaves courtroom at 12:58 p.m.)

2                    (Luncheon recess taken.)

3                    THE COURT:  Ms. Walker, bring in the jury,

4     please.

5                    We will take a short recess.  I just learned

6     that two of the jurors got stuck down there in security, and

7     some lawyers have as well.

8                    (Recess taken.)

9                    THE COURT:  All right.  We will try it again.

10                    Counsel, when you are coming up as well, I have

11    just spoken with our two lead CSOs, court security officers,

12    we are going to make an effort to have one of staff reach

13    out to people who are in line to determine if they are

14    lawyers or jurors.  You can self-identify as well.

15                    (Jury enters courtroom at 2:18 p.m.)

16                    THE COURT:  Ladies and gentlemen, please take

17    your seats.

18                    I know that some of you just got bottled up in

19    getting into the courthouse today and this morning, of

20    course.

21                    There is a lot of activity in the courthouse.  I

22    have just had a meeting.  What we are going to try to do is

23    make sure one of the guys in the blue coats that you have

24    seen, called court security officers, comes out when there

25    is a line and asks any one of the jurors to identify

1    yourselves as such and they would get you to the front of

2    the line.  I will ask the lawyers to do the same as well.

3    But you can also identify yourselves, if you see a line like

4    that, you know we are up here, raise your hand.  Somebody

5    should, in theory, do that.

6               All right.  Counsel.

7               MR. COYNE:  Thank you, Your Honor.

8               Good afternoon.  Before we start, I wanted to

9    just introduce some of the other people that you may see

10   coming in and out of the room that are assisting us with the

11   case.  Most important, I want to introduce Mike Dunn and

12   Tori Thomas, our paralegals.  As Judge Sleet mentioned with

13   respect to the court reporters, the Court doesn't operate

14   without good reporting, I can't function without good

15   paralegals.  Dave Brooks is going to be helping present some

16   of the evidence that we put up and show you on the screen as

17   the case goes forward.

18               I also wanted to introduce a couple of my

19   colleagues that may not be presenting anything to you, but

20   if you see them coming out, you will know who they are.

21   Gerson Panitch, Hayley Weimer, Cecelia Penesa (phonetic),

22   and Minjae Kang.

23               If you see them coming in and out, you will know

24   who they are and that they are associated with us.

25               Let me start by telling you, I am anxious today,

1    I am a little scared, and I want to tell you why.  This case

2    is a fairly simple case.  It's about refrigerators, but it's

3    got some complexity to it because we have got three patents,

4    and we have to present this to you in a very short amount of

5    time.  I am not worried about you being able to understand

6    it.  I am worried about me being able to present it clearly

7    enough that I can represent my client well.

8              Second, I am worried because we have a lot of

9    witnesses who are going to be testifying and some of them

10   will be testifying in a foreign language, Korean, through an

11   interpreter.  And that makes it even more complicated.

12             So if you will just bear with me and have some

13   patience as the process unfolds, we will try to make it as

14   simple and clear as possible so that you have got a clear

15   record from which you can make your decision.

16             Finally, I am also worried because, frankly, one

17   of our witnesses did something wrong in this case, and I

18   will tell you about that in a few minutes.  But I am worried

19   about that -- he did come forward, he turned himself in.  We

20   provided the information to the other side.  But I am

21   worried that this is going to be a big distraction for all

22   of us during this case.

23             So let me go right through.  Let's start talking

24   about the case itself.

25             You are going to hear evidence about three

1    patents in this case.  The first is what we call, Judge

2    Sleet referred to you, we talk about them in the last three

3    digits, is the '121 patent.  That is for an invention that

4    LG made for a refrigerator that has a retractable tray so

5    you don't spill the water on the ground from the dispenser,

6    out of the ice and water dispenser.  And it's got a

7    retractable spigot.  And it has a mechanical drive mechanism

8    on the spigot.

9            Your Honor, may I approach one of the units just

10   to demonstrate for a second?

11           THE COURT:  Yes.

12           MR. COYNE:  Thank you.

13           What we are talking about on these refrigerators

14   is the tray portion down here actually comes out a little

15   bit, so you can rest a pot or large container on it.  The

16   spigot right here rotates out in front of the front surface

17   of the refrigerator.  That way you don't have to take as

18   much space in this alcove, this indentation.  You can

19   actually get all of the functionality of the refrigerator

20   without having it take up so much space in the door.  That

21   is really what the '121 invention is all about.

22           Now, that's an LG invention.  There are two

23   other patents in this case, what you are going to hear

24   referred to as the '130 patent.  That is for what Whirlpool

25   calls its in-door ice storage system.  And what that

1    involves is the way the ice maker and various parts are

2    oriented inside the freezer compartment.

3            The third patent is the '601 patent.  What that

4    relates to is the indentations on the liner of the

5    refrigerator.

6            Can you put up, Dave, 403, please, PTX-403?

7            This one is a little subtle, so I want to show

8    you a picture of it so you can get an idea of what we are

9    talking about.

10           Can you go to the page with the interior view of

11   the refrigerator?

12           This is a Gold Star unit.  This is a brand that

13   LG manufactures.  You will hear evidence from several of the

14   witnesses about this.  What we are talking about right here

15   is there is very small indentations in the wall.  You can

16   see them very slightly here.  There is little recessed

17   areas, little panels that are puckered into the foam on the

18   side of the cabinet.  That is what this invention is talking

19   about.  You will hear evidence on that invention as well.

20           One thing that I want to point out when we

21   start, these patents, as you heard on the administrative

22   office video that we played during the preliminary

23   instructions, they are a contract, they are a bargain, as we

24   said in the video, between the government and the inventor.

25   And you go into the Patent Office, and you make your deal.

1   You negotiate with the Patent Office to get your patent.  We

2   would like to show you evidence in this case that shows what

3   the negotiation was that resulted in these patents, so that

4   you can understand what they cover.

5              With respect to each of these patents, however,

6   we will present to you evidence in this case that Whirlpool

7   is telling the U.S. Patent and Trademark Office one thing

8   and it's going to be telling you something else.  And that's

9   a problem.

10             First, with Dr. Lee's -- I am sorry, LG's '121

11  invention, the first person to put together the three pieces

12  that we just identified, the retractable tray, the

13  retractable spigot and a mechanical drive on that spigot,

14  was LG.  You will hear evidence about this from the

15  inventors, from people that were actually involved in making

16  this invention.  In particular, Dr. Lee whom I introduced

17  this morning.  LG was the first one to do it, is what the

18  evidence will show for you.

19             Second, the evidence will also show that

20  customers love it.  This is a feature that customers have

21  time and again told not only us but Whirlpool that it is a

22  very attractive feature for them that they want on the

23  refrigerators.  They value that very highly.

24             Third, this is contested.  I am going to say to

25  you, Whirlpool is going to bring you evidence as well and

1    they are going to tell you that what I said is wrong.  They

2    are going to say, no, they invented it first, they have an

3    inventor who put several of these pieces together.  But what

4    we believe the evidence will show you at the end of this

5    case is that Whirlpool did not have all three pieces of this

6    invention.  LG did.  What Whirlpool is doing is telling the

7    Patent Office one thing and trying to take the patent away

8    from, and it's going to be telling you something else;

9    namely, that it isn't an invention at all, it would have

10   been obvious to people of ordinary skill in the art to make

11   this thing, and there shouldn't be a patent at all on it.

12            Second, with respect to the '130 patent,

13   Whirlpool told the Patent Office that putting an

14   ice-dispensing system into a separate compartment on a

15   refrigerator door isn't what they cover.  Now, what you see

16   over here are two side-by-side units.  There is different

17   types of refrigerators.  If you go into Best Buy or Sears or

18   any of the large appliance sellers, what you will see is

19   refrigerators that have two doors like this, some that have

20   the old style, like I have in my basement, with the freezer

21   on top and a refrigerator on the bottom, it's called a

22   two-door top-mount.  Then some, they flip it around so the

23   freezer is on the bottom, and you have two doors, and it's a

24   two-door bottom-mount.  And then there is other styles that

25   you see, the fancier ones that are out in the stores these

1    days which is, frankly, what a lot of the product in this

2    case involves, where you have what are called French doors.

3    Where on the top it's a bottom-mount.  So the freezer is on

4    the bottom.  And on the top you have got, instead of one

5    door for a refrigerator and one door for the freezer, you

6    have two doors that open up like French doors that are both

7    opening into a refrigerator compartment.

8              One of the issues here is, where is the freezer

9    compartment exactly?  Because when Whirlpool filed its '130

10   patent application, the examiner came back to Whirlpool and

11   cited to Whirlpool a prior patent, two of them, actually,

12   one to a fellow named Gould and one to someone named

13   Buchser.  What the patent examiner said is this Gould patent

14   has a little freezing, an ice-making room in the middle of

15   the refrigerator door.

16             So you will hear testimony in this case, and it

17   will be a contested issue, about whether that is a freezer.

18   But look at the Gould patent.  The evidence will show you in

19   the Gould patent that what Gould says about that is that

20   it's a freezerless refrigerator.  That is not a freezer.

21   What happened is the examiner cited that against Whirlpool.

22   Whirlpool came back and argued with the examiner, or

23   presented its response to the examiner, and you will see

24   that evidence as well.

25             In that response, what Whirlpool said -- well,

1    it's unclear.  2 is contested.  There is an interview that

2    happens at the Patent Office.  And during the interview,

3    someone points out that the Gould reference, this

4    refrigerator door with a little ice room in the middle of

5    it, does not have a freezer compartment.  And that putting

6    things in that position are not mounting them on a freezer

7    door.

8              So that is what was said at the Patent Office in

9    order to get this patent.

10             What Whirlpool is telling you in this case, and

11   you will hear evidence on this, is that putting a little ice

12   room in the middle of the refrigerator door, they are going

13   to call it a freezer compartment, and they are going to say

14   that we infringe because we have that in our French door

15   model refrigerators.  But that's not the bargain that

16   Whirlpool struck with the Patent Office in order to get the

17   '130 patent.

18             This is a contract with the government.  You are

19   stuck with it.

20             With respect to the '601 patent, will you put up

21   PTX-16 for a second, this is the patent for the '601, it

22   shows a little bit better than the picture I showed you, the

23   real refrigerator in the catalog, these indentations formed

24   in the side wall.

25             What happened when Whirlpool filed this

1    application is the examiner came back and rejected it.  One

2    of the reasons the examiner rejected it is that people have

3    had indentations in the wall of their refrigerators before

4    Whirlpool made this invention.

5              Can we go to the bottom of Column 1 and the top

6    of Column 2?

7              We can see that right in the patent itself.  If

8    we go down to the very bottom of the first column, this is

9    it, starting at about Line 65, Whirlpool describes how it's

10   known that refrigerator liners have various forms of

11   embossing and indentations.  And they go on to list right in

12   the patent four prior patents that have embossings and

13   indentations in the liner.

14             What happens next is the examiner rejects the

15   application and Whirlpool comes back and says, no, I should

16   be able to get a patent and Whirlpool -- the examiner comes

17   back and says, no, you shouldn't.  But what we see with this

18   exchange is if we go to the original claim, that was

19   originally filed -- can we go to PTX-16 -- the language of

20   the original claim that Whirlpool asked for was a bowing

21   reduction.

22             What happens in these refrigerators is the

23   inside of the cabinet is a plastic liner.  Then you have

24   about two or three inches of foam.  Then you have got a

25   steel sheet on the outside.  When you put the refrigerator

1    on and you crank it up so that the freezer compartment is

2    really cold, the plastic sheet on the inside tends to shrink

3    a little, and the steel outside is a lot warmer, so it tends

4    relatively to expand.  And what you get is this bowing.  And

5    that is what we are talking about in this case.  The wall

6    tends to bow a little bit.

7              My hands are really exaggerated.  We are talking

8    about bow we think on a length of a cabinet wall like that,

9    we are talking about four millimeters, three milliliters of

10   bowing.  So it's a very subtle effect.

11             But it's enough to cause a problem if you have

12   got a refrigerator and a built-in cabinet and it bows four

13   millimeters and you can't get it out, that is a problem.  If

14   it bows enough that the shelves drop out, that is a problem.

15   But that is what this patent is talking about, a way to

16   reduce this bowing so it doesn't become a problem when you

17   use the refrigerator.

18             The claim they originally filed was for bowing

19   reduction.  It didn't have to stop it, it just had to reduce

20   it.  So this give-and-take I mentioned happens at the Patent

21   Office.  And you will see this evidence as the case unfolds.

22   Finally, what happens is Whirlpool files an amendment and

23   response.

24             Dave, can we go to that?

25             In the amendment and response after the examiner

1    has rejected this reducing bowing claim twice, Whirlpool

2    comes back and says, he argues with them again, saying, I

3    ought to be allowed this, but I am going to amend my claim.

4    I am going to add some additional elements to it.  What they

5    add is this whole section down here that's underlined that

6    says that these plaques have these edge portions that have

7    these expansion joints and beam elements that are preventing

8    bowing.  Not reducing bowing anymore, preventing bowing.  In

9    response to putting that amendment in, the examiner allows

10   the application.

11           So what we see from the evidence is that the

12   '601 patent is actually quite narrow.  Whirlpool wanted a

13   patent at first that covered reducing bowing.  And what they

14   got at the end of the process, the bargain they made with

15   the United States Government, was that their claims cover

16   preventing bowing.

17           You will hear evidence in the case from Dr.

18   Warren Bessler and Dr. Gary Mellinger.  They are both Ph.D.

19   engineers.  They will be talking about the validity and the

20   infringement issues on behalf of LG in this case.  They were

21   both at GE and worked for years making refrigerators.  They

22   actually designed refrigerators.  They built them.  They

23   know what the problems are involved in this industry.

24           You will not have any evidence from any other

25   witnesses in this case that have that experience.  These

people were making these products at GE.  They know what

they are talking about.  You will have the opportunity to

hear their testimony.

Now, we have also mentioned this morning, I read

off a list of about a half-dozen or dozen people, names that

we are going to be presenting testimony by deposition.

We would like to bring them here for you, but

they are not people that we can make come to court.  But we

do have depositions from them.  They were outside the

Court's subpoena power.

But we have deposition transcripts from them.

And you will have that evidence as well.  We will play

selected portions of them, and because we are doing it by

deposition we will try to keep that very short.

Playing depositions is very boring.  It can be

excruciating at times.  We will try to keep the segments

that we are playing short and to the point so that you get

the evidence that you need and need to consider in deciding

this case.

Some of this information that is in these

depositions, however, is very important.  I want to

apologize to you ahead of time, because by presenting it in

this way, it is going to come in a little disjointed.  It's

not like we can have a conversation with a witness and

present it in an organized fashion.  We will be selecting

1    pieces.   Whirlpool will have the opportunity to select other

2    pieces of their testimony and present it to you.

3          So I want to apologize ahead of time for it

4    being somewhat disjointed.   But both Mr. Partridge and I

5    will have an opportunity to talk to you at the end of the

6    case, and hopefully we can bring that evidence together.

7          I just wanted to remind you, in view of that, to

8    take to heart Judge Sleet's instruction that you keep an

9    open mind until you have heard all the evidence so you can

10   make your decision and have your deliberation with all the

11   benefit of all the evidence that is going to be presented to

12   you in this case.

13          I want to finish this little section of my

14   remarks by just pointing out, we believe the evidence will

15   show four things in particular.   A trial, let's face it, is

16   all about making and keeping promises.   Here is a couple of

17   the promises that I am making you.

18          We feel that the evidence will show that

19   Whirlpool is using LG's retractable tray and spigot and

20   mechanical drive patent.   We don't think you are going to

21   hear any evidence that they are not infringing it.   Their

22   issue is, it's not valid.

23          Secondly, we think that the evidence will show

24   you that Whirlpool is telling you one thing, namely, that

25   this patent is invalid, while they are telling the U.S.

1    Patent and Trademark Office something else, namely, that

2    they invented the same thing first and it is a patentable

3    invention.

4              Third, we feel the evidence will show you that

5    Whirlpool is trying to use the '130 patent to stop LG from

6    providing to customers a new and different and innovative

7    solution that isn't the same as Whirlpool's, and it provides

8    things that customers want that Whirlpool isn't providing.

9              Fourth, we also feel that the evidence will show

10   you that Whirlpool is trying to broaden the '601 patent,

11   which covers, in our view, preventing bowing, into a patent

12   that covers reducing bowing, the very thing they gave up at

13   the Patent Office.  And we will present to you evidence of a

14   number of pieces of prior art, prior refrigerators that

15   people have made over the years, catalogs of equipment

16   manufacturers, refrigerator manufacturers, that show this

17   very feature in it, prior patents that show this feature.

18             We have also gone out and we will present to you

19   testing that we did.  We have tested a number of samples of

20   these liners and a number of samples of wall.  Quite

21   frankly, Whirlpool has, too.  They have an expert, an

22   independent expert of their own, who went out and did

23   testing as well.  And what we believe the evidence will show

24   you at the end of this case is that every single one of

25   those samples that was tested, whether it was tested by us

1    or whether it was tested by them, shows exactly the same

2    thing.  When you put one of these indentations in the piece

3    of plastic on the liner, what happens is, if I try to

4    stretch on, pull a flat sheet that doesn't have any bends in

5    it, I'm kind of pulling against the strength of the

6    material, whereas if I put a bend in it and then I try to

7    pull on it, it makes it a lot more stretchy.  So it is

8    easier to stretch when it's got a little kink in it.

9              Similarly, if I put a bend in it, like this

10   folio, and I try to bend it this way, the bend makes it more

11   resistant to flexing.  That is what these plaques do.

12   That's what all these plaques have always done.  And

13   Whirlpool's whole theory, the evidence will show you, is

14   that by having a sheet of plastic liner that's a little more

15   stretchy, and a little less bendy, then that means it

16   reduces bowing.

17             Well, okay, we can accept that.  But that also

18   means that every other plaque that has ever been made that

19   we have tested in this case does exactly the same thing.

20   And Whirlpool's invention is not new.

21             Let's go to the specific patents and spend a

22   little more time showing you the evidence on each one.

23             Remember Avis, the car rental company years ago,

24   "We try harder"?  It was their logo.  They had a little red

25   ball.  That was their logo.  That is kind of -- the evidence

will show you, this is where LG was in about the late '90s

and early 2000s.  We will have Mr. John Taylor, who is here

as a corporate representative.  He will tell you the company

history about how LG came into being and what they have done

over the years and what kind of products they have made.

One of the things he will explain to you is LG -- it is a

big international company and we have made a lot of

different products.  But by the late '90s -- actually by the

'80s we were selling refrigerators into the United States.

They were small ones.  They weren't large format units like

this.  But he will explain to you that we were in fact

selling refrigerators and were developing relationships with

some major resellers, like Sears and General Electric, where

we were doing what people call original equipment

manufacturer, tolling production where you make a unit for

somebody else, like the Sears' Kenmore brand.  Sears really

doesn't make any of those units.  What Sears does is it goes

out and makes contracts with other companies, like LG, like

Whirlpool, and they make the units.  And they put the Sears

brand, the Kenmore brand on it and sell it through their

retail outlets.

Well, we were working -- Mr. Taylor will tell

you that we were working with companies like Sears and GE

making products for them and had been expanding our business

in the United States.  So that by about 2000, we were ready

1    to make the change from being an original equipment

2    manufacturer to start selling LG-branded products, major

3    appliances, washers, dryers, refrigerators, these types of

4    things, in the United States.  And we did make that

5    transition.  And around 2001 to 2004, Mr. Taylor will tell

6    you we made the transition and started selling our own

7    LG-branded products in a wide variety of home appliances.

8                    Can we put up PDX-1 and 2, please?

9                    I am sorry, I have got the wrong exhibit number,

10   excuse me.

11                   I will stop at this one because this is

12   pertinent to the story I was telling you.  This is one of

13   them.  The plaques I showed you a few minutes ago is one of

14   the refrigerators that we were making.  This one in

15   particular was not sold in the United States.  But this is

16   the kind of units we were making in the '80s.

17                   In any event, what the real issue here is

18   Whirlpool is going to present evidence to you that they say

19   LG copied.  We are just an evil Asian copyist going out and

20   knocking off other people's designs and didn't have any

21   original ideas of our own.  We took their ideas and are

22   infringing.  You will hear evidence and hear the testimony

23   of the people that worked on these projects.  Not only Dr.

24   Lee with respect to the '121 patent, but Dr. Lee also worked

25   on the '130 patent -- on the product that is accused of

1    infringing the '130 patent.  They call it their in-door-ice.

2    We feel we have made a new and different product, which we

3    will present evidence to you of, that we call Space Plus.

4    And Dr. Lee will be able to explain to you those differences

5    and how the product was better and more innovative.

6            You will hear testimony from Ill-Shin Kim who I

7    introduced this morning.  Mr. Kim is really the start of

8    this idea that ended up being the Space Plus system for LG.

9            He will explain to you how he came to the idea

10   and how the project moved through LG and progressed to a

11   product that's on the market today.

12           What LG called this was the Bics project,

13   B-I-C-S.  It was a very major innovation research effort

14   where we developed a number of inventions including the '121

15   patent and the Space Plus system that Whirlpool is accusing

16   of infringing the '130 patent.

17           The other thing to consider as this is going on

18   is when Whirlpool is giving you evidence that they say shows

19   copying is that in the United States at the time the

20   refrigerator market is consolidating.  What is happening is

21   manufacturers that have been around for a long time, Kitchen

22   Aid, Jennair, Amana, Maytag, Whirlpool, well-known U.S.

23   brands, for decades, a lot of them were running on hard

24   times.  The market had become much more competitive.  There

25   was a lot more foreign competition, not just from LG, from

1   Samsung, from Electrolux.  And you will hear testimony about

2   this from a number of the witnesses.

3           What happens, in the late 1990s is Amana is

4   picking up some of these companies as they are not doing so

5   well.  They pick up Jennair, they pick up Kitchen Aid.  And

6   in 2001, Maytag acquires Amana.  And in 2006, Whirlpool

7   acquires Maytag.  So all of these well-known U.S. brands are

8   now consolidated in Whirlpool.

9           In response to this foreign competition coming

10  in, LG is one of the companies -- you will hear testimony as

11  well that Electrolux and Samsung and other companies were

12  also competing.  The bottom line is this is a very

13  competitive market.  So when you hear Whirlpool presenting

14  you evidence that they say establishes copying, you have got

15  to consider how well can you sell a copied product in a very

16  competitive market at the high end of the market?

17          What is happening here, and we will give you

18  this evidence, to show that LG's system was not to make

19  bargain-basement knockoffs.  It was to innovate a better

20  product that gave the consumer what they want, to make

21  something innovative.  Why?  That seems to cost a lot more

22  money.  It does.  But the reason to do it is you build brand

23  loyalty.  The customer seeks out the product that gives them

24  what they need.  That was LG's decision.  You will hear

25  testimony from a number of our witnesses about that.

Let me back up a second.  On the commercial

side, one of the things that Whirlpool will argue is that

they just can't -- what happened in this market is LG came

in at about 2001, starts making entry, 2004 starts selling a

lot of the products that are accused of infringing here or

starting to work on them.  By 2006 some of these products

are actually reaching the market.  By 2008 LG is getting

significant market share because of that focus on innovation

and the consumer.  And you will hear that not only from Dr.

Lee and Mr. Kim, you will also hear it from Dr. Ching Ho

Lee, one of the other gentlemen I introduced this morning

who can talk about LG's research and development efforts.

Whirlpool looks at this and they just can't believe that LG

can come into a market that is this competitive, remember I

said it is consolidating, getting much tighter, there is a

lot of competition, how can LG come in here and in five

years, ten years, be able to acquire a substantial amount of

market share with a brand-new platform?

Whirlpool doesn't believe that we could do it

based on our own.  They simply said, well, you must have

copied, you must have cheated.

Our response is, and you will hear the evidence

from the individuals that I mentioned, that's not what

happened.  We made -- we focused on what the consumer wants.

You will hear evidence that we spent a lot of money and time

1    doing research and development targeted to that.  And we

2    focus on making something new and different and better, and

3    that is what we have been providing to the market.  That is

4    why we have gone from zero to hero in five, six years in

5    this market and not for any other reason.

6            What you will also see is, you will get a lot of

7    evidence in this case from both us and Whirlpool.  I am not

8    trying to pretend this issue is not contested.  It is.  It

9    is hotly contested.  What you are also going to see is

10   evidence of what the customer is saying.  You don't have to

11   take my word for it or Mr. Partridge's or the clients' words

12   for it.  What we have, for example, is feedback that

13   Whirlpool is getting from customers like Sears, who we are

14   both selling refrigerators to.

15           Can we see DX- -- I am sorry.  Let me back up

16   for just a second.

17           One of the things that I wanted to mention on

18   this copying issue first was that -- this whole issue on how

19   did LG do it so quickly.  One of the things that we looked

20   at in the beginning of this project, in about 2001, we sat

21   down as we decided to make this launch into the U.S. market

22   and we kind of took stock.  And you will see this evidence.

23   If we bring up 279, which is the 2001 memo -- or PowerPoint

24   presentation.

25           What the company did, you will see this evidence

1    and we will have the testimony of various witnesses about

2    it, where LG is looking at planning ahead, what do we need?

3    This is an ambitious project, to start going into a new

4    market that is this competitive.  What do we need in order

5    to do it?

6              If we go down a couple pages, the next page, if

7    we look at the SWOT analysis, this is very important because

8    we are kind of taking stock of what our capabilities are to

9    take on this ambitious project.  What do we have going for

10   us, what do we have going against us.  You will see a lot of

11   the challenges we knew we were facing.  Lack of cumulative

12   technical experience, short on manpower, fragile in securing

13   IP rights.  These were all challenges we knew we were facing

14   in starting to do this.

15             In addition to that, you look down at the

16   threats category, the T on the bottom right, you see,

17   "Patent rights for advanced enterprise."  We knew a lot of

18   companies we would be competing with had patents of their

19   own.  We had to deal with all of these challenges.  We

20   didn't do it blindly, and we certainly didn't do it by going

21   in and copying.  And that is what we believe we'll establish

22   for you.

23             We felt like we didn't have enough experience at

24   the beginning, yes.  But what we did is we hired a lot of

25   engineers.  We focused our efforts.  We put the money into

1    the R&D projects.  And Mr. Kim and Dr. Lee can tell you

2    exactly how they went about that and how they accomplished

3    it.  And what we came out of that process with was a new and

4    different product.

5            With respect to -- what I was getting to a

6    minute ago is how do we know that is really what happened as

7    opposed to what Whirlpool is telling you what happened;

8    namely, that we just copied their designs?

9            Well, we can look at what one of the customers

10   had to say.  As I mentioned, we were both selling to Sears

11   at the time.

12           Can we bring up PTX-187, please?

13           This is an internal e-mail at Whirlpool, and

14   it's talking about a meeting they have just had with Sears.

15   In particular, ████████████████████████████████████████

16   ███████████████████████████████████████ -- next line

17   down, ███████████████████████████████████████

18   ██████████████████████████████████  And they talk about

19   what is happening in the market.

20           The next sentence, ██████████████████████████████

21   ██████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ██████████████████████████████████████

24           So it isn't just LG saying we didn't copy and

25   Whirlpool saying we did.  This is the customer who is buying

1    these units, ██████████████████████████████████

2    ██████████████████████████████████████████  You will see

3    a number of memos like this as we go through the case.  And

4    you will hear testimony from witnesses on both sides.

5              Let me go back now, after we set the stage, for

6    how did this '121 come to be.  Let's go back to about 2002,

7    when we are talking about this '121 patent, the retractable

8    tray, the retractable spigot with the mechanical drive.  Dr.

9    Lee is the one who will explain this to you.

10             He is one of a member of a team.  He is a team

11   leader.  But there were a number of engineers in his group

12   working on this with him.

13             He will tell you how they came about it.  What

14   he is going to tell you is that I and my team were trying to

15   make a better refrigerator, one that's unique, one that has

16   value, that provides some difference that is beneficial to

17   the customers so that the customer will come to know and

18   love our products, too.

19             What he does is, in 2002, we start

20   brainstorming.  The team gets together, we set up in a room,

21   in the lab space in Seoul, and we -- a big room.  We put the

22   desks all around the side of the walls so all the engineers

23   can be very close together with a big table in the middle

24   and that's where we work.  And we keep working at that for

25   months and what we are doing is coming up with ideas, with

1    everybody in the same place at the same time, so we can

2    bounce things off each other, draw sketches, talk to other

3    people on the team and see how it works.

4             Out of this process comes dozens of sketches and

5    drawings and new concepts for new features for the

6    refrigerator.  This is really an exciting time.  And we come

7    up with a number of new ideas.  We worked this way every day

8    for months.

9             Finally, we get together in January of 2003 with

10   the product planning group.  In LG there is a whole

11   development process, and one stage of the process is we have

12   to meet with product planning and see which features we can

13   realistically put into the next refrigerator.

14            We meet with the product planning group, and if

15   we put up PDX-7, what we present is all these boards of all

16   the sketches, of all the design concepts that we have made

17   for the last several months.

18            Like I said, there is dozens of them.  Among

19   those sketches that are up there are several that relate to

20   this retractable tray and retractable spigot concept.  And

21   we go forward and put in a report for this meeting.  This is

22   a January 28, 2003, meeting where we are doing a lot of

23   brainstorming with our product planning colleagues and we

24   have the retractable tray and retractable spigot features.

25   And also in the report, a mention of the CD case openings.

1        That is what we are talking about on the spigot that I

2    demonstrated earlier, like a CD changer.  You push the

3    button and the thing pops out on its own with a drive

4    mechanism.

5             You will see the evidence on this from both

6    sides.  What we would submit to you is the evidence that we

7    are presenting to you shows that LG had all three components

8    and that Whirlpool did not.

9             Let's go to PTX-348.  This is the --  we

10   continue this process, there is a report that gets done.

11   And we do a draft report first and then a final report.  So

12   this one is taking place on February 24th, just a little

13   less than a month later.  What we have done now is refined

14   the concept.  So you see on the upper right-hand picture,

15   you have a mechanism with a flat front on the refrigerator,

16   you press it in, and the spigot pops out.  And you have the

17   pull-out tray on the bottom.  All three components

18   memorialized right there by February 24th.

19            And we go forward from there and to our next

20   meeting, which is at 349.  What we do next with this

21   invention after we have got it is send it over to the patent

22   department.  You will see evidence in this case of the

23   disclosures that LG made to the patent group within LG, and

24   there are five of these documents that show various features

25   and different permutations and combinations of these

1    features together.

2              We then file a patent application.  And that

3    is -- if you bring up PTX-96, please.  What we do is in the

4    beginning, on September 17, 2003, we file this patent

5    application in Korea.  So we have gone from January 28th to

6    September 17, relatively short amount of time in terms of a

7    development project from initial concept to filing the

8    patent application.

9              We then move forward and file in the United

10   States a little later.  And if we bring up PTX-2, we see on

11   PTX-2 -- can we go to the next page where it shows the

12   foreign priority?  Can you bring up the patent portion?  I

13   think it's Page 20 -- I am sorry, I don't have the page

14   number.  Can you go to the foreign priority citation?

15             Right here we are claiming priority on this

16   foreign application.  If we can look at the number here,

17   it's the same number we just looked at for the Korean

18   application a few moments ago.

19             So LG moved very quickly.  The evidence will

20   show you we moved from an initial concept on January 28th,

21   refining the invention, getting the patent application on

22   file in Korea in September, and by the next April, we have

23   got the application on file in the United States and are

24   going forward.

25             This feature ends up going into products,

1    products not only that we are making, but the evidence will

2    show you Whirlpool is making, too, and they are making them

3    without our authorization.

4             You will get to see these internal documents.

5    One of the issues in the case is what really is the value of

6    this technology?  How significant is it?  We are going to

7    present to you evidence from Dr. Mohan Rao, who I introduced

8    to you this morning, who is an independent economist.  And

9    he is providing testimony to you in this case about the

10   amount of damages.  One thing Whirlpool is going to say --

11   and this again is contested -- Whirlpool is going to say the

12   damages are a lot less.  Their patent is a lot more valuable

13   than ours.  Let me show you one thing, PTX-121.  This is an

14   internal Whirlpool marketing document.  It's talking about

15   the value of these relative technologies.

16            And what Whirlpool calls its in-door-ice and --

17   its in-door-ice storage system is the in-door-ice.  So you

18   will see this name throughout the case.  When it's referring

19   to "in-door-ice," that's Whirlpool's name for its '130

20   patent.  What Whirlpool is making that we allege infringed

21   the '121 patent is called Fast-Fill.  And this is a document

22   comparing what the value of the Fast-Fill is to the value of

23   the in-door-ice.

24   ███████████████████████████████████████████████████

25   ███████████████████████████████████████████████████

1       ████████████████████████

2               So you will have this evidence to consider as

3       the case goes forward.  The evidence will show you that

4       customers considered LG's invention to be at least as

5       valuable as Whirlpool's, perhaps more.

6               Dr. Rao will present to you his damages

7       calculation.  And what he is going to show you is that the

8       evidence that Whirlpool's own internal documents show is

9       that they felt that by using this feature in their product,

10      they would not only sell more of the products with the

11      in-door-ice feature itself -- I am sorry, with the Fast-Fill

12      feature itself, they would get other sales that would flow

13      from it, from having this attractive feature in their

14      product.  He is going to show you an estimate that

15      essentially Whirlpool had about ████████ units of

16      refrigerators that he feels they would have sold as a result

17      of this feature, that he has assessed the value of the

18      patented technology for the '121 patent at about an 8.5

19      percent royalty, and that using standard methods, he is

20      going to say, if you are licensing someone -- the Judge will

21      instruct you at the end of the case you have to consider the

22      parties having had a hypothetical negotiation.  These are

23      two competitors.  They might not have gotten to the point

24      where they could ever sit down and work it out.  We are here

25      after all in court instead of on a license.  But you have to

1    assume that people had a good-faith intent to get a license,

2    what would they reach as an agreement?

3                 So Dr. Rao is going to tell you, we have got two

4    big companies here.  They would have split that

5    profitability half and half.  And if you do that, what you

6    end up with is a royalty rate for Whirlpool of about 3.2

7    percent, based on the value of this technology to Whirlpool.

8    That comes out to about $34 a unit as a royalty on a

9    per-unit basis.

10                Now I come to a much more difficult issue,

11   frankly.  As I said to you, one of our employees did

12   something wrong.  I want to tell you about it first so you

13   don't have to hear about it from somebody else.

14                Having said this, I realize that we have to earn

15   your trust in this case.  It's going to be hard to do with

16   what I am about to tell you.  One of our people is the

17   president for sales of LG U.S.A.  And he had worked at Amana

18   for years.  When Amana was acquired years ago by Maytag, he

19   was given an offer to stay on.  And he decided not to.  They

20   wanted him to go into more product development and product

21   line development.  And he was a sales guy.  He will

22   testify -- he will come -- Mr. John Herrington, he will come

23   here and tell you himself what he did and what happened.

24                But what happened essentially is that after he

25   leaves Amana and comes to LG, he helped build -- as I

mentioned, LG was going into this market already.  They

hired a sales force.  Mr. Herrington headed up that sales

force.  And he has run it since then and runs it today.  He

is the president today of LG Electronics U.S.A.  He was

deposed in this case where the lawyers get a chance to take

his deposition, ask him questions.  He has to tell them

under oath what he knows.  And he was asked a question at

that deposition, do you have any documents from the time you

were at Amana?  And he answered, no.  All I have is my

personal stuff.

He went home that night and he started having a

nagging feeling about it, because ---and he will tell you

this himself -- he built a huge marketing apparatus, sales

apparatus, for LG in a very short time to support LG's

technical efforts to launch these new brands into a new

market.  And he is very proud of it, and he should be

because it was an enormous accomplishment.  But Whirlpool

was asking him questions at the deposition that made him

somewhat anxious, implying that he might have taken

information from other sources and not played fair in doing

that.  Like I said, Whirlpool can't believe that we can do

this in such a short time.

Mr. Herrington has got this nagging feeling, and

he goes home that night, his wife and kids are on a trip to

visit family, and he is feeling very anxious.  And he

1    decides, you know, they kept asking me about these

2    documents.  He goes and he looks in a closet in his house.

3    He was a bachelor for a long time.  Moved around a lot at

4    Amana.  Ends up marrying his wife at Amana in 2006.  And she

5    kind of cleaned out his old office and put everything in the

6    closet.  And he says, well, if I had anything left over from

7    then, it would be in the closet.  He goes in there, looks

8    around in the back of the closet, and he finds a three-ring

9    binder labeled "1997-1998 Amana Bottom-Mount Freezer Study,"

10   from a market survey company, these companies that do market

11   research, focus group research.

12              So he panics.  He is thinking, and he will tell

13   you this, I just testified that I don't have anything, and,

14   you know, Coyne and Rick Wingate, who is the LG Electronics

15   U.S.A. counsel -- I am sorry, I forgot to introduce Rick --

16   Mr. Herrington is going to testify, this is awful, I just

17   testified I don't have anything and Coyne and Wingate are

18   going to be mad at me for messing up in my deposition.

19              So he panics.  He is just overcome.  He tears it

20   up and throws it in the trash.

21              He then starts feeling bad about it for the next

22   couple of days and comes into Mr. Wingate's office on Monday

23   morning and turns himself in and tells what he has done with

24   this document.

25              He is asked to find anything else he has and we

make him available again to Whirlpool.  But apparently

nobody can find a copy at this point of this report.  And

the question is going to be presented to you to decide how

significant is that.

I am not going to defend what Mr. Herrington

did.  Not for a second.  It was a wrong thing.  It was a

stupid thing to do.  And it is just not defensible.  But I

am going to ask you to consider all of the evidence in the

case and think about how it fits into the issues that you

have to decide.

In particular, you are going to have evidence in

this case to consider about what the significance of it was.

For example, it would have been a lot easier for Mr.

Herrington just to keep quiet.  Nobody knew he had this

thing and nobody knew he destroyed it.  Instead, he was so

wracked by guilt, he came forward, and he turned himself in.

Another piece of evidence that you will be

presented, he will tell you this was at the time he

destroyed it, last August, it was a 12-year-old market

study.  Now, market studies, you will hear evidence from

other witnesses in this case, market studies don't have a

very long shelf life.  You do a market survey research.  You

need to get that information and use it quickly.  This one

is 12 years old by the time.  I am not defending that he

destroyed it.  He absolutely shouldn't have, but you have

1    got to consider the relevance of this information to the

2    issues in the case.  And I would like to ask you to listen

3    to Whirlpool's witnesses, too.  Whirlpool bought Maytag in

4    2006.  Maytag had bought Amana.

5              There isn't a copy of the document from them,

6    either, so we don't know exactly what is in the document.

7    But you will be presented this evidence and use it to make

8    your decision.

9              But like I said, it was a stupid mistake, and we

10   can't defend what he did.  You just have to decide how

11   relevant it is.

12             With respect to Whirlpool's '130 patent, I would

13   like to spend a few minutes on that and then finish up on

14   the '601 patent.  First, with respect to this '130 patent,

15   LG is going to present to you evidence on these three-door

16   bottom-freezer models.  Like I said, there is two designs

17   that are accused of infringing here.  One is the

18   side-by-side, like the two units you see over here, these

19   are not LG units, but it's that style, where you have got

20   the two long, parallel, vertical doors.

21             There is another style, which had the French

22   door at the top and a bottom pull-out freezer tray at the

23   bottom.  Whirlpool is accusing both LG products.  And what

24   we will present to you is evidence that this three-door

25   bottom-freezer unit, we feel, does not infringe, precisely

1    because when Whirlpool went to the Patent Office, remember I

2    said they cited the Gould patent against them?  Can we bring

3    up PTX-127 at Page 5?  If you look at the beginning section

4    of Gould -- let's go back to the picture first so we can

5    kind of see what we are talking about.  What Gould has is a

6    refrigerator that doesn't have a separate freezer

7    compartment.  So it's not like your top-mount or even these

8    side-by-sides.  There is just no freezer compartment in the

9    cabinet.

10           Instead, they have got this compartment, this

11   little ice-making space in the refrigerator door, where you

12   can make ice in the refrigerator door and store it there

13   without having to have a big amount of space given over to

14   the freezer.

15           If we can go back to Page 5.  The way Gould

16   describes this type of thing, with this below-freezing

17   temperature area on a refrigerator door, is as a freezerless

18   system.  He says it repeatedly.  This is just in the first

19   few lines of the patent.  It's repeatedly characterized as a

20   freezerless refrigerator.  No freezer compartment at all.

21   This little ice-making room Gould discloses is not a freezer

22   compartment.

23           What happens during the prosecution of this

24   application is the examiner finds this patent, and he finds

25   another patent to a fellow named Buchser and rejects the

1    application.

2              Can we bring up PTX-10 at Page 199?

3              What we see here, this is an office action from

4    the U.S. Patent and Trademark Office.  They file their

5    application, like you heard in the video this morning.  They

6    get a response from the examiner.  What the examiner says is

7    it's unpatentable over Gould in view of Buchser.  Gould

8    discloses a refrigerator having an ice maker and an ice

9    storage bin mounted on the door of the refrigerator.  But he

10   doesn't disclose the bin and the auger.  And Buchser does

11   that, so the examiner is saying to Whirlpool, I am going to

12   combine these two things, the bin and the motor, and the

13   auger, with the ice bin on the door from Gould, and you

14   aren't inventive over that.  You are not patentable.  It

15   would have been obvious.

16             Whirlpool responds to that.  They do it in an

17   interview.  They go in -- you are allowed to go into the

18   Patent Office and you can actually talk to the examiner.

19   You can set up a face-to-face meeting and have a

20   conversation with him.  And they do that.  They go in and

21   have an interview with the examiner.  During the interview,

22   these statements are made.  The examiner has to write it up

23   after it's over, and you'll that evidence of the summary of

24   the examiner's meeting with Whirlpool's representative.

25   This is actually disputed.  Whirlpool contends this is not

1    what they said.  They think it's what the examiner said.

2    You will get to decide that.

3              But in any event, during this interview,

4    somebody says that Gould does not have a freezer

5    compartment.  So whatever this thing is, where you have this

6    ice-making room on a refrigerator door, it's not a freezer

7    compartment.

8              And finally, the parties did agree that there is

9    nothing in this combination the examiner was using that

10   would be a combination of this Buchser with an auger and a

11   motor and a combination of Gould with this bin on the door.

12   He says, okay, you are right, it is not proper to combine

13   those two.  I don't see any reference that does combine

14   them, so, okay, I will give you a patent on this.

15             But what the examiner was not aware of at the

16   time is that there were other references that did show

17   precisely this.  It may not have been Buchser.  But there

18   are other references that we will present to you that show

19   that other people had combined an ice bin, an auger, and a

20   motor on a freezer door long before Whirlpool made this

21   invention.

22             You will see examples of Whirlpool agreeing with

23   the Patent Office in this action, and their professional

24   expert witness getting up in front of you and telling you

25   something different.  Again, this is evidence that you will

1    be presented.  These are contested issues.  We believe that

2    the evidence will show that Whirlpool is not correct in

3    doing that, that once they have told the Patent Office that

4    this is not a freezer compartment, their expert can't come

5    here to you and tell you that it is.

6              With respect to the '130 patent validity, this

7    particular teaching the examiner says is missing from

8    Buchser -- can we pull up PDX-6, please -- there are other

9    patents that do disclose this.  This is one of them.  This

10   is a patent that was issued to Hitachi.  You will have

11   evidence and hear testimony from various witnesses about

12   this patent.  This is what -- what Hitachi has done is

13   combined on the door of a freezer an auger --

14             THE COURT:  Let me see counsel for a moment.

15             (The following took place at sidebar:)

16             THE COURT:  I really do want to stay out of your

17   cases, I really do.  But this has long ago, Mr. Coyne,

18   evolved into an argument over an opening statement, I think.

19   Mr. Partridge hasn't objected.  I am sure that is the case

20   for strategic reasons, and that is fine.

21             But it's up to me to manage my time and the

22   jury's time.  So I would appreciate it if you would move it

23   along a little.

24             MR. PARTRIDGE:  I would ask for a little

25   flexibility.  I won't go as long, Your Honor.

1          THE COURT:  I will give you some flexibility.

2    You have got some things you probably want to address.  But

3    you are going to have your witnesses do what you do right

4    now.  You are losing this jury.

5          MR. COYNE:  Thank you.

6          (End of sidebar conference.)

7          MR. COYNE:  Could we go back to PDX-6?

8          Just to finish the thought.  You will have this

9    evidence to consider on whether this provides the things in

10   the interview summary that the examiner found were missing.

11         With respect to damages on this patent, again,

12   Dr. Mohan Rao will testify and provide you with his

13   assessment.  Whirlpool's expert will also testify on this.

14         Whirlpool is demanding $45 a unit for what it

15   says are the infringing sales.  What Dr. Rao will explain is

16   that this value is overstated.  The evidence will show you

17   ██████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████

19   ███████████████████████████████████████████████████████

20   █████████████████████████████████

21         With respect to the '601 patent, we showed

22   you -- I showed you earlier some of the summaries about the

23   claim language and how it ended up issuing in the patent.

24   And as I said, we believe that the evidence will show you

25   that Whirlpool said one thing to the Patent Office and is

1    going to say something different to you.

2              What I want to focus on here, though, is again

3    the damages case, because this is a very different issue.

4    These liners were out there for a long time.  You have seen

5    the Gold Star catalog a couple of times now during my

6    remarks.

7              One of the options that LG has, if you are

8    facing this kind of license, the hypothetical negotiation,

9    the evidence will show you that you would consider your

10   alternatives, and when you consider your alternatives, you

11   are not going to pay more for a license than it would cost

12   you to make something else that doesn't infringe.

13             The Gold Star type design that I showed you is

14   prior art.  It cannot infringe.  It was one of the options

15   available to LG because LG made those units.  LG knows they

16   work.  They know they are commercially acceptable.  And LG

17   would not, therefore, have paid more, hopefully the evidence

18   will prove to you, than it would have cost them to redesign

19   and use a different plaque even if they were infringing.

20   And the value of that is about seven cents per unit, not the

21   values that Whirlpool is giving you.

22             I want to just thank you very much for your

23   service.  I know it is difficult to take the time from your

24   daily life to sit here and listen to a patent case that

25   doesn't affect you at all.  But we really do appreciate it.

1          We will try to be as organized and as clear as

2     we can as we go through the evidence in the case, but I want

3     to just thank you for your patience ahead of time because

4     there are times when I know right now as I stand here in

5     front of you that we will fail in doing that.  But we will

6     try.

7          Saying this is your civic duty is not enough.

8     It is your civic duty, but it is an imposition.  We just

9     want you to know that we appreciate the time and attention

10    that you are spending on this case.  Thank you.

11          THE COURT:  Thank you, Mr. Coyne.  Mr.

12    Partridge.

13          MR. PARTRIDGE:  Thank you, Your Honor.  May I

14    take a moment to rearrange just a little bit?

15          THE COURT:  Yes.

16          (Pause.)

17          MR. PARTRIDGE:  Good afternoon, ladies and

18    gentlemen.  My name is Scott Partridge.  It's my pleasure to

19    be here representing Whirlpool in this case.

20          As I have listened to the opening argument or

21    opening statement of LG, I must say that I am sympathetic to

22    a couple of things that the jury faces.  That is that you

23    have heard a lot of names, you have heard a lot of numbers,

24    you have heard a lot of details that are a little difficult

25    to follow.

1           You know, the same would be true of some of the

2   things that I might say as well, although I will try to get

3   to what I think the main points are here.

4           I thank you for your time and attention here

5   this afternoon in advance.

6           Whirlpool, as you know, is a maker of home

7   appliances.  There are products that are made by Whirlpool

8   that are not involved in this case, and the same would be

9   true about LG.

10          This is a case about refrigerators.  It's not

11  about telephones, cell phones.  It's not about a lot of

12  other things that the parties make.

13          In particular, it is about three patents.  The

14  three patents are the '121, which is the LG patent, and the

15  '130 and '601, which are Whirlpool's patents.

16          All the disputes you will be asked to resolve

17  involve those three patents.

18          There will be a lot of side issues.  And one of

19  the difficult things about a case like this is trying to

20  figure out what actually matters to the job you have to do.

21  And, actually, in that patent video -- and I will get to

22  this in a little bit -- it focused you on what are called

23  patent claims in these patents.  And it talked about, and

24  you may remember, the video talking about the property

25  right, the legal boundaries.  I think, if I remember right,

1    the patent video put a deed up on the screen and compared a

2    patent to a deed, and then talked about boundaries of the

3    deed.

4              For my house, I remember that it says lot

5    number, square number.  I don't know what the deeds say up

6    here in Delaware.  But that's the kind of thing that patent

7    claims do.  They define the legal boundaries.

8              The interesting thing for you here is that

9    everything turns on those patent claims.  We are here over a

10   property case.  The property happens to be these patents.

11   The question will be as to everything in the case, are the

12   LG products within that property line or not?  And if they

13   are, they are said to infringe.  Or are they outside that

14   property line?

15             The same is true with respect to the allegations

16   made by LG against Whirlpool.  Are we within that property

17   line as defined by those patent claims or are we outside it?

18             When we look at these things called prior art

19   and look at whether or not claims are valid, it's the claims

20   again.  Is the prior art defining something that is in that

21   legal boundary or not?

22             So quite simply, I think you can deal with a lot

23   of what you are going to hear based on these so-called

24   patent claims.

25             You are helped in that regard by what is on the

```
1    last page of the preliminary instructions that you received

2    this morning.   There is a list of terms which Judge Sleet

3    has already construed.   There were some differences of view

4    between us about what these words meant.   Judge Sleet has

5    resolved that for you.   So you now have the keywords and

6    what they mean in your assessment of how the property right

7    here applies.

8              Now, you now know that Whirlpool owns a number

9    of marks, and we sell products under Amana, Maytag, Kitchen

10   Aid, Jennair, and Whirlpool.   And Whirlpool has been in the

11   business of home appliances and other products for 99 years.

12   It all started with washing machines a very long time ago.

13   A lot of those products focus on things for the kitchen.

14             We are going to talk to you a bit about the

15   history of Whirlpool, because I think it provides a context

16   for an examination of the issue of the property rights.

17             We will talk about some recognition that

18   Whirlpool has received recently with respect to its

19   innovation strategies and how it approaches innovation.   I

20   think it provides context for you.

21             Whirlpool, in case you didn't know, is based in

22   Benton Harbor, Michigan.   It's on the eastern shores of Lake

23   Michigan.

24             I am not going to introduce everybody.   I

25   couldn't get everybody in the jury room this morning, so I
```

```
 1    didn't have the chance to introduce people.  I hope you

 2    don't view that as impolite that I don't go through a list

 3    of names.  But I will introduce a few people.

 4              At the table here with me is Mr. Tom Catania,

 5    who is the vice president for Whirlpool governmental

 6    relations, and Mr. Tom Schwyn back here, who is the vice

 7    president/associate general counsel.  I am pointing them out

 8    because they will each testify in the area that I just

 9    described.

10              We will also call some Whirlpool engineers.  So

11    that we don't take too much of your time, we decided to pick

12    one engineer for each of our two patents, and one engineer

13    who will talk about why we think we invented LG's '121

14    patent first.

15              Let me talk about LG's '121 patent for a moment.

16              That patent is directed to a movable dispenser.

17    And you see it up here.  Simply put, Whirlpool invented that

18    first.

19              What is it you are going to be asked to decide

20    when you look at these patent claims that are asserted in

21    this case?  You will find that three narrow claims out of a

22    long list of claims in those patents are being asserted.

23              Those three narrow claims are limited to the

24    addition of a mechanical drive or spring.  That's the

25    difference.
```

1              And the base technology, the basic invention we

2    believe the evidence will show Whirlpool invented.   The

3    question you will be asked is whether or not popping it out

4    with a spring when you hit a button makes enough of a

5    difference to entitle LG to patent coverage as to that

6    spring.

7              You will hear Whirlpool's '130 patent.   That

8    concerns a feature called in-door-ice, or IDI.   If you don't

9    mind, let me walk briefly over to the refrigerator, just to

10   put a little context on what is in door ice.

11             The bin, which I just removed, is on the door.

12   Sounds simple.   The making of ice in a refrigerator is a

13   significant quality issue in manufacturing refrigerators.

14   You move ice and water and you are taking chances with

15   respect to the success of your refrigerators in the

16   marketplace.

17             There is a huge investment, as the evidence is

18   going to show, that goes into making a refrigerator.   And

19   the intensive capital investment that is required to make

20   manufacturing lines.   This is risky business to move ice and

21   move water and change where it is.   And it was unique to put

22   the ice bin on the door.   Why would you do that?   I don't

23   know if you remember, maybe you still have a refrigerator

24   that makes ice and has a bin up in the freezer below the ice

25   maker on rails or attached in some way and have ever tried

1    to get that thing out in order to dump the ice in a cooler.

2    Or, you discovered when you bought your refrigerator and you

3    brought it home, the door, you put it next to a wall and the

4    door wouldn't open more than 90 degrees and you couldn't

5    even get the bin out.  It was a big problem.  It took years,

6    and many engineers, to overcome the obstacles that Whirlpool

7    confronted in moving that bin to the door.

8              You will hear evidence as to why that was so.

9    Why that simple little step, what seems simple, was so

10   complicated.

11             The '601 patent, Whirlpool's second patent, has

12   to do with refrigerator walls.  And if I may walk back over

13   here, Your Honor.

14             THE COURT:  Sure.

15             MR. PARTRIDGE:  (Knocking on refrigerator).

16             This is metal.  You could come over here and

17   look at it and you would realize that.

18             Knocking on refrigerator plastic.  In between,

19   injected foam.

20             That has been around a while.  But one of the

21   problems that arose is that when you think about

22   particularly your freezer, there are temperature differences

23   between the inside of that freezer and the outside that are

24   actually pretty significant, depending on where you have

25   your freezer.  If it's in your garage, it's more so, but if

1    it's in your kitchen, it's less so.  Those temperature

2    differences over time cause the wall structure to bend a

3    bit, to bow a bit.

4         I don't know if you ever had shelves fall in

5    your refrigerator or in your freezer.  They are very tightly

6    designed.  There is sometimes not a lot of play with respect

7    to that.  There were problems that arose with respect to

8    bowing or bending of the walls that related to that, that

9    related to whether or not gaskets adequately sealed, whether

10   you were losing energy as a consequence.

11        The '601 patent addresses those problems.

12   Strategically placed what are called plaques -- and I must

13   confess, I have an engineering background.  When I got into

14   this case, I did not know what a plaque was.  It is

15   essentially an indentation in a surface.  These are

16   strategically placed indentations that address this problem

17   of bending or bowing.

18        So those are the patents in a nutshell.

19        As to the technology itself, during the course

20   of this case you will hear from our engineers, three of

21   them.  You will also hear from a couple of experts of ours

22   as well, Dr. Caligiuri is here, Ph.D. mechanical engineering

23   from Stanford.  Dr. Al Karvelis is here, Ph.D. from Penn

24   State, near where I grew up.  They will testify about the

25   patent claims and how they compare to the LG products, the

1  patent claims.

2         There will be some other Whirlpool witnesses

3  that you will hear from that relate to marketing and sales

4  activities and the like.

5         And you will hear from them about when Whirlpool

6  first developed the technology in both of its patents, as

7  well as the technology that is in the LG patent.

8         Now, how is that going to come about during the

9  course of this case?

10        LG is the plaintiff here.  As a consequence, the

11 way the procedure works, LG gets to go first.  So part of

12 what you are going to hear from us you are not going to hear

13 for maybe a couple days.  Maybe late tomorrow, maybe

14 Wednesday, as to the '130 and the '601 patents.

15        So you will hear mostly about the '121 once we

16 stop talking here.  And then following that will be

17 Whirlpool's case.

18        The fact that you are going to hear about the

19 '121 patent, does that mean it's the most important patent

20 in the case?  No.  Quite frankly, the most important patent

21 in this case is the '130 that's directed to that indoor-ice.

22        That in-door-ice patent and the technology that

23 Whirlpool developed was a game changer.

24        The development began back in the 1994 time

25 period.  And it took six years to get the product to market.

1   That's because you had to deal with all those issues

2   involved with moving ice and water.

3                The product was introduced in the spring of

4   2000.  And that product has been a game changer ever since.

5   It's been a game changer in the marketplace.  And it's

6   something that other companies, including LG, that wanted to

7   get into the U.S. marketplace and compete with Whirlpool,

8   put in its products.  LG took notice of Whirlpool's success.

9   And LG documents prove it.  You don't have to just take my

10  word for that.  I am going to show you the documents that

11  you will have when you deliberate.

12               I must say at this point that you will have all

13  the exhibits that are introduced back in the jury room with

14  you.  But you won't have all of these demonstratives.

15               That is why we have given you notebooks, so you

16  can take notes, because the demonstratives don't go back

17  with you.  Only the evidence, which includes the exhibits,

18  will go back.

19               So you are going to start hearing during the

20  course of this trial, especially when we start our case,

21  explanations from LG for what it did.

22               What I would ask you to do is remember LG's

23  documents from 2001 through 2003 that tell a story about

24  what LG thought before there was any litigation.

25               Whirlpool beat LG to the market with this

1    in-door-ice product by about five years.  LG knew about the

2    '130 patent before it ever introduced its product.  And it

3    charted ahead none the less.  Let's look at the first

4    document.  This is Defendant's Exhibit 16.  It's one of the

5    earliest documents we have.  Written May 4th, 2001.  It was

6    written in Korean.  But I don't read Korean and most of us

7    in the courtroom probably do not.  So we have had this

8    translated.

9          I do not believe you will hear any disputes in

10   this courtroom about Korean translations to English.  We

11   will spare you of that issue.

12          So I will show you a translation of this

13   document.  It was written after Whirlpool's '130 patent had

14   already issued.  The patent was already out there as an

15   issued patent.  The patent issued in July of 2000.

16          Why is that important?  Well, let's look at the

17   third page of this document.  LG's counsel referenced

18   something called a SWOT analysis, strengths, weaknesses,

19   opportunities, and threats.  That is an analysis that a lot

20   of companies use.  And I remind you that we are after

21   Whirlpool's patent has issued, and what does it say here as

22   a threat?  "Patent rights for an advanced enterprise."

23          That is interesting.  I wonder what's on the

24   next page of this document.

25          On the next page we find out that LG is rating

1    companies in the field.  Who are the advanced companies with

2    respect to ice makers and dispensing systems?  That black

3    dot means an advanced company.  And you see Whirlpool at the

4    top of the heap.

5            So at the top, their SWOT analysis talks about

6    threats from advanced technology companies.  They identify

7    Whirlpool as the advanced company when it comes to ice.

8            One year later, on May 10, 2002, high-level

9    executives, including vice president of LG, received a

10   progress report.  This is Exhibit DX-196.  It probably makes

11   sense.  I am doing this really for our record.  I wish I

12   could just skip telling you what the exhibit numbers are,

13   but it's DX-196.  Let's look at what that document says.

14   "Reestablish design concept that can catch up with

15   Whirlpool's door-bin-attached ice maker."

16           Later in 2002, in November, Exhibit DX-173, what

17   does it say?  "Only Whirlpool is supplying the side-by-side

18   refrigerator with the ice dispenser and bank," which is the

19   ice bin, "attached to the door."

20           The next year, what do they say in DX-177,

21   October 6, 2003?  This exhibit says, "Whirpool's IDI

22   technology has been leading the in-freezer ice maker

23   technology," and that the in-door ice technology was the

24   most advanced technology.  LG needed that technology in

25   order to compete.

1              Here is another document that shows specific

2    awareness of Whirlpool's '130 patent.  This is Defendant's

3    Exhibit DX-187.  It was also written in 2003.

4              It lists the Whirlpool patent, the '130 patent,

5    and it says that the Whirlpool patent -- it says other

6    companies, but the Whirlpool patent is the one listed on the

7    page as problematic in developing their system.

8              LG on this document went on to say that

9    "Whirlpool has uniquely advanced technology, and that a

10   dispute is expected when product is developed."

11             Now, here in this courtroom, LG will tell you

12   two different stories about its documents.  The first story

13   is that they believe they did something different in the

14   face of this.  The second story is that there is really

15   nothing new here.

16             Well, those stories don't stack up.  When you

17   hear the evidence, they do not stack up.

18             And you remember that the patent video told you

19   that you are in charge of determining infringement, whether

20   the patent claims describe LG's products.

21             You also get to decide validity.  Lots of juries

22   think that is strange that you get to do that, but you get

23   to do that, too.  Judge Sleet told you that when he read the

24   instructions, and the patent video told you that as well.

25             The interesting thing about validity is because

1    the Patent Office undertakes this examination process, there

2    is something called a presumption of validity.  It is in the

3    instructions you have in front of you.  It was in the patent

4    video.

5          What that leads to is a higher burden of proof

6    on the part of LG in its efforts to try to knock out the

7    '130 patent.  They have to prove that by clear and

8    convincing evidence.

9          I talked a little bit about the patent claims.

10   I pulled out this little picture from the video, because I

11   think it is a little bit helpful.  I mentioned before about

12   the boundaries of a patent.  This is the part where the

13   speaker told you about deeds and compared a patent to deeds

14   and said, hey, patent claims define the legal boundary.

15         I want to show you for a moment one of the

16   patent claims of the '130 patent.  This is Claim 1.  There

17   are several other claims that relate to this claim that will

18   be in issue.  But this is the main claim.  This claim is

19   directed to the in-door-ice technology.  Here is the first

20   page of the '130 patent itself.  You will see here that one

21   of the inventors listed is Mr. Verne Myers, who is here in

22   the courtroom this morning.  Would you stand, Verne?

23         He is one of those inventors.  He was the

24   project leader, which is why we asked him to come to trial,

25   because he could speak for the team that developed this

1   technology.

2           He will talk to you about the many years and

3   obstacles over those years that they overcame.  He will tell

4   you what predated this invention.  He will talk about the

5   existence of automatic ice makers and the existence of a

6   dispenser in the door and what was missing with respect to

7   that, and very, very importantly, he will talk about

8   consumer reactions to prior art refrigerators at the time.

9           And one of the things that Whirlpool discovered

10  when it surveyed consumers in undertaking its innovation

11  strategy, which you will hear is a key to Whirlpool's

12  innovation strategy, is that they found out that people

13  would go to the grocery store and they would come home to

14  put things in the freezer only to find out they didn't have

15  enough space, and that that storage bin up inside the

16  freezer took up space.

17          That, as well as the inaccessibility of the

18  storage bin, how am I going to get to this thing, were

19  problems that consumers identified.

20          So Whirlpool, Mr. Myers and others on his team,

21  went about trying to figure out how to give consumers what

22  they wanted.  And that turned out to be more usable space,

23  more accessibility to the storage bin.

24          Those problems were solved, and they were solved

25  by moving every major component of the ice-making and

1    dispensing system around.  Things had to be adjusted.  Some

2    things were the same.  But the overall system required

3    adjustment in order to deliver to the customer a

4    high-quality product where ice wouldn't fall on the floor,

5    water wouldn't leak, and where you had something that was

6    reliable and would last.  And he will talk about that.

7              What they accomplished when they solved all of

8    those problems was that the customer, the consumer, had 20

9    percent, almost 20 percent more usable shelf space in the

10   freezer.  That's why it was characterized as advanced

11   technology in the industry and by LG at the time.

12             Some in Whirlpool were skeptical.  This was

13   going to cost a lot of money to retool and build and put on

14   a production line.  Around there were those who were

15   skeptical.  Part of the reason it took a while was dealing

16   with that skepticism.

17             You will hear from an economic expert, Mr. Seth

18   Kaplan, who has looked at the impact of this feature on

19   Whirlpool's profitability.  And he will look at what premium

20   was associated with this IDI technology about the time it

21   was introduced to the marketplace.  Amazingly enough, it was

22   a hundred dollar premium on every refrigerator at that time.

23   And the profitability of that hundred dollars was high.

24             Sound like a success?  Well, Whirlpool thought

25   so.  So did LG.

1          We could take a few minutes to look at the

2    various ice bins.  I am going to pass on that.  I will talk

3    for a few minutes about Claim 1 again, and part of that

4    claim, and talk a little bit about the LG ice bin, if I may.

5          This claim includes -- if you will hang on just

6    a second, I am trying to skip things -- I skipped a really

7    important point, before we do this.

8               If we can take this down, please.

9               This is an issue that is confusing to most

10   people.  It was confusing to me when I got into this

11   business.  And there is a great temptation.  We will present

12   evidence to you about the Whirlpool design, the one that I

13   just showed you over here, that refrigerator on the right.

14   And there is a great tendency to think that that matters

15   with respect to your job here in applying the claims to LG's

16   product.  The truth of the matter is, what matters are the

17   claims and LG's product.  This is more in the way of letting

18   you know something about the underlying technology that led

19   to the patent.  But the real comparison is not one in which

20   you open the door to the Whirlpool refrigerator and open the

21   door to the LG refrigerator and say, gee, they look

22   different this way or that way.  That's interesting.  But

23   it's not what you are being asked to decide.

24          The dispute is over the patent claims and

25   whether the patent claims as written and as interpreted by

1   the Court cover the LG products.

2           I don't know if this is the best analogy, but I

3   use it, and it seems to work.

4           For example, I like hard-boiled eggs.

5   Unfortunately, I didn't have my hard-boiled egg this

6   morning.  Some people like their eggs sunny side up.  Some

7   like them over easy.

8           Let's suppose you had a claim to an egg and the

9   claim had two elements:  The yolk and albumin, the white or

10  clear part of the egg.

11          That claim would cover all the variations I just

12  described.  The hard-boiled egg, the sunny side up, the

13  over-easy egg.

14          But if you had a claim that would cover only an

15  egg with a liquid yolk, my hard-boiled egg wouldn't be

16  covered.  It's an egg, but it doesn't have the liquid yolk.

17          That's the way claims work.  That is a bit

18  simplistic.  But your job is to look at the claims and

19  compare them to the LG products and not get too caught up in

20  the similarities or not between the products.

21          Let's take a quick look at one of LG's products

22  that's at issue here.

23          I can't bring the whole refrigerator over to

24  you.  I am only going to deal with one part of the claim.

25  And it's the part that was up on the screen a moment ago.

1    This is the bin that has been taken out of one

2    of LG's refrigerators.  It's CPX113A, for those who just

3    must know that.

4    When you look inside this -- this is just one

5    part of the claim -- but when you look inside this, I know

6    it's hard from that distance, but you will see there is an

7    auger down here.  You will see there is a mechanism for

8    capturing ice when it falls from another place.  And if you

9    could look inside the bottom of this, you will find an ice

10   crusher.  And if you could look carefully in here, you would

11   find a hole at the bottom of this, near the side and at the

12   bottom, that comes out through the bottom.

13   One of the issues that you will be asked to

14   decide is whether that last phrase, "The auger moves ice

15   pieces from the ice storage bin through the bottom opening

16   for dispensing from the ice storage bin" -- my apologies.

17   What you will have to deal with is really the relationship

18   between the position of the auger and the bottom opening.

19   That is pretty much what it is.  Dr. Caligiuri will tell you

20   he thinks that infringes.  When you see the ice bin and the

21   components of the side-by-side refrigerator of LG, the bin

22   looks pretty much the same.  There are some differences in

23   size and the like.  And Dr. Caligiuri will tell you that

24   that infringes as well.

25   So the first main dispute involves that issue.

1    The second main dispute involves the French-door

2    refrigerator.  That was described to you earlier as a

3    refrigerator that has two upper doors that get into the

4    refrigerator, and one bottom drawer, which is where the

5    freezer is.

6    On LG's French-door refrigerators, they have two

7    freezers.  They have that bottom-drawer freezer, and they

8    put another freezer in the refrigeration compartment.  Guess

9    where?  On the door.  Guess what's on the door (indicating)?

10    The bin, the auger, the ice crusher, and the other

11    components.

12    What LG will tell you is that, gee, it takes two

13    doors to get inside the ice bin.  The claim says there is a

14    door with this ice bin and other components mounted on it.

15    You get to decide whether two doors really makes a

16    difference.  I don't think two doors make a difference.

17    That is what you will hear from our experts in the case.

18    The third issue that I didn't know was going to

19    be an issue until I heard LG's comments today is whether or

20    not that ice box on the door is a freezer.  It must be

21    written somewhere that refrigerators only have one freezer.

22    And it must be written somewhere that if a refrigerator has

23    one freezer, it can't have a freezer on a door.  It doesn't

24    make a lot of common sense.  And it didn't make a lot of

25    common sense to the person who labeled LG's French-door

refrigerators with a label that talked about it being an ice

system with an ice bin.  And you will see that on the label

of the refrigerator.

It didn't make a lot of sense before this

litigation when LG prepared a document, Exhibit DX-163, that

is a hand-drawn sketch.  This is the first page in Korean.

And what you see here, and I am going to walk over to it, if

I may, Your Honor, you can see on this side the cabinet of

the refrigerator.  And over here one of the doors, in an

open position.  That is what you see in that exhibit.

Let's look at the English version of this.  It

says "freezer."  That's what that word is, "freezer,"

pointing exactly to that thing on the door.  And

interestingly enough, the two names on this document, some

of the names you heard earlier today, LG engineers, earlier

than this litigation, saying that.

So the second story that LG will tell you is

that there is nothing new here.

Again, I would ask you to pay attention to what

they said in 2001, 2002, and 2003.  Some of the same

exhibits.  Here is Exhibit 187.  This is when, you know,

they knew about the patent.  Uniquely advanced.  Only

Whirlpool was supplying to the market an ice bin mounted to

the door.  And that system was characterized here as

advanced technology.

1          You remember in the video, the patent video, the

2     speaker talked about prior art.  He talked about Patent

3     Office procedure, and that there is a patent examiner who is

4     trained in the field.  You will hear about all of that.  You

5     will hear about the one and a half years or so that this

6     application was prosecuted before the Patent Office.  And

7     you will see that the examiner cited I think it's 20 or so

8     prior art references that he relied upon during prosecution

9     that was part of that back-and-forth.

10          In the face of LG's heavy burden of proof here,

11    clear and convincing, LG relies upon a prior art Hitachi

12    publication from Japan to say that there is nothing new

13    here.  Well, it's interesting, that, too, is inconsistent

14    with the documents from the earlier time period.  Let's look

15    at DX-173, written by LG in 2002.

16          Here is the Hitachi Japanese publication on the

17    right.  What do you think we have over here on the left?

18    That's Figure 3 of the '130 patent, the IDI patent.  What is

19    the characterization on that page?  "Advanced maker trends."

20    This is advanced maker trends.

21          So there will be other illustrations of this.

22    Even with the '130 patent in hand and the Hitachi

23    publication, LG was still describing Whirpool's IDI

24    technology as advanced technology.  There is nothing in

25    these documents that says, hey, what Whirlpool has here is

1     as old as the hills.  It doesn't say that.  It talks about

2     advanced technology over and over again.  Does it make sense

3     to you that the burden of clear and convincing evidence can

4     be satisfied here?  Well, that is a question we put to you.

5            The last point on the '130 patent is, as Judge

6     Sleet read to you the questions you have been asked to

7     address, it is the only patent for which this is true.  Of

8     the three patents in this case, we have asked you to find

9     that this infringement is not just infringement, which is

10    one standard of proof we face, but it's willful

11    infringement.  They knew what they were doing when they did

12    it.  They knew about the patent, they proceeded, and they

13    did so in a way that we think satisfies the law on

14    willfulness.  And you will see more of that evidence during

15    the trial.  You saw some of it here this afternoon.

16            The '601 patent, the only thing I have left to

17    say about that analysis for you is that in part it looks

18    like the argument is about the indentations in the LG

19    refrigerators being something more like aesthetic

20    indentations.  Well, I have looked at them.  I think beauty

21    is indeed in the eye of the beholder.  They don't look

22    beautiful to me.  They look like they are there for some

23    functional reason.  And you will hear our views on that.

24            You will hear that with respect to this

25    invalidity claim that's being made, that our view is the

evidence is a leap of faith, that what has been described to

you doesn't again stack up when you actually see the

underlying evidence.

As to the '121 patent, again, a picture may

paint a thousand words here.  That's Figure 8 of the '121

patent.

Let's look at the Whirlpool patent.  This is

figures 2 and 3 of PTX-742, the Whirlpool patent.  And you

can see this movable spigot in that patent.

The evidence is going to show that that basic

invention was made by Whirlpool more than a year before

anything that LG can legitimately claim, and almost two

years before they have a document that really shows they

even had the idea.

So you will hear about our invention date, our

development, LG's invention date, our physical prototypes

and the like.  And you will get to decide whether the basic

invention was ours.  And what happened here is that

something like a CD player, mechanical drive, spring, like

my cup holder in my car, which used to be manual and now I

can just push on it and it pops out, distinguishes the '121

patent.  You get to decide that.

What are we asking you to do when it comes to

damages?  We will present to you a case that we believe

establishes that as to the '130 patent our damages are a

1  little over $18 million and as to the '601, almost $4

2  million, a total of over $22 million.  And we will also

3  present a case to you with respect to the water spigot

4  patent, the '121 patent, which focuses on the fact that it's

5  going from manual to mechanical, and what is that worth in

6  light of my cup holder, CD players, and the like.  And

7  that's $250,000, even if you found we infringed a valid

8  patent.

9           Thank you very much for your patience this

10  afternoon.  I look forward to presenting Whirlpool's case to

11  you as this trial proceeds.

12           THE COURT:  Let me see counsel for just a

13  second.

14           (The following took place at sidebar:)

15           THE COURT:  Do you think we should start a

16  witness today?

17           MR. COYNE:  We are prepared to start witnesses

18  today, Your Honor.  I think Mr. Taylor can be on and off,

19  unless the cross is extensive.

20           MR. PARTRIDGE:  Let's give it a shot, Your

21  Honor.

22           MR. COYNE:  I don't have more than 20 minutes

23  for him.

24           (End of sidebar conference.)

25           THE COURT:  With your permission, ladies and

1    gentlemen, I would like to get right into the first witness.

2    Would everybody be all right with that?

3              I think we can get this witness on and off,

4    actually, and we will release you for the day by the 4:30

5    hour.

6              Mr. Coyne.

7              MR. COYNE:  Thank you, Your Honor.

8              Your Honor, LG calls to the stand John Taylor.

9              ... John I. Taylor, having been duly sworn as a

10   witness, was examined and testified as follows ...

11             MR. COYNE:  Your Honor, we have agreed with

12   counsel that we would give the witness a book of exhibits to

13   try to speed the examination along.  We would like to hand

14   one up to the Court as well.

15             THE COURT:  Thank you.

16                    DIRECT EXAMINATION

17   BY MR. COYNE:

18   Q.    Good afternoon, Mr. Taylor.

19   A.    Good afternoon.

20   Q.    Could you please tell the jury where you are employed?

21   A.    I work for LG Electronics, U.S.A.  I am based in

22   Chicago.

23   Q.    What do you do for LG?

24   A.    I am in charge of industry relations and government

25   affairs and public relations.  I am actually the vice

1    president of public affairs and communications.

2    Q.    Where did you go to school?

3    A.    I went to undergraduate work at a little school in

4    Indiana called DePauw, and graduate school at Northwestern

5    University.

6    Q.    What kind of degree did you take from Northwestern?

7    A.    I am actually a journalist by training.  I have a

8    journalism degree.  I am a former newspaper reporter.

9    Q.    What did you do after you finished your Master's?

10   A.    Two days after I graduated from Northwestern, I

11   started at a company called Zenith, based in Chicago.  I was

12   in the public relations department.  I was actually hired to

13   write the annual report in 1981.  And my career sort of

14   evolved from there.

15           And largely, I have been in public relations and

16   then evolving into government affairs.

17   Q.    How did you get from Zenith to LG?

18   A.    I guess I was acquired.  When LG acquired Zenith in

19   1989, I became an LG employee, officially on January 1st of

20   2000.

21   Q.    Let's back up a second.  Can you tell us a little bit

22   about LG, just the corporation, what does it do?

23   A.    LG Electronics is a multi-national corporation.  Our

24   2009 global sales, including subsidiaries, was about 57.1

25   billion U.S. dollars.  We have operations around the world.

Taylor - direct

1   We have about 82,000 employees, with 115 different

2   operations across the world, 84 different subsidiaries.

3            My main focus is, of course, in the United

4   States.  But in my job I stay on top of everything that is

5   happening in other parts of the world.  R&D and innovation

6   is a really important thing that we do.  We have about

7   17,000 engineers working in 36 different R&D and design

8   centers around the world.

9            In the United States we have a design center in

10  New York.  We have an R&D center for mobile phones in San

11  Diego.  We have the Zenith R&D center for digital television

12  in Chicago.  We also have a digital appliance R&D center in

13  Chicago as well.

14  Q.    During the opening we looked at -- one of the slides

15  we put up on the thing was a Gold Star refrigerator.  What

16  is the relationship between Gold Star and LG?

17  A.    Actually, Gold Star was the original name of our

18  company.  The Gold Star Company was founded in 1958, and

19  actually, we continue to own the Gold Star name.  You will

20  see some Gold Star products, as you will see Zenith products

21  on the market today.  But from those humble beginnings as a

22  Korean company, we have evolved over the last 50 years into

23  a global leader in all of our key product categories.

24  Q.    What product categories is the company in today?

25  A.    We have five main business areas.  Home entertainment,

Taylor - direct

1    which is basically consumer electronics, flat screen TVs,

2    Blue Ray players and the like.

3              Home appliances, which ranges from everything

4    from refrigerators and washing machines to air conditioners

5    and vacuum cleaners.

6              Mobile phones.  Many of us are familiar with

7    LG's position in mobile phones, the number two brand in the

8    United States.  About 35 million mobile phones a year sold

9    here.

10             Business solutions, which sells flat screens and

11   security systems to a wide range of commercial customers.

12             And our air conditioning business, which is a

13   separate division now, which was spun off from our original

14   appliances.

15   Q.    One of the dates that we kept hearing during opening

16   was around the 2000 time frame.  Can you kind of take us

17   back, before 2000, what was LG doing with respect to the

18   U.S. market before 2000?

19   A.    If you don't mind, it might be helpful to go actually

20   a little bit further back.

21             I had mentioned that Gold Star was founded in

22   1958.  In the 1960s, Gold Star was still relatively small,

23   but we were focused primarily at that point on the Korean

24   market, and Gold Star was proud to introduce and develop the

25   first television set sold in Korea, the first washing

Taylor - direct

1    machine, the first refrigerator, the first air conditioner.

2    That was sort of the beginnings of what has become LG today.

3              That was in the 1960s.  In the 1970s, the

4    company began to branch out around the world.  In fact,

5    that's when the company established its first sales office

6    in the United States, initially working with other

7    manufacturers to build products under their brand, and even

8    during the '70s, long before there was any real connection

9    with Zenith, Zenith was purchasing clock radios from Gold

10   Star at the time.  In the 1980s, Zenith was purchasing VCRs

11   from Gold Star.  Gold Star was building small appliances for

12   Kenmore -- for Sears under the Kenmore brand during that

13   period, starting in the '70s and continuing into the '80s.

14             It was during the '80s that the Gold Star name

15   was starting to grow in the United States.  Our employment

16   was growing in the United States.

17             THE COURT:  Sir, let me interrupt.

18             MR. PARTRIDGE:  611, Your Honor.  A little Q&A?

19   BY MR. COYNE:

20   Q.   Let's stop you there.  You mentioned the Gold Star

21   brand.  What was happening with the Gold Star brand in the

22   '80s in the U.S.?

23   A.   During the 1980s, I think it's fair to characterize

24   the Gold Star name as sort of a promotionally priced brand.

25   Particularly from my perceptive as a Zenith guy at the time,

1    Zenith was the premier player in the television business and

2    Gold Star was more of an entry-level product.

3              And indeed many of the products in the appliance

4    area also were more in the commodity area.  Early on during

5    that period in the '80s, that is.

6              By the 1990s, though, there was just this huge

7    transformation in the company.

8    Q.    What happened in the '90s with this transformation?

9    A.    There are many major milestones, I guess, during the

10   1990s, but two noteworthy ones were, of course, the

11   acquisition of the Zenith brand and the corporation called

12   Zenith.  That really positioned LG immediately as a leader

13   in the United States in more full-featured, higher-end

14   consumer electronics products.

15             But also the new corporate identity, moving from

16   Gold Star to LG Electronics, a new name, a new face on the

17   company, that happened in about 2005, at the same time that

18   the company was making enormous investments in R&D in all of

19   these key categories.

20   Q.    You mentioned a couple I think you said manufacturers

21   to build their brand.  In particular, before 2000, what was

22   the relationship between LG and Gold Star on the one hand

23   and some of the brands you mentioned, like Sears, Zenith?

24   A.    In that 1999-to-2000 range, I think it's fair to say

25   that, you know, a very large portion of our sales in the

Taylor - direct

1    United States were under somebody else's brand.  And during

2    2000, LG was actually, Gold Star at the time, building

3    refrigerators for GE and for a Amana, and for Sears under

4    the Kenmore name, and Whirlpool was in there as well.

5    Q.    So was -- you were serving as an original equipment

6    manufacturer for all four of those companies?

7    A.    We were during that period.  And off and on over the

8    years, all of those companies have been our customers.

9    Q.    When did LG make the transition to LG-branded products

10   in the U.S., in particular, refrigerators?

11   A.    Actually, in appliances, those first LG-branded

12   refrigerators were introduced in 2001.  And that's the same

13   time that the first cell phones were coming out, in 2001.

14   Q.    Okay.  Where is LG today in terms of its presence as

15   an LG-branded product as opposed to an OEM in the U.S.

16   market, particularly with respect to refrigerators?

17   A.    Sure.  Overall, and particularly with refrigerators,

18   the majority of our sales now are under the LG brand.  And

19   if I could just rewind a little bit --

20            THE COURT:  He can pose another question.

21   BY MR. COYNE:

22   Q.    Is there any OEM manufacturing being done by LG now?

23   A.    Absolutely.

24   Q.    Who are you manufacturing for still?

25   A.    Our largest customer has probably been our longest

1    customer, Sears, under the Kenmore name.  We have been

2    working with Sears for 25 years.  And our major supplier of

3    both refrigerators and laundry products to Sears.

4    Q.    You mentioned this transition.  Tell me about the

5    transition from the OEM, the largely OEM era to the largely

6    branded era for LG, when did that happen?

7    A.    Actually, it began in 2001, but the real turning point

8    was 2004.  Major launch of the branding campaign in the

9    United States with the new billboard in Times Square which

10   sort of kicked off the campaign.

11              THE COURT:  Mr. Coyne, you asked the question.

12   He has answered it.  Could you pose another question,

13   please?

14              MR. COYNE:  Yes, Your Honor.

15   BY MR. COYNE:

16   Q.    When you relaunched the LG brand in the States, what

17   products was LG selling under the LG brand at that time?

18   A.    When we first launched the brand in appliances was

19   2001.  But this period of 2004, this is when we moved from

20   Zenith to LG in major consumer electronics.  That's also the

21   period where we started to introduce more appliances under

22   the LG brand, as well as really stepping up our efforts in

23   mobile phones.

24   Q.    How successful has that effort been?  How has it

25   worked out?

Taylor - direct



Q.     We have talked a little bit today already with the

jury about these different forms or styles of the

refrigerator, the top-mount, side-by-side, bottom-mount.

         MR. COYNE:  Your Honor, could I ask your

permission for the witness to approach the board so at least

the jury has a conception of the forms of these various

models they are going to be hearing about in the case?

         THE COURT:  Yes.

BY MR. COYNE:

Q.     If you could do it high on the board so the jury can

see.

Taylor - direct

1        (Witness steps down from stand.)

2   Q.    Just a configuration of a top-mount, what that would

3   look like.

4

5   A.    (Witness drawing.)

6           Here is the type of refrigerator many of us grew

7   up with, with the freezer on the top.

8   Q.    The side-by-side, what is the configuration of the

9   side-by-sides?

10  A.    (Drawing.)

11  Q.    Is the freezer typically on the left or does it vary?

12  A.    In the United States I think it's pretty much on the

13  left.

14  Q.    How about the bottom-mount freezers, what is the

15  configuration of those?

16  A.    They come in several flavors (drawing).  This is the

17  aforementioned French-door refrigerator, with the freezer on

18  the bottom.

19          LG also has what we call a four-door

20  refrigerator, which has a separated freezer compartment.

21  Q.    Does LG currently manufacture each of those styles?

22  A.    We do.

23  Q.    The last area I want to explore with you is the --

24  what role does technology play in terms of LG's product

25  development?

Taylor - direct

1          (Witness resumes stand.)

2     A.     Technology is really key to LG's strategy around the

3     world, to first understand consumer insights, develop --

4     it's not really about the technology.  It's about the

5     features and benefits that will really address consumer

6     needs.  But because of the breadth of technology that LG

7     brings to market, we were able to do things I think in many

8     ways better than the competition.  We have the ability to

9     take some of the core technology, for instance, the LED

10    screen on the front of our washing machine is from our

11    display division.  Some of the other technologies from cell

12    phones are incorporated into consumer electronics.  So there

13    is synergy across the various product categories.

14    Q.     You mentioned a few moments ago a time years ago when

15    LG was looking at more promotionally priced products.  What

16    do you mean by that?

17    A.     Some of the less-expensive, more commoditized products

18    that, frankly, we are not in anymore.

19    Q.     Generics, or lower-cost pricing for the customer?

20    A.     Correct.

21    Q.     Lower value?

22    A.     Value is in the eye of the beholder.

23    Q.     How about today, where is the company positioning

24    itself in terms of its marketing focus?

25    A.     Our focus has been on premium products, really to

Taylor - direct

1    position LG as a premium brand in the U.S. market.   I guess

2    you would call it mass premium, because it's aspirational

3    but attainable.   That really again cuts across all of our

4    product lines.

5    Q.      What do you mean by "mass premium"?

6    A.      Well, certain segments in the appliance business, for

7    instance, you are familiar, may be familiar with companies

8    like Sub Zero and Viking, they make tremendous products.

9    But the market for a $10,000 refrigerator is pretty small.

10          We bring advanced technology and styling to the

11    marketplace to give consumers who want to create their

12    entire kitchen with premium products under the LG brand.

13

14

15

16

17

18

19

20

21

22

23

24

25

Taylor - direct



Taylor - direct

1 ███████████████████████████████████████████

2 █████████████████████████

3 Q.     And who is No. 1?

4 A.     Samsung at the moment.

5              MR. COYNE:  Your Honor, nothing further for this

6 witness at this time.

7              THE COURT:  Thank you, Mr. Coyne.

8              You may cross-examine, Mr. Partridge.

9              MR. PARTRIDGE:  Thank you, Your Honor.

10                    CROSS-EXAMINATION

11 BY MR. PARTRIDGE:

12 Q.     Good afternoon, Mr. Taylor.

13 A.     Good afternoon.

14 Q.     You and I met for the first time today.  Very nice to

15 meet you.  I have a few questions for you.

16              Looking at your artistry to your left, that

17 top -- the one on the immediate left is the top-mount.

18 Correct?

19 A.     Yes.

20 Q.     LG did not invent the top-mount refrigerator, correct?

21 A.     We did not.

22 Q.     The next --

23 A.     But we had the first top-mount in Korea.

24 Q.     My question was:  Did you invent the top-mount

25 refrigerator, and your answer to that question is, no, you

Taylor - cross

1   did not.  Is that correct?

2   A.    Correct.

3   Q.    The next refrigerator over is the side-by-side.   LG

4   did not invent the side-by-side refrigerator; is that

5   correct?

6   A.    Correct.

7   Q.    And the next one over is the bottom-mount

8   refrigerator.   LG did not invent the bottom-mount

9   refrigerator, did it?

10  A.    That's correct.

11  Q.    As a matter of fact, LG didn't invent the French door

12  refrigerator.   That was introduced by Amana.   Is that

13  correct?

14  A.    I am not sure who first introduced it.

15  Q.    It predated LG?

16  A.    Yes.

17  Q.    As I was listening to your testimony, I was wondering

18  what your testimony has to do with the three patents that

19  are actually in this case.   So my question is that, am I

20  correct that you are not offering any testimony to this jury

21  about the three patents?

22  A.    I am not a patent expert.   I wasn't asked to testify

23  about the patents.

24  Q.    So you don't have any information about the patents?

25  A.    I do not.

Taylor - cross

1    Q.    And would it be fair to say that you do not have any

2    specific knowledge about the ice-making technology in the

3    various LG refrigerators that are accused of infringement in

4    this case?

5    A.    Just on the periphery.  Not really.

6    Q.    More or less like a consumer would; is that right?

7    A.    Yes.

8    Q.    And am I correct in saying that you do not have any

9    specific knowledge about the technology that's in the

10   Whirlpool refrigerators that are at issue in this case?

11   A.    That's correct.

12   Q.    So you are here to give us some general knowledge

13   about LG; is that correct?

14   A.    Yes.

15   Q.    And for the past ten years, you have been at LG, I

16   think you said, 2000, something like that?

17   A.    Yes, sir.

18   Q.    And so what you said about LG predating 2000 had to do

19   with things you have heard or read or that was told to you.

20   Correct?

21   A.    As the company spokesman in North America, I need to

22   know those things.

23   Q.    And, in fact, actually, LG started as Lucky Chemical

24   Company in 1947; isn't that correct?

25   A.    The chemical part was Lucky.  The electronics part was

Taylor - cross

1   Gold Star, which started in 1958.

2   Q.    You changed the name or LG changed the name of that

3   chemical company to Lucky in 1974.  And it was that chemical

4   company that founded Gold Star in or about 1958.  Is that

5   correct?

6   A.    That's correct.

7   Q.    And for many years, as you said, the company Gold Star

8   or Lucky used the -- probably Gold Star at that point used

9   the Gold Star brand, Lucky used the Lucky brand, and within

10  many circles, Lucky and Gold Star were known as Lucky/Gold

11  Star.  Is that correct?

12  A.    Not so much in the United States.  But in parts of

13  Asia, yes.

14  Q.    And so this "Life is Good" answer, slogan, or logo,

15  which, by the way, is a very good logo, is something that

16  came about six or seven years ago?

17  A.    Actually started in '03 initially in Australia, and

18  then was adopted around the world by the end of that year.

19  Q.    So Lucky -- excuse me, "Life is Good" is of relatively

20  recent vintage compared to the years of operation of the

21  company.  Correct?

22  A.    It's a marketing theme, if you will.

23  Q.    You talked a little bit about Gold Star and its

24  products.  You mentioned that Gold Star was selling what I

25  think you characterized as commodity products.  Is that

Taylor - cross

1    correct?

2    A.    Yes.

3    Q.    And they were selling commodity products in the

4    refrigerator business as well, is that right, back in the

5    '80s and '90s?

6    A.    In the '80s I think there were some small

7    refrigerators.  Most of my knowledge was about other product

8    categories.  But they were all-all-all, in the United

9    States, starting in the smaller products.

10   Q.    Once something becomes a commodity, am I correct that

11   what that essentially means is that the only real variable

12   is price?

13   A.    Price is a very important factor in the commodity.

14   Q.    That is the primary factor.

15         So getting your foot in the door to be a

16   commodity seller is determined by, largely, price, correct?

17   A.    There are other factors.  But that's a major one.

18   Q.    And with respect to OEM, being an original equipment

19   manufacturer, for Sears and others, Gold Star got its foot

20   in the door as a commodity seller based on price.  Isn't

21   that fair?

22   A.    I wasn't there.  But I think price is always a

23   consideration when you are dealing with customers.

24   Q.    Before you were there, you had heard about Gold Star,

25   and you know that Gold Star was known for what were low-end,

Taylor - cross

1   lesser-quality products.  Is that fair?

2   A.   No question, during that period.

3   Q.   You talked a little bit about the number of employees

4   of LG.  I may have missed the number.  I think you said

5   there were about 2,000 in the United States.  Did I hear you

6   correctly?

7   A.   I don't know if I said that today.  But there are

8   about 2,000 in the United States.

9   Q.   I may have seen it in one of the documents.  I

10  apologize.

11          It's about 2,000?

12  A.   Yes.

13  Q.   How many of LG's employees in the United States are in

14  refrigerator design?

15  A.   You know, I don't have a breakdown.  We have some

16  people involved in refrigerator design in New York.  More

17  than the styling, and our R&D center in Chicago.  Much of

18  that activity is at the corporate headquarters in Seoul.

19  Q.   So you have industrial designers and people of like

20  backgrounds doing styling and other things, correct?

21  A.   Correct.

22  Q.   How many of those employees are engaged in

23  manufacturing in the United States and refrigerators?

24  A.   There are no -- LG does not manufacture refrigerators

25  in the United States.  We have manufacturing operations all

Taylor - cross

1

2

Q.     Thank you.  You mentioned mass premium.  I wasn't

entirely sure what that term means.  Does that have to do

with a market for premium brands manufactured on more of a

mass scale as opposed to the sort of customized

refrigerators that fit a certain large space within a house?

Am I in the right ballpark?

A.     I think so.  It's not the niche products, but a

more -- a product that's more broadly appealing to

consumers, to a wider number of consumers.

Q.     Do you agree with me that Whirlpool is in the mass

premium business as well?

A.     Whirlpool participates in many segments, from

commodity up to mass, for sure.

Q.     And with respect to the mass premium business, would

you agree with me that -- maybe you don't know.  If you

don't, that's fine -- that when the in-door ice technology

was introduced into the marketplace by Whirlpool, in the

early part of this decade, in the year 2000, that was in the

mass premium marketplace for refrigerators?  Is that

correct?

A.     I just don't know.  Sorry.

            MR. PARTRIDGE:  Thank you.  I have no further

questions.

1          THE COURT:  Any redirect, Mr. Coyne?

2          MR. COYNE:  No, Your Honor.

3          THE COURT:  Thank you, sir.  You are excused.

4          (Witness excused.)

5          THE COURT:  All right.  Members of the jury, we

6    have come to the end of our day.  It is time for me to

7    release you.  Just let me remind you of that which I told

8    you earlier.  You are not to talk with anyone about the

9    matters, any matters touching on this case.  Don't do any

10   research, don't listen to, watch anything, or read anything

11   regarding the matters touching on this case.

12          Keep an open mind.  Travel safely.  We will see

13   you back here tomorrow promptly at 9:00.  Have a good

14   evening.

15          (Jury leaves courtroom at 4:28 p.m.)

16          THE COURT:  Counsel, I just remained to see if

17   there was anything you needed to talk with me about.

18          MR. COYNE:  Yes, Your Honor.

19          THE COURT:  Those in the well of the court may

20   be seated, counsel may be seated, and those in the well of

21   the court are free to leave, to the extent you don't want to

22   have to listen to this.

23          MR. COYNE:  Your Honor, I just wanted to talk

24   briefly about the logistics for replacing the copies in the

25   book.

1              We had agreed on the content of the jury book,

2    which would have five tabs -- we are proposing to the Court,

3    I am sorry, five tabs --

4              THE COURT:  I usually leave this to counsel.

5              MR. COYNE:  Your Honor, we have agreed on the

6    format.  What we suggest is we provide copies tomorrow

7    morning with the corrected -- the voir dire taken out of the

8    preliminary instructions.  And I was going to suggest we

9    provide punch note papers so they can keep it in the

10   three-ring binder and it isn't loose.

11             THE COURT:  That is great.

12             MR. PARTRIDGE:  We have some pictures as well.

13   And we have agreed because we both know, and neither one of

14   us likes this practice, either, that there will be no

15   demonstrative exhibits that will end up in their notebook.

16             THE COURT:  That is a very good thing.

17             MR. COYNE:  I believe there are some other

18   evidentiary issues that we wanted to raise with respect to

19   the exchanges on the protocol.

20             MS. WOODALL:  I am not really sure, Your Honor.

21   We have an issue --

22             THE COURT:  Counsel, why don't you come up and

23   identify yourself.

24             MS. WOODALL:  We had an issue --

25             THE COURT:  Your name?

```
1              MS. WOODALL:  Amanda Woodall.  We had an issue

2    with one of the demonstratives that has been served pursuant

3    to the parties' protocol for the testimony of Dr. Rao.

4    Presumably or at some point he was identified as going

5    tomorrow morning.  I don't know if he is still going to go

6    tomorrow morning, given the lineup of witnesses LG has

7    proposed.  I don't know if now is the best time to raise it

8    with Your Honor or not.

9              THE COURT:  Mr. Coyne, when should we expect to

10   see Dr. Rao?

11             MR. COYNE:  I would hope we could get Dr. Rao on

12   and off tomorrow afternoon.

13             THE COURT:  We can deal with it now or later.

14   What you are telling me at some point we are going to have

15   to deal with it.  So let's deal with it now.

16             MS. WOODALL:  Your Honor, this specifically

17   deals with a demonstrative noted, I believe it's PDX-14.  I

18   have copies, if Your Honor is interested in seeing them, if

19   I could approach.

20             THE COURT:  Pass that up to Ms. Walker there.

21             MS. WOODALL:  Your Honor, this exhibit is

22   similar to a table that was provided in connection with Mr.

23   Rao's opening report on damages in this case.

24             THE COURT:  Whose opening report?

25             MS. WOODALL:  Dr. Rao.
```

1                 MR. COYNE:  Can I get a copy?

2                 MS. WOODALL:  Yes.  And we have an issue to

3      raise that deals with the Court's gatekeeping role.

4                 It is that, in looking more closely at issues of

5      law related to Dr. Rao's testimony, it has become clear that

6      there is a fundamental legally erroneous methodological

7      problem with Mr. Rao's calculation of a reasonable royalty

8      in this case.

9                 PDX-14 is kind of culmination, if you will, of

10     that error.  And I have a copy of Mr. Rao's report here.  I

11     don't know if Your Honor --

12                THE COURT:  Is it Mr. or doctor?

13                MS. WOODALL:  Doctor.  I am sorry.  I am used to

14     the social title for a Ph.D. versus an M.D.

15                THE COURT:  Well, there is some controversy in

16     the academy about that.  Okay.

17                MS. WOODALL:  I see Mr. Kaplan, but he goes by

18     Dr. Kaplan.

19                So I have a copy of Dr. Rao's expert report, if

20     Your Honor would like to see it.

21                THE COURT:  Not really.

22                MS. WOODALL:  I thought that was probably the

23     case.

24                The problem here is that the '121 patent issued

25     on January 8th, 2008.  And as the Court is well aware, the

1   date for hypothetical negotiation is the eve of

2   infringement.   It is the time right before infringement

3   commences.

4            Dr. Rao in his report has stated that he

5   understands that the time of the hypothetical negotiation

6   would have been mid-2005, because that's when Whirlpool

7   started selling refrigerators that included the Niagara

8   dispenser.

9            He has then taken the position that there was

10  only one document, that there was one key document, that is

11  a projection from Whirlpool that had projections of

12  incremental sales attributable to Niagara.  He has in

13  that -- it is a July 2004 document to which Mr. Coyne

14  referred during opening.  You will see referenced ██████ on

15  the top of PDX-14.  And then in that document, it indicates

16  that there may be ██████ incremental units attributable to

17  Niagara.

18           Dr. Rao goes on to state that this projection,

19  the ██████ units is the basis, the basis, not one of many

20  bases, but the basis for his calculation of a reasonable

21  royalty rate in this case.

22           Your Honor, it is rare, I actually had not seen

23  it come up ever before, that a reasonable royalty analysis

24  used a pre-infringement date to establish the date for the

25  hypothetical negotiation.

```
 1              If I could read to you a couple of key excerpts
 2      from Dr. Rao's report.
 3              Tab 13 of Dr. Rao's report is the discussion of
 4      the Georgia-Pacific factors.  In connection with Factor 7,
 5      which is the duration of the patent and the term of the
 6      license, Dr. Rao has stated, "At the time of the
 7      hypothetical negotiations, which I understand would occur at
 8      the time of first infringement, I understand that none of
 9      the patents in suit had been filed in the United States."
10      The footnote, "As discussed earlier, the '121 patent was
11      issued on January 8, 2008."
12              In the body of his report, he basically does the
13      same thing.  He says, it is in paragraphs 72 and a 73, he
14      says, "Based on sales data produced by Whirlpool in this
15      litigation, it appears that sales of refrigerators
16      incorporating the features" --
17              THE COURT:  Slow down, counsel.  They are trying
18      to take down what you are saying.
19              MS. WOODALL:  I was trying to go as fast as
20      possible for you -- "incorporating the features described in
21      LG's '121 and '689 patent, which is no longer in the case,
22      first occurred around mid-2005.  Therefore, the date of the
23      hypothetical negotiation to my analysis is around this time
24      period."
25              Another footnote, "The '121 and '689 patents did
```

1     not issue until January 8 and January 10 of 2008 and June

2     10th of 2008 respectively."

3              The next paragraph, Paragraph 73, goes on to

4     say, "In a reasonable royalty calculation, expected economic

5     benefit is typically based on projections of economic and

6     financial information available to the parties as of the

7     date of the hypothetical negotiation.  The closest

8     projections of incremental benefits associated with the

9     features of the '121 and '689 patents that I was able to

10    locate in Whirlpool's production in this litigation were

11    from 2004.  In a July 20th, 2004, financial study, Whirlpool

12    projected that it would sell ▓▓▓▓▓ refrigerator units

13    incorporating features from Project Niagara."  That's the

14    ▓▓▓▓▓ that you see on PDX-14.

15             Next sentence, "Of these, Whirlpool estimated

16    that ▓▓▓▓▓ units were incremental to features related to

17    Project Niagara.  These projections" -- that's the ▓▓▓▓▓

18    that you see on PDX-14.  "These projections by Whirlpool

19    form the basis for my reasonable royalty rate calculation.

20             You will see, Your Honor, that in PDX-14, it is

21    a simple mathematical formula.  If you were to take out

22    ▓▓▓▓▓ units, the formula changes entirely and you would

23    end up with a different result.

24             I have never seen this in a case before.  I have

25    consulted with my expert.  He has never seen a case like

1   this before.

2          Most issues dealing with damages are a subject

3   for cross-examination.  A lot of times experts say I looked

4   at this data set, another expert says I looked at this data

5   set and it's a subject for cross-examination.

6          But I haven't seen a case where the hypothetical

7   negotiation date was before there were patent rights, before

8   infringement could have possibly started.

9          In researching that point in connection with my

10  preparation for the trial, I thought, I will look and see if

11  this has been analyzed as more of a legal issue.  And it

12  has, Your Honor.

13         The Sixth Circuit, with Judge Markey writing the

14  opinion in *Panduit* addressed a factual scenario just like

15  this.  In that case -- and I have a copy for Your Honor if

16  you would like one.  It is a well-known case, normally

17  cited --

18         THE COURT:  I haven't memorized it.  If I need

19  it, I will ask for it.

20         MS. WOODALL:  It is normally cited for the lost

21  profits analysis.  But it also addresses the reasonable

22  royalty analysis.  The facts in that case were that Stoneman

23  was manufacturing and selling its Lock Slot and West Slot

24  ducts starting in 1957.  The patent in suit was issued on

25  March 6, 1962.  In examining when the hypothetical

negotiation would start, Judge Markey wrote:   "The key

element in setting a reasonable royalty after determination

of validity and infringement is the necessity for return to

the date when the infringement began.   In the present case,

that date is March 6, 1962.   You don't reach back to the

date when somebody was doing something that didn't infringe,

because there were no rights to infringe."

            And so it would be our submission that while

facially it would seem more attractive to make this simply

an issue for cross, the cross, Your Honor, would consist of

my asking Dr. Rao legal questions about the legality of

having chosen the date he did, when the Sixth Circuit has

spoken on that and on another panel, six years later, a

panel on which Judge Markey was sitting for the Federal

Circuit, they cited to *Panduit* for that very proposition.

            That is the law, the methodology set down by the

Federal Circuit for the date, selection of the hypothetical

negotiation, is not the subject of expert opinion.   It is a

fact established by law.   It is a date and time established

by law.   Either the date patent rights issued if the

activity was already going or it is the date on which

infringement activities started if they were commenced after

the issuance of the patent.   We would submit this is an

issue where there is a fundamental methodological flaw in

Dr. Rao's analysis.   And it would be misleading to the jury

1    for him to present this analysis when it is -- his

2    hypothetical negotiation date predates the patent rights by

3    2.5 years.

4              That is the only basis for his analysis.  There

5    is no alternative calculation in his report.

6              THE COURT:  Your request of the Court?

7              MS. WOODALL:  My request of the Court would be

8    that Dr. Rao be excluded from presenting this calculation to

9    the jury.  We are not opposed to Dr. Rao discussing

10   documents in the same context he did in his report.  So when

11   he looked at, say, a report from 2004, it's fine if he wants

12   to talk about it, but I don't think he should be permitted

13   to say that the date of the hypothetical negotiation was

14   2005.

15             He can examine and present his evaluation of the

16   percentage value of the infringing features to the Niagara

17   package dispenser that Whirlpool has made and has promoted

18   in its materials.  Anything that he relied upon in his

19   report, I think it's fair for him to still be able to

20   comment on those, give the same observations that he has

21   given in his report and in his deposition, but there is a

22   fundamental flaw with the calculation that he has performed.

23   And it cannot be fixed, because he has said this one

24   document that uses a legally erroneous date to commence the

25   hypothetical negotiation is the basis for his calculation.

1          THE COURT:  So, essentially, Whirlpool attacks

2     the methodology of the doctor, insofar as my gatekeeping

3     responsibilities, as prescribed by *Daubert*, *Kumho Tire* and

4     their progeny, you're asking me to exercise that function

5     and to exclude the testimony of the doctor?

6          MS. WOODALL:  Yes, Your Honor.

7          THE COURT:  Mr. Coyne.

8          MR. COYNE:  Your Honor, it will come as little

9     surprise that we oppose the motion.  There is a couple of

10    things here.

11         No. 1, if there is a factual error on the date,

12    that is a factual error and they can readily cross-examine

13    him about it.

14         The methodology that they are truly complaining

15    about is the methodology of relying on the --

16         THE COURT:  Let's establish first off, is there

17    a factual error in the doctor's analysis?  If that is the

18    case, then this becomes an easier problem to solve.

19         MR. COYNE:  Your Honor, I don't think so,

20    because I don't think the *Panduit* case is that clear as Ms.

21    Woodall has made it out to be on this particular issue.

22    *Panduit* is a case addressing a lot of different aspects of

23    this.  But I don't think there is a clear ruling that says

24    you should exclude an expert's testimony entirely based on

25    this issue.  Primarily, it's not material in this case, and

1    the reason I say that is there has been ample discovery of

2    both Dr. Nawrocki and Dr. Rao in this case.  We asked Dr.

3    Nawrocki during his deposition, this is what Whirlpool has

4    identified as an error, and he specifically said it wouldn't

5    make any difference.

6              So although the end of the day --

7              THE COURT:  Doctor who said that?

8              MR. COYNE:  Nawrocki, their expert, has conceded

9    that whether it's 2005 or 2008, it doesn't make any

10   difference.

11             The primary methodological attack they are

12   making is they don't want him relying on the incremental

13   sales.  That is not a date issue.  That is an issue about

14   Whirlpool's internal documents showing that there would have

15   been incremental sales regardless of what date you put the

16   hypothetical negotiation.  It's a 2005 document.  It exists

17   in 2005.  It continues to exist in 2008 and Dr. Rao is

18   perfectly able to rely on it either way.

19             If they want to cross-examine Dr. Rao about what

20   date he did it, Dr. Nawrocki can say it's wrong, but he has

21   already conceded that it's not a material error, that it

22   wouldn't make any significant change in the analysis.

23             What they are really complaining about is they

24   don't like the incremental profits analysis based on

25   Whirlpool's internal documents that have nothing to do with

1    this date, that show that this feature would have driven

2    additional sales.  And therefore, Dr. Rao used that internal

3    economic analysis to say, because this feature is driving

4    additional sales, the royalty rate would be up at 8.5

5    percent instead of -- I don't know what it would have been,

6    may be 5.  That is what they are really complaining about

7    and why they are trying to knock this chart out.  The date

8    really doesn't matter.

9              There are reasons why, I would submit, it is not

10   that clear -- it is not well-established that this is an

11   error that justifies knocking it out under *Daubert*.  One, we

12   are long past the time for filing a *Daubert* motion,

13   especially on an issue like this.

14             THE COURT:  I hadn't gotten, yet, to asking

15   counsel when she identified this issue.  But that's a fair

16   point.  Go ahead.

17             MR. COYNE:  Your Honor, they identified it at

18   his deposition, which was taken months before the pretrial

19   and months before the briefs were due on the in limine

20   motions.

21             At the end of the day, what he was trying to

22   avoid, he was looking at a situation, what would the

23   hypothetical negotiation be.  And I do not think *Panduit*

24   genuinely restricts this.  He is trying to find a date --

25   what happens in 2008.  They are already locked into Sears.

1    They have a long-term supply contract with Sears.  If he

2    picks 2008, what he is looking at is, wow, they have a lock,

3    in effect.  Am I going to be criticized for taking a point

4    in time when they are locked in and have less flexibility?

5                So the patent application, the statement is

6    wrong that it wasn't on file yet.  The '121 was filed, as we

7    just saw earlier today, in April of 2004.  So the

8    application was on file.

9                I don't remember off the top of my head whether

10   it was published at that point.  But people undertake

11   license negotiations for filed-yet-not-issued patents all

12   the time.  If they want to attack the date, that truly is a

13   matter for cross-examination.

14               It is ultimately a matter that is a tempest in a

15   teapot, because it's immaterial.

16               THE COURT:  The transcript you are holding up

17   is?

18               MR. COYNE:  Their expert Nawrocki.  Rao has been

19   asked whether it makes a difference and he said no.

20   Nawrocki was asked does it make a difference, and he said

21   no.

22               So we are looking at a shot to try to knock out

23   our expert witness on something that is, one, not material;

24   two, is too late; and, frankly, I think is genuinely a

25   subject for cross-examination on a fair set of assumptions.

1    The underlying documents are there.

2              THE COURT:  Thank you.  As to the issue of the

3    timing of your oral motion pursuant to *Daubert*, I think Mr.

4    Coyne asks a fair question.  Why so late?

5              MS. WOODALL:  Your Honor, he is correct that we

6    looked at this and it was part of the cross-examination.  I

7    would disagree with him on his characterization of what Mr.

8    Nawrocki was saying.  He was not conceding that it was

9    immaterial.

10              THE COURT:  That is not the question.

11              MS. WOODALL:  Yes, so --

12              THE COURT:  Counsel, don't interrupt me.  All

13    right?  When I open my mouth, yours has to close.  Are we

14    clear?

15              MS. WOODALL:  Yes, sir.

16              THE COURT:  Could you get to the point of

17    answering my question?

18              MS. WOODALL:  I believe it was identified as a

19    factual issue at the time, Your Honor, that is what I was

20    trying to relate.  It was identified during the course of

21    depositions.  It was something that was a subject for

22    cross-examination at that time.  As I looked at it more

23    closely, as my team looked at it --

24              THE COURT:  When did that occur?

25              MS. WOODALL:  Since the motion in limine time

1    had passed.

2                THE COURT:  Why is that?

3                MS. WOODALL:  Your Honor, at the time of the

4    motion in limine process, we had Dr. Rao's report --

5                THE COURT:  You see, the reason I ask that,

6    counsel, is because the way that I structure my due date for

7    the pretrial order, which includes motions in limine, which

8    you know, my date for the pretrial conference and my trial

9    date, is so that matters of this type can be addressed well

10    in advance, if they require some additional submissions,

11    maybe written submissions, some research by the Court, the

12    Court can do that in a manner where it's not under the gun

13    and can really well consider issues of this type.  It's not

14    an uncomplicated issue.  It's not one with which I am

15    unfamiliar.

16                But it also gives the Court, the Judge the

17    discretion if he or she chooses to order some repairs, if

18    you will.

19                I think I have done that in this case, as I

20    typically do in others.

21                So I am really reluctant at this time to

22    consider that the motion is properly timed and that it would

23    be fair for me to give it serious consideration, regardless

24    of whether I agree with your varying assessments, you and

25    Mr. Coyne's, as to what *Panduit* requires and what Judge

1    Markey said.  Whether it's part of the holding of the case

2    or not, and whether there really is a difference of view and

3    whether your expert really does agree one way or the other.

4              I will say this:  If during the course, after

5    the presentation of the parties' evidence, I will

6    reconsider, after I have had the benefit of direct and

7    cross-examination of both experts, I will reconsider, if I'm

8    asked, and give -- make a ruling and give an appropriate

9    instruction as needed.  Okay?

10             Right now, the motion is denied.

11             MS. WOODALL:  Thank you, Your Honor.

12             MR. PARTRIDGE:  Fair resolution, Your Honor.

13   Thank you very much.

14             THE COURT:  Anything else?

15             MR. COYNE:  One other, very minor point, but I

16   know it is a sensitive one, so I wanted to raise it with the

17   Court directly.

18             The refrigerators, we have tried to think about

19   the logistics for the next seven days, or six days now.  One

20   thing we don't want to be doing is moving a lot of heavy

21   equipment around your carpet.  So what I would like to

22   suggest to the Court and ask the Court's permission, could

23   we bring a second evidence camera into the courtroom and

24   place it by the refrigerators?  No recordings will be made

25   off of that evidence camera.  And just use it to display on

```
 1    a larger format the features of these refrigerators when we

 2    are going through the examination?

 3                THE COURT:  I have absolutely no objection to

 4    that, because I think it would be helpful so we wouldn't

 5    have to move the jury to the exhibits.

 6                What do you say, Mr. Partridge?

 7                MR. PARTRIDGE:  I say, Your Honor, I asked my

 8    graphics experts earlier today, recognizing this problem,

 9    whether they had the technology here to do that.

10                So I was thinking the very same thing.  If we

11    can arrange that, I think it would be helpful to the jury.

12                THE COURT:  I do, too.  I can see them

13    straining.  I imagine that you have these units here for a

14    reason.

15                Anything else?

16                MR. COYNE:  No, Your Honor.  That's it.

17                THE COURT:  Should we plan on an 8:30 session

18    tomorrow?  What do you think?

19                MR. PARTRIDGE:  That would probably be safe,

20    Your Honor.  We start with the jury at 9:00.  We are trying

21    to work things out.  But who knows.

22                THE COURT:  I will be here.  Counsel, have a

23    good evening.

24                (Court recessed at 4:50 p.m.)

25
```