IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

LG ELECTRONICS U.S.A., INC.,     :     Civil Action
and LG ELECTRONICS, INC.,        :
                                 :
          Plaintiffs,            :
                                 :
     v.                          :
                                 :
WHIRLPOOL CORPORATION,           :
                                 :
          Defendant.             :     08-234(GMS)
_____

WHIRLPOOL CORPORATION,           :
WHIRLPOOL PATENTS COMPANY,        :
WHIRLPOOL MANUFACTURING          :
CORPORATION, and MAYTAG           :
CORPORATION,                     :
                                 :
          Counterclaim            :
          Plaintiffs,            :
                                 :
     v.                          :
                                 :
LG ELECTRONICS U.S.A., INC.,     :
LG ELECTRONICS, INC., and LG      :
ELECTRONICS MONTERREY MEXICO,     :
S.A., DE, CV,                    :
                                 :
          Counterclaim            :
          Defendants.            :

- - -

Wilmington, Delaware
Tuesday, March 2, 2010
8:45 a.m.
Trial - Day Two

- - -

BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
                                        and a Jury

1   **APPEARANCES:**

2           RICHARD K. HERRMANN, ESQ.
            Morris James
3                   -and-
            PATRICK J. COYNE, ESQ.,
4           ANAND K. SHARMA, ESQ.,
            JEFFREY W. ABRAHAM, ESQ., and
5           WALTER D. DAVIS, JR., ESQ.
            Finnegan, Henderson, Farabow,
6           Garrett & Dunner, L.L.P
            (Washington, D.C.)

7
                        Counsel for Plaintiffs and
8                       Counterclaim Defendant

9           FREDERICK L. COTTRELL, III, ESQ., and
            ANNE SHEA GAZA, ESQ.
10          Richards, Layton & Finger, P.A.
                    -and-
11          SCOTT F. PARTRIDGE, ESQ.,
            PAUL R. MORICO, ESQ.,
12          AMANDA M. WOODALL, ESQ.,
            GENE SPEARS, ESQ.
13          Baker Botts L.L.P.
            (Houston, TX)

14
                        Counsel for Defendant and
15                      Counterclaim Plaintiffs

16                      -   -   -

17

18

19

20

21

22

23

24

25

```
 1                THE COURT:  Good morning.

 2                (Counsel respond "Good morning.")

 3                THE COURT:  Ms. Walker tells me there are some

 4    issues.

 5                MR. COYNE:  Yes, Your Honor, there are.

 6                THE COURT:  Mr. Coyne.

 7                MR. COYNE:  Your Honor, there are three possible

 8    issues.  We are trying to work through one of them.

 9                THE COURT:  Let's talk about the issues that

10    need to be addressed before the jury comes out at 9:00.

11                MR. COYNE:  That is what I am going to do right

12    now, Your Honor.

13                Last night we were working on the exchange of

14    the protocol of exhibits.  We have the stipulation.  In the

15    stipulation we agreed you will identify only the exhibits

16    that in good faith you intend to use with the witness.

17                On January 7th, when we had our discussion here

18    at the pretrial conference, we had specifically decided --

19    Mr. Partridge had actually recommended it, Your Honor said

20    you preferred it and I said I definitely prefer -- that we

21    not have the record loaded up with a bunch of exhibits that

22    are shuffled in about which there has been no substantive

23    testimony for the jury to make sense of it.  I thought we

24    were in agreement.

25                THE COURT:  The exhibits for the witness book or
```

1     the jury book?

2              MR. COYNE:  For the witness book.  We got a

3     designation book for Mr. Voglewede of 1,823 exhibits to be

4     used with Mr. Voglewede today.  That is exactly the kind of

5     shoveling evidence into the record and burdening the jury

6     which I thought we all agreed was not going to happen.

7              THE COURT:  I don't know if I misunderstood or

8     understood the issue correctly.  I don't remember the

9     discussion.

10             However, it seems to me, from my perspective,

11    the most concerning matter is the jury notebook and what's

12    going to be placed in front of the jury for their

13    consideration.

14             If one of the parties or both want to load up

15    exhibit books, as long as we are not talking about

16    displaying those exhibits to the jury, you will forgive me,

17    I don't much care.  What is the concern?

18             MR. COYNE:  The concern is that we are going to

19    have testimony from the witness who says, oh, yes, I did a

20    lot of work on this; here is 182 exhibits that reflect the

21    amount of work I did on it.

22             THE COURT:  You are concerned about the

23    atmospherics associated with that?

24             MR. COYNE:  Your Honor, two concerns.  No. 1, he

25    rattles off a list, puts a demonstrative or timeline up, and

```
 1    rattles off a list of exhibits.  They jot them all down and
 2    now we have the jury looking for 182 exhibits during their
 3    deliberations.
 4              THE COURT:  I am not going to allow either party
 5    to mislead this jury or to confuse them.  If I think or you,
 6    either side, thinks there is some gamesmanship afoot, you
 7    need to object.  I guess that is what you are doing right
 8    now.
 9              MR. COYNE:  It is, Your Honor.
10              THE COURT:  In sort of a preemptive way.  But I
11    don't need issues just to have issues, counsel.  It seems to
12    me this is something if it occurs during the course of these
13    proceedings, you need to bring it to my attention.  I will
14    deal with it.  But I am not going to tolerate gamesmanship
15    in my courtroom.  That is to both sides.  That is not just
16    directed to you, Mr. Coyne.  I just as soon not have to deal
17    with these nit-picky, death-by-a-thousand issues, if you
18    don't mind.
19              MR. COYNE:  Your Honor, that is it.
20              MR. HERRMANN:  Your Honor, I mentioned to the
21    Court that we are going to have a joint interpreter.
22              THE COURT:  Yes.
23              MR. HERRMANN:  Dr. Lee will be speaking in
24    English today, but there is going to be an interpreter
25    available to help just in case.  Your court deputy and I
```

```
 1    have talked about where that is going to be.  Would Your

 2    Honor like a microphone for that witness?  I think the Court

 3    has a portable microphone, a wireless microphone.

 4              THE COURT:  Is he going to be actively

 5    participate in this proceeding?

 6              MR. HERRMANN:  He very well might, if he is

 7    needed for that particular witness.

 8              THE COURT:  For the benefit of both sides, Ms.

 9    Walker runs the courtroom.  I don't micromanage those kind

10    of issues.

11              MR. HERRMANN:  I understand.  But she is not

12    here right now.

13              THE COURT:  Bring it up with her.  She is

14    perfectly competent and capable.  She's a wonderful

15    courtroom deputy.

16              MR. HERRMANN:  Should the interpreter be sworn

17    in?

18              THE COURT:  Mr. Herrmann, how many times have

19    you been in my courtroom?  We should swear the interpreter.

20    If the interpreter is going to participate, we actually have

21    an oath.

22              MR. HERRMANN:  Yes, sir.

23              THE COURT:  All right.

24              (Recess taken.)

25              THE COURT:  Ms. Walker.
```

```
 1                    (Jury enters courtroom at 9:09 a.m.)

 2                    THE COURT:  Good morning, members of the jury.

 3      Please take your seats.

 4                    Mr. Coyne.

 5                    MR. COYNE:  Thank you, Your Honor.

 6                    Ladies and gentlemen, good morning.

 7                    We will now be calling our next witness in the

 8      case, who is Dr. Manny Lee.  He will be talking about the

 9      invention of the '121 patent.

10                    Your Honor, LG calls Dr. Lee to the stand.

11                    THE COURT:  All right.  Dr. Lee.

12                    THE INTERPRETER:  Good morning, Your Honor,

13      Korean interpreter Albert S. Kim.

14                    THE COURT:  Good morning, sir.  I have been

15      advised of your presence.

16                    (At this point the interpreter, Albert S. Kim,

17      was sworn.)

18                    ... Myung Ryul Lee, having been duly sworn as a

19      witness, was examined and testified as follows ...

20                    THE COURT:  You may inquire, Mr. Coyne.

21                            DIRECT EXAMINATION

22      BY MR. COYNE:

23      Q.    Good morning, Dr. Lee.

24      A.    Good morning.

25      Q.    Mr. Kim is here and available for you as an
```

Myung Ryul Lee - direct

1    interpreter today, but I am going to ask you, are you

2    willing to try to testify for the jury today in English?

3    A.    Yes, because I would like to better communicate with

4    the jury today, so I will do that.

5    Q.    If you get stuck on a word or a phrase or you need an

6    interpretation of the sentence, please just note that to Mr.

7    Kim and he will be happy to do that.

8              THE COURT:  Hold on, Mr. Coyne.  I think Mr.

9    Herrmann would like to distribute these books.

10             (Witness notebooks distributed to jury.)

11   BY MR. COYNE:

12   Q.    Doctor, like I say, if you get stuck on a word or

13   phrase and you don't understand the question, either mine or

14   Whirlpool's lawyers, please ask Mr. Kim.  He will be

15   available for you.

16   A.    Okay.

17   Q.    How do you feel about trying to testify in English

18   today?

19   A.    I am still nervous, but I will try that.

20   Q.    What is the highest --

21             THE COURT:  Mr. Coyne, why don't we wait a

22   second while Mr. Herrmann and Ms. Walker get these books

23   distributed.

24             MR. COYNE:  Yes, Your Honor.

25             THE COURT:  All right.

1    BY MR. COYNE:

2    Q.    What is the highest level of education that you

3    achieved?

4    A.    I got a Ph.D. in mechanical engineering from the

5    University of Wisconsin.

6    Q.    When did you get that?

7    A.    It was 2001.

8    Q.    When did you finish your degree?  I just asked you

9    that.

10            Was your course work in English during that

11   study?

12   A.    Yes.  I did that in English.

13   Q.    Where do you work?

14   A.    I work at home appliance laboratory at LG

15   Laboratories.

16   Q.    What do you do there?

17   A.    I am in charge of the refrigeration system, freezers

18   in the home appliance laboratory.

19   Q.    When did you start working for LG?

20   A.    I joined LG in 1988.

21   Q.    What were you doing at that time when you started?

22   A.    First two years I worked for the air conditioning, and

23   then I moved to the refrigeration research.

24            MR. COYNE:  Your Honor, I would like to hand out

25   to the jury -- we have agreed to a format for the jury

Myung Ryul Lee - direct

```
 1    books, with the witness sheet, so that the jury can put them

 2    in their books.

 3               THE COURT:  Very well.  Do you want the jury to

 4    put that in the front of the notebook?  If you can just put

 5    those behind the first tab, the tab for LG witnesses.

 6               MR. PARTRIDGE:  We discussed there is two tabs,

 7    one for LG witnesses and one for Whirlpool witnesses.  The

 8    patents are in the book and there is note paper in the back.

 9               THE COURT:  Good.

10               MR. COYNE:  Thank you, Your Honor.

11    BY MR. COYNE:

12    Q.    Dr. Lee, what is your current title at LG?

13    A.    I am the research fellow, vice president position, in

14    charge of the refrigeration system group.

15    Q.    Why did you go to work for LG in the first place?

16    A.    LG is a manufacturing company.  They are interested in

17    the product innovation.  And also they focused on the

18    customer, creation for the users.  So they give us a chance

19    to engineer, improve their ability, and make new technology.

20               So I enjoy the time with LG, so I like LG very

21    much.

22    Q.    And, sir, do you have any patents that you are named

23    as an inventor on?

24    A.    Yes.  I have many patents.

25    Q.    How many Korean patents?
```

Myung Ryul Lee - direct

1   A.    Almost, over 130 patents I have.

2   Q.    How many U.S. patents?

3   A.    About 35 U.S. patents I have.

4   Q.    How many patents does your refrigerator research lab

5   file each year in the United States?

6   A.    We filed over 300 patents for the refrigerator only.

7   Q.    Three hundred?

8   A.    Yes.

9   Q.    Sir, one of the dates that has been significant in

10  this case is 2001.  How many refrigerator models was LG

11  selling into the United States, not models, but types, like

12  on the board over here, into the United States in 2001?

13  A.    I don't know the exact number.  But about -- the first

14  two -- the first part, the top-mount freezer, is a major

15  product to sell to United States.  And we just used to sell

16  it, 20,000 or that amount of the refrigerator unit.

17  Q.    What styles of refrigerators is LG selling into the

18  United States today?

19  A.    We are selling all types, the top-mount freezer and

20  the side-by-side, and the two-door bottom freezer and the

21  four-door bottom freezer, we sell to the United States.

22  ██    ███████████████████████████████████████████

23  ███████████████████

24  ██    ███████████████████████████████████████████

25  Q.    How do you explain LG's growth from 2001 to 2010?

Myung Ryul Lee - direct

1   A.      Yes.   As I mentioned before, LG always focused on the

2   value creation for the customer.   We investigated many, many

3   times to what the customer wanted, really, and we found out

4   the customer needs.   Then we put it to the research area.

5   And then we developed innovative and new and better and

6   different product them.   Then you can get so well processes

7   at that time.

8   Q.      What kinds of processes do you use in the research and

9   development lab to bring these types of new products to your

10   customers?

11   A.      Actually, we have two different ways of doing this.

12   The first one is -- the first one is, it comes from the

13   customer.   During the investigation of the customer, we try

14   to find out from the customer what the customer wants.   Then

15   we have a product patent group, doing research for that.

16   Then it's transported to the center we developed for the

17   customer.

18           The other ways we tried to find the in the

19   process the seeds to give to the engineer, the maker, a new

20   idea.   And they do -- they physically test it.   And if it

21   works, then we put into the product planning group to

22   investigate this constant visibility, whether the customer

23   wants it or not.   So if the customer really likes it, then

24   we will make the product.

25   Q.      The word you are saying is "seeds," like a seed

Myung Ryul Lee - direct

1    growing into a plant?

2    A.    Yes.  Seed needs to bring into a plant, like an

3    engineer's idea growing to the commercialized product.

4    Q.    I would like to turn to the '121 patent.  Can you

5    bring up PTX-001?

6          Sir, what is this document?

7    A.    This is the patent, U.S. patent.  I filed it.  It is

8    on the retractable dispenser and the tray, with the

9    mechanical driving mechanism.

10   Q.    There is a lot of names under "Inventors."  What were

11   all those people doing?

12   A.    Those people, including my name, I was part of this

13   team, the leader, and the last of them is my engineer.

14   Q.    What did you personally contribute to the invention of

15   the '121 patent?

16   A.    I suggested to develop or get some idea on the

17   retractable and the rotating type of the ice dispenser.

18   Q.    Where were you working physically?  Where were you and

19   your team working when you were doing the work that led to

20   this invention?

21   A.    At the time, we have a product team.  As I was in it.

22   Then we have an every-day meeting to get a new idea.  And

23   you have a small room, one part of one-quarter of this court

24   size.  We have tables to place on the wall.  And then there

25   is one around the table, in the middle of the room.  And

Myung Ryul Lee - direct

1    we -- when you turn around, then you can talk to each other.

2         So we have a really good time at that time,

3    because we get so many ideas coming up to -- we think about

4    things for the customer.  This is something the customer

5    wants or this is really good or this is really fantastic

6    technology, or not.  So we discuss it so many times, and you

7    get so many new ideas.

8    Q.   What was the mood in the room when you were working on

9    this?

10   A.   At the time it was very fundamental, and we enjoyed

11   the time.  And it was so exciting to make new things.

12        So it was really good for the engineers.

13   Q.   What did you do with all these ideas that you

14   generated after you had generated them?

15   A.   Pardon me?

16   Q.   What did you do with all of these concepts?  What is

17   the next thing you did with all of these concepts?

18   A.   Once we made this concept and transferred to the

19   product planning group, we discussed with them, you can make

20   a real product or not, and we have to investigate whether

21   the customer wants it or not.

22        And then we filed a patent, and later on we

23   tried to make it commercial.

24        THE COURT:  Mr. Coyne, I may have missed the

25   time frame.  When are we talking about?

Myung Ryul Lee - direct

1          MR. COYNE:   Your Honor, I am sorry.

2          THE COURT:   You can have the witness identify

3    it.

4    BY MR. COYNE:

5    ████   ████████████████████████████████████████████

6    ████████████████████████████

7    ████   ██████████████████████████████

8    ████   ████████████████████████████

9    ████   ████████████

10   ████   ███████████████████████████████████████████

11   ██████████████████

12   ████   █████████████████████████████████████████████

13   ███████████████████████████████████████████

14   ████   ███████████████████████████████████████████

15   █████████████

16   ████   ████████████████████

17   Q.     Can we bring up PTX-348, please?

18          What is this document, Dr. Lee?

19   A.     This is the brainstorming work.  I attended the

20   meeting, final meeting.

21   Q.     Did you do anything with the concepts that you had

22   developed at this brainstorming workshop?

23   A.     Yes.  We gave around new ideas for the new product.

24   Q.     Can we go to pages 4 and 25, please?

25          Dr. Lee, we see up here a number of boards.

Myung Ryul Lee - direct

1    What do those have to do with the concepts that you had

2    indicated you were working on?

3    A.    Most of the concepts we gave them to make a drawing.

4    So what is the point of the question?

5    ████  ██████████████████████████████████████████

6    ████████████████████████████████████████████████

7    ████  ██████████████████████████

8              THE COURT:  Did they give you a pointer?

9              MR. COYNE:  May I approach the witness, Your

10   Honor?

11             THE COURT:  Yes.  You may approach freely, Mr.

12   Coyne.

13   BY MR. COYNE:

14   Q.    You may continue.

15   A.    This one is one of the concepts related to the patent

16   '121.

17   Q.    Do you recognize any of the images on that page as

18   relating to the concepts?

19   A.    This is a kind of dispenser.  It is not a clear

20   picture.  But this is one of the retractable trays.  And

21   this is also the retractable spigot, this is the driving

22   mechanism.

23             This is also kind of that.  And this is also the

24   thing that related to the patent '121.

25   Q.    Sorry for the quality of the sketches.  We will get to

Myung Ryul Lee - direct

1    a more complete rendering in the next report.

2              Is there any other description in the report of

3    this meeting about the mechanical drive mechanism?

4    A.    Yes.  You can see the rest of the idea.

5    Q.    Can you bring up page 31, please?

6              Is there anything in here?

7    A.    Yes, in here.  This is the description of the idea we

8    made.  So it says the CD case opening.  It means when you

9    touch a button, the dispenser comes out, pops out.

10             So let's go to the right side.  Well, the level

11   cup is open.  When you use the CD cup and some part will

12   push it, or push the button, then the area of the patent

13   comes out.  So it's the same operation.  So this is the

14   concept, automatic or mechanical drive mechanism.

15   Q.    Can we go to PTX-349?

16             What is this report?

17   A.    This is the idea of gathering from the meeting.  We

18   are putting all our ideas into the report.

19   Q.    Is there anything in this report about the ideas that

20   ended up being in the '121 patent?

21   A.    Yes.  There is more specific drawing there.

22   Q.    Can we go to page 53, please?

23   A.    This is that.

24   Q.    What does this show?

25   A.    It shows that when you push this part, then this

Myung Ryul Lee - direct

1    spigot and the ice-dispensing system comes out.  Also, the

2    tray comes out.  So it shows where about you have

3    retractable dispenser and tray with the mechanical driving

4    mechanism.

5    Q.    Can we go to report PTX-353, please?

6          What is this document, sir?

7    A.    This is the new concept for the product.  The product

8    and planning report.

9    Q.    Does that include a description of the '121 invention?

10   A.    Yes.

11   Q.    Can we go to page 90, please?

12         Is there anything on this page?

13   A.    The second drawing is the same as you have seen

14   before.  There is the mention about if you push it once,

15   when needed, it slides out of the refrigerator, and you can

16   get water or ice.

17         So it describes how we can use that system, and

18   it shows we have a mechanical driving mechanism.  So this is

19   that idea sketch.

20   Q.    Did you file a patent application for this idea?

21   A.    Yes.

22   Q.    If we can bring up PTX-96, please.

23         Do you recognize there document, Doctor?

24   A.    Yes.

25   Q.    What is it?

Myung Ryul Lee - direct

1  A.    This is the patent, Korean patent we applied for.

2  Q.    Did you apply for a U.S. patent as well?

3  A.    Yes.

4  Q.    Could we bring up PTX-1 again?

5        Is this the U.S. patent you applied for?

6  A.    Yes.

7  Q.    One last question, Dr. Lee.  What are the benefits to

8  the consumer of this invention?

9  A.    I think this is really innovative and one that is a

10 great invention, providing many benefits to the customer.

11       First, this gives a good design, because as you

12 can see, this side-by-side refrigerator, there is the one

13 big concave box, dispenser.  Sometimes this looks real.  But

14 the -- this invention gives -- minimized that concave box.

15 So it gives a neat -- gives a neat design and better look.

16       The other thing is, it gives -- it saved us

17 space.  It means we can reduce the concave box, you can use

18 the most space, more interior space we can use.  So it gives

19 more space to the customer.

20       And the other thing is, it gives, also, the

21 convenience.  When you touch this button, then the dispenser

22 comes out.  And you can use any size of the container, big

23 one or large pot or any other container, you can use that.

24       So it gives a lot of convenience.  And then one

25 more thing is it gives -- the part of the spigot and the

Myung Ryul Lee - direct

1    dispenser area hiding into the surface.  So you cannot touch

2    it with any pollutant in the area or hands.  So it gives

3    more advantage to the customer.

4             So I think this is a wonderful invention I made.

5    And then it gives the perfect solution of the ice dispenser

6    to the customer.

7             MR. COYNE:  Thank you, Dr. Lee.

8             No further questions, Your Honor.

9             THE COURT:  Mr. Partridge, you may

10   cross-examine.

11            MR. PARTRIDGE:  Thank you, Your Honor.

12                      CROSS-EXAMINATION

13   BY MR. PARTRIDGE:

14   Q.   Good morning, Dr. Lee.  I know you just observed I

15   brought some documents to the table.  Lest you fear we are

16   going to go through all those papers, don't be afraid that

17   we are going to do that.  Do you understand?

18   A.   Yes.

19   Q.   Okay.  I will try to speak slowly, so that you can

20   understand my questions.

21            Let me begin with where you ended your testimony

22   when you were examined by Mr. Coyne.  Do you understand what

23   I have just said?

24   A.   What?

25   Q.   I am going to begin with where you finished with Mr.

Myung Ryul Lee - cross

1    Coyne.

2    A.    Yes.

3             MR. PARTRIDGE:    May I approach the refrigerator,

4    Your Honor?

5             THE COURT:   Yes.

6    BY MR. PARTRIDGE:

7    Q.    At the end of your examination, you pointed to this

8    refrigerator, correct, with the laser pointer?

9    A.    Yes, as an example of just side-by-side refrigerator,

10   I testified.

11   Q.    As you know, this is a Whirlpool refrigerator.   It is

12   Defendants' Physical Exhibit 26.

13   A.    Yes.

14   Q.    And on this Whirlpool refrigerator is a movable tray.

15   Yes?

16   A.    Yes.

17   Q.    Moved manually?

18   A.    Yes.

19   Q.    And there is a water spigot moved manually as well, to

20   push and turn, correct?

21   A.    Yes.

22   Q.    So this refrigerator has both movable tray, movable

23   water spigot, or water dispenser, correct?

24   A.    Yes.

25   Q.    Now, you understand, Dr. Lee, that Whirlpool contends

1    that it invented this manual spigot, water dispenser, and

2    manual tray before LG.  You understand that's what we

3    contend, correct?

4    A.    I don't think so.  We have a patent before you made.

5              THE COURT:  The word "contend" may be

6    problematic.

7              MR. PARTRIDGE:  Yes.  Let me try it another way.

8    BY MR. PARTRIDGE:

9    Q.    Do you understand that it is our position, Whirlpool's

10   position, that it invented the movable tray and the movable

11   water dispenser first?

12   A.    I don't know about that.

13   Q.    I am not asking you for your opinion as to whether we

14   were first.  I am asking you if you understand that we say

15   that.

16             MR. PARTRIDGE:  Mr. Kim.

17             (Witness consults interpreter.)

18             THE WITNESS:  Now, yesterday I heard from you.

19   BY MR. PARTRIDGE:

20   Q.    Yes, exactly.  In my opening statement.  You were

21   present in the courtroom?

22   A.    Yes.

23   Q.    So you understand that's what we say happened here?

24   A.    Yes.

25   Q.    Thank you.

Myung Ryul Lee - cross

1              Now, what I would like to do with that as

2       background is try to understand some of the invention dates

3       and the inventors for your '121 patent.  Do you understand?

4       A.    You said yesterday two years ago.  You said like that.

5       I heard that.

6       Q.    Yes.

7       A.    Yes.

8       Q.    What I would like to do -- and I will be perfectly

9       upfront with you.  This may make it easier.  I don't

10      think --

11              If I may, Your Honor.

12              Dr. Lee, I do not believe that today I will be

13      asking you questions that have not been addressed

14      previously.  For the most part, I will be talking about

15      things that you have already said.  So I am not going to try

16      to trick you.  I just want to get the facts.

17              I would ask if Mr. Kim could tell him that so

18      that he has some comfort with this.

19              (Interpreter consults with witness.)

20              THE WITNESS:  Yes.

21      BY MR. PARTRIDGE:

22      Q.    Let's begin with the '121 patent and your filing of

23      the '121 patent.  I would like to approach and hand you the

24      file history from the '121 patent.  It's Defendants' Exhibit

25      537.

Myung Ryul Lee - cross

1           MR. PARTRIDGE:  May I, Your Honor?

2           THE COURT:  You may.

3    BY MR. PARTRIDGE:

4    Q.    Now, if you would turn to page -- let me explain.

5    Look at the bottom of the document.  There are page numbers.

6    A.    Yes.

7    Q.    Turn to page 28963.

8    A.    28963.

9    Q.    Correct.  And you will see at the top of that page, it

10   says that it's a declaration and power of attorney for

11   utility or design patent application.  Do you see that?

12   A.    Yes.

13   Q.    And this is for your dispenser of ice maker in

14   refrigerator, correct?

15   A.    Yes.

16   Q.    And if you turn to page -- unfortunately, I have two

17   versions, one of which doesn't have the page numbers.

18         If you would turn to page 966, you will see your

19   signature on that page.  Correct?

20   A.    Yes.

21   Q.    You signed this document on April 16, 2004, correct?

22   A.    Yes.

23   Q.    And further down that page, you see the name Chang-Ho

24   Seo, correct?

25   A.    Yes.

Myung Ryul Lee - cross

1   Q.    Now, Mr. Seo -- did I pronounce that correctly, by the

2   way?

3   A.    Yes, right, perfect.

4   Q.    Thank you.  Mr. Seo signed this document on April

5   12th, 2004, correct?

6   A.    Yes.

7   Q.    And Mr. Seo was your co-inventor, a joint inventor

8   with you on this patent application, correct?

9   A.    Yes, right.

10  Q.    And when you signed this declaration, you were

11  swearing to the Patent Office that you believed all of you,

12  that group of people that you identified, were inventors

13  jointly of this invention.  Correct?

14  A.    Yes.

15  Q.    Now, with respect to -- actually, to make it easier,

16  let's go back to the patent, Plaintiffs' Exhibit 1, to the

17  front page of the patent where the inventors are listed.

18        You can see on the first page of the patent, Mr.

19  Seo is identified as one of the co-inventors.  Correct?

20  A.    Yes.

21  Q.    I am trying to think of the easiest way to do this, so

22  I apologize.  Maybe the thing to do, to put this in context,

23  is to go to the claims that are asserted.

24        You understand that the claims that are asserted

25  in this case by LG are Claims 20, 21, and 36, correct?

Myung Ryul Lee - cross

1   A.     I don't know much about the information.  I am not a

2   patent professional, so I don't know exactly about that.

3   Q.     I will represent to you that LG has asserted three

4   claims in this case, Claims 20, 21, and 36.  Do you

5   understand that representation that I am making?

6   A.     Yes, I understand what you are saying, what claim

7   number you are saying.

8   Q.     Yes.  So what I would like to do is to turn to Claim

9   20, and let's highlight the claim.  This claim describes a

10   mechanical drive mechanism; am I correct?  Do you see those

11   words?

12   A.     Yes, I can see.

13   Q.     And the claim refers to Claim 10.  Do you see that?

14   A.     Yes, I can see.

15   Q.     And let's go back to Claim 10 and see what that says.

16              MR. PARTRIDGE:  Can you put the two pieces

17   together?  Or is that too difficult?

18   BY MR. PARTRIDGE:

19   Q.     Magic.

20              This is Claim 10, and it includes a

21   water-dispensing assembly configured to move.  Do you see

22   that?

23   A.     Yes, I can see.

24   Q.     And it also contains a container support configured to

25   extended along a plane.  Do you see that?

Myung Ryul Lee - cross

1    A.    Yes.  I can see.

2    Q.    And in sort of plain English, a water dispenser

3    configured to move (indicating).  Correct?

4    A.    Yes.

5    Q.    A container support configured to extend along a

6    plane, correct?

7    A.    Yes.

8    Q.    So that if I am correct, that the claims being

9    asserted by LG are the ones that say that there must be a

10   mechanical drive mechanism rather than a manual mechanism.

11   Do you understand?

12   A.    What does it mean, manual, mechanical?

13   Q.    Let's go back to Claim 20.  Claim 20 says that the

14   operation of the water-dispensing assembly is mechanical.

15   Correct?  Mechanical drive mechanism?

16   A.    Yes.

17   Q.    And Claim 10 just says a moving water dispenser

18   assembly, correct?

19   A.    Yes.

20   Q.    So the invention that you were discussing in answering

21   Mr. Coyne's questions concerns the use of a mechanical drive

22   mechanism, correct?

23   A.    Yes, I heard that.

24   Q.    Yes.  And, in fact, when you were trying to explain

25   when you came up with the idea of this invention, you talked

Myung Ryul Lee - cross

1    about a CD player as an example of a mechanical drive

2    mechanism, correct?

3    A.    Yes.

4    Q.    This is hard for me, too, because I am used to doing

5    things fast in English, so please forgive me for being so

6    slow here.

7    A.    I am okay.

8    Q.    Okay.  Now, you understand that Mr. Seo, who we just

9    talked about, was the person who worked on the water

10   dispenser, correct?

11   A.    Yes.

12   Q.    That was his assignment on the project, correct?

13   A.    Yes.

14

15

16

17

18

19

20

21

22

23

24

25

Myung Ryul Lee - cross

1          MR. PARTRIDGE:  May I approach again, Your

2     Honor?

3          THE COURT:  You may, Mr. Partridge.

4     BY MR. PARTRIDGE:

5     Q.    Dr. Lee, this is a document that we were given during

6     one of your depositions in this case.  Do you recall that

7     occurrence?

8     A.    Yes.

9     Q.    This was a document that was created by LG during your

10    deposition to try to explain the dates of various documents

11    that LG had produced in the case.  Do you recall that?

12    A.    Yes.

13    Q.    Could we put this up on the screen, please?  If you

14    can enlarge it a bit, that would be great, so I can see the

15    four documents that are identified, please.

16          Now, at what is called tab 16 there are four

17    documents listed.  Do you see that?

18    A.    Yes, I can see.

19    Q.    And, in fact, if you look in the witness notebook that

20    Mr. Coyne gave you -- and I am not sure which tabs in the

21    book.

22          MR. PARTRIDGE:  I apologize, Your Honor.  I

23    didn't know what tabs they would use until this morning.

24    BY MR. PARTRIDGE:

25    Q.    But, Dr. Lee, if you would look at tabs 2, 3, 4, and

Myung Ryul Lee - cross

1    5, those are the four documents that are listed on the

2    screen right now.  Correct?

3    A.    Which tab?

4    Q.    Look in your notebook.

5    A.    The notebook?

6    Q.    Yes.

7          Mr. Kim, it may help if you just explain to the

8    witness that I want to compare the four tabs, 2, 3, 4, and

9    5, to the list of documents on Defendants' Exhibit 742.

10   A.    You mean this tab 16 is the tab 2?

11   Q.    Yes.

12   A.    That is the tab 3 and it follows, 4, 5?

13   Q.    Yes, that's correct.

14   A.    Yes.

15   Q.    Okay.  So the exhibits under those tabs are

16   Plaintiffs' Exhibits 32, 33, 34, and 35.  And my question to

17   you is:  Am I correct that none of those documents was

18   created any earlier than February 5th, 2003?

19          (Pause.)

20   A.    Yes, it is all data later of February.

21   Q.    Yes, February 5th.  An easier way to say it is no

22   earlier than February 5th of 2003; is that correct?

23          MR. PARTRIDGE:  Mr. Kim.

24          (Witness consults with interpreter.)

25          THE INTERPRETER:  2003 did you say?

Myung Ryul Lee - cross

1           MR. PARTRIDGE:  Yes.

2           (Witness consults with interpreter.)

3           THE WITNESS:  What you are asking, as to being

4      later than February 5th, 2003?

5      BY MR. PARTRIDGE:

6      Q.    February 5th, 2003, or later.

7      A.    (Through interpreter) In accordance with what is

8      indicated here, these files are said to have been created on

9      or about February 5th, 2003.

10     Q.    Thank you.

11           Am I correct, Dr. Lee, and I ask this based on

12     the answers you gave to Mr. Coyne's questions -- are you

13     with me so far?

14     A.    Yes.

15     ██    ████████████████████████████████████████████████████

16     ███████████████████████████████████████████████████████

17     ███████████████████████████████████████████

18     ██    ████████████████████████████████████████████

19     Q.    In fact, I think you indicated that the document we

20     just referred to is Plaintiffs' Exhibit 348, which is tab 7

21     of your notebook.  Is that correct?

22     A.    (Through interpreter) Are you asking if this has

23     something to do with this over here?

24     Q.    I am trying to confirm with you that this exhibit,

25     348, is the earliest document you have found that has

Myung Ryul Lee - cross

1    anything to do with the '121 invention.

2    A.    (Through interpreter) Yes, that is correct.

3    Q.    If I recall correctly, Dr. Lee, the project that led

4    to the '121 invention was called the Bics project, B-i-c-s,

5    correct?

6    A.    Yes.

7    Q.    And the Bics project started no earlier than October

8    of 2002; is that correct?

9    A.    It's not correct, because we started -- officially, we

10   started it from October 2002.  But before that we already

11   had some ideas and made some teams and we did some activity,

12   we had some activity people.

13            MR. PARTRIDGE:  May I approach, Your Honor?

14            THE COURT:  You may approach freely.

15   BY MR. PARTRIDGE:

16   Q.    I have handed you a transcript from earlier testimony

17   you have given.  I ask you to turn to page 906 -- excuse me,

18   907.  I gave you the wrong page.

19   A.    Yes.

20   Q.    You were asked the following question:  "And you said

21   that the Bics project started in October of 2002, correct?"

22            And the answer you gave was?

23   A.    Yeah, I said officially it start October 2002.  But we

24   already made a team and some ideas to start the project, our

25   activities of people that day.

Myung Ryul Lee - cross

1    Q.    Let me clarify my question, Dr. Lee.

2          You were asked:  "And you said that the Bics

3    project started in October of 2002, correct?"

4          And your answer was "Yes."

5          Did I read that correctly?

6    A.    Yes, officially.

7    Q.    Let's go back to the '121 patent.  You can set that

8    aside, Dr. Lee.

9          Let's look at the '121 patent.  If we could turn

10   to Figure 8.  Actually, let's go to Figure 7 first.  This is

11   what is called a cross-sectional view; is that correct?

12   A.    Yes.

13   Q.    So it's as though we took the refrigerator and sliced

14   it in half and looked at the side of it, correct?

15   A.    Yes.

16   Q.    And this particular slice of the refrigerator is in

17   the vicinity of the water dispenser, correct?

18   A.    Pardon me?

19   Q.    This is the area of the water dispenser.  The slice we

20   have taken in Figure 7 is in the area of the water

21   dispenser?

22   A.    (Consults with interpreter) Yes, that is correct.

23   Q.    And the mechanical drive mechanism shown in this

24   figure is something called a rack and pinion, correct?

25   A.    Yes.  This is the one example of the implementation of

Myung Ryul Lee - cross

1    that.

2    Q.    And there would be many different ways to make a

3    mechanical drive mechanism, correct?

4    A.    Yes.

5    Q.    And the one that you showed in the drawing is a rack

6    and pinion, correct?

7    A.    Yes.

8    Q.    And we have highlighted it in yellow.  In the wheel

9    portion, I think that is called the pinion.  Correct?

10   A.    It doesn't say in here --

11   Q.    As an engineer.

12   A.    Yes.

13   Q.    I apologize.

14   A.    As an engineer, it says it has the pinion.

15   Q.    What happens with this particular mechanical drive

16   mechanism is you turn the wheel and the element moves

17   outwardly as shown in the next figure.  Is that correct?

18   And we will show you the next figure.

19   A.    Yes, that is correct.  That's the one example I said.

20   Q.    And rack and pinions have been around for many, many,

21   many years, correct?

22   A.    Yes.

23   Q.    And in this figure there is a water pipe shown that on

24   the licensed figure, which is Figure 7, is element 326.  And

25   we are going to color that in blue.  Correct?

Myung Ryul Lee - cross

1   A.   Yes.

2   Q.   And in the next figure, Figure 8, we have covered the

3   water pipe in blue as well, and that is not labeled in

4   Figure 8, but you can see it there.

5   A.   Figure 8?

6   Q.   Look at the blue part of Figure 8, which is the one on

7   the right.   That is the water pipe.

8   A.   Yes.

9   Q.   This water pipe portion is the water dispenser that

10  your patent claims talk about, correct?

11  A.   Yes.

12  Q.   And this is the part that Mr. Seo developed for LG,

13  correct?

14  A.   Yes.   He suggested this idea to pull out the water

15  pipe with the retractable dispenser.

16  Q.   Claim 20 of this patent -- and we won't go to it.   We

17  won't take the time -- says that the mechanical drive

18  mechanism is a spring.   You recall that?

19  A.   Yes.

20  Q.   So one alternative to the rack and pinion would be the

21  use of a spring, correct?

22  A.   I said this is one of the examples.   We made a lot of

23  things to make the realization of this system.   We can use

24  just the coil spring or the -- we call it the prep plate

25  spring or the other kind of -- the tape spring.   Do you

Myung Ryul Lee - cross

1   understand?

2   Q.    Yes, I do.

3   A.    You can implement this idea to through many ways.

4   This is one of the examples of that idea.  And we can make

5   it the other way.  For either one, you made this idea with a

6   spring, also.

7   Q.    That is exactly my point.  At the time there were many

8   different ways for moving a simple mechanical element, a

9   rack and pinion, a spring.  All the things that you just

10  described were all available for you to consider in coming

11  up with your mechanical drive, correct?

12              MR. PARTRIDGE:  You may have to translate that.

13              THE WITNESS:  (Through interpreter) Be that as

14  it may, in terms of our actually going about implementing

15  this, in our opinion, the simplest yet most effective way,

16  indeed the best way for us to realize this was in our

17  thinking to go with the spring mechanism.

18  BY MR. PARTRIDGE:

19  Q.    Thank you, Dr. Lee.

20              As a matter of fact, when you disclosed the

21  spring in this patent application, the use of springs were

22  so well-known that you did not find it necessary to even

23  show the spring in the drawings.  Is that correct?

24              (Interpreter consults with witness.)

25  BY MR. PARTRIDGE:

Myung Ryul Lee - cross

1    Q.    Let me help you with that so we don't double up.  This

2    might make it easier.

3             If you turn to the '121 patent, line 63, column

4    5, that paragraph, let's look at the first sentence.  It

5    reads, "The dispenser also includes a spring or an oil

6    pressure means (not illustrated)."

7             Did I read that correctly?

8    A.    Yes.

9    Q.    So in your view at the time, when this patent

10   application was written, it was not even necessary to show

11   the spring in the drawings because springs had been used to

12   move things for a long time.  Correct?

13   A.    The spring is very simple.  We used it for a long

14   time.  But when you use it for the ice dispenser, this is

15   the -- no one made this, that kind of ice dispenser.

16            So it is very difficult to put into the spring

17   and the other mechanism to the ice dispenser.

18            So this deserve -- I made the spring type of the

19   mechanism.  It is so difficult to make it.  But the spring

20   is used in a lot of -- in a lot of mechanisms, a lot of

21   things, many, many applications.  You have already -- you

22   use used for a long time, but it is not easy to make it with

23   that spring.

24   Q.    I understand.  In the specification you felt that it

25   wasn't even necessary to illustrate the spring, correct?

Myung Ryul Lee - cross

1    A.    Yes.

2    Q.    And, Dr. Lee, your answer suggests to me that it's

3    your view that the design and development of refrigerators

4    is not as simple as a lot of people might think.  Am I

5    correct?

6    A.    Yes.

7                 MR. PARTRIDGE:  I have no further questions.

8                 THE COURT:  Thank you, Mr. Partridge.  Any

9    redirect, Mr. Coyne?

10                MR. COYNE:  Just one question, Your Honor.

11                        REDIRECT EXAMINATION

12   BY MR. COYNE:

13   Q.    Dr. Lee, Mr. Partridge pointed you to this

14   refrigerator, DPX 026.  I know you probably are obstructed

15   by the wood on the Bench to see the other one, but can you

16   see PTX 552?

17   A.    Yes, I can see.

18   Q.    Does that have a pull-out tray?

19   A.    Yes.

20   Q.    Does that have a spigot that extends?

21   A.    Yes, I can see.

22   Q.    Did it extend with a mechanical drive mechanism?

23   A.    Yes, it's mechanical driving there.

24                MR. COYNE:  No further questions, Your Honor.

25                THE COURT:  Thank you, Dr. Lee.  You are

Myung Ryul Lee - redirect

1    excused.

2              (Witness excused.)

3              THE INTERPRETER:  Your Honor, are there any

4    other witnesses?

5              THE COURT:  Mr. Coyne, may we excuse Mr. Kim?

6              MR. COYNE:  Yes, for right now we may.

7              THE INTERPRETER:  Your Honor, I believe Mr.

8    Coyne was referring to 552 and he said 522.

9              MR. SHARMA:  Good morning.  My name is Anand

10   Sharma.  Your Honor, as our next witness, LG would like to

11   call Dr. Warren Bessler.  We also have some witness binders

12   for Dr. Bessler as well.

13             Your Honor, we also have a photo witness sheet,

14   as we did for the other piece.

15             THE COURT:  Provide that to Ms. Walker, if you

16   would.

17             ... Warren Frank Bessler, having been duly sworn

18   as a witness, was examined and testified as follows ...

19                      DIRECT EXAMINATION

20   BY MR. SHARMA:

21   Q.    Good morning.

22   A.    Good morning.

23   Q.    Could you please tell the jury about your education

24   after high school, please?

25   A.    Yes.  After high school, I attended Rensselaer

1    Polytechnic Institute in Troy, New York.  And I got my

2    Bachelor's, Master's, and Ph.D. in mechanical engineering at

3    RPI.  When I graduated, I was top in my class.

4    Q.    Did you focus your studies in any particular aspect of

5    mechanical engineering?

6    A.    Yes.  My concentration was in heat transfer and

7    refrigeration.

8    Q.    And where did you go after you received your Ph.D.?

9    A.    After that I went to work at the General Electric R&D

10   center, which is located in Niskayuna, New York.

11   Q.    How long did you work at GE?

12   A.    I worked there about 23 years, before I retired in, I

13   think it was, 2002.

14   Q.    What types of things did you do at GE?

15   A.    I had several jobs there, but eventually I evolved

16   into the refrigeration lab.  And from 1985 to I think it was

17   around '96 or so, I was the lead engineer there in

18   refrigeration engineering.  And then after that, from '97 to

19   about 2002, I was in charge of the lab there.

20   Q.    And what type of work did you do in GE's lab?

21   A.    The lab is involved in primarily household

22   refrigerators.  Our job there is to try to come up with new

23   technologies and new designs for refrigerators.

24         In addition to that, we helped the company's

25   manufacturing division with help troubleshooting, assisting

1    models that are having problems and come up with ways to

2    improve their performance.

3              Also, we were involved with quite a bit of what

4    we called competitive benchmarking.

5    Q.    What is benchmarking?

6    A.    Competitive benchmarking is if a company is trying to

7    come up with a new idea or new technology, they generally

8    try to get ahold of the competitors' models.  In this case

9    we would look to see who had the best refrigerators out

10   there in a certain feature.  Then we would get ahold of

11   those refrigerators in the lab and we would put them through

12   a series of performance tests.  We take them apart; see how

13   they worked.

14             And also we look at the patents that were held

15   on those refrigerators, before we would come up with our new

16   ideas.  Then hopefully our ideas would be better than the

17   competition.  And we would have something to compare them

18   to.  That was like the benchmark.  That way, our patents

19   would come up to be with different ideas than what was

20   already out there.

21   Q.    Did the refrigeration lab at GE interact with any

22   other departments within GE?

23   A.    Yes.  We interacted with the sales and marketing with

24   divisions.  We interacted with our appliance part, which is

25   in Louisville, Kentucky.  That is where they make a lot of

Bessler - direct

1    appliances.  We also interacted with our factories.

2    Q.    Did your lab at GE produce any products that were

3    eventually sold to consumers?

4    A.    We came up with ideas and put them into prototype

5    form.  And they eventually became products that you can buy

6    now.

7                For example, the GE Arctica refrigerators were

8    developed at the lab.  They are the first GE refrigerators

9    that have fully electronic control.  And they came out and

10   were very well received by the magazines.

11   Q.    Dr. Bessler, do you have any professional licenses

12   related to your work in refrigeration?

13   A.    Yes.  I am a licensed professional engineer.  I also

14   have my universal license in refrigerants from the EPA.

15   Q.    Dr. Bessler, have you been named as an inventor on any

16   patents?

17   A.    Yes.  I am listed as an inventor on 33 U.S. patents.

18   Q.    What type of technology do those patents involve?

19   A.    There are several different types.  I would say the

20   majority of them are in refrigeration.

21   Q.    So you retired in 2002 from GE.  What do you do today?

22   A.    Today I do several things.  I am an independent

23   engineering consultant in the areas of refrigeration and

24   heat transfer.

25                I also teach at the local graduate school.  I

Bessler - direct

1    teach the courses in heat transfer and energy engineering.

2    In the summertime I teach people how to ride motorcycles.   I

3    am a licensed motorcycle safety coach.   And I take care

4    of -- my wife and I take care of my elderly parents at home,

5    which takes a lot of time.

6              Then I also have a hobby of making beers.   I am

7    a home brewer.   That is what I do for relaxation.

8    Q.    Dr. Bessler, have you ever testified as an expert

9    before a jury?

10   A.    No, I have not.

11   Q.    Have you ever testified as an expert?

12   A.    Yes.   I testified once before as an expert.

13   Q.    What type of case was that?

14   A.    It was a patent case that had to do with

15   refrigerators.

16             MR. SHARMA:   Your Honor, at this time we would

17   like to offer Dr. Bessler as an expert in refrigerators and

18   refrigeration technology.

19             THE COURT:   Any objection?

20             MR. MORICO:   No objection.

21             THE COURT:   The Court will accept Dr. Bessler.

22   BY MR. SHARMA:

23   Q.    Dr. Bessler, in front of you, you have a somewhat

24   thick binder.   There is a tab 1 in that binder.   It is

25   labeled "PTX 001."

Bessler - direct

1    A.    I got it.

2    Q.    Have you seen this before?

3    A.    Yes, I have.   This is the '121 patent.

4    Q.    Are you familiar with the '121 patent?

5    A.    Yes, I am.   I have read it several times.

6    Q.    And when you say "several times," how much time have

7    you spent considering the '121 patent?

8    A.    I have probably spent quite a few weeks looking this

9    one patent over.

10   Q.    Dr. Bessler, based on your experience, how are patents

11   used in the refrigerator industry?

12   A.    At GE, where I worked, patents were used for a few

13   reasons.   One, it gives the company a chance to show the

14   rest of the world they are a technology leader in a certain

15   area.   For an engineer like myself, it's very important to

16   get patents, because it demonstrates to the company that I

17   have some useful value and that I can be trusted to be an

18   innovator, and it certainly helps my career and my salary

19   along if I am successful in getting patents.

20          And also, I think there is a legal aspect to it,

21   that it gives GE the chance to protect itself against other

22   competitors who might be trying to steal their ideas.

23   Q.    Dr. Bessler, who owns the '121 patent?

24   A.    That's owned by LG.

25   Q.    What is the '121 patent about?

Bessler - direct

1    A.      In general terms, I think the '121 patent is about an

2    ice and water dispenser that is movable, has a movable tray,

3    and it has a movable spigot so that you can extend those

4    from the front of the refrigerator and fill large

5    containers.  And it also has to do with mechanical drive,

6    which makes that movement automatic for the spigot.

7    Q.      Dr. Bessler, for purposes of this trial, have you

8    focused on any particular claims of the '121 patent?

9    A.      Yes.  Claims 20, 21, and 36.

10   Q.      Do you know which Whirlpool refrigerators LG is

11   accusing of infringing those claims?

12   A.      Well, LG is accusing the Whirlpool refrigerators, and

13   also accusing some Kenmore refrigerators, which is the Sears

14   brand that Whirlpool makes for Sears.

15   Q.      Dr. Bessler, do you have any opinions as to whether

16   any of those Whirlpool-made refrigerators infringe the

17   asserted claims of the '121 patent?

18   A.      Yes.  My opinion is that there are certain Whirlpool

19   and Kenmore refrigerators that do infringe those claims.

20   Q.      Dr. Bessler, can you please tell us how you performed

21   your infringement analysis?

22   A.      Sure.  The idea is that we have a refrigerator with

23   certain features.  And then we have a patent with certain

24   claims.  So I need to understand what those claims -- what

25   the language means.  Then I need to look at the refrigerator

1    and see if it has the same features that are in those

2    claims.  And if they do, then they are infringing.

3    Q.    Did the Judge help you at all in understanding any of

4    those claims and what they mean?

5    A.    Yes.  The claims have a bunch of words, obviously.

6    But part of understanding a patent is to really understand

7    what those words mean.  For that, Judge Sleet provides us

8    with a document that gives his ruling on what the

9    constructions of those claims really mean.

10   Q.    Dr. Bessler, when you did your infringement analysis,

11   what mindset did you use?

12   A.    When I looked at whether the refrigerators are

13   infringing, I use what they call a mindset of one of

14   ordinary skill in the art.

15   Q.    Now, what is one of ordinary skill in the art in the

16   context of the '121 patent?

17   A.    When I say "ordinary skill in the art," I am trying to

18   put my head in the -- of one who would be a regular

19   refrigeration engineer.  And for that, I consider somebody

20   who would have a Bachelor's degree in mechanical

21   engineering.  And let's say also two years of experience in

22   the design of refrigerators.

23         There is plenty of engineers that don't have a

24   four-year degree.  So if there was an engineer that didn't

25   have a full four-year degree, I would expect him to have

1    more experience in the design and manufacture of

2    refrigerators, let's say five years.

3    Q.    Dr. Bessler, how did you arrive at that definition?

4    A.    In my course of working at General Electric, I had the

5    opportunity to work with a lot of engineers from GE and

6    other places that were involved in making and designing

7    refrigerators.  And on a daily basis I interacted with them.

8    That gave me a feeling of what a typical ordinary skill

9    engineer would be like.

10   Q.    Dr. Bessler, returning to the infringement analysis

11   that you performed, did you perform an analysis for each

12   asserted claim in the LG patent?

13   A.    Yes, I did.

14   Q.    Let's start with Claim 20.  Can you please explain

15   your infringement analysis for Claim 20?

16   A.    Well, Claim 20 is what they call a dependent claim.

17   So it actually depends on another claim, 10, which is an

18   independent claim.  So in order to do that I looked first at

19   the language of Claim 10 and then the language of Claim 20.

20   And in order to do that, I needed a Whirlpool or Kenmore

21   refrigerator to look at to compare it to.  And in that case,

22   I used the Kenmore refrigerator, the stainless steel one

23   there, PTX-0552.

24   Q.    Could you please walk us through your infringement

25   analysis using the Kenmore refrigerator that you identified

Bessler - direct

1    as PTX-552?

2              THE WITNESS:  Your Honor, if it's okay, if I can

3    go over and stand there.

4              THE COURT:  Sure.  Just keep your voice up,

5    please, Doctor.

6              THE WITNESS:  I am going to want to take over

7    the claim language.  I had some charts made up.

8    BY MR. SHARMA:

9    Q.    I think you are referring to PDX-11.  Dr. Bessler, is

10   that it on the screen, PDX-11?

11   A.    Yes.

12   Q.    I think you have some sheets in your binder as well?

13   A.    Yes.  This way I can just carry those over there and I

14   won't have to go back and forth.

15             THE COURT:  We will put a mike on you, Doctor,

16   since it sounds like you are going to be over there a while.

17             THE WITNESS:  Let me just get all these out of

18   here.

19             (Witness steps down from stand.)

20   BY MR. SHARMA:

21   Q.    Dr. Bessler, before you get started, when you get to

22   that PTX-552, can you just tell us what model number that

23   is?

24   A.    This was the bar code taped on the back of the

25   refrigerator.  It says it's Model 465870380.

Bessler - direct

1    Q.    Thank you.  If you could please proceed with

2    describing your infringement analysis.

3    A.    Sure.  The idea is that we have a refrigerator here,

4    which is a Kenmore refrigerator made by Whirlpool.  And we

5    have some claim language in the '121 patent.  My job as the

6    witness is to try to decide if the claim language matches

7    the features on this Kenmore refrigerator.

8              So in order to do that, can I just point out

9    these features?  Or do we have a camera?

10             MR. SHARMA:  Mr. Dunn, does that camera work?

11             THE WITNESS:  My thought was if there was a

12   camera, it would expand the shot of the dispenser.

13             THE COURT:  I think there is a camera.

14             THE WITNESS:  I think that's going to be all

15   right.

16             As I mentioned, Claim 10 is an independent

17   claim.  So the first element of that claim is a dispenser

18   for an appliance comprising a water-dispensing assembly

19   configured to move.

20             So we have an appliance, obviously, a

21   refrigerator.  And we have a water-dispensing assembly,

22   which is here (indicating).  As you can see, it's configured

23   to move.  When I release it, it moves out to the front of

24   the refrigerator.

25             If we can go back to Claim 10, what I can do is,

Bessler - direct

1    I can put -- let's see -- right there I can put a checkmark

2    that the Whirlpool refrigerator has that feature, which is

3    covered by the patent claim.

4              Now, if I look at the next one, it says, "an

5    outlet of the water dispensing assembly is positioned

6    outside an outer surface of a door of an appliance in at

7    least one position of water dispensing assembly movement."

8              So if we can go back to this refrigerator, you

9    can see that when I release this right here, there is a

10   water outlet where my finger is.  And this is the door.  So

11   in one position, that outlet is positioned in front of the

12   door.

13             So if we go back to the claim chart, if we can

14   put a checkmark here.

15             THE COURT:  Ladies and gentlemen, can you see

16   where the Doctor is pointing to?

17             One of you can't.  Is that a blue nozzle or

18   something?

19             THE WITNESS:  Yes.  It is a blue nozzle right

20   here.  There you go.  That is where the water comes out.  It

21   was hooked up to the waterline.

22             So with that in mind, if we can go to the next

23   element of the claim, which is "a container support

24   configured to extend along a plane perpendicular to the door

25   such that the container support is configured for movement

Bessler - direct

1    between a withdrawn and an extended position."

2              So if you look over here, this is the container

3    support.  This support here moves out to an extended

4    position.  Everybody can see that.  And it moves back into a

5    retracted position.  So if we go back to the claim language

6    again, we can put a checkmark here for a container support

7    that moves.

8              Now, it says that "the container support is

9    configured in the extended position to support a container

10   being filled by water by water dispensing when the outlet of

11   the water dispensing assembly is positioned outside an outer

12   surface of the door."

13             If we can go back to this, as you can see here,

14   if we take out our tray, we have this in the extended

15   position.  And we can take a large container, like a coffee

16   pot or something, underneath here, and because this is moved

17   out from the refrigerator and so is this, you can place your

18   large container on this support and fill it.

19             So back to Claim 10, we can put a checkmark

20   here.

21             Now we are ready for Claim 20, which depends

22   upon Claim 10.  Claim 20 says it's a dispenser of Claim 10

23   "further comprising a mechanical drive mechanism configured

24   to move the water dispensing assembly."

25             So back to the refrigerator.  This here is the

1    mechanical drive mechanism.  And when I release it, it moves

2    the water dispensing assembly.  So I go back to Claim 20 and

3    I can put a checkmark here.

4              As I mentioned, there were two other claims.

5    The next claim after 20 was 21.

6    BY MR. SHARMA:

7    Q.    Dr. Bessler, go to 21, please.

8              THE COURT:  Perhaps it's time to interpose a

9    question.

10   BY MR. SHARMA:

11   Q.    I was going to ask you:  You talked about that

12   water-dispensing assembly.  How does it move?

13   A.    Okay.  This dispensing assembly right here, when I

14   release it, you see it move like that.  That's because

15   inside of this assembly there is a spring that's wound up.

16   When I close this, the spring is wound up.  When I release

17   the catch, the spring unwinds and it presents the spigot.

18   Q.    How do you know that?

19   A.    Well, I know that because I took one of these apart

20   and saw how it worked.

21   Q.    What type of spring is it?  How would you describe the

22   spring?

23   A.    I would describe it as a torsional spring.  It's kind

24   of a coil spring.  You wind it up and it releases itself.

25   Q.    I think you were going to Claim 21.

Bessler - direct

1    A.    Yes.

2    Q.    How does Claim 21 of the '121 patent compare to

3    PTX-0552?

4    A.    I believe that it has the same language that the

5    refrigerator has as a component here.  If I look at Claim

6    20, it's dependent on Claim 21 -- if I look at 21, it's

7    dependent on Claim 20.  And it states that it is a

8    "dispenser of Claim 20 wherein the mechanical drive

9    mechanism includes a spring."

10              As I just said, this is the mechanical drive

11   mechanism.  The thing that actually moves that is the spring

12   inside it.

13              So I would say that based on my observations, I

14   would put a checkmark here.  But before I do that, I have to

15   go back and remind everybody that we just went through and

16   looked at 10, so we can check off the elements of 10, and

17   then that was from the previous exercise, Claim 20, which

18   depends on 10, and then Claim 21, we can check off with

19   that, since it depends on Claim 20.

20              So far, in comparing the claim language to the

21   refrigerator, I found that the refrigerator has all of the

22   features of that claim language.

23   Q.    Dr. Bessler, what about Claim 36?

24   A.    All right.  That is on another chart I had made, which

25   I think is tab 13.  Yes, there it is.

Bessler - direct

1          Claim 36 is an independent claim.  So what I

2     want to do now is compare the language of this to the

3     refrigerator.  It says, "a dispenser for an appliance

4     comprising a movable member."  So if we go back to the

5     refrigerator, appliance, dispenser, and here is our movable

6     member (indicating).  If I go to the chart, we can check off

7     those two.

8          Then it says "is a water supply mechanism

9     attached to a movable member."

10          Inside of here is a water tube that comes down

11     to the center of this dispense assembly.  That would be

12     satisfying that element of the claim.

13          THE COURT:  Doctor, it is probably going to help

14     for the record when you say "here," if you can describe what

15     you are describing.

16          THE WITNESS:  Fine.  Behind this dispense

17     mechanism, a water tube comes down and hooks up to the top

18     of it, inside the refrigerator.  That would be the element

19     of that claim.  You can't see it.  It's inside the

20     dispenser.

21     BY MR. SHARMA:

22     Q.    How does the blue spigot that you were talking about

23     before relate to that water tube?

24     A.    The water tube comes to this dispense assembly and

25     then it supplies that spigot through this piece right here.

Bessler - direct

1          So if we go back to the chart, we can put a

2    checkmark in there for that.

3    Q.    How about this last element?

4    A.    The final element, it says, "a mechanical drive

5    mechanism configured to, upon activation of a user control,

6    apply force other than supplied by a user to motivate

7    movement of the movable member from a first position at

8    which an outlet of the supply mechanism is positioned behind

9    a plane representing an outer surface of a door, to a second

10   position, which the outlet mechanism is positioned in front

11   of the claim, representing the outer surface of the door."

12   Q.    Dr. Bessler, can you explain what is meant by "apply a

13   force other than supplied by a user to motivate movement" --

14   "movable member"?

15   A.    Yes.  If we can go back to the refrigerator again,

16   what that claim language means to me is that when I release

17   this catch, the spring supplies the force, other than the

18   force of my releasing the catch.  That's what actually moves

19   the rotating spigot.

20   Q.    I am sorry, I interrupted you.  Could you compare that

21   last element of the claim to the Kenmore refrigerator?

22   A.    Yes.  I believe if we go back to that element, the

23   Kenmore refrigerator here has that kind of a mechanism that

24   supplies a force other than this force supplied by me, the

25   user, that forces the spring force.  So I will put a check

Bessler - direct

1    here.

2              Based on that analysis, since the refrigerator

3    has all the features that matches the claim language, I

4    would say that the refrigerator is infringing the '121

5    patent.

6    Q.    Thank you, Dr. Bessler.  If you would like to head

7    back to the chair, I don't think I have any more questions

8    on the refrigerator in front of you.

9              (Witness resumes stand.)

10   BY MR. SHARMA:

11   Q.    Now, Dr. Bessler, did you look at all the accused

12   Whirlpool models or just the refrigerator that is here in

13   the courtroom today?

14   A.    I looked at a few Kenmore models.  I didn't look at

15   all of them, because there was a list provided to me, which

16   I believe LG and Whirlpool both agreed to, which contains

17   all of the model numbers of the refrigerators that had the

18   automatic spigot and movable tray.

19              So it was my understanding, as long as I found

20   one model on that list that infringed, that all the models

21   on that list had the same features.

22   Q.    Dr. Bessler, can you turn to tab 3 of your binder?

23   That is PTX-771.  If we could pull that up on the screen,

24   please.

25              What is PTX-771?

Bessler - direct

1    A.    PTX-771 is that list of refrigerators I was talking

2    about.  It has a few different, separate categories in it.

3    I think it's the second page that has a category that says

4    spring rotates -- "spigot rotates with spring mechanism."

5    That would be the page I was talking about.

6    Q.    So, Dr. Bessler, your opinions that you have given on

7    the infringement of claims 20, 21, and 36, what models do

8    they apply to?

9    A.    It would be my opinion that they apply to all the

10   models on this page.  And the one I looked at over there,

11   that model number is on this list somewhere.

12   Q.    When you say "this page," can you identify by page

13   number or category heading?

14   A.    Sure.  It's the category heading "Spigot Rotates With

15   Spring Mechanism."  And it's page 2 of the document that

16   says "Whirlpool Models Incorporating and Extending Ice Trays

17   and Rotatable Spigot."

18              MR. SHARMA:  Thank you, Doctor.  I have no

19   additional questions.

20              THE COURT:  Mr. Morico, you may cross-examine.

21              MR. MORICO:  Thank you, Your Honor.

22                          CROSS-EXAMINATION

23   BY MR. MORICO:

24   Q.    Good morning.  I am Paul Morico with Baker Botts.

25              Good morning, Dr. Bessler.  Nice to see you

Bessler - cross

1    again.

2    A.    Good morning.

3    Q.    I have a few questions of you.  I hope to be brief.

4          First off, Dr. Bessler, you are being paid for

5    your testimony today, correct?

6    A.    Yes, I am.

7    Q.    And how much are you being paid for your testimony

8    today, Dr. Bessler?

9    A.    My rate is $150 an hour.

10   Q.    Prior to your engagement in this case, you have

11   previously done some consulting work for LG, correct?

12   A.    Yes.  When I was an independent engineering

13   consultant, like I am now, I did some work for them.

14   Q.    And were you paid the same rate for that consulting

15   work as you are being paid today?

16   A.    No, I was not.

17   Q.    Was it a lesser amount?

18   A.    Yes, it was.

19   Q.    Now, Dr. Bessler, you left GE, if I understand

20   correctly, in 2002.  Correct?

21   A.    Yes, that's true.

22   Q.    If I understand your testimony earlier, you said you

23   retired in that year from GE?

24   A.    Yes.

25   Q.    And at that point in time, you were about 49 or 50

Bessler - cross

1    years old; is that correct?

2    A.    I was about 50 years old, yes.

3    Q.    Fairly early retirement, then?

4    A.    Well, I worked there a long time.  I achieved some

5    goals that I really wanted to there involving refrigerators,

6    which was pretty much my main area of endeavor as an

7    engineer.

8          When I reached those goals, I had some other

9    opportunities in front of me, and I wanted to explore those.

10   And I really enjoyed teaching.  I had an opportunity to take

11   a university teaching position.  And also I really enjoy

12   motorcycles.  And I want to become an instructor.  So I had

13   a little change of career.

14   Q.    Dr. Bessler, the reason you left was because GE closed

15   your refrigeration lab and sent it overseas, correct?

16   A.    That's not the reason I left, although what you said

17   did indeed happen.

18          I had a position there, as I said, where I was

19   in charge of it.  And I felt that I had done a very good

20   body of work there.  And even though I could stay on and do

21   other things, I felt like the best use of my time would be

22   to move on and become a consultant.

23   Q.    Since 2002 to the present, the primary work you have

24   done in the refrigeration area has been for LG, correct?

25   A.    From 2002 to present?

Bessler - cross

1   Q.    Correct.

2   A.    I have worked with other companies as well in

3   refrigeration, in the refrigeration arena.  As far as

4   refrigerators go, I would say most of my work was with LG.

5   Q.    And since leaving GE, you have not worked on any ice-

6   and water-dispensing systems; is that correct?

7   A.    If you discount the activities involved with this

8   case?

9   Q.    Correct.

10  A.    Other than that, no.

11  Q.    Now, Mr. Bessler, you have reviewed Mr. Voglewede's

12  deposition testimony in connection with your analysis here

13  in this case, correct?

14  A.    Yes.

15  Q.    And you understand that Mr. Voglewede is the person at

16  Whirlpool who developed the ice and water dispensers that

17  you are accusing of infringement, correct?

18  A.    I am familiar with his name.  And I have read his

19  testimony.  I am not sure if he is the only inventor on

20  those patents or those ideas that I have seen from

21  Whirlpool.

22  Q.    Now, you would agree with me, Dr. Bessler, that in the

23  last eight years Mr. Voglewede has spent more time working

24  on developing ice- and water-dispensing systems than you

25  have, correct?

Bessler - cross

1          MR. SHARMA:  Your Honor, I would like to

2    interpose an objection.  I believe we are outside the scope

3    of Dr. Bessler's testimony.  I think we might be moving

4    toward validity.

5          THE COURT:  I disagree.

6          MR. MORICO:  This goes to his qualifications,

7    Your Honor.

8          THE COURT:  It is overruled.

9          THE WITNESS:  I am sorry.  Could you repeat that

10   again?

11   BY MR. MORICO:

12   Q.    Yes.  My question is, Dr. Bessler:  In the last eight

13   years, since leaving GE, you have spent less time than Mr.

14   Voglewede weed, the developer of the accused ice and water

15   system, in connection with developing ice- and

16   water-dispensing systems, correct, in the last eight years?

17   A.    Since I left GE.

18   Q.    That's my question.  You would agree with that,

19   correct?

20   A.    I am not sure how many hours or what work -- Dr.

21   Voglewede or Mr. Voglewede --

22   Q.    Mr. Voglewede.

23   A.    -- Mr. Voglewede has spent, so I really don't know if

24   I could answer that question for you.  I mean, if he has

25   been doing a lot of work in that area, then he has been

Bessler - cross

1  doing more than I have.

2  Q.    Now, turning to your U.S. patents, you said you had 33

3  issued U.S. patents.  Something along that order.  Does that

4  sound about right?

5  A.    That sounds about right, yes.

6  Q.    And none of those issued patents are for ice- and

7  water-dispensing systems, are they?

8  A.    No.  I am not listed as an inventor on any of those,

9  of my patents for that topic.  Although while I was at the

10  lab there, we did develop work on new ice and water systems.

11  Q.    That wasn't my question.  My question is:  The patents

12  that you have received, none of them relate specifically to

13  ice- and water-dispensing systems, correct?

14  A.    They don't relate directly to ice and water systems.

15  Q.    That was my question.  You would agree with that,

16  correct?

17  A.    Yes.

18  Q.    And, in fact, the three articles you listed in the

19  resume that you provided to us in this case, none of those

20  relate to ice- and water-dispensing systems or

21  refrigerating, refrigeration systems for commercial or

22  residential refrigerators, do they?

23  A.    Could you say those categories again?

24  Q.    Yes.  Let me help you, actually.

25          MR. MORICO:  Your Honor, if I may approach the

Bessler - cross

1    witness?

2                    THE COURT:  Yes.

3    BY MR. MORICO:

4    Q.    Dr. Bessler, I have handed you your expert report.  If

5    you could turn to tab A.

6    A.    Is that right in the front?

7    Q.    I am sorry.  It's actually tab B.  It's in the back.

8    A.    Okay.  The problem is, I don't see any tab numbers on

9    here per se.

10   Q.    It's Exhibit B to your report in the back.

11   A.    Okay.

12              Sorry, Your Honor, I'm going to have to --

13   Q.    It's B.

14   A.    I am finding my way there.

15              Okay.  I am there.

16   Q.    Do you see under "Articles" on the second page of your

17   resume, do you see that?

18   A.    Yes, I do.

19   Q.    One of those is for solar-assisted heat pumps for

20   residential use?

21   A.    That's right.

22   Q.    Another one is for electrically driven automotive air

23   conditioners?

24   A.    Yes.

25   Q.    And the third one is for progress on free piston

Bessler - cross

```
 1   sterling coolers, correct?

 2   A.    That's right.

 3   Q.    And none of those relate to ice- and water-dispensing

 4   systems, correct?

 5   A.    That's correct.  There is a reason why I don't have

 6   many publications in the area of refrigerators.  It's not

 7   because we didn't have a lot of good ideas.

 8   Q.    Mr. Bessler, I didn't ask you that question.

 9              THE COURT:  Dr. Bessler, what you need to try to

10   do is answer his question and you will have an opportunity

11   to explain further, because I am sure your lawyer is going

12   to ask you some questions.

13              THE WITNESS:  Okay.  Sorry.

14              MR. MORICO:  Jason, if you could put up the

15   claim chart that Dr. Bessler stepped through.  It's the

16   demonstrative exhibits of plaintiffs'.

17              Now, with respect to Claim 10, which is the

18   claim that you just stepped through for the jury, that claim

19   is not being asserted in this case, correct?

20   A.    I am not an attorney.  But my understanding is that

21   when you look at a claim that's asserted claim, if it is a

22   dependent claim, then you have to consider the claim it

23   depends on.  So that would be Claim 10.

24              THE COURT:  You are about to move into a

25   different area, into the claims?
```

Bessler - cross

1              MR. MORICO:  Yes.

2              THE COURT:  We are going to take our morning

3    break.

4              (Jury leaves courtroom at 11:00 a.m.)

5              (Recess taken.)

6              THE COURT:  Ms. Walker, would you bring the jury

7    in, please ?

8              (Jury enters courtroom at 11:18 a.m.)

9    BY MR. MORICO:

10   Q.    Dr. Bessler, before the break, we had the claim

11   language up on the screen here.  I had asked you about Claim

12   10.  Let me rephrase my question.

13              Claim 10 standing alone by itself is not being

14   asserted in this case, correct?

15   A.    That's correct.

16   Q.    And all of the asserted claims, 20, 21, and 36, all

17   require that the outlet of the water-dispensing assembly

18   must extend outside the outer surface of the of door,

19   correct?

20   A.    I don't think that 20 says that it specifically has to

21   extend outside of the door.  I think that's in Claim 10, the

22   wording.

23   Q.    But 20, as I understand you testified earlier, is

24   dependent on Claim 10?

25   A.    Right.

Bessler - cross

1    Q.    And, therefore, as a matter of law, incorporates all

2    of the elements of Claim 10, correct?

3    A.    That's my understanding of how that works.

4    Q.    So you can't infringe Claim 20 unless it has all of

5    the elements of Claim 10, including that the outlet must

6    project or extend outside the outer surface of the door.

7    Correct?

8    A.    In order to infringe 20, you are saying the elements

9    of Claim 10 also have to be met.

10   Q.    Correct.  Isn't that what you just stepped us through?

11   A.    Yes.

12   Q.    And one of those elements of Claim 10 is that the

13   outlet must extended beyond the outer surface of the door,

14   correct?

15   A.    That's what that language requires.

16   Q.    Right.  And Claim 36 -- excuse me, Claim 21 is

17   dependent upon Claim 20?

18   A.    Right.

19   Q.    And, therefore, also has that requirement, correct?

20   A.    That's correct.

21   Q.    And Claim 36 makes it even more explicit, because it

22   talks about the outlet of the water-dispensing assembly

23   extending from the inside of the surface of the door to the

24   outside of the surface of the door.  Correct?

25   A.    I believe that's right.  If you could just put 36 up

Bessler - cross

1   there, where you are saying the door -- yes, outer surface,

2   yes.

3   Q.   So all of the claims require that the outlet of the

4   water-dispensing assembly must project or extend outside the

5   outer surface of the door, correct?

6   A.   That's what that language states.

7   Q.   And all of the claims require, 20, 21, and 36, some

8   sort of mechanical drive mechanism, correct?

9   A.   20, 21, and 36, mechanical drive mechanism, yes.

10  Q.   So you can't infringe any of the claims, 20, 21, and

11  36, unless the outlet of the water-dispensing assembly

12  projects outside the outer surface of the door, correct?

13  A.   I am not -- well, let me answer it this way:  Without

14  being an attorney, there is a few different kinds of

15  infringement.  There is what I understand as an engineer

16  direct infringement, where like you just follow the language

17  and --

18  Q.   Correct.  But, Dr. Bessler, you just testified about

19  infringement of all these claims.  You said you read the

20  patent, you read the file history, you read the claims, you

21  read the patent many times.  You understand what the claims

22  say and what they mean.  I am asking you a very simple

23  question; that is, whether all of the claims require -- in

24  fact, they all require, 20, 21, and 36, all require that the

25  outlet of the water-dispensing assembly must project outside

Bessler - cross

1    the outer surface of the door.  Very simple question.  That

2    is a correct statement, isn't it?

3    A.    Yes, that is a correct statement.  I thought you were

4    asking me something about infringement.

5    Q.    We now have established that.

6          With respect to the mechanical drive mechanism,

7    20, 21, and 36 all require a mechanical drive mechanism of

8    some sort.  Therefore, to infringe any of those three

9    claims, you must have a mechanical drive mechanism, correct?

10   A.    In order to infringe those claims, you must have a

11   mechanical drive mechanism, yes.

12   Q.    All right, very good.  Thank you.  Let's move on to

13   the list, the model list that you showed us.

14         If you could put that up on the board, please,

15   Jason.

16         Now, this is the list that was produced.  And

17   you testified that the products fall into three separate

18   categories.  And one of them is a side-by-side platform with

19   a rotatable spigot and the spigot rotates manually.  Do you

20   see that?

21   A.    I see that.

22   Q.    And then the next category is where the spigot -- also

23   a side-by-side platform, where the spigot rotates with the

24   spring mechanism, correct?

25   A.    Yes.  I believe that's the sheet I was referring to.

Bessler - cross

1   Q.    And that is the one you have given an opinion on

2   today, correct?

3   A.    Yes.

4   Q.    And then the third category is French-door,

5   bottom-mount platforms rotatable spigot where the spigot

6   rotates manually, correct?

7   A.    Correct.

8   Q.    Now, with respect to that last category, you have no

9   opinions whether Claims 20, 21, and 36 infringe -- or are

10  infringed by any of those products, correct?

11  A.    I didn't look at that particular product.

12  Q.    Right.  Therefore, you have no opinions on

13  infringement with respect to those three claims, with

14  respect to those products' configuration, correct?

15  A.    For the French-door, bottom?

16  Q.    Correct.

17  A.    No.  I looked at the ones on the other list.

18  Q.    So we can cross those off the list, agreed, because

19  you have no opinions on those?

20  A.    I could give an opinion if I had a chance to look at

21  them.

22  Q.    But you have not given an opinion as required at the

23  time with respect to this set of units, correct?  You have

24  no opinion with respect to those, correct?

25  A.    Well, I looked -- when I looked at this infringement,

Bessler - cross

1    I was looking for refrigerators that had a mechanical drive.

2    I didn't look at refrigerators that didn't have a mechanical

3    drive.

4    Q.    So these don't have a mechanical drive, so they would

5    not meet the claim limitation that there be a mechanical

6    drive mechanism, correct?

7    A.    That's why I didn't look at them.

8    Q.    Let's go on to the next list, the side-by-side list,

9    where the spigot rotates manually.  Again, they rotate

10   manually and, therefore, don't have a mechanical drive

11   mechanism.  So you have no opinions as to whether those

12   infringe, correct?

13   A.    Based on the claims that were being asserted for this

14   trial, they required a mechanical drive mechanism.  So I

15   didn't look at refrigerators without a mechanical drive

16   mechanism.

17   Q.    Right.  In fact, they couldn't infringe because they

18   don't have a mechanical drive mechanism, correct?

19   A.    Well, they could still infringe the patent.  But not

20   the claims that we are talking about here.

21   Q.    Asserted, very good.  Thank you for that

22   clarification.

23         We can put an X through that one as well in

24   terms of Claims 20, 21, and 36 in terms of there being no

25   infringement with respect to those claims.

Bessler - cross

```
 1            Let's now turn to the products that you did do

 2    an investigation on.

 3            I believe, Dr. Bessler, you testified that that

 4    unit over there, PTX- -- I believe it's 0652, it's a little

 5    hard to see, is one of the units that you inspected and you

 6    opined on that infringed, correct?

 7    A.    The stainless --

 8            THE COURT:  Is that the stainless steel?

 9            MR. MORICO:  Yes.

10            THE COURT:  PTX-0552.

11    BY MR. MORICO:

12    Q.    Thank you.  0552.

13            You have opined that unit infringes, correct?

14    A.    Yes.

15    Q.    In connection with your analysis in this case, you

16    also inspected a manual unit.  In particular, a model

17    identified in your report as GC5NHAXS.  Do you recall

18    inspecting that unit in connection with your infringement

19    analysis in the report that you provided us?

20    A.    I inspected a lot of refrigerators, as you can

21    imagine.  I can't possibly recall that exact number.  But if

22    you say that's in my report, I am willing to believe that.

23    Q.    And that refrigerator, if I may walk over there

24    briefly, it's this refrigerator here, Dr. Bessler, and it

25    has a pull-out tray.  Do you see that?
```

1    A.    Yes, I do.

2    Q.    And it has a rotatable spigot.  Do you see that?

3    A.    Yes, I do.

4    Q.    It is a manually operated rotatable spigot.  There is

5    no spring in this.  Do you recall investigating a unit of

6    this type?

7    A.    I do see it, and I have seen units like that, yes.

8    Q.    And this unit has two positions.  It can be rotated

9    where the water outlet is in what the unit actually says its

10   center faucet.  Do you recall inspecting that feature?

11   A.    If I recall this -- like I said, I have seen a lot of

12   refrigerators, but I remember there is a refrigerator with

13   like two positions, halfway out maybe and all the way.

14   Q.    And in the halfway position, the outlet of the

15   water-dispensing mechanism is not outside the outer surface

16   of the door, correct?

17   A.    Well, I probably have to come down there and take a

18   look.  I really can't see.

19            THE COURT:  Okay.  Why don't you take a look.

20            (Witness steps down from stand.)

21   BY MR. MORICO:

22   Q.    Do you recall inspecting this?

23   A.    Maybe not this exact unit, but something similar to

24   this, yes.

25   Q.    You can see that the rotating spigot has two

Bessler - cross

1    positions, one which actually right here says -- it probably

2    may not be visible.  It says "center faucet position."  Do

3    you see that?

4    A.    All right.

5    Q.    Do you see in this position it says "center faucet

6    position"?

7    A.    Yes, I do.

8    Q.    And do you see in this position where it says

9    "extended faucet position"?  Do you see that, Dr. Bessler?

10   A.    Yes, I see the words.

11   Q.    And you would agree with me in the extended faucet

12   position, the outlet is outside the outer surface of the

13   door?

14   A.    The outlet is outside the outer surface of the door,

15   yes.

16   Q.    And you would agree with me that in the center faucet

17   position, it is not, correct?

18   A.    Well, I am going to have a little trouble agreeing

19   with you right away, because there is a little question here

20   as to exactly what the outer surface is.

21          If this is the outer surface of the door

22   (indicating) --

23          THE COURT:  Indicate what you are pointing to,

24   Doctor.

25          THE WITNESS:  Just the flat front of the freezer

1   door.

2           It's hard to tell whether this spigot is in

3   front of this or not.  If we are talking about this piece

4   right here being in front of the door, which is actually the

5   dispensing housing, the spigot is behind the front of this.

6   But without taking it apart, it's hard to see if it's

7   actually in front of this piece (indicating).

8           Again, depending on the language of the claim,

9   you know, where it's saying the front surface of the door.

10  If I'm saying this is the front surface of the door, I have

11  trouble saying that's in front of it.

12  BY MR. MORICO:

13  Q.    You understand that the Court has construed the term

14  "outer surface" to have its plain and ordinary meaning, the

15  outer surface of the door.  Do you understand that?

16  A.    Yes, right.

17  Q.    And you understand that in this case LG argued that

18  "outer surface" meant the plane of the door and not just the

19  plain and ordinary meaning.  Do you understand that?

20  A.    Well, I guess it's up to the Judge to decide what the

21  plain and ordinary meaning is.

22          But to me, this is a door.  So this is plain and

23  ordinary meaning.  This is a dispenser housing.

24  Q.    The dispenser is part of the door, is it not?

25          THE COURT:  Let me see counsel for a moment.

Bessler - cross

1              By the way, ladies and gentlemen, from time to

2     time -- I have now summoned the lawyers twice to the side of

3     the Bench here.  They may from time to time ask me to go

4     over and chat with them as well and I will put on this white

5     noise machine.  It's not that we are trying to keep anything

6     from you.

7              I am simply trying to make sure that the

8     evidence you hear is being adduced or presented to you

9     under -- and consistent with the rules of evidence.  We are

10    not trying to hide anything from you.

11             We will have as few of these as possible.  From

12    time to time I am going to get involved.

13             (The following took place at sidebar:)

14             THE COURT:  Mr. Morico, I am trying to

15    understand how this witness, No. 1, why you would think he

16    would know what LG argued at Markman.  And, No. 2, why it's

17    relevant to this jury's consideration and why it's not,

18    furthermore, confusing potentially.

19             MR. MORICO:  I can withdraw the question, Your

20    Honor.  The problem was he was referring to the plane of the

21    door.

22             THE COURT:  I get that.  They made the argument.

23    But he is not a lawyer.  He wasn't at Markman.  None of

24    that.

25             MR. MORICO:  I can get this a different way,

Bessler - cross

1    Your Honor.  My apologies.

2                THE COURT:  You need to be alert.

3                MR. SHARMA:  Your Honor, I have been trying to

4    sit and be patient.

5                THE COURT:  Counsel, don't sit and be patient.

6    If you think there is a reason to stand up, if there is a

7    strategic reason, fine, you try your own case.  If you think

8    something is going on that is not right, I would just as

9    soon not be calling these sidebars.

10               MR. SHARMA:  Thank you, Your Honor.

11               THE COURT:  But I don't want my jury confused.

12   That's what this is all about right now, this particular

13   sidebar.

14               (End of sidebar conference.)

15               THE COURT:  You may proceed.

16   BY MR. MORICO:

17   Q.    Thank you.

18               Let's assume for argument's sake that the outer

19   surface of the door includes this dispenser.  Let's assume

20   that for a moment.  You would agree with me, then --

21               THE COURT:  Counsel, do you have an objection?

22               MR. SHARMA:  I have an objection, Your Honor.

23   This is, I believe, confusing because this is not a model

24   that we have accused of infringement.  We are having a lot

25   of questions here on Dr. Bessler's opinions on infringement

Bessler - cross

1    and this model has not been accused of infringing the claims

2    that are asserted.

3              MR. MORICO:  Your Honor, the witness has

4    actually inspected this very unit.  And I am about to go to

5    this next unit.  I am using this just for demonstrative

6    purposes.

7              THE COURT:  I will permit it.  The objection is

8    overruled.

9    BY MR. MORICO:

10   Q.    My question again, Dr. Bessler is:  In this center

11   faucet position, the outlet does not extend beyond the outer

12   surface of the door, if you accept my premise that the outer

13   surface of the door includes the front face of the dispenser

14   housing.  Would you agree with me, then?

15   A.    Yes.  If you are talking about this one position, not

16   the other one where it's all the way up, just this one

17   position, and you are saying this is the front portion of

18   the refrigerator?

19   Q.    Correct.

20   A.    Yes, then the word "dispensed spigot," which is right

21   here, is not in front of the surface.

22   Q.    Turning to this unit, assuming the same question, that

23   the outer surface of the door includes the outer surface of

24   the dispensing system, the outlet does not project beyond

25   the outer surface of the door, correct?

Bessler - cross

1   A.     I think this outlet does project beyond the front

2   surface of the door.

3   Q.     Let me show you something, Dr. Bessler.

4             MR. MORICO:  If I may, Your Honor.

5             THE COURT:  Please do.

6   BY MR. MORICO:

7   Q.     We have pulled one of these dispensing units out of

8   the door and we have extended the plane and we have put sort

9   of a molecule water coming out of the outlet.  As you can

10  see, Dr. Bessler, the water does not break that plane, does

11  it?

12            THE COURT:  I wouldn't object if you gentlemen

13  want to go over in front of the jury.

14            MR. MORICO:  Thank you, Your Honor.  I was going

15  to ask that, actually.

16  BY MR. MORICO:

17  Q.     Assuming, Dr. Bessler, that the front surface of the

18  door includes this outer surface of the dispensing

19  mechanism, and the plane extends as my piece of paper shows,

20  the water does not clearly extend outside the outer surface

21  of the door in this case, the outlet, does it?

22  A.     I would do this differently.  I am sorry.

23            THE COURT:  Answer the question to the best of

24  your ability.

25            THE WITNESS:  The question is -- I think this is

Bessler - cross

1   outside the front.  If you take this thing you have here and

2   put it actually in the plane of this dispensing front, like

3   I would do it, and I put it like here, that there is a part

4   of this spigot, and especially on the one over there that I

5   looked at, that is in front of this plane of the

6   refrigerator.  So I don't agree with that.

7   BY MR. MORICO:

8   Q.    When does it stop becoming in front of the plane?

9   When I move it just this much, about 10 degrees or so, is

10  that now just outside the outer surface of the plane?

11  A.    Well, there is two things here.  One is, you know,

12  arguing the exact instant that it moves behind this plane, I

13  can't tell you how many degrees that is without looking at

14  it.  It's my opinion that there is part of this that is in

15  front of the front plane of this.

16          But I think more importantly is the idea that

17  this device is moved out from inside the dispensing cabinet

18  so you can fill large pots, that that is really the intent

19  of the whole patent, is to fill large containers.

20          So it's moving forward.  That's the feature that

21  LG was trying to patent.

22  Q.    Right.  But we are not talking about the intent of the

23  patent.  We are talking about the claim language.  You can't

24  infringe unless you practice all the elements of the claim.

25  And the claim, as we established earlier --

1       THE COURT:  Is that an instruction to the jury,

2    counsel?  Or is that a question?

3       MR. MORICO:  I am about to get to a question.  I

4    am sorry, Your Honor.

5       THE COURT:  Be careful.

6    BY MR. MORICO:

7    Q.    The claim requires, does it not, that the outlet of

8    the water-dispensing arm, not just the arm itself, the

9    outlet of the water-dispensing arm must project outside the

10   outer surface of the door.  Correct?  We established that?

11   A.    The claim language requires that this piece here move

12   out in front of this door.  You said -- the Judge, Your

13   Honor, you said something else to him.  But he was talking

14   about infringement.

15       THE COURT:  You need to speak to the jury, sir.

16       THE WITNESS:  You were talking about

17   infringement.  What I was saying is that even if this -- I

18   believe this thing is in the front of here.  But I think

19   there is a legal mechanism, if you will, that says even if

20   you try to make this thing move slightly behind here to

21   avoid the patent, that you can still infringe.  And that's a

22   different kind of infringement, but you can still infringe.

23   BY MR. MORICO:

24   Q.    But you have provided no opinions in this case on that

25   type of infringement, correct?

Bessler - cross

1    A.    I know about it.  I know --

2    Q.    But you have provided no opinions in this case with

3    respect to that type of --

4    A.    I am not sure if I have or not.

5    Q.    I will represent to you you have not, sir.

6    A.    All right.

7    Q.    So let's focus on the literal infringement analysis

8    that you did.  With respect to the outlet on this

9    water-dispensing assembly, you would agree with me, if this

10   rotates just a little bit, maybe 10 degrees more, maybe even

11   a couple degrees more, even under your opinion, assuming the

12   jury doesn't accept that it's not clearly outside the outer

13   surface of the dispenser as I have advocated, assuming that

14   they accept your position, how many degrees does it need to

15   no longer become infringing?

16   A.    I think, when you ask me that question, no longer

17   becomes infringing, what I am saying to you is that this

18   small amount of degrees doesn't really matter, because as

19   long as this thing -- the intent of this is to get out front

20   and fill large containers, the same way as if it was this or

21   that position, the two or three extra degrees doesn't make a

22   difference because you can still infringe under this other

23   thing called the doctrine of equivalents.

24          THE COURT:  Doctrine of equivalents is not an

25   issue about which I believe you have testified.  We will

1    confine your testimony to the area we call literal

2    infringement.

3              Ladies and gentlemen, you will be instructed on

4    that subject in much greater detail when I give my final

5    instructions.  There is a difference.  The Doctor has not

6    been called to testify about what we call doctrine of

7    equivalents at this point.

8              MR. MORICO:  A few more questions, Your Honor.

9    BY MR. MORICO:

10   Q.    You would agree with me that when this is rotated a

11   few degrees inward, that clearly the outlet does not extend

12   beyond the outer surface of this dispensing system.  You

13   would agree with me, would you not?

14   A.    If we take this as the front plane and we push this in

15   enough, whatever that enough is, eventually this spigot,

16   where the water comes out, gets behind the front of this

17   surface.

18   Q.    And you would agree with me also that this spigot in

19   this position is much closer to the center position on that

20   manual unit than it is to the 180-degree position when the

21   spigot is clearly outside the outer surface of the door.

22   You would agree with me with that, would you not?

23   A.    You are asking about the position of this spigot right

24   now?

25   Q.    Correct.

Bessler - cross

1    A.    In relation to -- can we go back over to the

2    refrigerator?

3              MR. MORICO:  Can we go back over, Your Honor?

4              THE COURT:  Yes.

5    BY MR. MORICO:

6    Q.    You would agree with me, Dr. Bessler, that when the

7    faucet is in the center position in this manual unit, that

8    that is much closer to the outlet in this accused device

9    than it is when it's in the 180-egree position, which the

10   unit says "extended position."  Would you agree with me

11   there?

12   A.    I wouldn't say it's much closer.  I would say it's

13   almost right in the middle, because when you look at where

14   this is positioned in here, it's hard to see.  But it's

15   quite a bit a ways inside here.  Then it comes all the way

16   out.  Somewhere in the middle of that I think is about right

17   where this is right now.

18   Q.    Do you understand this is at 90 degrees?

19   A.    Like I said, I don't have any measurement tools with

20   me right here.  It looks like it's about 90 where the stop

21   occurs.  If I look at the position relative to the front of

22   this plane and see where this nozzle is right now, then I

23   take it all the way out here, and I go somewhere about

24   halfway in between, that looks to be about where that is.

25   So I would not agree that it is much closer to one or the

Bessler - cross

1    other.

2    Q.    Dr. Bessler, I think we will leave it to the jury to

3    decide how far out that goes.

4    A.    I think that's a great idea.

5    Q.    I will ask you one other question, Dr. Bessler.  If we

6    were to remove the spring from this device, it would no

7    longer infringe Claim 21 and 36, correct?

8    A.    If we took the spring out of that device.

9    Q.    Right.  It would no longer be spring-activated, so it

10   would no longer infringe?

11   A.    Without the spring, it would no longer have a spring,

12   and also, it would not apply a force other than supplied by

13   the user.

14   Q.    So it wouldn't infringe 21 and 36, correct, if I took

15   the spring out of this?

16   A.    Well, 21 depends on 10.  So it would still infringe

17   Claim 10.

18   Q.    But 10 is not being asserted by itself.  We have

19   already established that, correct?

20   A.    Not by itself.  But 21 depends on 10.

21   Q.    And 21 adds a spring, correct?

22   A.    Yes.

23   Q.    So to infringe 21 you need to have a spring, correct?

24   A.    Correct.

25   Q.    And my hypothetical asked you:  If there was no spring

Bessler - cross

1    in here, 21 would not be infringed.  Correct?

2    A.    Hypothetically, if you remove the spring and 21

3    requires a spring, you don't infringe Claim 20.  But you

4    still have issues with some of the other claims in the

5    patent, like Claim 10.

6    Q.    None of which are asserted today, correct?

7    A.    10 is not asserted.

8                MR. MORICO:  Thank you very much, Dr. Bessler.

9                THE COURT:  You may resume the stand, Doctor.

10               (Witness resumes stand.)

11               THE COURT:  Mr. Morico, have you completed your

12   examination?

13               MR. MORICO:  Yes, Your Honor.  I have.

14               THE COURT:  Mr. Sharma, you may redirect.

15                       REDIRECT EXAMINATION

16   BY MR. SHARMA:

17   Q.    Just a few short questions.  I apologize, you have

18   already taken the microphone off.  If you could head back to

19   PTX-552.

20   A.    I am getting pretty good at this now.

21               (Witness steps down from stand.)

22               MR. SHARMA:  If we could also pull back up I

23   think it was PDX-11.

24   BY MR. SHARMA:

25   Q.    My question is not about the mockup but the actual

Bessler - redirect

1    model that is in the room.  If you could take a look at

2    PTX-552 and the claim language that talks about the

3    water-dispensing assembly, which is positioned outside an

4    outer surface of the door, can you tell me your opinion on

5    that claim language as it relates to that refrigerator?

6    A.    Yes.  I believe that this outlet --

7                 MR. SHARMA:  Your Honor, may I turn on the

8    camera as well?

9                 THE COURT:  Yes.

10                Doctor, why don't you move that mike up a little

11   closer.  Put it in your tie.  It actually works better.

12                THE WITNESS:  Okay.  Is that better?

13                THE COURT:  Yes.

14                THE WITNESS:  Okay.  I believe you asked me in

15   the extended position, if I believe that the outlet of the

16   dispenser is in front of the front surface of the

17   refrigerator, which is taken to be this surface.  My answer

18   is yes.  If I put my finger right here, my finger is in

19   front of the surface.

20   BY MR. SHARMA:

21   Q.    Dr. Bessler, one other item.  I believe inside the

22   refrigerator you used a piece of paper for a model number.

23   If you could take that back with you to your seat.  I have

24   just one more question.

25   A.    Sure, I have got them.

Bessler - redirect

1    Q.    If you could return to your seat, because I have

2    another document I am going to pull up for you.

3    A.    All right.

4              (Witness resumes stand.)

5              THE COURT:  Ms. Walker, why don't you get that

6    mike, or we are going to get feedback.

7              (Witness resumes stand.)

8    BY MR. SHARMA:

9    Q.    Now, Dr. Bessler, I don't want to talk to you about

10   mockups.  I want to talk to you about actual models that we

11   are accusing of infringement.  Can you go to PTX-711?

12   A.    Okay.

13   Q.    PTX-771, I am sorry.

14   A.    I have it here.

15   Q.    Do you see the model number from that Kenmore

16   refrigerator that you gave opinions on on that list?

17   A.    Just give me a second.  There is a lot of numbers

18   here.  I am sure it's on here.  But I have to find out

19   where.

20   Q.    I believe it's on the second page of the list.  And

21   the model number is 465870380; is that correct?

22   A.    Yes.  If you look at the chart you have there on the

23   fourth column, about two-thirds of the way, three-quarters

24   of the way down, the numbers are sort of in sequence, and

25   there it is, 465870380.

Bessler - redirect

1    Q.     And your opinions on infringement apply to that model

2    and all the models on that list, correct?

3    A.     Correct.

4          MR. SHARMA:  No further questions, Your Honor.

5          THE COURT:  Doctor, before you step down, you

6    discussed earlier the person of ordinary skill.

7          THE WITNESS:  Yes.

8          THE COURT:  Did you have a time in mind as to

9    when you gave that definition?

10         THE WITNESS:  Yes.  That would be at the time

11   when these patents were being filed for.  That was my

12   understanding.  Like 2003-2004 time area.

13         THE COURT:  Thank you.  You are excused.  Thank

14   you, sir.

15         (Witness excused.)

16         MR. DAVIS:  Good morning.  The next witness is

17   coming in just right now.  If I could have Mr. Herrmann hand

18   out the photos we have.

19         My name is Walter Davis on behalf of LG.

20         The plaintiffs call Young Noh.

21         (Interpreter Mr. Kim returns.)

22         ... Young Noh, having been duly sworn as a

23   witness, was examined and testified as follows ...

24         MR. DAVIS:  I should have mentioned before that

25   Mr. Noh is also going to attempt to testify in English

```
 1    today, but I would like the assistance of the interpreter.

 2                    THE COURT:  Okay.

 3                    MR. HERRMANN:  We may have taken his witness

 4    notebook away.

 5                    THE COURT:  Thank you, Mr. Herrmann.

 6                    Good morning.

 7                         DIRECT EXAMINATION

 8    BY MR. DAVIS:

 9    Q.    Good morning, Mr. Noh.

10    A.    Good morning.

11    Q.    Are you going to testify in English today?

12    A.    Yes, I will try, but I would like to have a translator

13    when I need it.

14    Q.    Where are you currently employed?

15    A.    I am working for LG Electronics, U.S.A., which is

16    located in Englewood Cliffs, New Jersey.

17    Q.    What do you do for LG Electronics, U.S.A.?

18    A.    I am a product marketing manager for refrigeration.

19    Q.    How long have you been with LG?

20    A.    I have been with LG for about 11 years.

21    Q.    What are your current job responsibilities?

22    A.    I am a product marketing manager.  Product marketing

23    manager is kind of a customer manager, handling almost

24    everything about that product category.

25                    I am talking about refrigeration.  I am in
```

Noh - direct

1    charge of that.  And I do inventory management and product

2    lineup management and then marketing communication, and so

3    on.

4    Q.    I would like to discuss refrigerators a bit with you

5    today.

6             Mr. Noh, when did LG first introduce LG-brand

7    refrigerators in the U.S.?

8    A.    It was June, around June 2001.

9    Q.    And prior to June 2001, what was LG's experience with

10   LG-brand refrigerators outside the U.S.?

11   A.    In 2001 LG was already a very strong global

12   refrigeration player.  Other than United States, we had a

13   very nice business all around the world.  We had a business

14   in Europe, the Middle East, Asia, and Australia, and Russia,

15   South America.  LG was one of the global leaders in the

16   refrigeration business.

17   Q.    What kind of refrigerators did LG sell outside of the

18   U.S. prior to June 2001?

19   A.    Because LG was operating in a global manner, we had

20   all types of refrigerators, like top-mount refrigerators for

21   Asian market and the Middle East market.  And bottom-freezer

22   refrigerators for European market.  And side-by-side

23   refrigerators for Korean domestic market and Australia

24   market.

25   Q.    When did LG begin making bottom-mount refrigerators

1    for the European market?

2    A.    Actually, I am not sure exactly from what time.  But I

3    am very sure that we did a bottom-freezer refrigerator

4    business at least before 1999.  I joined in 1999.  And I was

5    in charge of the European market at that time.  And we did a

6    pretty good business in European market for bottom-freezer

7    refrigerators.

8    Q.    What was LG's marketing philosophy when it entered the

9    U.S. market for LG-brand refrigerators?

10   A.    When we were starting refrigeration business in 2001,

11   refrigerator was the first product we are bringing with the

12   LG brand in this market.  So building LG brand as a premium

13   brand was the most important thing at that time.

14              And we thought a premium band is possible only

15   through product leadership.  So we emphasized a lot about

16   technological innovation and stylistic design to make our

17   product different from others that were already available in

18   the market.

19   Q.    And what type of refrigerators did LG sell in the U.S.

20   when it first entered?

21   A.    When it first entered in 2001, we started with the

22   only available product at that time, like a top-mount

23   refrigerator, and small-size bottom-freezer refrigerators

24   and slightly small-sized side-by-side refrigerators.

25   However, we did have our plan to develop U.S.-dedicated

Noh - direct

1    product, like U.S.-sized top-mount and U.S.-sized bottom

2    freezer or refrigerators.

3    Q.    If you could turn to the tab, it might be the only tab

4    at this point, to PTX-108.

5              Can I get to PTX-108?

6              Mr. Noh, what is PTX-108?

7    A.    This is official registration document for product

8    development planning.

9    Q.    What model?

10   A.    This is for 20-cubic-foot and 22-cubic-foot

11   bottom-freezer refrigerators.  The one I said U.S.-dedicated

12   bottom-freezer refrigerator.

13   Q.    What is the significance of PTX-108?

14   A.    When you have this official registration, it means you

15   did a lot of market research and consumer research, and you

16   decided what kind of work picture you will bring with this

17   product.  It means now you can invest actual money for the

18   model that will be used producing the refrigerator.  And you

19   are going start to use human resources developing this new

20   product.

21   Q.    What is the date on PTX-108?

22   A.    This is dated December 20, 2001.

23   Q.    What does that mean?

24   A.    As I explained, it takes around six months to study

25   features and consumer requirements.  In that case, we

1   already started studying this product six months before this

2   date.

3   Q.    And when would that be in this case?

4   A.    It would be around June 2001.

5   Q.    How does that compare to the time that LG entered the

6   U.S. market?

7   A.    It's a very similar time we entered this market.

8   Q.    When did LG start selling the bottom-mount

9   refrigerators of PTX-108?

10  A.    If you look at the document 0724059, it shows the

11  target production date of April 2003.  Actually, this model

12  is launched around that time, as far as I remember.

13  Q.    Does LG currently sell bottom-mount refrigerators in

14  the U.S. other than the type shown in PTX-108?

15  A.    Currently, we are also selling three-door

16  bottom-freezer refrigerators and four-door bottom-freezer

17  refrigerators.

18  Q.    When did LG start selling bottom-mount refrigerators

19  with three or more doors?

20  A.    We started to sell three-door bottom-freezer

21  refrigerators from around April 2004.

22  Q.    That's in the U.S.?

23  A.    That was in the U.S.

24  Q.    How about outside the U.S.?

25  A.    Outside the U.S., we had, actually, six-door

Noh - direct

1    bottom-freezer refrigerators for Korean domestic market,

2    like early 1990s.

3    Q.    Could you describe that six-door bottom-mount

4    refrigerator, please?

5    A.    That was a bottom-freezer refrigerator with four

6    freezer doors, with two freezer doors, and two refrigerator

7    doors in French door shape.

8    Q.    What about bottom-mount refrigerators from companies

9    other than LG?

10   A.    Actually, European market as a competitive-size

11   bottom-freezer refrigerators, and Japanese market has a lot

12   of different shape of bottom-freezer refrigerators.  They

13   have a three-door, four-door, sometimes five to six doors

14   bottom-freezer refrigerators.

15        As far as I know, Japanese market had that type

16   of refrigerators from late 1980s or early 1990s.

17   Q.    Thank you.  You can put PTX-108 aside.

18        What kind of resources does LG invest in

19   research and development?

20   A.    We are very proud of our commitment for R&D.  Globally

21   we have around 82,000 employees.  Out of 82,000 employees,

22   about 16,000 employees are working for R&D center.

23        We have manufacturing R&D center, but we also

24   have -- it's called core technology R&D center as well.

25   Core technology R&D center has a core technology and core

Noh - direct

1    components.   They handle all types of vertical integration

2    of technology and horizontal integration of technology.

3    Q.    What is vertical integration of technology?

4    A.    Vertical integration of technology means you have

5    technology of a core component within your house.   We

6    manufacture and develop refrigerator compressor, we

7    manufacture and develop washing machine motor, and we also

8    manufacture and develop dishwasher motor, and compressor for

9    air conditioner as well.

10          If you have vertical integration, you have a

11   core technology and core component within your house.   It is

12   an advantage to bring technological innovation faster and

13   make your product more reliable.

14   Q.    Has LG's marketing philosophy worked?

15   A.    Yes.   If you consider the market share, when we were

16   studying LG-brand business in 2001, we were nearly -- we had

17   nearly zero market share.   Over the last year in the

18   refrigeration, we have around 9 percent of the market share.

19          If you look at the product category of

20   French-door refrigerators, which LG is focusing on, we had

21   around a 17 percent market share in the market, ranking No.

22   2 next to Samsung Electronics.   In case of 2008, we were No.

23   1, around 20 percent of market share in French-door

24   refrigerators.

25   Q.    What about brand awareness?

Noh - direct

1    A.    We improved brand awareness a lot.  In 2001 we had

2    nearly no brand awareness.  But these days we are enjoying

3    brand awareness of more than 90 percent of brand awareness.

4    Q.    Who are LG's main retail customers?

5    A.    Sears, Home Depot, and Best Buy.

6    Q.    That was Sears, Home Depot, and Best Buy?

7    A.    Yes.

8    ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10   ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   Q.    How does LG's philosophy of innovation and style apply

23   to its products, its refrigeration products specifically?

24             Let me ask a different question.  How does LG's

25   philosophy of innovation and style compare to products other

1   than refrigerators?  Let me ask that first.

2   A.    Actually, as I explained, our philosophy about product

3   leadership and technological innovation and stylish design

4   is our brand recognition.  It applies not only for

5   refrigerator.  It applies for washing machines, dryers, and

6   dishwashers and ranges and all the cooking products as well.

7   Q.    How important is marketing to LG?

8   A.    Marketing is as important as product leadership.  Even

9   if you have a very nice product, if you don't have a very

10  nice marketing activity, you might not be able to sell

11  product very well.

12        By the same token, even if you have a very nice

13  marketing strategy, if you have a -- if you don't have a

14  competitive product, you might not be able to sell a product

15  very well.

16        So in order to be successful in the market, you

17  need both product leadership and nice marketing activity.

1    Q.    I just have a few more questions for you.

2              How are the features that LG offers in its

3    refrigeration products related to LG's growth in the market?

4    A.    We believe we grew because of technological

5    innovation.  And we do our best, whenever we bring new

6    product, to introduce our new product with a new innovation

7    and stylistic differentiation.

8              For example, titanium finishes and hidden

9    dispenser and electronic temperature control and multi-air

10   duct cooling system, and bright interior lights and hidden

11   dispensers and two- and three-freezer drawers.  Those kinds

12   of innovations.

13   Q.    What is the hidden dispenser?

14   A.    Hidden dispenser is a unique design for a dispenser.

15   When you don't use it, it's like the refrigerator looks like

16   it doesn't have any dispenser.  It's just a clean and fresh

17   look.

18              If you press a button, ice and water dispenser

19   pops out.  And then under the popped-out ice and water

20   dispenser, you can fill any size or any shape of a container

21   with ice and water.

22   Q.    What is the significance of being able to fill a

23   container of any size?

24   A.    Actually, consumer uses a dispenser more than you

25   realize.  They use not only for drinking water, they use it

1    for cooking, they fill not only just a glass, they fill

2    sports bottle and big pot for cooking.

3                So having that kind of technology is a big

4    convenience.

5    Q.    Why do consumers use the refrigerator for cooking?

6    A.    Because a consumer thinks refrigerator water, because

7    it has a water filtration system, they believe the water is

8    cleaner than tap water.  So it is used more than you

9    believe.

10               MR. DAVIS:  Thank you, Mr. Noh.  I have no

11   further questions for you.

12               THE COURT:  Counsel, cross-examine.

13               MR. PARTRIDGE:  Your Honor, I am going to

14   introduce new counsel to the jury and to the Court.  This is

15   Ms. Amanda Woodall, who will be doing the examination of

16   this witness.

17               THE COURT:  Ms. Woodall.

18                     CROSS-EXAMINATION

19   BY MS. WOODALL:

20   Q.    Good morning, Mr. Noh.

21   A.    Good morning.

22   Q.    We met last summer.  Do you recall that, possibly, at

23   your deposition?

24               Now, you mentioned a hidden dispenser that LG

25   was introducing; is that correct?

Noh - cross

1    A.    Yes, that is correct.

2    Q.    But isn't it true that LG has not ever sold a product

3    in the past with an extendable water arm such as is covered

4    by the '121 patent?

5    A.    '121 patent is -- I do not know exactly about '121

6    patent.  What is '121 patent?

7    Q.    You are aware that LG is asserting certain patent

8    claims from one of its patents in this suit against

9    Whirlpool?

10   A.    Yes.

11   Q.    Has LG ever sold an LG-branded product with an

12   extendable water spigot?

13   A.    (After consulting interpreter) If you are talking

14   about LG-branded product, it is not true.  But we sold

15   hidden dispenser for Kenmore brand, under Kenmore brand.

16   Q.    So the extendable water arm is a feature that you have

17   produced only for Kenmore; is that correct?

18   A.    That is correct.

19   Q.    Earlier you were talking about LG's mindset and plans

20   in about the 2001 time period for getting into the United

21   States markets.  Do you recall that?

22   A.    Yes.

23   Q.    And you said that you were looking to introduce your

24   products into the United States at a premium level.  Do you

25   recall that?

1    A.    Yes.

2    Q.    And that part of your approach to doing that was to

3    introduce a premium brand for product leadership,

4    innovation, and stylistic leadership?

5    A.    Yes.

6    Q.    And that would include the introduction of advanced

7    technology, wouldn't it?

8    A.    (After consulting with interpreter) Yes.

9    Q.    If we could turn to PTX-108, which your counsel used

10   with you earlier.  Do you recall this document?

11   A.    Yes.

12   Q.    And you testified that there would have been some

13   preliminary work done, some research and investigation work,

14   starting about six months prior to the date on this document

15   of December 20th, 2001.  Correct?

16   A.    Yes.

17   Q.    But you have not come to court today with any

18   documents showing those plans or research or anything that

19   took place prior to December 20th.  Correct?

20   A.    I didn't bring any document.

21   Q.    Do you recall discussing the introduction of

22   French-door, bottom-mount in the United States market?

23   A.    Yes.

24   Q.    You indicated your market share for French-door

25   bottom-mount in certain years.  Do you recall that?

1   A.     (After consulting interpreter) The market share I

2   talked about previously was not for bottom-freezer

3   refrigerator but for bottom freezer with a French-door

4   refrigerator.

5   Q.     So what we sometimes call a French-door bottom-mount?

6   A.     Yes.

7   Q.     What was LG's market share in the United States for

8   French-door bottom-mounts in 2005?

9   A.     You mean our market share in 2005?

10  Q.     In the United States, for that platform, yes.

11  A.     Total refrigeration?

12  Q.     No.  Just for French-door bottom-mounts.

13  A.     I don't remember our market share for bottom French

14  door.

15  Q.     When did you first introduce a French-door

16  bottom-mount in the U.S.?

17  A.     From 2004.  And we increased the market share from

18  that time very much, and we reached No. 1 market share in

19  2008.

20  Q.     I am going to show you a document.  It's PTX-158.

21  Have you seen this document before?

22  A.     Yes.

23  Q.     I am going to pull up the page that is 236594, please.

24  Are you familiar with the graph shown on this page?

25  A.     Yes.  It's showing total market demand in the market.

1    Q.    Is that market demand or is that the number of sales

2    that LG has had during that time period?

3    A.    I believe, looking at the number, it just shows the

4    market, the total market demand.

5    Q.    Is it your understanding that this document was

6    material presented to Home Depot by LG regarding its

7    capabilities in the refrigeration area?

8    A.    That is right.

9    Q.    And so on this page that we are looking at, this was

10   LG telling Home Depot about its incredible growth in the

11   French door category; isn't that correct?

12   A.    This is showing incredible growth over French door

13   demand in the market, not LG's growth.  This chart is

14   explaining.  French door is increasing in the market very

15   fast.  So, you say to a person, you have to understand,

16   consumers are looking for French doors more and more and

17   more.  That is the point of this chart.

18   Q.    And we see that there was market growth between 2005

19   and 2006 in LG's French-door bottom-mount sales?

20   A.    As I explained, this is the total market growth.  LG

21   also increased the market share very much during that time

22   frame.

23   Q.    Could you now turn to page 236606, if that is in the

24   exhibit, please?

25         You see here that LG is talking about its

1    improved convenience for its tall ice and water dispenser in

2    this presentation to Home Depot?

3    A.    Yes.

4    Q.    You understand that LG does not have a patent that

5    covers a tall ice and water dispenser?

6    A.    I am not very good at patent.  I am just in marketing.

7    So I am not an expert for patent.

8    Q.    And this is showing that LG only uses, in connection

9    with its LG-branded refrigerators, the slide-out tray, but

10   again, does not use the extendable water spigot.  Correct?

11   A.    This dispenser features extendable tray, but it

12   doesn't have an extending water faucet.

13            MS. WOODALL:  That is all my questions.  Thank

14   you.

15            THE COURT:  Mr. Davis, your redirect.

16            MR. DAVIS:  No further questions.

17            THE COURT:  Thank you, Mr. Noh.

18            (Witness excused.)

19            MR. COYNE:  Your Honor, we are going a little

20   faster than I expected.

21            Thank you, Your Honor.  I apologize for the

22   delay.  Your Honor, LG calls John Herrington to the stand at

23   this point.

24            ... John Herrington, having been duly sworn as a

25   witness, was examined and testified as follows ...

1        MR. COYNE:  Your Honor, may I hand up the pages

2    for the witness book?

3        THE COURT:  Please do.

4                    DIRECT EXAMINATION

5    BY MR. COYNE:

6    Q.   Good morning, Mr. Herrington.

7    A.   Good morning.

8    Q.   Where are you employed?

9    A.   LG Electronics.

10   Q.   The jury has heard a little bit about your story.  How

11   are you feeling about testifying today, sir?

12   A.   I am nervous, and I am embarrassed about my behavior

13   as it relates to this case.

14   Q.   Why?

15   A.   Because I have created some uncertainty for my

16   company, and I have created some uncertainty for my family.

17   Q.   Sir, where were you employed before you joined LG?

18   A.   Amana Appliances.

19   Q.   What were you doing there?

20   A.   I was vice president of marketing and sales.

21   Q.   For how long?

22   A.   I was with Amana from '92 until 2001.

23   Q.   And who owned Amana when you first started working for

24   them?

25   A.   Raytheon Company.

Herrington - direct

1    Q.    Was there a change of ownership of Amana?

2    A.    Yes.

3    Q.    What was that?

4    A.    At some point, Goodman Manufacturing, which is a

5    Houston-based company, acquired Amana Appliances.

6    Q.    When did that occur?

7    A.    I don't know the exact date.  Late '90s.  '97.

8    '96-'97.

9    Q.    What was your relationship with Goodman while you were

10   at Amana?

11   A.    They were the owners of the company.

12   Q.    And did you have any agreements, an employment

13   agreement at that time?

14   A.    I did.

15   Q.    What was that?

16   A.    I had a bonus program with Goodman and I had a

17   retention program with Goodman.  A retention program, at

18   some point Goodman announced they were going to sell the

19   company and they offered certain employees a retention

20   program to stay with the company through the sale.

21   Q.    Was there a subsequent sale of Amana?

22   A.    Yes.

23   Q.    To whom?

24   A.    Maytag.

25   Q.    When did that happen?

Herrington - direct

1    A.    It happened in 2001.

2    Q.    What happened to your position when Maytag acquired

3    Amana?

4    A.    My position was eliminated.  I was offered a job to go

5    to work for Maytag.  And I elected not to pursue that

6    opportunity and to go do other things.

7    Q.    Why didn't you take the Maytag offer?

8    A.    The job that Maytag offered me was to be vice

9    president of the refrigeration category, so it was a

10   technically oriented job, and I was more interested in

11   selling and working with customers.

12   Q.    When did you finish up at Amana?

13   A.    I finished up in -- I believe in the July time frame.

14   Q.    What did you do after you finished up at Amana?

15   A.    I started looking for jobs.

16   Q.    What did you find?

17   A.    I found it took longer than I realized.  I had a

18   number of interviews and a number of opportunities and a

19   number of second interviews.  And ultimately had interviewed

20   with LG Electronics in New Jersey, and accepted a job with

21   LG.

22   Q.    Well, had you had any prior contact with LG before you

23   were looking for a job with them?

24   A.    I had an opportunity to go to South Korea to visit LG

25   in 2001, I believe it was 2001, and visit the factories and

1  visit the facilities.  So I have had prior contact.

2  Q.    That was while you were at Amana?

3  A.    Yes.

4  Q.    Why were you going to LG while you were at Amana?

5  A.    Amana purchased certain microwave ovens and other

6  products from LG.

7  Q.    Did you have any other offers that you got -- let me

8  ask you first:  What did you think of LG when you visited

9  them in 2001?

10  A.    I was amazed.  I had never seen a company that had

11  cleaner factories, had more technology and a more motivated

12  workforce than I had ever seen in the appliance business.

13  Q.    When you finished up at Amana and you were looking for

14  a job, how long were you out of work?

15  A.    I was out of work for four months.

16  Q.    Did you get any other offers or any other prospects?

17  A.    I was in the process of interviewing with Goodman,

18  which was my prior employer.  And they had indicated to me

19  that they were going to give me an offer.  But they had not

20  come forward with an offer and I had made a commitment to LG

21  to get back to them by a certain date, accepting their

22  offer.  And I did that.

23  Q.    Did you talk to Goodman about accepting the LG offer?

24  A.    I did.

25  Q.    What was the discussion with Goodman about the LG

1    offer?

2    A.    I indicated to Goodman that I was in the process, I

3    had an offer on the table.   I was going to go to work -- I

4    needed to accept that offer or decline that offer.   And if

5    they were going to come with an offer, they needed to do so

6    quickly because I had to make a decision.

7    Q.    Why did you go with LG in particular at that point?

8    Why not just keep looking for something else?

9    A.    I was excited about going to work for a company with

10   the capability of LG.

11   Q.    What capabilities in particular interested you?

12   A.    Just, as I said, the enthusiasm and the commitment to

13   the appliance industry, and the opportunity to go out and

14   build new customer relationships and build the business

15   together.

16   Q.    When did you start at LG?

17   A.    I started December 26th, 2001.

18   Q.    What was your role when you started then?

19   A.    I was vice president of sales.

20   Q.    Did you have any technical responsibilities?

21   A.    No.

22   Q.    Did anyone at LG ever ask you for any confidential

23   information that you had while you were at Amana?

24   A.    No.

25   Q.    Did you ever volunteer or share any confidential

Herrington - direct

1    information while you were at Amana?

2    A.    Absolutely not.

3    Q.    Sir, I know this is going to be sensitive issues, so I

4    apologize in advance.  But your deposition was taken in

5    August of last year, right?

6    A.    Yes.

7    Q.    You testified at that time that you took only personal

8    papers when you left Amana; is that right?

9    A.    Yes.

10   Q.    What happened after the deposition?

11   A.    As you indicated, a question was asked of me at the

12   deposition if I had taken any documents from Amana, and I

13   indicated personal documents.

14              I drove home, and over the course of the next

15   day began thinking a lot about my time at Amana.  It was

16   eight years prior to the August deposition.  And I began

17   thinking about all of the questions and about whether I

18   answered them as accurately as possible, and I had a nagging

19   feeling that I may have a document from Amana somewhere in

20   my house.  And I decided to go and look for that document.

21              In our home we have what used to be -- I was

22   single when I moved into our house.  There was sort of a

23   makeshift home office in one of our rooms upstairs.  I got

24   married four years ago.  It's now a guest room.  And I

25   knew --

1     THE COURT:  Do you have an objection?

2     MR. PARTRIDGE:  Objection, 611.  If we could

3 have some Q&A, Your Honor.

4     THE COURT:  Mr. Coyne.

5 BY MR. COYNE:

6 Q. Tell me about the home office and what did you want to

7 tell me?

8     THE COURT:  What did you want him to tell you?

9 BY MR. COYNE:

10 Q. What did you find?

11 A. I looked and I found a document in the top of the

12 shelf in the closet where I had a lot of things that was

13 titled, "1997-1998 Bottom Freezer Study From Amana."

14 Q. What was your reaction when you found it?

15 A. I couldn't believe when I found the document.  I

16 panicked.  It was a three-ring binder.  I took the document

17 into the kitchen, I emptied the contents, I ripped the pages

18 in half, I threw it in a Hefty bag.  And we -- in our

19 community we have a community garbage collection.  And I

20 threw it in the garbage.

21 Q. Did you recognize the document when you saw it?

22 A. I recognized it.  I didn't page through the document.

23 I recognized it as a report from a group -- market research

24 company called Monitor that had done work with Amana over

25 the course of a couple of years.

Herrington - direct

1    Q.    What kind of work had they done?

2    A.    Market research and market studies and things of that

3    nature.

4    Q.    Well, if it was just a market research study, why did

5    you panic when you saw it?

6              MR. PARTRIDGE:  Objection.  Leading.

7              THE COURT:  It is leading.  Could you rephrase?

8              MR. COYNE:  Yes, Your Honor.  What he said a

9    moment ago, he panicked when he saw it, I am just asking why

10   he panicked.

11             THE COURT:  Fair enough.

12             THE WITNESS:  Because the day before I testified

13   in the deposition that I had no documents from Amana.

14   BY MR. COYNE:

15   Q.    Why would that cause you to panic?

16   A.    Because it was inconsistent with my testimony of the

17   prior day.

18   Q.    Sir, what were you feeling like when you saw this

19   document, when you realized you had this on your shelf?

20   A.    My heart sank to the floor.  I felt terrible.  My

21   first reaction was just to get rid of the document.

22   Q.    Why?  Why not just call somebody, call counsel at LG?

23             MR. PARTRIDGE:  Objection, leading.

24             THE COURT:  No.  Overruled.

25             THE WITNESS:  I just reacted emotionally to the

1    situation because I had testified the day before that I had

2    no documents.

3    BY MR. COYNE:

4    Q.    Were you concerned about something else that was in

5    the document?

6    A.    No.

7    Q.    Well, sir, okay, you have destroyed the document.  Did

8    anybody else know that you had found it in the shelf?

9    A.    My wife and kids were gone the latter part of that

10   week and returned either Friday or Saturday.  And I spoke to

11   my wife about it over the course of the weekend.

12   Q.    Let's go back to the point where you saw it and

13   reacted and destroy it.  Did anybody else know you had found

14   it at the time you found it?

15   A.    No.

16   Q.    Did you tell anybody else you had found it at the time

17   you found it?

18   A.    No.

19   Q.    Was there any way anybody could have found out that

20   you had found it at that point.

21   A.    No, not that -- not that I can think of.

22   Q.    Did you make a deliberate decision to destroy it?

23   A.    I made an emotional decision to destroy it.  I found

24   that I was shocked, and I just reacted emotionally.  I am

25   embarrassed to say that that is what I did.

Herrington - direct

1    Q.    If nobody knew about it, then why did you come

2    forward?

3    A.    Because I didn't want to live with knowing that on one

4    day I said I had no documents and the next day I discovered

5    a document.  I didn't really want to go through my life

6    knowing that that is what I was doing.

7    Q.    Well, when did you come forward?  You said that you

8    destroyed this and you talked to your wife over the weekend.

9    Who did you talk to, and when did you come forward about it?

10   A.    On Monday morning I went to our general counsel at LG

11   and told him what I had done.

12   Q.    Okay.  And what did you do next?

13   A.    I followed the instructions of the lawyers.

14   Q.    Did you find any other documents?

15   A.    They asked me -- I didn't want to go back into the

16   room after I had discovered this document, back into the

17   office.  And I was advised to search high and low for any

18   and all other documents that there might be.  And that's

19   what I did.

20   Q.    What did you do with those?

21   A.    I turned those over to my company.

22   Q.    And was there a subsequent deposition after you

23   produced those other documents?

24   A.    Yes.

25   Q.    Have you found anything else?

1    A.    No.

2    Q.    Sir, how are you feeling about this situation now?

3    A.    I feel embarrassed, as I said.  And I feel very badly

4    about the situation now.

5              MR. COYNE:  No further questions of Mr.

6    Herrington at this time, Your Honor.

7              THE COURT:  Mr. Partridge.

8              MR. PARTRIDGE:  Thank you, Your Honor.

9                        CROSS-EXAMINATION

10   BY MR. PARTRIDGE:

11   Q.    Good afternoon, Mr. Herrington.  I had to check to see

12   if we were in the afternoon.  We are.  We have not met

13   previously.  It is nice to meet you.  I appreciate the

14   difficulty of the circumstances that arose, and I need to

15   ask you a few questions that relate to that.

16              First, I would like to begin with some of the

17   things that you have described in your initial testimony

18   with respect to Amana.  I think you said you had been at

19   Amana from around '92 to 2001.  Is that right?

20   A.    Yes.

21   Q.    And at the end of that period of time, you were the

22   vice president of sales for Amana?

23   A.    I was vice president of marketing and national

24   accounts.

25   Q.    Did that include refrigerators?

Herrington - direct

1    A.    Yes.

2    Q.    And during that eight or nine years you had been at

3    Amana, was your responsibility largely in the area of

4    marketing and sales of Amana products?

5    A.    It was largely in the sales function.  But parts of my

6    tenure were in marketing as well, yes.

7    Q.    And marketing and sales that you were doing during

8    that time period related to home appliances, including

9    refrigerators.  Is that fair?

10   A.    Yes.

11   Q.    Was that your first experiences in your professional

12   career in marketing and sales of products like

13   refrigerators?

14   A.    My time at Amana?

15   Q.    Yes.

16   A.    Yes.

17   Q.    And during that time at Amana, Amana was one of the

18   market leaders in that space; is that correct?

19   A.    In which space?

20   Q.    In the kitchen appliance space.

21   A.    Amana had a very strong position in bottom-freezer

22   refrigerators.  That was a strong category for Amana.

23   Q.    The bottom freezer was one of its main products in

24   terms of the refrigerators offered by Amana.  Is that what

25   you are saying?

1   A.      There were many products, but it was certainly one of

2   the larger categories, yes.

3   Q.      During that period of time, given the activities in

4   which you engaged, you were familiar with bottom-mount

5   refrigerator offerings of Amana; is that fair?

6   A.      Yes.

7   Q.      When you joined LG in December of 2001, is it fair to

8   say that at best LG had a very limited assortment of small

9   refrigerators that it was offering in the United States

10  marketplace?

11  A.      Yes.

12  Q.      It was a relatively clean slate that you were walking

13  into at that time, with respect to its efforts to get into

14  the U.S. refrigerator market.  Is that correct?

15  A.      Yes.

16  Q.      And if I understand correctly, I get this somewhat

17  from some of the things I heard yesterday in the opening,

18  that you over the next several years were quite successful

19  in building up the sales force and enabling LG to begin to

20  penetrate the U.S. market.  Is that fair?

21  A.      Yes.

22  Q.      Did you understand that when LG hired you in 2001 into

23  a position in which you became the vice president of sales,

24  that your knowledge and experience with respect to the

25  marketing and sales that you acquired while you were working

Herrington - cross

1    for Amana was important in your hiring at LG?

2    A.    I think my sales and track record and my sales

3    experience was important in my hiring at LG.

4    Q.    That would have included the eight or nine years while

5    you were at Amana learning the business of Amana, correct?

6    A.    Well, I think it was that and my experience since

7    1985.  So the additional seven years I had selling washers

8    and dryers with Speakman Company as well.

9    Q.    In the next few years after you joined LG, a number of

10   other people, Jacquelyn Graham, Tim Cavanaugh, Dave Hoffman,

11   all hired by LG, these were people that you knew from your

12   days at Amana; is that correct?

13   A.    Yes, there were a number of people that joined the

14   company.  Some had been with Amana.  Some had been with

15   Maytag.

16   Q.    But a group of people came from Maytag and Amana to LG

17   to help in the marketing and sales efforts of LG; is that

18   fair?

19   A.    Well, I wouldn't say it was a group.  We hired

20   individuals as we had needs in the marketplace, as the

21   business grew.  So there were some people that joined the

22   company over the course of time that had backgrounds with

23   Maytag, I mean.

24   Q.    So you have known for some time -- obviously, you knew

25   when you left Amana that it was going to become part of

1   Maytag and then you learned thereafter that Maytag became

2   part of Whirlpool, correct?

3   A.    Yes.

4   Q.    So when your deposition was taken on August 19th,

5   2009, you knew as of that time that the company that was

6   taking your deposition, Whirlpool, through the lawyers at my

7   firm, was representing a company that now included Amana,

8   Maytag, as well as Whirlpool.  Correct?

9   A.    Yes.

10  Q.    With respect to the products that Amana was selling

11  prior to your departure, those bottom-mount refrigerators

12  that you described, you were aware that those bottom-mount

13  refrigerators included a number of different features, one

14  of which was something that's called a pop-up drawer, pop-up

15  lid for a refrigerator drawer.  You were familiar with that

16  while you were at Amana; is that correct?

17  A.    I was familiar with -- I am not sure which drawer you

18  are describing.

19  Q.    A drawer that when you pull it out, there is a lid on

20  it and the lid rises as you pull the drawer out?

21  A.    Yes.

22  Q.    Amana had that kind of product in the '90s while you

23  were there?

24  A.    I don't know exactly the year.  But I am familiar with

25  that feature and that it was available in the '90s.

Herrington - cross

1    Q.    I apologize, I just interrupted you.  I will try not

2    to do that.

3              That particular feature was in Amana's

4    bottom-mount refrigerators, correct?

5    A.    Yes.

6    Q.    At your deposition on August 19th, you were asked a

7    number of questions about the Amana bottom-mount

8    refrigerator with that pop-up drawer.  Do you remember that?

9    A.    I remember it, yes.

10   Q.    So when you left that deposition that day, you knew

11   that there was something that Whirlpool was going after that

12   related to Amana's bottom-mount refrigerator.  Correct?

13   A.    I don't know if I left thinking that there was

14   something Whirlpool was going after.  I don't know if I

15   could say that that is accurate.

16   Q.    But you were asked questions about that bottom-mount

17   refrigerator and questions about this pop-up drawer in that

18   refrigerator, correct?

19   A.    Yes.

20   Q.    Did you know at the time of the deposition -- strike

21   that.  Let me start over again.

22              You are aware of the fact that in this

23   litigation at various times there have been different

24   allegations that have been made by the parties, meaning that

25   today we have three patents in this case, but at one time

1    there were more than three patents in this case?  Are you

2    aware of that?

3    A.    Yes.

4    Q.    And at the time of your deposition, there was a patent

5    in this case of LG's that related to a pop-up lid for a

6    drawer in a refrigerator.  Correct?

7    A.    I don't know specifically what the patents -- you

8    know, what the content of the patents were.

9    Q.    Well, I will represent to you that there was such a

10   patent in the case, and that you have made clear, I think,

11   to me that at the time of the deposition there were

12   questions directed to Amana's product that had this pop-up

13   lid that popped up on a drawer.  Correct?

14   A.    I remember being asked questions about the pop-up

15   drawer, yes.

16   Q.    So when you went home and entered the -- was it a

17   bedroom did you say?

18   A.    Guest room.  Yes.

19   Q.    When you entered the guest room and you looked in the

20   closet, the notebook that you found referenced a

21   bottom-mount refrigerator; is that correct?

22   A.    The notebook I found, the cover said, "1997-1998

23   Bottom Freezer."

24   Q.    The very subject that you were asked about in your

25   deposition that month, correct?

1   A.    I don't --

2   Q.    The subject of bottom-mount refrigerator at Amana you

3   were asked about at your deposition?

4   A.    Yes, I was asked about bottom-mount refrigerators at

5   Amana.   But I was asked many things over the course of six

6   hours.

7   Q.    I am only focusing on this one thing.   I understand

8   that you did not look at the contents of the notebook.   You

9   saw what the subject matter of the notebook was, but you did

10  not at the time examine the contents; is that correct?

11  A.    That's correct.

12  Q.    So we don't know to this day how many documents were

13  in there, and we don't know the content of the documents,

14  and we don't know whether it was merely a market study or

15  something else.   We just don't know what was in that

16  notebook; is that correct?

17  A.    Well, what I can tell you is that I am -- over the

18  course of two years was very familiar with the work by

19  Monitor, and so the types of things that those studies

20  involved were consumer research and market size and market

21  characteristics and trends and so on.

22  Q.    I don't want to take the time to show you your

23  deposition transcript.   Suffice it to say, you did not look

24  at the contents of the document before you destroyed it.

25  You got the -- excuse me, the notebook.   You got the

Herrington - cross

1    notebook out, you took it to your kitchen, you tore up the

2    pages, you threw them away, you put them in a garbage bag,

3    and threw it out.  Correct?

4    A.    Correct.

5    Q.    At the time all of this happened, did you understand

6    that you were under an obligation to produce documents that

7    were requested in this litigation by Whirlpool?  In other

8    words, had requests been made of LG to make to you to

9    produce certain documents.  You understood that?

10   A.    I don't recall being asked to do that.

11   Q.    That you were not asked by the lawyers to do that?

12   A.    I am certain I was, but I don't recall specifically

13   being asked to search for documents relative to this case.

14   Q.    And prior to your deposition, just prior to your

15   deposition, as best you recall, you did not undertake any

16   further search for documents that were specifically

17   requested from you by Whirlpool.  Is that correct?

18   A.    That's correct.

19   Q.    At the time -- strike that.

20         I think that's fine, Your Honor.  I will stop

21   right there.  I think that's sufficient.

22         THE COURT:  Mr. Coyne, do you have any

23   additional questions?

24         MR. COYNE:  Just a couple questions, Your Honor.

25                    REDIRECT EXAMINATION

1   BY MR. COYNE:

2   Q.   This Monitor report, sir, is this time-sensitive

3   information or is it just the kind of stuff that is

4   reference material?

5            MR. PARTRIDGE:  Objection, leading.

6            THE COURT:  It is leading.

7   BY MR. COYNE:

8   Q.   Are market research studies reference material of some

9   type?

10  A.   The study, as I said, was 1997 or 1998.  So that data

11  is about as good as when it was done.  In other words, it

12  becomes less valuable through time because consumers change

13  and the market changes.

14  Q.   Just one last question, sir.

15           Mr. Partridge was asking you about your time at

16  Amana.  When you were at Amana doing this work, were you

17  moving around a lot or were you in one place?

18  A.   I moved -- I have moved eight times.  In my career, I

19  think I have moved four times with Amana.  I would have to

20  check.  But quite a few times.

21  Q.   Can you explain to the jury how the document got in

22  your closet?

23  A.   There is only two possibilities that I know of.  One,

24  I was reviewing the document and had it at my home in Iowa.

25  The other was when I left, it may have been packed up with

1    other things and ended up in a box.

2              When I moved to New Jersey, I was in temporary

3    housing for a year, and all of my things in Iowa went into

4    storage.

5              So at some point I unpacked all of my things and

6    put them into this sort of catchall closet in this room.

7    And I am certain that that is how it got to my closet.

8    Q.   Why did you keep it?

9    A.   I don't -- you know, I don't know why I kept it.  I

10   think -- my best guess is I was just unloading files and

11   books and things and putting them in the closet.  And I

12   wanted to get the packing and unpacking over with.

13             MR. COYNE:  No further questions, Your Honor.

14             MR. PARTRIDGE:  Your Honor, if I may.  That

15   first question prompted something that went beyond what was

16   elicited in the previous examination.

17             THE COURT:  I normally don't permit recross, but

18   just in that limited area.

19             MR. PARTRIDGE:  I appreciate that, Your Honor.

20                        RECROSS-EXAMINATION

21   BY MR. PARTRIDGE:

22   Q.   Your deposition was in 2009.  These documents were

23   from 1997 or 1998, some 12 years later, after Amana had gone

24   from Amana to Goodman to Maytag to Whirlpool.  Did it occur

25   to you that the existence of marketing data with respect to

1    Amana's bottom-mount freezer might be relevant to

2    Whirlpool's ability to prove that that Amana product had

3    been on sale long before any of the patents or any of the

4    issues that had been raised by LG in this case?

5    A.    I am sorry, can you restate the question?

6    Q.    Would you agree with me that for a company to find

7    documents like Amana's documents 12 years after the fact,

8    when that company has gone through three different

9    acquisitions, to Goodman, to Maytag, to Whirlpool, might be

10   a little difficult?  Did it occur to you that you may

11   actually have had the only documents from that time period

12   that related to the marketing of that product?  Did it occur

13   to you at that time?

14   A.    No, that didn't occur to me.

15             MR. PARTRIDGE:  Thank you.

16             THE COURT:  Thank you, Mr. Herrington.  You are

17   excused.

18             (Witness excused.)

19             THE COURT:  We will take our lunch break.  We

20   will resume at 2:00.

21             (Jury leaves courtroom at 12:55 p.m.)

22             (Luncheon recess taken.)

23             THE COURT:  Ms. Walker, please bring in the

24   jury.

25             Mr. Coyne, I take it we are doing okay on time?

1    MR. COYNE:  Yes, Your Honor.  I think we are.

2    We are at least trying.

3             (Jury enters courtroom at 2:07 p.m.)

4             THE COURT:  All right, ladies and gentlemen.

5    Please take your seats.  We will continue.

6             Mr. Sharma.

7             MR. SHARMA:  Good afternoon.  For LG's next

8    witness we would like to call Dr. Mohan Rao.

9             ... Mohan P. Rao, Ph.D., having been duly sworn

10   as a witness, was examined and testified as follows ...

11                  DIRECT EXAMINATION

12   BY MR. SHARMA:

13   Q.    Good afternoon, Doctor.

14   A.    Good afternoon.

15   Q.    What do you do?

16   A.    I am an economist.  I am a managing director at a firm

17   called LECG, which is a global economics consulting firm.  I

18   am also on the faculty at Northwestern University in

19   Chicago.  I teach financial economics and corporate finance.

20   Q.    Could you please describe your educational background

21   after high school?

22   A.    I have an engineering degree from the University of

23   Michigan.  I have a Ph.D. from the University of Colorado.

24   I was in a dual Ph.D. program in economics and international

25   relations.  I have a doctoral fellowship from Harvard

Rao - direct

1   University.

2   Q.    Before joining LECG, could you provide for us a short

3   description of your professional career?

4   A.    I was a teaching fellow at Harvard University and

5   after that I was a teacher at UCLA for a number of years,

6   and, as I said, I now teach at Northwestern University and a

7   member of LECG.

8   Q.    Are you a member of any professional associations?

9   A.    Yes, I am a member of a number of them.  The key ones

10  are I'm a member of the American Economic Organization,

11  which is the leading organization for academic economics

12  worldwide.

13          I am a member of IEEE, which is the largest

14  professional engineering professional organization.  I also

15  am a member of the Licensing Executive Society, which is the

16  main professional organization for intellectual property,

17  licensing and valuation.

18  Q.    What is your involvement with the Licensing Executive

19  Society?

20  A.    I have a longstanding relationship with the Licensing

21  Executive Society.  I served as chair of the Valuation and

22  Taxation Committee for LES, which is one of their most

23  important committees.

24          I have taught intellectual property valuation to

25  executives for a number of years.  In fact, I double up

Rao - direct

1      their most advanced intellectual property valuation course,

2      which largely focuses on patent valuation and discusses

3      issues such as the ones that are at stake in this

4      litigation.

5      Q.      Any other experiences with technology licensing?

6      A.      Yes.  I have advised companies and assisted them in

7      licensing transactions and with valuation.  In addition, I

8      am a partner at a biotechnology company where we specialize

9      in pharmaceutical products for hemophilia, which is a deadly

10     bleeding disorder.

11             So as part of that, I negotiate typical ventures

12     that we have with other companies, including licensing

13     deals.  So that's where I am doing it, obviously, where my

14     own money is at stake as well.

15     Q.      Dr. Rao, how many times have you estimated patent

16     infringement damages in the past five years?

17     A.      On numerous occasions, probably several dozen times,

18     including a number for -- cases that involve this particular

19     Court.

20     Q.      How many times have you testified at trial?

21     A.      Probably about 15 times, including two occasions in

22     the courtroom next-door with Judge Farnan.

23             MR. SHARMA:  Your Honor, we would like to offer

24     Dr. Rao as an expert in the economics of intellectual

25     property, licensing, and valuation.

1           MS. WOODALL:  No objection.

2           THE COURT:  The Court accepts the Doctor in

3    those areas as an expert.

4    BY MR. SHARMA:

5    Q.     Dr. Rao, what were you asked to do in this matter?

6    A.     In this case I was contacted by counsel for LG, Mr.

7    Coyne, and I was asked to provide an economic analysis of

8    the various patents at issue in this litigation.

9    Q.     What patents did you do this for?

10   A.     I did it for a number of patents, but the three that

11   are remaining are LG's '121 patent and Whirlpool's '130 and

12   the '601 patents.

13   Q.     Dr. Rao, today let's talk about the '121 patent.

14   Later in the week we will have an opportunity to talk about

15   the other patents.

16           Can you generally describe what the '121 patent

17   is about?

18   A.     It's my understanding that the '121 patent is related

19   to an ice and water dispenser on refrigerators and it

20   particularly has an extendable tray and an extendable spigot

21   and a mechanical drive.

22   Q.     Who owns the '121 patent?

23   A.     It's my understanding that LG does.

24   Q.     Did you carry out any analysis with respect to the

25   '121 patent?

1   A.   Yes, I did.

2   Q.   And what conclusions did you reach with respect to the

3   '121 patent?

4   ██   ████████████████████████████████████████████████████████

5   ███████████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████████

7   ████████████████████████████████████████

8   Q.   Dr. Rao, how did you get to that number?

9   A.   That number is based on what is known as reasonable

10  royalty damages.  And that usually contains two components.

11  The first is determining a royalty rate, and then the second

12  is applying that royalty rate to some number of infringed

13  units that are accused in this litigation.   ████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████

16  Q.   How do you determine a reasonable royalty rate?

17  A.   Well, in general, a reasonable royalty rate is

18  determined through negotiation.  And basically, it's sort of

19  like the price for a product.  Price for rent, for instance,

20  to rent an apartment or to lease a car, something like that.

21  It's basically just a price that we pay.  It's in the

22  context of a negotiation.  And there are some economic

23  principles that guide the negotiation.

24          For instance, if I am a T-shirt maker and I can

25  charge ten bucks for a plain T-shirt and if I put a logo,

Rao - direct

1    like Mickey Mouse or Winnie the Pooh or some sports team on

2    it and I can charge $20, let's say that additional price

3    means I can make some additional profit, let's say $5, then

4    what that means is I am willing to pay some portion of those

5    $5 to license that technology.

6                So where exactly we end up depends on the

7    benefit we received and then the negotiation process we have

8    with the licensor.

9    Q.    Now, Dr. Rao, based on your experiences, how do

10   businesses negotiate a patent license?

11   A.    It's actually a very, very similar process.  The key

12   thing to keep in mind always is businesses are in the

13   business for making profit.  And so when they license a

14   technology, they are looking for the additional value, the

15   incremental value that they get from that technology.  That

16   value typically is additional profit.

17               So once you figure out what the additional

18   profit is from licensing a technology, then we can figure

19   out how to split that profit, that additional profit, into a

20   royalty rate that would be shared.  So basically those

21   profits would be shared between the licensee and the

22   licensor.

23   Q.    How does this negotiation apply in a litigation?

24   A.    The idea is to essentially have the same process, the

25   same logic of how somebody would come to a royalty

Rao - direct

1    calculation in a litigation context.

2               There are a couple of differences.  The first

3    is, we know that in the real world the parties at issue in a

4    litigation did not actually sit across the table and

5    negotiate; otherwise, we wouldn't be here.

6               So the first thing is we have to put on a

7    hypothetical construct; that is, imagine what they would

8    have done had they actually sat across the table and

9    negotiated, which, of course, in the real world you don't

10   have to worry about it because two parties would mutually

11   come to the table to negotiate.  So that is the first thing

12   to keep in mind, it's a hypothetical construct.

13              The second is when you have direct competitors,

14   such as what we have here, LG and Whirlpool, sometimes there

15   may not be any economic rationale to negotiate with each

16   other, because if -- let's say I have an important

17   technology, and I license that to you, and because of that,

18   if a consumer purchases your product rather than mine, then

19   I lose all the profit than I would otherwise make on my

20   product.  But on the other hand, there may not be any

21   meaningful royalty rate you can provide me where you are

22   left with any profit on your own.

23              So there are some circumstances when you have

24   direct competitors.  You may not actually end up with a

25   royalty rate like the way we would have in the real world.

1    Because of that we introduce this concept of a reasonable

2    royalty.

3             So assume that you have, in a hypothetical

4    construct, two players sit across the table from each other,

5    they negotiate as willing licensor, willing licensee, in

6    good faith.  And what would they have negotiated that would

7    be reasonable.

8             That is sort of the basic difference.

9    Q.    And how did you determine the reasonable royalty rate

10   for the '121 patent?

11   A.    In order to get to that reasonable royalty rate, the

12   first step is the same as what we would try to do if we were

13   just negotiating outside in the real world, outside of a

14   courtroom.  That is to figure out what is the value of the

15   technology.

16            So in order to figure that out, I looked at a

17   number of things to determine that value.  In this case, the

18   technology we are looking at are the features that are

19   covered by the '121 patent.

20   Q.    How did you determine that value?

21   A.    There are at least three things I looked at, three

22   types of information.  The first information is to look at

23   market research studies.  And, to give an example, I looked

24   at a study by a company called Mintel, M-i-n-t-e-l.  It is a

25   global market research company that routinely covers trends

Rao - direct

1     in the refrigerator marketplace and does surveys of

2     consumers, potential consumers, and asks them questions

3     about features that they like, why they are purchasing

4     certain refrigerators, and things of that sort.

5             What I have noticed is ice and water dispensers

6     are usually at the very top, among the very top features

7     that consumers prefer.  That is the first thing.

8             The second thing I did was look at Whirlpool's

9     own documents, and there were a number of them that were

10    produced in this litigation.  And Whirlpool's documents,

11    too, show that consumers, in fact, have a strong preference

12    for ice and water dispensers in general, but more

13    specifically, for the patented features, which are the

14    rotating spigot and the extendable tray that you have heard

15    about yesterday and today.

16    Q.    Dr. Rao, if you could turn to tab 8 of your binder,

17    PTX-0693.  If we could bring that up on the screen as well?

18            Have you seen this document before, Dr. Rao?

19    Let me give you a moment to get there.  I apologize.

20    A.    Yes, I have.  This is an example of the kind of

21    Whirlpool studies that I have been talking about.  This was

22    a document that was done specifically on dispensers by a

23    research company called Smith Dahmer Associates for

24    Whirlpool.  So it is essentially a Whirlpool study.  And if

25    you would turn, for instance, to page 5 of this study, and

1    they are still in the executive summary of this, if you look

2    at the last two bullets, the second last one says, for

3    instance, "Respondents have a need for the extendable water

4    arm because currently they have difficulty filling larger

5    containers with filtered water."  This solves the problem.

6           So the core of the features of the '121 patent

7    is this extendable arm, because that provides an important

8    solution to a problem.

9           The second aspect they say is that the

10   extendable water tray and extendable water arm, when coupled

11   together, the majority of people across segments choose it

12   as their favorite feature.

13          So this is an example of demand for the patented

14   feature that I am trying to ascertain before I come to a

15   quantity as to what that demand is.

16   Q.    Now, Dr. Rao, were there any other Whirlpool documents

17   that provide similar information?

18   A.    Yes.  In fact, there are numerous other documents.

19   Some studies done by Smith Dahmer Associates.  Others that

20   are internal to Whirlpool that are based on their own

21   research, market research, focus group studies, things of

22   that sort, that essentially come to similar conclusions.

23   Q.    Dr. Rao, were there any other categories of

24   information that you considered?

25   A.    Yes.  So now, I am giving you a flavor for the demand

Rao - direct

1    for the patented feature.  The next thing I need to figure

2    out is, okay, what is it worth in this case particularly to

3    Whirlpool.  In fact, Whirlpool itself has prepared an

4    estimate of what this technology would be worth to itself.

5    Q.    Can you turn to tab 6, PTX-347?

6    A.    Yes.

7    Q.    Have you seen this document before?

8    A.    Yes.  In fact, this is an example of the document I

9    was just discussing.  It's a little hard to read here, so

10   maybe I believe just walk you through a couple of

11   highlights.

12            At some point around 2004, Whirlpool decided

13   that it was going to create a new platform, that is a new

14   model of refrigerators, that contained some key features.

15   Particularly the features are related to the ice and water

16   dispensers, and more specifically to the spigot, to the

17   extendable tray, and a couple of other features that are

18   called the fast-fill and measure fill.

19            And that particular set of features and the new

20   platform of refrigerators they called Project Niagara.  This

21   is an estimate of what that Project Niagara is worth to

22   them.

23            So what they do, for instance, if you look in

24   the bottom half, in the second column --

25   Q.    Dr. Rao, I apologize for interrupting.  Do you need a

1    laser pointer or anything?

2    A.    That would be very helpful, thank you.

3              MR. SHARMA:  Your Honor, may I approach the

4    witness?

5              THE COURT:  Yes.

6              THE WITNESS:  If you look in this column, there

7    is a number that is ███  If you could just highlight that

8    row, please, from there to there.  What that ███ refers to

9    is actually ██████ units, which is what they are expecting

10   to sell of these Project Niagara refrigerators.

11             They are expecting, because of these features,

12   that they would be able to sell, if you look at this ████

13   that is ██████ -- I am sorry, ██████████████ they are

14   saying that is the incremental volume, that is additional

15   volume that they are able to sell because of these features.

16   In other words, some people would buy the refrigerators

17   without these features anyway, but some would buy because of

18   these features.

19             And this is similar to forecasts that Whirlpool

20   does.  I have studied a number of different products of

21   Whirlpool over time in different contexts.  And this is very

22   typical not only of Whirlpool but of how corporations

23   typically generate forecasts of expected value before,

24   obviously, they go invest in developing a new technology or

25   a new product line.

Rao - direct

1          They are trying to figure out whether there is

2    enough of an adequate return for those.

3          This provides actually a quantifiable estimate

4    we can use as to the value.

5    Q.    How do Whirlpool's early estimates compare to reality?

6    A.    So this is a forecast, and chemists realize forecasts

7    are forecasts.  So we want to obviously go check to see if

8    this actually came to pass.

9          What I did was a statistical analysis, that I

10   have some exhibits here as well, to see, when they

11   introduced Project Niagara, which happened around mid-2005,

12   whether they did in fact get a bump that they were expecting

13   here.  What I find is that they did get that bump.

14         I conducted a statistical analysis, what is

15   known as a regression analysis, and I forgot to mention

16   earlier that that is something that I have taught at UCLA

17   for a number of years to Ph.D. students, and that is one of

18   my areas of specialization.

19         So I built a model here, built a regression

20   analysis, and, in fact, demonstrated that when they

21   introduced Project Niagara, they have two phases to it.  The

22   first phase got a bump, and the first phase is related to

23   the features that we are talking about.  They had a second

24   phase, a Niagara 2, which had some additional features, such

25   as LED displays and external controls and so on.  They got a

1    bump for those as well.  But, of course, that is not related

2    to these features.  So I verified that in fact this forecast

3    turned out to be true.

4    Q.    Dr. Rao, what did you do next in your analysis?

5    A.    Okay.  So the next thing is I want to obtain the

6    inputs that Whirlpool itself has estimated and calculated

7    that into an incremental value, incremental profit.

8              So I have a table that I have prepared for that

9    purpose.

10   Q.    Dr. Rao, could you turn to tab 1, PDX-14?  Is this the

11   table you are referring to?

12   A.    That is correct.  This table has a lot of numbers on

13   it.  I just want to jog you through the way this works.

14             Basically, on the very top, you see the ▮▮▮▮▮▮

15   units that they were forecasting for Niagara refrigerators,

16   and then they were forecasting this incremental sales of

17   ▮▮▮▮▮▮  which means that all sales, even without Niagara,

18   they would be able to sell would be the ▮▮▮▮▮▮

19             What I am trying to figure out is, what is

20   additional profit on this ▮▮▮▮▮ units.  What I do is,

21   here, this ▮▮▮▮▮▮▮ is what they would have made on this

22   ▮▮▮▮▮ units of sales.  And the profit margin is also from

23   the previous document we saw.  So this is the Whirlpool

24   profit margin that they estimated on those old units.

25             Then I look at what they would have made on

Rao - direct

1    these additional ▉▉▉▉▉ units, and that is this roughly ▉▉▉

2    ▉▉▉▉▉▉  That is just the estimate from this ▉▉▉▉▉

3    multiplied by the new profit margin they were expecting to

4    make.  I am sorry, I misspoke.  That is additional profit

5    margin on the new features.

6              So the difference between those two is this ▉▉▉

7    ▉▉▉▉▉▉  That is exactly what they were expecting to make

8    as profits, and this is just in the one year, this is the

9    first year.

10              Now I say, okay, that is ▉▉▉▉▉▉▉▉ in profit.

11    We are trying to calculate a royalty rate.  A royalty rate

12    is usually expressed as a proportion of sales.  What I do is

13    just take the ▉▉▉▉▉▉ divide it by the total sales that

14    they were expecting to make, which is the average price,

15    again, this just comes from -- all these inputs come from

16    the forecast document, the average price to them, not to

17    what we as a consumer paid, because the manufacturer makes

18    less, because there is a retailer, like Sears and Best Buy,

19    there is a markup, so this is what Whirlpool would get for

20    selling these refrigerators.

21              If you multiply the ▉▉▉▉▉ by that, we get ▉▉▉

22    ▉▉▉▉▉ again, this is in the first year.  If you then

23    divide this ▉▉▉▉▉▉ by that, that gives us a value, an

24    incremental value of ▉▉▉▉▉▉▉ percent.

25              So basically, because of Project Niagara, which,

Rao - direct

1    remember, has four features, four key features, they are

2    expecting to make an additional ▮▮▮▮▮▮▮▮ percent in

3    profit.  That is the value of those features.

4    Q.    Dr. Rao, what are the four features for Niagara?

5    A.    The four --

6    Q.    Dr. Rao, if I can take a step back.  What is Niagara?

7    A.    Niagara is that project of Whirlpool with these

8    additional features in an ice and water dispensers that they

9    were planning to launch.

10   Q.    What are the four features of Niagara that you are

11   referring to?

12   A.    The four are the rotating spigot, the extendable tray,

13   and then a feature called measured fill, which, instead of

14   having to hold the cup, let's say, or a pot under it until

15   you get the right measurement that you want, you may be able

16   to press a button and say I want, let's say, 20 ounces.  So

17   you get that measured amount.

18           And then the last one is something called

19   fast-fill, which is basically you get twice as fast as you

20   would normally get if you just had it as a typical filtered

21   dispensers.

22   Q.    Dr. Rao, you have this ▮▮▮ percent estimated value.

23   What did you do next?  What did you do with this ▮▮▮

24   percent?

25   A.    Now, the next step is we need to figure out what's the

1    value of just the two patented features, rotating spigot and

2    the extendable tray.  So we need to take out the other two

3    features from that calculation.

4           In order to do that, we need to think of the

5    importance of the relative features.  If we think of this as

6    a pie, what is relevant features that we care about.  That

7    is the next step I do in my analysis.

8    Q.    How do you account for the different features?

9    A.    We saw a document earlier, a Whirlpool document, prior

10   to the launch of Niagara, where we saw that the rotating

11   spigot was in many ways the problem solver.  That was the

12   feature that consumers, particularly combined with the tray,

13   preferred the most.

14          Now I look at documents after they launched this

15   project.  As I said, they launched it around mid-2005.  They

16   did some focus group studies right after that to see what

17   the consumer reception was to these four features to figure

18   out their relative value.

19   Q.    What did you learn from those documents?

20   A.    I have a document that we can use where what the

21   customer reaction seems to show is that it's a spigot that's

22   at the heart of the benefits.  Spigot is what seems to drive

23   sales of these refrigerators.

24          The others are complementary to it.  The

25   extendable tray and the spigot is something that are

Rao - direct

1    together.  Measure fill is something they like together in

2    the context of the spigot.  And the fast-fill as well is

3    something they like in the context of the spigot.  It's the

4    spigot that solves the problem of being able to fill larger

5    containers.  That is the reason they are doing these

6    features to begin with.

7                  So it's a need for the larger containers.  If

8    you do not have the extendable spigot, what would happen is

9    you would need such a deep cavity that it would eat into the

10   door and to the internal space.

11                 What the spigot solves by moving that out, the

12   hose out, it allows you not to have such a deep cavity, but

13   still be able to fill larger pots and whatever other

14   containers you would like to fill.  That is at the core of

15   the technology.

16   Q.    Dr. Rao, can you please turn to tab 9 of your binder?

17   I believe it's PTX-695.  Have you seen this document before?

18   A.    Yes, I did.  In fact, this is an example of the kind

19   of post-research I was referring to.

20                 So this document is a Whirlpool study, again by

21   Smith Dahmer Associates, for it, in November of 2005, after

22   Niagara launched.  And it's called "Fast-Fill Followup."

23                 If you turn, for instance, to page 4 of this

24   document, this is customer reaction.  So you see the

25   rotating faucet at the top.  And it says, "The rotating

Rao - direct

1    faucet was highly distinguishable on the sales floor.  Many

2    consumers named the feature as a main selling point for

3    Whirlpool Gold refrigerators."

4              And you have actually what I understand as

5    direct thoughts, which is we bought it because of the

6    rotating faucet.  If you look at the bottom, it says,

7    "Rotating faucet is fantastic."

8              It talks about how the faucet frequently rotated

9    for precise dispensing and for large containers.  That is

10   exactly the solution they were trying to provide.

11             This is an incidence of customer reaction such

12   that there was demand for this feature, and it appears to be

13   that this feature was a commercial success in that sense.

14   Q.    Are you aware of any other documents that concern that

15   same consideration?

16   A.    Yes.  There are a number of documents throughout the

17   record that are generally similar to these.  They have

18   different combinations of what they are comparing at

19   different points of time.  At the core of it, it appears to

20   be the spigot with others as complementary, particularly the

21   combination of spigot and a tray.  If you sort of look at

22   the entirety of the documents, it seems to be the main

23   feature set that seems to be of value to consumers.

24   Q.    Dr. Rao, what did you do with this information?

25   A.    What I am trying to do, recall, is I have these four

Rao - direct

1    features, I am trying to allocate what the value is of the

2    two patented features.  So what I have been discussing is

3    that the core is the spigot.  All the others are enhanced by

4    it.  I also looked at information later, because we have

5    information from 2008, 2009, and so on.

6            One of the things I noticed is that Whirlpool,

7    which had all these features, launched in 2009 a new French

8    door refrigerator with -- it looks like they pulled

9    fast-fill out of it.  They have the other three features.

10   They have the spigot and the tray and the measure fill.  But

11   they took fast-fill out of it.  At least they don't

12   advertise it.  They did prior to it.  I have looked at

13   Whirlpool and Kenmore manuals.  They don't seem to advertise

14   it.

15           That suggests to me that ultimately all these

16   companies are reacting to consumer preferences and demands,

17   and it, again, reinforces that it is the spigot that is at

18   the center of it.

19           To start out, I give a valuation of 75 percent

20   for the spigot and the tray, and 25 percent for the other

21   two features.  That is my allocation among these four key

22   features.

23   Q.    Dr. Rao, can you turn to tab 2, PDX-15?

24   A.    Okay.

25   Q.    What is this document?

Rao - direct

1   A.      This document is my calculation of unit sales and net

2   sales on which I calculate damages.  It's based on two

3   inputs.  If you go to the very bottom of this, and I will

4   come to the top in just a moment, it's based on one

5   document, which is an Excel spreadsheet.  That is the one

6   that begins with WP.  That contains sales information that

7   Whirlpool provided.

8           The second document where you see updated,

9   incorporating products list, PDF, February 25, 2010, that is

10  the latest version of what I understand are the accused

11  units in this litigation for the '121 patent.

12          So I take those two pieces of information.  I

13  try to merge them and summarize them, which is what

14  generates this list.

15          Now, the damages are being calculated only for

16  two years.  I have summarized it for the previous two years

17  as well, for 2006 and '7.  But the damages only for 2008 and

18  2009.  And it's something that is important to notice, that

19  the bulk of the damages are on the Kenmore model that

20  Whirlpool makes.  Not Whirlpool's own branded model only.

21  So those are referenced with a k-e-n.  Then you have the

22  actual model numbers are the ones in the third column.

23          And they usually have a few more digits to it,

24  that indicates the color and things like that.  But this is

25  basically a platform.

1          Then I have the number of accused units that are

2    in the fourth column.  And then finally the revenue that

3    they have in the last column.

4          If you look at 2008, for instance, the Whirlpool

5    model is about ███ units of the total █████████

6    ████████ accused units.  So between ██ percent of these are

7    essentially ██████ models.  If you look at the next year,

8    2009, we are now talking about ██████ units that are

9    Whirlpool's.  Again, we are talking about something like ██

10   percent are ███████ models.

11         One thing I would like to flag here, if you look

12   at in 2009, the ██████ model that has the number ███████

13   that is █████████ -- that is Whirlpool's ██████████

14   model.  If you look at it in 2009, that unit sold ████████

15   ██████████████████████████████ because it's ██████ out of

16   ██████.

17         So that by far is the most important unit.  That

18   unit is the stainless steel unit that you see that's sitting

19   in the courtroom, that Dr. Bessler discussed.

20         That unit does not have fast-fill.  Fast-fill is

21   not advertised.  In fact, I looked at all the Kenmore

22   manuals and I did not see fast-fill for any of these units

23   at all.  All we are talking about is the rotating tray and

24   spigot -- sorry, rotating spigot and the tray and then the

25   measure fill feature.  Those are what we see.

Rao - direct

1          Basically, this reinforces my allocation of

2     75-25 percent.  But moreover, we are calculating damages

3     only on those automatic spigots, not on the kind that you

4     see on the left, the white refrigerator.  That is a

5     Whirlpool brand, except for one Whirlpool brand that you

6     see, the GS6, which is automatic, the rest of them we are

7     not calculating any damages.

8     Q.    Dr. Rao, you have a 75 percent allocation, and we had

9     an �In percent value.  What do you do with those numbers?

10    A.    So now I take 75 percent of ▉ percent.  Remember,

11    ▉ percent was the value for all the feature set.  So I

12    take 75 percent of that; allocate that to these two

13    features.  Those two features being the rotating spigot and

14    the extendable tray.  That gives me ▉ percent.

15    Q.    Can we go to PDX-14?  I believe this is one of the

16    documents you were talking about before.  Is that shown on

17    this slide?

18    A.    Yes.  If you look at that ▉ percent, that is what we

19    calculated as the incremental profit before.  We multiply

20    that by .75, and that gives the ▉ percent.

21    Q.    Dr. Rao, what does ▉ percent mean?

22    A.    So ▉ percent is the incremental profit to Whirlpool.

23    Obviously, if it paid all of that, it would have nothing

24    left.  Why would it bother to license these features?  We

25    are now back into the hypothetical negotiation, a reasonable

Rao - direct

1    negotiation, good-faith negotiation, between a willing

2    licensor and a willing licensee.

3              Obviously, it would like to pay zero, but at

4    zero LG would not be willing to license.  Setting aside for

5    the fact, again, this is hypothetical, LG may not be willing

6    to license.  But assume for the moment they are a willing

7    licensee and a willing licensor.

8              So where would they come?  Where would they

9    meet?  There is an economics of how bargaining works, and

10   economic principles in an area called game theory.  There is

11   a famous economist called John Nash, who was cast in "A

12   Beautiful Mind."  Some of you may have seen it.  And won a

13   Nobel Prize in economics.  He developed a solution that says

14   the core intuition is if two parties are comfortable and the

15   choice is either they agree to something or get nothing,

16   they will meet in the middle.  Like a slice of cake, how do

17   we split it.  Either we agree to something, have no cake or

18   we split it.

19             So what I did is split it in the middle, and

20   that ▮▮ benefit would turn into a ▮▮ percent royalty rate

21   that Whirlpool would pay to LG.

22   Q.    The hypothetical negotiation that you were discussing,

23   what date did you use for this hypothetical negotiation?

24   A.    That's an important question here.  The patents

25   themselves issued in 2008.  We saw that they launched this

Rao - direct

1    project in 2005.  This poses a problem for chemists.  If you

2    are trying to simulate the real world of how they would have

3    negotiated, nobody negotiates just before patent

4    infringement, just before infringement of the patents, when

5    you already have a product in the market.  That's kind of

6    like trying to get medical insurance when you are in the

7    emergency room with a heart attack.  Nobody does that.

8              Companies normally negotiate well ahead of time

9    before they invest in the money, because otherwise what

10   happens?  Like we have in this case, Whirlpool has already

11   been in the marketplace, has sold tens of thousands of these

12   refrigerators, has made sales of tens of millions dollars.

13   They are making these sales.  The bulk of these sales are to

14   Sears.  They have long-term contracts.  Now the patents

15   issue and LG will have a holdup value.  LG can come and say,

16   look, you better pay us more than ▊ percent, which is what

17   we may have agreed otherwise, because we have a holdup

18   value.  You are going to lose all these sales to Sears, you

19   are going to have representational harm because you have

20   been advertising all these features, now you have to remove

21   all those features.

22             So the question is, where would you pick?  So to

23   avoid the holdup value, because it's a willing licensee,

24   willing licensor, I assumed that they would have based it

25   not on a holdup but basically the way they negotiated it.

Rao - direct

1          So I sort of drafted it as if it would have

2    happened around 2005.  But if you assume no holdup value and

3    you get to 2008 when the patent was issued, it would be the

4    same analysis.  It would be exactly the numbers I have here.

5          MR. PARTRIDGE:  Your Honor, may we have a short

6    sidebar?  I am concerned about the confidentiality issue.

7          THE COURT:  Yes.

8          (The following took place at sidebar:)

9          MR. PARTRIDGE:  I did not expect that we would

10   belabor the slide up there and describe it in such detail.

11   There are people in the courtroom, particularly on the LG

12   side, diligently taking notes.  I really didn't have to ask

13   you to close the courtroom.  It may be a lot of the cat is

14   out of the bag here, unfortunately.

15         THE COURT:  Could be.

16         MR. SHARMA:  Your Honor, I can take the slide

17   down now.

18         THE COURT:  We can take the slide down.

19         MR. PARTRIDGE:  When we had talked earlier

20   today, I thought we were not going to belabor some of the

21   numbers.  I do appreciate that you needed to put the slide

22   up and talk through it, but I don't know how much more of

23   this you are going to do.

24         We are conscious of the fact that notes are

25   being taken now by people --

```
 1              THE COURT:  I can direct that notes not be

 2    taken.  But what flows into someone's head --

 3              MR. PARTRIDGE:  I understand that.  Could we --

 4              THE COURT:  He says he is going to take the

 5    slide down.

 6              MR. PARTRIDGE:  Could we ask that the notes be

 7    collected or is it too much to do that?

 8              MR. COYNE:  Oh, I have a problem with that.  We

 9    have some legal people inhouse here.

10              MR. PARTRIDGE:  Not the legal people.  I have no

11    problem with the legal team.

12              MR. COYNE:  I would object to collecting the

13    notes.

14              MR. HERRMANN:  I haven't looked to see if there

15    is anybody from the press here.  But how are you going to

16    collect something from the press?

17              THE COURT:  Not easily.

18              MR. PARTRIDGE:  I think you are probably right.

19    That request is probably not one that you can --

20              THE COURT:  I think that is overreaching.  I

21    think there are limits.  It's called the Constitution.

22              But we should be mindful of these issues on both

23    sides because obviously these are competitors and these are

24    sensitive matters.

25              So I am willing to suggest that you speak with
```

Rao - direct

 1    the parties, representatives of parties, and ask that they

 2    refrain from note-taking.  You are competitors.  This should

 3    not be an opportunity to try to gain a competitive

 4    advantage.  Okay?

 5              MR. PARTRIDGE:  Would it be good, bad, or not --

 6    should we say anything about -- for you to say anything

 7    before that?

 8              THE COURT:  I wouldn't want to do it in front of

 9    the jury.

10              MR. PARTRIDGE:  I understand.

11              THE COURT:  What is your feeling?

12              MR. COYNE:  Your Honor, we have a very tight

13    group here.  I can talk to them all this afternoon as soon

14    as we finish in court or at the break.

15              THE COURT:  I also don't want to impugn

16    anybody's integrity.  I don't want to do that.  And we do

17    have some cultural differences here that may -- or

18    sensibilities, more or less, that may -- quite frankly, I

19    may not fully understand.  So I am a little reluctant to do

20    that.

21              MR. PARTRIDGE:  I would be satisfied if Mr.

22    Coyne was willing for those not on his legal team who are

23    present in the courtroom, if he would ask them to give you

24    their notes that they have taken on just the economic

25    aspects of this.  You don't have to show --

Rao - direct

1           MR. COYNE:  I am happy to do that, Your Honor.

2           THE COURT:  I don't think that is an

3    unreasonable request.

4           MR. COYNE:  I am happy to do that.  If we are

5    going to have a rule that none of the non-lawyer.

6    attendees --

7           THE COURT:  It goes both ways.  I think that is

8    a fair request.  You two can work that out.  If there is a

9    problem, there is a good way to find me.

10          (End of sidebar conference.)

11   BY MR. SHARMA:

12   Q.    Dr. Rao, did you consider any other factors in

13   arriving at your royalty rate?

14   A.    Yes, I did.  In the context of the litigation, the

15   Court has provided some guidance on what experts should look

16   at.  It's named after a famous case in intellectual property

17   called Georgia-Pacific.  So there are 15 Georgia-Pacific

18   factors that one should consider.  We have subsumed actually

19   many of them in my analysis, but I will sort of briefly

20   touch on a few.

21          Factors 1 and 2 of Georgia-Pacific basically say

22   what we are trying to figure out is what is a reasonable

23   value.  One easy way to figure that out is if there are

24   already licenses for this technology out there between, in

25   this case, LG and other refrigerator manufacturers, because

Rao - direct

1      then that is the market value for that technology.  We don't

2      even have to do this valuation.

3               So I looked for those, and there are none.

4               Factor 2 says look for similar technologies with

5      these parties.  Again, there are none that are relevant.

6      There are some -- four storage bins and things of that sort.

7      But none for water-ice dispensers.  Those are two factors.

8               Factor 8, for instance, says look at the

9      commercial success of this particular product, customs

10     demand for this patented feature and consumer reaction to

11     it.  And as I discussed, that's at the heart of what I did.

12              Factor 13, for instance, says apportion the

13     value of the profit generated from the technology to these

14     features, because obviously, Whirlpool sells refrigerators

15     for lots of reasons, brand and quality and service and a

16     whole bunch of things, relationships with customers,

17     suppliers.  We are trying to isolate the incremental value

18     of this technology.  That is what factor 13 does.  I looked

19     at that.

20              Factor 15 sort of brings these altogether and

21     says essentially what would a reasonable royalty be based on

22     the sort of willing licensee-willing licensor scenario.

23     That is basically the gist of all of the analysis to walk

24     through.

25              There are others.  Again, it takes way too long

Rao - direct

1    to go through them.  They are generally related to the

2    relationship between the licensee/licensor and the practice

3    of the licensee or the licensor to license these kinds of

4    technologies and so on.

5          But the essence of that is that I have taken

6    those factors into account in arriving at my reasonable

7    royalty rate of ▮▮ percent.

8    Q.    That reasonable royalty rate of ▮▮ percent, what next

9    did you do to arrive at a royalty damage?

10   A.    So we just need one last step, which is, as I

11   mentioned at the very beginning, now we have the royalty

12   rate, we need to apply it to some base of sales.  I showed

13   you that list, sales for '8 and '9.  And then the revenues.

14   So I just need to take those revenues, apply ▮▮ percent to

15   them, and that gives me the royalty damages.

16   Q.    Dr. Rao, if we could look very briefly at PDX-16.  Is

17   this something you prepared?

18   A.    That is correct.  So this is that last step.  So from

19   that earlier document we saw, here are the numbers for 2008

20   and 2009.  The patent issued, I believe, on January 8 of

21   2008, that's why it starts there.  So the first week is

22   missing.

23          And then I just assumed the same sales volume

24   and extended it for two months of this year for which we

25   didn't have actual data.  And so that's the ▮▮ units.

1    These are the revenues based on those units.   Then we

2    applied the ███ percent.   That basically gives a damages

3    estimate of █████████████

4    Q.     Dr. Rao, what does this translate to in terms of a

5    dollar value per refrigerator?

6    A.     That's a simple calculation.   So if you take this ████

7    ███████ divide it by this approximately ██████ or so units,

8    you would get to a per-unit value of about ████  So that's

9    just a simple division of this.   My royalty rate would be

10   approximately $34 per refrigerator, mostly the kind that we

11   are looking at here, which are these Kenmore Elite

12   refrigerators.

13            MR. SHARMA:   Thank you, Dr. Rao.   No additional

14   questions.

15            THE COURT:   Ms. Woodall, you may cross.

16            MS. WOODALL:   I think we may need to distribute

17   some notebooks first.

18            THE COURT:   You may proceed.

19                      CROSS-EXAMINATION

20   BY MS. WOODALL:

21   Q.     Good afternoon, Dr. Rao.

22   A.     Good afternoon.   Good to see you again, Ms. Woodall.

23   Q.     Good to see you as well.

24            Your opinion in this case is that an appropriate

25   reasonable royalty for Whirlpool's alleged infringement of

1    the '121 patent, the asserted claims of the '121 patent, is

2    ▇▇ percent of the refrigerator sales price.  Isn't that

3    correct?

4    A.    It is of the sales price to the manufacturer, not at

5    the retail level.

6    Q.    But it's on the sales price at that level of the

7    entire refrigerator, correct?

8    A.    That is correct.

9         MS. WOODALL:  Can we have PDX-16, please?

10   BY MS. WOODALL:

11   Q.    Now, PDX-16 is a summary of the damages calculation

12   that you have performed in this case; is that correct?

13   A.    That is correct.

14   Q.    And as you noted with LG's counsel, you have started

15   the damages period at January 8th, '08.  Is that correct?

16   A.    That is correct.

17   Q.    And January 8th, 2008, is the date the patent issued?

18   A.    That is my understanding.

19   Q.    And consequently, January 8th, 2008, is the first date

20   on which Whirlpool could have infringed LG's '121 patent,

21   correct?

22   A.    Now you are getting into legal issues.  But my

23   understanding is that's the way we would start a damages

24   calculation.

25   Q.    But you also understand, Dr. Rao, that LG cannot

1    recover patent damages in this lawsuit prior to having given

2    Whirlpool actual notice of its alleged infringement.   Isn't

3    that correct?

4    A.    You are getting into legal issues.   Those are the

5    kinds of things we usually take as an assumption, as

6    direction from counsel, and we calculate damages based on

7    that.

8    Q.    Well, you have done two reports in this case, correct?

9    A.    That is correct.

10   Q.    And in your first report, you calculated the damages

11   for the '121 patent starting with January 8th.   Do you

12   recall that?

13   A.    I think that would be consistent with here.

14   Q.    And then you served a second report, where you

15   calculated damages from April 24th, 2008, the date on which

16   LG gave Whirlpool actual notice of its alleged infringement.

17   Isn't that correct?

18   A.    Yes.   Again, I was just simply asked to calculate from

19   that date.   What I am saying is we usually don't get into

20   the legal issues.   We are told sort of roughly the

21   infringement period.   We calculate based on that.

22   Q.    I would represent to you that there have been certain

23   comments and documents that indicate that LG acknowledges

24   that that is the date for actual notice.

25         So using April 24th as the date for the damages

1    period to start, we will need to change some of the numbers

2    on PDX-16.  Isn't that correct?

3    A.      Again, now you are asking me to assume something.  If

4    that is the case, if the damages start not from January but

5    from April, basically you can take that column and instead

6    of applying 12 months, you would apply 7 months to it and

7    adjust it.

8    Q.      Let's do that.  If we go to the number of infringing

9    units, for the correct time period, we would have ████████

10   infringing units for the applicable time period in 2008.

11   Correct?

12   A.      I don't have a calculator, but if you are representing

13   that you did that correctly, I take it.

14   Q.      We did it in the exact same method you did, prorating

15   for the dates.

16   A.      That works for me.

17   Q.      Then using a different base number is, of course,

18   going to impact the infringing dollar sales as well.

19   Wouldn't you agree?

20   A.      Sure.

21   Q.      So if we do that calculation as well, we see that the

22   infringing sales, or allegedly infringing sales, were a

23   little bit under ███████████  for that time period,

24   ████████████  Do you see that?

25   A.      Okay.

Rao - cross

1   Q.     Okay.  And that's more than a ██████████ difference,

2   isn't it?

3   A.     Right.  Because now you are looking at a much shorter

4   period.

5   Q.     So if we calculate the royalty using your royalty rate

6   of ████ percent, which is, of course, different than

7   Whirlpool's proposed royalty rate, then that number changes

8   as well.  I think we might have an error on that slide.  It

9   would actually change from ██████████ to ████████  Would

10  you say that is probably right?

11  A.     I will take your representation.  I am not doing the

12  calculation.  But I follow what you are doing.

13  Q.     So your total royalty calculation for the damages

14  period in this case would not be about ████████████.  It

15  would be about ██████████  I think we have a math error

16  on our corrected slide here.

17  A.     Now you are making me doubt all your numbers.

18         (Laughter.)

19  Q.     I don't do all the PowerPoints.  If we were to make

20  those corrections, we would have approximately ████████████

21  In damages for this time period.

22  A.     Okay.  I am going to go check, again, with a

23  calculator.  But I assume you did the math correctly or

24  somebody did it for you and you assume that damages start

25  from April, then that sounds like what I would do.

Rao - cross

1    Q.      And that ███ percent again is on the sales price for

2    the refrigerator at the wholesale level, correct?

3    A.      That is correct, but with a caveat.  Remember,

4    Whirlpool was forecasting it would make additional sales.

5    And those additional sales means they would get additional

6    profits on a whole refrigerator.  Because remember, they

7    were making ███ additional units that they were

8    forecasting.  So the profits are a mix of existing units

9    plus additional units.

10            So it's more like ███ percent of the profits on

11   Niagara in a given year, rather than -- we calculated an

12   implied profitability, an implied royalty rate per unit.

13   But I want to make it more precise.

14   Q.      Thank you for that clarification, but the answer to my

15   question, which is you have applied the ███ percent to the

16   entire sales price of the refrigerators, would be yes?

17   A.      That is correct.  It is an implied rate.

18   Q.      If you applied that rate to the entire refrigerator,

19   even though the patent claims that are asserted in this case

20   only address the extendable water spigot and only when it's

21   spring-loaded and the extendable water tray?

22   A.      I think now you are actually confused.  This is how

23   every royalty calculation works.  Suppose I license five

24   patents.  And I look at the incremental value of each of

25   those patents, let's say five different players.  I

Rao - cross

1    calculate the incremental profits.  Some portion of it I am

2    willing to pay as a license fee or a royalty rate.

3                But by convention, the royalty rate is just

4    translated as a rate of sales.  So it's not that we are

5    claiming the whole sale.  It's just a different way to

6    represent it.

7                I could say it's let's say 5 percent of profit.

8    Usually companies don't like doing that in licensing

9    negotiations because they don't want to reveal what the

10   profits are, and profits can be fudged.  Typically, by

11   convention, royalty rate is just over sales.  So you take 5

12   percent of profits, say, okay, what is it as a percent of

13   sales.  That doesn't mean you are claiming over the

14   wholesale.  It is just a way to represent it.  I want to

15   make sure you are not confusing that issue.

16   Q.    I don't think so.  Again, you have applied the ███

17   percent royalty rate to the entire sales price for

18   refrigerators, correct?

19   A.    That is what I am saying.  That's how royalties are

20   calculated.

21   Q.    Could we go to PDX-14, please?

22                And this is one of the documents that LG's

23   counsel went through with you, if you will recall.  And you

24   had calculated a base contribution margin or pre-Niagara

25   units, as you call them.  Do you see that?  You had said

1    that the base unit contribution would have been ▆▆▆▆

2    A.    I didn't calculate that.  That's what Whirlpool

3    calculated.  That just comes from the Whirlpool forecast

4    sheet that we looked at.

5    Q.    Can you highlight the fourth line?

6          And then the post-Niagara unit contribution,

7    that margin actually went down a little bit.  It's under

8    ▆▆▆▆

9    A.    That's correct.  That's, once again, a Whirlpool

10   calculation.  There are three ways in which you can make

11   more profit.  Either through a higher price, more profit.

12   Lower cost, more profit.  If you reduce the cost, profits

13   can go up.  Or you sell more units and you can get a higher

14   profit.  This is the version where they are selling more

15   units, they are expecting to sell more units, that's how

16   they are making profit.  Not on individual -- not on

17   existing units, because it turns out these ice and water

18   dispensers are somewhat more expensive to put in rather than

19   what people are paying, but they expect to sell more than

20   ▆▆▆▆ units.  So that's how the profits go up.

21   Q.    I think it goes down.

22          THE COURT:  Counsel, what you think is of no

23   moment to this jury.

24          MS. WOODALL:  You are right, Your Honor.

25   BY MS. WOODALL:

1    Q.    You would agree it is appropriate to use the

2    contribution margin, though, in calculating a reasonable

3    royalty?

4    A.    I just want to be clear.  The general answer is no,

5    it depends.  And it depends on how you get into profits.

6    Suppose you expect that because you are paying, let's say, a

7    royalty rate, and it's expensive to implement whatever,

8    whatever it is, that technology is.  So maybe you are making

9    a little less on profit per unit.  But you expect to sell

10   ten times more T-shirts or 20 times more T-shirts.  So even

11   though your contribution margin has come down, just like

12   here, but now you are making a lot more sales, since you are

13   going to make profits on those additional T-shirts, that is

14   exactly what is happening here.

15        By the way, these are all Whirlpool's

16   calculations.  I am just simply using their forecast, their

17   calculations to come to the value.  But these are not

18   numbers I made up.  These are estimates from Whirlpool that

19   were prepared as part of its normal course of business.

20   Q.    My question is a little bit simpler.  You have used

21   Whirlpool's contribution margin in calculating your

22   reasonable royalty, have you not?

23   A.    That is correct.

24   Q.    Then if we go down below the last bold line, we have

25   estimated value of patented features at ███ percent,

Rao - cross

```
 1    correct?

 2    A.      That is correct.

 3    Q.      Then in parentheses it says, "assuming entire value of

 4    Niagara from the patent."  Do you see that?

 5    A.      Actually, now that I read it, that's poorly worded.

 6    Assuming entire value of Niagara is from the features.  I

 7    don't mean -- so I then apportion it for the patent.  That's

 8    just poorly worded.  I apologize for that.  In fact, it

 9    should stop at "assuming entire value of Niagara," and just

10    stop there.  It's just poorly worded.

11    Q.      Then we go down to the 75 percent, the value of the

12    allegedly infringing features within Niagara, right?

13    A.      That is correct.

14    Q.      And so the calculation you did earlier was that 75

15    percent of the ████ percent is how you arrived at the ████

16    percent.  Is that right?

17    A.      That is correct.

18    Q.      Okay.  And we see here that in connection with the 75

19    percent, you have a footnote to your report at tab 15(c).

20    That's where you get the 75 percent, correct?

21    A.      That is correct.  There is an updated tab to that.

22    Q.      This is referring to your September 4th report.  Let's

23    go to that.  And you have a copy of your report in the

24    binder that you were given, if you would like to refer to

25    it.  That is your tab and you might be familiar with it
```

1    already.  Can we go to tab 15(c)?

2              Now, just a little while ago you told the jury

3    that in your opinion the spigot was driving the entire value

4    of the infringing features of Niagara.  Isn't that correct?

5    A.    That's not what I said.  I said that's a key driver of

6    value, among these four features of product Niagara.  That

7    is the one that provides a solution.  The reason that they

8    implemented Project Niagara is to be able to fill larger

9    containers.  Without the spigot, the other ones would not be

10   as useful to be able to do that.

11   Q.    But originally, when you served your expert report in

12   this case and signed your name to it after having reviewed

13   it, you had assigned 25 percent value to each of four

14   features that you called key.  Correct?

15   A.    Actually, that's not quite correct.  As we discussed

16   extensively at my deposition, this was a mistake.  This was

17   a typo.

18             I sent you an updated tab 15(c), which, of

19   course, you are ignoring and going with the original one.  I

20   told you this was a typo, that I did not approve to put that

21   in there.  But it accidentally got in there because there

22   were a lot of tabs to the report.  But then I sent you an

23   updated one and I gave you my analysis.

24   Q.    But on the slide that you are using here in court

25   today you referenced the original.  That's why I am using

1    it.

2    A.    I meant the updated tab 15(c).

3    Q.    So if we look at what you originally did, that at

4    least at one point had been your opinion or it would never

5    have been created.  Correct?

6    A.    As I said, it was one that I had changed this tab

7    because there are a number of just simply English mistakes

8    on here.  And, unfortunately, this got through in the report

9    to the Court.  As I said, I sent an updated report.  I

10   discussed this in my deposition.

11   Q.    Are you saying it was replaced because of English

12   problems?

13   A.    No.  What I am saying, this whole tab, the corrections

14   I made to it did not get into the report, the first report I

15   sent you.  Therefore, we discussed it at my deposition, I

16   sent you an updated one.

17   Q.    You have chosen to assign values to the four features,

18   setting these particular numbers aside for the moment, the

19   four features that you have assigned values to, you didn't

20   get those numbers from any Whirlpool documents saying this

21   feature is 25 percent, this feature is 25 percent, did you?

22   A.    That's correct.  In fact, I was looking for that,

23   because that would be in some ways probably the most

24   straightforward way to do it.  But I couldn't find that.  So

25   I had to assign it myself.  I had to allocate the value

1    among those four features.

2    Q.    So the values that you used represent your judgment as

3    to what the values for each feature within Niagara were

4    based on your review of the documents?

5    A.    That is correct, based on my review and my analysis of

6    the Whirlpool documents and what I understand about these

7    features, that is my allocation.

8    Q.    So those would be subject to a judgment call,

9    depending on an individual expert's analysis of the

10   documents?

11   A.    At some broad level, that is fair enough.  That is an

12   expert opinion.  But obviously, it's based on a specific

13   type of document and analysis.  So it has to be credible

14   within that context.

15   Q.    You understand that fast-fill is not a patented

16   feature in this case?

17   A.    That is correct.  As I said, that is the first thing I

18   corrected on this slide.  Fast-fill is not a feature.  It is

19   a feature that is enhanced by the spigot, but it's obviously

20   not an infringing feature.

21   Q.    Okay.  Why don't we go to your updated tab 15(c).  The

22   other one like this with a slightly different...

23                MS. WOODALL:  Could I have just a moment, Your

24   Honor?

25                THE COURT:  Sure.

1       (Pause.)

2   BY MS. WOODALL:

3   Q.    So is this a copy of that updated tab 15(c) that you

4   created after your deposition in this case?

5   A.    That is correct.

6   Q.    Okay.  And again, we see that you have bundled the

7   tray and the water spigot together, and now you have

8   assigned 75 percent to those two features as opposed to

9   25-25 from your prior version?

10  A.    That's correct.  The buckets have not changed.  They

11  remain the same.  As I said, the first one just simply had

12  typos.  One of my analysts created it, I corrected it, sent

13  it back to her to put it in the report before it went out.

14  That just didn't get put in.  But the buckets are the same,

15  so my analysis has not changed.  Just the tab has been

16  updated.

17  Q.    Okay.  But when you revised it, you put fast-fill

18  under a noninfringing feature, right?

19  A.    Exactly.  I mean, it should always have been there.

20  It was never my intention to do it otherwise.

21  Q.    Really, if we look at this, and we have got

22  noninfringing features and infringing features, another way

23  that somebody else might evaluate this would be that there

24  is a 50-50 split between the infringing features and the

25  noninfringing?

1    A.     That would not make any sense in this context, because

2    as I mentioned, the Kenmore refrigerators, in fact, this

3    particular one, you can go and check, it has no fast-fill.

4    That is more than half the sales, this one particular

5    refrigerator model, that has no fast-fill.  If you were to

6    allocate 50-50, now you are giving value to a feature that

7    doesn't even exist in the refrigerators and is not

8    advertised in the refrigerators.  And I have checked the

9    manuals for these refrigerators.

10   Q.     You understand in this case as well that there is a

11   distinction to be drawn between a spigot, water spigot that

12   is mechanically operated and one that is manually operated.

13   Correct?

14   A.     That is my understanding from the testimony today, and

15   perhaps yesterday.  But as I said, I only calculated it on

16   the automatic spigots, not on the manual.  Only of the kind

17   that are on the right.  The stainless steel, not the

18   Whirlpool model.

19   Q.     So in allocating value to the extendable water spigot,

20   you have not attempted to segregate the value of one that is

21   spring-loaded versus one that is manual?

22   A.     I am not sure I understand.  I am only calculating

23   damages on what you are calling the spring-loaded and what I

24   am calling the automatic.  I am not calculating any damages

25   on -- what did you call the other one?  The manual.  I am

1    not calculating any damages on that, so there is no reason

2    to allocate because all the damages are coming solely from

3    the automatic.

4    Q.    But you have not done any analysis to determine what

5    value there was of a spring-loaded water spigot versus a

6    manual water spigot?

7    A.    Okay.  In the first instance, the answer is that is

8    not quite right, because the first thing is that I have only

9    calculated on the automatic.  But remember, these automatic

10   ones, almost all of them, they are the Kenmore brand, with

11   one exception of the Whirlpool brand.  So they are all going

12   to Sears.  It appears that Kenmore only has automatic.  It

13   has no manual spigots.  So for whatever reason, Sears only

14   seems to want automatic.  And that's what I calculated the

15   damages on.

16   Q.    You have also included Whirlpool models in your

17   damages calculations?

18   A.    There is only one Whirlpool model, which is the one

19   that Whirlpool identified as having an automatic spigot.

20   Q.    At the time that you created tab 15, both your

21   original and then your later corrected one, you had not made

22   a distinction in your damages calculation between automatic

23   spigots or spring-loaded spigots and manual spigots.  Isn't

24   that true?

25   A.    That is correct.  At that time, the list that you

Rao - cross

1   provided, because, remember, it's coming from a list of

2   accused products that Whirlpool provided, you did not make

3   the distinction.  So I basically took -- I understand at

4   that time all spigots were in the damages analysis.  So I

5   took that.  Then you provided an updated list.  Then I just

6   cut it based on just the updated list to automatic spigots.

7   Q.    Right, exactly.  So originally, your analysis was with

8   regard to manual and spring-loaded spigots.  And that's how

9   you did your allocation.  But when that list changed and the

10  only ones that were at issue were spring-loaded, you didn't

11  do anything to take that into account here on your valuation

12  of the allegedly infringing features?

13  A.    I did not change it.  Except now fast-fill largely

14  just becomes moot, because it's not a feature, except on

15  that one Whirlpool model, which is 10 percent or so of the

16  value of the total damage.  But other than that, fast-fill

17  is no longer an issue.

18  Q.    Are you aware that fast-fill is, in fact, in the

19  French-door bottom-mount and continues to be sold, and that

20  it was deemed or called fast-fill at the time it was

21  launched simply as a comparison to what had come before?

22  A.    I am sorry.  Which one are you talking about?

23  Q.    You keep saying that fast-fill has been abandoned.  I

24  am just asking you if you are aware that the term

25  "fast-fill" was used for comparison to what had come before.

1   But that standard -- that feature is now standardized in all

2   of the dispensers and so is not called out for comparative

3   purposes anymore.

4   A.      That is not quite right.  In fact, I think it is

5   exactly the opposite of what my research showed.

6           If you go to Whirlpool's refrigerators, they

7   advertise fast-fill for the ones that have them.  There is

8   one refrigerator that was launched in 2009, where I did not

9   see fast-fill in the advertisement.  And we discussed this

10  at my deposition.  You said, well, you know, don't you know

11  that they still have the feature.

12          So I went and checked the manual.  And the

13  manual has no feature, either.  Because it's one thing not

14  to advertise it for the moment.  But that's interesting,

15  because you typically don't advertise features that don't

16  get you any additional sales; otherwise, you want to

17  indicate them to the customer.

18          In this case I went to the manual for that exact

19  model that doesn't have fast-fill.  Moreover, the comparison

20  companies make is not with their old products.  It is with

21  their other products.  For instance, if all Volvo cars are

22  safer than let's say anybody else, Volvo still advertises

23  it's safer, not because it's -- this car today is no safer

24  than the one of yesterday, but rather it wants to show its

25  cars are safer than a Lexus or BMW or whoever it wants to

Rao - cross

1   compete with.

2           So if fast-fill is, in fact, a valuable feature

3   to consumers, then you would expect Whirlpool to advertise

4   it, even if it's no faster than its previous model, because

5   others don't have fast-fill.  That is the point I am trying

6   to make.  It is exactly the opposite of the conclusion I

7   think you drew.

8   Q.   That is on the assumption that it does not actually

9   fill twice as fast like the ones with which it was

10  advertised initially?

11  A.     That is not true.  I think you just mischaracterized

12  what I said.

13          First I looked at the manual.  It's not there.

14  Some of the other manuals will tell the customer there is a

15  2X button.  So you press that button and get the fast-fill.

16  In this case, they don't have that feature.  And they don't

17  have an explanation.

18          But secondarily, as I said, as a chemist, what I

19  would expect is that you are trying to differentiate your

20  products that compare to competitors, not compared to your

21  old products only.

22          So therefore, it doesn't matter what others --

23  Whirlpool's older products were.  If that is a

24  distinguishing feature of value to consumers, you would

25  still advertise it.

Rao - cross

1    Q.    Okay.

2              MS. WOODALL:   Your Honor, may I approach the

3    refrigerators?

4              THE COURT:   Yes.

5    BY MS. WOODALL:

6    Q.    Can you see me over here?

7    A.    I can see your head but not anything else.

8    Q.    You understand that the Niagara dispenser refers to

9    this entire box of a bunch of features and attributes, don't

10   you?

11   A.    That is my understanding.  It refers to an ice and

12   water dispenser of which Whirlpool itself identifies there

13   are four key features within the Niagara 1 project.  As I

14   said, Niagara 2, which launched later, also has external

15   controls and the LED displays and things like that.

16   Q.    But Niagara 2 had launched around the same time as the

17   patent at issue here?

18   A.    They launched in 2007, that's correct.

19   Q.    And if we just assume for the moment that both of

20   these have fast-fill, we may have a disagreement there, but

21   let's just assume that for the moment.  We also know that

22   these refrigerators have what's called measure fill that was

23   talked about earlier, right?  And you took that into

24   account?

25   A.    Yes, I did.

Rao - cross

1   Q.      That is a noninfringing feature?

2   A.      That is correct.

3   Q.      This one, also, it's similar, the Niagara is the

4   entire box here and it's the dispenser.  Correct?

5   A.      That is correct.

6           THE COURT:  By "this one," counsel, you mean?

7           MS. WOODALL:  PTX-552.

8   BY MS. WOODALL:

9   Q.      And both of the refrigerators here, PTX-552 and DPX26,

10  they have what's referred to as a taller and wider dispenser

11  cavity as well, don't they?

12  A.      That's correct.  Now, once you get into the concept

13  that you are going to fill larger containers, which again,

14  as I said, is made possible, the feature that solves that

15  problem is the spigot, you are also obviously going to

16  increase the size of the cavity.  These are all features

17  that go together, because the goal is to fill the bigger

18  pots.

19  Q.      Right.  The taller, wider cavity is not part of the

20  patent, is it?

21  A.      That's correct.  It's just a simple consequence of

22  putting those other features in.

23  Q.      Okay.  And PTX-552 has the spring-loaded extendable

24  water arm.  Do you see it come out?  Have you seen it?

25  A.      Yes.  I have tested that.  It has a very smooth arm

1    that comes out.

2    Q.    And DPX26 doesn't have a spring?

3    A.    That's my understanding.

4    Q.    Okay.  And no refrigerators that do not have a

5    spring-loaded water arm are accused of infringement.  Isn't

6    that correct?

7    A.    Could you repeat that question?

8    Q.    You understand that LG has offered no opinion

9    regarding infringement of refrigerators that do not have a

10   spring-loaded water spigot?

11   A.    Are you referring to Dr. Bessler's testimony earlier?

12   Those are not reports I have read.  I don't know exactly

13   what the infringement story is.  As I said, economists and

14   financial experts usually are asked to assume infringement

15   because damages only come into play if you find

16   infringement; otherwise, there are no damages.

17              So we don't usually get into the infringement

18   issues as to which ones do and do not, other than take the

19   list of accused products in this case that Whirlpool

20   provided for the '121 patent.

21   Q.    And in this case that's just ones with the

22   spring-loaded spigot?

23   A.    That's the list that I received from Whirlpool, and

24   that's what I calculated damages on, which is what I am

25   calling the automatic spigots.  I am not calculating any

Rao - cross

1    damages on the manual.

2    Q.    And looking at the two refrigerators, the one, DPX26

3    and PTX-552, isn't it fair to say that with respect to the

4    manual spigot, DPX26, that the extendable tray really has no

5    value independent of the spigot?

6    A.    Could you repeat that question?

7    Q.    It was possibly a bad question.

8          If only refrigerators with a spring-loaded water

9    spigot are accused of infringement, then how could the

10   extendable tray, which exists in a noninfringing form, have

11   any value apart from the spigot?

12   A.    I just want to make sure I understand you correctly.

13   You are saying, is there value to the tray on the right-hand

14   side, which is a stainless steel refrigerator, that is

15   independent of what's there on the left-hand side, which is

16   the manual refrigerator.

17   Q.    Or independent of the spigot, because in one

18   configuration it infringes and in the other -- or is alleged

19   to infringe and in the other it doesn't.

20   A.    Well, recall, that is why I said I did not separate

21   out value between the spigot and the tray.  Spigot is really

22   the driving feature that makes all of this other stuff

23   really possible in that commercially viable way.  That's why

24   I did not attach a separate value to the tray.  In fact, I

25   showed documents where consumers prefer the spigot and the

Rao - cross

1    tray together as the main feature.

2           And if you didn't have the spigot, you probably

3    wouldn't have much of a need for the tray.  Similarly, you

4    may not have a need for the other features.  For instance,

5    measure fill those documents show is the least preferred

6    feature.  And typically, for measure fill you need larger

7    containers.  You don't need measure fill typically when you

8    are filling a cup or something.  In fact, on the Kenmore

9    models, the typical measure fill is larger than what you

10   would typically use for a coffee cup.  So you need to put a

11   bigger pot there.

12   Q.   Let's take a look at DX-700.  If we could just show

13   the first page first.

14          This is a 2007 document, still before the '121

15   patent issued.  If we turn to I guess it's the last page,

16   it's page 41 of this exhibit.  We see where Trade Partners

17   were interviewed.  If we blow up the value, these are

18   specifically ice-and-water-feature values, we see that the

19   Trade Partners, Whirlpool's Trade Partners listed a number

20   of features, and fill speed was the sixth on the list.  And

21   that's one of the things you have taken into consideration.

22   That would be like fast-fill.  And then below that we have

23   dispenser height, that was ranked.  Do you see those two?

24   A.   Yes, I do.

25   Q.   Then if we keep going down, we see that the cavity

1    size -- I am sorry, that repeats that.  We see that we have

2    measure fill, a few lines down, and again, that's a

3    noninfringing feature, correct?

4    A.    That is correct.

5    Q.    Then underneath that we have a rotating faucet, which

6    would be the extendable water arm, correct?

7    A.    That is correct.

8    Q.    And we have two more down, getting close to the bottom

9    here, the slide-out tray.  Do you see that?

10   A.    I see.

11   Q.    The only patented features in this case are the

12   rotating faucet.  And then only when it's spring-loaded and

13   the slide-out tray.  Isn't that correct?

14   A.    I think you misinterpret this particular document.

15   Q.    That's not my question.  You can be asked that on

16   redirect.  We are tight on time.  Could you please answer my

17   question?

18   A.    The only one that I understand that is accused -- I am

19   sorry.  The features of the '121 patent are the rotating

20   spigot and the extendable tray with the drive mechanism.

21   Q.    I think you may have reversed those.  Extendable tray

22   is just manual and the spigot is mechanical-drive driven,

23   right?

24   A.    Well, I don't recall what I said.  Whatever it is, I

25   meant to say the rotating spigot, extendable tray, with the

1    mechanical drive.  I thought that's what I said.

2    Q.    I may have misheard you, I am sorry.

3             Then we see there are a number of other ice and

4    water dispenser features that Whirlpool's Trade Partners

5    said in 2007 were important.  We have got at the top of the

6    list the in-door-ice, we have got a nightlight, which is

7    also included on the Niagara suite of features.  We have a

8    dispenser lock, which is on the suite of features.  And a

9    number of other things, the different types of touch

10   buttons, et cetera.  Right?

11   A.    If you keep misinterpreting these documents, whatever

12   you are saying, I mean, it's whatever it is, but the point

13   is, it says -- the top of the document says "value versus

14   cost."  They are not talking about the relative importance

15   of these features to customers.  They are just simply

16   talking about what is the perceived value to the cost.

17            For instance, the nightlight may not cost very

18   much in a refrigerator with a nightlight and without a

19   nightlight.  That may not have a meaningful price

20   difference.  But it is a feature, so you're getting a lot of

21   value, paying little cost.  Whereas something like the other

22   features, you are paying a pretty high price.  And then the

23   question is what is the relative value to that.  And it is

24   showing that there is value, but just the price is higher.

25   Q.    Why don't we look and see what the Trade Partners

Rao - cross

1    actually said.

2              THE COURT:  Counsel, why don't we take an

3    afternoon break.

4              (Jury leaves courtroom at 3:30 p.m.)

5              (Recess taken.)

6              THE COURT:  Okay.  Ms. Walker, will you bring in

7    the jury, please?

8              MR. PARTRIDGE:  Judge, there may be motions

9    after this.  This is their last witness.

10             THE COURT:  I will be right back.

11             (Jury enters courtroom at 3:50 p.m.)

12             THE COURT:  Please take your seats, ladies and

13   gentlemen.

14   BY MS. WOODALL:

15   Q.   Dr. Rao, I would like to go back to DX-700 and take a

16   look at what Trade Partners told Whirlpool.  "My sense is

17   that the response to measure fill, slide-out, and rotating

18   faucet is not overwhelmingly great.  I'm not hearing

19   consumers coming in and asking for it on our floor."

20             Do you understand that is a Trade Partner

21   comment to Whirlpool in 2007 before the issuance of the LG

22   patent?

23   A.   That's correct.

24   Q.   I would like to move back to PDX-14 for a moment.

25   This is your reasonable royalty calculation where you have

Rao - cross

1    inserted 75 percent of the value of Niagara's attributable

2    to the claims at issue from the '121 patent.  I wanted to

3    highlight, if the jury were to find that only 25 percent of

4    the value of Niagara is attributable to the spring-loaded

5    extendable water spigot and the pull-out tray, we would end

6    up with a reasonable royalty of approximately █ percent.

7    Isn't that right?

8    A.    If you are purely asking, under that assumption, I

9    mean, that's a math exercise.  But for all the reasons we

10   discussed, that is not consistent with the evidence in this

11   case.

12   Q.    But ultimately, the jury is going to have the chance

13   to evaluate that, correct?

14   A.    Absolutely.

15   Q.    And then let's go to PDX-16.  If the jury were to

16   conclude that the value of the patented features of Niagara,

17   just the spring-loaded extendable water spigot and the

18   extendable tray, were only worth 25 percent of the value of

19   Niagara and we got the 1 percent royalty rate, then the

20   damages for Whirlpool's alleged infringement would be less

21   than ████████    Isn't that correct?

22   A.    Once again, with all the assumptions that you are

23   making, and assume for the moment that the math is correct,

24   that would be correct.

25   Q.    I note that we corrected our math errors here on this

```
 1    one and show the correct numbers.

 2              If the jury were to decide it's less than 1

 3    percent, they have that ability as well, correct?

 4    A.    I mean, they are ultimately the jury, so it's whatever

 5    they -- obviously the conclusion that they reach is the most

 6    important.  I can only provide assistance based on my review

 7    of the documents and my analysis.

 8              MS. WOODALL:  Thank you, Dr. Rao.  No further

 9    questions.

10              THE COURT:  Mr. Sharma.

11              MR. SHARMA:  Your Honor, no questions.

12              THE COURT:  Doctor, you are excused.

13              THE WITNESS:  Thank you.

14              (Witness excused.)

15              MR. COYNE:  Your Honor, at this time LG rests

16    its direct case on the '121 patent.

17              THE COURT:  Let me see counsel briefly at

18    sidebar.

19              (The following took place at sidebar:)

20              THE COURT:  You were trying to say something.

21              MR. PARTRIDGE:  I apologize, Your Honor.  I

22    shouldn't have done that.  Just that we would have motions.

23    The reason I did that was because you were about to bring

24    the jury out.  And I wanted you to know we might be doing

25    this back-and-forth business.
```

1              THE COURT:  It is no surprise.

2              The question is, let's assume for a moment that

3    I am either going to deny or reserve, from the standpoint of

4    witnesses, we have about 35 minutes left in the day.  Can we

5    make good use of that time?

6              MR. PARTRIDGE:  Yes, we can.  What we could do,

7    if you would like, is just put on our first witness, which

8    would probably take most of that time.

9              MR. COTTRELL:  Your Honor, I think 20 minutes on

10   direct.

11             MR. PARTRIDGE:  That will complete the day, then

12   we can do the motions.

13             THE COURT:  Let's do that.  We can get the jury

14   out.  We will leave the record open for that purpose.  I

15   will take the JMOL motions as if we had done them right at

16   the conclusion of the plaintiffs' evidence.  I think the Fed

17   Circuit will let me do that still.

18             (End of sidebar conference.)

19             THE COURT:  Mr. Cottrell, you have the first

20   witness.

21             MR. COTTRELL:  Yes, Your Honor.  Thank you.

22   Whirlpool calls Tom Catania.

23             ... Thomas Catania, Jr, having been duly sworn

24   as a witness, was examined and testified as follows ...

25             MR. COTTRELL:  Ladies and gentlemen, my name is

1    Fred Cottrell.  I am an attorney here in Wilmington.  I am

2    one of the attorneys here for Whirlpool.

3              As my colleague, Mr. Partridge, reminded you in

4    the opening, there will come a time for Whirlpool to put on

5    its patents, its people, and its products.  Now is that

6    time.  Our first witness is Mr. Tom Catania who will talk a

7    little about the history and the innovations at Whirlpool.

8                        DIRECT EXAMINATION

9    BY MR. COTTRELL:

10   Q.    Good afternoon, Mr. Catania.

11   A.    Good afternoon.

12   Q.    Can you tell us about yourself, please?

13   A.    I grew up in this part of the country.  Actually, in

14   the Bronx, in New York, is where I spent my childhood.  My

15   family moved around.  Eventually, by the time I got to high

16   school, I was living in Minnesota.  I went to college at the

17   University of Minnesota, where I met my wife.  And we are

18   now the proud parents of two college-age daughters.

19              I live currently at our corporate headquarters

20   in southwestern Michigan, a little town called Benton

21   Harbor.  It's right across the lake from Chicago.

22   Q.    Give us after high school your education.

23   A.    I went to the University of Minnesota for my

24   undergraduate degree.  I was a political science major.  And

25   then I went to law school in St. Paul, Minnesota, William

1   Winchell College of Law Enforcement.  That is my education

2   beyond that.

3   Q.    After you graduated law school, what did you do?

4   A.    My first job as an attorney, I was a law clerk for the

5   Minnesota Supreme Court.  That is a one-year assignment.

6   And then I began my first job, I was Assistant Attorney

7   General for the state of Minnesota.  I represented the

8   people in the state of Minnesota.  I was primarily an

9   antitrust prosecutor, but I also did work in the criminal

10  and consumer protection divisions.

11  Q.    When did you start at Whirlpool?

12  A.    I started at Whirlpool a little over 23 years ago, in

13  1986.

14  Q.    And you have been there continuously?

15  A.    Yes.

16  Q.    And what is your current job at Whirlpool?

17  A.    I started at Whirlpool -- my first ten years were in

18  the law department.  And then in 1997 I became vice

19  president of government relations.

20  Q.    And what does that job entail, what do you do

21  day-to-day?

22  A.    I am primarily responsible for interface between our

23  company and the government, at all levels and globally.

24        I should add, I also have the responsibility for

25  interaction with trade associations, the most significant

1    one being the Association of Home Appliance Manufacturers,

2    which is our industry trade association.

3            But I also have represented our company before

4    broader business associations, like the National Association

5    of Manufacturers and the Chamber of Commerce and so forth.

6    Q.    That one trade group that you mentioned, the

7    Association of --

8    A.    Home Appliance Manufacturers, yes.

9    Q.    Is LG a member of that, too?

10   A.    Yes, they are.  I know Mr. Taylor from our mutual

11   involvement with that group.

12   Q.    And have you been a witness at trial before, Mr.

13   Catania?

14   A.    No, I have not.

15   Q.    Mr. Catania, I have given you some slides.  I would

16   like to put the first up, if I could, slide 2.  I am going

17   to ask you some questions about the history of the Whirlpool

18   company.  As all things, let's start at the beginning, about

19   a hundred years ago.

20   A.    I promise you I won't take you through all hundred

21   years.

22            We are about to celebrate our hundredth

23   adversary next year.  It is something our company is very

24   proud of.  It is interesting that this is a patent matter,

25   because Whirlpool Corporation was really built on a patent.

1    Lou Upton is one of the two brothers that founded the

2    company.  He had a business venture that, frankly, failed.

3    And he was asked what assets he wanted out of that venture.

4    And the only asset that he thought was worth anything was a

5    washing machine patent.

6              So he brought that back to Michigan.  And with

7    his brother and his uncle, they used this washing machine

8    patent to create a motorized wringer washer.  You use to

9    have to crank them by hand.  You see the picture there.  He

10   thought he could add a motor to it.

11             So Whirlpool was really built and started on

12   that initial washing machine patent.

13             The next important event in the company's

14   history happened just before the Great Depression,

15   unfortunately.  There was a merger with a company that was

16   based in New York called the Nineteen Hundred Corporation.

17             But despite the very difficult economic times

18   that the country was experiencing, they were able to keep

19   their company together and continue to grow it.  And the

20   company began to be an extensive manufacturer, a pretty

21   successful one.

22             So when the country entered World War II, we

23   were asked to contribute to the war effort, as many

24   companies were at the time.  And we began using our

25   manufacturing facilities to aid in the war effort.  We were

Catania - direct

1    even making airplanes at at least one of our factories that

2    I am aware of.

3    Q.    Mr. Catania, let me take you forward a little bit to

4    the layout 1940s-1950.  If you could continue to talk about

5    washing machines and a bit about Sears.

6    A.    Yes.  Whirlpool Corporation for almost its first 50

7    years of its history was basically an original equipment

8    manufacturer for Sears under their Sears brand name.  It was

9    primarily a washing machine company.  But as we continued to

10   expand our relationship with Sears, we realized that we

11   needed to be a broader company.  We needed to have more

12   products to fill out the home and the kitchen.

13           So the company began to use the name Whirlpool,

14   and in 1955 the company expanded to a full line of

15   appliances.  One of the most important additions was

16   refrigeration, a company called Seeger had these other

17   products.

18           1955 was of special importance to me.  It was

19   the year I was born.  I had a birthday around the time that

20   I joined Whirlpool.  And they print out these little

21   publications that list things that happened on your

22   birthday.

23           Amazingly, Whirlpool's announcement of its full

24   line of appliances was one of two business headlines on my

25   birthday.

Catania - direct

1    Q.    So you were destined to work for Whirlpool?

2    A.    I guess we are stuck with each other.

3    Q.    Let me go back just briefly.  You may have covered

4    this, and I apologize.

5          There came a time where Whirlpool became known

6    as Whirlpool.  That was in about 1950?

7    A.    Well, we had the brand name Whirlpool.  I think it

8    came actually from the Nineteen Hundred Corporation.  But it

9    really wasn't used because we were primarily trying to serve

10   our Sears customer.  And frankly, we sort of asked

11   permission from our customer to begin to expand our own

12   brand.  And that did happen in the fifties.

13   Q.    Let's jump forward, Mr. Catania, to the 1980s.  Can

14   you talk about the sort of next evolution at Whirlpool?

15   A.    Yes.  A couple of important things happened in the

16   '80s.  We began to expand our line and we began to expand

17   our brands.

18         No matter how good your products are, consumers

19   do have an association with certain brands.  For instance,

20   for us the acquisition in the mid-1980's of the Kitchen Aid

21   brand brought us a premium association, a brand that meant

22   premium in the minds of the consumer that was important to

23   us.

24         The other thing that happened that was

25   transformational for our company was at the end of the 1980s

1    we began to significantly expand internationally.  And so

2    the company acquired a European company, N.V. Phillips

3    appliance business, in late 1989.  And we also began to

4    expand in other countries, Mexico, Indonesia, China, and so

5    forth.

6    Q.    Let's jump forward to a few years ago.  Maytag has

7    come up in this case already.  Can you talk about the

8    relationship of Whirlpool and Maytag?

9    A.    Yes.  In 2006, obviously, we did acquire the Maytag

10   Corporation.  It was an interesting experience for our

11   company in the sense that our cultures are very similar.

12   But, of course, for much of my history with the company,

13   Maytag was an important competitor of ours.  So it took a

14   little while to get used to thinking of the Maytag man as

15   part of us.

16          But it's been a very smooth merger, I think.

17   And now it's added some additional valuable brands to our

18   portfolio.

19   Q.    What are a couple of those brands from Maytag?

20   A.    With Maytag, in addition to the Maytag brand, the

21   Jenn-Air brand, and also, you see them up here, the Amana

22   brand, which they had previously acquired.  I think you

23   heard about that in earlier testimony.

24   Q.    Here we are a hundred years later and Whirlpool still

25   has operations in Benton Harbor?

Catania - direct

1    A.    We do.  And we have had the good fortune to grow from

2    this small town in Benton Harbor to now become the largest

3    home appliance manufacturer in the world.  So we compete

4    with all of our global competitors everywhere in the world.

5    Q.    Let's talk about that just for a second.

6          Does Whirlpool have a presence in most countries

7    around the world?

8    A.    I believe we sell our products in 170 different

9    countries.  And we manufacture in many, many countries as

10   well.

11   Q.    And just roughly, how many employees around the world?

12   A.    I believe that we have 67,000 employees.

13   Q.    Let's talk a little bit about Whirlpool in the United

14   States.  Approximately how many facilities does Whirlpool

15   have in the United States?

16   A.    We have at least 10, a mixture of manufacturing

17   facilities, as well as engineering and technology centers,

18   physical distribution centers, call centers.  I would say

19   the majority of our 17,000 employees in the United States

20   work in our factories.  But we do also have hundreds of

21   engineers throughout the country.

22   Q.    Do we also have a facility in Mexico?

23   A.    We do.  In the late 1980s, we did acquire a failing

24   operation in Mexico.  I think GE and Whirlpool at about the

25   same time acquired operations in Mexico.

1   Q.     The next slide is up.  These are some brands

2   manufactured by Whirlpool.  Can you tell us which of these

3   involve refrigerators?

4   A.     I believe, of course, the Kenmore brand is Sears

5   brand.  We did manufacture products for a long time for them

6   under the Kenmore brand.  It really was the foundation of

7   our company.

8              These other brands, though, also are used on

9   refrigerators, including -- people may not be as familiar

10  with the Gladiator brand.  It is storage systems design for

11  the garage.  But we also have some appliances with that same

12  design, including the refrigerator for the garage.

13  Q.     And the refrigerator business is important for

14  Whirlpool, is it not?

15  A.     I would say it's a third of our total sales.  It's

16  probably one of the most global products among all the

17  appliances.  In some countries, for example, you won't see

18  clothes dryers sold for a variety of reasons.  But almost

19  everywhere you will see demand for some form of

20  refrigeration.

21  Q.     You talked about the Kenmore brand.  If we could

22  please go to the next slide.  The Kenmore brand is sold by

23  Sears?

24  A.     That's right.

25  Q.     Can you tell us what's on this slide?

1    A.     Well, this would represent, of our total global sales,

2    the average over the last few years of the percentage of

3    those revenues coming from Sears and the Kenmore brand.

4           So I would say what this slide really represents

5    is not that Sears is not an unimportant customer to us, it

6    is a very important customer, we sell not only Kenmore

7    brand, but we sell our own branded products through Sears.

8    But it does reflect the sheer size of the company as we have

9    grown globally.

10   Q.     Let me ask you a few questions about innovation and

11   research and development at Whirlpool.  How does Whirlpool

12   compete with others in the appliance industry?

13   A.     Well, I think you have heard the word "innovation"

14   used a lot.  As the leader in our industry, we probably

15   started using that as a core business strategy maybe earlier

16   than some others.  Being able to develop what we would refer

17   to as consumer-relevant innovations is a critical part of

18   our whole business strategy.

19          That means that it's not just a good idea.  It's

20   got to be an idea that matters to consumers.  So we spend a

21   lot of time developing what we hope is that core competency

22   in our ability to focus resources and develop innovations

23   that matter to the consumer.

24   Q.     So consumer demand can drive innovation?

25   A.     Absolutely.  And ultimately your brand's reputation

1   depends on the consumer's evaluation of your products.  We

2   have an industry where we sell to retailers, and sometimes

3   it's easy to get caught up in what your retailer wants from

4   you at any given time.  But long-term our success really

5   depends on getting close to our consumers.

6   Q.   Let's talk about just a few examples of innovation at

7   Whirlpool, if we could go to slide 5.

8        Can you just give us a couple of examples from

9   this slide?

10  A.   Well, the first one listed there in 1949, having to do

11  with developing a top-loading spinning style, automatic

12  washing machine and electric dryer, that is, again,

13  Whirlpool's heritage was in the laundry room.  So that was a

14  very important initial development.  I guess it was the

15  ultimate extension of Lou Upton's original patent to start

16  motorizing what was almost a hand-washing process a little

17  after the turn of the century.

18        As early as 1977 we began to development

19  automatic clothes washers with solid-state electronic

20  controls.  And the 1980s brought a direct-drive washing

21  machine, which may not be self-evident what that means.  But

22  washing machines' biggest repair issues in the past had been

23  belts breaking.  So the ability to directly connect the

24  motor to the agitator was a very important innovation, not

25  only because of reliability, but it meant fewer parts.  So

Catania - direct

1    it was a very -- I remember it very well because it was soon

2    after I had joined the company.  We were still enjoying the

3    initial enthusiasm about that.

4           Then the last one is when I had the opportunity

5    to be involved with last year, we announced -- you may have

6    heard about the smart grid a lot in the news.  We announced

7    we would be prepared to make by 2015, every appliance we

8    make in the world, capable of receiving a signal from a

9    utility and responding, which means we can safe a lot of

10   energy and money for consumers, as well as improve the whole

11   environmental friendliness of the electric grid.  So it is

12   an exciting new area for us.

13   Q.    Of course, a lot of other things happened along this

14   timeline which we haven't talked about.  Others from

15   Whirlpool are going to talk about what happened in the '90s

16   in this case; is that correct?

17   A.    That's right.

18   Q.    Let me ask you about some recognition or achievements

19   that Whirlpool has received recently.  I am not going to go

20   through all these.  I would like to start with the second

21   one here.  The second one, the Ocean Tomo 300 patent index,

22   can you tell us a little bit about that?

23   A.    This index I think is just a reflection that people

24   who evaluate companies believe that your intellectual

25   property has a material impact on your success.  So they

1    look at companies around the world and assign a value to the

2    portfolio of patents as they assess them.  And so among the

3    companies in the world, we are viewed to be by this index,

4    anyway, that I think is well-recognized, in the top 300

5    companies in the world.

6             We are competing with a lot of companies in that

7    list that other people would maybe regard as more high-tech

8    than ours.  So we are proud to be in that list.

9    Q.    Let me ask you about Whirlpool's receipt of the Energy

10   Star award.  What is Energy Star?

11   A.    Energy Star is a program that the Department of Energy

12   and the Environmental Protection Agency have inaugurated.

13   It is called the market transformation program.  It is a

14   program that is designed to stimulate manufacturers to

15   produce products at efficiency levels above the minimum

16   standards, and to give consumers an easy way to identify a

17   product that not only is more environmentally friendly but

18   will save you money to operate.

19             That award is important to me and to my group

20   because we are responsible every year for submitting the

21   application in December.  And just Monday of this week, they

22   announced that again we have won that award 11 out of the 12

23   times that it has been awarded.

24   Q.    What years has Whirlpool won that award, roughly?

25   A.    Counting back 12 years from this year.  We have won a

Catania - direct

1    total of 22 of these sorts of awards.   They were predecessor

2    programs to Energy Star, such as Green Lights, where we won

3    awards as well.

4              In fact, we won the partner of the year award

5    for appliances so many times that they created a new award

6    called the Sustained Excellence Award for people who had won

7    in multiple years.

8    Q.   Again, why is Energy Star important to the consumer?

9    A.   Well, it tells the consumer two things, I think --

10   really, three.   No. 1, I think the consumer assumes that an

11   energy-efficient product is probably a technologically

12   advanced product.   So we get some credit on that dimension.

13             Secondly, I think it tells the consumer that a

14   product is going to be better for the environment in some

15   respect.

16             And third, frankly, it tells the consumer that

17   it's going to be cheaper to own because the product will use

18   less energy and, therefore, you will have a lower utility

19   bill.

20   Q.   Let's if we could go to the last topic, the last

21   slide.   Talk a little bit about research and development at

22   Whirlpool on this slide.   Can you just summarize what's

23   here?

24   A.   Well, I think what this chart tells you is several

25   things.   First of all, it tells you that we spend a lot of

1  money on research and development.  In absolute dollars, in

2  relative dollars, as opposed to other companies, that is a

3  lot of money.

4          But the other thing it tells you is that we have

5  to invest in our future even in difficult times.  So you

6  will see that 2008 would not have been a year that you would

7  expect R&D investments to go up.  It was sort of the

8  beginning of a crisis year, frankly.  The appliance industry

9  started experiencing a recession a couple of years before

10  the rest of America, American industry because of the

11  housing industry declining a little quicker than other

12  sectors.

13          As you can see, despite the economic

14  difficulties, we felt we had to continue to invest in our

15  future, which we have been doing.

16  Q.    Of the facilities you mentioned that Whirlpool

17  operates in the United States, which ones are designed or

18  involved with research and development?

19  A.    Well, we have technology centers of competence

20  throughout the United States.  In the refrigeration area, we

21  have them in Iowa, as well as our headquarters in Michigan.

22  Q.    I would assume they employ a fair number of folks and

23  engineers?

24  A.    It would be hundreds of engineers, yes.

25          MR. COTTRELL:  Thank you, Mr. Catania.  That's

1    all I have.

2              THE COURT:  Mr. Coyne.

3                    CROSS-EXAMINATION

4    BY MR. COYNE:

5    Q.    Good afternoon, Mr. Catania.

6    A.    Good afternoon.

7    Q.    We have not met before.  Hello.

8    A.    Nice to see you.

9    Q.    The first thing I want to ask you, some of the slides

10   you put up, for example, one of them was, you mentioned,

11   innovation.  Would it be fair to say when a company is

12   growing it really has two fundamental choices, build or buy?

13   Right?

14   A.    I think a company probably has lots of choices.  I am

15   not sure build or buy --

16   Q.    One way to do it is to grow externally and expand, and

17   expand your staff and continue organic growth.  That's one

18   way.  Right?

19   A.    Yes.

20   Q.    Another way is to buy, right?  Buy up competitors, for

21   example, correct?

22   A.    There are efforts to expand geographic markets.

23   Sometimes those geographies are ones that we aren't in

24   already, but others are there, yes, that's right.

25   Q.    Let's look at these brands because many of these are

```
 1   well-known in the geography of the United States, right?
 2   A.    Yes.
 3   Q.    The Kenmore brand, that is a Sears brand, right?
 4   A.    That's correct.
 5   Q.    Let's set that one aside.  Maytag, that was a brand
 6   that Whirlpool bought, right?
 7   A.    We bought the entire company.  The brand was one of
 8   the assets.
 9   Q.    The Amana company is a company that was acquired
10   through the Maytag acquisition as well, right?
11   A.    That's a company that Maytag had acquired before we
12   bought Maytag.
13   Q.    And when you bought Maytag, you acquired them, too,
14   didn't you?
15   A.    Maytag had already acquired it.
16   Q.    How about the Jenn-Air brand, was that a brand that
17   Whirlpool bought or built internally?
18   A.    That was a brand that Maytag had acquired before we
19   acquired them.
20   Q.    How about the Magic Chef brand, was that a brand
21   Whirlpool built internally or bought from another company?
22   A.    Magic Chef was purchased by I believe Maytag before we
23   bought it.
24   Q.    Are there any other brands on this list?  That leaves
25   the Gladiator, Estate and Kitchen Aid brand.  Was Kitchen
```

Catania - cross

1      Aid a brand that Whirlpool built or bought?

2      A.    I would say we built the brand significantly since we

3      bought it.  But, yes, we did buy it.

4      Q.    How about the Estate brand.  Is that a brand that

5      Whirlpool built or bought?

6      A.    I am honestly uncertain.  I think that brand has been

7      part of our group as long as I have been there.

8      Q.    How about Gladiator?

9      A.    Gladiator I think is our brand that we developed.

10     Q.    Very well.  Thank you, sir.

11            I would like to put up another slide that you

12     had shown.  The Pac Man.  Mr. Cottrell has asked you about

13     this.  What is the implication of this?  Is Whirlpool

14     gobbling up Sears?

15     A.    I am sorry?

16     Q.    The slide appears to be like a Pac Man gobbling up

17     Sears.  What is the implication of the graphic?

18     A.    Are you asking me if we intended to design this as a

19     Pac Man symbol?

20            THE COURT:  If you don't understand the

21     question, just tell him.

22            THE WITNESS:  I am sorry, I just don't

23     understand.

24     BY MR. COYNE:

25     Q.    The Sears business, you said the last couple of years

1    it's about 12.5 percent of Whirlpool's total business.  When

2    you went back to the early 1900's, how much of Whirlpool's

3    business was the Sears business then?

4    A.    I couldn't quote an exact percentage, but I am sure it

5    was the vast majority.

6    Q.    And Sears is a very sophisticated customer, isn't it?

7    A.    Absolutely.

8    Q.    And they are a demanding customer, aren't they?

9    A.    Yes, they are.

10   Q.    Could we go to PTX-117, please?

11         Before we get to that slide, let me ask you:

12   That percentage, is it falling or rising at the present

13   time?

14   A.    It is hard for me to answer that question, because our

15   other business is growing.  If the growth outside the

16   U.S. -- I can't tell if that is a bigger variable on this

17   equation.

18   Q.    Well, you also mentioned -- one of the things you

19   talked about was competing in all these countries around the

20   world.  Since Whirlpool is out competing in those countries,

21   don't you think it's fair for companies from those countries

22   to be competing with Whirlpool here?

23   A.    Fair competition is something we absolutely support.

24   Q.    Let's go back to the Sears, then, PTX-117.  What is

25   this document, sir?  Have you seen this before?

Catania - cross

1    A.    No.

2    Q.    Let's go to 187, then.  This is the slide we were

3    looking at during the opening yesterday.  This is 2006,

4    apropos my question to you about whether the business is

5    growing or shrinking.  ███████████████████████████████

6    ████████████████████████████████████████████████████████

7    ███████████████████████████████████████████████

8    █████████████████████████████████████████████████████

9    █████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████

12   ███████████████

13              Did I read that correctly?

14   A.    Yes, I think you read it correctly.

15   Q.    Is that the feedback your company is getting from your

16   significant customer?

17   A.    I know Tina Settecase.  I have been in meetings with

18   her.  We went together to Energy Star Partner of the Year

19   dinner.  I know she very much supported the relationship

20   with Whirlpool.  I think what is missing from that slide is

21   the branded business that we sold to Sears, which has been

22   growing significantly during my career with Whirlpool.

23   Q.    But at least with respect to whatever business she is

24   talking about with Sears, there is some disturbing trends.

25   Right?

1    A.    I am reading the same language you are for the first

2    time.

3    Q.    Sir, let me go to another one of the slides you put

4    up, the awards for innovation.  You are aware that LG has

5    also gotten awards for innovation, aren't you?

6    A.    I am just assuming that they have.  I am not aware of

7    any specific awards they received.

8    Q.    Well, one of the things you note on here is the

9    hundred most innovative companies, world's hundred most

10   innovative companies.  Where does Whirlpool rank in that

11   ranking?

12   A.    I am sorry, I don't know precisely where.

13   Q.    Let me see if I can help you out a little bit.

14         Can we bring up PDX-21, please, and go to the

15   third page of the document?

16         This is the list we pulled off the website just

17   yesterday, sir, from *Business Week*.  It indicates at the

18   top, do you see No. 85, LG Electronics?

19   A.    Yes.  Is that their electronics innovations or is that

20   some other part of their business?  I am not sure what it

21   refers to.

22   Q.    I am sorry, sir.  I am just reporting what is in the

23   *Business Week* website.  Do you see No. 85 for LG

24   Electronics?

25   A.    Yes.

1   Q.     Can you find Whirlpool on the list?

2   A.     I can.

3   Q.     Where is Whirlpool?

4   A.     No. 98.

5   Q.     Thank you.  Can we go to PDX-22?

6              MR. COTTRELL:  Your Honor, I haven't seen these.

7   I thought the protocol was I could have copies of these.

8              MR. COYNE:  I am sorry, Your Honor.  It is my

9   oversight.  I apologize to Mr. Cottrell and to the Court.

10  BY MR. COYNE:

11  Q.     This one, sir, is dated Thursday, February 25, 2010.

12  I would like to direct your attention to the second page,

13  the entry for No. 27.

14  A.     Could you tell me again, this is from what time?

15  Q.     If you look at the first page of PDX-22, this is

16  *Business Week's* 50 most innovative companies dated Thursday,

17  February 25.  They put out a top hundred list and they put

18  out a top 50 list.  This is their top 50 list, including the

19  2008 and 2009 rankings.  Do you see at the left?

20              If we could go back to the first page so you can

21  see the legend.  If you look at the left-hand side, it

22  indicates 2009 rank and 2008 rank?

23  A.     Yes.

24  Q.     If you look down to the entry for No. 27, LG

25  Electronics is indicated there, correct?

1   A.    Yes.  I see it says "product."  Does it specify what

2   kind of product?

3   Q.    Sir, I am just reporting what is on the website.  Do

4   you see Whirlpool -- you have the list now in front of you.

5   I apologize for not providing it to you earlier.  Can you

6   see Whirlpool listed anywhere on PDX-22 of the 50 most

7   innovative companies?

8   A.    I don't see it, no.

9   Q.    The last set of questions.  You put up another slide.

10  Whirlpool invests millions of dollars in this innovation.

11  Is this all in refrigeration?

12  A.    No, it's not.

13  Q.    How much of it is refrigeration?

14  A.    Based on my general understanding of the breakdown in

15  our business, I would assume that about a third of it is in

16  refrigeration.

17  Q.    But a lot less than is shown on the graph you put up,

18  right?

19  A.    I guess I will just stand by my answer of about a

20  third.

21             MR. COYNE:  I have no further questions, Your

22  Honor.

23             THE COURT:  Anything further, Mr. Cottrell?

24             MR. COTTRELL:  Two questions, Your Honor.

25                     REDIRECT EXAMINATION

1    BY MR. COTTRELL:

2    Q.    Mr. Catania, the graphic Mr. Coyne referred you to as

3    the Pac Man, that didn't mean that Whirlpool was buying

4    Sears, did it?

5    A.    No, it didn't.

6    Q.    It just showed the important percentage of business

7    Whirlpool has with Sears?

8    A.    That's right.  I think, as I explained, our company

9    was built on our relationship with Sears.  But we have grown

10   since that time.  So its relative size for our total

11   business has reduced as our total business has increased.

12   Q.    And the top 50 list Mr. Coyne put up on the screen,

13   had you seen that before?

14   A.    No.

15   Q.    Do you have any idea what products that refers to?

16   Does that refer to refrigerators?  Does it refer to TVs?

17   A.    Well, it just says "products."  So I would assume that

18   it incorporates other innovations besides the appliances.

19             MR. COTTRELL:  Thank you, Mr. Catania.

20             THE COURT:  Thank you, Mr. Catania.  You are

21   excused.

22             (Witness excused.)

23             THE COURT:  Members of the jury, we have come to

24   the end of our trial day.  I ask you remember the

25   instructions I gave you at yesterday's end.  Travel safely.

Catania - redirect

1            We will see you back here at 9:00.

2            (Jury leaves courtroom at 4:30 p.m.)

3            THE COURT:  All right.  You can take your seats.

4    Are you going to handle this chore, Mr. Partridge?

5            MR. PARTRIDGE:  Your Honor, I will do the first

6    part.

7            THE COURT:  You have a JMOL motion, I take it?

8            MR. PARTRIDGE:  Yes, we would move that, as a

9    matter of law, LG has failed to establish its case on

10   infringement.  The only evidence that was introduced that

11   compared the claims of the '121 patent, claims 20, 21, and

12   36, to the accused products was that of Dr. Bessler.  And in

13   Dr. Bessler's comparison of the claims to those products, he

14   presented no evidence with respect to any of the Whirlpool

15   refrigerators that have the manual spigot and acknowledged

16   that, in fact, he was offering no opinion with respect to

17   that.

18            It's not a hundred percent clear to me whether,

19   based on the damage analysis we heard, whether there are any

20   allegations that remain with respect to it.

21            But to resolve any uncertainty about that, we

22   would move as a matter of law with respect to that.

23            And secondly, as to the other refrigerators that

24   have been characterized as automatic water dispenser

25   refrigerators, he used one refrigerator as an example of the

1    entire set, which is the one that all of us get the wrong

2    exhibit number for.  I can't see it here.

3              THE COURT:  PTX-552.

4              MR. PARTRIDGE:  Yes, Your Honor.

5              With respect to that particular model, for at

6    least this reason, Dr. Bessler failed to establish that the

7    water spigot itself, not the structure on which it's

8    mounted, but the spigot itself, which is what all three of

9    those claims address, does not extend outside the front

10   surface of the refrigerator.

11             And that is a failing with respect to all of

12   LG's proofs here, Your Honor.  It applies to all of the

13   refrigerators, because they relied on that single

14   refrigerator as a basis for all of their infringement

15   allegations here.

16             As you will recall --

17             THE COURT:  Let me ask you this, Mr. Partridge:

18   On that subject, the spigot extending beyond the frame or

19   the -- I am drawing a blank on the term of art, the surface,

20   didn't he take issue with Mr. Morico in his efforts to get

21   him to agree?

22             MR. PARTRIDGE:  He said, Your Honor, that, gee,

23   he would have to pull that thing out and make measurements

24   to see exactly where it was, but that his observation was

25   that maybe it was -- that's the way I heard it.  They bear

1    the burden of proof, yes, it's not clear and convincing,

2    it's preponderance of the evidence.  That's a burden they

3    need to satisfy in their case-in-chief.

4              THE COURT:  True.

5              MR. PARTRIDGE:  I would suggest to Your Honor

6    that the testimony that we heard did not measure up to that

7    particular standard.  For that reason, that is the basis for

8    our motion for judgment as a matter of law on the issue of

9    infringement.

10             THE COURT:  If he had unequivocally agreed with

11   Mr. Morico in Mr. Morico's efforts at cross-examining him

12   with the mockup, I might agree.  But wouldn't it be better

13   that I try not to invade the province of the fact-finder and

14   let them draw a conclusion about that one way or the other?

15             MR. PARTRIDGE:  Your Honor, you would be

16   perfectly within your right to draw that conclusion, as I am

17   here standing on my motion at the same time.

18             THE COURT:  I understand.  Do what you have to

19   do, Mr. Partridge.

20             MR. PARTRIDGE:  Exactly.  Your Honor, we

21   understand each other perfectly.

22             We do have a motion with respect to damages that

23   we would like to make as well.

24             THE COURT:  I am going to deny your motion.  I

25   don't need to hear from you, Mr. Coyne.

1          MR. PARTRIDGE:  We accept that ruling, Your

2     Honor.

3          I would say, as Ms. Woodall comes up to address

4     the damages issue, that while we don't think the claim has

5     been made across the board, there are some sort of subsets

6     to this that I think she can address as part of our motion.

7          THE COURT:  That is fair.  Mr. Partridge, let me

8     add, I think as to the 552, didn't he talk about a list?

9          MR. PARTRIDGE:  He did, Your Honor.  And his

10    testimony was that he was going to treat everything on that

11    list the same as that refrigerator, and all the testimony

12    was then directed to that refrigerator.

13         THE COURT:  So I think it's left to the

14    fact-finder to determine whether he was just talking about

15    the 552 or all of the accused products.

16         MR. PARTRIDGE:  I understand, Your Honor.

17         THE COURT:  I wanted to clear that up.

18         Yes, Ms. Woodall.

19         MS. WOODALL:  We would also move for judgment as

20    a matter of law on LG's damages claim in this case.  We have

21    a number of bases for this.  As you heard from Dr. Rao, he

22    has calculated his reasonable royalty as a percentage of

23    sales of the entire refrigerator.

24         This is violative of the Federal Circuit's

25    recent case law and the application of the entire market

1    value rule.  LG has not carried its burden to show that the

2    spigot or the extendable tray that are the subject of the

3    claims at issue in the case are the basis of the customer

4    demand of the entire refrigerator.  While counsel for LG did

5    attempt at times to imply a royalty rate, that appears

6    nowhere in Dr. Rao's analysis.

7           His analysis was entirely percentage of sales of

8    the entire refrigerator.  So we believe their claim fails

9    for that purpose.  They have not shown that they are

10   entitled to recover any damages that are based on use of the

11   entire refrigerator as the royalty base.

12          The second point would be that we do not believe

13   there is a fact issue with respect to the date upon which

14   damages begin in this case.  The patent issued on January

15   1st of 2008.  But counsel for LG has indicated in one of the

16   summary judgment letters to the Court that they implicitly

17   acknowledge that they did not provide Whirlpool with actual

18   notice of infringement until the complaint was filed on

19   April 24th, 2008.

20          Further to that point, at no point during LG's

21   case-in-chief did they present any evidence that they

22   provided Whirlpool with actual notice as required by Federal

23   Circuit precedent of their patent rights prior to the filing

24   date of the complaint.

25          Our third point would be just to reurge at this

1    point the oral motion made yesterday with regard to the

2    methodology used --

3              THE COURT:  I am not going to hear you on that,

4    counsel, at this time.

5              MS. WOODALL:  I wanted to reserve it for the

6    record.

7              THE COURT:  It is reserved.  The worst thing you

8    can do with me is to beat the proverbial dead horse.  It

9    gets on the wrong side of me.

10             MS. WOODALL:  Yes, Your Honor.  Just for the

11    record.

12             THE COURT:  Even just for the record.  Just for

13    the record, let me say that to you again.

14             MS. WOODALL:  Understood, Your Honor.

15             And those would be our bases for moving for

16    judgment as a matter of law.  We believe that the foregoing

17    would suggest that LG has not carried its burden.  While the

18    statute does indicate that upon showing of infringement a

19    patentee is entitled to some form of damages, the Federal

20    Circuit has said that that does not mean that they get

21    damages where they have not carried their burden.

22             THE COURT:  A lot of courts have said that,

23    counsel.

24             Mr. Coyne.

25             MR. COYNE:  Thank you, Your Honor.

1              THE COURT:  Well before the Federal Circuit was

2      even formed, I might add.

3              MR. COYNE:  Your Honor, I don't believe Ms.

4      Woodall's attempt to restrict the base for the royalty --

5      yes, if the royalty is being applied on a unit part basis

6      against the entire product, there is a problem with the

7      methodology.  But Dr. Rao laid out his methodology to you

8      and the fact-finder.

9              There is nothing wrong with what he laid out

10     that can't be dealt with and wasn't dealt with during

11     cross-examination.  It is a fact issue, in our view.  We

12     respectfully submit it would be improper to do what Ms.

13     Woodall is suggesting.  He does, in fact, show a basis for

14     consumer demand.  That was part of his analysis.  Went

15     through in agonizing detail and pulled right out of

16     Whirlpool's documents the incremental demand for this

17     product are driven by that feature.  Even if we go --

18             THE COURT:  I am going to cut you off, Mr.

19     Coyne, because I agree with you.  The Doctor clearly

20     rejected the premise, at least two or three of the premises

21     upon which Ms. Woodall was examining him.  And there was a

22     difference of view.  It's up to the jury.  It's going to be

23     up to the jury to decide whether they accept his testimony.

24             So the motion is denied.

25             MR. COYNE:  Thank you.

1            THE COURT:  Matters for tomorrow, do we have

2    issues we need to discuss?

3            MR. PARTRIDGE:  I am not aware of any, Your

4    Honor.  We do appreciate that you allow us to come in at

5    8:30.  If we have something, we will be here and we will try

6    not to burden you with anything that is not necessary for

7    the day.

8            THE COURT:  I operate under the assumption that

9    stuff is going to happen overnight.  So I try to get in here

10    in time so that I can hear you at 8:30 and we don't delay

11    the jury.

12            So I will be here.  We will recess.  Good

13    evening.

14            (Court recessed.)