1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4    LG ELECTRONICS U.S.A., INC.,     :    Civil Action
     and LG ELECTRONICS, INC.,        :
5                                      :
                  Plaintiffs,          :
6                                      :
          v.                           :
7                                      :
     WHIRLPOOL CORPORATION,            :
8                                      :
                  Defendant.           :    08-234(GMS)
9    _____

10   WHIRLPOOL CORPORATION,            :
     WHIRLPOOL PATENTS COMPANY,        :
11   WHIRLPOOL MANUFACTURING           :
     CORPORATION, and MAYTAG           :
12   CORPORATION,                      :
                                       :
13                 Counterclaim        :
                   Plaintiffs,         :
14                                     :
          v.                           :
15                                     :
     LG ELECTRONICS U.S.A., INC.,      :
16   LG ELECTRONICS, INC., and LG      :
     ELECTRONICS MONTERREY MEXICO,     :
17   S.A., DE, CV,                     :
                                       :
18                 Counterclaim        :
                   Defendants.         :
19                              - - -

20                         Wilmington, Delaware
21                         Friday, March 5, 2010
                                8:40 a.m.
22                          Trial - Day Five

23                              - - -

24   BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
                                       and a Jury
25

1    APPEARANCES:

2            RICHARD K. HERRMANN, ESQ.
             Morris James
3                     -and-
             PATRICK J. COYNE, ESQ.,
4            ANAND K. SHARMA, ESQ.,
             JEFFREY W. ABRAHAM, ESQ., and
5            WALTER D. DAVIS, JR., ESQ.
             Finnegan, Henderson, Farabow,
6            Garrett & Dunner, L.L.P
             (Washington, D.C.)

7
                         Counsel for Plaintiffs and
8                        Counterclaim Defendant

9            FREDERICK L. COTTRELL, III, ESQ., and
             ANNE SHEA GAZA, ESQ.
10           Richards, Layton & Finger, P.A.
                     -and-
11           SCOTT F. PARTRIDGE, ESQ.,
             PAUL R. MORICO, ESQ.,
12           AMANDA M. WOODALL, ESQ.,
             GENE SPEARS, ESQ., and
13           ROBINSON VU, ESQ.
             Baker Botts L.L.P.
14           (Houston, TX)

15                       Counsel for Defendant and
                         Counterclaim Plaintiffs
16

17                       -   -   -

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning, please be seated.

2          (Counsel respond "Good morning.")

3          MR. PARTRIDGE:  Your Honor, we have a few issues

4     this morning.  Fortunately, we resolved a lot of them last

5     night.  The first witness we are calling this morning is Dr.

6     Hank Marcy, and there are two exhibit issues.  One concerns

7     Exhibit 57.  I know from asking him this morning that he

8     doesn't have personal knowledge of it.  It's been one of our

9     objections, but I suppose we can deal with that realtime and

10    not bother you with it.

11         THE COURT:  We can deal with it right now.

12         MR. PARTRIDGE:  I am happy to do so.  It's

13    Exhibit 57, Exhibit 123.  Exhibit 57 is up here now.  And

14    it's a report on an international builders show, as you can

15    see from the title, from 2006.  Mr. Marcy says this is not

16    something he has seen before.

17         If we go forward with it, I want to be sure that

18    they ask him that question first, because then he can say

19    that, as opposed --

20         THE COURT:  Perhaps, Mr. Partridge, rather than

21    just jumping into it, you can give me a little background as

22    to Marcy.

23         MR. PARTRIDGE:  Thank you.  I am sorry, Your

24    Honor.  I am trying to go through this too quickly this

25    morning.

1          Dr. Hank Marcy is the former vice president of

2     global technology who left Whirlpool last Friday and started

3     a new job at Bissell Corporation Monday of this week.

4          We are calling him mostly because they wanted to

5     call him.  This is one of the exhibits they have identified

6     with respect to their calling him for purposes of the trial

7     this morning.

8               THE COURT:  He is not familiar with this?

9               MR. PARTRIDGE:  He is not familiar with this

10    document.

11              MR. COYNE:  Your Honor, there are several items

12    in the document.  I don't know whether he is familiar with

13    it.

14              THE COURT:  Let's assume for a moment that I am

15    going to take Mr. Partridge's word that he is not.  And you

16    will establish that with the witness?

17              MR. COYNE:  Yes, Your Honor.

18              THE COURT:  One way or the other.  Let's assume

19    for a moment that he is not.

20              MR. COYNE:  I also want to ask him about, there

21    is a number of policies and guidelines.  This is basically

22    how to behave at a trade show.  This is a trade show where

23    they allege we have misbehaved.  In particular, they

24    allege -- and what I am worried about, Your Honor, is this

25    is literally the last witness that they will be putting up.

1    And I will have the opportunity to ask this type of question

2    to.  He is high enough in the company, he was an officer,

3    and he is in a position where he should know what's going

4    on.  He may not have written this memo, I will accept that.

5    Mr. Partridge is representing it.  He may not have seen the

6    memo.  I will accept that.

7                    THE COURT:  Would he be aware of underlying

8    policy that is reflected in the memo?  Is that your point?

9                    MR. COYNE:  Yes, Your Honor.  My concern is they

10   are going to get up on their rebuttal case, they have put

11   their willfulness proof in, I am going to get our guys up

12   and say, no, we weren't willful, and they're going to come

13   back on rebuttal and say, you guys were sneaking around at

14   trade shows, taking photographs and doing this kind of

15   thing.  In particular, what is in this document is how to

16   take pictures surreptitiously at a trade show.  Let's face

17   it, everybody does this.  I am not saying they are bad by

18   doing it.  But I want to be able to defend my client

19   effectively by pointing out that everybody does it this way

20   and you have your own guidelines on how to do it without

21   getting caught.

22                    THE COURT:  Some of those guidelines looks like

23   are in this document?

24                    MR. COYNE:  Yes, Your Honor, they are

25   specifically at page 4, I don't want everybody in the

1    courthouse reading it, but I can show you the sentence under

2    "photography."

3                    THE COURT:  Mr. Partridge, Mr. Coyne's position

4    is that the issue is not as easily resolved by simply saying

5    you're contending, even if it is true, that he is not

6    familiar with the document.

7                    MR. PARTRIDGE:  He can answer those questions,

8    though, Your Honor, and I don't have an objection to Mr.

9    Coyne asking those questions.

10                   THE COURT:  We will let the witness establish

11   his familiarity with the document.

12                   MR. PARTRIDGE:  That is fine, Your Honor.

13                   The second document is Exhibit 123.  This is a

14   document that to the extent it has any relevance it would be

15   for the Bench trial, which is their unclean hands defense.

16                   This document talks about a strategy with

17   respect to how, as most competitors would, documents about

18   each of their competitors, gee, here is what we are going to

19   do --

20                   THE COURT:  Why do law departments let

21   businesspeople create things like this?  I was in a law

22   department at what used to be a Fortune 250 company and it

23   used to drive me nuts.

24                   But go ahead.

25                   MR. PARTRIDGE:  As a matter of fact, Your Honor,

1    this document is one that lays out a strategy with respect

2    to our competition with these particular companies, and if

3    we use this document, I would have to request the Court to

4    close the courtroom to the public, because it lays out a

5    particular strategy.

6              There isn't, in the document, as best I can

7    tell, something that I would think is directly related to

8    whether the patents in this case are infringed, whether the

9    patents in the case are valid.

10             THE COURT:  Mr. Coyne, would you object to the

11   courtroom being closed?

12             MR. COYNE:  Your Honor, I have no objection to

13   closing the courtroom for this, but my point is with this

14   document, they are accusing us of being an evil --

15             THE COURT:  You don't object?  He's just asking

16   for --

17             MR. PARTRIDGE:  I don't think it is relevant to

18   anything in the current case.  It arguably could be relevant

19   to --

20             THE COURT:  You did start out by saying that,

21   that this is relevant to the Bench portion.

22             MR. PARTRIDGE:  To the Bench portion, Your

23   Honor.

24             THE COURT:  Your position on that?

25             MR. COYNE:  Whirlpool's argument is we are the

1    evil Asian copyist.  And what this shows --

2              THE COURT:  But, you know, they have never --

3    the only time I have heard that is out of your mouth,

4    frankly, Mr. Coyne, and I thought it was unfortunate when

5    you said it at the time.

6              Go ahead.  That has not been the matter in which

7    they have conducted these proceedings.

8              I am not naive and my head is not in the sand on

9    this.  But I am eternally hopeful that we can rise above

10   these issues and that our jury will do that.  My point,

11   however, is they have not conducted this trial in that

12   manner.

13             Go ahead.

14             MR. COYNE:  Your Honor, the document not only

15   includes that.  It also includes a number of items of their

16   strategic plan and it establishes very effectively, in fact,

17   more effectively than most of the other documents that I

18   have had access to that I can use with these witnesses, that

19   our capabilities, in terms of advanced technology, advanced

20   design, advanced styling, this is their strategic assessment

21   of us as a competitor.  Frankly, it is very powerful.

22             THE COURT:  I will permit this.  We can close

23   the courtroom.  I don't think there has been any press here

24   at all, No. 1.  It's mainly interested parties.

25             To the extent that certain people need to be out

1    because they are involved in certain aspects of the action,

2    and, counsel, you can confer on that and decide who can stay

3    and who needs to go.

4              MR. PARTRIDGE:   I would not want any of the LG

5    employees here.

6              THE COURT:   Whatever you can agree on.  If you

7    can't, then I will resolve those issues.

8              MR. PARTRIDGE:   Very well, Your Honor.

9              MR. COYNE:   Your Honor, we have no problem with

10   asking all the client representatives to leave the courtroom

11   for that portion of the testimony.

12             MR. PARTRIDGE:   The next issue --

13             THE COURT:   I am assuming the technology,

14   gentlemen, can remain?

15             MR. PARTRIDGE:   That what can remain, Your

16   Honor?

17             THE COURT:   The gentlemen who are running the

18   presentation.

19             MR. PARTRIDGE:   Yes, on both sides, Your Honor,

20   that is fine.

21             The next exhibit concerns two exhibits that they

22   intend to use with Dr. Lee, Plaintiffs' Exhibit 211 and

23   Plaintiffs' Exhibit 380, which are Korean publications,

24   Korean patent applications that -- patent applications that

25   are published there.

1              They are dated in the late '90s.  They intend to

2    use them with Dr. Lee.  Dr. Lee's name is not on the

3    patents.  He is a different inventor on both patents.

4              THE COURT:  These are prior art publications,

5    did you say?

6              MR. PARTRIDGE:  They are not prior art

7    publications.  They are not relying on them for prior art.

8    There is no expert opinion with respect to them.  They

9    offered no expert opinion on the part of Dr. Lee with

10   respect to them.

11             What they are telling us with respect to their

12   use, yesterday they said they go to willfulness and copying.

13   And there is not one word in all of the development

14   documents from the beginning of the Bics project through the

15   introduction of the refrigerators to the market about either

16   of these publications.

17             So the intention --

18             THE COURT:  These are both patent applications,

19   did you say?

20             MR. PARTRIDGE:  Yes, patent applications.  They

21   have been published, one or the other of them, they are in

22   Korean, they may have issued as patents.  But in essence,

23   they are putting Dr. Lee on the stand to now more or less

24   tell a story about a couple of patent applications from the

25   '90s as having some relationship with their developments

1    that occurred in the Bics project some five years later.

2              THE COURT:  And they are not prior art?

3              MR. PARTRIDGE:  They are not prior art.  It is a

4    '701 problem, it is a '402/'403 problem.

5              THE COURT:  You really like numbers, don't you,

6    Mr. Partridge?

7              MR. PARTRIDGE:  Yes.  One of your former

8    colleagues told me when I had a trial before him --

9              THE COURT:  McKelvie?

10             MR. PARTRIDGE:  Not McKelvie.  It was Judge

11   Jordan, he told me, I must use rule numbers.

12             THE COURT:  I have a different approach.  I

13   think that the record is better served.  If I were an

14   appellate judge -- as we know, most our Federal Circuit

15   judges have not been trial judges.  It's just a fact -- I

16   would rather have the lawyers say, this is why I am

17   objecting, rather than citing a rule.

18             MR. PARTRIDGE:  I think it's better as well.

19   That is our objection, Your Honor.

20             THE COURT:  Okay.  Mr. Coyne?

21             MR. COYNE:  Yes, Your Honor.

22             We are not alleging these are 102(b) references,

23   we never have.  We are using them to respond to the argument

24   of copying.  It is important where we start this process.

25             These documents establish that as early as

1    **1996 --**

2    **THE COURT:  Is it true they were never mentioned**

3    **in any of the Bics documentation that we have seen thus far,**

4    **the jury has seen?  I think that was Mr. Partridge's**

5    **contention, that there has been no mention of these**

6    **applications.**

7    **MR. COYNE:  In the company's internal memos?**

8    **THE COURT:  In what the jury has seen.**

9    **MR. COYNE:  In what the jury has seen so far.  I**

10   **don't know.  But Dr. Bessler is relying on them for his**

11   **invalidity.**

12   **THE COURT:  I think one of the concerns must be,**

13   **mustn't it, whether this is going to potentially matters for**

14   **the jury.**

15   **Is that part of what you object to?**

16   **MR. PARTRIDGE:  Yes, Your Honor.**

17   **THE COURT:  Mr. Spears wants you to object on**

18   **another basis as well.**

19   **MR. PARTRIDGE:  They are going to see these**

20   **publications which are not offered to show the claims are**

21   **invalid.  They are going to put them up there and say there**

22   **is some connection between these and their development when**

23   **the documents don't show that.  And the amount of prejudice**

24   **and confusion that is created as a consequence will be near**

25   **impossible for me to deal with Dr. Lee in Korean.**

1                    THE COURT:  If there is no mention made -- then

2        I will let you get back into it.  Here is one of the

3        concerns I have after listening to Mr. Partridge.

4                    Mr. Herrmann wants to say something.

5                    MR. COYNE:  Your Honor, to respond on the merits

6        first.  These two documents that the project reports are

7        totally prospective.  There is no project report, unlike

8        Whirlpool's, where we say here is a survey of what we have

9        done in the past.

10                   This is part of the information the company had

11       in its knowledge base.  What I need to use this to establish

12       is, for example, we were already working on -- we are not

13       saying it's 102(a), 102(b), anticipatory art.  We had

14       already installed ice storage bins and dispensing devices in

15       the door years before.  And this was a continuation, Il Shin

16       Kim is going to be testifying that these came out of his

17       group.  Dr. Lee is going to be testifying, this is

18       information that they had in the company and were basing --

19       when they went into this ice and water project, were basing

20       it from this background.  We weren't starting from scratch.

21       We were starting from this base of knowledge internally in

22       the company and were trying to make -- these are things we

23       have deployed in Asia.

24                   THE COURT:  The testimony related to these

25       documents -- I am assuming they are exhibits.

1              MR. COYNE:  Yes, Your Honor.

2              THE COURT:  -- is directed to what issue in the

3      case?

4              MR. COYNE:  Willfulness.  Copying.  In other

5      words, we're not getting these ideas to put the ice maker

6      and the bin on the door with them.  We have been working

7      with these ideas in other implementations and other markets

8      in the world for a very long time, before the patent was

9      filed.

10             THE COURT:  Go ahead.

11             Were you finished, Mr. Coyne?

12             MR. COYNE:  Yes, Your Honor.

13             MR. PARTRIDGE:  If that was true, there would be

14     some mention of this in all of the documents, many, many

15     documents.

16             THE COURT:  Maybe that is an argument that you

17     are going to have to make and maybe it's up to the jury to

18     decide that, Mr. Partridge.

19             MR. PARTRIDGE:  I understand that, Your Honor,

20     that it could come to that.

21             THE COURT:  In spite of your protestations that

22     you are not going to be able to deal with it.  You just

23     began to give a hint of how you might deal with this in your

24     closing.  So I am not sure that it's as formidable an issue

25     as you make it out to be.  I wouldn't want to have to deal

1    with it, either.

2              MR. PARTRIDGE:  The thing I want to be careful

3    with here, Your Honor, is I think I am walking into a

4    situation where witnesses who have not given reports on

5    these documents are going to begin opining on them.

6              THE COURT:  That is not going to happen, because

7    you are going to object.  Your team is going to be more

8    active in objecting.

9              MR. PARTRIDGE:  Yes, Your Honor.

10             THE COURT:  On issues like this.

11             MR. PARTRIDGE:  I understand the ruling of the

12   Court.

13             THE COURT:  Because I am not going to let that

14   happen.  But I am not going to try the case.  If it happens

15   and there is not an objection, I am going to sit there and

16   let it happen.

17             MR. PARTRIDGE:  Fair enough.  I understand the

18   ground rules.  That works for us.

19             We do have a set of issues that arise -- by the

20   way, we are going to withdraw our objection to the Bessler

21   slides, the two remaining slides.  So we don't have to deal

22   with those.

23             We are going to withdraw our objections with

24   respect to Ken Whah's deposition.

25             We have some inventor testimony that I am not

1    sure when it's going to be introduced.  Is that going on

2    today or Monday?

3              MR. COYNE:  It depends on when you finish your

4    case and who we have available.  I think we have identified

5    three live witnesses today.  If there is sufficient time, I

6    would like to try to plow through the live witnesses rather

7    than read the depositions.  But if we have a little gap of

8    time, I would like to reserve the flexibility not to waste

9    any time.

10             THE COURT:  I agree.

11             My comments about objections, and again, I don't

12   mean to seek to impose the Court's will on counsel's trial

13   strategy, but they go for both sides, is my point.  Try the

14   case the way you want.  Every once in a while I can't

15   resist.  But I would really like to do the job the way it's

16   perceived to be done, as a neutral arbiter of the rules.

17             MR. PARTRIDGE:  Maybe the way to do this, Your

18   Honor, is there is a set of issues that are probably more

19   important that could come up with the live witnesses that

20   maybe Mr. Spears ought to address.

21             The depositions of employees of Whirlpool

22   involve two issues:  A violation of the Court's claim

23   construction ruling with respect to the freezer compartment,

24   and it's testimony that they attempted to use during the

25   Markman ruling that you said was extrinsic evidence, and now

1    it's being offered from the stand, through the depo.

2              The second is, questions about opinions about

3    prior art that witnesses had never seen before, which during

4    the motion in limine process you had said was a nonstarter.

5    Where the level of skill, the relevant time, none of that is

6    in there.  And it's really not many questions and answers.

7    One thing I could do is just give you a highlighted portion.

8    It's probably, added all up, three pages of testimony, and

9    you might just look at it and X through, say, yeah or nay

10   with respect it, and I am fine with it.

11             THE COURT:  Why don't you do that.

12             MR. PARTRIDGE:  I will pull these out while Mr.

13   Spears is discussing it.

14             THE COURT:  I am assuming that is an acceptable

15   process to you?

16             MR. COYNE:  Yes, Your Honor.  I would like some

17   opportunity to address the merits of those citations at some

18   point.  Is now the appropriate time or not?

19             THE COURT:  As a general matter, you know from

20   the pretrial conference that -- it shouldn't take the

21   pretrial conference to inform counsel that the Court is not

22   going to permit an expert to give testimony that seems to

23   contradict the Court's claim construction.

24             MR. COYNE:  Yes, Your Honor.  Your Honor, if I

25   may.  Again, this testimony, we are absolutely not trying to

1    undermine Your Honor's authority with this jury.  That is

2    not our intention at all.

3            I am happy to put in whatever transitional

4    statements or have Your Honor give whatever instructions,

5    cautionary instructions, would be appropriate.  But what the

6    evidence will -- there is two issues that Mr. Partridge

7    identified.  This claim construction issue goes to

8    specifically whether being mounted on the door is disposed

9    within the freezer compartment.  Several of the inventors

10   felt that, if it's mounted on the door, it's not disposed

11   within the freezer compartment and testified that way.  We

12   accept your construction.

13           THE COURT:  Regardless of what the inventors

14   thought, I have issued a ruling on the construction, of the

15   relevant elements.  We are not going to get into that.

16           MR. COYNE:  Your Honor, the problem is many of

17   our inventors and people that were working on the Bics

18   project reached the same conclusion.  That is our basis

19   for --

20           THE COURT:  You want to offer that to debate

21   with the Court on the meaning of the terms?

22           MR. COYNE:  No, Your Honor.

23           THE COURT:  Then what is the purpose?

24           MR. COYNE:  We are not offering it to debate

25   with the Court.  The only purpose is, how can we be

1   objectively reckless if we reach the same conclusion on this

2   point that some of the inventors did?  We agree that given

3   the Court's construction, that view is incorrect.  But the

4   issue here is whether it is objectively reckless.  And the

5   fact that some of our people reached the same conclusion

6   that some of the inventors reached is very powerful evidence

7   that shows that we weren't objectively reckless.  We may be

8   wrong.  Under Your Honor's ruling, we are wrong.  But we are

9   not objectively reckless.

10              THE COURT:  Go ahead.  I understand your point.

11  Mr. Partridge, what about that?

12              MR. PARTRIDGE:  Your Honor, the problem with

13  that is that the claims mean what they mean.

14              THE COURT:  You heard Mr. Coyne.  I want you to

15  react to specifically his proposal that the Court fashion,

16  perhaps with the parties, an appropriate instruction.

17              MR. PARTRIDGE:  The problem is that these

18  witnesses were not looking at the patent specification, and

19  considering the patent specification in connection with

20  their answers to these questions.

21              And the witnesses of Mr. Coyne's had the patent.

22  They had it in front of them.  They were considering it

23  during their development of their products.

24              And they had all the language to use in

25  connection with their evaluation of their position.

1              Whereas these individuals were not evaluating

2      the patent.  They were asked general questions that are

3      inconsistent with Your Honor's ruling, which takes into

4      account the specification of the patent, which is what they

5      had before them when they were taking their position.

6              THE COURT:  Part of your point as well is that

7      it might be misleading?

8              MR. PARTRIDGE:  Yes, Your Honor.  And they will

9      hear something that is inconsistent with your ruling.

10             I will hand it up, Your Honor.  I think you have

11     heard the arguments of the parties.  I am happy, obviously,

12     with however you rule on this.  We will live with it.  Here

13     is a set for Mr. Coyne with the highlighted portions that

14     are in dispute.

15             THE COURT:  This is all in the deposition?

16             MR. PARTRIDGE:  Yes, Your Honor.

17             THE COURT:  Mr. Coyne, you wanted to say

18     something?

19             MR. COYNE:  Yes, Your Honor.  I only addressed

20     one of the two points.  The second point was the opinions on

21     the prior art.  We have taken Your Honor's ruling to heart.

22     We have gone back and limited and taken out any of the

23     questions where the witness was shown something they hadn't

24     seen before and asked about it.

25             Those are not in.  We have taken them all out.

1            The questions that remain are very few questions

2       about what did the inventors think about an automatic ice

3       maker at the time.  It was their state of mind, their

4       understanding, not giving an opinion, it was them as

5       inventors, what did they consider at the time.

6            MR. PARTRIDGE:  There are questions about

7       obviousness in there, without any reference to skill in the

8       art, asking after the fact, a witness with 30 years of

9       experience in refrigeration engineering and a guy who had

10      developed this product and the product had been out there

11      eight or nine years, without reference to level of skill and

12      the appropriate point in time in which the obviousness

13      analysis is made, asking him if it's obvious.

14           The questions that they have asked our witnesses

15      about was this common knowledge as of the '90s and the like.

16      We haven't objected to any of those.  Those are proper

17      questions.

18           The questions that are objectionable are the

19      ones that get into an obviousness question of a witness who

20      has no frame of reference from which to answer the question.

21           THE COURT:  Okay.  I will take a look.

22           Mr. Spears?

23           MR. SPEARS:  Yes.  We have another issue.  This

24      is going to be a major issue once Mr. Ching Ho Lee testifies

25      as a fact witness for LG.  And then a number of expert

1    witnesses will be called on this issue as well.

2              THE COURT:  When is Mr. Lee going to testify?

3              MR. COYNE:  Your Honor, I believe it will be

4    Monday at this point.

5              MR. SPEARS:  We can address the issue then.

6              THE COURT:  We will address it later.

7              MR. SPEARS:  Okay.

8              THE COURT:  Later may be today, Mr. Spears.  I

9    don't know.  Not right now when I am trying to get the jury

10   in.

11             MR. PARTRIDGE:  We reached a resolution on that

12   clawed-back document, Your Honor, so you won't have to deal

13   with that.

14             We do have an offer of proof that we would like

15   to make with respect to our damages expert.  It may be that

16   you can deal with that quickly right now.

17             The issue has to do with actually enhancement of

18   damages.  The witnesses are here.  The experts are here.  It

19   has to do with the period of time from when they actually

20   knew about the patent up until the actual notice kicked in.

21             And there is authority for the proposition that

22   you can consider that as part of your enhancement

23   determination if the jury comes back with a willfulness

24   finding.  We are happy to defer that until the Bench trial

25   next week.  That is fine with us.

1           But given how Federal Circuit law changes and

2    evolves over time, I wanted to be on this record as having

3    said that before we actually conclude the jury trial.  And

4    if you simply say, we will hold that over, I am happy.

5           THE COURT:  Is there any objection to holding it

6    over?

7           MR. COYNE:  No, Your Honor.

8           MR. PARTRIDGE:  We do have one other issue that

9    could arise before we conclude our case, which is the

10   stipulation that we are trying to work out with respect to

11   the volunteering documents, that big binder of documents.

12          THE COURT:  Do you want to continue to talk

13   about it?

14          MR. PARTRIDGE:  Yes, Your Honor.  But we may

15   have an issue for you before we close our case.

16          THE COURT:  So, then, this morning, Mr.

17   Partridge, we are going to start out with live witnesses?

18          MR. PARTRIDGE:  Yes, Your Honor.  Dr. Hank Marcy

19   will be the first witness.

20          THE COURT:  Okay.  Are we ready, then?

21          MR. PARTRIDGE:  Yes.

22          THE COURT:  I will be back.  Let's recess for a

23   moment.

24          (Recess taken.)

25          THE COURT:  All right.  Good morning, ladies and

```
 1    gentleman.
 2              MR. PARTRIDGE:  As our first witness, we call
 3    Dr. Hank Marcy.
 4              ...Henry O. Marcy having been duly sworn as a
 5    witness, was examined and testified as follows...
 6                      DIRECT EXAMINATION
 7    BY MR. PARTRIDGE:
 8    Q.    Dr. Marcy, would you introduce yourself to the jury,
 9    please?
10    A.    Hi.  I am Hank Marcy.  My full name is Henry Marcy,
11    but I go by Hank.  I'm married with two kids, one in college
12    in California, one a senior in high school.  I live in
13    Stevensville, Michigan.
14    Q.    Would you tell the jury your educational background,
15    please?
16    A.    Sure.  I have a Ph.D. in electrical engineering from
17    Northwestern University.  I earned that in 1990.  I have a
18    Master's degree in electrical engineering, also from
19    Northwestern, 1987.  Then my undergraduate degree is from
20    the University of Maine, in 1984.
21    Q.    When did you first join Whirlpool?
22    A.    I joined Whirlpool in January of 2002.
23    Q.    And would you describe for us the positions you held
24    at Whirlpool?
25    A.    Yes.  I had kind of three different positions at
```

Marcy - direct

1    Whirlpool.  The first, when I hired in this January was

2    being in charge of advanced product development and

3    electronics.  So essentially, all of the advanced

4    technologies, the innovations, for our products,

5    refrigerators, dishwashers, cooking products, fabric care

6    products, all around the world.  I was also kind of the

7    voice and face of innovation for the corporation.  I did

8    that for four years.

9              For two years after that I was in charge of our

10   refrigeration business.  So it was like October 2005 to

11   August 2007.  And then for the last two and a half years,

12   roughly, I have been in charge of technology development for

13   all of our products from early stage technology development

14   through to delivery of technologies into production

15   products.

16   Q.   What was the last title you held at Whirlpool?

17   A.   Vice president of global product technology.

18   Q.   You mentioned that during that period of time during

19   the last nine or ten years or so, you held a number of

20   positions that involved the refrigerator business.  Is that

21   correct?

22   A.   Yes.  Actually, during my entire eight years, there

23   would have been a number.

24   Q.   Would you describe generally your role in connection

25   with the refrigerator business of Whirlpool during that time

1    period?

2    A.    Sure.   When I started, in 2002, in charge of advanced

3    product development in electronics.   I would have had a team

4    of people located primarily in Benton Harbor, Brazil, Italy,

5    accountable for advanced product development of

6    refrigerators.   I had other teams accountable for the other

7    products, and I would have had an electronics group

8    accountable for the electronics that go into the

9    refrigeration as well.

10          My second role as vice president of

11   refrigeration, now I am accountable for running the global

12   product team, which are the four P&L owners from each of our

13   business regions, then all of the product development.   So

14   roughly a thousand engineers around the world, in a whole

15   variety of different locations.

16          In my last role, again, kind of all of the

17   product development for refrigeration, technology

18   development for refrigeration with people all over the

19   world.

20   Q.    Dr. Marcy, who is your current employer?

21   A.    Actually, my current employer is Bissell Incorporated.

22   Q.    And what is Bissell Incorporated?   What do they do?

23   A.    Bissell Incorporated is the leader in floor-care

24   products in the United States.   They make carpet cleaners,

25   vacuums, and a whole line of chemistry that goes with those

Marcy - direct

1    products.

2    Q.    When did you start that position?

3    A.    Monday, this past Monday.

4    Q.    Your last day with Whirlpool was when?

5    A.    Friday, February 26th.

6    Q.    A week ago today?

7    A.    That's right.

8    Q.    Did you volunteer to attend trial here today?

9    A.    I did.

10   Q.    Why did you volunteer to come?

11   A.    Whirlpool was a tremendous part of my career, a

12   tremendously positive part of my career and intellectual

13   property, the technologies that go into our products, that

14   was my accountability.

15           So this trial has held great interest for me and

16   my people for quite some time.

17   Q.    You mentioned that, and I think you said it this way,

18   that you were the face of innovation.  I want to ask you, in

19   connection with innovation, what over that period of time

20   was your perspective of the commitment of Whirlpool to

21   innovation?

22   A.    So, actually, the commitment to innovation at

23   Whirlpool is a big piece of what attracted me.  Just an

24   incredible commitment to using innovation, to change the

25   culture of the company to one that was focused on the

Marcy - direct

1    consumer and to build on loyalty to our brands.

2              When I say "commitment," it was right from the

3    top, from the CEO, from my boss, the chief technology

4    officer, a whole curriculum that thousands of people went

5    through, certification programs, and then, from my

6    perspective and from the perspective of all the people that

7    I worked with, you know, trying to focus on what are we

8    going to do to bring better features and benefits, better

9    living, if you will, to all of our consumers.  So I found

10   that credibly unique and interesting to talk about

11   innovation.  This was a real program system around it.  Then

12   also just very exciting and kind of engaging in terms of

13   professionalism.

14   Q.    During your timer at Whirlpool, what was your specific

15   role in that regard?

16   A.    Me and my people were really accountable for all the

17   content.  So the features and of the benefits that go into

18   our products, the technologies that provide those features

19   and benefits, the partnerships that would be formed to drive

20   those into production.  And then, of course, I spoke at lots

21   of conferences.  I spoke inside the company all the time.

22   How to create the management system, if you will.  How are

23   we going to measure innovation.  How are we going to talk

24   about it.  How would we know we were working on the right

25   thing.  So this kind of connection from the consumer to

1    what's right for features and benefits in our product to

2    what causes us to win in the marketplace and everything

3    about that.  That's what me and my organizations were really

4    accountable for.

5    Q.    Are you familiar with in-door-ice, or IDI, technology?

6    A.    Certainly.

7    Q.    From your perspective, what is in-door-ice, or IDI,

8    technology?

9    A.    In-door-ice was all about moving the ice storage and

10   ice-delivery system from kind of inside the freezer

11   compartment onto the door.  What did that do?  That freed up

12   all the space inside the freezer compartment, the

13   side-by-side.

14          That was how it started.

15   Q.    How important was the technology that you just

16   described, the IDI technology, to Whirlpool?

17   A.    I think it was huge.  Over time, it caused about a

18   25-point shift in market share.  It's just an asset.  We

19   went from being kind of one of the pack to being the clear

20   leader, particularly in the U.S. market where side-by-sides

21   were really the dominant -- became the dominant product, in

22   large part because of in-door-ice technology.

23   Q.    From your perspective, how important was IDI

24   technology to consumers?

25   A.    Huge.  You know, I think getting water and ice through

Marcy - direct

1    the door kind of drove the initial interest in

2    side-by-sides.  But, you know, if you looked at like a

3    freezer on the top model or even a freezer on the bottom

4    model, it looked like a lot more freezer space than when you

5    looked at a side-by-side and you had kind of a skinny

6    freezer, particularly when the top third of it was taken up

7    with the ice storage and ice-making.  When all that ice

8    storage and a chute that brought it onto the door, it opened

9    up all this space and people were like, yay, now I can

10   really use this product.  And it drove the sales of the

11   product for years.

12   Q.    Did the launching of the IDI technology have an effect

13   on further innovation work at Whirlpool?

14   A.    For sure.  You know, with consumers really, you know,

15   voting with their pocketbooks, so to speak, for side-by-side

16   refrigerators with ice and delivery of water through the

17   door, that really drove a focus, really intense effort on

18   how to add, how to make that feature and benefit much

19   better, but also to add additional features and benefits

20   around the ice and water delivery system.

21   Q.    Focusing just for a moment on the side-by-side

22   refrigerator market, did the introduction of IDI technology

23   have a particular effect when it was first introduced in the

24   next couple of years on the side-by-side refrigerator

25   market?

Marcy - direct

1    A.    Yes, I think there was a pretty clear shift in buying

2    behavior to side-by-sides, again, because, you know, what

3    looked like a fairly unusable freezer suddenly became --

4    looked like, you know, very usable space.  So people started

5    choosing side-by-sides over the other types of freezers much

6    more frequently.  That is my understanding.

7              MR. PARTRIDGE:  Pass the witness, Your Honor.

8              MR. COYNE:  We have cross binders for this

9    witness.

10             THE COURT:  Okay.

11                   CROSS-EXAMINATION

12   BY MR. COYNE:

13   Q.    Dr. Marcy, I appreciate that it's an imposition to

14   drag you away from your new job a week after you started.

15   We appreciate you coming.

16   A.    No problem.

17   Q.    Thank you.

18             I wanted to talk to you about a couple of

19   selected topics.  You understand that we have also asked for

20   you to attend as a witness on behalf of LG for some issues.

21   Correct?

22   A.    Yes.

23   Q.    So I may be asking questions that go beyond what Mr.

24   Partridge asked you about.  Right?

25   A.    Okay.

Marcy - cross

1    Q.      One of the things that you were exposed to in your

2    position at Whirlpool is that Whirlpool was worried about

3    losing the Sears business to LG.   Correct?

4    A.      Sure.

5    Q.      ████████████████████████████████████

6    ████████████████████████████████

7    ████████████████████████████████████

8    ██████████████████████████████   Correct?

9    A.      There is a very specific portion of the Sears

10   business.   Of course, we sell all of our brands to Sears.

11   But what I believe you are referring to is the Kenmore brand

12   business.   We were providing refrigerators and Sears was

13   then selling under the Kenmore brand.   Of course, we also

14   sold Whirlpool and Kitchen Aid, Maytag, Jenn-Air, or brands

15   for Sears as well.   ████████████████████

16   Q.      I was not referring to the Whirlpool-branded product

17   but rather the Kenmore-branded product.

18   A.      Right.

19   Q.      In fact, ███████████████████████

20   ███████████████████████████   Right?

21   A.      Correct.

22   Q.      And in some sense, Whirlpool is coming up short,

23   frankly.   Right?

24   A.      With respect to the Kenmore brand, I think that's

25   true.   But, you know, it's actually allowed us to focus on

Marcy - cross

1    our own brands to a fairly significant degree, improving the

2    sales of those brands, Whirlpool, Kitchen Aid.

3    Q.    I would like to switch to a slightly different topic

4    now.

5              This is a very competitive market,

6    refrigerators, isn't it?

7    A.    Yeah, it's a very competitive market.

8    Q.    In fact, all of the competitors, just as a matter of

9    everyday business, keep track of what each other are doing,

10   don't they?

11   A.    That's, you know, through a whole variety of means,

12   yes, absolutely.

13   Q.    And people engage in what is called competitive

14   intelligence.  Right?

15   A.    Right.

16   Q.    And there is nothing wrong with that, is there?

17   A.    No.

18   Q.    In fact, people go to trade shows and they look at

19   what's in each others' booths?

20   A.    Yes.

21   Q.    Sometimes they take pictures of what's in each others'

22   booths.  Right?

23   A.    Yes.

24   Q.    And they are doing what are called tear-down, where

25   they might acquire a unit a competitor has on the market and

1    bring it back to the lab and tear it down to see what makes

2    it tick and how it works.  Right?

3    A.    Yes, we have a pretty comprehensive tear-down

4    activity, where we buy products from all of our competitors

5    around the world, really to understand not just what are

6    they doing, but also to learn about new possibilities for

7    implementing features and benefits and basic operation of

8    the product.  That is a pretty standard practice, sure.

9    Q.    Again, there is nothing wrong with that.  Right?

10   A.    No.

11   Q.    In fact, that's pretty much how people do their

12   business in terms of trying to acquire this competitive

13   intelligence in this industry.  Right?

14   A.    Sure.

15   Q.    And in particular, with respect to the tear-downs,

16   among the company's products that Whirlpool has torn down

17   are LG products.  Right?

18   A.    Sure.  Amongst all of our competitors, yes.

19   Q.    And among the activities, people go to trade shows to

20   find out what competitors are doing as well.  Right?

21   A.    Trade shows are often where new features and benefits

22   are introduced.  So, yes, we would often have a small group

23   of engineers go to trade shows.

24   Q.    Sir, I don't mean anything by asking you it the way I

25   am.  But it's a competitive market, so people are kind of

Marcy - cross

1    looking for things, picking up literature, if they overhear

2    things, eavesdropping.  That is generally the way the

3    industry works, because you are trying to gather

4    intelligence about what your competitors are up to?

5    A.    Trade shows are public events, yes.

6    Q.    Okay.  Sir, with respect to LG in particular --

7              MR. COYNE:  Your Honor, I would like to publish

8    on the screen PTX-123 that we had talked about.

9              THE COURT:  That's fine.

10             MR. COYNE:  Mr. Brooks, could you bring up

11   PTX-123, please?

12             Before we get into the merits of it, Your Honor,

13   this is the document we had a discussion about.

14             THE COURT:  I know what document.

15             MR. COYNE:  We talked about the confidentiality

16   concerns.

17             MR. PARTRIDGE:  I am okay at the moment.

18             THE COURT:  He hasn't said anything yet.

19             MR. COYNE:  I didn't want to do anything

20   untoward.

21   BY MR. COYNE:

22   Q.    Sir, could you turn to the next page, page 272, Mr.

23   Brooks, that is the second page of the document.

24             LG and Samsung are, in particular, companies

25   that Whirlpool has identified as strong competitors in this

Marcy - cross

1   field.  Correct?

2   A.    Correct.

3   Q.    Could we go to, I believe it's the fourth page of the

4   document?  It would be the next one.  It's labeled "page 4"

5   in the lower right-hand corner.  That is it.

6        Whirlpool has done a competitive analysis on the

7   relative strengths and weaknesses of these competitors to

8   try to determine where they are in the marketplace.  Right?

9   A.    Yes.

10  Q.    And one of the issues that they have identified with

11  respect to LG is that the product is highly designed and

12  consumer-marketing-focused.  Correct?

13  A.    Sure.

14  Q.    And with respect to some of the other features, can we

15  go down to page 7 of the document, Mr. Brooks?  I believe

16  it's page 6 on the lower right-hand corner.  Can you

17  highlight the portion in the center on the left-hand side,

18  under this area here?

19        One of the assessments that Whirlpool has

20  reached about LG's capabilities is that LG is being

21  recognized around the world for its leading design in

22  appliances and consumer electronics.  Is that correct?

23  A.    That's what it says there, sure.

24  Q.    Can we go to the next page, Mr. Brooks?

25        Sir, on the left-hand side, with the various

1    refrigerators, what are we looking at here?

2    A.    On the left-hand side?

3    Q.    Yes, sir.

4    A.    So no, I am not sure I have seen this exact document

5    before.  But what it looks like to me is we are looking at

6    how LG's products line up against the different brand of

7    products, probably at specific price points or closely

8    similar price points in the marketplace.  So you have LG and

9    Samsung products at the top and then Whirlpool's current

10   product lineup, what we have in the market.  Of course, what

11   is at the top would be what they had in the market at the

12   time.  And what our product development and response is

13   going to be across the bottom.

14   Q.    In making that response --

15                THE COURT:  Yes, Mr. Partridge?

16                MR. PARTRIDGE:  Your Honor, I have an objection

17   on the continued use of the document based on lack of

18   personal knowledge, given the witness' statement.

19                THE COURT:  He said he wasn't sure.  Do you want

20   to inquire?

21   BY MR. COYNE:

22   Q.    Sir, it's your understanding that in trying to move

23   forward --

24                THE COURT:  Inquire into whether this witness

25   has ever seen this document before.

Marcy - cross

1          MR. COYNE:  I am sorry, Your Honor.  I was going

2    to ask him a question removed from the document.  This was

3    actually the last set of questions I had on the document.

4          THE COURT:  I will let Mr. Partridge make those

5    inquiries.  Go ahead.

6    BY MR. COYNE:

7    Q.    Apart from the document, sir, with respect to

8    Whirlpool trying to adapt its products and move forward, you

9    would tend to benchmark against a competitor's product like

10   an LG to try to make improvements to your own.  Correct?

11   A.    Sure.

12   Q.    We can take that down now, Mr. Brooks.  Thank you.

13          Sir, does Whirlpool acknowledge that LG has

14   features and benefits that consumers are attracted to?

15   A.    Yes, I think in particular LG and Samsung kind of set

16   a new standard in aesthetic design.  You can see it in the

17   products across the way there, hiding the hinges, bringing

18   stainless steel and what I'll refer to as a kind of euro

19   styling to the marketplace in a fairly comprehensive way.

20   Again, at kind of the high-end price points, I will call

21   them.  Whirlpool competes with its brands across every price

22   point.  LG and Samsung, in particular LG, focus at the

23   higher end.

24   Q.    Are the two models that we see over here against the

25   wall, the DPX-22 and the DPX-23, the stainless steel

1    refrigerators, are those examples of what you were just

2    talking about?

3    A.    Examples, they are, you know, not their first models

4    they introduced.  They are later on.  But, yes.

5    Q.    Sir, among the other things that you have identified

6    at Whirlpool about LG as a competitor is that LG is able to

7    bring products onto the market faster than Whirlpool does.

8    Correct?

9    A.    I would say they had a cadence of more frequent

10   product introductions than we had.  I don't know that their

11   ability to execute is any faster or slower than our own.

12   But they certainly were introducing products more frequently

13   than we were introducing products.

14   Q.    Sir, in this industry, because it's so competitive, if

15   a feature is not proprietary, people do copy other features

16   that appear to be attractive on competitors' products, don't

17   they?

18            MR. PARTRIDGE:  Objection.  Calls for

19   speculation.

20            THE COURT:  No.  You can answer that, if you

21   can.

22            THE WITNESS:  You know, we are always looking at

23   the consumers' response to features and benefits.  If people

24   come out with things that consumers respond to strongly,

25   then we would like for a way to provide a similar benefit.

Marcy - cross

1        You know, "copy" is probably a strong word.  We

2    always want to have it be our own.  But, yes, if there is a

3    good feature and benefit, we would like to provide that,

4    sure.

5    BY MR. COYNE:

6    Q.    Were you involved in what Whirlpool calls it's IDI 2

7    project?

8    A.    Yes, I was.

9    Q.    In that IDI 2 project, Whirlpool identified that LG

10    had a proprietary position in the marketplace.  Correct?

11    A.    I am not sure what you mean by that.

12    Q.    Patents.

13    A.    We were certainly aware that LG had filed patents

14    around in-door-ice technology.

15    Q.    And at Whirlpool, frequently, when you encountered

16    that situation, you do attempt to design around or make

17    product changes to avoid the competitors' patents.  Correct?

18    A.    You know, I wouldn't have specific knowledge around

19    IDI 2 because we had what we felt was a very strong position

20    in in-door-ice technology with patents, as borne out by no

21    other competitor introducing in-door-ice technology for

22    over -- roughly eight years, having been in the market.

23        So specifically designing around LG patents, I

24    am not personally aware of.

25    Q.    Let me ask you more broadly, then.  Has Whirlpool ever

Marcy - cross

1    designed around anyone's proprietary or patented technology?

2    A.    Yes, I would say that is a fairly common practice.

3    Where you are looking to provide a feature and benefit and

4    not infringe on other people's intellectual property, for

5    sure.

6    Q.    And there is nothing wrong with designing around or

7    trying to make changes to avoid another competitor's

8    proprietary rights, is there?

9    A.    No.

10   Q.    In fact, that's what you want people to do, isn't it?

11   A.    Right.

12   Q.    And, sir, one of the competitors that Whirlpool does

13   look at specifically is the technology that LG is putting

14   out on the market.  Right?

15   A.    I am sorry, say that again.

16   Q.    One of the competitors that Whirlpool does look at is

17   LG?

18   A.    Again, we look at all the competitors, LG included,

19   sure.

20   Q.    And, in fact, at times, when Whirlpool feels a feature

21   is not proprietary, Whirlpool copies with pride.  Correct?

22   A.    I have seen that term used, you know, two years of

23   development, copy with pride, I suppose.

24   Q.    But that's something that Whirlpool does from time to

25   time, copy with pride?

Marcy - cross

1    A.    On occasion.

2              MR. COYNE:  Your Honor, I have no further

3    questions for the witness.

4              THE COURT:  Mr. Partridge?

5              MR. PARTRIDGE:  No further questions, Your

6    Honor.  Thank you, Dr. Marcy.

7              THE COURT:  Thank you, Doctor.  Good luck at

8    Bissell.

9              THE WITNESS:  Thank you very much.

10             (Witness excused.)

11             MR. PARTRIDGE:  Your Honor, if I may, for our

12   next three witnesses, we are going to see very short

13   videotapes from their deposition.

14             The first of these witnesses is Dae, D-a-e, Y.

15   Kim.  This will be very quick.  He is an LG engineer.  The

16   tape is about two minutes.  And this concerns the '601 or

17   plaques patent.  Let's play that one first.

18             (Deposition played as follows:

19             "Mr. Kim, I'm going to hand you what's been

20   designated, marked as Kim Exhibit 4.  Do you recognize Kim

21   Exhibit 4?

22             "Answer:  Yeah.  I think I have -- yeah.  I

23   think I've seen this.

24             "Question:  What is it?

25             "Answer:  We call this bead.

Day Y. Kim - depo.

1                "Question:  You call those beads?

2                "Answer:  Yes.

3                "Question:  And are those formed in the liner of

4      the refrigerator?

5                "Answer:  Are you talking about the door liner?

6                "Question:  Excuse me.  No.  The cabinet liner.

7                "Answer:  Yes."

8                MR. PARTRIDGE:  And the next witness is someone

9      we have heard a little bit about previously.  He is a

10     research engineer with LG.  His name is Chang H. Seo, S-e-o.

11     And he is one of the inventors on the '121 patent, which is

12     the water dispenser patent.

13               This will last about seven minutes.

14               Then we will stop and there is a two-minute

15     counter-designation by LG.

16               (Deposition played as follows:

17               "Question:  Sir, who is your current employer?

18               "Answer:  LG Electronics.

19               "Question:  And how long have you worked for LG

20     Electronics?

21               "Answer:  It has been about six and a half

22     years.

23               "Question:  Did you start with LG in 2002, 2003?

24               "Answer:  Yes, it was 2003.

25               "Question:  Do you recall what month in 2003 you

|Chang H. Seo - depo.

1   started with LG?

2           "Answer:  Yes.  It was in January.

3           "Question:  Sir, you have been handed Exhibit 9,

4   which is U.S. Patent 7,316,121, and Exhibit 10, which is

5   U.S. Patent 7,383,689.

6           "Sir, from looking at the front page of Exhibit

7   9, can you tell whether or not you were listed as an

8   inventor on that patent?

9           "Answer:  Yes.  My name does appear in the

10  inventor section.

11          "Question:  You've been handed Exhibit 15,

12  LGDEL206379 through 81 and the English translation

13  LGDEL385013 through 6.  Have you seen this document before?

14          "Answer:  Yes, I do remember this document.

15  ████████████████████████████████████████████

16  ██████████████████████████████████

17  ███████████████████████████████████████

18  ██████████████████████████████████████████

19  ████████████████████████████████

20  ███████████████████████████████████████

21  ████████████████████████████████████████████

22  █████████████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████

25  ██████████████████████████████████████

|Chang H. Seo - depo.

1    in Exhibit 15, were you involved in any further development

2    of that idea?

3              "Answer:  I do not recall.

4              "Question:  Do you recall whether a prototype

5    was ever made of the dispenser idea shown in Exhibit 15?

6              "Answer:  I do not recall that, either."

7              MR. PARTRIDGE:  There is a two-minute section of

8    this deposition which LG requested to be played.  This is

9    the counter-designation of Mr. Seo by LG.

10             "Question:  Do you know whether the idea set

11   forth in Exhibit 15 was ever turned into a final product to

12   be used in an LG refrigerator?

13             "Answer:  Yes, I know.

14             "Question:  Was the idea set forth in Exhibit 15

15   ever used in a final LG product?

16             "Answer:  Yes, I do believe that a portion,

17   slash, the portions of the idea set forth here have been

18   employed."

19             MR. PARTRIDGE:  The third and last of this

20   series of videotapes is Mr. Wook Y. Lee, who is also one of

21   the listed inventors on the '121 patent and is a chief

22   research engineer, or at least at the time of the videotape

23   with LG.  It's three minutes.

24             (Deposition played as follows:)

25             "Question:  Okay.  Based on the looking that

Wook Y. Lee - depo.

1    you've done recently, what is your best estimate of the date

2    when you had formed in your mind the idea, the concept, of

3    the '121 and the '689 patents?  And by you, I mean you and

4    your colleagues working together on this project.

5               "Answer:  Actually, looking at this document

6    of -- made in May of 2003, for us to come up with such a

7    summarization document by this time, I believe that before

8    that, we had to do quite a bit of work leading up to that.

9    For instance, we had to probably get the opinion from the

10   patent team, and we needed to, I'm sure, go through the

11   ideation, and we needed to probably check the redundancy

12   issues and whether or not this idea is realistic enough.  So

13   we have to go through such processes in order to come to

14   this type of a summarization record.

15              "So if we had come up with such a summarization

16   report by May of 2003, I would assume that it would have --

17   we would have gone back quite a bit of time to date back to

18   the original work at the beginning.

19              "So looking at the company process in general

20   and how we would work on this type of a matter, I would say

21   at the latest, we probably would have begun this process by

22   March of 2008.  So we should have had the ideas before we

23   could come up with this report in May.  So I'm saying that

24   at least within the team by May of -- March of 2003, we

25   would have started some work on this."

Wook Y. Lee - depo.

1                MR. PARTRIDGE:  Your Honor, now we can go back

2       to live witnesses.  Ms. Woodall will call our next witness.

3                MS. WOODALL:  For our next witness, Whirlpool

4       calls James Nawrocki..

5                ... James J. Nawrocki, having been duly sworn as

6       a witness, was examined and testified as follows ...

7                THE COURT:  You may inquire, Ms. Woodall.

8                MS. WOODALL:  Thank you.

9                        DIRECT EXAMINATION

10      BY MS. WOODALL:

11      Q.    Good morning, Mr. Nawrocki.

12      A.    Good morning.

13      Q.    Could you please introduce yourself to the jury and

14      tell them what you do?

15      A.    My name is James Nawrocki.  I go by Jim.  I am a

16      financial consultant.  I have been asked to testify

17      regarding damages in this case.

18                I am president of a company called IPFC, which

19      stands for Intellectual Property and Financial Consulting.

20      Q.    Could you please describe your educational background

21      and training?

22      A.    Yes.  I attended St. Mary's University of Texas;

23      graduated in 1979 with a Bachelor's of business

24      administration with a major in accounting.

25      Q.    Are you licensed in accounting?

1   A.     Yes.   I am licensed in several states, and also a

2   member of different state CPA organizations.

3   Q.     Are you a member of any professional organizations?

4   A.     Yes.   I am a member of the American Institute of CPAs,

5   as I have mentioned, several CPA societies.   I am also a

6   member of an organization called Licensing Executive

7   Society, which is LES, goes by the initials LES.   That is an

8   organization of several thousand executives throughout the

9   world that deal with licensing of technology.   So we have

10  workshops, seminars, throughout the year, offering training

11  and education, as well as conferences involving licensing

12  and technology.

13  Q.     What involvement have you had with LES?

14  A.     I have been on several committees involving

15  coordinating training at meetings, program chairs, in which

16  people attend workshops, and I put together a curriculum for

17  some of those workshops and have been involved in other

18  committees as well.

19  Q.     Can you tell us what kinds of work you have done in

20  the area of patent valuation?

21  A.     Yes.   A majority of my career has involved financial

22  consulting specifically relating to intellectual property

23  matters.   Intellectual property are patents, trademarks,

24  copyrights, things such as that.   And I have been involved

25  in the valuation of that, either involved in licensing or,

1   in a case such as this, in terms of what the damage analysis

2   would be.

3   Q.    How long have you done that?

4   A.    Probably since the mid-'80, early '80s.  I guess more

5   than 25 years.

6   Q.    Have you lectured on the subject of patent valuation?

7   A.    Yes, I have.  I have been a guess lecturer at

8   different universities and different forums, including the

9   University of Texas, the University of Chicago Kent, other

10   organizations as well, involving licensing, what license

11   rates would be, what the value of technology is to companies

12   or different industries.

13   Q.    And what types of cases have you worked on?

14   A.    As you imagine, a lot of the cases I have worked on

15   are high-tech, technology related.  Those include everything

16   involving drug cases, as well as high-tech cases for

17   companies involving Microsoft, for example, Internet

18   Explorer.  I have been involved in a case involving X Box,

19   the video game.  I worked on a matter involving Yahoo and

20   Google.  There are other companies or industries that have

21   technologies as well, such as the chemical industry.  I have

22   worked with DuPont, several other chemical companies.  And

23   other industries as well, like consumer products, as an

24   example.

25   Q.    Have you valued patent assets outside the context of

Nawrocki - direct

1    litigation?

2    A.    Yes, I have.  I have sometimes been involved in

3    analyzing technology for matters such as this where

4    companies are in a dispute.  Sometimes that evolves into a

5    licensing matter.  Sometimes it involves a sale of an asset

6    or an acquisition of an asset.  Sometimes it's not a dispute

7    at all.  It might just be a tax valuation.

8          One case I had, it involved Nestle.  Nestle was

9    making an acquisition of different brands.  They were

10   acquiring the Carnation brand.  So I was involved in the

11   patents, the trademarks, the trade secrets, what the value

12   of those were.

13         MS. WOODALL:  Your Honor, Whirlpool would offer

14   Mr. Nawrocki as an expert in intellectual property

15   valuation, licensing, and damages.

16         MR. COYNE:  No objection.

17         THE COURT:  Mr. Nawrocki is accepted by the

18   Court as an expert in those areas.

19   BY MS. WOODALL:

20   Q.    Mr. Nawrocki, what have you been asked to do in this

21   case?

22   A.    As I mentioned, I have been asked to analyze the

23   damages in this case, both Whirlpool's claim for damages

24   based upon LG's alleged infringement, and LG's damages based

25   on the alleged infringement by Whirlpool.

Nawrocki - direct

1    Q.     Have you formed an opinion regarding the appropriate

2    amount of damages for Whirlpool's '130 patent and '601

3    patent?

4    A.     Yes, I have.

5    Q.     And are you familiar with the patents at issue in this

6    case?

7    A.     Yes, I am.  I have seen the patents and had

8    discussions with the difference technical experts and

9    company personnel.

10   Q.     Have you prepared a set of demonstrative exhibits to

11   aid in your explanation of your opinions today?

12   A.     Yes, I have.

13   Q.     Did you perform a damages analysis for the '130 and

14   then '601 patents?

15   A.     Yes, I did.

16   Q.     What was your first consideration in that analysis?

17   A.     The first I think I looked at was basically the

18   guidance that is provided for patents and for patent

19   damages.  What we have here is a section of the U.S. Code,

20   it provides that what a patent does is allows the right to

21   exclude others from making, using, offering for sale, or

22   selling the invention.

23          So that is basically what a patent provides, in

24   short.

25   Q.     What else did you look at?

1   A.      Another section of the Code provides some broad

2   guidance on damages, how you calculate damages.  It says,

3   upon finding for the claimant, that would be the patent

4   owner, the Court shall award the claimant damages adequate

5   to compensate for the infringement, but in no event less

6   than a reasonable royalty.

7           So the reasonable royalty would be the floor

8   level of damages.  Damages should be adequate to compensate,

9   but should be in no event less than a reasonable royalty --

10  so the royalty would be the floor -- for the use made of the

11  invention by the infringer.

12          That is taking a look at what use has been made,

13  how many sales there have been.  In other cases you might

14  look at how many pounds of production, but in this instance

15  we looked at the number of sales units as an example.

16  Q.      Could you describe a little bit more what a reasonable

17  royalty is?

18  A.      A reasonable royalty is like a rent payment, like

19  renting a house.  You pay somebody.  Instead of owning a

20  house, they own a piece of property, intellectual property,

21  and that is a patent.

22          When you want to use someone's patent, you

23  ideally enter into a license agreement and then pay them a

24  rent or a royalty for that patent.

25          All patents are not the same, just like all

1    houses are not the same, so the royalties can vary based on

2    what type of property you are licensing and what your use

3    has been in that property.  The royalties vary commensurate

4    with the use and what those specific patents are.

5    Q.    Have you made any assumptions regarding the patents at

6    issue, the '130 and the '601, in the context of your

7    analysis?

8    A.    Yes.  I specifically looked at the information

9    relating to those, both in terms of the use made, as well as

10   what royalty would be applicable.

11   Q.    And did you make some assumptions in your analysis

12   with regard to validity and infringement?

13   A.    Yes.  In order to calculate damage, you have to assume

14   that there is a valid infringed patent.  And that is the

15   assumption I made in the case as well.

16   Q.    Have you prepared a summary of LG's use of Whirlpool's

17   '130 patent?

18   A.    Yes.  This is a chart that summarizes LG's sales of

19   the accused products that are incorporated in the '130

20   patent.

21          What you will see here is sales from the years

22   2006 through 2010.  The last line, 2010, is in italics,

23   because that has been estimated through the end of February.

24   So I had actual data through '09.  We estimated the two

25   months of '10 just based upon '09 sales.

Nawrocki - direct

1   Q.    What information did you use in compiling this

2   summary?

3   A.    What I used is an identification of the accused

4   products, specifically model numbers were identified, and

5   then I used LG's own sales records.   They provided us

6   electronic data.   We summarized that data by model and by

7   specific year, as we show here.

15  Q.    Have you calculated damages for LG's use of the '130

16  patent since 2006?

17  A.    No.   In fact, I use a smaller period.

18  Q.    Can you explain the period you have used?

19  A.    So what I have shown here is this is a bar chart that

20  represents the information from that prior chart.   And you

21  will see the sales from 2006 through 2009, with an estimate

22  for 2010.

23          The red portion of the chart shows the damages

24  amount.   That is for the damages period starting when

25  Whirlpool first put LG on notice.

Nawrocki - direct

1   Q.      Using the damages period, have you also summarized

2   LG's use of the patent?

3   A.      Yes, I have.

Nawrocki - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Q.    Taking this information into account, have you also

21    created a summary of the reasonable royalty damages you

22    believe are appropriate in this case for the '130 and the

23    '601 patents?

24    A.    Yes, I have.

25    Q.    And have you also prepared a standalone version of

Nawrocki - direct

1   this?

2   A.     Yes, there is a large chart that we have, I believe,

3   as well.

4              MS. WOODALL:  Your Honor, may we approach and

5   place a demonstrative by the witness?

6              THE COURT:  Sure.

7   BY MS. WOODALL:



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   ▬▬▬▬▬▬▬▬▬▬▬▬

2   Q.    What did you consider in connection with the licensing

3   factors?

4   A.    Several things I have considered.  For example, things

5   that I have considered are summarized on this chart.  The

6   first thing is there was no established royalty rate for the

7   patents at issue.  In other words, these specific patents

8   weren't licensed individually.  There was a portfolio

9   license that Whirlpool had that they had licensed their

10  internal companies for as they transferred technology, but

11  it was part of a broad patent portfolio.

12          Additionally, I went through the information.

13  There was various license agreements produced by both

14  parties, and LG and Whirlpool both had some minimal

15  licensing activity, involving refrigerator-type technology,

16  different aspects of them.  So I looked at that information

17  as well.

18          I also looked at industry royalties.  The LES

19  organization, Licensing Executive Society, that I mentioned,

20  and other organizations, put together information on what

21  licenses are in different industries.  I think we have

22  actually a chart I have that we might show, give an example

23  of that.  Yes.

24          So this is an article that was published by LES,

25  or Licensing Executive Society, back in the early 2000s.  It

1    is a summary of different royalties and royalty rates for

2    different industries.

3              If you look at the bottom portion -- do you have

4    a pointer, by chance?  It might be helpful.  I keep wanting

5    to point up there.  It might be easier if I use a pointer.

6              MS. WOODALL:  May I approach the witness, Your

7    Honor?

8              THE COURT:  Yes.

9              THE WITNESS:  So if you will notice, right at

10   the bottom there, it's part of this article, the people

11   putting together the article summarized the agreements from

12   1,500 license agreements.  And they looked at various

13   industries here.  The industry I looked at was the consumer

14   goods industry, where there was 90 license agreements.  And

15   there was a median rate for that industry of 5 percent.

16   That is the midpoint.  The median is the midpoint.  There is

17   a variety of agreements above and below it.  5 percent would

18   represent the midpoint.  I considered that as the midpoint

19   as part of my licensing factors as well.

20   Q.   Did you also consider existing Whirlpool licenses?

21   A.   Yes, I did.  I considered those as well.  I think it

22   was the prior chart we talked about.

23   Q.   If we could go back, please.

24   A.   So the second point talks about LG and Whirlpool

25   having minimal licensing activity.

1          The next point is within Whirlpool's licenses

2     they had ████████████████████████████████████

3     again upon the different types of technology they were

4     licensing.

5          Then the last point that I assessed from the

6     licensing standpoint is Whirlpool would consider the profits

7     it would lose if it was licensing a competitor.  We talked

8     earlier about the fact, and I think it's been mentioned many

9     times in this case, that LG and Whirlpool are direct

10    competitors.  So in licensing a competitor, one

11    consideration would be Whirlpool looking at LG as a

12    competitor.  That would impact their negotiation.

13    Therefore, Whirlpool would consider whether this is the type

14    of technology that would impact sales and would they be

15    losing a sale as a result of that.  That is a factor of

16    consideration here.

17    Q.    And what did you consider in connection with the

18    technical factors of *Georgia-Pacific*?

19    A.    So this chart summarizes the various technical

20    factors.  Or summarizes those factors I considered.  The

21    first point is that in-door-ice, the first patent we are

22    talking about, is a revolutionary change in the

23    refrigeration industry.

24          I think Mr. Marcy talked about it and Mr.

25    Langbo, various documents that I have seen talk about the

1    importance of in-door-ice.  So that was one of the

2    considerations I made.

3    Q.    And, Mr. Nawrocki, have you seen evidence that LG also

4    considered IDI to be a revolutionary technology?

5    A.    Yes.  That type of consideration was contained in

6    several of their documents as well.  Not only mentions of it

7    but the importance of IDI.

8    Q.    Please go on.

9    A.    The next point is that IDI, or in-door-ice, solved the

10   consumer need for additional space.  Again, I think Mr.

11   Marcy just talked about that.  But that's been talked about,

12   in both Whirlpool documents and LG documents,

13   contemporaneously over the last several years, that this has

14   been installed by both companies.

15            It provided additional space for them, you know,

16   by moving the ice to the door.

17   Q.    If we could stop you at the '130 patent.  You have a

18   binder in front of you.  Could you turn to tab 4?  I believe

19   it's Exhibit DX-189 in your binder.

20   A.    Yes, I have that.

21   Q.    What is DX-189?

22   A.    Most of the LG documents that I have here are in

23   Korean.  Let me look at those.  There is an English

24   translation.  Let me get to the English translation which I

25   have.  This is a cover of the document, it's called "In-Door

Nawrocki - direct

 1   Ice-Making System."  It is a summary.  If you look at the

 2   bottom there, it's in 2003.  You can see, 2003.  I guess you

 3   can highlight that.

 4              Back in 2003, before they implemented

 5   in-door-ice as they were looking at the indentations, this

 6   is a document they were looking at and assessing their

 7   options.

 8   Q.    Can you turn to the page marked 243076?

 9   A.    Yes, I have that.

10   Q.    What did you consider in connection with this

11   document?

12   A.    This document provided the project background, if you

13   low at the top portion there.  And it starts out by saying

14   there is an increase in consumer needs for increased freezer

15   shelf space and its practical efficiency of the side-by-side

16   refrigerator.  And it identifies several bullet points.

17              For example, the first point is there was

18   dissatisfaction with ice-making that takes up 20 percent of

19   the freezer.  That has been talked about in the case.

20              The second thing is it was practical to secure

21   up some of this freezer space by moving the ice to the door.

22   Q.    What else did you consider?

23   A.    The other thing is, the last point there, the final

24   point, if you would highlight that, that LG wanted to

25   explore the North American market based on the premium

1    in-door-ice side-by-side refrigerator.  That is kind of a

2    mouthful.  But they are talking about looking at North

3    America, assessing that, but in the premium side-by-side

4    marketplace for in-door-ice.

5              Up above there is a point similar to that as

6    well.  The point right above it says, "Good responses by

7    customers to the Whirlpool products."  So they identify

8    Whirlpool that had ice-making equipment in its door already.

9    Q.    If we could go back to the technical factors, could

10   you tell us what you looked at for the '601 patent?

11   A.    Yes.  The '601 patent involved the plaque liners.

12   That is the next several bullet points here.

13             For the plaque liners, these are the

14   indentations in the walls of the product, though that is

15   something a consumer might not know they have in the

16   product.  It does allow for reduced warranty costs.  My

17   understanding is that Whirlpool was finding if they were

18   having bowing in some of their products or cracking or

19   bowing, that either within warranty or outside of the

20   warranty period they were having to provide new

21   refrigerators to consumers to replace the problems they were

22   having.

23             So these plaque liners assisted with that

24   problem and that's what the next point is.  "Plaque liners

25   improved the rigidity of the refrigerator and prevents some

1    bowing or cracking of the liner."

2           That is from a technical standpoint what I

3    understand these had provided the benefits of.

4    Q.    And on technical factors, what else did you consider?

5    A.    The last point was there was no evidence, to my

6    knowledge, of any acceptable noninfringing alternatives that

7    were available to LG during the damages period.

8    Q.    Okay.  Could you tell us what you considered in

9    connection with the financial and business factors of

10   *Georgia-Pacific*?

11   A.    So now we are going to go into the financial and

12   business factors.  This is one of the last set of factors,

13   but there is a lot of information here.

14          So we talked about some of these points already,

15   but we will now get into some specific schedules.

16          The first point is that Whirlpool and LG are

17   direct competitors, as I mentioned, in the highly

18   competitive home appliances market.  There are several other

19   companies that compete in that market as well.  But I think

20   there has been a lot of documents produced that show the

21   nature of that competition.

22   Q.    Could you turn to tab 8, DX-651, in your binder?

23   A.    Yes, I have that.  Let me get to the American portion,

24   the English portion, I should say.  Okay.

25   ██    ████████████████████



Nawrocki - direct



1

2

3

4

5

6

7

8

9

10

11  Q.     And did you also consider LG's profitability

12  projections in connection where your analysis?

13  A.     Yes.  So in addition to looking at their sales and how

14  they were looking at increasing their sales, I also looked

15  at some profitability information as well.

16  Q.     Could you turn to tab 5 in your binder?  It's DX-214,

17  please.

18  A.     Yes, I have that.

19

20

21

22

23

24

25

1          This basically again is another document from

2     LG's records where they are taking a look at assessing the

3     in-door-ice.  And if you take a look at the center portion

4     of the document, there is an area called "Differentiation

5     Point."

6          They mention several things there.  They say

7     they want to strengthen their competitiveness by maximizing

8     the internal capacity.

9          The next two points say they want to improve the

10     profitability of the first-year model refrigerators.  So

11     they want to improve their profitability, both through

12     introducing this product, as well as other initiatives they

13     were incurring as well.

14     Q.    Could you turn to your tab 7, DX-563 in your binder,

15     please?

16     A.    This is another project plan document.  This was done

17     in '02.  So this is another document in which they made some

18     expectations.  It's called the "Door Ice Maker."  Again,

19     this was in '02, a couple years before they introduced it.

20     And they made some profitability assessments in this

21     document as well.

22     Q.    Could you turn to page 242306, please?

23     A.    Yes.

24     ■■       ████████████████████████████████████████████

25     ████████████

Nawrocki - direct

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24     Q.     Could you turn to tab 2 in your binder, which is

25     DX-179?  What is this?

1    A.    I am sorry.  Could you identify the document again?

2    Q.    It's tab 2, DX-179.

3    A.    Yes.  So this document is of a similar nature, making

4    different financial assessments from LG.  Again, this at the

5    top is called "Development of In-Door-Ice."  And it's got

6    several people's names on it and identifies various

7    financial objectives that they had as they were introducing

8    in-door-ice.

1   ████████████████████████████████████████

2   Q.    Mr. Nawrocki, did you also look at LG's actual

3   profitability for IDI?

4   A.    Yes.   What we have talked about right now is their

5   expectations as they were going into it.   That is an

6   important consideration, when you look at a hypothetical

7   negotiation, their expectations are one consideration.   I

8   looked at that.   I also looked at their actual profitability

9   as well.

10  ███  █████████████████████████████

11  ███  ████████████████████████████████████

12  █████████████████████████████████████████

13  ████████████████████████████████████

14  ███████████████████████████████████████████

15  ███████████████████████████████████████

16  ████████████████████████████████████████

17  █████████████████████████

18      ████████████████████████████████

19  ██████████████████████████████

20  ████████████████████████████████████

21      ████████████████████████████

22  ██████████████████████████████████████

23  ███████████████████████████████████████

24  ██████████████████████████████

25  ████████████████████████████████



Q.    Could you tell us what else you considered in

connection with the business and financial factors?

A.    Yes.  So the other things that we talked about, we

mentioned their desire to enter the North American market.

We mentioned LG's ability to use their products.

The next thing was the last two bullet points,

is that when you take a look at the licensing.  I mentioned

that Whirlpool would want to take a look at whether if we

license this company, are they going to impact our sales at

all.  Is this something we can license and it won't affect

Nawrocki - direct

1  us or is this something that is significant and will affect

2  us.  When it relates to in-door-ice and the patents that

3  issued for that, I think it is a significant point that

4  Whirlpool would look at the impact of their lost sales if

5  they would license them.  And they obviously were aware of

6  the fact that LG was impacting their sales through the sales

7  of in-door-ice.

8

9

10

11

12

13  Q.    Could you turn to DX-174, please?

14  A.    Yes.

15  Q.    That's tab 4.

16  A.    Okay.

17

18

19

20

21

22

23

24

25

Nawrocki - direct



19   Q.     I believe you mentioned Whirlpool documents.  Could

20   you turn to tab 10 in your binder?  It's DX-700, please.

21   A.     Okay.  I have that.

22   Q.     What is DX-700?

23   A.     So this is called bottom-mount feature value workshop.

24   Bottom-mount refers to the French-door market which has a

25   bottom-mount to it.  This was done in 2007.  So this was

Nawrocki - direct

1    several years after Whirlpool had already introduced

2    in-door-ice.  Now they were looking at French doors.  Within

3    this document there is various assessments that are made.

4    And one of the things they looked at, if you go to --

5    Q.    It is 185116?

6    A.    Yes.  There is a chart.  This again is a Whirlpool

7    chart, taking a look at Whirlpool's share ████████████

8    ████████████████████████████████  One of the things they look

9    at here is Home Depot.  We talked about Sears previously.

10   Let's look at what's happening at Home Depot.  This is

11   Whirlpool's market share at approximately ██ percent in

12   ██████   And it ███████████████████████████████████████████

13   ██████████   So within the course of, you know, less than a

14   year and a half, their market share had gone down

15   considerably and LG's market share ███████████████████████

16   ███████████████████████████████████████████

17   ████████████████

18          What do you see happening here?  ██████████████

19   ███████████████████████████████████████████  That is

20   the impact I was talking about, after LG introduced

21   in-door-ice starting in 2006.

22   Q.    Did you consider Whirlpool's profitability in

23   connection with your analysis?

24   A.    Yes.  What that caused me to take a look at was, now,

25   let me take a look at Whirlpool's profitability.  If they

1    were losing sales, what impact would that have on them?  How

2    much money would they have at risk if they had lost

3    business?  If they were going to look at it from a licensing

4    standpoint, what sort of contribution margin would they have

5    at risk?

6            So this summarizes the per-unit amounts that

7    they would have at risk.  In other words, what is their

8    incremental profit for Sears, the French-door, and for Home

9    Depot?  What you will see is those profit rates -- again,

10   these units are selling for more than ███████ a couple

11   ███████ dollars.  For Sears, their contribution market

12   ranged from ███████ per unit.  And Home Depot, it ranged

13   from ███████

14           Then side-by-sides, they considered that as

15   well, and they are ███████ on the side-by-sides.  So

16   at Sears, they make ███████ per unit.  And at Home

17   Depot, a similar range, ███████

18           That is the type of information Whirlpool would

19   consider in a license.  Is that we potentially would be

20   losing this amount of profit.  So they would be much less

21   willing to license someone for an insignificant amount.

22   They would need a pretty substantial amount.

23   Q.    And how has this evidence influenced your opinion as

24   to the royalty rate?

25   A.    This was an important consideration as well, that

1   amount of loss.

2        So what is summarized here is various data

3   points that I have considered.

Nawrocki - direct



Nawrocki - direct

1 █████████████████████████

2     ████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 █████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ███████████████████████████████████████

8 ████████████████████████████████████████████

9 ████████████

10 Q.    Could we turn back to your opinion on the '601 patent

11 for a moment?

12 A.    Yes.

13 ██    ███████████████████████████████████████████

14 ███████████████████████████████████

15 ██    █████████████████████████████████

16 ███████████████████████████████████████████████

17 ████████████████████████████████████████

18 ██████████████████████████████████

19 ████████████████████████████████

20 ████████████████████████████████████

21 ████████████████████████████████████████████

22 ██████████████████████████████████████

23 ███████████████████████████████████████

24 ████████████████████████████████████████

25 ███████████████████████████████████████

Nawrocki - direct

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Nawrocki - direct

10    Q.    Mr. Nawrocki, have you also prepared an analysis with

11    respect to LG's '121 patent?

12    A.    Yes.  Additionally, I was asked to analyze LG's claim

13    for damages under their patent.

14    Q.    Have you formed an opinion with respect to adequate

15    damages for LG's '121 patent?

16    A.    Yes, I have.  I have a summary chart that I prepared

17    for that as well, summary charts.

18    Q.    What did you look at in forming your opinion for the

19    '121 patent?

20    A.    So somewhat similar information.  I looked at the

21    models that were specifically accused, so I was looking at

22    Whirlpool's models that were accused.  And I prepared this

23    summary, which goes from April 2000 -- April 24th, 2008,

24    through February 28th.  So this represents the whole period

25    through February 2010, similar to what I did for the other

1    damages calculation that I made.

2              This chart shows that Whirlpool's total sales

3    for this period were ▮▮▮▮▮ total sales were ▮▮▮▮▮▮▮

4    The average price is approximately a ▮▮▮▮▮▮▮▮▮ a

5    little bit more than a ▮▮▮▮▮▮▮▮▮▮

6    ▮▮▮▮



17   Q.    In using this information, have you calculated a

18   royalty amount for the '121 patent?

19   A.    Yes, I have.  I have done a similar analysis as what I

20   did for Whirlpool's patent.

21   Q.    And is this a chart summarizing your opinion with

22   respect to that?

23   A.    Yes, it is.

24   Q.    Could you explain it?

25   A.    Yes.  So what this chart summarizes is my calculation

1    of what LG's reasonable royalty damage would be.  And what

2    this shows is that for the '121 patent, the spring-loaded

3    spigot or spring-loaded faucet, that the total royalty base

4    is the ████████ units -- that's what I talked about in the

5    prior chart -- times a royalty rate here, and I used here

6    $5 -- I will talk about how I came up with that amount -- to

7    arrive at total royalty damages of $262,260.

8    Q.    In connection with your analysis for the '121 patent,

9    have you made certain assumptions with respect to validity

10   and infringement?

11   A.    Yes, I have.  This damages calculation, it would only

12   be appropriate if the patents were found valid and

13   infringed.  As with Whirlpool, if the patents are not valid

14   and infringed, there would be no damages, the same here.

15   Q.    What else did you take into consideration in forming

16   your opinion for the '121 patent?

17   A.    The other thing I made considerations for, certainly,

18   the *Georgia-Pacific* factors I talked about previously would

19   apply as well, and based upon looking at those factors and

20   what was in issue, I took a look at the different features

21   that were included within the Niagara dispenser.

22          The subject matter within this patent is the

23   spring-loaded extendable spigot that's been talked about.

24   However, that was incorporated into the overall Niagara.

25   When you look at the refrigerator, that whole area is

1    referred to as Niagara.  The spigot represented one feature

2    of that system.

3              So I considered the other features, such as the

4    height and depth of the cavity, the fast-fill feature,

5    measured fill, which has been identified, spring-loaded

6    spigot, the pull-out tray, as well as various other

7    features.  There was electronics.  There was that

8    nightlight.  There was a lock-out.  There was various other

9    features as well.  These identify most of the major features

10   that are included within the Niagara system.

11   Q.    And what evidence did you consider in evaluating these

12   various features?

13   A.    Various documents again that existed within Whirlpool

14   and LG's own documents.

15             In this instance I looked mostly at Whirlpool's

16   documents to take a look at studies they did and how they

17   assessed the different features.  And so what you will see

18   from that information is these types of things are talked

19   about.  It seems to be very much a consumer -- I don't want

20   to be consumer finicky, but the importance of these features

21   varies based upon the consumers.  Some consumers might not

22   like certain features.  Some might not like other features.

23   One of the things I found, I thought fairly evident, is the

24   fast-fill, in other words, the ability to provide faster

25   water was an important capability, as well as the size of

Nawrocki - direct

1       the cavity that allowed larger devices to fit within the

2       dispensing unit.

3       Q.      Could you turn to tab 10 in your binder?  It's DX-700.

4       A.      Yes, I have that.

5       Q.      This is a document we looked at earlier.

6       A.      Let me see.  This is the same document.  This is the

7       2007 assessment of French-door-mount, yes, that's correct.

8       Q.      Could you turn to page 185144, please?

9       A.      Yes, I have that.

10      Q.      Is this a document we have looked at a little bit

11      before in connection with this case?

12      A.      Yes.  I think one of the other witnesses, I think Mr.

13      Langbo talked about this as well.

14      Q.      Could you tell me what you considered in connection

15      with this document?

16      A.      So what this document shows is various ice and water

17      features and different values and costs.  On the left

18      portion, if you blow up that, maybe the whole chart would be

19      good -- yes, that is fine.  What this shows, and it is hard

20      to read the title, it says "Value Versus Cost For Specific

21      Features."  And it puts various average values for different

22      capabilities.

23              On top is the in-door-ice.  That's listed as the

24      highest value.  Then you will see several other things.  We

25      will identify a few of those.  You see rotating faucet is

1    listed there.  There is a value of ███ I think there is a

2    slide-out tray which has been talked about here, that's ███

3            You will see other features that are part of

4    Niagara as well, the measure fill, the rotating faucet.

5    That is part of Niagara, as I understand it.  There is a

6    water filter indicator identified, tall dispenser height at

7    ███ Fill speed at ███ So various features with different

8    rankings up and down.  The highest ranking being in-door-ice

9    and then rotating faucet and slide-out tray much lower in

10   the list.

11   Q.    How did that inform your analysis?

12   A.    This is confirmation, this provided confirmation of

13   the fact that, though some people, you know, have some value

14   for the rotating faucet and the slide-out tray, it was an

15   indication of, it wasn't as significant as Dr. Rao had

16   identified, where he said 75 percent of the value of Niagara

17   was related to the spring-loaded faucet.

18            I thought that was much too high of a valuation.

19   I thought it was much less value that should be attributable

20   to the spring-loaded rotating faucet.

21   Q.    Do you have --

22   A.    I am sorry.  This confirmed that.

23   Q.    Do you have an understanding as to whether or not LG

24   uses an extendable water spigot in its own LG-branded

25   products?

1    A.    LG, no.  Surprisingly, or maybe not so surprisingly,

2    LG in their own branded product, this is LG, they don't use

3    the spring-loaded product, as I understand it, in their own

4    branded products.  So if it was that type of significant

5    feature, one would expect -- it's surprising that they don't

6    use it if they put that much value on it.

7    Q.    Did you consider anything else in connection with this

8    document?

9    A.    Yes.  Actually, if you look at the right side, there

10   are several comments as well that are consistent with some

11   of the comments that I made.  This talks about some trade

12   partner comments.  They talk about aesthetics are important.

13   But they also mention fast-fill is a highly important

14   feature and supports Whirlpool's success.  Fast-fill

15   dispenser is critical for water.  Whirlpool is on par until

16   you get into the fast-fill mechanisms.

17            Again, fast-fill is the speed of the water.  You

18   know, so you can use the -- as I understand it, you can

19   use -- you can fill the glass with or without using that

20   extended arm.  So the water comes faster just by having the

21   fast-fill capability.

22            I thought those were important considerations as

23   well.

24   Q.    And were there other comments on DX-700 that you

25   considered?

1    A.    Yes.   They talk about various other aspects.   They

2    talk about LG's capabilities here.   And they talk about the

3    aesthetics that I mentioned up above as well.   If you look

4    under the aesthetics, I am jumping around a little, I

5    apologize, the aesthetics, they talk about those being

6    important.   I think that's been talked about.

7              They mention, if you go down, the interaction of

8    the dispenser, styling, and lighting are important.   It

9    says, "My sense is that the response to measured fill,

10   slide-out tray, and rotating is not overwhelmingly great."

11             So measured fill, slide-out tray, and rotating

12   faucet, I am not hearing consumers coming in and asking for

13   it on the floor.   I think there is mixed responses for this.

14   Some people might like it.   Some people might not.

15   Q.    Mr. Nawrocki, is this information consistent with what

16   you saw at a time closer to Niagara's launch?

17   A.    Yes.

18   Q.    Could you turn to tab 11 in your binder?   It's DX-701.

19   Have you seen this document?

20   A.    Yes, I have.   This is a document that is in July 2004.

21   Q.    And could you turn to page 565504, please?

22   A.    Yes, I have that document.

23   Q.    What did you consider in connection with this

24   document?

25   A.    So this is one of the documents that talks about

Nawrocki - direct

1    fast-fill.  Another document talking about the importance.

2    It says, "Time savings is the most important benefit of

3    fast-fill."  It solves a problem they have with their

4    current dispenser.

5            The next point, "Respondents like this feature.

6    It allows them to do everyday tasks faster, like filling

7    water glasses."

8            So again, talking about the importance of

9    fast-fill.  But again, there are various features within

10   Niagara.  Fast-fill, I think, shows it is a very, very

11   important one.

12   Q.   Could you turn to tab 9?  It's DX-699 in your binder,

13   please.  Have you looked at this document?

14   A.   Yes, I have.

15   Q.   Is this before or after Niagara launched?

16   A.   This is afterwards.  It was a fast-fill followup.  So

17   it was November 2005.

18   Q.   Could you turn to page 565540, please?  Did you

19   consider this?

20   A.   Yes.  So this document relates to the slide-out tray.

21   That is the tray that comes out the front bottom of the

22   Niagara unit.  It says, "This feature is utilized the least.

23   Some consumers were unaware of the feature.  Others

24   questioned the functionality of the feature."

25            Again, this talked about, as far as the trade

1    was concerned, that didn't seem to have a large impact.

2    Again, some customers might like it, some wouldn't.

3           But this talks about, you know, some rather

4    negative comments about the slide-out tray.

5    Q.    Mr. Nawrocki, did you consider the profitability of

6    the accused features in connection with your analysis for

7    the '121 patent?

8    A.    Yes.  I took a look at a couple things, sales value

9    and profitability information as well.

10   Q.    And have you prepared a summary of that analysis?

11   A.    Yes, I have.  I have got a summary chart on that as

12   well.

13   Q.    And is this that chart?

14   A.    Yes.

15   Q.    Could you explain it, please?

16   A.    Yes.  So this talks about apportioning profit

17   attributable to the '121.  In this instance, what we are

18   taking a look at is what is the sales value attributable.

19   The first patent we looked at was IDI.  We looked at a whole

20   variety of things, profitability, sales, sales price,

21   plaques, we looked at costs.  This one we are looking at

22   sales value.  It does have something that is facing the

23   consumer, so I am looking at what sort of value consumers

24   might place on this feature.

25           In order to start, I took a look at what

1    consumers were willing to pay for the overall Niagara.

2    There were some documents that talked about a range of ████

3    ████████     You will see here at the bottom.  So I used the

4    midpoint of that range, ██████ saying that is an overall

5    value that has been assigned to the overall Niagara.  Some

6    people might not assign that much.  I think some documents I

7    saw from LG said as low as ██████  But I said, well, let's go

8    with ██████  It's conservative in terms of dollars to use a

9    higher number.  So I said, let's use the midpoint, ██████

10              I then took a look -- that is what consumers

11   would pay.  Then I had to arrive at what the revenue

12   attributable to Niagara would be for Whirlpool or LG.

13              And then highlighted in blue is how much I

14   attributed to the value.  So what's the value attributable

15   to the '121 patent?  In other words, the spring-loaded

16   spigot, as well as the tray.  And I thought that ████████

17   percent would be fair.  I think that is reasonable, when you

18   look at all the other features that are considered, not the

19   75 percent that Dr. Rao had assigned for just the spigot

20   feature.

21              This is a big difference between us.

22              What I arrived at was, okay, what is the revenue

23   attributable to that patent?  That's the ████████████

24   applying these percentages out.  Took Whirlpool's profit

25   percentage, which ranged generally from ██████ percent,

1    and said, well, here's the profits, approximately, it is an

2    estimate, attributable to the '121 and the '980, assuming

3    validity and infringement, and then I assumed a split of

4    that, a 50/50 split, saying take half of that, that would be

5    1.80 to 4.90, would be the range of royalties that I would

6    consider.

7              That is what this analysis is.  Somewhat

8    complicated, but generally, it's taking a look at the value

9    of Niagara, trying to figure out what the profits associated

10   with that are, and trying to apportion it to the spigot as

11   opposed to the whole Niagara feature.

12   Q.    How did this influence your opinion with respect to

13   the damages?

14   A.    Well, the royalty rate that I then used was $5, I

15   talked about.  So I looked at this range and I said, well,

16   it is a consumer-facing feature, some people do talk about

17   it.  So I thought $5 would be appropriate.  I think that is

18   a conservative estimate.  You could come up with the middle

19   of this range, come up with an amount in the $3 to 3.50

20   range.  I felt to be conservative, $5 I think would be

21   something, recognizing they are competitors and potentially

22   negotiate for a higher range.  So I included the rate of $5,

23   which was above the range that I came up with here.

24   ▆▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

25        ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22          MS. WOODALL:  No further questions.

23          THE COURT:  We will have cross-examination after

24    our morning break.

25              (Jury leaves courtroom at 11:05 a.m.)

1              (Recess taken.)

2              THE COURT:  Ms. Walker.

3              (Jury enters courtroom at 11:25 a.m.)

4              THE COURT:  All right, ladies and gentlemen.

5    Take your seats.

6              Mr. Coyne, cross-examine.

7              MR. COYNE:  Thank you, Your Honor.

8                      CROSS-EXAMINATION

9    BY MR. COYNE:

10   Q.    Can you put that chart on the easel for my first set

11   of questions?

12              Mr. Nawrocki, before I start into your

13   qualifications, I wanted to look at the chart you had just

14   put up, because I thought you just said that volumes was the

15   most important factor.  Right?

16   A.    I said there was two factors.  Volumes were the most

17   significant difference, then the royalty rates based upon

18   the different types of patents.  So two factors.

19   ███        ████████████████████████████████████████████

20   ███████████████████████

21   ███    ████████████████████

22   Q.    And the rate your using for the '121 patent is only $5

23   a unit.  Right?

24   A.    For the '121?

25   Q.    Yes.

Nawrocki - cross

1    A.    That's for the spring-loaded spigot, $5, right.

11   Q.    Thank you.

12         Mr. Herrmann, you can take that down.   Thank

13   you.

14         Mr. Nawrocki, you have been engaged in over a

15   hundred intellectual property matters as an expert witness.

16   Isn't that right?

17   A.    Yeah.   I would say more than a hundred.   Since the

18   early '80s, probably about, you know, five to ten cases a

19   year, or engagements a year, depending upon the schedule and

20   things such as that.

21   Q.    Five to ten of actual testimony in court?

22   A.    No, no.   I would say five to ten different client

23   matters.   Sometimes it's more, sometimes it's less.   But

24   during the course of the year I would say five to ten

25   different client engagements I have over the course of the

1    last 20 years.

2    Q.    You have been working during that time as an expert

3    witness.  Correct?

4    A.    Yes.  Well, I'd say as a financial consultant.  If the

5    case goes to trial, I would need to testify in trial.  I

6    have testified in trial certainly before.

7    Q.    Would it be fair to say, sir, that you are a

8    professional witness?

9    A.    No.  I would say I am a CPA and a financial

10   consultant.  I do analyze damages.  And I am asked to

11   testify, if, in fact, the parties don't work out their

12   dispute.  If they don't work out their dispute, then I am

13   asked to testify in court based upon my analysis.

14   Q.    None of those prior engagements have involved

15   residential refrigerators of the type that are at issue in

16   this case.  Is that correct?

17   A.    No, not that I recall.  There might be some aspect of

18   it, sometimes I am involved in cases that involve chips or

19   motors, I think.  But they may or may not be used in the

20   refrigerator business.  Not the refrigerator business in its

21   entirety.

22   Q.    You have a number of publications and presentations

23   that you have made over the years.  Correct?

24   A.    Yes.

25   Q.    And none of those involve residential refrigerators.

1    Correct?

2    A.    I have not done a presentation on the refrigerator

3    business, that's correct.

4    Q.    Sir, in terms of the material that you analyzed in

5    reaching your opinions, you reviewed the information that

6    Whirlpool's lawyers had sent you.   Correct?

7    A.    I would say we had access to various electronic data

8    that was produced in the case.   We obtained that through

9    counsel, but we also did our own independent research on the

10   Internet.   So looking at models on the Internet, I actually

11   went to stores to take a look at the products.   So I

12   obtained some information from the attorneys and some

13   information we obtained ourselves.

14   Q.    Did the attorneys provide you all of the information

15   that was produced in the case or only a subset of it?

16   A.    I wouldn't call it they produced a subset.   It was

17   extremely voluminous.   Again, a lot of it was electronic.

18   Significant volumes of electronic data in terms of sales,

19   profitability.   But I don't think they produced the entire

20   set of documents in terms of the technical and the patent

21   stuff.   A good portion of the financial information.

22   Q.    Sir, you don't read or speak Korean.   Correct?

23   A.    I don't, but I still have a bunch of Korean documents

24   up here.   But they were translated.   I don't speak Korean,

25   that's correct.

Nawrocki - cross

1   Q.     The profit value that you were using in some of your

2   calculations was an incremental profit.  Correct?

3   A.     There was a couple different profits.  Generally, what

4   I looked at was what was called contribution, marginal or

5   incremental.

6          That was pretty commonly referred to in some of

7   the documents.  There are some documents that talk about

8   gross profits, some that talked about ordinary profit.  We

9   saw one chart that talked about ordinary.  Candidly, I

10  wasn't exactly sure what they meant by "ordinary profits."

11  But there is different levels of profits certainly to look

12  at.  And I looked at what was contained in the documents, as

13  well as the electronic data.

14  Q.     Sir, other measures of profits would vary.  Correct?

15  For example, operating profit for a corporation?

16  A.     Operating profit would be different than gross profit

17  and that would be different from contribution margin, that

18  is correct.

19  Q.     And the number of units that are accused of

20  infringement in this case, LG's units, are a relatively

21  small proportion of the total number of refrigerator units

22  that Whirlpool sells each year.  Correct?

23  A.     Let me make sure I understand your question.  You are

24  talking about the number of LG's units?

25  Q.     Yes, sir.

Nawrocki - cross

1    A.     I don't know what they are relative.   There is over a

2    billion dollars of sales of one of the products at issue and

3    half a billion.   I would say those are rather significant.

4    Proportionately to Whirlpool, I didn't make that comparison,

5    but I saw that as a fairly large volume of sales.

6    ▆▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

7    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

8    ▆▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

9    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

10   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

11   Q.     What is the total number of units Whirlpool sells a

12   year?

13   A.     I don't know what the total units are.

14   Q.     A lot more than that, though.   Right?

15   A.     That Whirlpool sells or that LG sells?

16   Q.     Whirlpool.

17   A.     I don't know the total number of units they sell.

18   Q.     Did you look at the 10-Ks of the companies with

19   respect to the profit figures reported there?

20   A.     Yes.   As part of the analysis, we looked at various

21   public filings they had as well.   So to the extent it was

22   available, we looked at that information.

23   Q.     Mr. Brooks, can you bring up PDX-123?

24          Sir, I would like to show you two charts.   The

25   first one is from Maytag.   I will represent to you, this is

1    information that was reported out in the 10-K for Maytag for

2    the years that are indicated.  We have included the table,

3    included the values from the various 10-Ks.

4             Were you aware that from approximately 2000

5    until 2005, prior to the time that it was acquired by

6    Whirlpool, Maytag's profitability fell from about 30 to

7    about 10 percent?

8    A.   I would have to take a look at the information.   I

9    can't verify the information.  But I know their

10   profitability various, certainly, cyclical.  I think in

11   recent years their profitability changes as well.

12            I can't verify this.  But these wouldn't be

13   surprising numbers.  But I can't verify that.

14            I see you have taken it from the 10-K, but I

15   don't have it.  If you have the 10-Ks, I will be happy to

16   take a look at them.

17   Q.   I am happy to have you accept as a hypothetical that

18   the values are correct.

19   A.   Okay.

20   Q.   This didn't have anything to do with the infringement

21   that is accused in this case.  Right?

22   A.   I don't know exactly what you are showing here.   I

23   assume you're showing total Maytag?

24   Q.   Total operating profits.  Actually, for Maytag, Maytag

25   reports it as gross profit.

1   A.    **Washers, dryers, refrigerators?**

2   Q.    **Yes, sir.**

3   A.    **I would say that is broad from a company standpoint.**

4   **What I looked at was specifically product line information**

5   **for the product at issue.  That may be included in here, but**

6   **candidly, this is for periods prior to the damages period.**

7   **So I couldn't verify this.**

8   Q.    **Let's go to the next one, PDX-124.  Sir, the same type**

9   **of analysis.  This is the operating profit that is recorded**

10  **in Whirlpool's 10-Ks for the years 2000 through 2008.  I**

11  **have the same question for you.  Assuming these values -- I**

12  **have accurately reported these values from the 10-K's, this**

13  **trend that you see falling from only about 8 percent to**

14  **about 3 percent, it's not caused by the alleged infringement**

15  **in this case.  Right?**

16  A.    **I didn't say that it was.  And I would say again, for**

17  **Whirlpool it would be the same information.  This would**

18  **include a whole variety of products.  So I wouldn't suggest**

19  **that this has impacted their overall profitability except**

20  **for the fact that if they have lost sales for refrigerators,**

21  **they potentially make higher profitability.  Because this is**

22  **company-wide.  I wouldn't say the losses here would have a**

23  **significant change on the rates, however.**

24  Q.    **Sir, I would like to change topics and go back to what**

25  **I asked you about originally.**

1    A.    The chart?

2    Q.    You don't need the chart.  I will just ask you the

3    question.

4    A.    Sure.

5    Q.    We were talking about the difference, the impact of

6    the royalty rate per unit and what impact it has on these

7    various calculations.  Would you agree with me that the

8    claimed features are a significant basis for consumer demand

9    with respect to the '121 patent?

10   A.    Again, you are talking about the '121 patent?

11   Q.    Yes, sir.

12   A.    So the rotating spigot -- I thought you were talking

13   about the chart.  The chart was on Whirlpool's damages.  You

14   are talking about LG's?

15   Q.    Yes, sir.

16   A.    Let me refer to them.

17         Okay.  What was your question?

18   Q.    Are the claimed features of the '121 patent a

19   significant basis for consumer demand?

20   A.    As I mentioned, I think for certain customers, they

21   may have that.  I haven't seen significant evidence of that.

22   I have seen mixed evidence.  Some people, apparently, like a

23   rotating faucet, some don't.  There are different types of

24   faucets, be in manual faucets, which as I understand is not

25   accused, versus spring-loaded.

Nawrocki - cross

1        I haven't seen any demand issues that I have

2   seen for a spring-loaded rotating faucet to be specific to

3   what I understand is at issue here.

4        Though there are some documents that talk about

5   people liking the faucet, some don't.  Some might like the

6   tray, some don't.  I wouldn't say it was pervasive.

7   Q.   Let's go back to the document you had up, DX-700,

8   please.

9   A.   Sure.  Is that in the binder that you provided?

10  Q.   No, sir.  It's in the direct binder.

11  A.   Okay.  Let me pull that up.

12  Q.   Can we go back to the page 144 that Ms. Woodall had up

13  on the value versus cost?

14        Sir, on the first line --

15  A.   Just a second.  Let me get to the document.  This is

16  on the French door document?

17  Q.   It's entitled "Ice and Water Feature Values and

18  Costs."

19  A.   But the document is the bottom-mount feature document,

20  Exhibit 700?

21  Q.   It's at page 41 of DX-700.

22  A.   I guess I can see it here.

23  Q.   On the chart you had indicated to Ms. Woodall the

24  in-door-ice line 66 -- Mr. Brooks, can you back it out a

25  little bit so we can pick up the footnotes, too, please?

1    The comparison that you were looking at here for

2    in-door-ice is not based on an alleged infringing versus

3    uninfringing ice and water dispenser.  Is it?

4    A.    Did you say uninfringing?

5    Q.    Yes, noninfringing.

6    A.    Yes, this is -- this says in-door-ice.  It is not

7    making any comments about infringement or noninfringement.

8    This is a document within Whirlpool taking a look at various

9    features.  And in-door-ice I understand is one of the things

10   that is accused.

11   Q.    What it is compared against is having no ice and water

12   dispenser at all?

13   A.    Right.  I see that.

14   Q.    In fact, a lot of units have an ice and water

15   dispenser that don't have in-door-ice.  Correct?

16   A.    Yes.  You can't have it in the door or the

17   old-fashioned not within the door.

18   Q.    So this valuation here is not comparing an in-door-ice

19   in a system that has an ice and water system versus another

20   refrigerator that has no in-door-ice but still has the ice

21   and water system, is it?

22   A.    I don't know if they are making that comparison of no

23   ice whatsoever.  Like any automated, I don't know exactly

24   what that refers to.  I see it says no ice.  I don't know if

25   that is referring to a model with no ice capability

1    whatsoever or not.

2    Q.    But to be a fair comparison, it would still have to

3    have the ice and water dispenser, wouldn't it?

4    A.    That would be another comparison, comparing it to ice

5    and water.  I am not saying this does or doesn't.  I don't

6    know from that footnote.

7    Q.    Could we go to DTX-121?  Sir, this is a Boston

8    Consulting outside report, right, that we just looked at,

9    DX-700?

10   A.    Are you talking about 121?

11   Q.    I did go there.  I want to figure out this Boston

12   Consulting Group, that is not an internal Whirlpool

13   memorandum, DX-700, is it?

14   A.    That is a Whirlpool-produced document, as I understand

15   it.  It was done for them by Boston Consulting Group.

16   Q.    By an outside vendor?

17   A.    That is my understanding.

18   Q.    Let's look at what Whirlpool itself puts on these

19   things as a valuation, if we can.  Can we go back to DX-121.

20   A.    Just so I am with you, that is in the binder you

21   produced.  Right?

22   Q.    Yes, sir.  That should be DX-121.

23   A.    I have that.

24   Q.    Mr. Brooks, can we go to the page, the tag line at the

25   bottom "consumers get it"?

1      I am sorry, this should be PTX -- I am sorry, I

2  said DX.

3      MR. COYNE:  I misspoke, Your Honor, I apologize.

4  BY MR. COYNE:

5  Q.    For the record, it's PTX-121.

6  A.    Sir, I am not following.  I have PDX in here.

7  Q.    PTX.

8  A.    That's what I was on.

9  Q.    It's the fifth tab of your binder.

10  A.    I have PTX-121, yes.

11      What page is this?

12  Q.    It's the page that ends with 678.  Do you see that?

13  A.    Yes, it's titled "Niagara Redesign," yes.

14  Q.    Did you review this page in formulating your opinions

15  in this case?

16  A.    I can't recall.  I have seen various information like

17  this from the documents that talked about Niagara and the

18  different features.

19  Q.    This, sir, is an analysis that Whirlpool is comparing

20  the accused Niagara features against the in-door-ice

21  features of the '130 patent.  Correct?

22  A.    Say that again, I am sorry.

23  Q.    This is a comparison between the Niagara features,

24  some of which are accused of infringing the '121 patent,

25  against the '130 patent features for the in-door-ice.

Nawrocki - cross

1    Correct?

2    A.    I am not aware of it being comparisons of patent

3    features.  What it talks about are several things.  It talks

4    about Niagara.  It talks about in-door-ice.  So when you

5    talk about the patent features, I am certainly not going to

6    talk about the technology.  In-door-ice is one of the things

7    we have been talking about in the context of Whirlpool's

8    patents, and Niagara we have been talking about generally.

9    But there is different capabilities and different

10   technologies, certainly.

11   Q.    You understand that certain of the features of Niagara

12   are accused of infringing the '121 patent.  Correct?

13   A.    Certain of the features.  Not all the features.  There

14   are several features I identified that I understand are not

15   at issue.

16   Q.    In making this internal comparison, Whirlpool itself

17   concluded consumers get it with ███████████████████████████

18   ████████████████████  preferred over in-door-ice.  Did I read

19   that correctly?

20   A.    Yes, you did.  That ██████ is what I referred to

21   earlier.  I used ███████████████████████████  what that

22   document says.

23   Q.    In terms of this document, there is a roughly

24   comparable value being placed on those two suites of

25   features by the consumers whose preference is reflected

Nawrocki - cross

1    here.  Correct?

2    A.    I wouldn't say comparable value.  Keep in mind, we are

3    talking about overall Niagara.  And then they are mentioned

4    in-door-ice.  What is at issue I think is only one aspect of

5    Niagara.

6    Q.    Have you seen any documents, sir, that indicate that

7    the Niagara feature is the most important feature?

8    A.    I have seen documents that have, again, depending upon

9    the studies, have assessed Niagara and in-door-ice

10   differently.  Some say in-door-ice is a big deal, some say

11   Niagara.  I think they both have significance.  In-door-ice

12   and Niagara were both important to consumer-facing

13   capabilities.

14   Q.    Sir, are you aware that there are Whirlpool internal

15   documents that refer to the Niagara as their favorite

16   feature?

17   A.    I wouldn't be surprised.  I would have to look at the

18   documents.  If you are talking about overall Niagara, yes.

19   And some customers might even prefer one of the features.

20   Q.    Would you look at PTX-693, please?

21   A.    Okay.  It's upside-down.  Let me flip it around.

22         Okay.  This is the Smith-Dahmer study you are

23   referring to?

24   Q.    Yes, sir.  If you look at the bottom of the page that

25   ends in 692, do you see the last bullet point on that chart,

Nawrocki - cross

1    sir?  "If the extendable water tray and extendable water arm

2    are coupled, the majority of people across segments choose

3    it as their favorite feature."

4    A.    Yes, I see that.

5    Q.    Did you consider that in reaching your opinions in

6    this case?

7    A.    Yes, I think some people like the tray and the arm.

8    Some people don't, depending upon the different time

9    periods.

Nawrocki - cross



Q.    Just so we get the timing straight, what time did you

consider this hypothetical negotiation to have occurred for

the '121 patent?

A.    Basically, taking a look at the first period of

infringement.  So the patent, as I understand, was issued in

early '08.  So I would say you take a look at the period of

that time period, late '07-early '08, right before the first

accused sale is made.

1    Q.      What is the time frame when the hypothetical

2    negotiation, in your view, occurred with respect to the '130

3    patent?

4    A.      The '130 patent would be much earlier.  It would be

5    based upon the first infringement by LG.

6    Q.      What time frame?

7    A.      Let me take a look.

8            When they first introduced the product, when LG

9    first introduced the in-door-ice, which was in 2006.

10   Q.      Sir, you are aware also that Whirlpool didn't give LG

11   notice of the infringement as you talked about with the '121

12   until 2008.  Correct?

13   A.      That's correct.  My understanding is the hypothetical

14   would take place at the time of first infringement even

15   though I have calculated damages for a smaller basis, based

16   upon being on notice.

17   Q.      With respect to the '601 patent, when did the

18   hypothetical negotiation occur, in your view?

19   A.      That patent is a much older patent.  So I believe that

20   the first period of accused use -- let me just take a look

21   back -- was 2003, I believe.

22   Q.      Thank you, sir.

23           Let's go to the '130 patent for a few minutes.

24   A.      I am sorry.  Let me make sure.  You are talking about

25   the in-door-ice patent, yes.

Nawrocki - cross

1    Q.    Did you want to correct your prior answer?

2    A.    No, I wanted to make sure we were on the right page.

3    You are shifting over to Whirlpool's patents now?

4    Q.    Yes, I am.

5    A.    Thank you.

6    Q.    If the French-door does not infringe because the jury

7    ultimately finds that the features are such that it doesn't

8    meet the claims of the patent, then it would be not

9    appropriate to include the French-door model in the damages

10    calculation.  Correct?

11    A.    You would only apply damages to those products found

12    to be infringing.  So the number of units that I calculated

13    include both side-by-side and French-door.  You would apply

14    the royalty rate to those units that are found to be

15    infringing.  If side-by-side and French-door are both found

16    to be infringing, then that information was provided.  If

17    just one of them is, that information was provided.

18    ██   ██████████████████████████

19    ████████████████████████████

20    ██   ███████████████████████████████

21    █████████████████████████████

22    █████████████████████████████

23    ███████████████████████████████

24    ███████████████████████████████

25    █████████████████████████

Nawrocki - cross

1   Q.      By 2006 LG had a lot better information about what

2   their profitability improvement actually was than their

3   projections from 2002 or 2003.  Correct?

4   A.      Yes.  As you get further along, there is different

5   profitability expectations.  We talked about the other

6   documents, recall the charts that talked about the

7   profitability improvement as well.  So they would have

8   various considerations over a period of time as they

9   embarked upon the project.

10  ██    ███████████████████████████████████

11  ████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████

13  ██   ████████████████████████████████████████████████████

14  ██████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ███████████████████

19  Q.      Let me try to clarify my question, then.

20          In terms of the actual profitability, you were

21  basing it, at least for the 2008 and 2009 models, on

22  side-by-side comparisons of units that had Space Plus and

23  did not have Space Plus.  Correct?

24  A.      That's correct.

25  Q.      You made, I think, four comparisons?

Nawrocki - cross

1    A.    Actually, we talked about just a comparison of two

2    models, basically, for 2009.

3    Q.    Then the two comparisons.  So two refrigerators and

4    then two other refrigerators were compared.  Right?

5    A.    I looked at a variety of refrigerators.  I looked at

6    the price difference in LG's models.  I also looked at

7    Whirlpool's as well.  I believe you are referring to the

8    ones that we showed on direct, which was comparing two

9    models of LG for 2009.

22   Q.    For purposes of my question, it is going to be

23   directed at the refrigerator as opposed to the profit

24   center.  Will this suffice for that purpose?

25   A.    This is one piece of their profitability, yes.

1    Q.    And these features have other differences than just

2    the Space Plus.   Correct?

3    A.    There are some differences in terms of bins and

4    ratings and things such as that.

5    Q.    And the tall dispenser is a difference between them.

6    Correct?

7    A.    Yes.   If you look at the picture there is a tall

8    dispenser, a slightly smaller one on the right.   I would

9    have to take a look at the actual data sheet to see if that

10   is identified as such.

11   Q.    And you mentioned during your direct, I believe, that

12   this calculation is going to produce different results,

13   depending on the two models you pick, right?

14   A.    Yes, they have different sales prices and different

15   costs relating to them.   So different models would show

16   different profitability.   As I looked at a variety of them,

17   you will see different levels of profitability, higher and

18   lower.

19   Q.    How many comparisons did you make in doing this

20   analysis?

21   A.    For LG I looked at these models, as well as several

22   other models they had.   These two were the most

23   representative in terms of being sold for a period of time,

24   having no in-door-ice and then having in-door-ice.

25        There were a variety of other models.   Sometimes

1    they were sold in only limited periods and they were

2    discontinued.  So I tried to find some that had relatively

3    significant sales.  I think both of these models had tens of

4    thousands of units of sales in each year, millions of

5    dollars.  So I looked at these and presented these, but

6    there is a whole variety of models I looked at as well, for

7    LG and Whirlpool.

8    Q.    There is a lot of other models, some of which may

9    actually show a negative difference, correct?

10   A.    It would depend upon the comparison.  You have to take

11   a look at the features and see if there is a difference.

12   But I would caution because some of the information relating

13   to that shows unusual things.

14          One of the models that I think Dr. Rao used as

15   an example showed a negative price as an example.  That

16   didn't make any sense.  And they showed negative costs.  I

17   looked at that and tried to use the models that I thought

18   were most representative.

19   Q.    Actually, sir, what he showed was that the

20   profitability for the unit with the Space Plus was actually

21   lower than the profitability without Space Plus.  That's

22   what he showed, isn't it?

23   A.    He showed some of that.  I will let Dr. Rao talk for

24   himself.  But when you look at the specific information, it

25   is very inconsistent with looking at information on a

1    specific year period.  I looked at it in a period where he

2    was looking at multiple years and costs for a certain year.

3    If you looked at the specific information consistent with

4    this, you would find much different results than he found.

5    Q.    In fact, what he did is look at a group of units, not

6    just one-to-one comparisons, he took a group of units and

7    compared them and derived what he felt was the incremental

8    profitability.  Correct?

9    A.    He looked at various units, and I looked at various

10   units as well, for purposes of court.  We showed these as

11   examples of what are representatives of the differences in

12   price.

13         He looked at a variety, for multiple years, but

14   had some issues in terms of what his profitability

15   information was based upon.  He was not consistent with the

16   years and the data that he was showing for sales.

17   Q.    I am sorry, sir.  Maybe it was the way I asked the

18   question.  I was simply asking:  Did he compare a number of

19   units, as opposed to making a one-by-one comparison as you

20   did?  Correct?

21   A.    You will have to ask Dr. Rao.  He looked at a variety

22   of models, as did I.

23   ▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Nawrocki - cross

1   ▇▇ ▇▇▇▇▇▇

2   ▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

3   ▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

4   Q.   I am just going to ask you -- let me do this, then,

5   first and then let's talk about the split.

6            One of the things that, for example, the article

7   that you showed from the table that you displayed in your

8   slides, was that you would have rules of thumb that you use

9   in licensing.  Correct?

10  A.   No, I didn't say rules of thumb.  If you are talking

11  about the chart that had the different lines on it?

12           THE COURT:  Counsel, is there a reason you are

13  standing?

14           MS. WOODALL:  We have an objection to the

15  hypothetical.  Could we approach?

16           THE COURT:  Yes.

17           (The following took place at sidebar.)

18           ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

19  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

20  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

21  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

22  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

23  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

24  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

25  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



            MS. WOODALL:  I am not sure which defendant he

is referring to.

            MR. COYNE:  Dr. Rao's prior testimony in the

proceeding.

            MS. WOODALL:  He had not testified on the '130

patent's value.  He has not yet come up on rebuttal for

that.  He was talking to you about the '121.

Nawrocki - cross

1           THE COURT:  She is saying he perhaps should not

2   be able to testify about it now because it may never come in

3   evidence.

4           MS. WOODALL:  That is mostly my concern, Your

5   Honor.  We need to address that at the time of Dr. Rao's

6   testimony.  In his report he has expressed --

7           THE COURT:  Let me interrupt.  Not that he

8   shouldn't be able to testify, but based on the hypothetical

9   you posed.

10          MS. WOODALL:  If he wanted to use any other

11  number and say other than what Dr. Rao has calculated,

12  because Dr. Rao has calculated in another specific context.

13          MR. COYNE:  Why don't I not reference Dr. Rao

14  and it be a high hypothetical question, and he can say yes

15  or no, not referring to Dr. Rao.

16  ████████████████████████████████████

17  ██████████

18  ████████████████████

19          MS. WOODALL:  I think the cat is out of the bag.

20  He said Dr. Rao proposes this number.  I am not opposed to a

21  hypothetical to my expert.  But I don't think it would be

22  fair to get this far, where there has been a representation

23  to the jury that that is Dr. Rao's number.

24  ████████████████████████████████████████

25  ████████████████████████████████████████████

Nawrocki - cross

1

2

3

4              THE COURT:  I think that would suffice.

5              (End of sidebar conference.)

6   BY MR. COYNE:

7   Q.    Mr. Nawrocki, I am going to ask you a hypothetical.

8   But first I want to talk about the split between -- when you

9   are doing a hypothetical negotiation, frequently you figure

10  out the incremental profit or if it's an incremental cost

11  basis, whatever basis you are using, you would apply a split

12  between the licensor and licensee about how they would

13  divide that incremental profit.

14  A.    You could split or apportion the benefits.  It would

15  be those profits or whatever the benefits might be.  You

16  could split or apportion those, that is one consideration,

17  yes.

18  Q.    Among the factors you might consider in making that

19  apportionment or split is the relative size and bargaining

20  strength of the two companies.  Correct?

21  A.    That's one consideration, yes.  The competitive

22  relationship that we talked about earlier, yes.

23  Q.    Well, in this particular market, we have seen a lot of

24  evidence in this case about the competitive relationship,

25  and you have been in court for much of that, haven't you?

Nawrocki - cross

1    A.    Not only in court, but I have seen the documents as

2    well.

3    Q.    And we are dealing with companies that are both very

4    large, correct?

5    A.    Very large, global companies, more than a billion

6    dollars in sales, certainly.

7    Q.    I am going to ask you for this hypothetical to assume

8    that in the hypothetical negotiation that took place over

9    the '130 patent, they are going to agree on a 50-50 split.

10    Okay?

11    A.    For the '130 patent?

12    Q.    Yes, sir.

13    A.    That's one way of looking at it, yes.

14

15

16

17

18

19

20

21    Q.    Yes, sir.

22    A.    I will assume that.

23

24

25

Nawrocki - cross

1  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

2  &#9608; &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

3  &#9608;&#9608;

4  &#9608; &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

5  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

6  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

7  &#9608;&#9608;&#9608;&#9608;

8  &#9608; &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

9  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

10 &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

11 &#9608;&#9608;&#9608;

12        THE COURT:  It's just a hypothetical.

13        THE WITNESS:  I understand.

14        So I would say that that would be one way of

15  looking at the split, is 50-50.

16  BY MR. COYNE:

17  &#9608; &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

18  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

19  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

20  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

21  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

22  &#9608; &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

23  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

24  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

25  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

Nawrocki - cross

1    ████████████████████████████████████████████

2    Q.    Thank you, sir.

3              Sir, I am going to ask one further clarification

4    on this hypothetical.  I am going to also ask you to assume

5    that the jury decides in this case that the French-door

6    units do not infringe.  Okay?

7    A.    Okay.

8    Q.    Applying those three assumptions -- could we have

9    PDX-10, please, Mr. Brooks?  So these are the calculations

10   and the values that you put up on the board earlier.

11   Correct?

12   A.    Yes, that's correct.

13   ██  ████████████████████████████████████████

14   ████████████████████████████████████████

15   ████████████████████████████████████████

16   ████████████

17   ██  ██████████████████████████████████

18   ██████████

19   Q.    And there would be no incremental units that were

20   being sold that would be infringing for the French-door

21   units under the hypothetical I have given you.  Correct?

22   A.    I am sorry.  You said there would be no incremental

23   units?

24   Q.    You would not include in the royalty base any of the

25   French-door units, if we are assuming that the jury finds

1    that the French-door units do not infringe?

2    A.    If the French-doors do not infringe, they shouldn't be

3    included in the calculation.

Nawrocki - cross



19  Q.   Can we go to the '601 patent, sir?

20  A.   Yes.

21  Q.   You indicated that the inclusion of this technology

22  decreased consumer warranty claims?

23  A.   Yes, it can have an effect--- yes, I did.

24  Q.   Did you do an analysis of all of Whirlpool's warranty

25  claims for a period before and after this technology was

1   implemented?

2   A.    I didn't analyze their warranty claims as over this

3   period of time.   They already used plaque liners.   So they

4   didn't have any that related to not using them.   They were

5   using the plaque liners throughout this.   It would be years

6   before that they hadn't used this, which would have been

7   many years ago.   They had been using the plaque liners for

8   several years.

9   Q.    Did you do any analysis of warranty claims with and

10  without the plaques?

11  A.    Not by dollar amount.   My understanding is without

12  them, they were concerned about having that as an issue, and

13  that is one of the benefits that they had experienced years

14  before they developed the plaque liners.

15  Q.    My question, sir, is whether you have conducted any

16  analysis of the warranty claims in the period when the

17  unplaqued liners were used compared to when plaque liners

18  were used.

19  A.    No, I didn't.

20  Q.    Instead, you relied on statements by Mr. Whah during

21  conversations you had with him.   Correct?

22  A.    That's correct.   He informed me that they provided new

23  refrigerators at the time to people who were having problems

24  in that area.

25  Q.    You didn't see any evidence in the materials you

1   reviewed of drop in warranty claims before and after the

2   '601 patent was implemented, correct?

3   A.      That's correct.

4   Q.      Sir, are you assuming for purposes of your analysis

5   that plaques do not actually prevent bowing?

6   A.      I am assuming that they assist or they prevent bowing.

7   I understand that they are used on the side, but I am not a

8   technical expert.  I think you have to talk with the

9   technical experts of that.  My understanding is they assist

10  in that process of either cracking or bowing.

11  Q.      That's specifically my question.  Are you assuming for

12  purposes of your analysis that the plaques prevent bowing or

13  rather that they simply help reduce bowing?

14  A.      I don't recall making a distinction.  I recall that

15  they either assist or prevent bowing.

16  Q.      And you mentioned, now, a couple of times that

17  cracking is one of the factors that was considered, as well

18  as warranty claims.  Right?

19  A.      I remember there were some issues on cracking.  If

20  things would bow, I guess potentially they could crack.

21  Again, I would defer to the technical experts' analysis of

22  those claims.

23  Q.      Have you reviewed Whirlpool's internal documents about

24  whether the plaques really do eliminate these problems

25  associated with bowing?

Nawrocki - cross

1    A.    I have seen some documents.  It depends on the

2    documents.  Some of that was more of a technical nature.  I

3    would have to take a look at the document and see which one

4    you are referring to.

5    Q.    Can we go to PTX-400, Mr. Brooks?

6          THE COURT:  Does it really matter?

7          MR. COYNE:  That is fine, Your Honor.  I am

8    prepared to move on.

9    BY MR. COYNE:

10   ██    ████████████████████████████████████████████████

11   ██    ████████████████████████████████████████████

12   ████████████████████████████████

13   Q.    You considered that there was no noninfringing

14   alternative.  Correct?

15   A.    As I mentioned on that chart, I was not aware of any

16   alternatives that LG had available during the infringement

17   period that were commercialized.

18   Q.    Can we bring up PTX-403, please?

19   A.    The exhibit number, I am sorry?

20   Q.    PTX-403.

21   A.    Okay.

22   Q.    Sir, this is a catalog from 1988-1989, for a Gold Star

23   refrigerator.  Do you see that?

24   A.    Yes.  I think I have got it here.  Yes, I have that.

25   Q.    403.

1  A.    Okay.

2  Q.    This is a catalog from 1988-1989 for a Gold Star

3  refrigerator that was actually sold.  Do you understand

4  that?

5  A.    I don't think I have seen this before.  This is a Gold

6  Star one?

7  Q.    Yes, sir.

8  A.    I don't recall seeing this before, but okay.

9  Q.    So you did not consider this in your analysis.

10 Correct?

11 A.    I don't think I have seen this.  This is Gold Star, in

12 '88.

13 Q.    You recognize that as an LG brand, correct?

14 A.    I think Gold Star was part of the LG before it became

15 LG, Gold Star and Lucky.  I heard what was talked about

16 before, and that is generally what I understand, is that

17 they were eventually folded into LG.

18 Q.    For this hypothetical I am going to ask you to assume

19 that this refrigerator that is shown in this catalog was

20 actually commercialized.  Okay?

21 A.    Okay.

22 Q.    That it was sold in a number of markets, not the U.S.

23 necessarily but a number of markets around the world.

24 A.    Okay.

25 Q.    And that the unit and the features in it were

1   commercially acceptable in those markets.  Okay?

2   A.   Okay.

3   Q.   Could we go, Mr. Brooks, to the page that shows the

4   interior of the refrigerator?  I think it's GR-602.

5            On the right-hand side, sir, in the middle of

6   the page, there is an image of the interior of the

7   refrigerator.  Do you see that?

8   A.   Yes, I see that.

9   Q.   Do you see on the left -- I am sorry, the contrast is

10  not high -- but you see on the left-hand side of that

11  refrigerator wall, the refrigerator has these indentations

12  or plaques formed in it?

13  A.   I couldn't say those are plaques or not.  I will defer

14  to the technical experts.  I see different lines in there.

15  I don't know if they are considered plaques or not.

16  Q.   I will ask you to assume for purposes of this

17  hypothetical that they are, in fact, indentations in the

18  liner.  Okay?

19  A.   They are indentations, okay, I will assume they are

20  indentations.

21  Q.   I will ask you to further assume that those are

22  indentations that satisfy all the other limitations of the

23  claims of the '601 patent.  Can you make that assumption for

24  me, as well, please?

25  A.   Okay.

1    ▮

2

3    ▮

4

5

6    ▮

7    Q.    I am sorry, sir.  Yes.  My mistake.  I see that now.

8              Sir, the difference in cost, you based your

9    estimate, your analysis on difference in cost, or it would

10   be the cost analysis for the royalty calculation based on

11   the cost of the liner plus the foam.  Correct?

12   A.    Based on the cost of the plastic liner, as well as the

13   foam that is adhered to the plastic liner.

14   Q.    You would still have plastic foam adhered to the

15   plastic liner even if the foam was unplaqued.  Correct?

16   A.    I don't know from a technical manufacturing standpoint

17   whether or not it would be able to be used without the

18   plaques.  You might be able to physically put foam there,

19   but whether or not you would be able to use that

20   configuration with plastic, foam, and metal without plaques,

21   I don't know from a manufacturing or technology standpoint.

22   Q.    Let's assume that for purposes of this hypothetical as

23   well --

24   A.    Just a blank wall?

25   Q.    Yes, sir.

Nawrocki - cross

1   A.    Okay.  I am not a technical expert, but I will assume

2   it's a flat wall.

3   Q.    Sir, LG would have had to have had dies and tooling to

4   make that liner that is shown in PTX-403.  Correct?

5   A.    Are you talking about the Gold Star model?

6   Q.    Yes, sir.

7   A.    Either they had them or their subcontractors would

8   have some type of molds.

9   Q.    I am going to ask you to assume that the only

10  difference between a plaqued liner and an unplaqued liner

11  would be the cost of doing the molds to remove the

12  indentations.  Will you make that assumption for me?

13  A.    It is inconsistent with what I would expect, but I can

14  make that assumption.

15  ████   ███████████████████████████████████████████████████

16  ███████████████████████████████████████████████████

17  ███████████████████████████████████████████████

18  ███████████████████████████████████████████████████████

19  ████████████████████████████████

20  ████   █████████████████████████

21  Q.    Yes, sir.

22  A.    Okay.  That would be one cost.  I will make that

23  assumption.  I don't know if it is accurate or not.  But I

24  will assume that.

25  ████   █████████████████████████████████████████████████

Nawrocki - cross



Nawrocki - cross

```
1              MR. COYNE:  No further questions, Your Honor.

2              THE COURT:  Ms. Woodall, redirect?

3              MS. WOODALL:  Yes, Your Honor.

4              Could I have PTX-403, please?

5    BY MS. WOODALL:

6    Q.    Mr. Nawrocki, when is this catalog from?

7    A.    Where was it from?  From Gold Star.

8    Q.    What year?

9    A.    It says '88 and '89 on top.  It says '88 and '89.  I

10   don't know.  I don't recall seeing this.  That's what it

11   says on top.

12   Q.    How does the size of a United States refrigerator

13   compare to that of one sold outside of the United States?

14   A.    My understanding is the refrigerators here are larger.

15   Q.    Did you hear testimony from certain LG witnesses

16   during the course of this trial, indicating that they had to

17   change the size of their refrigerators for the U.S. market?

18   A.    I recall that being discussed.

19   Q.    So could you relate for us what would be necessary for

20   the liner that is depicted in PTX-403, what steps would be

21   necessary for that to be a viable noninfringing alternative?

22   A.    Well, I believe there was some discussion about

23   molding costs.  If you could -- you would have to first come

24   up with a mold design that would be noninfringing.  And that

25   would take some time.  If it's viewed that these molds
```

1    are -- these indentations, these plaques are appropriate,

2    you would have to redesign it for the molds for the U.S.

3    market.  And there would be a whole series of models.  If

4    you go to the store, you will see various models, there

5    might be 10, 15 models, but there would be a whole series of

6    models, not only for those, but French-doors, side-by-side,

7    and that changes year by year.  So there would be a lot of

8    additional mold costs.  There would be time to implement

9    them.

10            Then there would be the issue to decide what you

11   do with each one of these, in terms of the inventory and

12   things such as that.  So there would be time as well as

13   costs associated with it if you tried to implement something

14   there into another product.  That would be from a

15   manufacturing standpoint something to consider.

16   Q.    During that time would LG be able to sell any of the

17   refrigerators with the accused plaque?

18   A.    If they sold an accused product, my understanding is

19   they would have to pay something on that.  It would be up to

20   the Court whether or not they could sell it or not.

21   Q.    But if LG were not selling any refrigerators during

22   the time of design-around and implementation, what would

23   happen?

24   A.    If they weren't able to sell the product that was

25   accused of infringement, that would be a significant impact

1   for LG, having these products that you couldn't sell and you

2   would have to either disassemble them, put in new walls, or

3   start from scratch.  There would be a cost for that.

4   Q.   Are you aware of the legal proposition that legal

5   damages should be capped at a design-around cost?

6   A.   No.  It's a consideration of what the design-around

7   costs are, but it's not necessarily a cap.  It depends upon

8   overall *Georgia-Pacific* factors and taking a look at all of

9   them in their entirety.

10  Q.   Could we turn to DX-70, please?  It's page 1885144,

11  please.

12           Earlier, LG's counsel asked you about footnote 1

13  and the value of IDI.  Do you recall that?

14  A.   Yes.

15  Q.   Does LG sell any French-door bottom-mount

16  refrigerators with ice and water through the door that do

17  not have IDI?

18  A.   Not to my knowledge.

19  Q.   So would this comparison, in your mind, still be a

20  valid one?

21  A.   Yes.  Taking a look at the in-door-ice and the value

22  that is placed on in-door-ice, I still think it's

23  appropriate in terms of the relative value.

24  Q.   Can we have PTX-121, please?

25           What is the date on this document?

1    A.    September 2004.

2    Q.    Is that before or after Niagara launched?

3    A.    That was before.

4    Q.    Could we have PTX-693, please?

5          What is the date of this document?

6    A.    2003.

7    Q.    Is that also before Niagara launched?

8    A.    Yes.

9    Q.    What information did Whirlpool have after the launch

10   of Niagara that may or may not be different from these two

11   documents that you have just seen?

12   A.    I think what happened, and you see it in the

13   documents, as well as I think Mr. Langbo testified to it, is

14   they put a lot of features in things and they sometimes

15   aren't always met with what they thought they were going to

16   be.  They thought this would be great.  People would like

17   it.  Sometimes there is mixed reaction in the marketplace.

18   I think sometimes there is expectation and then sometimes

19   what actually happens is there is not as much when they

20   introduce the product.

21   Q.    And when did LG's '121 patent issue?

22   A.    LG's '121, January, I believe January of '08.

23   Q.    And at the time of the hypothetical negotiation for

24   the '130 patent -- what is that date?

25   A.    For the '130?

Nawrocki - redirect

1   Q.   **Yes.**

2   A.   **Now we are coming to in-door-ice.  That is 2006.**

3   Q.   **At that time had Niagara already launched?**

4   A.   **Yes.**

5   Q.   **And did Whirlpool already know about the performance**

6   **of Niagara?**

7   A.   **Yes.**

8   Q.   **Could we have slide 36, please?**

9        **Mr. Nawrocki, have you attributed all of LG's**

10  **incremental profit to IDI?**

11  A.   **No, I have not.**

Nawrocki - redirect



Q.    Do you know what level of margin Whirlpool uses in making its business decisions?

A.    They will use either a product margin or an incremental margin as well, which I talked about as well.  A

1    product margin, how much you make on a refrigerator before

2    all your corporate allocations.

3    ████  █████████████████████████████████████████

4    ██████████████████████████████████

5    ████  ███████████████████████████████████████████

6    ███████████████████████████████████████████████████████

7    ██████████████████████████

8                    MS. WOODALL:  No further questions.  Thank you.

9                    THE COURT:  Thank you, Mr. Nawrocki.

10                   (Witness excused.)

11                   THE COURT:  It's been a long morning, leading

12   into an early afternoon.  I think we will take our lunch a

13   little earlier today.  Let's come back at 1:30.

14                   (Jury leaves courtroom at 12:25 p.m.

15                   (Luncheon recess taken.)

16                   THE COURT:  Okay, Ms. Walker.

17                   MR. COYNE:  Your Honor, just before the jury

18   comes in, we have been discussing kind of the schedule for

19   the rest of the day.  It appears that Whirlpool is going to

20   be resting soon.

21                   How do you want us to handle the 50(a) motions

22   that we would be proposing?

23                   THE COURT:  You can Bench-file it if you would

24   like.  If you prepared writings?

25                   MR. COYNE:  We could file them at the end of the

1    day, if that's Your Honor's pleasure.

2            THE COURT:  You can do that.  If you have

3    something that you really think in earnest you should

4    prevail upon, Mr. Coyne, I will listen briefly.  But it

5    really needs to be good.

6            MR. COYNE:  I do.  But they are relatively

7    limited issues and they won't terminate the proceedings.  So

8    why don't I just Bench-file --

9            THE COURT:  There's no point in taking my time.

10           MR. PARTRIDGE:  I hadn't planned on

11   Bench-filing.  I will give you something at the end of the

12   day that renews our motion and protects our record.

13           THE COURT:  The ones that I denied already?

14           MR. PARTRIDGE:  Only for the purposes of the

15   appellate record, and the way the rules are read, sometimes

16   strangely, you can simply deny them again, Your Honor, when

17   we are done.  As to the proofs that we made, we will give

18   you a short Bench memo on this.  It is to preserve our

19   appellate record.

20           THE COURT:  Unless there is something new that

21   you want to say, let the record be clear, those will be

22   denied.

23           MR. PARTRIDGE:  Very well, Your Honor.  Thank

24   you.

25           THE COURT:  Mr. Partridge, for your edification,

1  if I thought it was even close...

2          MR. PARTRIDGE:  I understand, Your Honor.  It's

3  only an appellate record issue.

4          THE COURT:  I am not sure I read the rules

5  exactly the same that that is required.  Even in the Federal

6  Circuit.  I don't mean that disparagingly.  The regional

7  circuits, quite frankly, interfere a lot more with trial

8  judges' prerogatives than the Federal Circuit.  I don't

9  appreciate that about my colleagues in D.C.  It is Markman

10  that I don't appreciate.  But don't let me get started on

11  that.  That is not their fault at this point.  Maybe it is.

12          MR. PARTRIDGE:  Like many lawyers, I get nervous

13  about any of these variations.

14          THE COURT:  You don't want to waive something.

15  I understand.

16          (Jury enters courtroom at 1:35 p.m.)

17          THE COURT:  All right, members of the jury.  We

18  will proceed.

19          MR. PARTRIDGE:  Your Honor, a brief statement,

20  if I may.

21          We have three witnesses left in our

22  case-in-chief.  The first will be by video.  His name is

23  Sung W. Kim.  He is a research engineer with LG.  He talks

24  about what in this case is Defendants' Exhibit 769, which is

25  the document that talks about strengths, opportunities,

Sung Kim - depo.

 1    weaknesses and threats.

 2              (Deposition played as follows)

 3              "Question:  Mr. Kim, I'm going to hand you

 4    what's been marked as Kim No. 2.  If you'd just take a

 5    minute to look at the document, my question is, do you

 6    recognize the document?

 7              "Answer:  Yes, I've seen this.

 8              "Question:  What is the document?

 9              "Answer:  Well, it's a master plan and, well, if

10    you will understand it to be a master plan, sir.

11              "Question:  What is it a master plan for.

12              "Answer:  It's a master plan for the ice and

13    water -- for ice and water.

14              "Question:  Do you know who prepared the

15    document?

16              "Answer:  Now, that I am not entirely certain

17    about, but I think in terms of the putting together of the

18    document, assembling -- assembly of the document as such, I

19    think that may have been either Mr. Si Yun Kim -- I'm sorry,

20    Si Yun An or Il Shin Kim.

21              "Question:  Did Mr. An or Mr. Kim have a better

22    sense of the technical expertise of the ice and water group

23    than you did in 2003?

24              "Answer:  Yes, indeed.  As far as I would be

25    concerned, I think they were a little more enlightened on

Sung Kim - depo.

1    the overall thing, state of things within ice and water than

2    I.

3                 "Question:  Mr. Kim, could I turn your attention

4    to page -- it's 3 of 9 in the middle.

5                 "Answer:  All right.

6                 "Question:  Do you recognize what's shown on

7    page 3 of 9?

8                 "Answer:  Yes.

9                 "Question:  And what is it?

10                "Answer:  It's a SWOT analysis as part of an

11   environmental analysis.

12                "Question:  What is your understanding of what

13   SWOT means?

14                "Answer:  It's basically sort of a pros and cons

15   type analysis.

16                "Question:  Do you see how there are four boxes

17   on the left side of the page and each box has an S, W, O,

18   and T in it?

19                "Answer:  Yes.

20                "Question:  Do you know what the box is with

21   S -- excuse me.  Do you know what the S means?

22                "Answer:  Strength.

23                "Question:  Do you know what the W means?

24                "Answer:  Weakness.

25                "Question:  Could you take a look at the words

Sung Kim - depo.

1    inside the box labeled with the W?

2              "Answer:  All right.

3              "Question:  Can you tell me what the top bullet

4    point says?

5              "Answer:  Lack of accumulated technical

6    experience.

7              "Question:  And beneath what you've just read,

8    could you tell me what that says?

9              "Answer:  Lack of technical manpower with

10   expertise.

11             "Question:  And does that refresh your memory

12   whether the ice and water group lacked technical manpower

13   with expertise in 2003?

14             "Answer:  Well, in the former case, I don't know

15   that I would know the exact meaning here, but I believe the

16   reason why they wrote this down at the time is because each

17   of our personnel is charged with lots of tasks, so in that

18   regard we were lacking.

19             "Question:  So you didn't have enough technical

20   specialists in the ice and water group?

21             "Answer:  Well, so what this is when they say

22   they lack in terms of the manpower for technical matters,

23   they are talking about not having enough people.

24             "Question:  In the third item in the W box, can

25   you tell me what that says?

Sung Kim - depo.

1          "Answer:  Acquisition of IP rights, goals

2     wanting.

3          "Question:  And what does the last item say in

4     the W box?

5          "Answer:  Weak as to fundamental source

6     technology.

7          "Question:  Well, the ice and water group

8     currently is 13 people?

9          "Answer:  Yes, that's right.

10          "Question:  How big was the ice and water group

11     in 2003?

12          "Answer:  Seven."

13          MR. PARTRIDGE:  For our last two witnesses,

14     because of the time that is consumed by the translation that

15     you have been observing, we will read these last two

16     depositions to you to shorten the amount of time it takes

17     for you to listen to the testimony.

18          The first of the two witnesses is Mr. Il Shin

19     Kim, who is a chief research engineer with LG.  And we will

20     have two of our lawyers, Mr. Tom Rooney will play the role

21     of the witness and will take the witness stand, and Ms. Liz

22     Durham will ask the questions.

23          They will also do the second deposition of Dr.

24     Lee.  And both of these deposition transcripts deal with the

25     Bics project that you have heard about thus far in the case.

Sung Kim - depo.

1           THE COURT:  All right.

2           MR. PARTRIDGE:  One thing I might add is just

3    that we will be identifying a number of exhibits through

4    these depositions.  They are not particularly exciting.  And

5    I apologize for that.  It turns out it's something we need

6    to do in order to make our record.

7           (Deposition read as follows.)

8           "Question:  Are you familiar with a project

9    called BICS, B-I-C-S?

10           "Answer:  Yes, I am.

11           "Question:  And what does BICS project relate

12    to?

13           "Answer:  That relates to installation project

14    for overall ice and water system mounted on the door of a

15    refrigerator.

16           "MR. MORICO:  Can you please mark these as

17    DX-156 and DX-162, in that order, please.

18           "Question:  Okay.  What is the Bravo two

19    project?

20           "Answer:  That includes the ice and water system

21    for the door and the three door button."

22           MR. ROONEY:  At this point the check interpreter

23    McDonald replied and he says, "It's bottom."  Interpreter

24    Kim replied and said, "oh, bottom freezer."

25           "Question:  Okay.  Referring to DX-162, which is

Sung Kim - depo.

1   the drawing, does DX-162 refer to the ice bin, which is used

2   in DPX 12?  And for the record, I am going to go ahead and

3   mark the ice bin that came out of DPX 12 with DPX 13?

4            "Answer:  Yes, I believe so.

5            "Question:  I've handed you what's been marked

6   as DX-163.  Does DX-163 contain sketches of the Bravo ice

7   and water dispensing system?

8            "Answer:  Yes, it does.

9            "Question:  I just want to direct you to -- I

10  want to just highlight it, so it's easy to read, can you

11  read what I just highlighted, there?  For the record, I've

12  highlighted some Korean characters in yellow.

13           "Answer:  It is a freezer room."

14           MR. ROONEY:  Check Interpreter McDonald

15  interjects and says, "Oh, no, he didn't say 'freezer.'  The

16  answer continues:  "Refrigerator room."

17           "Question:  What does the pink say?

18           "Answer:  Freezer room.

19           "Question:  I stand corrected.  Mr. Kim, I've

20  handed you what's been marked as DX-164.  Do you recognize

21  this document?  And, for the record, DX-164 contains Bates

22  documents LGKR 0051697 through 51730?

23           "Answer:  Yes, I do.

24           "Question:  Okay.  And I'm just going to

25  identify all these documents, for the record, for a moment.

Sung Kim - depo.

1          "Mr. Kim, you've been handed Exhibits DX-16,

2    DX-157, DX-212, DX-196, DX-158, DX-165, DX-155, DX-152,

3    DX-159, DX-166, and DX-167.  For the record, DX-16 bears

4    Bates range LGKR 778 through LGKR 786.  DX-157 bears Bates

5    Nos. LGKR 757 through LGKR 759.  DX-212 bears Bates document

6    Nos. LGKR 20765 through 20769.  DX-196 bears document Nos.

7    LGKR 48415 through Bates range LGKR 48417.  DX-158" --

8                THE COURT:  Let me see lead counsel.

9                (The following took place at sidebar.)

10               THE COURT:  You are going to have to figure out

11   another way to adduce, another way to protect your appellate

12   record.  We are not doing this.  Don't put this jury through

13   this.  I don't want to sit here.

14               MR. PARTRIDGE:  I would be amenable to simply

15   agreeing that the set of exhibits in both of these

16   depositions are received in evidence, in the record, without

17   having to read these deposition transcripts in.

18               THE COURT:  Mr. Coyne?

19               MR. COYNE:  I am happy to agree, Your Honor.

20   But I don't have a clear view in my mind exactly what is in

21   this whole list.  I would have to check it.  The other thing

22   is, the witness is right down the hall.  He is here.

23               MR. PARTRIDGE:  It would take longer, as you can

24   appreciate, in Korean --

25               THE COURT:  I am not going to micromanage to

Sung Kim - depo.

1    that point.  But I am going to insist that something better

2    be done than what was witnessed.  I was going to let it go

3    on, but I didn't realize it was this extensive.

4              MR. PARTRIDGE:  I understand, Your Honor.  I

5    don't like it either.  We did make the offer as to the group

6    of exhibits that are in these deposition transcripts to

7    simply have them admitted in the record.  They are discussed

8    by other witnesses.

9              THE COURT:  I will accept that.  If it should

10   come to pass, because you have indicated you are not exactly

11   sure what's on the list, if you should have an issue later

12   on, we can revisit it.

13             MR. COYNE:  I expect I will not.  I appreciate

14   the latitude.  Thank you.

15             THE COURT:  This is nuts.

16             (End of sidebar conference.)

17             THE COURT:  Ladies and gentlemen, we are going

18   to try to rescue you a little bit from what you have heard.

19             MR. PARTRIDGE:  We are going to refrain from

20   putting you through hearing about a list of exhibits from

21   both Mr. Kim and Dr. Lee.  What we will instead do is work

22   out an agreement with each other that these exhibits will

23   all be admitted for your consideration.  They are exhibits

24   that will -- in fact, many of them have been referenced thus

25   far in the proceeding.  But they need to be officially part

Sung Kim - depo.

1    of the record.  And this was the procedure by which we were

2    going to do that.

3           Now we have agreed to do that, so that we will

4    enter into a stipulation so that you will officially have

5    the exhibits to consider and you will hear more about them

6    as the case proceeds.

7           With that, Your Honor, we have completed our

8    case-in-chief and will rest, subject to the completion of

9    this agreement and subject to the completion of the

10   agreement with respect to the Voglewede exhibits that we

11   talked about I guess it was yesterday, I am losing track of

12   time, both of those agreements are in the works and

13   hopefully will be to the Court and available to the jury

14   very shortly.

15          With that exception, those exceptions, we rest.

16          THE COURT:  Thank you, Mr. Partridge.  You have

17   the floor, Mr. Coyne.

18          MR. COYNE:  Thank you, Your Honor.  We are

19   collecting the witness from the lounge right now.  I will do

20   a brief transition statement while he is coming.

21          Ladies and gentlemen, we are about to start our

22   stage of the case responding to the evidence Whirlpool has

23   put in.  We will present as our first witness Mr. Il Shin

24   Kim.  LG calls Il Shin Kim, Your Honor.

25          Your Honor, it appears we are without an

1    interpreter.

2              THE COURT:  He probably wasn't expecting to be

3    here at this particular moment.

4              MR. PARTRIDGE:  He anticipated this would take

5    30 minutes or so.  My guess is he is probably on the floor

6    somewhere.

7              THE COURT:  Maybe out at the front of the

8    building?

9              MR. SPEARS:  Your Honor, he is not outside.

10             MR. PARTRIDGE:  May I confer with Mr. Coyne?

11             THE COURT:  Yes, please.

12             (Counsel confer.)

13             MR. PARTRIDGE:  We are going to try to work out

14   an alternative, because I am amenable to have a substitute

15   until the official interpreter can get here.

16             THE COURT:  All right.

17             MR. PARTRIDGE:  We had a backup interpreter.

18   And I understand she is with him, wherever he is.

19             MR. HERRMANN:  Your Honor, they have located

20   him.  He is on his way from the Sheraton.

21             THE COURT:  Okay.  Let's take a short recess

22   while Mr. Kim arrives.

23             In fact, maybe I will talk with counsel for a

24   few moments.

25             Ladies and gentlemen, you can return with Ms.

1    Walker to the jury room.

2              (Jury leaves courtroom at 1:55 p.m.)

3              THE COURT:  Counsel, you may sit down.  Those in

4    the well, you can relax, whatever you choose to do.

5              So I wanted to report back to you on the

6    deposition designations controversy and how I see it and how

7    I am going to resolve it, counsel.  I just had a couple of

8    quick questions.

9              We are talking about designations and

10   counter-designations with regard to Gregory Hortin, David

11   Schwartz, Daryl Harmon, and Todd Kniffen, K-n-i-f-f-e-n.

12             Do I understand correctly, gentlemen, that these

13   are all fact witnesses?

14             MR. PARTRIDGE:  That's correct, Your Honor.

15             THE COURT:  This won't be all that articulate or

16   erudite -- one other question.  The yellow highlights --

17   perhaps I should be a little more specific in the record.  I

18   have in front of me Mr. Schwartz's pages.

19             Mr. Partridge, is it the case that the yellow

20   highlights are the portions that are objected to by

21   Whirlpool?

22             MR. PARTRIDGE:  Correct, Your Honor.

23             THE COURT:  Do you understand that to be the

24   case, Mr. Coyne?

25             MR. COYNE:  Your Honor, I do not have a copy of

```
 1    what he has handed you.

 2              THE COURT:  You need a copy.  Here is what I

 3    will do --

 4              MR. PARTRIDGE:  I gave it to him this morning.

 5              THE COURT:  I am going to identify the pages and

 6    the line numbers for the record, Mr. Coyne.  Maybe you can

 7    follow along.  That way, if you can't, let me know and we

 8    will have to make sure you get highlighted copies.

 9              MR. PARTRIDGE:  He will come share with me.

10              THE COURT:  Okay.  I am now looking at the

11    deposition of David Schwartz, and the particular testimony

12    that is objected to is at two pages, 598 and 599, beginning

13    at line 4 -- it's actually line 5 on 598 through line 2 on

14    599.  Agreed?

15              MR. PARTRIDGE:  Yes, Your Honor.

16              THE COURT:  Then as to Mr. Harmon, this is the

17    next one I happen to have in my file, it's page 63 of his

18    deposition, lines 9 through 13, page 168, lines 6 through

19    13.  Are you with me?

20              MR. PARTRIDGE:  Yes, Your Honor.

21              THE COURT:  169, lines 15 through 22.  At page

22    170, lines 1 through 8.  171, lines 5 through 15.  Are we

23    agreed on that?

24              MR. PARTRIDGE:  Correct, Your Honor.

25              THE COURT:  As to Todd Kniffen, page 85, lines 4
```

1    through 7, and 98, lines 1 through 3, as I see it.

2              Finally, Mr. Hortin at page 51, lines 7 through

3    16.

4              MR. PARTRIDGE:  Correct, Your Honor.

5              THE COURT:  Mr. Coyne, when you discussed this

6    matter with me earlier, are these the sections you had in

7    mind?

8              MR. COYNE:  Yes, Your Honor.  I believe they

9    are.  I would be willing, however, to try to short-circuit

10   this a little bit.  One of them, he was specifically asked,

11   was it obvious.

12             I think that was Mr. Kniffen at 85, 4 to 7.

13             THE COURT:  Yes.

14              "Question:  Can you think of any reason why it

15   wouldn't have been obvious to make a door ice bin removable?

16             "Answer:  No, I can't."

17             Are you willing to agree that is a legal

18   conclusion to which he is not qualified to testify?

19             MR. COYNE:  Your Honor, I am willing to withdraw

20   that.

21             THE COURT:  All right.  Doesn't Mr. Harmon -- I

22   believe he also discusses obviousness as well.

23             MR. PARTRIDGE:  Yes, Your Honor.  If you look at

24   page 169, the portion at line 15 there, through the

25   designated portions on pages 170 and 171, all have to do

1    with the concluding question about obviousness.

2              THE COURT:  Right.  Where that concluding

3    question is at line 10 at 171:

4              "Do you believe it was obvious to use an

5    automatic ice maker in the system of this application?

6              "Objection.

7              "Answer:  If I was doing it, I would have used

8    an automatic ice maker, yes."

9              I think that falls prey to the same --

10             MR. COYNE:  We are happy to withdraw 10 to 15,

11   with the question that was objected to.  Would that be

12   objectionable?

13             MR. PARTRIDGE:  I think the whole section is a

14   lead up to that.  And it concerns a document that he

15   indicates he hasn't seen before.  So we are trying to get

16   him to opine about it.

17             THE COURT:  Do you two want to confer, make sure

18   you are talking about the same thing?

19             MR. COYNE:  I am trying to find the portions in

20   my own copy.

21             THE COURT:  Take your time.  Go ahead.  Mr. Kim

22   is not here yet.

23             MR. COYNE:  Your Honor, the questions at 171

24   from 5 to 9 are not related to the document.  I would be

25   happy to withdraw the rest of it.  We would like to --

1    THE COURT:  You would like to use, "Were

2  automatic ice makers in existence from the IDI project?

3    "Answer:  Yes"?

4    MR. PARTRIDGE:  5 to 7 is acceptable if the rest

5  goes, Your Honor.

6    THE COURT:  That is fine with the Court.

7    Mr. Partridge, I think that leaves, then, does

8  it not, page 63 of that same section?

9    MR. PARTRIDGE:  Yes, Your Honor.

10    MR. COYNE:  Your Honor, we would like to retain

11  that.  That is a fact.

12    MR. PARTRIDGE:  Your Honor, we will withdraw our

13  objection to that.

14    THE COURT:  Okay.  So I think that completes the

15  consideration of Mr. Harmon's designations.

16    MR. PARTRIDGE:  A little piece of this, I think

17  we neglected the part at the top of page 168 where that

18  exhibit is introduced, the Japanese application.  I think

19  that comes out as well.

20    MR. COYNE:  We withdraw that.

21    THE COURT:  Lines 6 through 13?

22    MR. COYNE:  We will withdraw that, Your Honor.

23    THE COURT:  All right.  Then I think that

24  completes Mr. Kniffen and Mr. Harmon.  Right?

25    MR. PARTRIDGE:  I think that's correct.

1  　　　　　　　THE COURT:  The next one I have in my pile is

2  Mr. Schwartz.

3  　　　　　　　MR. PARTRIDGE:  Your Honor, we missed one with

4  Mr. Kniffen.  At the top of page 98.

5  　　　　　　　THE COURT:  Yes.  This, Mr. Coyne, is going to

6  run into the problem that I have with Mr. Schwartz's, the

7  objected-to portions of Mr. Schwartz's deposition that we

8  have already identified.  And I am constrained to agree with

9  Whirlpool that this risk of potential confusion with this

10  jury that I, frankly, do not believe can be remedied

11  sufficiently by an instruction.

12  　　　　　　　So I am going to agree with Whirlpool and

13  sustain the objections to these designations that were

14  identified.  Again, specifically for the record, as to Mr.

15  Kniffen, at 98, 1 through 3, and as to Schwartz, page 598,

16  lines 5 through 21, actually, 22.  And it continues on to

17  the next page, 599, lines 1 and 2.  Those designations shall

18  not be displayed to the jury.

19  　　　　　　　This, also, Mr. Coyne, runs into a concern that

20  I have, spills over a little bit, about a line of inquiry

21  that you made with one of the witnesses where you talked

22  about pizza going into a freezer.  As a child, where would

23  you expect that child to put that pizza.  I am not going to

24  let you do that anymore.

25  　　　　　　　I thought it was problematic at the time.  It

1   also implies, I think, frankly, some, albeit -- I know you

2   don't intend to be disrespectful or openly hostile to the

3   Court's claim construction, but it at least has that

4   potential to have that impact.  I am not going to permit it,

5   in the designations or in any further examination or any

6   argument to the jury.  Are we clear on that?

7               MR. COYNE:  Yes, Your Honor.

8               THE COURT:  Then, finally, that leaves Mr.

9   Hortin.  Again, that is the same issue.  Page 51, 7 through

10  16, those lines, I am going to sustain Whirlpool's

11  objection.

12              Mr. Kim is still not here, okay.

13              Do we know if he was driving himself?

14              MR. SPEARS:  I think he is walking, Your Honor.

15              THE COURT:  Okay.  We will take a recess, then.

16              Mr. Herrmann, I did have one question.  I got

17  another verdict form from LG.  It's another iteration.  I

18  have confused them, quite frankly, in the paper that I have.

19  I don't even know what I did with it.  Would you take a look

20  at this one and see if this is the one I am supposed to

21  have?

22              MR. SPEARS:  Mr. Kim is here, Your Honor.

23              INTERPRETER KIM:  Good afternoon, Your Honor.

24              THE COURT:  Welcome, Mr. Kim.

25              MR. HERRMANN:  Your Honor, I don't know whether

1    there were any changes made after Mr. Partridge sent you our

2    verdict form.

3              THE COURT:  They are both pretty different.  Why

4    don't --

5              MR. HERRMANN:  Let me investigate, Your Honor.

6              THE COURT:  Make sure you have the one you want

7    me to have.

8              MR. HERRMANN:  Thank you, Your Honor.

9              MR. COYNE:  Your Honor, I just wanted to make a

10   proffer on these issues.  Not with respect to the Court's

11   claim construction ruling.  Obviously, Your Honor, we accept

12   it.  We respect the Court's position on this.

13             As I mentioned this morning, our inventors, our

14   people who worked on our part of the project had the same

15   view as some of the inventors --

16             THE COURT:  But they didn't have the benefit, I

17   think has been pointed out, at the time that they were

18   making these statements, or they testified.  I am not going

19   to rehash them, Mr. Coyne.

20             MR. COYNE:  I am not trying to rehash it.  I am

21   just asking that we be permitted to file a proffer on it.

22   That's all.  So we have a record.

23             THE COURT:  I see no reason for it.  No.  You

24   have made your argument.  We know the evidence that you are

25   referencing that is in the record or been ruled out.  So you

1    have preserved your appellate rights, I think.

2              MR. HERRMANN:  Your Honor, there are some notes

3    on this form.  I don't know whether they are Your Honor's

4    notes or not.

5              THE COURT:  They are, yes.  Thank you, Mr.

6    Herrmann.  I appreciate that.  Because I had a question

7    about that.

8              MR. HERRMANN:  I will investigate, Your Honor.

9              THE COURT:  Here is the question, just for your

10   benefit, both sides, Mr. Herrmann has correctly and

11   thankfully -- I don't know if you can read my chicken

12   scratch anyway.

13             MR. HERRMANN:  I did not even try to.

14             MR. PARTRIDGE:  Your Honor, they have further

15   insight than we do.

16             THE COURT:  A little bit.  I don't know that

17   it's real helpful.

18             LG, at least the iteration I have, it's the

19   verdict form under obviousness, it has a paragraph 3(a).  It

20   has what purports to be, and at least by word, two different

21   definitions of the person of ordinary skill.  Quite frankly,

22   I have two questions about that.

23             The overriding question is, really can't the

24   parties agree upon what the proposal is in this case?

25   Because as I read these two definitions, there is not much

1    difference.

2              MR. PARTRIDGE:  We had a conversation about that

3    over lunch today about the difference, and it not being

4    much, and I said to Mr. Coyne at that time, I did not

5    realize until reading the verdict form how close they were.

6    Maybe we should just agree.

7              He was concerned that the jury had already heard

8    some slight variations.  I just as soon agree on something.

9              MR. HERRMANN:  Your Honor, the last proposal we

10   made that I thought we had an agreement to is we would draft

11   an instruction for Your Honor to read indicating that during

12   the trial there was testimony, but there is no significant

13   difference.

14             THE COURT:  That would be helpful.  That's

15   better than this.  But I think would be --

16             MR. HERRMANN:  Then it would be out of that

17   form, Your Honor.

18             THE COURT:  It seems to me that it should not be

19   an issue that the jury has to wrestle with at all.

20             MR. HERRMANN:  That's correct.

21             MR. PARTRIDGE:  That's what I think, Your Honor.

22   I think the odds that someone is going to remember that

23   there is a variation, when, in fact, we simply agreed on

24   what the level of skill is is so small that I just as soon

25   agree on it.

1    MR. HERRMANN:  We would agree, it should be out

2  of the jury verdict form, Your Honor.

3    THE COURT:  That is fine.  That will be an issue

4  that won't take up deliberating time.

5    MR. HERRMANN:  I will investigate further, Your

6  Honor.

7    THE COURT:  Thank you, Mr. Herrmann.

8    I think we can bring the jury back.

9    (Jury enters courtroom at 2:11 p.m.)

10    THE COURT:  All right, ladies and gentlemen.  We

11  are ready for you.

12    Mr. Coyne.

13    MR. COYNE:  Thank you, Your Honor.  LG will be

14  calling its next witness, Mr. Il Shin Kim, who will talk

15  about some of the development work that led to the BICS

16  project.

17    ... Il Shin Kim, having been duly sworn as a

18  witness, was examined and testified through the interpreter

19  as follows ...

20    MR. PARTRIDGE:  Your Honor, if I may, Mr.

21  Robinson Vu will be handling this witness.  And I wanted to

22  introduce him before Mr. Coyne began.

23    THE COURT:  That is fine.

24    Mr. Kim, that microphone is pretty sensitive.

25  So if you are more comfortable to sit back, that chair

1  doesn't move.

2                    **DIRECT EXAMINATION**

3  BY MR. COYNE:

4  Q.    Good afternoon, Mr. Kim.

5  A.    Nice to meet you.

6  Q.    Would you tell the jury where you work, please?

7  A.    I currently work for LG Electronics, located in

8  Changwon, Korea.

9  Q.    Where is Changwon?

10  A.    That's in the southern part of South Korea, in the

11  countryside.

12  Q.    How long have you worked at LG?

13  A.    This would be my 20th year.

14  Q.    When did you start?

15  A.    I came on board in 1991.

16  Q.    And what have you been doing for the company since

17  then?

18  A.    I have mostly been charged with the development of

19  refrigerators.

20  Q.    And any particular portion of the refrigerator?

21  A.    As for me, I have been developing the ice and water

22  system, starting in 1996 through the end of 2004.

23  Q.    And, sir, what is the highest level of education you

24  have achieved?

25  A.    I have obtained up to a Master's degree in mechanical

1    engineering.

2    Q.    Let's go back to '96, then, when you started working

3    in the ice and water group.  What were you doing at that

4    time?

5    A.    I worked for a GE little place, a GE facility for a

6    period of four months, starting in November of 1996 through

7    September of '97.

8    Q.    What were you doing there?

9    A.    At the time, the company had plans to enter into a

10   joint venture agreement with GE, and as such, I was

11   dispatched to GE and I learned things as to the ice and

12   water system.

13   Q.    What did you learn about the ice and water system

14   during the time you were at GE?

15   A.    Well, I essentially learned the ropes as to

16   everything, all the components that comprise an ice and

17   water system, for instance, the ice maker, water valves,

18   water filter, the water-dispensing system.

19   Q.    And when you came back to Changwon after you finished

20   your time at GE, what were you doing?

21   A.    I then began working on the development of a

22   Korean-oriented side-by-side refrigerator's ice and water

23   system.

24   Q.    Were you working alone or as part of a team at that

25   time?

Il Shin Kim - direct

1    A.    I did so as a member of a team.

2    Q.    Do you know a Mr. Jung O. Yoon, Y-o-o-n?

3    A.    Now, that individual, I have only heard as to his

4    name.  I don't really know the gentleman.

5    Q.    Have you ever worked with him?

6    A.    No, sir.

7    Q.    In what context have you heard of him?

8    A.    Well, in terms of my hearing his name, I have simply

9    heard as to how the said individual had briefly come on

10   board with the company and then left soon thereafter.

11   That's about it.

12   Q.    What was he doing while he was on board with the

13   company?

14   A.    I don't exactly happen to know as to what he may have

15   done.

16   Q.    Was he in your group or a different group?

17   A.    My understanding is that he was with a different

18   group.

19   Q.    Sir, I would like to take you to 2000, just skip ahead

20   a few years.  What were you doing in 2000 at your work?

21   A.    I was in charge of LG Electronics' ice and water

22   group.

23   Q.    And what did that involve at that time?

24   A.    Essentially, I was in a position of having to design

25   and develop the entire ice and water system, if you will, as

Il Shin Kim - direct

1    would comprise LG Electronics' ice and water system.

2    Q.    What were you working on specifically say in about

3    July of 2000?

4    A.    What I began working on starting in the July time

5    frame of 2000 was to develop a North American-oriented

6    premium ice and water system.  And, further, I then also

7    embarked upon a global worldwide search and investigation

8    into ice-and-water-related patents.

9    Q.    Let me back up a second.  What do you mean by a

10   "premium ice and water system"?

11   A.    The North American market is a market in which there

12   is a lot of ice.  The overall volume of ice requirement

13   happens to be on the high side.  So by that I am referring

14   to coming up with an ice maker that could provide a lot of

15   ice.

16   Q.    Just so the jury understands, what do you mean by

17   that?  Do people in other parts of the world use more or

18   less ice than we do here?

19   A.    Well, for instance, the country in which I reside,

20   Korea, people don't use a whole lot of ice there.  So it's

21   not necessary that you have an ice maker that can crunch out

22   a lot of ice.

23         Similarly, Japan, the rest of Asia, indeed,

24   Europe, at least in comparison to North America per se,

25   folks there don't really require a whole lot of ice.  So in

1    this regard, I needed to come up with an ice maker that was

2    especially dedicated towards the North American market.

3    Q.    How did you go about doing that?

4    A.    I personally took it upon myself to basically

5    contemplate and come up with an appropriate structure and

6    design for an ice maker, and in addition to that, when you

7    nearly going about doing something, you want to keep the

8    competition in mind, specifically trying not to infringe any

9    patents of theirs, for such must be respected.  So I further

10   looked, I undertook some investigations in that regard.

11   Q.    A few minutes ago you mentioned looking at patents.

12   What did you do specifically?

13   A.    The patents that I looked into were those from, say,

14   GE, Hitachi, Mitsubishi, Sanyo, Sharp, Whirlpool, LG,

15   Samsung, Daewoo, Bosch, et cetera, et cetera.  Basically,

16   all the worldwide refrigerator makers' patents and patent

17   applications concerning ice and water systems.

18   Q.    What did you learn as a result of this investigation?

19   A.    What I was able to see was that, whereas a lot of

20   companies and engineers out there, especially ice and water

21   engineers, made a lot of efforts in order to somehow place

22   the ice and water system towards the door side, basically, I

23   saw that in spite of all those efforts, especially when it

24   came to the placement of the ice maker, essentially, I saw

25   that no products had been released in that, nobody really

1    succeeded in commercializing these systems.

2    Q.    And what did you do with that information?

3    A.    And as a result of that, I was able to set up a

4    certain vision of my own, as far as this is concerned.  By

5    "vision," I am talking about how if we were to, per chance,

6    be successful in the placement of an ice and water system on

7    the door side, then this might possibly lead to our company

8    to become a global No. 1.  That was my vision.

9    Q.    How did you proceed going forward?

10   A.    And as such, I came to share my vision as such with my

11   group members.

12   Q.    How did you do that?

13   A.    We basically altogether participated in a workshop.  I

14   from the start kind of anticipated that this was going to be

15   a pretty difficult sort of journey.  As such, we went off on

16   a hike together to conduct this workshop and ended up

17   sharing in my vision together.

18   Q.    How did the members of your team receive this vision?

19   A.    As in the case of a lot of other engineers out there,

20   their reaction was that this was going to be impossible.

21   Q.    Why?

22   A.    I believe that even general lay folks would easily be

23   able to understand this, in that if you place the ice maker

24   on the door, then it's going to result in a spillage of

25   water; that is, when you open and close the door, basically,

1  the fact that there is going to be water spilling over.

2  This is easily understood.  And as such, our team members'

3  initial reaction was that this was going to be impossible

4  because, by virtue of that, you are going to end up

5  defeating the purpose as to an ice and water maker.  That

6  was their initial reaction.

7  Q.    Why did you think it was possible?

8  A.    Well, I guess I, for one thing, did not believe this

9  to be impossible.  In fact, I was quite certain that this

10  was a problem that we must overcome no matter what, and that

11  we ought to achieve our vision and thus make it become a

12  global No. 1 leader.  As such, I strongly pushed this upon

13  our members.

14  Q.    Well, at that time how did you think you were going to

15  achieve this vision?

16  A.    This is what I said to our team members at that time.

17  I said, there is nothing that an engineer, or that engineers

18  cannot achieve.  I said the only thing is that we must line

19  out each and every step that we must now undertake, and

20  explain as to what those were.

21  Q.    Can we come back for a second to this patent

22  investigation you did?  Were any of the companies that you

23  found that had a position in the ice and water area

24  particularly strong or particularly weak?  What were your

25  views on that at the time?

Il Shin Kim - direct

1  A.     Well, in terms of the results of my patent

2  investigation, I could tell that in such companies as

3  Hitachi of Japan had applied for a lot of patents out there.

4  Hitachi, Matsushita, Toshiba, et cetera, et cetera.  Of

5  course, in the U.S. we would be talking in terms of GE and

6  Whirlpool who had applied for a lot of patents.

7  Q.     What kind of technologies did you find from GE and

8  Whirlpool?

9  A.     I was able to, for instance, with respect to GE and

10  Whirlpool, that they had applied for a lot of patents in the

11  area of ice makers, especially in terms of dispensing

12  systems.

13  Q.     How about the Japanese manufacturers, what kind of

14  positions did they have?

15  A.     As I explained at the outset of my testimony, in the

16  Asian countries, such as Japan and Korea and what have you,

17  you can get by with relatively smaller ice-making capacities

18  in terms of those countries.  And there, they use what's

19  called a twisting-type ice maker as an auto, say,

20  twisting-type ice maker.

21          In terms of the supply of water, it's not

22  directly connected to the pipe.  Rather, within the

23  refrigerator compartment, there is a water tank that has a

24  pump unto itself.  And that's how the provision of water is

25  achieved for ice-making purposes.  That is in terms of Asia.

1    Again, when it comes back to North America, here

2    you need a lot of ice-making capacity.  There, they

3    typically use aluminum die cast.  This is basically what we

4    call a heating-type ice maker.  As such, I was able to see

5    that depending on the countries involved, there happen to be

6    different types of patents involved.

7            MR. COYNE:  Your Honor, if I might just go to

8    the refrigerator for a second, just to show the jury what we

9    are talking about.

10            THE COURT:  That is fine.

11            MR. COYNE:  I am opening up the door to DPX-22.

12   Mr. Brooks, can I get the Elmo on?

13   BY MR. COYNE:

14   Q.    Sir, in terms of the ice maker, what style, among the

15   styles that you just mentioned, what style is the one I am

16   pointing to here, the metal piece inside DPX-22?

17   A.    Right.  That would be a North American-type

18   heating-type ice maker.

19   Q.    Let me come back to this workshop you mentioned.  When

20   exactly did this workshop occur?

21   A.    That would be in February of 2001.

22   Q.    Mr. Brooks, could we please bring up DX-795, please?

23            Sir, what is this document?

24   A.    Now, this would be that which I related to you earlier

25   in terms of organizing, sorting out my vision, the things I

Il Shin Kim - direct



Il Shin Kim - direct



Il Shin Kim - direct



Il Shin Kim - direct



Il Shin Kim - direct

1  Brooks, can you please bring up PX-5727?

2            Sir, what is this?

3  A.    This would be my invention, as I had applied for a

4  patent on.

5  Q.    Mr. Brooks, can you please bring up PTX-9 and put

6  Figure 3 of the two exhibits side-by-side?  Can we put any

7  marking on which one is which, please?

8            Do you recognize which one is which?

9  A.    The one on the left side would be mine.

10  Q.    How can you tell?

11  A.    Well, you, yourself, should be readily able to tell in

12  terms of how on the outside of the door there is an ice

13  maker that is attached.

14  Q.    This area (indicating)?

15  A.    Yes, that's right.

16  Q.    What other differences?

17  A.    In order to provide water vis-à-vis the ice maker, you

18  need to have on the inside portion of the door the water

19  conduit.

20  Q.    That is this item?

21  A.    Yes, that is right.

22  Q.    What else, is there anything else?

23  A.    And if you will further go down towards the lower

24  portion, say around the middle, you will see that there is a

25  water filter attached.

1    Q.    This item 70?

2    A.    Yes, that's right.

3    Q.    And, is there anything else?

4    A.    Basically -- and you can't quite see this from a side

5    cross-section, but towards the inside portions, you will

6    also see that there is provided a water valve, as well as a

7    water tank.

8    Q.    Is there a number for those?

9    A.    I am enable to tell exactly at the present moment.

10   Again, you can't quite see these things from a side view,

11   but you can see this from a frontal cross-section.

12   Q.    Sir, are you copying the '130 patent?

13   A.    Not at all.

14   Q.    Why do you say that?

15   A.    For my patent is far more advanced than that of

16   Whirlpool's.  It is, indeed, newer.  And basically, for the

17   benefit of our customers, I have provided more room within

18   the freezer compartment.

19   Q.    Can we go to Column 1 of the '701 patent?  PTX-527,

20   Mr. Brooks, please.

21         Sir, if we go to a description of the prior art.

22   Can you see that portion, that first paragraph?

23         You see the portion you are referring -- can you

24   read English?

25   A.    Well, when it comes to English, I may not be able to

1   exactly, say, understand things.  But I am able to read

2   numbers, certainly.

3   Q.    You can at least see the '130 patent reference there,

4   can't you?

5   A.    Yes, that's right.

6   Q.    What is the relationship between your invention and

7   the '701 patent and the '130 patent?

8   A.    When I was applying for my patent, I referenced the

9   so-called '130 patent as being one of the prior art, and

10   disclosed that to the U.S. Patent and Trademark Office.

11   Q.    What is the relationship between your '701 invention

12   and the '130 invention?

13   A.    When it comes to my patent, I believe I was issued the

14   said patent by the U.S. PTO because mine essentially is

15   something that surpasses the '130 patent, that it represents

16   a step further compared to the '130 patent.  I believe that

17   is the reason.

18              MR. COYNE:  Thank you, sir.  No further

19   questions for the witness at this time.

20              THE COURT:  Counsel, you may cross-examine.

21                        CROSS-EXAMINATION

22   BY MR. VU:

23   Q.    Mr. Kim, could I direct your attention to tab 11 in

24   the binder that was just handed to you?  For the record,

25   this is DX-173.  Earlier, your counsel asked you about

Il Shin Kim - cross

1    patent searches that you had done in 2001.  Based on those

2    patent searches, you believed Whirlpool's '130 patent to be

3    known technology.  Do you recall that testimony?

4    A.    What I said was that my personal thought on that was,

5    the '130 patent, as far as I was concerned, constituted

6    previously known technology, given the existence of a

7    certain Hitachi patent.

8    Q.    Could I turn your attention to page 305 of tab 11.

9    This is, again, DX-173.  Mr. Kim, do you see on the bottom,

10   on the left, the very bottom, in the left box, it says,

11   "Identify idea through patent research"?

12            Do you see that?

13   A.    Yes, that's right.

14   Q.    One of those ideas that you found or identified was

15   Whirlpool's '130 patent.  Is that correct?

16   A.    There wasn't just the Whirlpool patents or there were

17   other companies' patents such as Hitachi and others as well.

18   Q.    Mr. Kim, turn to page 308.  Do you see a figure from

19   Whirlpool's '130 patent on the left side of the document

20   under the heading "Technology/Market/Advanced Maker Trends"?

21   Do you see that?

22   A.    Yes, that's right.

23   Q.    And on the left side, I think are these the other

24   Hitachi references you were discussing?

25   A.    Yes, that is right.

Il Shin Kim - cross

1   Q.    And if you turn to page 306, I want to direct your

2   attention to the bottom left corner.  It says, "Trend of

3   Technology/Market/Advanced Makers."  Do you see underneath

4   that, the first bullet, before anything else, "In door ice

5   Bank of Whirlpool"?

6   A.    Yes, I see it.

7   Q.    I want to direct you to one more document, Mr. Kim,

8   with respect to these questions.  Could you pull up DX-335?

9         Mr. Kim, do you see this document is related to

10  your Bics project?  And it's dated December 16, 2003?

11  A.    Yes, I see that.

12  Q.    This is about two years after you did your patent

13  searches and concluded that Whirlpool's was known, old

14  technology?

15  A.    Yes, that's right.

16  Q.    Let's turn to page 774, please.  I want to direct your

17  attention to the center of the page on the right, Mr. Kim.

18  Do you see that it says, "Since Whirlpool has the uniquely

19  advanced technology and rights in this area, a dispute is

20  expected when product is developed."

21        INTERPRETER KIM:  Does counsel have the Korean

22  underlying pictures?

23        MR. VU:  I don't, actually.

24        INTERPRETER KIM:  The interpreter understands

25  that this is an agreed-upon translation between the parties?

1              MR. VU:  Correct.

2              INTERPRETER KIM:  So the interpreter will rely

3    on that.

4              THE WITNESS:  Yes, I see that.

5    BY MR. VU:

6    Q.    Mr. Coyne asked you a couple of questions about this.

7    I wanted to ask you a couple of bullet points on 780 he did

8    not ask you about.  We talked about the W indicating

9    witnesses.  Correct?

10   A.    Yes, that's right.

11   Q.    What your counsel didn't identify to the Court was the

12   last bullet point, which says, "fragile in a base/foundation

13   technique."

14             THE COURT:  Is that a question, counsel, or is

15   that your testimony?

16             MR. VU:  Pardon me, Your Honor.

17   BY MR. VU:

18   Q.    Did your counsel identify "foundation in a

19   base/foundation technique"?

20   A.    No, he did not.

21   Q.    This document was in May 2001.  I want to direct your

22   attention to the same analysis I have seen in December of

23   2003, DX-164.  This would be tab 5 of your binder.  Mr. Kim,

24   do you see that the date of this document is December 8,

25   2003?

Il Shin Kim - cross



Il Shin Kim - cross



Il Shin Kim - cross



6          MR. VU:   Your Honor, may I approach the

7     refrigerator?

8          THE COURT:   Yes.

9     BY MR. VU:

1

2

3

4              MR. VU:  No other questions, thank you.

5              THE COURT:  Mr. Coyne, you may redirect.

6              MR. COYNE:  Thank you.

7                    REDIRECT EXAMINATION

8   BY MR. COYNE:

9   Q.    Sir, you are familiar with the Hitachi design.

10  Correct?

11  A.    Yes, I mean, indeed.

12  Q.    And did that have an auger inside the bin?

13  A.    Yes, it goes without saying.

14  Q.    Did that have an ice maker above the bin?

15  A.    There was no indication there on top or above the ice

16  maker, though.

17  Q.    Were the other sides, except for the top, closed?

18  A.    Now, when it comes to that, those amount to just

19  general sorts of patent figures.  So it's not something that

20  I can really know about.

21  Q.    How about, was there a motor in the door?

22  A.    Yes, that's right.

23  Q.    Did the motor turn the auger to dispense the ice?

24  A.    Yes, that's right.

25  Q.    What use, if any, did you make of those concepts in

1    your vision in implementing your design?

2    A.    Based upon our prior art search, our patent search, I

3    was able to tell that Hitachi's technology constituted

4    previously known technology, which meant that we could

5    utilize this, you know, as much as we wanted to.  So we used

6    that, took that into reference quite a bit.

7    Q.    Did you use it?

8                   THE COURT:  Yes?

9                   MR. VU:  Improper foundation, Your Honor.

10                  THE COURT:  Do you have an objection?

11                  MR. VU:  Yes, Your Honor.

12                  THE COURT:  We will talk.

13                  (The following took place at sidebar.)

14                  THE COURT:  What is your objection?

15                  MR. VU:  He is getting into a practicing prior

16   art defense, Your Honor.

17                  THE COURT:  I don't know what you mean.

18                  MR. VU:  He asked him -- the witness answered if

19   he thought he was practicing and if he was free to use it.

20   Mr. Coyne, asked, were you practicing Hitachi.  I think it

21   is going to confuse the jury that if you practice a prior

22   art patent you don't infringe another patent.

23                  MR. COYNE:  It expired at this point.  That is

24   what he was saying.  He was using concepts out of this other

25   design that was public domain information.  That is all I am

1   asking him.

2           THE COURT:   Therefore, not copying Whirlpool's

3   patents?

4           MR. COYNE:   Yes, Your Honor.

5           MR. VU:   That is fine.   If it gets to

6   infringement...

7           THE COURT:   I don't think there is anything

8   improper with Mr. Coyne's questions.   I overrule the

9   objection.

10          (End of sidebar conference.)

11  BY MR. COYNE:

12  Q.   Did you use Hitachi?

13  A.   We carved out our own niche area.   And, further, we

14  did utilize Hitachi.

15  Q.   Mr. Vu asked you a couple times about your Bics

16  project.   Were you one of the members on the team Bics

17  project?

18  A.   Well, when it comes to the Bics project itself per se,

19  that was spearheaded by the Seoul-based R&D center.   As for

20  me, I would joined them maybe once or twice a month and

21  review things.

22  Q.   But it wasn't your Bics project.   Right?

23  A.   Yeah.   But because this was based upon my vision, you

24  could say that it was my project.

25  Q.   Could we go back to DX-16, please?   Mr. Brooks, would

Il Shin Kim - redirect



Il Shin Kim - redirect



10          Was that patent still in existence at the time

11   you were still doing this work?

12   A.      The Hitachi patent, by the time I was working on this,

13   was already known, publicly known technology.

24   Q.      Did you think you would be infringing Whirlpool's

25   patent by using the ideas out of the Hitachi patent?

Il Shin Kim - redirect

1    MR. VU:  Objection.  The same objection as

2  before.

3    THE COURT:  That we had at sidebar?  Overruled.

4    THE WITNESS:  No, that is not at all the case.

5    MR. COYNE:  Thank you, Your Honor.  No further

6  questions.

7    THE COURT:  Thank you.  Sir.  You are excused. .

8    (Witness excused.)

9    THE COURT:  Ladies and gentlemen, let's take our

10  afternoon break.

11    (Jury leaves the courtroom at 3:30.)

12    (The following took place at sidebar.)

13    MR. VU:  Just because they are practicing the

14  invention doesn't mean you don't infringe.

15    THE COURT:  I agree.  It goes to the question of

16  willfulness, doesn't it?

17    MR. VU:  It does.  But it's a difficult

18  question.  They should have been.

19    THE COURT:  We don't have to do this on the

20  record.

21    (Sidebar conference not reported.)

22    THE COURT:  Ms. Walker.

23    (Jury enters courtroom at 3:55 p.m.)

24    THE COURT:  Okay, ladies and gentlemen.

25    Mr. Coyne.

1       MR. COYNE:  Thank you, Your Honor.  LG calls Dr.

2    Manny Lee back to the stand.

3           Your Honor, we have new direct binders for this

4    portion of the testimony.

5           Ladies and gentlemen, at this point the Doctor

6    will be coming back to testify about the Bics project.

7           (Myung Ryul Lee having been previously sworn as

8    a witness, was examined and testified further as follows ...

9                    DIRECT EXAMINATION

10   BY MR. COYNE:

11   Q.    Good afternoon, Dr. Lee.

12   A.    Good afternoon.

13   Q.    Do you understand you are still under oath?

14   A.    Yes.

15   Q.    What were you doing in early 2002?

16   A.    Early 2001?

17   Q.    2002.  Let's say 2001-2002.  What were you doing with

18   your time in those days?

19   A.    At that time, early 2002, I do the new project related

20   to the energy saving.

21   Q.    You talked the other day about your doctoral work.

22   When did you finish your doctoral work?

23   A.    I finished my Ph.D. in 2001.

24   Q.    What did you do after you finished your doctoral work?

25   A.    I came back to the LG Laboratories.

Myung Ryul Lee - direct

1   Q.   What did you do when you came back to LG?

2   A.   First I did an energy save project of the

3   refrigerator.

4   Q.   Had you had any contact with Mr. Il Shin Kim prior to

5   the time that you came back to LG after your doctoral work?

6   A.   No.  I don't have any contact with him.

7   Q.   After you came back.  After you finished your Ph.D.,

8   did you have any contact with him?

9   A.   Yes.

10  Q.   How did that happen?

11  A.   The first time we met around May 2002, he suggested to

12  us to make a new ice and water system, means to put the old

13  component of the ice and water to the door.

14  Q.   And what did he explain to you about that idea?

15  A.   He has -- what I mentioned before, he has an idea of

16  the device and system, indoor-ice system.  It is a very

17  great idea, I think, and then, though, it costs a lot.  And

18  he want us to develop that idea.

19  Q.   When you said it was a great idea, are you saying what

20  he thought or what you thought?

21  A.   I think it is very wonderful idea here.  And I loved

22  that idea very much.

23           So I was willing to do that.

24  Q.   What did you do to take that idea forward?

25  A.   (After consulting with interpreter)  After that, I

Myung Ryul Lee - direct

1  really liked to do that project.  And I have some funds, I

2  needed some funds.  So I talked with my lab director; told

3  him what I needed.  I needed some engineers and funds and

4  some facilities to develop that project.

5  Q.    And did you get the funding and the engineers that you

6  needed?

7  A.    Yes.

8  Q.    How did you go about getting the engineers and the

9  funding?

10           I will rephrase it.

11           What did you do when you started working on this

12  project?

13  A.    First time we had to study on that project, the

14  project was great, but we have to know, really, we can make

15  it or not.  So we discussed with many engineers about that,

16  and we made some feasibility study for that.

17  Q.    Are you saying "feasibility study"?

18  A.    Yes.  Feasibility study.

19  Q.    Okay.  How did that feasibility study progress?  What

20  did you do first when you started that?

21  A.    You make some idea of how we make an in-door-ice

22  system.  Then we saw the issues, such as the water spilling

23  over of the ice maker.  Let me explain that there is so many

24  technical issues.  The first and most important issue is the

25  water spill over from the ice maker.

Myung Ryul Lee - direct

1    When you -- in the ice maker, the ice maker

2    located in the door.  So the customer will always open and

3    close the door of the refrigerator.

4    So that ice maker located in door, when you open

5    the door, it's moving with the door.  And you close the

6    door, it closes, would follow with the door.

7    So when you open the door and close the door,

8    then at that time the water supplied to the ice maker, but

9    it is not freezing yet, but the customer opens the door and

10   closes the door, then the water is spilled over.  And it is

11   spilled over to any of the freezer door, and the freezer

12   compartment.

13   So it is one of the most important technologies

14   to develop.  So we had -- tried to make some idea of that

15   first.

16   Q.   At the time you were trying to make these ideas, were

17   you aware of the '130 patent?

18   A.   Pardon me?

19   Q.   Did you know about the '130 patent when you started

20   doing this feasibility study?

21   A.   At that time I didn't know the patent of the '130.

22   But I realized the '130 patent, just after we started -- or

23   around just the start of the project at the facility.

24   Q.   When did you find out about the '130 patent?

25   A.   As long as -- I believe it was just studying the

Myung Ryul Lee - direct

1     project, it was around October 2002.

2     Q.     How long did the feasibility study last?

3     A.     It takes about three or four months.

4     Q.     What months was the feasibility work being done?

5     A.     After that, though, we decided to start the project,

6     and then we go forward with the activity of to make some

7     samples to prove our feasibility would work.

8     Q.     When did you make those samples?

9     A.     From around January of 2003.

10    Q.     Can you tell me what months the feasibility study work

11    was being done?

12    A.     It takes about six months, from the start of the

13    project, I am from October of 2002.

14    Q.     So it was six months before the start of the project?

15    A.     Pardon me?

16            THE WITNESS:   (After consulting with

17    interpreter)  No.  I mean, the feasibility is just the

18    study, just before the process start.  And then we made some

19    Bench tests.  And then we -- to prove our concept will work

20    or not, it takes about six months, the kind of concept

21    building.

22    BY MR. COYNE:

23    Q.     When you did this feasibility study, what did you

24    conclude at the end of the feasibility study?

25    A.     You mean the feasibility study ended just the

Myung Ryul Lee - direct

1   beginning -- the feasibility takes next to six months.  So

2   which point are you asking?

3                MR. COYNE:  Your Honor, I just want to get these

4   dates out.  Would it be permissible if I just ask the three

5   questions to get this in context for the jury?

6   BY MR. COYNE:

7   Q.   You did the feasibility work what, from about May to

8   October?

9   A.   (After consulting with interpreter ) Yes, correct.

10  Q.   And then you started with the concept building when

11  you began the project in October?

12  A.   (After consulting with interpreter) Yes.

13  Q.   And then when did the Bics project end?

14  A.   The Bics project ended December 2003.

15  Q.   Was it completed on schedule?

16  A.   Yes.

17  Q.   Would you please pull up DX-700 again, please, Mr.

18  Brooks?  I am sorry, it is DX-770.  Excuse me.

19  A.   Yes.

20  Q.   Sir, have you seen this document before?

21  A.   Yes.

22  Q.   What is it?

23  A.   This is a project completion report of the Bics

24  project.

25  Q.   Is this the final report or a draft report?  What is

Myung Ryul Lee - direct

1    it exactly?

2    A.    This is the final report.

3    Q.    Were there other versions of this, other drafts of

4    this?

5    A.    Yes.  We have another person with the draft.

6    Q.    Do you see that in your binder?

7    A.    Yes.  DX-772 is the rest of our final report, the

8    draft of our final report.

9    Q.    How do you know which one is the draft and which one

10   is the final?

11   A.    The draft has not been finished yet, so we don't have

12   enough amount of the documents.  So the draft is little bit

13   short and the final report is all files, all contents.  So

14   it is thick, more pages.

15   Q.    Mr. Brooks, can we get DX-770 and DX-772, the first

16   pages of each, side-by-side?

17              Dr. Lee, the dates on both of them are December

18   16, 2003.  Correct?

19   A.    Yes.

20   Q.    Okay.  Were they both written the same day?

21   A.    No, because this is a final due date of the report.

22   So we prepared this document before the -- about one month

23   before we prepared it.

24   Q.    Thank you.

25              MR. COYNE:  With respect to the final report,

Myung Ryul Lee - direct

1    Your Honor, I would like permission to publish it to the

2    jury for their books.

3              MR. PARTRIDGE:  We would object, Your Honor.

4    They have singled out one exhibit to publish for the jury's

5    books.  There could be any number --

6              THE COURT:  Fair enough.  No.

7              MR. COYNE:  Thank you, Your Honor.

8    BY MR. COYNE:

9    Q.    Let's go back, then, to the Bics project, sir.  Mr.

10   Brooks, can we bring up DX-0165?

11             When you started the project in October, what

12   did you do as you began working on it?

13   A.    You have a meeting in our lab, how we can make this

14   project.

15   Q.    And what did you discuss at that meeting?

16   A.    Just a second.  I have to see that.

17             Initially, at the time, we made two products for

18   the Bics in-door-ice system.  The first one is the system

19   development, beginning development things.  And the other

20   one is central and functional development.  So we separated

21   that project at that time.  But finally, we didn't do the

22   sensor and control development.  We just do the system and

23   the mechanical development of the in-door system.

24   Q.    Could we go to page 3 of 4 of the document, Mr.

25   Brooks?

Myung Ryul Lee - direct

1              Doctor, here we have one of the pages of the

2     report we were just looking at.

3              What information is on this page?

4     A.    This says how long we are going to do this project, or

5     what time we want to make, view the product and how much

6     money you have to spend or how many people involved in this

7     project.

8              So this is a brief outline of our project.

9     Q.    So at this time in September, how much were you

10    estimating the project was going to cost?

11    A.    At that time, we think about 500 million -- $5

12    million.

13    Q.    Five million U.S. dollars?

14    A.    Yes, for just ours.

15    Q.    Mr. Brooks, can you get the cost of development box?

16    Can you highlight the development costs?  You can leave it

17    small.

18    A.    At the time, our currency is higher than that one.  So

19    it costs us more than that one.

20    Q.    Sir, in terms of the objective, what were you trying

21    to do?  Can you explain to us what your objectives were for

22    this project?

23    A.    It says one better than ice maker attached to the

24    door.  And then we want to ensure the integrity of the

25    ice-making system with the door, then we want to get the

Myung Ryul Lee - direct

1 highest speed of the ice-making system.

2 Q. Why did you need to increase the speed of the

3 ice-making system?

4 A. Because the customer want more ice than the small one.

5 Q. Sir, why would you need to make ice faster to get the

6 same amount of ice?

7 A. The fast time is we want to make more ice capacity.

8 So we want to give more ice to the customer.

9 Q. Then on the upper right-hand side you have an

10 indication under "Advanced Trend USA," "Attachment of a

11 Whirlpool's door bank side-by-side refrigerator."  What do

12 you mean by that?

13 A. At the time Whirlpool has the in-door-ice bank on the

14 side-by-side refrigerator.

15 Q. And what was your intent with respect to this project?

16 A. (After consulting with interpreter)  My proposal of

17 this project is to develop, well, the first device in making

18 the system.  As I mentioned before, in-door-ice-making

19 system is really difficult to us.  Nobody done it before.

20   So we want to make it, because it is the most

21 intelligible to me.  And I loved the kind of product are

22 have very much.  So I would like to do this project.  I

23 ideally want to do this project.

24   So my proposal of this project is, I mentioned

25 before, well, the first in-door-ice system.

Myung Ryul Lee - direct

1  Q.    Who was in charge of this project?

2  A.    I was the leader of this project.  And we had three

3  more engineers.

4  Q.    Now, when you discover, right-hand corner, "Attachment

5  of a Whirlpool ice bank," were you trying to copy Whirpool's

6  ice bank?

7  A.    No, definitely not.  We want to really make something

8  different and something new, ice and water system.

9  Q.    Wouldn't it just have been easier to copy somebody

10  else's?

11          THE INTERPRETER:  Repeat the question, please.

12  BY MR. COYNE:

13  Q.    Would it have been easier to copy somebody else?

14  A.    (After consulting with counsel)  It is the easiest

15  way.  But we don't want to never do that, because, as I said

16  before, we really want to make a wonderful and good

17  technology.  I am interested in that.  I don't want to never

18  about someone else's technology.

19  Q.    Could we go to DX-332, please, Mr. Brooks -- I am

20  sorry, DX-333, I misspoke.

21          Sir, what is this document?

22  A.    This is our project, the project of our in-door-ice

23  make system project.

24  Q.    Do you see the term "door icing" on the first page?

25  A.    Yes.  It was the usually name of our project.

Myung Ryul Lee - direct

1   Q.     Was that changed to something else at some time?

2   A.     Yes.  I changed this name, because the door icing

3   means some technical pump.  So from this project, the

4   customer gets more space.  And then I want to change the

5   name, as the customer's value.  So Bics means the Bics

6   piece.  So really we want the big space.  Really we want to

7   give the customer big space.

8   Q.     Does Whirlpool's '130 patent give the customer big

9   space?

10  A.     Yes.  Even Whirlpool gives more space than most

11  people, but we gave 90 percent of the space we were able to

12  give.

13  Q.     Can we go to the next page, Mr. Brooks?  I think 678

14  are the last three digits.  What is this page showing?  If

15  we look over on the right-hand side, there is a paragraph,

16  "Develop Whirpool ice bank patent avoiding technology."

17              What does that mean?

18  A.     At the time we learn about the Whirlpool technology

19  and Whirlpool '130 patent.  So we want to try to design

20  around the Whirlpool ice storage bin.

21  Q.     Okay.  And if you look down in the middle of the

22  document, if you pull back out, Mr. Brooks, down in here,

23  what is this portion of the document indicating?

24  Door-attached ice bank, ice maker is located in the freezer

25  part, has been launched by Whirlpool only?

Myung Ryul Lee - direct

1   A.   Yes, at that time, right.

2   Q.   What does that mean?  Can you tell us what that means?

3   Are you talking about a product?

4   A.   Yes.  At that time, the ice maker is located --

5   Whirlpool has the product that the ice maker is located in

6   the freezer compartment, and the ice storage bin is located

7   in the door.  They have a different product.

8   Q.   Can we go down two more pages to the section that is

9   on page 680?

10  A.   Yes.

11  Q.   This is DX-333.

12        If we go down to the next document, 332, sir,

13  the next document is dated November 19, 2002.  What are you

14  doing between those two reports?

15  A.   Yes.  We made for the first time the people planning,

16  and then this is the final report, planning report for the

17  approval, our top management.

18  Q.   So on November 19, 2002, report is going up to

19  management?

20  A.   Yes.

21  Q.   What are you proposing at this time?

22  A.   We propose to develop the new technology, including

23  in-door-ice system, having the old components -- actually,

24  the ice and water system needed -- the ice-making system

25  needed seven components.  First, the water supply, and then

Myung Ryul Lee - direct

1   the water prepared, and the water tank, to keep the water

2   cold.  And the ice maker, and the ice storage bin, and open

3   water to feed the ice to the dispenser.  And we need to suck

4   it.  We need seven components to make ice-making system.

5          We want to put the old components to the door.

6   But Whirlpool has only two components in the door.  The ice

7   storage bin and the open water.

8          So we wanted to develop the new technology, any

9   other one have done.  So I suggested how management will --

10  this is really fantastic project.  So I asked for their

11  help.

12  Q.    Mr. Brooks, could we bring up a split screen with

13  DX-165?  The page ends in 7821 on one side.  Then can we go

14  to the November 19 report and bring up the page that ends in

15  2308?

16         Sir, the report on the right is the earlier

17  report that we looked at a few minutes ago, with this design

18  that I am highlighting with the laser pointer.  Do you see

19  that?

20  A.    Yes.

21  Q.    Okay.  And in the November report, you have included

22  the page that has the picture of the Hitachi door ice bank,

23  Whirlpool door ice bank, and Hitachi door ice maker.  Do you

24  see that?

25  A.    Yes.

Myung Ryul Lee - direct

1    Q.      Which of these concepts were you proposing to

2    management in November of 2002?  What were you asking

3    management for approval to start working on?

4    A.      At that time we suggested to our top management, on

5    the right side of the picture shown there.  And we want to

6    make a whole system into the door, ice system, we want to

7    develop it.

8    Q.      So which of these concepts, the Hitachi, the Whirlpool

9    door ice bank, or the Hitachi refrigerator, the ice maker,

10   what exactly were you proposing to management that you would

11   continue working on?

12   A.      We wanted to use the Hitachi type of ice bank, because

13   that invented in 1976.  So it passed the 20 years, it passed

14   all of the 20 years.

15           So the patent right expired.  So we -- as I

16   mentioned in front of the report, we want to design-around

17   from Whirlpool.  So we want to use that technology because

18   they expired their rights.  We used the Hitachi concept.

19   Q.      After the date of this report in November, do you

20   continue working on a design of this type of configuration

21   that is shown on the right, the vertical design?

22   A.      No.  We never used that Whirlpool-type ice storage bin

23   after that date.

24   Q.      Did you ever make a prototype or a product with that

25   Whirlpool-style design?

Myung Ryul Lee - direct

1    A.    No, never.  We didn't consider, never considered that.

2    Q.    Sir, if we go back.  Mr. Brooks, can we go back to

3    Exhibit 332?  And pick up page 42306.

4          Sir, we are at this page labeled "Project Plan

5    Summary."  What is this portion of the document?

6    A.    This is the project plan of the in-door-ice system.

7    Q.    Okay.

8    A.    This is a summary of the whole project.

9    Q.    If we go down to the lower left-hand corner, there is

10   a box entitled, "Trend of Technology/Market/Advanced

11   Makers."  Do you see that?

12   A.    Yes, I see.

13   Q.    Then it says below it, "In-door ice bank of

14   Whirlpool."  And below that, "Development of the technology

15   for manufacturing the ice maker installed on a door of

16   Hitachi."

17         Do you see that portion?

18   A.    Yes.

19   Q.    What does that mean?

20   A.    This means we showed the two technologies exist.  One

21   is the Whirlpool ice storage bin in the door, and the other

22   one is the Hitachi door with the ice maker.

23   Q.    Mr. Brooks, can we go back out again?

24         In the center portion of the document there is a

25   box that's labeled "Differentiation Point."  Do you see

Myung Ryul Lee - direct

1    that?

2    A.    Yes.

3    Q.    Underneath that, are "Strengthen the competitiveness

4    of our product by maximizing the space using capacity of a

5    big freezer."  And "The capacity of the freezer is expected

6    to be increased by more than 20 liters."  Then finally below

7    that, "Reduce the refrigerator manufacturing cost by

8    simplifying its manufacturing process."

9              What does all that mean?

10   A.    It means, as we want to give more space to the

11   customer.  The first sentence means that.

12             The next one is how much you can give the

13   customer after this product is done.

14             And the last one is, when we built the whole ice

15   and water system into the door, it is very simple to make

16   into mass production, because we made a whole cabinet and we

17   put the whole system into the door, then we made a door,

18   then we attached those two.  Then we can make mass

19   production simple.  So we can save the money in the mass

20   production.

21             So this is the cost of reduction of the

22   manufacturing.

23             MR. COYNE:  Your Honor, may I approach the units

24   for just a second?

25             THE COURT:  Yes.

1    BY MR. COYNE:

2    Q.    Sir, in making this unit, it seems like it's a lot

3    more complicated than a regular refrigerator and freezer

4    system.  How can you make it cheaper when you have got all

5    these extra components?

6    A.    (Speaking Korean.)

7                   THE COURT:  We are going to save that response

8    for another day, Monday.  I am going to let you leave.

9    Remember my earlier instructions to you, remember them for

10   the weekend.  Should there be anything written for the

11   weekend, I don't know that there will be, don't discuss it,

12   watch TV or go on the Internet or anything, please avoid

13   that.  Stay out of Home Depot, the appliance section.  It is

14   a temptation.  I understand that.  It is really vital that

15   you do that, and not discuss the case with anyone.

16                   We will see you back here at 9:00 on Monday.

17                   (Jury leaves courtroom at 4:35 p.m.)

18                   THE COURT:  My only question is, Mr. Herrmann,

19   have you reached that verdict form?

20                   MR. HERRMANN:  I don't have an answer for you

21   yet.  I can tell you that we are going to take out and agree

22   on a jury verdict form section that relates to the issue of

23   schooled in the art.

24                   And if there are any differences, and I hope

25   there are not, if there are any differences between

Myung Ryul Lee - direct

1    Whirlpool ---our version of the jury verdict form that

2    Whirlpool sent to the Court and ours, we will alert the

3    Court.  We will also alert the Court that there was no

4    difference, tonight.

5              I will tell Your Honor --

6              THE COURT:  Why don't you just send me over a

7    fresh copy when you are ready.

8              MR. HERRMANN:  That is fine.

9              THE COURT:  As for Whirlpool's form, I do have a

10   concern about the manner in which you have treated the

11   questions on obviousness.  They give jury instructions.  I

12   am not going to let you do that.  I am going to instruct the

13   jury.  Not through the verdict form.

14             MR. PARTRIDGE:  Yes, Your Honor.  By way of a

15   brief clarification as to why I did that.  I fully

16   understand your choice in that regard.  Again, it goes back

17   to this evolving standard.  There was a committee put

18   together by Chief Judge Michel last year that came up with

19   new jury instructions.

20             THE COURT:  We know about those.

21             MR. PARTRIDGE:  My concern was the evolution of

22   the case law.  I wanted to preserve again an issue.  If we

23   weren't on this record and we were talking privately, I

24   might have a different position than the one I need to take

25   officially in terms of that verdict form.

Myung Ryul Lee - direct

1           Given that direction, that helps, Your Honor.  I

2    now know how you have instructed us and I now know how to

3    further simplify our version of the verdict form.

4           THE COURT:  Good.  I have sort of skimmed

5    through them and I have identified a couple of issues.  I am

6    not sure that I feel that one approach has, necessarily, any

7    benefit over the other.  Mr. Coyne's burden of proof

8    approach, your patent approach.  I am not certain one way or

9    the other at this point.

10          What I was more concerned with trying to do was

11   identify where I thought I might see substantive differences

12   between the parties as opposed to form differences.  Perhaps

13   over the weekend you will actually be able to agree as to

14   form.  I don't know.  There don't seem to me to be too many

15   substantive differences.

16          MR. PARTRIDGE:  I think we are actually fairly

17   close, Your Honor.  There are some things, now that we have

18   some direction from you, maybe we can narrow this further.

19   I would note in terms of burden of proof in the middle of

20   the infringement section is the willful infringement

21   instruction, which, of course, the willful infringement

22   interrogatory has a different burden of proof.  So there is

23   that confusion built into the proposal that LG has made.

24          THE COURT:  If I were to make the call today,

25   and I am not saying that I am, at this point, having only

Myung Ryul Lee - direct

1    skimmed, my leaning is toward the patent-by-patent approach,

2    because it calls out the burdens.  I think it does.

3              MR. PARTRIDGE:  It does, Your Honor.  And it's

4    consistent with your preliminary instructions in that

5    format.

6              THE COURT:  I don't know if that helps.  At

7    least that's my inclination at this point.

8              Is there anything you need from me?

9              MR. PARTRIDGE:  I don't think so, Your Honor.

10             THE COURT:  Have a good weekend.

11             (Court recessed.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25