1                   IN THE UNITED STATES DISTRICT COURT

2                   IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4     LG ELECTRONICS U.S.A., INC.,      :     Civil Action
      and LG ELECTRONICS, INC.,         :
5                                       :
                     Plaintiffs,        :
6                                       :
            v.                          :
7                                       :
      WHIRLPOOL CORPORATION,            :
8                                       :
                     Defendant.         :     08-234(GMS)
9     _____

10    WHIRLPOOL CORPORATION,            :
      WHIRLPOOL PATENTS COMPANY,        :
11    WHIRLPOOL MANUFACTURING           :
      CORPORATION, and MAYTAG           :
12    CORPORATION,                      :
                                        :
13                     Counterclaim     :
                       Plaintiffs,      :
14                                      :
            v.                          :
15                                      :
      LG ELECTRONICS U.S.A., INC.,      :
16    LG ELECTRONICS, INC., and LG      :
      ELECTRONICS MONTERREY MEXICO,     :
17    S.A., DE, CV,                     :
                                        :
18                     Counterclaim     :
                       Defendants.      :
19                             - - -

20                        Wilmington, Delaware
21                        Monday, March 8, 2010
                               9:00 a.m.
22                        Trial - Day Six

23                             - - -

24    BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge,
                                        and a Jury
25

1    **APPEARANCES:**

2              **RICHARD K. HERRMANN, ESQ.**
               **Morris James**
3                        **-and-**
               **PATRICK J. COYNE, ESQ.,**
4              **ANAND K. SHARMA, ESQ.,**
               **JEFFREY W. ABRAHAM, ESQ., and**
5              **WALTER D. DAVIS, JR., ESQ.**
               **Finnegan, Henderson, Farabow,**
6              **Garrett & Dunner, L.L.P**
               **(Washington, D.C.)**

7
                              **Counsel for Plaintiffs and**
8                             **Counterclaim Defendant**

9              **FREDERICK L. COTTRELL, III, ESQ., and**
               **ANNE SHEA GAZA, ESQ.**
10             **Richards, Layton & Finger, P.A.**
                         **-and-**
11             **SCOTT F. PARTRIDGE, ESQ.,**
               **PAUL R. MORICO, ESQ.,**
12             **AMANDA M. WOODALL, ESQ.,**
               **GENE SPEARS, ESQ., and**
13             **ROBINSON VU, ESQ.**
               **Baker Botts L.L.P.**
14             **(Houston, TX)**

15                            **Counsel for Defendant and**
                              **Counterclaim Plaintiffs**
16

17                            **- - -**

18

19             **THE COURT:  Good morning.  Please be seated.  I**

20    **understand there are some issues?**

21             **MR. PARTRIDGE:  Yes, Your Honor.  I think there**

22    **are at least three.**

23             **The first one I regret that I even have to**

24    **raise.  Mr. Lee was on the stand when we finished on Friday.**

25    **What we received over the weekend was a revision of the**

1    exhibits that he is going to use.  What has happened is that

2    there are quite a number of exhibits that have been

3    translated.  Many of these exhibits have been used with

4    other witnesses.  What we now find ourselves facing is an

5    effort to restructure the translations, enlarge some of the

6    language.  I think that the actual translation is still the

7    same.  We received their final CD this morning.  But we have

8    exhibits that have come in and been used with witnesses, and

9    now they have taken those translations and reorganized them

10   a bit to blow up some language, enlarge some language, do

11   some different things to it.  There are so many of them,

12   there are about a dozen or so of them, Your Honor.  I can't

13   put them all up here.

14          I think, a witness is on the stand, the

15   submission has been made as to what is going to be used with

16   the witness.  That ought to be it.  There are three or four

17   new exhibits that have been added to Dr. Lee's list of

18   exhibits as well.  Personally, I think that is improper.

19   Those exhibits probable aren't that big a deal.  But it just

20   strikes me, Your Honor, as improper to start a witness, and

21   then change the set of exhibits, change the translation

22   structure in any way, especially when the exhibits have been

23   previously used with other witnesses.

24          THE COURT:  It seems that but for the

25   happenstance of the passage of time, there wouldn't have

1   been an opportunity to do that.

2           MR. PARTRIDGE:  Absolutely not, Your Honor.  We

3   had our set of exhibits ready to go on Friday.  In fact, I

4   was surprised we didn't finish Mr. Lee on Friday.  I really

5   thought that we would.  Of course, we didn't.

6           THE COURT:  Okay.  Mr. Coyne?

7           MR. COYNE:  Your Honor, I agree with Mr.

8   Partridge.  I looked at the protocol after we sent that

9   designation over.  And we are not trying to now add in any

10  more exhibits.  It was an error on my part, and I apologize

11  to the Court and to Mr. Partridge for it.  So those three or

12  four other exhibits are not at issue.  The issue is the

13  translations.

14          As we were working off -- each party has

15  translated the same documents.  What happened with

16  Whirlpool's translations, we tried to include the figures on

17  the English language page so that you could see everything

18  on one page and not have to go back and forth between the

19  Korean original and the English translation.

20          In some instances Whirlpool didn't even put on

21  the English translation, the English words that were on the

22  Korean original.  What I am faced with is -- we brought this

23  up on Saturday.  We asked them to please put the pictures

24  back into the English translation so that the document was

25  complete so the jury doesn't have to flip back and forth

1    between the two documents.

2            Mr. Partridge is not correct that any of the

3    language has been changed.  We have agreed upon the

4    translations.  And I have had people spending -- when they

5    refused to correct them, we had people spending the entire

6    weekend assuring that the language is the same as the

7    agreed-upon translation.

8            So there is no issue on the language.  It's

9    merely, can we put the pictures in the English translations

10   where they belong so the jury doesn't have a document that,

11   quite frankly, Your Honor, looks like it is more heavily

12   redacted than it is.  That's my real concern.  It misleads

13   the jury into thinking that we are hiding information from

14   them.  We feel that is prejudicial.  I would rather -- it

15   will simplify the witness' testimony to have all the

16   pictures in the same translation document so that we can go

17   through the document.  If they ask for it, they can go

18   through the document, without having to flip back and forth

19   and get confused.

20           THE COURT:  Did you say pictures, Mr. Coyne?

21           MR. COYNE:  Can we pull up 770, please, the old

22   version and what we submitted over the weekend as 770 and

23   display those side-by-side?

24           THE COURT:  On the left is an original?

25           MR. COYNE:  Yes, Your Honor, it is.  The left is

1    the original document that we have been using, and the right

2    is what we asked them to fix on Saturday and they declined

3    and we fixed it.  Up the top it says DX-770 -- I am sorry.

4    Let me get a laser pointer.  This portion right here

5    indicates that it's the version that we are proposing right

6    now.

7              This over here is the original that we have been

8    using up to now through the trial.

9              THE COURT:  That's the way it looked when first

10   submitted?

11             MR. COYNE:  Right.  What is up there now.  This

12   is what the original looked like with Korean in each of

13   these locations.  We feel it is more appropriate and less

14   misleading to the jury to have the pictures in the document

15   next to the language that it's relating.

16             Otherwise, it's going to be very confusing to go

17   back and forth.  Again, my fear, Your Honor, quite

18   practically, is that this looks like we have redacted a

19   bunch of more stuff.  They have thrown down the gauntlet.

20   It is an issue that I do have to deal with.

21             THE COURT:  Well, regardless of the appearance

22   of redaction, it does, Mr. Partridge, seem to me that the

23   left-hand configuration means that the jury would have to

24   turn to another page and somehow in their minds assimilate

25   two documents.  The one on the right appears to have images

```
 1    and on its left to have arrows pointing to a unit, a

 2    refrigeration unit.  And locations of certain elements, I

 3    guess.

 4              MR. PARTRIDGE:  Yes, Your Honor.  When we went

 5    through this exercise of agreeing on all the translations,

 6    which took weeks to do before the start of the trial, we

 7    agreed on every single one of these documents.

 8              I do agree, Your Honor, had we done this at the

 9    very beginning and gone through this effort, it probably

10    would have been easier.

11              On the translations, there isn't anything about

12    redactions and the like.  But the dilemma we now have is

13    that these exhibits have been used with other witnesses.  In

14    fact, we have been going back and forth between the

15    translations and the pictures.

16              THE COURT:  You are right.  That has been the

17    state of affairs.  At times I will confess myself, it has

18    been a little confusing to me, in trying to follow the

19    documents, and at various times I have given up, actually.

20              MR. PARTRIDGE:  That is my main concern.  I

21    didn't say, we didn't think they changed the translations.

22    It looked as though they kept true.

23              THE COURT:  You didn't accuse them of changing

24    the translations?

25              MR. PARTRIDGE:  Correct.  I am just concerned
```

1   that now we have two sets of exhibits to come to the jury

2   for the same document when the witnesses who testified

3   previously did not have the advantage of seeing these

4   pictures here.

5              THE COURT:  What is the volume of exhibits we

6   are talking about here?

7              MR. PARTRIDGE:  A dozen or so.

8              THE COURT:  May I see them, please?

9              MR. COYNE:  There are a dozen.  I truly

10  genuinely care about two of them.

11             THE COURT:  May I see them?

12             Mr. Herrmann, that was an excellent example of

13  lawyers not listening.  I appreciate what you just did, I

14  really do.

15             Listening to the sound of your own voice rather

16  than a judge trying to get your attention.

17             MR. PARTRIDGE:  Your Honor, if we are down to

18  two -- let me see if I can simplify this -- if we are down

19  to two and he will tell me the two, I will accept this so we

20  can move on.

21             MR. COYNE:  They are DX-772 --

22             THE COURT:  Please, talk to one another.

23             Mr. Herrmann, while we are doing that, do we

24  have a verdict form?  The latest update?

25             MR. HERRMANN:  We e-filed a verdict form

```
 1    yesterday, Your Honor.  I don't know whether our paralegal

 2    also sent one to Ms. Walker.

 3               THE COURT:  We will get it off the e-system.

 4               MR. PARTRIDGE:  We sent one as well.

 5               THE COURT:  I should throw -- here it is.  Thank

 6    you, Ms. Walker.

 7               MR. PARTRIDGE:  So I am clear as to what has

 8    been withdrawn, DX-174, DX-209, DX-210, PTX-381, and

 9    PTX-382.  Those were the new ones that were added.  Am I

10    correct that those are withdrawn?

11               MR. COYNE:  Yes, Your Honor.  But 381 and 382

12    are the same as DX-772 and 770, which is the other problem.

13    The jury has already been exposed --

14               THE COURT:  Mr. Coyne, rather than cluttering

15    the record, which you all are paying for, why don't you talk

16    to one another off the record.

17                    (Counsel confer.)

18               MR. PARTRIDGE:  Your Honor, I think I have an

19    understanding.  Let me state for the record what I think the

20    situation is.

21               As I understand Mr. Coyne's position, he wants

22    to substitute or use PTX-381 as a sort of reformatted

23    translation of DX-770, and PTX-382 as that reformatted

24    translation of DX-772.  And as to all the other exhibits, he

25    is going to stick with what we had on Friday.  If that is
```

1    the deal, I am fine with it.

2              THE COURT:  Is that the deal, Mr. Coyne, as Mr.

3    Partridge says?

4              MR. COYNE:  Yes, Your Honor.

5              THE COURT:  Then the Court accepts the deal.

6              MR. PARTRIDGE:  There are other issues.  Mr.

7    Spears will address them.

8              MR. SPEARS:  The next issue is a jury confusion

9    issue.  It is a jury-confusion issue that arises in the

10   context of the '601 plaques patent.

11             Specifically, it concerns information about

12   refrigerators other than refrigerators accused of

13   infringement that will be placed in front of the jury, first

14   during the testimony of Mr. Ching Ho Lee, and then during

15   the testimony of LG's experts.

16             As the Court may recall, during his opening

17   statement Mr. Coyne talked about a Gold Star refrigerator

18   that was sold in 1988.  And he said that this isn't a

19   refrigerator that was sold in the United States.  Well, if

20   that is the case, that means it isn't prior art.

21             Mr. Lee will presumably talk about Gold Star

22   development activity in Korea.  And I am not sure whether LG

23   is going to make a prior art argument based upon this

24   information, but I do know that they are going to make an

25   argument to the effect that whatever Gold Star was doing in

1  Korea in the 1980s LG ought to be free to do in the United

2  States today.

3         As an initial matter, we don't entirely agree

4  with the factual premise of this argument.  We think there

5  are big differences between those 1980 Gold Star

6  refrigerators in Korea and the accused refrigerators in the

7  United States.

8         But our bigger concern is one of law.  The

9  patent statute very narrowly defines what qualifies as prior

10  art in foreign jurisdictions.  It is publication, it's

11  patenting.  It doesn't matter what LG was selling in Korea

12  in the 1980s or the 1970s or even the 1950s.  This has been

13  a feature of patent statutes going back to the first one

14  enacted by the Republic of Venice.  The original patent

15  statutes had absolutely nothing to do with encouraging

16  innovation in a home jurisdiction.  The whole point of those

17  statutes was to encourage skilled artisans to immigrate to

18  other cities from the city that enacted the statute.  So

19  when LG stands up and says, look, what we were doing in

20  Korea in the 1980s, we should be free to do today?  I admit,

21  that is a very appealing type of argument to the layperson.

22  The jury may buy it.  But it's counter to the law and it's

23  counter to the way the patent statutes have been structured

24  from the very beginning.  The fact is, whatever they have

25  done in Korea we are free to patent in the United States.

1    We are not trying to stop them from selling these

2    refrigerators in Korea.  What we are trying to stop them

3    from doing is infringing a United States patent.  That is

4    kind of the first issue.

5              A related issue is going to arise when their

6    experts begin to testify about allegedly prior art

7    refrigerators.  The problem is going to arise from their

8    ability to lay a foundation that any of this information is

9    prior art.

10             Their clear and convincing evidence burden

11   includes a duty to provide clear and convincing evidence

12   that whatever they say is prior art actually is prior art.

13             As we look at their witness list, we don't see

14   people who can testify from firsthand knowledge about either

15   of the identity of refrigerators that Dr. Mellinger is going

16   to talk about, the chain of custody of refrigerators that

17   were tested, or that refrigerators manufactured as of a

18   certain date, and manufacturer is not prior art activity in

19   the United States -- were sold in the United States, which

20   is the actual prior art testimony.

21             If we were going over each of those objections

22   individually, it would take a long time, time that I think

23   would be wasted.  But I think there is a better remedy here.

24   The remedy we would propose is that before any of LG's

25   witnesses publish to the jury any refrigerator that is not

1    an accused LG refrigerator, that we have an adequate

2    foundation in the record that that refrigerator qualifies as

3    prior art under U.S. law and that they provided clear and

4    convincing evidence as to what that refrigerator is.

5              If we don't think that is a case, we will make a

6    foundation objection and I think the Court will be able to

7    rule on those quickly, without the need for any sidebar.

8              THE COURT:  Mr. Spears, before you leave, when

9    you say without the need for a sidebar, you must be

10   suggesting I dismiss the jury?

11             MR. SPEARS:  The way I see this happening is,

12   they are about to publish an exhibit, say, with Mr. Lee, a

13   document from Korea in 1988.  We make a foundation

14   objection.  I think at that point the Court would probably

15   be able to recognize what our problem is without a sidebar.

16   And I think you would be able to rule on it without having

17   to take the time to have a sidebar on that issue.

18             Of course, if you want one, we are perfectly

19   happy to do it.

20             THE COURT:  It's not that I want them.  It's

21   that I am trying to make a correct ruling.  Oddly enough,

22   judges do benefit from the advocacy of good lawyers.

23             The point being that, where should that

24   discussion, if needed, take place?

25             MR. SPEARS:  Sidebar is perfect.

1    THE COURT:  Mr. Coyne?

2    MR. COYNE:  Thank you, Your Honor.

3    First off, Mr. Spears is mistaken.  There are a

4    number of references and a number of refrigerators and a

5    number of printed publications.

6    We are relying on these not only under 102(b) as

7    on sale.  In fact, we are relying on them as 102(a), known

8    or used in this country, even the Gold Star unit, which I

9    will concede to Your Honor was not sold in this country.  It

10    was sold throughout the Middle East.  It was sold throughout

11    Asia.  It was sold throughout Korea, for years.  What brings

12    it into this country is that we sought the Underwriters

13    Laboratory's approval for that refrigerator to start making

14    U.S. sales before the date that Mr. Williams testified he

15    invented it.  That brings it into this country under 102(a),

16    the refrigerator; in other words, it was known by others; in

17    other words, the people at UL, in the United States before

18    the invention date, before the conception date.  It is a

19    102(a) reference.

20    Specifically, we are relying on the brochure as

21    a 102(b) reference.  That is the exhibit PTX-403 that has

22    been used throughout the proceeding.  That is a printed

23    publication.  It doesn't matter where in the world it was

24    available.  It was a printed publication that was available

25    under the statute.

1   With respect to the other refrigerators, we do

2   have a witness who has personal knowledge.  And that is Dr.

3   Ching Ho Lee.  He began at LG in 1986.  He will testify

4   about his personal knowledge about these units and where

5   they were being used, where they were being sold, who they

6   were known by, where these things were going in the world,

7   including U.S. manufacturers.

8   Yes, we are relying on the dates of manufacture,

9   but not as a 102(b) sale.  As a 102(a), known or used by

10  others in this country before the invention thereof by the

11  patentee.

12  THE COURT:  Okay.  Mr. Spears?

13  MR. SPEARS:  Mr. Coyne's argument illustrates my

14  very concern.  Let's take the Underwriter Laboratories

15  issue, for example.  There is no one on their witness list

16  from Underwriters Laboratory who can testify about their

17  practices, whether refrigerators they evaluate are done

18  under a confidentiality obligation, which would remove them

19  from the scope of what is known or used in the United

20  States.

21  Likewise, we don't have anyone who is going to

22  testify from firsthand knowledge based upon public access to

23  a refrigerator that has been merely manufactured,

24  supposedly, that would be a person, in the case of, for

25  instance, a GE refrigerator who would take the stand and

1    explain to the jury that GE's factory was open to tours,

2    that the general public go to the manufacturing floor and

3    see the GE refrigerators there.  But we aren't going to have

4    a witness that is going to say that.  That is why, instead

5    of arguing the point right now, it needs to be policed as

6    this evidence comes in during the course of the trial.

7              THE COURT:  Do you concur with your colleague's

8    view, Mr. Coyne, as to how the Court should handle this

9    evidence?

10             MR. COYNE:  Your Honor, the Court -- I am

11   certainly happy to have the Court handle it during sidebars

12   as they come up.  But as I have explained, this is 102(a)

13   evidence.  We will present witnesses that will establish the

14   basis for it.  I don't know what else to say, sorry.

15             THE COURT:  You make that assertion, I suspect

16   that you are confident that you will be able to offer these

17   witnesses within the parameters of the rules of evidence?

18             MR. COYNE:  Yes, Your Honor.  For two reasons.

19   Dr. Mellinger was actually building these GE Hotpoint units

20   at GE during the prior art period.  He will testify.  Ching

21   Ho Lee was building the Gold Star units in Korea and he

22   knows about their history and publication of the catalog, et

23   cetera.

24             THE COURT:  I will look forward to the

25   conversation at sidebar.

1       MR. COYNE:  Thank you, Your Honor.

2       MR. PARTRIDGE:  Your Honor, given the hour, I am

3    not sure whether we should deal with this, because I don't

4    want to hold up the jury, but there is an issue with respect

5    to Dr. Rao's testimony on damages.  He will probably be on

6    late this afternoon.  We could deal with it over the lunch

7    hour, if you would prefer.

8       THE COURT:  Okay.  Any other issues that we need

9    to address before the jury comes in this morning?

10      MR. PARTRIDGE:  The only other thing I would

11   note, Your Honor, is we have made a lot of progress on the

12   charge.  There are a set of issues that I think have been

13   sent in to you.  I think what you have now is a set of

14   instructions --

15      THE COURT:  They have been e-filed as well?

16      MR. PARTRIDGE:  Yes, Your Honor.  I think they

17   came in yesterday.  If you wanted to have a conference at

18   the end of the day, I think both sides would be prepared to

19   do that.

20      There are some other outstanding issues that I

21   hope to get resolved during the day, but we may have to

22   discuss them at the end of the day with you as well.

23      THE COURT:  Based upon our plan, we are going to

24   expect to have the Court charge the jury tomorrow?

25      MR. PARTRIDGE:  Correct, Your Honor.  Our hope

1   was tomorrow, in looking at the hours, that we complete -- I

2   know you would like to do it earlier in the afternoon.  But

3   as I look at the number of witnesses that are set, if we

4   could get the case to the jury at 4:00 tomorrow --

5           THE COURT:  Then dismiss them and let them come

6   back and begin deliberations?

7           MR. PARTRIDGE:  If they want to deliberate

8   tomorrow night, fine.  If they want to come back Wednesday,

9   that is fine, too.

10          THE COURT:  I usually leave that in their hands.

11  But I may, depending upon the hour, at least offer them the

12  opportunity to at least pick a foreperson and take care of

13  some ministerial things, and begin deliberations the next

14  day.

15          We will see.

16          MR. PARTRIDGE:  Thank you, Your Honor.

17          THE COURT:  Ms. Walker has just shared with me

18  that one of our jurors has a second job that requires her

19  presence at 8:30 in the evening.  I don't think that is

20  going to be a problem, and I think it's probably something

21  that I would prefer the jurors work out among themselves as

22  to how long they are going to go in any given evening.  I

23  don't like interfering with any part of the process.

24          MR. PARTRIDGE:  Not an issue for us, Your Honor.

25          THE COURT:  Okay.  I am just going to step out

```
 1    for a moment and we will come back and bring in the jury.

 2                    (Recess taken.)

 3                    THE COURT:  Ms. Walker.

 4                    (Jury enters courtroom at 9:14 a.m.)

 5                    THE COURT:  Ladies and gentlemen, happy Monday.

 6              All right, counsel.  Let's continue.

 7                    ... Myung Ryul Lee, having been duly sworn as a

 8    witness, was examined and testified further through the

 9    interpreter as follows...

10                    DIRECT EXAMINATION (continued)

11    BY MR. COYNE:

12    Q.    Good morning, Dr. Lee.

13    A.    Good morning.

14    Q.    We were talking about Exhibit DX-332 when we broke off

15    on Friday.  If we can have Exhibit 332 back and go to page

16    16 of the document.

17              I would like to direct your attention to the box

18    on the lower left-hand corner, this area that talks about

19    "Ice pickup and transfer:  Development of the unique method

20    of LG."

21              What did you mean by that portion of the

22    document?

23    A.    This means that when we used -- that is a patent for

24    our ice storage bin.  Then the ice move horizontally from

25    the storage into the crushed area.
```

Myung Ryul  Lee - direct

1    So this is our own technology.  So we have to

2    develop the auger, bank, dispenser, crusher, and then the

3    motor location and structure of the motor settings.

4         This means the auger moves horizontally, the

5    idea.

6    Q.   What did you mean by the last entry on that list, the

7    "Identify idea through patent research"?

8    A.   We find the idea from the others done, I mean, the

9    Hitachi patent, because the right expired.  So that's why.

10   Q.   Can we go to the next page, please, Mr. Brooks?

11        Dr. Lee, on the next page, I want to direct your

12   attention to the lower portion on the bottom right here,

13   when it is talking about the budgeting and the category.

14        How much was this project going to cost?

15   A.   It's about $6 million.

16   Q.   Won or dollars?

17   A.   $6 million.

18   Q.   With respect to people, how much personnel were going

19   to be needed to make this project work?

20   A.   Our lab research, we input almost 60.5 -- five person

21   included in that project.

22   Q.   So five people for a year or one person's time for

23   five years?

24   A.   It's about, let me see, five persons per year.

25        So our project appeared to start from the

Myung Ryul  Lee - direct

1      October to the next year December, so totally, it might be

2      more than four, between four and five persons involved in

3      that project.

4      Q.    Can we go down, Mr. Brooks, to page 22 of the

5      document, the schedule?

6             Dr. Lee, what is it that we are looking at here?

7      A.    This is first the time schedule to develop our

8      project.

9      Q.    Okay.  Why did it take so long?

10     A.    It has so many technical issues.

11            MR. COYNE:  Your Honor, I would like to use the

12     Elmo and talk to Dr. Lee about those technical issues and

13     just write them on a piece of paper as he goes along.

14            THE COURT:  Sure.

15            MR. PARTRIDGE:  No objection.

16     BY MR. COYNE:

17     Q.    Dr. Lee, what were the technical issues, the technical

18     challenges you were facing in this Bics project?

19     A.    First thing is the -- one of the most important issues

20     in this project is how we can put the ice maker into the

21     door.  So that means when the door opens and closes, and

22     water is supplied to the ice maker, then it is not frozen

23     yet, the customer opens the door or smashes it to close,

24     then the water spills over.  That is one of the most

25     important technical issues to solve.

Myung Ryul  Lee - direct

1    Because of that technical issue, though, other

2    company have done, that is one of the issues.

3    And the second one --

4    Q.    What other technical issues?

5    A.    Second is, we have to reduce the size of the ice

6    maker, to fit to the door.

7    The other, we have to compact the ice storage

8    bin, also have that fit into the door.

9    The conventional ice maker has three part,

10    consists of three part.  One is the auger, and helix, and

11    the crusher.  So the size was about 16 inches of depth

12    totally.  But we had to reduce it to six inches totally.  So

13    we need a more creative idea to do that.  So we make an

14    auger, and the helix, blade helix, we invented it.

15    Q.    Is that a separate item or is that part of this third

16    item?

17    A.    No.  We make an auger, and helix is just the one

18    piece, blade helix.

19    Q.    What other technical challenges did you face on the

20    Bics project?

21    A.    The motor was another issue.  The motor was about four

22    inches thick, the motor, so we have to reduce it to one

23    inch.  So that is another challenge to us.

24    Q.    What other challenges did you face?

25    A.    And then, also, we have to put the water tank into the

Myung Ryul  Lee - direct

1    door.  It is very difficult to control the temperature.

2    It's the freezer door.  So when you put the water tank on

3    the door, it has to control the temperature.  If we get the

4    temperature not right, the water temperature freezes.  So it

5    doesn't work well, so we need to make it efficiently.

6    Q.    What other challenges, if any, did you face on the

7    Bics project?

8    A.    And then we need to control on the door, also, because

9    when we put the ice, whole ice system into the door, we need

10   the microprocessor to control the whole ice and water and

11   dispenser system.

12              So we separated the control circuit and the

13   microprocessor for that.

14   Q.    Were there any other challenges that you faced in the

15   Bics project, technical challenges?

16   A.    And then -- there were so many.  That's the main

17   challenges to develop the in-door-ice system.

18   Q.    The list that we have here labeled "Technical

19   Challenges (Bics)" is that an accurate summary of the

20   challenges that you faced on the Bics project?

21   A.    Yes.

22   Q.    Thank you, sir.

23              I would like to go now to PTX-146.  What did you

24   do next in the project?

25              MR. COYNE:  Your Honor, can I mark that exhibit

Myung Ryul   Lee - direct

1    first before we move on?

2              MR. PARTRIDGE:   Only as a demonstrative, Your

3    Honor.

4              THE COURT:   As a demonstrative, Mr. Coyne.

5              MR. COYNE:   It would be PDX-171.

6              THE WITNESS:   Yes.

7    BY MR. COYNE:

8    Q.    What did you do next?   After this report was done, how

9    did you proceed with the Bics project?

10   A.    We make a horizontal-moving ice storage bin.   It's

11   basically the same meaning of bin.   So we tested several

12   storage bins that has the same concept, horizontal-moving,

13   but there is a sizer and the direction, the movement of

14   direction is different.   This is the report of the tester of

15   the ice storage bin.

16   Q.    After you started working on that horizontal design

17   idea from Hitachi, did you ever go back to a vertical design

18   like Whirlpool had used in the '130 patent?

19   A.    Not at all, because after we start our own project, we

20   never considered any vertical system.

21   Q.    Did you ever abandon the Hitachi approach?

22   A.    Pardon me?

23   Q.    Did you ever abandon, or give up, on the Hitachi

24   approach?

25   A.    No.   We continuously focused on that idea, because we

Myung Ryul  Lee - direct

1    don't want to -- we did not want to have any small

2    accomplishment with work.  So we focused on that horizontal

3    idea.

4    Q.    Mr. Brooks, can you go to page 5 of is this document,

5    please?

6              What are we looking at here, sir?

7    A.    The first picture is the original, conventional ice

8    storage bin.  The depth was 16 inches.  But the second one

9    is the horizontal-moving one, but it is horizontal and the

10   front-loading ice storage bin.  We installed the ice storage

11   bin to the door, it's front-loading.

12             The third one is the -- we call it the Bravo.

13   It's the bank for the three-door bottom freezer.  So it is

14   the more compact size of the second one.

15             And the fourth picture is the horizontal, but it

16   is stored in the side, from the side.

17             So that is the whole idea of the three, is based

18   on the horizontal-moving ice storage bin.

19   Q.    We see multiple bins up here.  Were you looking at

20   alternative designs at that time?

21   A.    Alternative.  What do you mean, "alternative"?

22   Q.    Were you studying multiple different designs of a

23   horizontal bin?

24   A.    Yes.

25   Q.    Can we go, please, to DX-331?

Myung Ryul  Lee - direct

1      Sir, what is this report?

2    A.    This is the report -- this is the report of, actually,

3    almost end of the project, but it's not final.  Omitted from

4    the report is our project.

5    Q.    Can we go to page 25 of the exhibit, Mr. Brooks?

6           I want to direct your attention, Dr. Lee, to the

7    portions down here in the lower right-hand corner, with the

8    two headings that read "Problem" and "Resolution."

9           What is that information in this report?

10   A.    This is a progress report.  But there are so many

11   technology issues.  But we don't have enough time.  So we --

12   it means we don't have enough time to finish up the project.

13   Q.    Were you ever able to resolve this problem?

14   A.    Our concept building was already done, but the fine

15   tuning of optimization, we need more time.

16   Q.    On the right-hand side, under "Resolution/Request,"

17   what does that information indicate?

18   A.    We need to communicate earlier in the project to the

19   Changwon factory.  That means a very good concept, and we

20   did some prototype tests.  But we really want to make a

21   commercial product.  So the Changwon manufacturing or design

22   member should have involved their project earlier.  It means

23   that.

24   Q.    Dr. Lee, this table in here, in the middle, this one

25   right here, "Effective shelf space," what is that

Myung Ryul  Lee - direct

1    information indicating?

2    A.    This is the usable space that you can give to the

3    customer.   Inside the cabinet is the conventional ice and

4    water system.   The customer used only 75 percent of the

5    freezer compartment, it means.   The other in-door system, in

6    the case of Whirlpool, can use 91 percent of the space, can

7    be used by the customer.   And then the last one is our

8    in-door-ice-making system can keep 100 percent of the usable

9    space to the customer.

10           So it means our technology gives a perfect

11   solution to the customer.   It means that.

12   Q.    Could we go to the next page, Mr. Brooks?

13           Dr. Lee, I would like to direct your attention

14   down here.   What is being shown on this page, in the lower

15   portion?

16   A.    This is the kind of ice maker history.   That means,

17   the 1960s, there are two -- two different ice maker shaped

18   introduced.   A rounded ice shape and a crescent ice shape.

19           In the 1960s, flexible ice maker introduced by

20   the Japanese company.   We call that twisting ice maker.

21   It's made by the plastic.   So when we want to deicing, it is

22   just twisting, then the ice would come out from the ice

23   maker.

24   Q.    Let me back up for a second and just go to the

25   right-hand cell in this table.   In particular, over here,

Myung Ryul  Lee - direct

1    under "LG," there is an entry, "1998 Twisting," it looks

2    like it says "DIOS."  What is that entry?

3    A.    Yes.  We have two different types of ice maker.  One

4    is the heating type we call it, heating type.  It's made

5    with the oven meter.  So when we want to detach ice from the

6    ice maker, we have to heat up the bottom, between the ice

7    maker to the ice, and that area slightly melts it, and we

8    eject the ice from the ice maker.

9             That is the one type.  The other type is the

10   twisting type made by plastic.  So it is easily twisting,

11   then the ice come out from the ice maker.

12            We end up with that twisting type in 1998, for

13   our side-by-side refrigerator.  The brand name is DIOS in

14   Korea.

15   Q.    Sir, do you know Yong Shik Kim at LG?

16   A.    I don't know who he is.  But he was an engineer of our

17   refrigeration business unit, factory engineer.

18   Q.    Instead of knowing him personally, do you know of him?

19   Is he a name you have heard before?

20   A.    Yes, I heard that.

21   Q.    Could you bring up DX-380, please?  Can we go to the

22   first page -- I am sorry, PTX-380.

23            MR. PARTRIDGE:  Objection, Your Honor.  Personal

24   knowledge, relevant time, possible delay, opinion testimony.

25            MR. COYNE:  Simply trying to identify the ice

Myung Ryul  Lee - direct

1    maker style that we just looked at the Bics project chart,

2    Your Honor.

3              MR. PARTRIDGE:  I object.  May we have a

4    sidebar?

5              (The following took place at sidebar.)

6              THE COURT:  Okay, counsel.

7              MR. PARTRIDGE:  There are two publications,

8    which I think Mr. Coyne is going to try to get in.  They are

9    Korean publications by the fellow that he doesn't know.  He

10   knows of him.  This is sort of an end-around way to try to

11   get it in, to talk about, well, gee, we were using the same

12   ice maker and the objective is to talk about ice being on

13   the door as which I think they have him here to offer an

14   opinion about it, when in fact there isn't one single

15   document in all of the Bics documents that refers to these

16   two patent publications.

17             The question is whether he has personal

18   knowledge at the relevant period of time and whether or not

19   he is going to try to get him to offer opinion testimony

20   with respect to the document.  We have no expert report.

21             MR. COYNE:  I am not going to ask him for

22   opinion testimony whatsoever.  We just looked at the Bics

23   project, the twisting style LG ice maker.

24             THE COURT:  To what?

25             MR. COYNE:  The twisting style LG ice maker,

Myung Ryul  Lee - direct

1    that was the entry we just looked at in the chart.  This is

2    a Bics document, which is a Bics project document.  It

3    refers to a twist style document.  I am simply going to get

4    him to identify, if I may, Mr. Kim's patent, the picture,

5    and say is that the style of ice maker we are talking about

6    here.  I am not going to go any further than the document.

7               MR. PARTRIDGE:  It is irrelevant, Your Honor.

8               THE COURT:  Sustained.

9               (End of sidebar conference.)

10   BY MR. COYNE:

11   Q.    Mr. Brooks, could you bring up either 381 other 770?

12             Mr. Lee, the last date we looked at was October.

13   What happened after that October date?

14   A.    Would you repeat the question, please?

15   Q.    Yes.  The last report we were looking at was October

16   of 2003.  What happened after that October 2003 date with

17   respect to the Bics project after that?

18   A.    We have to complete the whole research task.  So we

19   tried to finish up the whole test research.  And we had to

20   make a final.  That was the Bics project.

21   Q.    Were there drafts of this document?

22   A.    Yes.  We prepared the final report about -- I cannot

23   remember how long, but about one month.

24   Q.    How many drafts did it go through before arriving at

25   this final project report?

Myung Ryul  Lee - direct

1  A.      Many, many drafts.  We revised them most every day.

2  So it has many.

3  Q.      Who was in charge of preparing this report?

4  A.      Mostly, it's my responsibility, but me and our members

5  prepared that.

6            MR. COYNE:  Your Honor, I would like to publish

7  this to the jury, but we will collect it after Dr. Lee's

8  testimony is finished and it won't go into their jury books.

9  Would that be acceptable?

10           MR. PARTRIDGE:  Your Honor, we haven't been

11  publishing other documents to the jury.  This is one of

12  many, many exhibits we have been displaying to the jury.  I

13  am not sure this is a good place to start doing that.

14           THE COURT:  I agree.

15           MR. COYNE:  We will work off of the screen.

16  BY MR. COYNE:

17  Q.      With respect to page 2, Mr. Brooks, if you would go to

18  page 2, Dr. Lee, what is the information that is being

19  displayed here on page 2?

20  A.      This is a brief report for our project.

21  Q.      Can we go to the upper right-hand box?  Under "Key

22  Development Technology," what is that section indicating?

23  A.      This is what I mentioned, this is the main technology

24  development all through this project.

25  Q.      Under one of those items is the front-loading ice

Myung Ryul  Lee - direct

1    bank.  What design is that based on?

2    A.     This is based on the horizontal, the Hitachi original

3    ice storage bin.  We have two different horizontal types.

4    One is the side-loading and the other one is the

5    front-loading.  Those are all horizontal-moving.  So it's

6    one of the horizontal-moving ice makers.

7    Q.     Can we back up, Mr. Brooks?

8           Under this section over here, Doctor, there is a

9    setting for patent applications.  Do you see that?

10   A.     Yes.

11   Q.     What does that information indicate?

12   A.     Originally, our plan for the patent application was

13   to, in Korea, 10, but we applied 75 patent for the Korea,

14   and actually 13 patent for overseas.

15   Q.     Does that include through the U.S.?

16   A.     Yes, definitely.

17   Q.     Can we back out again?  And under the investment

18   section, if we look at the annual R&D investment, what is

19   this investment indicating?

20

21

22

23

24

25

Myung Ryul  Lee - direct

1

2

3

4

5

6

7

8

9

10   A.   Yes.

11   Q.   With respect to the number of people that are needed,

12   how many people were needed for this project?

13   A.   Actually, you have to add those 10 months, so it was

14   45, 47, and 4, plus 4, and 51 members, 4 people involved

15   with this project.

16   Q.   Can we back out to page 4 of the document?

17        Under the heading "Key research details," it's

18   page 5 of 20.  Sir, under the "Research Background" section,

19   what is this portion of the document indicating?

20   A.   This indicates that background of the project.  So

21   first -- the first paragraph, the first thing is we want to

22   give the customer more usable space.  So our conventional

23   side-by-side refrigerator cannot give the whole freezer

24   compartment.  They cannot use a portion of the space.

25        So it's kind of their complaints.  So we want to

Myung Ryul   Lee - direct

1    give them perfect space.

2    Q.    Can we go to page 6 of 20, Mr. Brooks?

3          Doctor, what are we seeing on this chart?

4    A.    This is our major project.   There is separate two

5    areas, the ice bank and the ice maker.

6          For the ice bank we want to make for our own ice

7    bank structure.

8    Q.    What is this indication here "redacted"?

9    A.    I don't know.

10   Q.    Why was information taken out?

11   A.    I don't know.

12   Q.    With respect to the next page, then, could we go to

13   page 7 of 20, what are we seeing here, sir?

14   A.    This is the ice bank structure.   Those two

15   side-loading and front-loading, those two are based on the

16   horizontal-moving ice storage bin.

17         So we tested those two, and we built the

18   benefit, or the merit and demerit in this chart.

19   Q.    How do these designs relate to the Hitachi structure

20   that you testified about earlier?

21   A.    It's the same concept with Hitachi patent, because the

22   ice is moving horizontally.   So it's based on the Hitachi

23   patent.   The same concept.

24   Q.    Can we go down to page 18 of 20?

25         Sir, you see over here an indication on the

Myung Ryul  Lee - direct

1    right-hand side of Bravo-V.  What is that?

2    A.    Bravo-V is -- it's not Brave-5, it's Bravo-V.  It's

3    the same project as Bravo-2.

4            Initially, I called the project Bravo-2, but our

5    Changwon factory want to put the name Bravo-V.

6            So this is another application of the

7    in-door-ice maker.  But this is a totally different project,

8    because we put the ice maker into the fresh-food compartment

9    door, fresh-food compartment door.

10           The fresh-food compartment is above the freezing

11   temperature, so we cannot make ice there.  So we made a

12   small compartment, ice-making room, and we take some cold

13   air from the freezer and we make ice there.  So it is

14   totally different project with side-by-side.

15   Q.    How does that relate to the exhibit we have over here,

16   DPX-22, this room that I am indicating with the laser where

17   the ice-making room is?

18   A.    It is that project.

19   Q.    Can we please go, Mr. Brooks, to page 20 of 20?

20           Doctor, you see at the top there is an

21   indication in the first paragraph of a patent application.

22   What is that information?

23   A.    This is our patent application.  We filed, applied 75

24   patent for Korea and 13 patent applied to overseas.

25   Q.    And two sections down it says "Self-Evaluation and

Myung Ryul  Lee - direct

1   Thoughts."  Did you have any input into this paragraph?

2   A.    Yes, I wrote that.

3   Q.    Does this reflect your thinking or somebody else's?

4   A.    This is my own thinking.

5   Q.    What do you mean by the first paragraph, "Patented

6   layer was formed on the door water overflowing preventive

7   structure"?

8   A.    It means we made the new idea, innovative idea.  And

9   then we solved the water spillover problem in the ice maker.

10  It's the first time in the world.  Nobody had done this

11  before.

12          We think we made a very good technology better.

13  Q.    The next paragraph, "We were successful in avoiding

14  the existing Whirlpool's patent layer in bank area."  What

15  does that mean?

16  A.    This is the -- we made the ice storage bin to

17  escape -- to avoid the Whirlpool patent map.  And then we

18  make another patent map, then we successfully make a patent,

19  and technology.

20  Q.    The next paragraph, "At first, we thought Whirlpool's

21  patented layer seemed too solid and strong," what do you

22  mean by that paragraph?

23  A.    At the beginning of the project, we think that

24  Whirlpool has so strong for the patent map, but after we

25  finish up this project, we were very happy, and we made

Myung Ryul  Lee - direct

1    historical masterpiece of the new technology.

2    Q.    Can we go, Mr. Brooks, to DX-772?  It's PTX-3A2.  Can

3    we go to page 13 of 20 of this document?  I believe it's 35

4    in the document.

5              Sir, looking at this language on the right-hand

6    side, you had indicated earlier this was a draft.  Right?

7    A.    Yes.

8    Q.    And the statement, "a dispute is expected," we didn't

9    see that in the final project report, did we?

10   A.    Yes.

11   Q.    Why not?

12   A.    We put these words because Whirlpool is obviously a

13   very aggressive company --

14              MR. PARTRIDGE:  Your Honor, I think we need a

15   sidebar.

16              (The following took place at sidebar.)

17              MR. PARTRIDGE:  So the situation we are facing

18   is they have heavily redacted the document, so we don't know

19   whether there is an opinion of counsel in there.  I let that

20   question go because the witness fortunately just gave a

21   short answer and we didn't have a problem with it.  Now we

22   are getting into an explanation of why he wrote the language

23   that they expected a dispute.  And we're getting into, we

24   are aggressive, it was because of his perception of

25   Whirlpool aggressiveness, while at the same time they are

Myung Ryul  Lee - direct

```
 1    withholding as privileged information from this pair of

 2    documents.

 3              It may well be Mr. Coyne didn't anticipate this

 4    would be the response of the witness.  But we are now going

 5    into an area that is going to open a can of worms if we go

 6    down that path.

 7              MR. COYNE:  Your Honor, I'm trying to establish

 8    his state of mind of what the dispute is that is expected.

 9              THE COURT:  That may be the state of mind that

10    you are trying to establish.  I think Mr. Partridge is

11    concerned about the reason, and you don't know what he is

12    going to say, because I imagine you weren't expecting him to

13    use the word "aggressive."

14              You can rephrase.  I might let you lead a little

15    bit so you can avoid this problem.

16              (End of sidebar conference.)

17    BY MR. COYNE:

18    Q.   Dr. Lee, even after this language was taken out of the

19    draft, did you still expect a dispute with Whirlpool?

20    A.   (After consulting with interpreter)  Yes.

21    Q.   Did you expect a dispute because you thought you were

22    infringing the '130 patent or for some other reason?

23    A.   No.  Because Whirlpool --

24              THE COURT:  Could you rephrase that?  It

25    invites --
```

Myung Ryul  Lee - direct

1      MR. COYNE:  Okay.

2   BY MR. COYNE:

3   Q.    Did you expect a dispute with Whirlpool because you

4   felt as an engineer that you had developed a technology that

5   infringed Whirlpool's patent?

6           (Witness consults with interpreter.)

7           THE COURT:  Mr. Kim, will you join us at

8   sidebar, please?

9           (The following took place at sidebar.)

10          THE COURT:  Let's get the interpretation on the

11  record.

12          THE INTERPRETER:  Not at all.  The patent, the

13  technology that we created was something that targeted

14  innovation, so to say.  And we felt rather confident that we

15  had pulled off quite some feat.

16          And in terms of the bank, the technology of

17  placing on or in the door the ice bank, why, that was

18  something that had been achieved by not only LG but GE,

19  Toshiba, Hitachi, lots of companies out there.  And this

20  business of putting on or in the door the ice bank, as such,

21  the way we looked at it, this wasn't really patentable.

22  Instead, the ice storage bank, in terms of the structure

23  thereof, whereas Whirlpool's was vertical, ours, a la

24  Hitachi, was vertical in a different way.  And therefore, as

25  far as we were concerned, the way we looked at this problem,

Myung Ryul  Lee - direct

1    Whirlpool, being a rather aggressive company, we figured

2    that no matter, they were going to cause a dispute, is what

3    we figured.

4             THE COURT:  Here is my view, and I will hear

5    from the parties.  I am prepared to strike the last portion

6    of the answer.

7             Do you feel up until that point, the part about

8    Mr. Lee's statement or repeat of the use of the word

9    "aggressive" as referencing Whirlpool, the other parts of

10    the answer, were they responsive to your question?

11             MR. COYNE:  Yes, Your Honor, directly.

12             THE COURT:  So you are not going to ask another

13    question to try to get him to answer a different way, as

14    patent lawyers like to do?  Any problem up to that point?

15             MR. PARTRIDGE:  The first couple of sentences I

16    thought were fine, because he said not all --

17             THE COURT:  He goes through, again, his view

18    that he has testified about what was known in the art and

19    that kind of thing.  From my point of view, Mr. Partridge, I

20    can understand why you might not want that repeated.  But

21    the jury has already heard it and it's appropriate testimony

22    for this witness to have given.  So I don't have a problem

23    with it.

24             MR. PARTRIDGE:  Normally I would say absolutely

25    right, Your Honor.  It's the claim of privilege that is in

Myung Ryul  Lee - direct

1  that document that concerns me.  I think he goes so far as

2  to open that door with respect to the privilege that is

3  being claimed.

4           There is obviously like 13, 14 pages in there

5  that have been redacted.

6           THE COURT:  When you say "that document," you

7  mean the Bics?

8           MR. PARTRIDGE:  No.  The final report that is

9  the focus of all of this testimony.

10           THE COURT:  I didn't hear him reference the

11  final report again.

12           MR. PARTRIDGE:  We are talking about the

13  document that says that he expected a dispute.  And now he

14  is explaining why that language wasn't in the final report.

15           THE COURT:  No.  That wasn't the question.

16           MR. PARTRIDGE:  Okay.

17           THE COURT:  The question was what his

18  expectation was, not why the language wasn't in the final

19  report.  That is a different objection.

20           I am prepared to accept the answer up to the

21  point, Mr. Kim, the last portion about the word

22  "aggressive."

23           THE INTERPRETER:  Interpreter we have two ways

24  to do this.  Personally, I would like to have the reporter

25  reread that.

Myung Ryul  Lee - direct

1           (Discussion among Court, Interpreter, and court

2     reporter.)

3               THE COURT:  Let's do that.  If he has gone

4     further, Mr. Kim, give him the hi sign to cut it off.

5               THE INTERPRETER:  Procedurally, I envision we

6     may have a few more of these moments.  Technically the

7     interpreter would observe essentially that if he were to

8     testify in English, the jury would have heard the whole

9     thing.

10              THE COURT:  No.  You don't need to be worried

11    about that.  I don't think we are going to have a few more

12    of these moments.

13              (End of sidebar conference.)

14              THE COURT:  Ladies and gentlemen, our court

15    reporter is going to read back the last answer.

16              (Record read as follows:

17              "Answer:  Not at all.  The patent, the

18    technology that we created was something that targeted

19    innovation, so to say.  And we felt rather confident that we

20    had pulled off quite some feat.

21              "And in terms of the bank, the technology of

22    placing on or in the door the ice bank, why, that was

23    something that had been achieved by not only LG but GE,

24    Toshiba, Hitachi, lots of companies out there.  And this

25    business of putting on or in the door the ice bank, as such,

Myung Ryul  Lee - direct

1     the way we looked at it, this wasn't really patentable.

2     Instead, the ice storage bank, in terms of the structure

3     thereof, whereas Whirlpool's was vertical, ours, a la

4     Hitachi, was vertical in a different way."

5     BY MR. COYNE:

6     Q.    Mr. Brooks, can we go to 336 and jump to page 14?

7                Before I do that, Dr. Lee, what is this?

8     A.    This is the presentation material in the LG R&D award.

9     Q.    Would you go to page 14?

10                This line, "Countless meetings for ideas were

11    held every morning to avoid the Whirlpool storage bank

12    patent," what does that mean?

13    A.    We have every day countless meeting for a better idea,

14    and we avoid the Whirlpool patent, and we think that we

15    cooperate work with engineers, and that is great.

16                So we successfully designed around it, the

17    Whirlpool patents.

18    Q.    A few minutes ago you were testifying about the

19    problems and the resolution.  Did you ever get together with

20    folks, engineers at the Changwon plant to move forward on

21    commercialization?

22                THE COURT:  Rather than using a colloquial term

23    like "get together," which doesn't translate, probably, you

24    can use more precise English.

25                MR. COYNE:  Yes, Your Honor.

1   BY MR. COYNE:

2   Q.    You mentioned before the problems and resolution of

3   working with the engineers at Changwon.  Did you do that?

4   A.    We communicate with them.  So sometimes we talk with

5   them during our project.

6   Q.    Did you do any further projects with them?

7   A.    Yes, after we completed the first Bics project, then

8   we start the next project to support the making of this

9   technology commercialization, and also, though, we planned

10  to reduce the cost of this technology.

11            So we did the second project of the Bics.

12  Q.    Were you successful in reducing the cost of the

13  technology?

14  A.    From the second Bics?

15  Q.    Yes, sir.

16  A.    Yes, we did.

17  Q.    Can we go to DX-211, please, Mr. Brooks?

18            Dr. Lee, what is this document?

19  A.    This is the project completion report of the second

20  Bics project.

21  Q.    How much did that project cost, the second Bics

22  project?

23  A.    I have to see the patent of this project.

24  Q.    Mr. Brooks, can you go to the second page, in the

25  lower right-hand corner?

Myung Ryul  Lee - direct

1   A.    It reads .5 -- $500,000 for that.

2   Q.    Sir, can you go to page 63 of the document?

3         Dr. Lee, did you consider other different styles

4   of ice banks as a part of this project?

5   A.    No.  We focused consistently on the horizontal ice

6   bank, ice storage bin.

7   Q.    Did you consider different variations of the

8   horizontal ice bin?

9   A.    (After consulting with interpreter.)

10        THE INTERPRETER:  Alternatives?

11        MR. COYNE:  Or variations of the horizontal ice

12  bank, still being horizontal.

13        I will withdraw it.

14  BY MR. COYNE:

15  Q.    Did you consider any variations of a horizontal ice

16  bank, still keeping the auger horizontal?

17  A.    Yes.  We made some new ideas for the horizontal to be

18  more compact and cost-effective.

19  Q.    Mr. Brooks, will you bring up the original Korean page

20  next to this?

21        THE COURT:  Mr. Coyne, could you remove that

22  from the Elmo, please?

23        MR. COYNE:  I am sorry, yes.

24  BY MR. COYNE:

25  Q.    I believe it's page 27 of the Korean version and 63 of

Myung Ryul  Lee - direct

1    the English.

2                Were these some of the variations that you

3    considered?

4    A.    Yes.

5    Q.    Did you consider any of them, in your view as an

6    engineer, to infringe the '130 patent?

7    A.    There is no -- there is no branding infringe the

8    Whirlpool patent.

9    Q.    What time frame were these variations being

10   considered?

11   A.    It is between the Bics 2 project, between.

12   Q.    What dates?

13   A.    From the first of the -- January 2004 to December

14   2004.

15   Q.    Could you look at the one in the middle, sir?  How

16   much would this design have cost to implement?

17   A.    Cost?

18   Q.    Yes.  How much would it have cost you to go with this

19   design rather than the one that you went with?

20   A.    You mean the whole cost or --

21   Q.    The development cost.

22   A.    I cannot say how much, but it takes about several

23   months to develop it.

24                MR. COYNE:  Your Honor, I have no further

25   questions for the witness at this time.

Myung Ryul  Lee - direct

1            THE COURT:  Mr. Partridge, you may

2    cross-examine.

3            MR. PARTRIDGE:  Thank you, Your Honor.

4                CROSS-EXAMINATION

5    BY MR. PARTRIDGE:

6    Q.    Good morning, Dr. Lee.

7    A.    Good morning.

8    Q.    Dr. Lee, I want to begin with sort of where you left

9    off.  You talked about infringement and whether or not you

10   had a view -- you were asked a question about whether you

11   had a view about infringement.  Do you remember that

12   question?

13   A.    Yes.

14   Q.    It is true you have a number of U.S. patents of your

15   own.  Correct?

16   A.    Yes.

17   Q.    And it's true that you understand, when one looks at

18   the question of infringement, one looks at the claims of the

19   patent.  Correct?

20   A.    I cannot -- I cannot understand the claims or such a

21   thing.  But as an engineer, I have my own opinion for that,

22   this technology is the same with another one or not.

23           So this is my engineer opinion, not the claims

24   or not.

25   Q.    That wasn't really my question.  My question was, you

1    understand that the issue of infringement is decided based

2    on the claims.  I am not asking you to go into the claims.

3    I am just asking you if you understand that the question of

4    infringement is determined by the claims.

5    A.    I am saying that I understand the point of the

6    technology.  So when I look at the one technology, then I

7    understand what kind of technology it is.  And then I am

8    saying the infringing one or not is in point of the

9    technology as an engineer.  So it is somewhat different with

10   legal infringement or not.

11   Q.    So if I understand your answer to the question about

12   infringement that you just gave, it's based on being an

13   engineer and it may have nothing whatsoever to do with

14   whether or not there is actual infringement under the law.

15   Am I correct in understanding that?

16   A.    (Through the interpreter) Not that I profess to know

17   the law in any way.  I would believe that I am an engineer

18   with quite some experience in this respective area.  And as

19   such, I have a modicum of understanding myself.

20   Q.    Then I have to go back to the previous question I

21   asked you, which is a very simple one:  Do you understand

22   that the question of infringement is determined by the

23   claims as opposed to anything else in the patent?

24   A.    (Through the interpreter) I understand where you are

25   coming from, but what I am trying to tell you, sir, is I, as

Myung Ryul Lee - cross

1    an engineer, have a sufficient amount of knowledge in terms

2    of the engineering of it, and have made certain

3    determinations on my own, which is what I have told you

4    about.  If you would understand that part, as an engineer.

5    Q.    Let's see if we can get more specific here.  Let's go

6    to Defendants' Exhibit 8, Claim 1.  This is the '130 patent.

7    You will be able to see it on your screen.  Let's blow up

8    Claim 1.  Let's go down to the auger limitation.  "An auger

9    disposed"...

10             This is Claim 1 of the '130 patent which is

11   asserted in this case, Dr. Lee.  As I read this particular

12   limitation, and I will read it to you, it says, "an auger

13   disposed within the ice storage bin and drivingly connected

14   to the motor."

15             Would you agree with me that the word "vertical"

16   is not in the claim?

17   A.    (Through the interpreter) Lacking any legal knowledge

18   so as to render an interpretation as to this one particular

19   claim here, sir, I, by looking at this one particular

20   passage here, don't know that I am in any position to say

21   yea or nay as to whether this constitutes Whirlpool's patent

22   or not.

23   Q.    Would you agree with me, sir, that there is nothing in

24   this limitation in the claim that says excluding a

25   horizontal auger?  Am I correct?

Myung Ryul  Lee - cross

1   A.     (Through the interpreter) Given that I am not an

2   expert in patents, I don't believe that I am going to be

3   able to answer any of your questions concerning these

4   claims, given that I am not a legal professional.

5   Q.     Fair enough.  Let's turn to something else you

6   testified about.

7               We can take that down, Mr. Roberts.

8               You said that you didn't believe that LG copied

9   Whirlpool.  Do you recall giving that testimony?

10  A.     (Through the interpreter) Yes, definitely right.

11  Q.     When you gave that testimony, did you understand that

12  the question of copying concerns the subject matter of the

13  claims, not what is described in the specification?

14  A.     (Through the interpreter) Well, see, as I mentioned to

15  you earlier, I am an engineer with a lot of years of

16  experience in this particular field.  When comparing one

17  technology to another, and when I say that it's either the

18  same or not, and this is my opinion that I am trying to tell

19  you about, again, based upon my many years as an engineer.

20              I do want to fully emphasize the fact that this

21  is but my personal opinion on the matter.

22  Q.     Understood.  Fair enough.

23              Let's turn to something perhaps a little

24  simpler.  Let me see if I understand the facts correctly.  I

25  am going to ask you some questions about the Bics project.

Myung Ryul  Lee - cross

1          MR. PARTRIDGE:  (Addressing the interpreter)

2     Would you explain that to the witness?

3               THE WITNESS:  Yes.

4     BY MR. PARTRIDGE:

5     Q.    And the first Bics project concerned LG's building of

6     a side-by-side refrigerator.  Correct?

7     A.    Yes.

8     Q.    And during the course of that project you were aware

9     of the '130 patent, you were aware of Whirlpool's commercial

10    refrigerator, and you had in your laboratory the Whirlpool

11    commercial refrigerator to evaluate.  Am I correct on all

12    those points?

13    A.    Yes.

14    Q.    You mentioned that you had looked at patents or that

15    there had been a search done and that you had a collection

16    of patents as part of the Bics project.  Do you recall that

17    testimony?

18    A.    (Through the interpreter) What are you saying, that we

19    made as a result of conducting a patent search during the

20    Bics project?

21    Q.    You met with Dr. Il Shin Kim in December of 2002 to

22    discuss with him his idea for a refrigerator with an ice

23    system on the door.  Correct?

24    A.    Yes.

25    Q.    And during that meeting, Mr. Kim illustrated to you

Myung Ryul  Lee - cross

1    what he had in mind.  Correct?

2    A.    Yes.

3    Q.    And he told you that he had undertaken some patent

4    searches in connection with his work.  Correct?

5    A.    (Through the interpreter) Well, it wasn't something

6    that I said, right.

7    Q.    With respect to his patent searches, he told you that

8    sometime in the fall of 2002 he had found the Whirlpool '130

9    patent.  Correct?

10   A.    (Through the interpreter) Are you asking if I am aware

11   of what Mr. Kim had told me?

12   Q.    Yes.  In other words, just the general subject of

13   having done patent searches, as part of his work.

14   A.    (Through the interpreter) Do I know about that?  I am

15   not sure that I quite understand the question itself.

16   Q.    Let's go to DX-158.  We will put it up on the screen

17   for you.  If you would like a copy, I will give it to you.

18          Would you agree with me that the drawing on the

19   bottom of DX-158 is an illustration of what Mr. Kim

20   described to you at your meeting in September of 2002?

21   A.    (Through the interpreter) Yes, the left figure would

22   be correct, yeah.

23   Q.    And in the upper right-hand corner of the document,

24   there is a description -- just the upper right-hand

25   corner -- of the Whirlpool ice and water system, which was

1 Whirlpool's side-by-side refrigerator.  Correct?

2 A.    (Through the interpreter) I cannot quite make out the

3 shape of these figures.  I understand that it says

4 "Whirlpool" at the top, but I cannot tell personally whether

5 this is Whirlpool's or not.

6 Q.    Can we go to the Elmo?

7            This is a slightly better copy.  But whether you

8 can make it out or not, you agree in the upper right-hand

9 corner it describes the Whirlpool side-by-side refrigerator

10 with ice in the door.  Correct?

11 A.    (Through the interpreter) I cannot recognize just

12 seeing that picture, I cannot recognize it is Whirlpool or

13 not.

14 Q.    Looking at the upper left-hand side of this particular

15 page, you agree with me that the box labeled "Preexisting

16 Ice & Water System" is empty.  Am I reading that correctly?

17 A.    That part, the picture is empty, you are right.

18 Q.    Now, you mentioned during your testimony -- and I

19 don't have the exact words -- but you talked about your view

20 that there was something, I think you said unique, about

21 putting the ice maker on the door.  Do you recall testimony

22 along those lines?

23            Mr. Kim, if you will.

24 A.    Yes.

25 Q.    Let's turn to PTX-379.  Dr. Lee, if you would like a

1    copy of this exhibit, I am happy to hand it up.

2              Let's look at the description on the upper left,

3    the whole block on the upper left.  This is a Whirlpool

4    patent filed in December 1998.  The issue date on the top is

5    November 21st, 2000.  That is before you started the Bics

6    project.  Correct?

7    A.    Yes.

8    Q.    And if we go down to the abstract and we look at the

9    first two lines of the abstract, it reads, "A refrigerator

10   having a cabinet forming a freezer compartment having an

11   access opening.  A closure member is hinged connected to the

12   cabinet for closing the access opening and an ice maker is

13   mounted on the closure member."

14             Do you see that language?

15   A.    Yes.

16   Q.    Let's go to Figure 1 of the patent.  Here we have a

17   depiction of a refrigerator in Figure 1.  Do you follow me

18   so far?

19             MR. COYNE:  Your Honor, may we approach sidebar?

20             THE COURT:  Sure.

21             (The following took place at sidebar.)

22             MR. COYNE:  Your Honor, I am sorry to interrupt.

23   I was hoping this was going to be impeachment, then I

24   wouldn't have needed the exhibits.  We had an agreement to

25   exchange the exhibits, and I got no cross exhibits.  I am

Myung Ryul   Lee - cross

1     trying to follow along without the original documents.

2                    MR. PARTRIDGE:  I am happy to give them

3     documents.  We specifically talked about whether we were

4     going to exchange cross exhibits and we decided that we

5     weren't.  In the second pretrial conference or just before

6     the start of this trial, Mr. Coyne raised that issue.  I

7     argued that we shouldn't have to do that.  And we agreed.

8                    MR. COYNE:  We have been doing that with every

9     witness until now.

10                   MR. HERRMANN:  We have been exchanging cross

11    notebooks at the time the witness is being crossed, not in

12    advance.  We didn't get a cross notebook for this gentleman,

13    except for impeachment.

14                   MR. COYNE:  For example, I don't know if there

15    is --

16                   THE COURT:  It is not to anybody's benefit if

17    your opponent can't follow.

18                   MR. PARTRIDGE:  I have copies and I neglected to

19    hand them to him.

20                   THE COURT:  Why don't you do that.

21                   (End of sidebar conference.)

22                   MR. PARTRIDGE:  May I approach, Your Honor?

23                   THE COURT:  Yes.

24    BY MR. PARTRIDGE:

25    Q.    Dr. Lee, I hadn't intended to go very far with this.

Myung Ryul   Lee - cross

1   But as you can see, if you open up that patent to Figure 1,

2   you will see there is a refrigerator and you will see

3   element 22 at the top of the refrigerator door.  Do you see

4   element 22?

5   A.     Yes.

6   Q.     And if you look at the patent specification, and we

7   have blown up for you the description of the preferred

8   embodiment, and in the second paragraph it identifies

9   element 22 as an ice maker.  Do you see that?

10  A.     Yes.

11  Q.     In the various patent searches that were undertaken by

12  LG during and before the Bics project, did you come across

13  the Whirlpool patent that has an ice maker on the door,

14  which you described as unique to LG?

15  A.     (Through the interpreter) Sir, I had previously given

16  you a sort of technical explanation, and it was not that the

17  placement of the ice maker on or in the door itself was

18  unique.  Rather, in going about so placing an ice maker on

19  or in the door, we had pulled off something unique in the

20  sense of preventing the spillage of water.  And hence, my

21  earlier testimony about the aid or, say, seven items of

22  technology that we had uniquely developed.

23  Q.     Thank you, Dr. Lee.  That helps clarify the testimony.

24  I appreciate that.

25         Turning to Hitachi for one brief moment.  You

Myung Ryul   Lee - cross

1   mentioned that, I think you said that the auger could be

2   horizontal, side-by-side, or front-to-back.  Did I

3   understand you to say that you had considered augers in both

4   positions?

5   A.    Yes.

6   Q.    And Hitachi publication that you talked about earlier

7   had the auger side-to-side.  Correct?

8   A.    (Through the interpreter) Yes, it was horizontally

9   placed.

10   Q.    But it was side-to-side?

11   A.    (Through the interpreter) Well, the thing is, the

12   notion as to side-by-side or side-to-side, that all depends

13   on from which perspective you are looking at things.  What

14   is definitely the case here is it was horizontal.  By

15   horizontal we are talking about horizontal relative to a

16   certain plane.  When it moves along a certain plane,

17   together with a plane, the plane being a plane surface, that

18   is -- that is what I mean by "horizontal."  When you say

19   side-by-side, it all depends on the, say, location from

20   which you are looking at it.

21   Q.    This is a yes-or-no question or you can decline to

22   answer it, Dr. Lee, whichever you choose.

23        It is true that you did not continue with the

24   side-by-side configuration in the Hitachi publication that

25   you discussed earlier today.  You reoriented the auger.  Is

1    that correct?

2    A.    (Through the interpreter) Well, the sort of Hitachi

3    patent that I have in mind when I think about that is one in

4    which the movement is horizontal.  Whether it is

5    side-by-side or front or back, that is not important.  The

6    fact is, it's horizontal, and what we did was to use the

7    Hitachi patent as is.

8    Q.    Let's go to Defendants' Exhibit 187.  This exhibit

9    corresponds, for the benefit of the jury, I think there were

10   two numbers for this.  We will have to go with 187 because I

11   don't know what the other number is at the moment.

12         This is the draft -- what you called the draft

13   completion report from December of 2003, correct?

14   A.    (Through the interpreter) Yes, that is right.

15   Q.    Let's go to the page that you discussed with Mr.

16   Coyne, page 774.  And let's pull up the language that

17   concerns "a dispute is expected when product is developed.".

18         You discussed this with Mr. Coyne earlier this

19   morning, correct?

20   A.    (Through the interpreter)Yes.

21   Q.    Let's put up, if we can, next to it the conclusion

22   from what you called the final report, the statement you

23   also discussed with Mr. Coyne concerning your view that you

24   had done something different than the Whirlpool patent.

25   This is your PTX-381, and the first document was your

Myung Ryul  Lee - cross

1    PTX-382.

2              Let's go to page 714 of the second of these

3    documents.  Let's highlight the language, "We were

4    successful in avoiding the existing Whirlpool's patent layer

5    in bank area."

6              Do you see that?

7    A.    (Through the interpreter) Yes.

8    Q.    And you agree that between the first draft and the

9    final report, the design remained the same.  Correct?

10   A.    (Through the interpreter) Yes.

11   Q.    Dr. Lee, am I correct that the second statement was

12   written by you precisely because you expected a dispute with

13   Whirlpool and that was a convenient way for you to change

14   the final report to not reflect your expected dispute?

15             MR. PARTRIDGE:  Please translate.

16   A.    (Through the interpreter) Sir, if I may explain to you

17   the relevant passage that is part of that draft version.

18   Basically, we start off here by first talking about how we

19   selected for ourselves a number of countries.  With respect

20   to which countries, we conducted a patent search, and upon

21   actually coming across patents, we saw that Whirlpool had

22   lots of patents.  They had a number of patents there.

23   Whereas this further states that a dispute is anticipated.

24             If you will look at Section 3, we then set forth

25   a means of resolving these things.  And it basically states

Myung Ryul  Lee - cross

1    that we ought to design around these patents.

2              And No. 4, as such, we, LG, would come to file a

3    number of patents, and that was basically how we steered

4    around, how we designed around.  And it as such entails this

5    overall process, if you will.

6              So going back to the parenthetical No. 2 section

7    here, and it first basically it talks about how upon

8    conducting lots of patent searches, and analyses, it sets

9    forth the results thereof, but those, mind you, are not our

10   ultimate conclusion.  Time-wise, it wasn't -- period-wise,

11   it wasn't.

12   Q.    Thank you, Dr. Lee.

13             Last question.  I have reviewed carefully and

14   had my team review carefully both the final completion

15   report and the draft completion report.  And I found nothing

16   in either report that suggests that the '130 patent was

17   invalid, even though you had the Hitachi publication in your

18   possession.

19             My question to you is simply this, and this is a

20   yes-or-no answer:  Do you have any reason to dispute my

21   reading of these documents?

22             Dr. Lee, if you need to review them, in order to

23   answer my question, you can do that on Mr. Coyne's time.  My

24   question is whether you, sitting there right now, have any

25   reason to dispute my statement.  You either do, or you

Myung Ryul  Lee - cross

1    don't, or you don't know.  Which is it?

2    A.    (Through the interpreter) All right.  In answer to

3    you, I do not agree with you.  And I have sufficient reason

4    not to agree with you.

5              MR. PARTRIDGE:  Very well.  That ends my

6    questioning, Your Honor.

7              THE COURT:  Mr. Coyne, you may redirect.

8              MR. COYNE:  No questions, Your Honor.

9              THE COURT:  Thank you, Dr. Lee.  You are

10   excused.

11             (Witness excused.)

12             THE COURT:  We will take our morning break,

13   ladies and gentlemen.

14             (Jury leaves courtroom at 10:57 a.m.

15             THE COURT:  Counsel, where are we on the most

16   recent iteration on the parties' proposed jury instructions?

17             MR. HERRMANN:  Your Honor, I hope we might have

18   something to submit to the Court at the end of this break.

19             THE COURT:  Counsel, you had the entire weekend.

20   I would expect that.  You have had multiple hands on deck to

21   deal with this.  It is going to be at the end of the day

22   just me and my law clerk having to resolve these issues.

23   And I don't want to do it under undue time pressure.  Am I

24   clear on that?

25             That is all I need to hear on that, Mr.

```
 1    Herrmann.  We will recess.

 2                   (Recess taken.)

 3                   THE COURT:  Ms. Walker.

 4                   Counsel, thank you.  I have gotten the most

 5    recent iteration, Exhibit 1, I guess it's (ii).  Then I

 6    received LG's submittal.

 7                   (Jury enters courtroom at 11:27 a.m.)

 8                   THE COURT:  Okay, ladies and gentlemen.  Please

 9    take your seats.

10                   Mr. Sharma, you have the next witness.

11                   MR. SHARMA:  Thank you, Your Honor.  I do.  LG

12    would like to recall as its next witness, refrigerator

13    expert Dr. Warren Bessler.

14                   Your Honor, we have also provided to Ms. Walker

15    some direct witness binders.

16                   THE COURT:  Yes, I have them.

17                   ...Warren Bessler, having been previously sworn

18    as a witness, was examined and testified further as

19    follows...

20                        DIRECT EXAMINATION

21    BY MR. SHARMA:

22    Q.    Good morning, Dr. Bessler.

23    A.    Good morning.

24    Q.    Were you in court during Dr. Karvelis's testimony

25    concerning the invalidity of the claims of the '121 patent?
```

Bessler - direct

1   A.   Yes, I was.

2   Q.   Did you agree with his opinions?

3   A.   No, I did not.

4   Q.   Why not?

5   A.   I believe that his opinions regarding the invalidity

6   of the '121 patent were not correct.  I believe it's a valid

7   patent because there is some prior art out there,

8   particularly the Hitachi '165 patent and also --

9   Q.   Dr. Bessler, just to stop you.  Let's take a step

10  back.  I am talking about LG's '121 patent.

11  A.   I am sorry.

12  Q.   Do you recall that?

13  A.   Yes.

14  Q.   What is that about?

15  A.   That is about a rotating spigot and automatic

16  mechanism for presenting that spigot and a sliding tray.

17  Q.   So let's go back.  I was asking you about Dr.

18  Karvelis's opinions on invalidity and whether you agree with

19  them or not.  Do you recall?

20  A.   Yes.

21  Q.   Do you agree with them?

22  A.   No, I do not.

23  Q.   And why not?

24  A.   Because I believe that LG was the first to come up

25  with the idea of combining a rotating spigot and a sliding

1    tray in a mechanical mechanism.  They were the first ones to

2    come up with the idea, they were the first ones to file a

3    patent application, and they were the first ones to get a

4    patent on those three ideas.

5    Q.    What do you base that opinion on?

6    A.    I base that opinion on my work in reviewing that

7    patent.  I have looked at the claims from that patent, and I

8    believe that their documents were valid.

9    Q.    Dr. Bessler, when did LG first conceive of the idea

10   for a removable spigot and an extendable tray and a

11   mechanical drive mechanism?

12   ███      ███████████████████████████████████████████

13   ████████████████████████████████████████

14   Q.    When did Whirlpool first have that idea of combining a

15   movable spigot and extendable tray and mechanical drive?

16   A.    I think Whirlpool, their first idea of that was when

17   their customer, Sears, had had a meeting with them.  I think

18   that was about April of '04.  And Sears asked them if they

19   could put together a concept with the mechanical drive

20   operating the spigot and a sliding tray.

21   Q.    What about Whirlpool's 2002 prototype, what features

22   did that include?

23   A.    Their 2002 prototype did not have a mechanical drive

24   and it did not have a rotating spigot.

25   Q.    How about Whirlpool's 2003 prototype?

Bessler - direct

1    A.    If I recall from what Mr. Voglewede said, the 2003

2    prototype did not have a mechanical drive.

3    Q.    Do you recall Mr. Voglewede's invention sheets?  I

4    believe they were PTX-709 and PTX-708.  They are tabs 2 and

5    3 of the binder.

6            Mr. Brooks, if we could put them up on the

7    screen.  Thank you.

8    A.    Tabs 2 and 3?

9    Q.    Tabs 2 and 3, PTX-708 and PTX-709.

10   A.    Yes, I recall those invention sheets.

11   Q.    What did they tell you?

12   A.    Well, those invention sheets were explaining a record

13   of the Whirlpool invention.  What I found was they had two

14   dates on that were quite different.  If you could blow that

15   up.

16           Can I use my pointer from here?  Let's see.

17   Does that work?  Yes.

18           Okay.  They had a typed-in date of conception

19   here, which is the -- I think it says March 2001.  And then

20   down here, they have some signatures of the witnesses, where

21   it says that it's preferable that they witness this

22   invention when it was first disclosed.  And those signatures

23   are like June of '03, which is more than two years from when

24   the typed-in date of conception is.

25   Q.    Based on your experiences, how soon into a project

Bessler - direct

1    would you prepare an invention disclosure sheet?

2    A.    Based on my experiences at the GE labs, when we had an

3    invention, we made every effort to get that recorded --

4              THE COURT:  Let's see counsel.

5              (The following took place at sidebar.)

6              THE COURT:  Are you content with this testimony?

7              MR. SPEARS:  I don't think it's going anywhere.

8    But being I think it's proper.

9              THE COURT:  You don't think it's testimony with

10   which you may have to contend?

11             MR. SPEARS:  I don't think it is going to be

12   terribly effective in front of the jury.

13             THE COURT:  Do you think it's admissible under

14   the rules?

15             MR. SPEARS:  I do not think it's admissible.

16             THE COURT:  Why aren't you participating in

17   raising an objection, counsel?  You think this witness'

18   opinion and testimony as to what they did at GE is pertinent

19   to his opinion that he has provided with regard to the

20   validity of this patent?

21             MR. SPEARS:  No, not at all.  And I will take a

22   more active profile in my objections with this witness.

23             (End of sidebar conference.)

24   BY MR. SHARMA:

25   Q.    I apologize, Dr. Bessler.  Could you finish your

1 answer, please?

2 A.    When I was working at the GE labs, if we came up with

3 a new idea or invention, it was key for us to record that

4 invention in our patent notebook as soon as possible.  By

5 that I mean a few days after coming up with the patent.  And

6 when we did that, we would have our witnesses sign in the

7 patent notebook.

8          That was because of a couple reasons.  First, as

9 an engineer you would want to get credit for your ideas and

10 document your timeline, and also for the company to help

11 protect their invention dates as well.

12 Q.    Dr. Bessler, do you recall in Dr. Karvelis's testimony

13 him indicating that the Patent Office did not have any

14 information about Whirlpool's advanced dispenser prototype?

15 A.    Yes, I remember him saying that.

16 Q.    Why did the Patent Office not have information about

17 Whirlpool's advanced dispenser?

18 A.    I believe Whirlpool did not share that with the Patent

19 Office.  They kept it to themselves.  It was a secret.

20 Q.    Now, Dr. Bessler, let's shift to tab 4 of your binder,

21 DX-570.

22          If we could pull that up on the screen, Mr.

23 Brooks.

24          If you could confirm, once you get there, this

25 is the Kim reference Dr. Karvelis was talking about.

Bessler - direct

1    A.    Yes, I do.

2    Q.    Do you know whether LG knew about this reference when

3    it filed the '121 patent?

4    A.    I don't believe they knew about this reference.

5    Q.    Do you recall Dr. Karvelis's opinions about the Kim

6    reference?

7    A.    Yes.  I think he used that in his invalidity

8    arguments.

9    Q.    Did you agree with his opinions?

10   A.    No, I did not.

11   Q.    Why not?

12   A.    Well, if you look at the Kim reference, there is a

13   couple of figures, maybe we could pull up --

14   Q.    Figures 5 and 6?

15   A.    Yes.  Figure 5.

16   Q.    Can you please explain what we are looking at here,

17   Dr. Bessler?

18   A.    Yes.  This is a schematic of a Kim reference.  In

19   general terms, it shows a dispensing nozzle here, which is

20   kept inside the refrigerator.  And then what happens is

21   the -- this is the front of the refrigerator here -- the

22   customer would push the button in for water delivery, and

23   when he does that it extends the spring here, loads the

24   spring up.  And then the dispenser comes forward through the

25   refrigerator out the front of the refrigerator door.  And it

Bessler - direct

```
 1    stays there as long as he keeps his hand on the button, and

 2    water comes out of here.

 3              When the customer releases the button, then the

 4    spring pulls the -- or retracts the nozzle back into the

 5    refrigerator.

 6    Q.    Now, is the water spigot in the Kim reference biased?

 7    A.    The spigot in this invention is biased to stay inside

 8    the refrigerator door.  By that what I mean is that

 9    normally, in its rest position, it's inside the door.  In

10    order to make it come out, you have to put a force on the

11    spring and push your button in and extend the spring to hold

12    it there.

13    Q.    What relevance, if any, does the biasing of the spigot

14    in the Kim reference have in relation to the '121 patent?

15    A.    That type of arrangement is actually directly opposite

16    from the mechanism in the '121 patent.

17              In the '121 patent, when you release the catch,

18    the spring actually supplies a force to the dispenser and it

19    rotates it out to you automatically.  So it's exactly the

20    opposite type of bias.  It's biased to open in the '121

21    patent.

22    Q.    Are you aware of any other distinctions between the

23    Kim reference and the '121 patent or Whirlpool's advanced

24    dispenser prototype?

25    A.    Yes.  I mean, there are some other distinctions.  The
```

Bessler - direct

1   Whirlpool dispenser prototype and also the '121 patent are

2   all about providing the customer with some convenience in

3   that he is able to fill large containers hands-free.   In

4   this type of device, there is no way to do that because you

5   have to hold your hand on the button to keep the spigot out

6   there.   And there is no tray, extendable tray to put any

7   large containers on.

8           Another thing is, I think the intent of the '121

9   patent and also the advanced dispenser is to provide some

10  extra space in the freezer by making the cavity for the

11  dispenser as small as possible.   And they get that by

12  allowing the spigot to rotate out to the customer.

13          This device is pretty large and cumbersome.

14  It's got a lot of gears and a bellows, valve.   I would

15  expect this to take up a lot of space.

16  Q.   Do you recall Dr. Karvelis's testimony where he may

17  have indicated that the use of springs were primitive?

18  A.   Yes, I do.

19  Q.   Do you agree that springs were primitive in the

20  context of refrigerator dispensers in 2003?

21  A.   Well, I mean, I agree with Dr. Karvelis that springs

22  are a well-known mechanical component.   But what I think was

23  going on there was that Dr. Karvelis was using some

24  hindsight as far as it relates to refrigerator designs and

25  springs and dispensers.

Bessler - direct

1   Q.     Could you please explain what you mean by "hindsight"?

2   A.     Well, there is an expression, you know, hindsight is

3   20/20.  In the patent, you can't use hindsight to say that

4   something was obvious.  In other words, back in the time of

5   invention, 2003, nobody had come up yet with the idea of

6   using a spring to power an automatic dispensing mechanism.

7   So you really can't say that it was an obvious idea.

8   Q.     Are you aware of any other examples of springs in

9   hindsight analysis?

10  A.     Well, I have an example of my own that I like, which

11  is, if you just look at these types of pens that everybody

12  has, a ballpoint pen with a click mechanism to push the pen

13  in and out from the housing, that type of spring mechanism,

14  in hindsight, looks very obvious.  You look at that and

15  think, you know, anybody could think of that.  But the truth

16  is, before they had springs in pens, nobody had come up with

17  that idea, and whoever did went ahead and got a patent on

18  it, and it became a huge commercial success.

19  Q.     Dr. Bessler, I would like to shift and talk about

20  Whirlpool's '130 patent.

21  A.     Okay.

22  Q.     Have you been asked to give any opinions with respect

23  to Whirlpool's '130 patent?

24  A.     Yes, I have.

25  Q.     What opinions were you asked to provide?

Bessler - direct

1    A.     For the '130 patent, I was asked to provide an opinion

2    on the validity of that patent and also whether LG's

3    refrigerators infringed the '130 patent and whether the

4    refrigerators willfully infringed that patent.

5    Q.     Dr. Bessler, what did you review in the context of the

6    '130 patent?

7    A.     In my work on the '130 patent, I obviously looked at

8    the patent and the claims that Whirlpool was asserting.  I

9    looked at the file history of the patent.  And I looked at

10   the prior art that existed.  I reviewed Whirlpool documents,

11   LG documents.  And I also read testimony from the inventors.

12   Q.     Did you also review the Judge's claim construction?

13   A.     Yes, I did.

14   Q.     How much time did you spend?

15   A.     I spent a lot of time on that.  I would say, if I

16   added it up, several months looking at the '130 patent.

17   Q.     If you could please turn to tab 1 of your second

18   binder.  This is PTX-9, the '130 patent.

19          Mr. Brooks, if we could place it on the screen.

20          Briefly, Dr. Bessler, what is the '130 patent

21   about?

22   A.     I think in a nutshell the '130 patent is about placing

23   an ice maker in a freezer cabinet and placing an ice storage

24   bin with a motorized auger on a freezer door.

25   Q.     In the '130 patent, where is the ice maker located?

Bessler - direct

1  A.    In the '130 patent, the ice maker is located in the

2  freezer cabinet.

3  Q.    Does the '130 patent describe any other locations for

4  the ice maker?

5  A.    No.  As far as I can see, reading this patent, it

6  doesn't describe any ice makers located on a freezer door or

7  on a fresh-food door.

8  Q.    Dr. Bessler, were you in the courtroom during Dr.

9  Manny Lee's testimony early today?

10 A.    Yes, I was.

11 Q.    I would like to show you an exhibit from his

12 testimony.  It's PDX-171.  I am going place it on the Elmo.

13 A.    Okay.

14 Q.    Do you recall Dr. Lee's testimony about PDX-171?

15 A.    Yes, I do.

16 Q.    Are these challenges that LG faced in placing the ice

17 maker on the door?

18 A.    I would agree that those are definitely challenges for

19 placing an ice maker on a door, yes.

20 Q.    Are any of those challenges discussed in the '130

21 patent?

22 A.    From what I remember, in reading that patent, no,

23 those things are not mentioned.

24 Q.    Any solutions to these challenges, were any discussed

25 in the '130 patent?

1   A.     No, I don't think so.  As I said, that patent is

2   really concerned with mounting the ice maker in the freezer

3   cabinet.

4   Q.     Dr. Bessler, I would like to talk to you about

5   Whirlpool's infringement claims.  Do you see the LG

6   French-door refrigerators that are accused of infringement

7   in the courtroom today?

8   A.     Yes, I do.

9   Q.     Can you point them out, please?

10  A.     Yes, the refrigerators right there, the stainless

11  steel.

12  Q.     Are you identifying DPX-22?

13  A.     Yes.

14  Q.     Now, can you just briefly describe how LG's

15  French-door refrigerators compare to a side-by-side

16  refrigerator?

17  A.     Yes, I can.

18          Your Honor, if it's okay, can I go over to the

19  refrigerator?

20          THE COURT:  Yes.

21          THE WITNESS:  Okay.  I think I am going to take

22  the claim constructions over there, too.

23          MR. SHARMA:  Your Honor, would it be okay if Dr.

24  Bessler is miked?  I think I am going to have Dr. Bessler

25  over there for a few questions.

Bessler - direct

1    THE COURT:  He can be miked.

2    (Witness steps down from stand.)

3    BY MR. SHARMA:

4    Q.    Dr. Bessler, if you could just briefly describe how

5    this LG French-door refrigerator compares to a side-by-side

6    refrigerator?

7    A.    Sure.  The French-door refrigerator is called a

8    French-door refrigerator because up here there are two doors

9    that open, just like a set of French doors that you might

10   have in your house.

11        And up top here is a fresh-food cabinet, where

12   you put your regular food items at fresh-food temperature.

13   That cabinet is closed by these two doors.  These would be

14   fresh-food doors.

15        Then down here you have a bottom-mount freezer.

16   And in here is where your frozen foods are placed.  This is

17   below-freezing temperatures.  That's the freezer cabinet.

18   Then this door here is the freezer door.

19   Q.    Dr. Bessler, did you hear Dr. Caligiuri's opinions on

20   infringement by LG's French-door refrigerators?

21   A.    Yes, I did.

22   Q.    Did you agree with him?

23   A.    No, I did not.

24   Q.    Why not?

25   A.    In the French-door refrigerator, the claims require

Bessler - direct

1    that there is --

2    Q.    Maybe we should pull up the claims.

3    A.    Yes.

4    Q.    PTX-9.  If you can go to Claim 1, Mr. Brooks.

5    A.    Okay.  Claim 1 is one of the -- is the independent

6    claim that is being accused of infringement.  And that claim

7    has some language --

8    Q.    I am having a little difficulty hearing you, Dr.

9    Bessler.

10   A.    Is that any better?

11   Q.    Yes.

12   A.    This is Claim 1, so what I was talking about was there

13   is some language in here that is required in order to

14   infringe Claim 1.  And one of those first things is "an ice

15   maker disposed within the freezer compartment."  And as you

16   can see down here, there is no ice maker --

17              MR. SPEARS:  Objection.  Irrelevant, Your Honor.

18              THE COURT:  Sustained.

19   BY MR. SHARMA:

20   Q.    Dr. Bessler, let's look at the first element.  "An ice

21   maker being disposed within the freezer compartment for

22   forming ice pieces."

23   A.    Yes.

24   Q.    Is that claim language found anywhere in DPX-22, LG's

25   French-door refrigerator?

Bessler - direct

1   A.    No, I don't believe it is.

2              MR. SPEARS:  Same objection.

3              THE COURT:  Same ruling.  I previously discussed

4   the Court's views on this particular line of inquiry, Mr.

5   Sharma.  To be fair to you, I don't think you were at

6   sidebar when I think -- I think it was at sidebar.

7              MR. SHARMA:  Could I have one moment, Your

8   Honor?

9              THE COURT:  Sure.

10             MR. SHARMA:  I wasn't thinking.

11             (Pause.)

12  BY MR. SHARMA:

13  Q.    Dr. Bessler, let's then look at the next element of

14  the claim, "an ice storage bin"...  Do you see that

15  language?

16  A.    Yes.

17  Q.    "Ice storage bin mounted to the closure member below

18  the ice maker for receiving ice from the ice maker."

19  A.    Yes.

20  Q.    Does that language have a structure in the LG

21  refrigerator, DPX-22, or its equivalent?

22  A.    No, I don't believe so.  That claim language to me

23  states that you need an ice storage bin mounted to the

24  closure member --

25             MR. SPEARS:  Same objection.

Bessler - direct

1    THE COURT:  Let's see counsel at sidebar.

2    (The following took place at sidebar.)

3    THE COURT:  Mr. Spears, let's be fair, for Mr.

4    Sharma's benefit.  Let me have you articulate the objection.

5    MR. SPEARS:  Dr. Bessler keeps on returning to

6    the lower freezer compartment, which is not what we contend

7    to be the freezer compartment.

8    What we need for him to do is to apply the

9    Court's claim construction as opposed to LG's commercial

10   designation to the actual structure that we are accusing of

11   infringement.

12   THE COURT:  Do you understand the import of his

13   objection?

14   MR. SHARMA:  I do, Your Honor.

15   THE COURT:  I have already ruled on this, by the

16   way.  I think Mr. Coyne understands the ruling.

17   MR. COYNE:  Yes, Your Honor.

18   THE COURT:  So you need to adjust.

19   MR. SHARMA:  Whirlpool's point is there are two

20   freezer compartments in this refrigerator.

21   MR. SPEARS:  That is not Whirlpool's point at

22   all.  We don't give a damn about that.  Just direct your

23   witness to what we are actually accusing of infringement.

24   MR. SHARMA:  We know each other well enough.

25   You don't have to treat me like that.

Bessler - direct

1    THE COURT:  I appreciate the zealous advocacy,

2    but to the point.

3         (End of sidebar conference.)

4    BY MR. SHARMA:

5    Q.    If we could pull back up PTX-9, Claim 1.

6         Dr. Bessler, where is the ice maker and ice bin

7    located in LG's French-door refrigerator?

8    A.    LG's French-door refrigerator, in there, the ice maker

9    and the ice bin are located on the fresh-food door, the left

10   fresh-food door.

11   Q.    Is that a freezer compartment, in your opinion?

12   A.    No.  In my opinion, this is not a freezer compartment.

13   Q.    Can you please explain?

14   A.    Sure.  When you consider a freezer compartment, the

15   thing I used was the claim construction as construed by

16   Judge Sleet.  So I don't know if we can put that --

17   Q.    Tab 20 is the Judge's claim construction.

18   A.    Okay.  If you could just expand that a little bit.

19         When I read this claim construction here, it

20   says that a refrigerator includes a freezer compartment

21   having an access opening and a closure member for closing

22   that access opening.  Then it goes on to say that is

23   construed by the Court to mean a refrigerator including a

24   section of the refrigerator cabinet kept at a below-freezing

25   temperature.

1    Now, my understanding is, being a refrigerator

2    engineer, that this outside piece that goes all the way

3    around here is what we call refrigerator cabinet.  And down

4    here there is a section of that cabinet that's kept at or

5    below freezing temperature.

6    So I would consider this down here to be the

7    freezer cabinet.

8    MR. SPEARS:  Objection.  Completely irrelevant.

9    THE COURT:  We should meet on this again.

10   (The following took place at sidebar.)

11   THE COURT:  Mr. Spears, I am not so sure that I

12   agree.  I think we say applying the Court's claim

13   construction as one of skill in the art would.  I think

14   that's all we can require of him.

15   MR. SPEARS:  Fair enough.

16   (End of sidebar conference.)

17   THE COURT:  You may proceed, Mr. Sharma.

18   BY MR. SHARMA:

19   Q.    I apologize for interrupting.  If you could start from

20   the beginning, we can pull back up the Judge's claim

21   construction.

22   A.    Sure.  What I was trying to explain was that in

23   looking at the claim construction for what a freezer

24   compartment is, the statement there talks about a

25   refrigerator including a section of the cabinet kept at a

 1    below-freezing temperature.  So this being the cabinet back

 2    here, and here is a section of the cabinet at a

 3    below-freezing temperature.

 4              THE COURT:  Doctor, make sure you are explaining

 5    on the record, when you say "here," what you mean.

 6              THE WITNESS:  Sure.  In the lower portion of the

 7    cabinet is where I am pointing to.  That is a section that's

 8    below freezing temperatures.  So I consider that a freezer

 9    cabinet.

10              Now, it also says that it has an opening that

11    provides access, which is right here, the opening I am

12    pointing to, around the edge of the cabinet, the lower

13    portion of the cabinet.  And I would say that that is the

14    access opening, to get access into the interior of the

15    freezer cabinet.

16              Then there is a closure member, that is the next

17    part, which allows access to this opening.  So the closure

18    member is actually this element right here that closes the

19    access opening.  And I would call that the freezer door.

20    Q.    Dr. Bessler, there is a footnote 1.  What does that

21    footnote 1 refer to?

22    A.    Yes, that is a very important footnote.  Footnote 1

23    relates to this construction, and it says, "In making its

24    ruling, the court concludes that the closure member is part

25    of the freezer compartment."

Bessler - direct

1    So I believe what that says is, if you look at

2    this cabinet down here, the freezer cabinet, and you look at

3    the freezer door, that together, they form the freezer

4    compartment.  That's my understanding of the claim

5    construction.

6    Q.   How does the claim construction apply to where LG has

7    its ice maker and ice bin?

8    A.   Okay.  LG has its ice maker and its ice bin located

9    here on the fresh-food door.  Just like we had the freezer

10   compartment up here, there are two fresh-food doors, and

11   they close the access opening here to the refrigerator

12   cabinet.  And this refrigerator cabinet is actually a

13   section of the cabinet that's kept at fresh-food

14   temperatures.

15   So I call this a fresh-food cabinet.  I call

16   these two doors fresh-food doors.  And I call this whole

17   part up here the fresh-food compartment.

18   Q.   Dr. Bessler, in your opinion, is the French food door

19   that has the ice maker in LG's refrigerator, is that a

20   freezer compartment, under the Court's claim construction?

21   A.   No, I don't believe this is a freezer compartment.

22   Q.   Is it a freezer door?

23   A.   No, I don't believe it's a freezer door.  I believe

24   it's a fresh-food door.

25   Q.   Are you aware of anything that supports your opinion?

Bessler - direct

1    A.    Yes.  I am aware that Whirlpool and the patent

2    examiner agreed that when you have an ice box like this

3    mounted on a fresh-food door, that that is not a freezer

4    compartment.  And this is not a freezer door.

5              There was a prior art reference, I believe it

6    was Gould, that had a structure similar to this ice box.

7    And when Whirlpool and the examiner looked at that, they

8    said that that structure was mounted on a fresh-food door,

9    like this one, and that that refrigerator was a freezerless

10   refrigerator.

11   Q.    Now, Dr. Bessler, I would like for you to assume, if

12   you can assume that Dr. Caligiuri is correct, and where LG

13   places its ice maker in this fresh-food door, if that is the

14   claimed freezer compartment, how would that affect your

15   conclusion of no infringement of LG's French-door

16   refrigerators?

17   A.    I still believe that LG's refrigerators would not

18   infringe the Whirlpool patent even if hypothetically this

19   was a freezer compartment.

20   Q.    Could you please explain?

21   A.    Yes.  If we can go back to the claim language of Claim

22   1.

23              Claim 1 has some claim language in it where it

24   talks about "an ice storage bin mounted on a closure

25   member."  Then it talks down here about "a motor mounted on

Bessler - direct

1  the closure member; and an auger disposed within the ice

2  storage bin."

3           So all of these things would be mounted to a

4  closure member.

5           Now, in this case that closure member is the

6  closure member of the freezer compartment.

7           So, if, hypothetically, we call this a freezer

8  compartment, which I don't think it is, but let's say we

9  call this a freezer compartment, then right here, where the

10 green tape is, it's still up there, this would be considered

11 the access opening to the freezer compartment.  And then

12 this here I would consider the closure member.  This closes

13 the access opening to the freezer compartment.  So this is

14 the closure member for the freezer compartment.  And I am

15 looking at the claim language, which requires that we have a

16 motor, an auger, and an ice storage bin mounted to this

17 closure member.  And I don't see anything mounted to it.

18 Q.   What effect does that have on whether this LG

19 French-door infringes, even under Dr. Caligiuri's --

20 A.   What that says is this doesn't meet the claim language

21 of Claim 1, so it would not infringe.

22 Q.   Did you hear Dr. Caligiuri's opinions on the doctrine

23 of equivalents and his views as to whether LG's

24 refrigerators infringe under doctrine of equivalents?

25 A.   Yes, I did.

Bessler - direct

1   Q.    Did you agree with them?

2   A.    No, I did not.

3   Q.    Why not?

4   A.    This cabinet right here, this section right here,

5   which I call an ice box, this keeps the temperature below

6   freezing.  But I think it does it in a substantially

7   different way than the way this compartment down here is

8   kept below freezing.

9            The reason I state that is because this is

10  normally in a temperature above freezing.  So in order to

11  keep ice in this compartment --

12            THE COURT:  You are talking about the fresh-food

13  section?

14            THE WITNESS:  Yes, this section here is normally

15  above freezing.  So in order to keep this ice frozen in

16  here, first we need to provide an insulated storage box.

17  Then we need to bring some air from the freezer compartment,

18  or from the evaporator down here, the refrigeration system,

19  we have to bring air from that evaporator up, supply it to

20  this cabinet through these door seals, which come -- the

21  cold air comes up through some special ducts that they have

22  in the side of the refrigerator here.  And that freezer air,

23  from the evaporator, comes up from this supply into this

24  seal into this frozen compartment, the ice compartment, and

25  then back down again to the evaporator, or to the freezer

1    section.

2              That type of supply is controlled by a control

3    system primarily for making ice.

4              Now, an ice control system, to make these ice

5    cubes here, is based on temperatures primarily for efficient

6    ice-making and for rapid ice-making.  Those type of

7    temperatures are not really controlled for fresh-food

8    preservation.  By that I mean there is no thermostat in here

9    to control the temperature level.  You can't set as a

10   customer whether you want your ice cream frozen, hard or

11   soft.  This is really controlled just to make ice.  So it is

12   a substantially different way than you would have in your

13   normal freezer compartment, where you would put your food,

14   where you get to adjust your frozen temperature.

15   Q.   How is it done in a normal freezer compartment?

16   A.   In a normal freezer compartment, you set the

17   temperature of the freezer as you would like and there is a

18   cooling coil and an evaporator in the back there and a fan

19   and it blows the air for the freezer right into the freezer

20   compartment.

21   Q.   Dr. Bessler, what about Dr. Caligiuri's equivalence

22   analysis for the claimed closure member?

23   A.   I think Dr. Caligiuri was trying to say that this

24   fresh-food door here and this ice box door here were both

25   part of the freezer closure member.  My read of the claim

1    language is that, as far as closure members for a freezer

2    compartment, you only have one, that the freezer compartment

3    closure member is something that has to close the access

4    opening to the freezer compartment.

5              So if we assume that this is a freezer

6    compartment for the moment and this door here would be

7    closing the access opening, I would consider that the

8    freezer door.

9              This here is closing the access opening of the

10   freshfood cabinet.  So I consider this the fresh-food door.

11   Q.   If we could bring the claim up on the screen, Mr.

12   Brooks, Claim 8?

13             Now, Dr. Bessler, do you have an opinion as to

14   whether Claim 8 is infringed?

15   A.   Yes, I do.  Claim 8 is a dependent claim on Claim 1,

16   which was the independent claim we were talking about.  So

17   if Claim 1 is not infringed, then Claim 8 would not be

18   infringed as well.

19   Q.   How does that affect the other dependent claims that

20   Whirlpool is asserting?

21   A.   All of the dependent claims would be the same way.

22   They all depend on Claim 1.  So if you did not infringe

23   Claim 1, then you would -- the other claims would not be

24   infringed as well.

25   Q.   Is it your opinion that the LG French-door

1   refrigerator does not infringe Claim 1?

2   A.    Yes, that is what I was just speaking about.

3   Q.    How about Claim 8, if you could talk to Claim 8?

4   A.    Well, Claim 8, as I said already, it is a dependent

5   claim.  But I think there is another reason why Claim 8 is

6   not infringed.  That has to do with some of the language in

7   Claim 8.

8            Particularly, Claim 8 talks about an ice storage

9   bin, and that ice storage bin has an upper member, which has

10  a bottom edge, and it has a lower ice bin member right here

11  connected to the lower edge of the upper bin.  Then there is

12  some other requirements on the lower bin.  It states that

13  the lower ice bin member has to define an ice-crushing

14  region through which the ice pieces pass.

15           This type of a bin structure, in my mind, is

16  really well-represented in the '130 patent.  If I can put

17  that up?

18  Q.    Is there a figure that you are referring to?

19  A.    I think it's Figure 3.

20  Q.    Mr. Brooks, is it possible to split the screen, see if

21  we can get Figure 3 on one side and the claim on the other.

22           Claim 8 is the claim I was referring to.

23  A.    Okay.  When you look at this, this is Figure 3 from

24  the '130 patent, this type of an ice storage bin is what I

25  call a vertical bin.  The reason being is it has an upper

Bessler - direct

1    bin, which is right here, I can maybe shade that in yellow,

2    yes, that upper bin right there, that's where the ice cubes

3    are kept.

4              What happens is the ice maker here in the

5    cabinet dumps the ice into this upper bin, where it sits.

6              Now, when the auger, which is 172, this thin

7    piece here, rotates, it sends the ice through this opening

8    down here into a lower bin, which maybe we could put a

9    different color, right here.  And that lower bin right there

10   is where the blades, these things right here -- it's a

11   side-view -- those are the crushing blades.  So basically

12   the lower bin, which is the blue, the lower bin right here,

13   is connected to the lower edge of the upper bin.  There is a

14   floor right in here.  That would be the lower edge of the

15   upper bin.  And the lower bin member, which is the blue

16   right here, defines a crushing region, which has the blades

17   in it, right there.

18             So I think this type of vertical bin is very

19   repetitive of the language in Claim 8 from the patent that

20   is included.

21   Q.    Dr. Bessler, how does the language of Claim 8 compare

22   to LG's ice bin?

23   A.    LG has a different kind of ice bin entirely.

24             Is it okay if I take it out of the refrigerator?

25             THE COURT:  Yes.

1      THE WITNESS:  This is the ice bin that is found

2  in the LG refrigerator.  This is what we call a horizontal

3  design.

4      Can I show the jury?

5      MR. SPEARS:  No problem.

6      THE COURT:  Yes, sir.

7      THE WITNESS:  Thank you.

8      This bin here is the storage bin from the LG

9  refrigerator.  This is what we call a horizontal-style bin,

10  because if you look inside it here, as you can see, this is

11  the shaft here where the auger is, and the ice sits in this

12  side of the bin right here.  That's where the ice cubes are

13  kept.

14      Now, when this auger rotates, it moves the ice

15  sideways into the crushing region.  And the crushing region

16  in here is this section right in here where these blades

17  are.

18      So in a horizontal-type design, it's really a

19  side-by-side design.  There is no upper and lower bin.

20  There is an ice storage section with its floor down here,

21  where you keep the ice cubes, and then on the side of it is

22  a crushing region.

23      So with a horizontal auger you end up with a

24  side-by-side design.  There is really no upper and lower bin

25  in this type of design.

1  BY MR. SHARMA:

2  Q.    So, Dr. Bessler, what is your opinion as to whether

3  LG's refrigerators infringe Claim 8?

4  A.    Well, I think both the side-by-side and the LG

5  French-door refrigerator have these types of bins which

6  don't have an upper and lower bin member.  So I would say

7  they don't infringe Claim 8 for that reason as well.

8  Q.    When you are referring to the side-by-side LG

9  refrigerators, are you referring to DX-23?

10 A.    Yes, the refrigerator like this.

11 Q.    And the bin that is inside DPX-23?

12 A.    Yes.  This bin here has the same type of design,

13 side-by-side, as the bin over there.

14 Q.    Dr. Bessler, on the LG side-by-side refrigerators, do

15 you have any additional opinions on infringement?

16 A.    Well, relative to infringement on a side-by-side

17 refrigerator, this is a freezer compartment here.  And this

18 is a similar type of a structure that was referred to in the

19 prior art, which we will, I guess, get to.  It was a JP '165

20 patent that had a similar type of structure.

21           So to the extent --

22           MR. SPEARS:  Objection, irrelevant.  The witness

23 appears to be giving a noninfringement opinion based on

24 comparing this exhibit to prior art instead of the specific

25 limitation.

1    THE COURT:  Fair enough.  Sustained.

2    MR. SHARMA:  Dr. Bessler, you can return to your

3    seat.  Thank you.

4    (Witness resumes stand.)

5    BY MR. SHARMA:

6    Q.    Dr. Bessler, you referred to a JP '165 reference.

7    What is that?  What are you referring to?

8    A.    I was referring to a prior art reference.

9    Q.    Have you heard it called by any other names in here in

10   court since you have been here this week?

11   A.    Yes.  It's a patent that was granted to Hitachi.  So I

12   heard it referred to as a Hitachi patent.

13   Q.    Dr. Bessler, I would like to talk to you now as to the

14   validity of the asserted claims of the '130 patent.

15   A.    Okay.

16   Q.    What is your opinion as to the asserted claims of the

17   '130 patent?

18   A.    Well, there are several claims.  I believe that Claims

19   1, 2, 6, and 9 are invalid when you consider the Hitachi

20   patent and also the known ice maker technology at that time.

21   Q.    Can you please explain, Dr. Bessler?

22   A.    Yes.  In a nutshell, I think the Whirlpool patent here

23   is about mounting an ice bin and a motor on the door.  When

24   the Patent Office and Whirlpool -- when the Patent Office

25   granted Whirlpool this patent, they didn't have any prior

Bessler - direct

1    art in front of them with that feature.

2                Now, since then, if you know about the Hitachi

3    patent, that really gives the prior art that was necessary.

4    Q.    Let me see.  This is tab 2 of your binder.  This is

5    PTX-10.  I am trying to get an understanding of what you

6    were referring to when you were talking about the Patent

7    Office.

8    A.    Sure.

9                Okay, I am there.

10   Q.    What is PTX-10, Dr. Bessler?

11   A.    This looks like it's the Hitachi patent.

12   Q.    PTX-10?

13   A.    Hang on.  I am sorry.  I got the wrong one here.

14             PTX-10.

15   Q.    Is that the file history of the '130 patent, Dr.

16   Bessler?

17   A.    Yes.  Now that I am here, sure.  It's a pretty

18   substantial section of pages.

19   Q.    Let's turn to page 227.

20             Mr. Brooks, if you could show page 227.

21             What is this page referring to, Dr. Bessler?

22   A.    This page, in the file history, is an interview

23   summary between the patent examiner and Whirlpool.  I think

24   it's talking about what I just mentioned.  If we could blow

25   up this paragraph down at the bottom here.

1          Yes.  It's speaking over here about the fact --

2    let's see, let me find where I am.  Maybe starting right

3    here, it says, "it was also pointed out that several

4    problems would occur in trying to mount a prior art auger

5    such as taught in Buchser in a bin that is mounted on a

6    freezer door."

7          So they are talking there about the problems of

8    putting the motorized auger and bin on a freezer door.

9          Then it says, for example, you would have

10   wiring, spacing location, the weight of the motor on the

11   door, these were some of the problems.

12   Q.    Dr. Bessler, what did Buchser teach?

13   A.    Buchser was a prior art patent that had a motorized

14   auger and an ice bin, but it was not mounted on the freezer

15   door.  It was mounted in the freezer cabinet.  So here they

16   were talking about the complexities of mounting that on a

17   freezer door, and then it says next that it was agreed that

18   there was nothing directly in Buchser that would lead one

19   skilled in the art to solving these problems of combining

20   the ice auger with a bin mounted on a freezer door.  Based

21   on the fact that they didn't have any prior art, I think

22   that's why the patent was granted.

23   Q.    Could you explain?

24   A.    Yes.  Whirlpool and the patent examiner were agreeing

25   that there was no prior art at that time in front of them

1    that had to deal with mounting a motorized auger and a

2    storage bin on a freezer door.

3    Q.    You talked about an Hitachi reference.  How does the

4    Hitachi reference relate to these statements?  And the

5    Hitachi reference is in tab 3 of your binder, PTX-130.

6          Mr. Brooks, is it possible to split this screen

7    and put the Hitachi reference on the right side?

8    A.    Okay.

9    Q.    It's tab 3, PTX-130.

10   A.    I got it.  Let me just get to the English translation.

11   Okay.

12         Yes, that is the Hitachi '165 patent I was

13   talking about.  I think there is a figure in there that is

14   probably a good example of this.

15   Q.    Mr. Brooks, if we can go to Figure 3, please?  Figure

16   2 and 3.  Thank you.

17   A.    Yes, that's what I had in mind.  Figures 2 and 3.

18   Q.    Dr. Bessler, how does Hitachi, which is on the

19   right-hand side, PTX-130, relate to the statements that were

20   made and the agreements made at the Patent Office?

21   A.    Well, the agreements made at the Patent Office, we are

22   talking about the fact that nowhere was there a motorized

23   auger and a storage bin mounted on a freezer door.  Then it

24   turns out that this prior art patent from Hitachi shows just

25   exactly what they were talking about didn't exist at the

1    time.   In other words, the Hitachi patent shows that we have

2    a motorized auger here and a storage bin mounted on a

3    freezer door.   Here is the freezer door and here is a

4    side-view of the freezer door right here, and here is the

5    storage bin and behind here is the auger and a motor.

6              So basically, the Hitachi patent is supplying

7    the missing element that the examiner and Whirlpool said

8    wasn't available.

9    Q.    So how was the examiner able to allow this '130 patent

10   if Hitachi already described the missing element?

11   A.    At the time the examiner didn't have the Hitachi

12   patent in front of him.   He didn't know about it.

13   Q.    Now, what type of ice maker does Hitachi have?

14   A.    In the Hitachi patent, if you read the language of it,

15   it talks about what they call an ice-making tray.   An

16   ice-making tray is a little bit unclear.   In some other

17   Hitachi patents, the ice-making tray actually means an

18   automatic ice maker, because those kind of components can be

19   part of an automatic ice maker.   On the other hand, there

20   are other Hitachi patents where an ice-making tray just

21   refers to a simple manual cube tray.

22             In any case, I would believe that in a system

23   like this, you would expect that you would have an automatic

24   ice maker present.

25   Q.    At the time of Whirlpool's '130 patent, how would you

Bessler - direct

 1   describe the prior art status of automatic ice makers?

 2   A.    At the time of the Whirlpool -- of the '130 patent?

 3   Q.    Yes.

 4   A.    Yes.  At that time ice makers were -- automatic ice

 5   makers were already well-known and accepted in the industry.

 6   Automatic ice makers for refrigerators actually were a

 7   pretty old invention.  And by the mid-'70s they had become

 8   commercialized and they were available in the higher-end

 9   refrigerators.

10   Q.    Did Whirlpool recognize this in the '130 patent

11   itself?

12   A.    Yes.  I think in the '130 patent there is some

13   language in the text where they talk about the fact that

14   automatic ice makers were well-known at the time.

15   Q.    When we are talking about these automatic ice makers

16   that were known before Whirlpool's '130 patent, where are

17   those automatic ice makers located in the refrigerator in

18   relation to the ice bin?

19   A.    Automatic ice makers in relation to an ice bin,

20   generally all the automatic ice makers are located above the

21   storage bin.  And there is a very good reason for that.  The

22   way these systems work, after ice is made in the automatic

23   ice maker, it's taken from there and placed into the bin.

24   In order to do that, the ice falls out of the automatic ice

25   maker and the easiest way to get it in a bin is just let

1    gravity do its work and carry the ice for the automatic ice

2    maker to the bin.

3              That requires, if you want to use gravity, to

4    put the bin underneath the ice maker, you know, below it in

5    spatial relationship.

6              If you leave the top of the bin open, then the

7    ice will fall right in there.

8    Q.    Are you aware of any automatic ice makers that have

9    been placed below ice storage bins?

10   A.    No, I am not aware of any that would be below the bin.

11   If you put the ice maker below the bin, then you would have

12   to add some engineering structure to grab the cubes and lift

13   them up and put them in the bin, and that would be a lot

14   more expensive and complicated than just letting gravity do

15   its job.

16   Q.    When you were talking about Hitachi and the ice-making

17   trays, you were referring to at some times Hitachi refers to

18   that as an automatic maker and sometimes it refers to that

19   as an ice tray.   In the Hitachi reference itself that we are

20   talking about here as PTX-130, does this Hitachi reference

21   suggest a preference for an ice tray versus an automatic ice

22   maker?

23   A.    Yes.   If you read the '165, the Hitachi patent here, I

24   think it supports my thought that there is an automatic ice

25   maker.   Some of the language in the patent talks about the

Bessler - direct

1    need to have some hygiene, that is more hygienic, not to

2    touch the ice cubes.

3    Q.    Dr. Bessler, let's turn to tab 4 of your binder,

4    PDX-148.   If we could take a look at that?

5              Mr. Brooks, if we could bring up PDX-148.

6              What is this referring to?

7    A.    Yes.   This is what I was talking about.   In the

8    Hitachi patent, there is some language, it is translated to

9    mean, besides being cumbersome, however, this method of

10   handling has the drawback that cold air is lost by opening

11   and shutting the door, and directly touching the ice by hand

12   is unsanitary.

13             So the '165 patent, I think, is saying here you

14   don't want to have a manual tray because you are going to

15   have to touch the ice cubes and you are also going to have

16   to open the door and lose some freezer air.

17   Q.    If you used an ice tray in the Hitachi reference,

18   would you describe for me how you would actually have to

19   operate the refrigerator to get ice?

20   A.    If you had a manual ice tray in this refrigerator, it

21   wouldn't make any sense to me, because you have an automatic

22   ice dispenser on the door.   So if you wanted to use that,

23   you would have to go in there, take your ice tray, open your

24   freezer door, take your ice tray, dump your cubes into the

25   dispenser, close the door, and go around and press the

Bessler - direct

1   dispenser and get the ice dispenser out of your hands, that

2   you did a couple seconds ago.  It doesn't seem to make any

3   sense to me.

4   Q.    If we could go to the next tab in your binder,

5   PDX-146.

6         Mr. Brooks, if you could pull that up on the

7   screen.

8         What is shown on PDX-146?

9   A.    These are a couple of pages of the GE service handbook

10  for ice-making systems.  That handbook covers GE and Hot

11  Point models from the mid-'70s through 1990.  These are just

12  a couple of pages from that book showing several different

13  part number ice makers that were available at the time for

14  different refrigerators.

15  Q.    PDX-146, these GE ice makers, does that come out of

16  the GE service handbook that has been marked as PTX-177?

17  A.    Yes, that is where they are from.

18  Q.    Why are there so many different variations or models

19  of ice maker shown?

20  A.    Even by that time, in the mid-'70s through the '90s,

21  there were a lot of different models to accommodate

22  different size and type refrigerators, different ice-making

23  rates, different time cycles, things like that.

24  Q.    Dr. Bessler, going back to the Hitachi reference, is

25  the bin in the Hitachi reference removable?

Bessler - direct

1    A.    If we could go back to the sketch there.

2    Q.    This is at PTX-130, figures 2 and 3.

3    A.    Yes.  What you asked me, I think, is this bin here on

4    the door removable.  And I think if you read the '165

5    reference, it's not clear as to whether it's removable or

6    not.  They don't explicitly say it is or it isn't.

7         But in my experience with ice storage bins, they

8    are always removable from the refrigerator.  And there is a

9    good reason for that.  When you have an ice storage bin, you

10   want to be able to take it out.  When you fill large

11   containers, you want to be able to take it out of the

12   refrigerator, when you clean it, take the old ice out of

13   there sometimes.

14        In my experience, all the bins I am familiar

15   with are removable.  And I am pretty sure some of the

16   Whirlpool inventors agreed with me on that.

17   Q.    Dr. Bessler, let's turn to the next tab in your

18   binder, tab 6, which is PDX-145.

19             PDX-145, Mr. Brooks.

20             What is shown on PDX-145?

21   A.    Yes.  This chart here shows some different prior art.

22   There is several more of these as well.  But I chose four of

23   them here as examples.  And all of these prior art patents

24   and the GE service handbook there, what they show is an ice

25   maker, which is labeled, and a bin, which you can see, and

1    the bins are located on the door, the freezer door.  And in

2    the case of the Gould there, that bin is actually a

3    fresh-food door, I think.

4    Q.    Are the bins shown on this slide, PDX-145, removable?

5    A.    Yes, they are all removable.  And in all cases, the

6    ice makers are above the bins.  The difference is the

7    Winfield, Brubaker and Gould patents show what they call a

8    belt-type ice maker.  It is a little bit of a different

9    design in that it has a low-profile horizontal.

10   Q.    Are you referring to PTX-374, PTX-375, and PTX-127,

11   respectively?

12   A.    Yes.

13   Q.    What about the GE handbook?

14   A.    The GE handbook shows a different kind of design where

15   they have the ice bin located on the freezer cabinet and

16   they have the ice storage bin located on the freezer door.

17   Even though it is on the door, it is still an ice maker.

18   Q.    Dr. Bessler, do you have an opinion as to whether one

19   of ordinary skill in the art would include an automatic ice

20   maker and a removable bin in the Hitachi reference by the

21   mid-1990s before Whirlpool's '130 patent?

22   A.    Yes, I do.  I believe that an engineer of ordinary

23   skill would certainly include an automatic ice maker in the

24   Hitachi reference and the bin would be removable.  But I

25   would say that based on an engineering background at that

1    time, anybody of ordinary skill would be familiar with ice

2    makers in an engineering sense, and they would want to

3    include that, especially when you have a sophisticated

4    system with an automatic dispenser.

5    Q.    Would there be a motivation to combine that automatic

6    ice bin with Hitachi?

7    A.    Yes.  By that time customers who were buying

8    high-energy refrigerators with dispensing systems would

9    absolutely expect an automatic ice maker to be present.  And

10   also, I can't imagine any company allowing that system to be

11   made without having an ice maker.

12   Q.    And does the Hitachi reference itself speak to any

13   motivations to combine an automatic ice maker?

14   A.    Yes.  They suggest in the patent itself the idea of

15   having an automatic ice maker to keep your hands off the ice

16   cubes and to also save on the cold air.

17   Q.    Dr. Bessler, could you compare the asserted claims of

18   the '130 patent to the Hitachi and known ice maker and ice

19   maker designs and show how the two compare?

20   A.    Yes, I could.  If we could, I think I made some charts

21   up with the claims and the language.  Let me see which tab

22   it is.

23            If you look at PDX-149.

24   Q.    Dr. Bessler, can you just describe for us how the

25   language of Claim 1 compares the Hitachi application and

Bessler - direct

1    known technology at the time of the '130 patent?

2    A.    Yes.   What I have done here is I have put the claim

3    language of Claim 1, of the '130 patent, on the left side,

4    then I put the Hitachi '165 prior art on the right side.

5    And what I am trying to do is show that the Hitachi

6    reference in combination with the known automatic ice maker

7    technology would directly match up with the claims, claim

8    language in the '130 patent.

9            So if I start right off here with the '130

10   patent, the first paragraph up here calls for a

11   refrigerator, which we have, including a freezer

12   compartment, which is up here, it has an access opening,

13   which is this door, and a closure member -- an access

14   opening behind the door and then the door for closing it and

15   opening it.

16           So I would say I could put a checkmark next to

17   this first paragraph and say that that is covered here.

18   Q.    If you could just continue with the next paragraph.

19   A.    Sure.   The next paragraph talks about an ice maker

20   being disposed within the freezer compartment for forming

21   ice pieces.   As we just discussed, automatic ice makers were

22   well-known at that time, and I would expect they would have

23   one in here.   So I put a checkmark on that.

24           The next paragraph talks about an ice storage

25   bin mounted to the closure member for receiving ice, that's

Bessler - direct

1    right here.  And that it has a bottom opening, which is over

2    here.

3              So I could put a checkmark there.

4              The next part asks for a motor mounted on the

5    closure member, that is this green section right here, that

6    is the motor.  So I check that off.

7              Then we need an auger which is disposed within

8    the ice storage bin, and that's right here.  And it's

9    drivingly connected to the motor through a gear box right

10   there.  So I put a checkmark on that.

11             Then it talks about whereupon energizing the

12   motor, the auger moves ice pieces from the bin through a

13   bottom opening.  And that's -- this is the auger here.  If

14   you have the ice pieces which are shown when the auger

15   turns, it would move them this way, they go through the

16   crushing region and come out the bottom.

17             So I could check that.

18             So if I look at the Hitachi reference and I

19   combine it with automatic ice maker technology, I am saying

20   that I have all the elements of Claim 1.  So I would say

21   that's invalid.

22   Q.   What about Claim 2?

23   A.   I have a chart for Claim 2.  That's PDX-150.

24   Q.   How does the language of Claim 2 compare to the

25   Hitachi reference?

1    A.    Okay.  Claim 2 is a claim -- again, we need a

2    refrigerator, which we have, so we can check that right off.

3              And then we need an ice discharge chute through

4    the closure member below the bottom opening in the ice

5    storage bin.  Here is the bin.  There is a bottom opening

6    here.  Here is a chute right down here.

7              When the motor is energized, the auger moves ice

8    pieces from the bin through the bottom opening to this ice

9    chute.  So I would say that's covered as well.  As I would

10   put a checkmark there.

11             In that case, I would consider Claim 2 invalid.

12   Q.    What about Claim 6?

13   A.    Okay.  Claim 6 is PDX-151.

14   Q.    If you could walk through and compare the language of

15   Claim 6 briefly with the Hitachi reference.

16   A.    Claim 6, we have a refrigerator with an ice storage

17   bin, so we can check that.

18             And it says that the ice storage bin defines a

19   crushing region through which the ice pieces pass, which is

20   right here, the ice goes through this crushing region right

21   here.  When they are discharged from a bottom opening.  And

22   the ice-crushing region has an inlet opening, which is right

23   here.  So I check that box off.

24             We have an auger, where the shaft passes into

25   the crushing region, so I check that.

1           And we have an ice crusher blade rotatably

2     connected to the shaft for rotation, that's this yellow

3     blade right here.  It turns around when the auger turns.

4     And we have -- so we can check that off.

5           Then we have a stationary blade, which is the

6     blue one right here which sits right there, that is fixed.

7     When the ice crusher blade rotates past, it moves into that

8     other blade.  So we have the stationary blade met as well.

9     We can check that off.

10          So we have all the elements of Claim 6.  I would

11    say that's invalid as well.

12    Q.    Dr. Bessler, I think the other claim you mentioned was

13    Claim 9, that is PDX-153.  Tab 11 of your binder, Claim 9.

14    A.    Okay.

15    Q.    Can you please compare the language of Claim 9 to the

16    Hitachi reference and known technologies at the time of the

17    Whirlpool '130 patent?

18    A.    Yes.  This claim here is talking about a storage bin,

19    which we have right here.  It says it's removable from the

20    freezer compartment.  As I stated, I consider all bins at

21    the time in that technology to be removable.  So we have a

22    removable storage bin.  I checked that as well.

23    Q.    Dr. Bessler, based on your analysis, what is your

24    opinion as to the obviousness of Claims 1, 2, 6, and 9 of

25    the '130 patent?

Bessler - direct

1    A.      I believe that those claims are invalid because they

2    are obvious when you combine the Hitachi reference with the

3    known automatic ice maker technology that I talked about.

4    Q.      And what about removable bins?

5    A.      That automatic technology includes the ice makers,

6    removable bins, and the fact that the ice maker would be

7    above the bin.

8    Q.      And are there any examples of prior art references

9    that you are referring to?

10   A.      For those examples, yes.  There was a chart I had

11   before with the four prior arts, then there was quite a few

12   other ones as well.

13   Q.      Is PDX-145 what you were referring to?

14   A.      Yes, I think that's the one.

15           Yes.  That shows four possible examples from the

16   prior art.

17   Q.      Dr. Bessler, what about Claim 8?  That is the last

18   asserted claim of the '130 patent.

19   A.      Yes.  We could put that up, I think I have a PDX

20   here.

21   Q.      PDX-152, tab 10.

22   A.      Okay.  Yes.  This is Claim 8, the one that talks about

23   an upper and a lower bin member.

24           Now, as I stated before, the Hitachi reference,

25   in my opinion, doesn't really have an upper and lower bin

Bessler - direct

1    member.  It's a -- it's more of a horizontal design, just

2    like LG has a horizontal design.

3              Now, if that's the case, you know, I don't agree

4    that it has an upper and lower bin.  However, Whirlpool is

5    asserting that we are infringing this claim.  So, indeed, if

6    these type of bins match -- if the LG-type bin, which is

7    like this one, matches the claim language here, then the

8    Hitachi patent would also match the claim language.  And

9    that would make this claim invalid.

10   Q.    Dr. Bessler, last subject, willful infringement.  I am

11   going to try to move through this quickly, Whirlpool's claim

12   of willful infringement.

13   A.    Yes.

14   Q.    What is your opinion on willful infringement?

15   A.    I disagree that LG willfully infringes the '130

16   patent.

17   Q.    Now, what did you consider in arriving at your opinion

18   on willful infringement?

19   A.    When I considered my opinion, I considered the same

20   documents I talked about earlier, which are the same ones

21   that Dr. Caligiuri considered.  And I also considered a

22   couple of other things.  I considered the final Bics report

23   that LG issued, and I also considered a patent application

24   that LG filed on some of their refrigerator ideas.

25   Q.    What is your understanding of the willful infringement

1  test?

2  A.   Not being a legal expert, I recall there is some

3  terminology called "objectively reckless."  In order to be a

4  willful infringer, you have to be objectively reckless.  And

5  the way I see that is, it means that if you knew about the

6  '130 patent, then you wouldn't have made any efforts to try

7  to come up with something different.  You would just go

8  straight ahead and build the same thing, that would be

9  reckless.

10  Q.   Dr. Bessler, you mentioned that you reviewed

11  documents, several documents.  What did these documents tell

12  you?

13  A.   Well, overall, they told me that LG knew about the

14  '130 patent, they recognized it.  And then they took some

15  steps to try to come up with an idea that was different.

16  And they did that by looking at prior art and using some of

17  the older patents, like Hitachi, that had already expired,

18  so that they could use that technology without any trouble

19  and also coming up with some of their new design concepts,

20  like putting the ice maker on the door.

21  Q.   Dr. Bessler, when did LG first consider placing ice

22  bins and ice makers on a freezer door?

23  A.   Well, they had a Korean patent application, which I

24  think was filed in 1997.

25  Q.   If you could turn to tab 12 of your binder, PTX-380.

Bessler - direct

1        Mr. Brooks, if we could put up PTX-380, please.

2   If we can flip to the English version of it.

3   A.    Yes, that is the one.

4   Q.    What is PTX-380?

5   A.    PTX-380 is a Korean patent application that was filed

6   in Korea, and I am looking for the date there.  I think it's

7   December 16, 1997.

8        MR. SPEARS:  Objection.  Confusing and

9   irrelevant.  I don't see what this has to do with the

10  concept of objective recklessness, the fact they filed

11  patent applications here.

12       MR. SHARMA:  Your Honor, I am trying to show

13  context for LG's state of mind before Whirlpool's patent

14  even issued, what they were doing and how what they were

15  doing continued and evolved after they saw the '130 patent

16  and how it evolved with the Hitachi reference.  I am just

17  trying to provide that context.

18       THE COURT:  Overruled.

19  BY MR. SHARMA:

20  Q.    Dr. Bessler, I apologize.  If you could continue.

21  What is the date on PTX-130, this LG Korean application?

22  A.    It's highlighted there.  This was filed December 16,

23  1997.

24  Q.    How does that compare to the filing for Whirlpool's

25  '130 patent?

Bessler - direct

1   A.     It's approximately one year before.  That patent, I

2   think, was filed in December of '98.

3   Q.     Are you able to identify who the inventor is on this

4   LG Korean application?

5   A.     Yes.  If you go down there to I guess it's No. 72, it

6   says the inventor is Yong Shik Kim.

7   Q.     Now, what does this Korean application, PTX-38,

8   describe?

9   A.     Well, it describes some of LG's idea that they had at

10  that time regarding ice makers and storage bins on a freezer

11  door.  And that's shown on figure -- I think it's Figure 5

12  and 6.

13  Q.     Mr. Brooks, if you could please bring up figures 5 and

14  6.  Can you describe what is shown here, Dr. Bessler, in

15  figures 5 and 6?

16  A.     Yes.  These are a couple of figures from that

17  application.  And what the bottom one shows down here is the

18  automatic ice maker.  This is one of those ice-making tray

19  types, so the cubes in here actually form ice and then they

20  are twisted out with a motor here.  And there is an ice bin

21  down here with an auger and a hole for discharging the ice.

22  That whole ice-making and storage assembly is located up

23  here on the freezer door.

24         And then down below it here, I think that's No.

25  5, is a -- No. 5 is where the dispensing section is that

Bessler - direct

1    would send the ice out to the front of the door.

2    Q.    Dr. Bessler, can you turn to tab 13 of your binder?

3    This is PTX-381.

4             What is PTX-381?

5    A.    PTX-381 is the LG completion report for the Bics

6    project.  I believe it's the final version of that report.

7    Q.    Can you turn to page 20, please?

8             Mr. Brooks, if you can expand under

9    "Self-Evaluation and Thoughts."

10            I think this is a document we have seen a lot in

11   the past few days.  What is being described under that

12   heading, if you can just briefly describe it?

13   A.    Sure.  I mean, one of the bullets there under that

14   heading is LG believes they were successful in avoiding

15   Whirlpool's patent bank area, and that they formed their own

16   new patent layer, and established themselves as well.

17   Q.    Dr. Bessler, do you believe that LG's stated

18   conclusion was objectively reckless?

19   A.    No, I don't.  I believe what we are saying here is

20   they knew about Whirlpool's patent and that they did a lot

21   of hard work to come up with an idea and use prior art so

22   that they avoided Whirlpool's patents.

23   Q.    What prior art are you referring to?

24   A.    That would be the Hitachi patent we were talking

25   about.

1   Q.   So then, Dr. Bessler, all things considered, how does

2   LG's behavior compare to the objectively reckless standard?

3   A.   I don't think that they were recklessly objective --

4   reckless at all.

5             In fact, I think they were cautious.  I think

6   they spent a lot of time evaluating the '130 patent, and

7   then looked for ways to come up with something totally

8   different.

9             Based on my experience, that's what you would do

10  if you were developing a new product.  You would find out

11  everything you could about what was out there, what the

12  patents were, and then come up with something different.

13  Q.   How does LG's behavior compare to the work that you

14  did at GE?

15            MR. SPEARS:  Objection.

16            THE COURT:  I will sustain that objection.

17            MR. SHARMA:  No additional questions.  Thank

18  you, Dr. Bessler.

19            THE COURT:  I think it might be prudent, I will

20  be guided by your thoughts, Mr. Spears, to take our lunch

21  now.

22            MR. SPEARS:  I will be closer to a half-hour

23  than 15 minutes.

24            THE COURT:  Let's take our lunch, ladies and

25  gentlemen.

 1                    (Jury leaves courtroom at 12:47 p.m.)

 2                    (Luncheon recess taken.)

 3                    THE COURT:  Okay.  Ms. Walker.

 4                    (Jury enters courtroom at 1:47 p.m.)

 5                    THE COURT:  All right, ladies and gentlemen.

 6    Please take your seats.

 7                    Mr. Spears, you may cross-examine.

 8                         CROSS-EXAMINATION

 9    BY MR. SPEARS:

10    Q.     Dr. Bessler, were you in the courtroom when Verne

11    Myers testified about all the time and effort that went into

12    the development with his in-door-ice invention?  Were you in

13    the courtroom for that testimony, sir?

14    A.     Yes, I was.

15    Q.     Likewise, were you in the courtroom when various

16    Whirlpool witnesses testified about the reception of that

17    invention in the marketplace and the significance of that

18    invention to Whirlpool's business?  You have heard some of

19    that testimony as well, haven't you?

20    A.     Yes, I have.

21    Q.     Now, in light of the importance of this invention to

22    Whirlpool, would you agree that it would be unfair for any

23    expert to even question the validity of the '130 patent

24    until he had made a thorough study of all of the relevant

25    information available to him?

Bessler - cross

1  A.    I believe that I have studied all the relevant

2  information.

3  Q.    Fair enough.

4         I believe you indicated that it would be unfair

5  to look at LG's '121 patent using hindsight.  Do you recall

6  that testimony?

7  A.    Yes, I mentioned that this morning.

8  Q.    And it would be every bit as unfair to look at

9  Whirlpool's '130 patent using hindsight.  Correct?

10 A.    My understanding of hindsight is it's not appropriate

11 for patent evaluation, that's right.

12 Q.    Okay.  Now, your opinion that the '130 patent is

13 invalid, that is an opinion that you didn't form until

14 sometime after 2007.  Correct?

15 A.    I would say it's probably after 2007.

16 Q.    Yet you are aware that as early as 2001 or 2002, LG's

17 engineers were working on the development of a refrigerator

18 that would have an ice bin placed on the door?

19 A.    I don't recall exactly when they started their work.

20 Q.    But it was a lot earlier, years earlier, than you

21 began your analysis of the validity of the '130 patent.  We

22 can agree on that, can't we?

23 A.    When I actually did the analysis, yes.

24 Q.    Now, if the jury finds that what these LG engineers

25 were writing in their documents about the IDI invention is

1  inconsistent with the opinions that you have provided them,

2  it would be perfectly reasonable for them to either question

3  your opinions or just disregard them entirely.  That would

4  be a reasonable thing for them to do.  Right?

5  A.    Could you just repeat the first part?  If what

6  happened?

7  Q.    If the jury believes that what LG engineers were

8  writing in their documents about Whirlpool's invention is

9  inconsistent with the opinions that you have provided them,

10  it would be perfectly reasonable for them to either question

11  your opinions or disregard them entirely.  That would be a

12  reasonable thing for them to do.  Right?

13  A.    It would be reasonable.  I am just not sure what you

14  mean by "inconsistent."  We have had a lot of translations

15  of Korean documents, so in my estimation sometimes the

16  wording comes across a little bit confusing, if you will,

17  due to the translations.

18  Q.    Let's talk about some of the wording that we have seen

19  during the course of this trial.

20         We have seen up on this screen LG documents that

21  talk about Whirlpool's IDI as advanced technology.  Right?

22  A.    We have seen those documents talking about the

23  Whirlpool patent, and as I mentioned, LG was well aware of

24  that.

25  Q.    Right.  And we have seen them refer to Whirlpool's

1   advanced technology and uniquely advanced technology.  You

2   have seen those words in LG's documents.  Correct?

3   A.    I have probably seen them.  I can't recall the

4   document numbers or exactly where they were, but we have

5   seen a lot of phrases up on that screen.

6   Q.    I take it from the testimony that you have just

7   provided that you don't think IDI is advanced technology at

8   all, you think it's old technology and obvious technology.

9   Is that correct, Dr. Bessler?

10  A.    When you say I don't agree that it's advanced

11  technology at all, I don't think I said those words.  I said

12  that LG's products don't infringe the '130 patent.  And I

13  think that the claims that we looked at, those specific

14  claims, I said, were obvious in view of some previous

15  patents that I was aware of.

16  Q.    So if I understand your testimony correctly, you have

17  no reason to question that IDI is advanced technology or

18  uniquely advanced technology?

19  A.    When you say "question," you are asking me about

20  advanced technology.  Technology is what it is.  I mean,

21  Whirlpool has put out a product.  What I am saying is that

22  LG's patents -- well, Whirlpool's patents are not infringed

23  by the LG refrigerators.

24          I don't think I was passing judgment on whether

25  Whirlpool's technology was advanced or not.

Bessler - cross

1  Q.    Let's move on, Dr. Bessler.  I would like to talk

2  about the Hitachi reference that you spent a fair amount of

3  time discussing with the jury.

4           I believe you indicated, because I was very

5  careful to write it down, that this Hitachi reference was in

6  your view a patent granted to Hitachi.  Do you recall that

7  testimony?

8  A.    If I said that, I am not sure I said those exact

9  words, but I think it's a patent application.

10  Q.    That's correct, Dr. Bessler.  It is not a patent that

11  was granted to Hitachi, is it?

12  A.    If I said that, I misspoke.  It's what they call a

13  patent application, which, I am not a legal -- I can't

14  explain the details of that, but I believe they applied for

15  that patent, so they call it an application.

16  Q.    Insofar as you know, the Japanese Patent Office never

17  even looked at that application, much less granted it as a

18  patent to Hitachi?

19  A.    I don't really know the answer to that question.

20  Q.    Now, the language in that Hitachi reference that you

21  thought disclosed an automatic ice maker reads ice-making

22  tray.  Correct?

23  A.    Yes.  And as I mentioned, I think that ice-making tray

24  is unclear.

25           THE COURT:  Let me establish some ground rules.

Bessler - cross

1    If you answer his questions, you will have a chance to

2    answer additional questions from Mr. Sharma.  It will

3    probably go quicker if you just answer his questions.

4             THE WITNESS:  I am sorry, Your Honor.

5    BY MR. SPEARS:

6    Q.    I believe you indicated in response to Mr. Sharma's

7    question, that same phrase, "ice maker tray" was used in

8    other Hitachi patent applications to refer to the sort of

9    manual ice tray that I might pour water into, stick in a

10   freezer, and then empty once that water is frozen into ice?

11   A.    I mentioned that other Hitachi patents or applications

12   had it both ways.

13   Q.    Now, when you reviewed the Hitachi reference, I take

14   it you didn't see any illustration of an automatic ice maker

15   in the figures of the patent.  Correct?

16   A.    Yes, as I mentioned, I didn't see one.  But I

17   suspected that a normal engineer would expect that one would

18   exist at that time.

19   Q.    Sure.  And I believe you have indicated that the

20   position you would expect to find an automatic ice maker

21   would be above the ice bin.  Correct?

22   A.    Yes.

23   Q.    And the Hitachi reference doesn't say anything about

24   where the ice-making tray is located, correct?

25   A.    I don't think it says anything explicitly.  But as I

Bessler - cross

1    said, automatic ice makers are always placed above a bin,

2    and any engineer would know that.

3    Q.    I understand that opinion.

4              Now, if the bin in the Hitachi reference were

5    meant to be used with an automatic ice maker, you would

6    expect to find some type of overflow prevention structure so

7    you don't have this sorcerer's apprentice situation where

8    the ice is overflowing out into the refrigerator and out

9    into your kitchen.  Right?

10   A.    If an automatic ice maker was in there, you would have

11   to have some mechanisms for controlling the ice flow.  And

12   they can be on the bin or they could be with the ice maker.

13   Q.    My point is, Dr. Bessler, there is no such structure

14   illustrated in the Hitachi ice bin.  Correct?

15   A.    It is not in there because I don't think a normal

16   engineer would need to see it in there.

17   Q.    Let's look at something that is actually in the

18   Hitachi reference.  And I would like to direct your

19   attention to page 6 of the translation, to the text that

20   appears right above the description of the drawings.  If we

21   could have that up and enlarged.

22             Here we see a statement that "By attaching the

23   entire device on the inner side of the door 2, among other

24   significant practical effects, the capacity of the freezer

25   compartment can be used more effectively," and here is the

Bessler - cross

1   part I am interested in, "and the operation of emptying ice

2   cubes 4 from the ice making trays into the ice storage

3   section 5 is more pleasant."

4           Are you with me, Dr. Bessler?

5   A.    Yes, I am.

6   Q.    Now, when an automatic ice maker empties ice cubes,

7   that's not a pleasant experience for the ice maker, is it?

8   A.    I don't believe ice makers have the ability to

9   experience pleasure.

10  Q.    You answered my question, Dr. Bessler.

11          Would it be reasonable for the jury to conclude

12  from this language that what it's talking about is a

13  pleasant experience encountered by the user of the

14  ice-making tray upon removing this manual ice tray and

15  emptying it into the bin?  Is that at least a reasonable

16  conclusion that the jury could draw from this language?

17  A.    I don't think so.  I think that that would tell me

18  something totally different.

19  Q.    Okay.  But if the jury does draw that conclusion, that

20  there is no automatic ice maker in the Hitachi reference,

21  you have, nevertheless, provided an alternative opinion that

22  it would have been perfectly obvious to stick one in there

23  at least as late as 1998.  Correct?

24  A.    An engineer of ordinary skill would be able to do

25  that, that's right.

Bessler - cross

1    Q.      Could we have Figure 1 of the Hitachi reference put on

2    the screen?

3            Easy question, Dr. Bessler:  That refrigerator,

4    that is a top-mount refrigerator.  Correct?

5    A.      Yes.  That is referring to the fact that the freezer

6    cabinet is on the top section up there.

7    Q.      And once this top-mount refrigerator is modified to

8    include an automatic ice maker, what we would have is a

9    top-mount refrigerator with an automatic ice maker stacked

10   above an ice bin, stacked above some type of dispensing port

11   to get ice out of the door.  Correct?

12   A.      Depending on how you arrange your dispenser, the ice

13   maker would have to be over the bin, and then you would have

14   to decide, like the schematic shows there, how your bin and

15   dispenser were set up.

16   Q.      To move this examination along, I would like to refer

17   to that configuration of top-mount refrigerator, one with an

18   ice maker, a bin beneath it, and some type of dispensing

19   portion of the door as the obvious refrigerator.  Okay?

20           For the next set of questions, I would like for

21   you to turn to tab 6 in your binder, where we have placed a

22   copy of Defendants' Exhibit 815.  I would like you to turn

23   specifically to page 95 of that exhibit.

24   A.      Did you say tab 6?

25   Q.      Yes, it's tab 6, I believe.  And the jury has seen a

1   bit of this before when Dr. Caligiuri testified.  What we

2   have here --

3   A.    I am sorry.  Could you just tell me the page again?

4   Q.    Page 95.  There is no page number actually on 95, so

5   you may have to look at 96 and work your way backwards, or

6   94 and work your way forwards, whatever the case is.

7   A.    Okay.

8   Q.    What this is, Dr. Bessler, is a listing of various LG

9   top-mount refrigerators that are at issue in this case.  And

10  the X on the right-hand box indicates that they are accused

11  of infringing the '601 patent, whereas the absence of X's

12  under "In-Door Ice Storage" indicates that they are not

13  accused of infringing the '130 patent.  Do you understand

14  that?

15  A.    I think so.

16  Q.    Okay.  So on pages 95, 96, and through the first half

17  of 97, what we have are a listing of maybe 50, 60, 70

18  different LG top-door refrigerator models, none of which

19  have in-door-ice in them.  Correct?

20  A.    From this chart, it looks like there is no in-door-ice

21  in top mounts.  And I would say that's pretty normal in the

22  marketplace, because those type of refrigerators aren't

23  really what they call like a high-end or even a mid-range

24  refrigerator.  They are generally very low cost, sort of

25  commodity builder models.  And they generally don't have the

Bessler - cross

1    features of these high-end ones like are in the courtroom.

2    Q.    I think we might be moving to a point of agreement,

3    Dr. Bessler.  I would like to ask a couple of followup

4    questions on it.

5            So out of all these LG top-mount refrigerators,

6    not one of them is the obvious refrigerator that would have

7    the ice bin, the automatic ice maker, and the three-door

8    dispense system.  Correct?

9    A.    I think, when you are saying "obvious," you are using

10   it in a legal sense.  This is just showing in the

11   marketplace, there is not any top-mount refrigerators that

12   are sold commercially by LG with that type of dispenser in

13   the door.  It doesn't mean it can't be done, and I know over

14   time there have been models with dispensers in that type of

15   arrangement.

16   Q.    Dr. Bessler, if we were to go to bestbuy.com and look

17   at all the top-mount refrigerators that were offered by Best

18   Buy today, what we would see is a couple of hundred

19   top-mount refrigerators offered by various suppliers and not

20   one of them would have the automatic ice maker, the ice

21   storage bin, and the three-door dispense system that you

22   would say would have been obvious to make in 1998 based on

23   the Hitachi reference?

24   A.    I would say it would be obvious to make from an

25   engineering standpoint.  I think what you are confusing

1    there is from a marketing standpoint, I don't think the

2    customers are asking for those kind of features in a

3    top-mount refrigerator.

4    Q.    To that extent, I don't think we need to take you to

5    bestbuy.com.  You are perfectly willing to accept that if we

6    went there, we would not see a top-mount refrigerator with

7    that feature set.  Correct?

8    A.    I would say without going there I could take your word

9    for it.

10   Q.    I would like to talk about one reason we might not be

11   seeing these obvious refrigerators either offered by LG or

12   offered by any of the suppliers who retail through Best Buy.

13             MR. SPEARS:  May I approach the refrigerators,

14   Your Honor?

15   Q.    I am standing next to DPX-23, the representative

16   side-by-side model that is accused of infringement.  This

17   freezer compartment, it's almost as tall as I am, isn't it?

18   A.    Yes.

19   Q.    So there is plenty of room in this freezer compartment

20   to fit an automatic ice maker above the storage bin, above

21   the dispense system, to the door.  Correct?

22   A.    In that type of design, because it's a tall and narrow

23   freezer compartment, LG has elected to put a design together

24   that fits well into that type of a space.

25   Q.    Okay.  Now, if I were to take this and walk it over to

Bessler - cross

1    this top-mount refrigerator, it won't fit in the freezer

2    compartment, will it, Dr. Bessler?

3    A.    I am sure it won't fit in that refrigerator.   And

4    that's because that type of design is made for a

5    side-by-side refrigerator, which has a much taller freezer

6    opening.   When I showed one of my references this morning,

7    there is different kinds of ice makers, particularly belt

8    ice makers, which have a very low aspect ratio.   And there

9    is no reason I couldn't apply something like that.

10   Q.    Okay.   Now, Dr. Bessler, when you were at General

11   Electric, working on the design of refrigerators, isn't it

12   the case that you and your fellow engineers actually tried

13   for years to come out with a refrigerator that had an

14   in-door storage bin for ice, an automatic ice maker, and a

15   three-door dispense system?   That's something that GE

16   actually tried to develop.   Correct?

17   A.    We did actually develop it in the lab.   We had some

18   prototypes I was involved with that were made.   They never

19   found their way to production.   But we had them working in

20   the lab, that's true.

21   Q.    And I take it the reasons that GE never came out with

22   that product included financial reasons, safety reasons, and

23   technical reasons, too?

24   A.    You know, I'm not really sure what all the reasons

25   were.   But I would say it was a combination of factors and

Bessler - cross

1    could well involve the things that you were talking about.

2              MR. SPEARS:  May I approach, Your Honor?

3              THE COURT:  Yes.

4    BY MR. SPEARS:

5    Q.    I am going to show you a copy of a deposition that you

6    provided on October 15th of 2008.  And I have actually put a

7    cellophane tape on the specific testimony that I would like

8    to direct you to.

9              MR. SHARMA:  Your Honor, if this is being used

10   for impeachment, this is improper impeachment.

11             (The following took place at sidebar.)

12             THE COURT:  Hasn't he agreed with you?

13             MR. SPEARS:  He kind of waffled on whether they

14   included technical reasons.  I got an "I am not sure."

15             MR. SHARMA:  I believe it is entirely consistent

16   with that testimony, Your Honor (handing document to Court.)

17             THE COURT:  I agree with Mr. Sharma.

18             (End of sidebar conference.)

19   BY MR. SPEARS:

20   Q.    Dr. Bessler, insofar as you know, the first

21   refrigerator maker to actually come out with a refrigerator

22   that had Whirlpool's in-door-ice invention, that was

23   Whirlpool.  Correct?

24   A.    The first manufacturer that had their invention?

25   Q.    The first one to bring to market this in-door-ice

Bessler - cross

1    invention, that was Whirlpool.  Correct?

2    A.    I would say in modern times that I can think of now,

3    the first ones to come out with the ice in the door, the

4    bin, and the auger motor in the U.S. market?  Is currently,

5    the only one I can recall, is Whirlpool.

6    Q.    And that was done in the year 2000.  Correct?

7    A.    I am not sure exactly what year.  I remember Mr.

8    Voglewede was mentioning something around that time frame.

9    Q.    This was almost 25 years after this Hitachi reference

10   that we have been talking about published.  Correct?

11   A.    Yes, that would be about 25 years, between those two

12   periods, yes.

13             MR. SPEARS:  May I approach the refrigerators,

14   again, Your Honor?

15             THE COURT:  Yes.

16   BY MR. SPEARS:

17   Q.    I would like to talk briefly about this French-door

18   refrigerator, Dr. Bessler.

19   A.    Okay.

20   Q.    You don't dispute that the region inside this ice box

21   is maintained at a freezing temperature, otherwise the ice

22   would melt, right?

23   A.    Yes, I agree that that is a freezing temperature.

24   Q.    Likewise, you would agree that if I want to get to

25   that ice box, I have to open this left-hand door.  Correct?

1   A.    You would have to open that left-hand door to get into

2   the fresh-food cabinet, is what I believe.

3   Q.    But I can't get to this ice box if I don't open the

4   left-hand door.  Correct?

5   A.    Well, the way you are looking at it there, if the door

6   was already open, you could get in the ice box by opening

7   the ice box door.

8   Q.    One last question, Dr. Bessler.  This door, it's a

9   closure member.  Correct?

10  A.    I only see that door as a closure member for the

11  fresh-food cabinet, not as a closure member for the freezer

12  cabinet.  I think each opening needs one closure member.

13  Q.    Now, that ice box, you have seen, have you not, LG

14  documents that refer to it as a freezer?  You have seen

15  those documents, haven't you?

16  A.    I believe I saw one translated document.  It may have

17  even been handwritten where some engineer marked the word

18  "freezer."

19  Q.    Could you turn to tab 17 of your binder?

20        There we have placed a document which, for the

21  record, bears LGKR production Nos. 126715 through 762.  Are

22  you with me?

23  A.    You said tab 17?

24  Q.    Correct.

25  A.    Yes.  It says "Exhibit A" in front of it?

Bessler - cross

1  Q.     No, I don't think that is it.  Exhibit A should be tab

2  16.

3  A.     All right.  I have Exhibit A in tab 17.

4  Q.     We can move on, Dr. Bessler.

5         Now, I believe you indicated to Mr. Sharma that

6  it's your opinion there was no willful infringement in this

7  case on LG's part with respect to the '130 patent.

8  A.     Yes, that's what I said.

9  Q.     And that it is your opinion that instead of following

10  the Whirlpool in-door-ice refrigerator, that what LG was

11  really doing was following up on the Hitachi refrigerator.

12  Correct?

13  A.     Well, when you say "following up on," I think what LG

14  was doing is, they were looking to see how they could come

15  up with a system that did not infringe the Whirlpool patent.

16  And part of that was using existing technology, like the

17  Hitachi patent, and part of that was using some of their new

18  ideas that they had.

19  Q.     Now, I would like for you to look at that Exhibit A

20  that you found in your binder.

21  A.     Okay.

22  Q.     And I believe that that Exhibit A is a list of

23  information that you have reviewed in connection with your

24  work in this case.  Correct?

25  A.     It's got a lot of documents on it.  I imagine at one

1    time or another I have seen every one of them.

2    Q.    The heading of Exhibit A is -- it indicates it's

3    information that you have reviewed.  Correct?

4    A.    Correct.

5    Q.    And not only is it information that you have reviewed,

6    it's information that, according to your expert report, you

7    have reviewed and relied upon in connection with your work

8    in this case?

9    A.    Okay.

10   Q.    And one of the bits of information that you reviewed

11   and relied upon is the deposition of a gentleman named Greg

12   Garavalis.  Do you see that on Exhibit A?

13   A.    I see it on Exhibit A here.  The name doesn't ring a

14   bell with me immediately.  But I am seeing it's on the list

15   here.

16           MR. SPEARS:  May I approach the witness, Your

17   Honor?

18           THE COURT:  You may.

19   BY MR. SPEARS:

20   Q.    I am handing you a copy of the transcript of the

21   deposition of Greg Garavalia.  And what I would like to do

22   is have you read along while we play video of certain pages

23   which I am about to identify for you and Mr. Sharma.  Those

24   pages are 66, line 20, through 68, line 9?

25           THE COURT:  Do you want to mark that in some

Bessler - cross

1    way?

2                    THE WITNESS:  Page 66, you said?

3                    THE COURT:  Mr. Spears, why don't you stay

4    there.

5                    MR. SPEARS:  I need my notes, Your Honor.

6                    THE WITNESS:  You said page 66, line?

7                    MR. SPEARS:  It's 66, line 20, through 68, line

8    9.

9                    THE COURT:  Mr. Sharma?

10                   MR. SHARMA:  Your Honor, I have a question as to

11   what purpose this is being used for.  Is this impeachment?

12                   THE COURT:  We will find out in just a moment.

13   I am going to have him mark the relevant questions.  You can

14   follow along, and if we need to, we can discuss it at

15   sidebar.

16   BY MR. SPEARS:

17   Q.    After that, 69, line 11, through 71, line 5.

18   A.    If you don't mind, the first ones start at page 66,

19   line 20, and ended at --

20   Q.    68, line 9.

21   A.    Then you said 69, 11, to page 71, line 5.

22   Q.    Then 71, line 9, through 74, line 5.

23                   We have it all marked out, Your Honor.

24                   MR. SHARMA:  Excuse me, Your Honor, I am not

25   sure what the purpose is.  As I look at the testimony, it

Bessler - cross

1   doesn't appear to be anything --

2           THE COURT:  Let him ask a question.

3   BY MR. SPEARS:

4   Q.    Shall we play the tape, then?

5           THE COURT:  Let's talk.

6           (The following took place at sidebar.)

7           THE COURT:  I had forgotten we were ready to go

8   to the videotape.

9           MR. SPEARS:  We have heard from three witnesses

10  now.  It is more clear with the prior two witnesses than Dr.

11  Bessler that LG wasn't at all interested in the '130 patent,

12  that what they really had in front of them in their

13  development effort was the Hitachi reference.

14          What this testimony is going to show, and this

15  is information he reviewed and relied upon, Rule 705 gives

16  me a lot of leeway in cross-examining that sort of thing, so

17  what this information will show is that the very first time

18  that in-door-ice was displayed to the public in a trade show

19  in Las Vegas, that LG's representatives were so interested

20  that they not only crowded the booths, but they broke in at

21  midnight later.

22          I will note that the reason that LG insisted on

23  bringing Mr. Marcy was, according to Mr. Coyne, to preempt

24  this very testimony.  They expected all along that we would

25  put it in, and this is the place we are putting it in.  It's

1    only seven minutes long.  I have five minutes with this

2    witness when I am done.  And none of the testimony was

3    objected to at the deposition.

4               MR. SHARMA:  Your Honor, first, it's hearsay.

5    Second, it appears to be an improper depo designation.

6               THE COURT:  Let's deal with the hearsay.

7               MR. SHARMA:  We haven't even established that

8    Dr. Bessler has relied --

9               THE COURT:  We established that he relied upon

10   it.  You need to move on from that.  It's listed on the

11   information that he just acknowledged, the list, Exhibit A,

12   that lists all the information upon which he relied.  He

13   relied on it.  Go ahead.  There may be another basis.

14              MR. SHARMA:  It appears to be improper

15   deposition designations.  This was never designated.

16              THE COURT:  Wait.  That's altogether different

17   from live witnesses -- witnesses who would otherwise be

18   potentially live witnesses.  That doesn't fall within the

19   deposition designation protocol, as I understand it.

20              MR. SPEARS:  No.

21              MR. SHARMA:  Is it being played for impeachment

22   purposes?

23              MR. SPEARS:  It is being played under Rule 705

24   to get in front of the jury what this witness relied on.

25              THE COURT:  Just a second.  I want to refresh my

Bessler - cross

1    recollection on the rule we are applying.  It's not a

2    situation that we often encounter.

3                    MR. SHARMA:  Your Honor, would you mind if I get

4    my rules?

5                    THE COURT:  No.  Get your rules.

6                    Are you there, Mr. Sharma?

7                    Here is the language that Mr. Spears is relying

8    on.  It is the extension in the ruling.  It provides:  "The

9    expert may in any event be required to disclose the

10   underlying facts or data on cross-examination."

11                   I am assuming I am correct.

12                   MR. SPEARS:  Yes.

13                   THE COURT:  I have to say, in 11 years of doing

14   this, it's the first time it has come up.  I am going to

15   permit it.

16                   (End of sidebar conference.)

17                   MR. SPEARS:  I believe we are ready to play the

18   tape now.

19                   (Deposition played as follows:)

20                   "Question:  Mr. Garavalia, Mr. Abraham has asked

21   you some questions about an incident that occurred at a

22   trade show, and I'd like to sort of follow up to put

23   everything in orderly progression.  Where was this trade

24   show that you were discussing held?

25                   "Answer:  In Las Vegas.

Bessler - cross

1    "Question:  And in what month and year was this

2    trade show?

3    "Answer:  I believe it was in January of 2000.

4    "Question:  Did you personally attend this trade

5    show?

6    "Answer:  I did.

7    "Question:  Could you describe for me what your

8    responsibilities at this show were?

9    "Answer:  Responsibilities at the show

10   specifically?

11   "Question:  Yes.

12   "Answer:  I worked the -- I was involved in --

13   principally, since it was a new product, new launch, I was

14   working the -- working the booth and discussing not just

15   this product but other products in refrigeration to vendors.

16   Suppliers -- mainly vendors --

17   "Question:  What was this.

18   Answer:  -- trade vendors.

19   "Question:  What was this new product that you

20   referred to in your last answer?

21   "Answer:  And the new product was in-door ice,

22   that's the feature, we call it in-door ice, but it was the

23   Conquest refrigerator, as it was the name that we gave --

24   that we gave the product, Conquest was the name of the

25   product, and Conquest included in-door ice as one feature.

Bessler - cross

1   There were more features than that, including a new door

2   styling on the outside.

3           "Question:  Where in Las Vegas was this booth

4   set up?

5           "Answer:  It was at the convention center.

6           "Question:  Okay.  And did the Las Vegas

7   convention center have its own security?

8           "Answer:  They did.

9           "Question:  Okay.  While you were in the booth

10   displaying Whirlpool's IDI product, did any LG employees

11   visit the booth?

12           "Answer:  They did.

13           "Question:  What did they do?

14           "Answer:  I have a -- my -- what I remember

15   about this show and LG in the booth was as we were trying to

16   discuss the -- the new product with our trade partners, we

17   were coming into the conversation in close proximity to our

18   trade were LG employees.  And it was -- it wasn't conducive

19   to a good business conversation, when it was not two people

20   talking.  It was with two plus the competitors that were

21   sitting there -- standing there, and so we were having to

22   ask them to leave the booth and come back at another time.

23           "Question:  And did they come back at another

24   time?

25           "Answer:  They came back.

Bessler - cross

1              "Question:  At what time did they come back.

2              "Answer:  Well, they came back at different

3      times --

4              "Question:  Mm-hmm.

5              "Answer:  -- obviously, but they -- but the --

6      frankly, the problem we had was we had -- it was a -- a lot

7      of interest in this product.  It was a very well-attended

8      show, and we had a lot of traffic with a lot of foot

9      traffic, people, vendors, trade partners, kitchen designers,

10     architects, just to name the type of people who are there.

11     We had a -- we were busy in front of the product explaining

12     what this product was and what the innovations were, so they

13     were having a hard time -- LG was having a hard time getting

14     time in front of the product without us with having another

15     trade partner there.

16             "Question:  Okay.  Was any incident reported to

17     Whirlpool about LG trying to get time in the -- in front of

18     the product when Whirlpool wasn't there?

19             "Answer:  The incident -- there was an incident

20     in the middle of the night.

21             "Question:  Okay.  Please describe that

22     incident.

23             "Answer:  Well, to set that up, what -- one --

24     one of the mornings, and to my recollection it was either a

25     Friday morning or a Saturday morning, when I went -- and

Bessler - cross

1    before the booth opened, and I want to say the booth opened

2    at 9:00 or 9:30 in the morning, I would get there early just

3    to make sure the product was cleaned, wiped down,

4    presentable in a showroom fashion to our trade partners.

5         "When I went into the booth that morning, we

6    already had employees in the booth waiting for the show to

7    open, and there was common -- there was a -- there was

8    common knowledge at that point that an incident had taken

9    place that evening -- that night before of two LG employees

10   being in the booth and that they're -- and this -- at the

11   time.  I thought it was kind of funny that their badges had

12   been removed from them while they were there by the venue

13   security, and then those -- and we were informed of it.

14   'We' being Whirlpool, was informed of it, of the incident,

15   and that would have been Diana Seaman and Mark Raglan.  Mark

16   Raglan is the -- at that time was the Director of Training

17   for our training organization.  One of his responsibilities

18   was administration and running of our trade shows that we

19   attended.

20        "Diana Seaman was the manager for our trade

21   shows.  So it was her responsibility to manage the show,

22   put -- organize it, put the schedules together.  Just, she

23   was the point of contact.  So the venue security reached

24   out, informed Diana and Mark that there was this incident

25   with these two employees, and the word spread from there

1    that -- that an incident had taken place, and it was, again,

2    all our -- and all our employees knew about it at the time.

3              "Question:  So it was the venue security that

4    caught the LG employees?

5              "Answer:  It was the venue security that caught

6    the LG employees.

7              "Question:  At what time?

8              "Answer:  I don't recall what time, it was in

9    the late evening.  I think the words used to describe it was

10    middle of the night, whether that was middle of the night, 2

11    in the morning, or 11:00, it was late.

12              "Question:  Where in Whirlpool's booth were

13    these LG employees caught by the venue security?

14              "Answer:  They were caught in front of the

15    Conquest refrigerator which had the new in-door-ice feature.

16              "Question:  Okay.  January of 2000, this trade

17    show in Las Vegas, was this the first public exhibition of

18    Whirlpool's in-door-ice refrigerator?

19              "Answer:  It was."

20    BY MR. SPEARS:

21    Q.    One last question, Dr. Bessler.

22              Do you still think that LG did not copy this

23    invention?

24    A.    Yes.  I absolutely do.  I have been to a lot of those

25    trade shows myself.  And other than the odd hour, it's a

Bessler - cross

```
 1    public display of your new products.  I remember when GE had
 2    new products, our displays were mobbed by competitors.  And
 3    there was nothing wrong with them looking at our new
 4    products.  They were going to look at them one way or the
 5    other.  That is what the trade show is all about.
 6              MR. SPEARS:  Pass the witness.
 7              THE COURT:  Mr. Sharma, your redirect.
 8              MR. SHARMA:  Your Honor, may I approach one of
 9    the refrigerators?
10              THE COURT:  Yes, you may.
11                      REDIRECT EXAMINATION
12    BY MR. SHARMA:
13    Q.    Dr. Bessler, can you hear me from here?
14    A.    Yes, I can.
15    Q.    Mr. Spears had asked you questions about this
16    refrigerator and he was asking you questions about this left
17    fresh-food door.  Do you recall that?
18    A.    Yes.
19    Q.    And he was asking you questions about this ice box
20    inside the French door.  Do you recall that?
21    A.    Yes, I do.
22    Q.    Can you see the butter bin that is in the left French
23    door?
24    A.    Yes, I believe they call it either a dairy or butter
25    bin, that's right.
```

Bessler - cross

1    Q.      What relationship does this butter bin door have to

2    the right French door?

3    A.      They are two totally different doors.  The one is the

4    fresh-food door, the one right there, and the other one

5    inside closes the butter bin.  That is the butter bin door.

6    Q.      Would you call the right French door, DPX-22, a butter

7    bin door?

8    A.      No, I would call that a fresh-food door.

9                MR. SHARMA:  No further questions, Your Honor.

10               THE COURT:  Thank you, Dr. Bessler.

11               (Witness excused.)

12               MR. SHARMA:  Your Honor, for our next witness,

13   we will have some deposition designations from Mr. Willis of

14   Whirlpool.

15               THE COURT:  They are going to be played?

16               MR. SHARMA:  That's right, Your Honor.  Very

17   short.  Half a minute.  It may not be that long.

18               Your Honor, we have a witness sheet for the

19   jurors' binders, listed in the binder.

20               As background, we are going to be playing video

21   of the deposition testimony from Mr. Willis.  Mr. Willis is

22   a 30-year employee of Whirlpool.

23               Mr. Brooks, can you play the video, please?

24               (Video played as follows:)

25               "Question:  So every single ice bucket that

Bessler - redirect

1    you've worked with at Whirlpool for 30 years has been

2    removable from the freezer, is that true?

3               "Answer:  Yes."

4               MR. SHARMA:  Your Honor, it was closer to 10

5    seconds.  There were no counter-designations.  Thank you.

6               THE COURT:  All right.

7               MR. COYNE:  Your Honor, LG calls Dr. Ching Ho

8    Lee to the stand.

9               ... Ching Ho Lee, having been duly sworn as a

10   witness, was examined and testified through the interpreter

11   as follows ...

12                      DIRECT EXAMINATION

13   BY MR. COYNE:

14   Q.   Good afternoon, Dr. Lee.

15   A.   Yes.  Good afternoon.

16   Q.   Where do you work?

17   A.   I currently work for LG Electronics' refrigerator

18   division.

19   Q.   Where specifically, what location?

20   A.   Yeah.  We are located in the city of Changwon in

21   Cansam (phonetic) Province, located in South Korea.

22   Q.   How long have you been at LG?

23   A.   I joined the company in 1986, and to date I have been

24   serving within the company for 24 years.

25   Q.   What have you done during those 24 years at LG?

1    A.     After first joining the company, I first worked on

2    product development, then eventually served as team leader,

3    the head of the R&D lab, and currently I serve as vice

4    president.

5    Q.     What is the highest level of education you have

6    achieved?

7    A.     I obtained a Ph.D. in mechanical engineering from

8    Pusan National University in Korea, and I further obtained

9    an M.B.A. at Helsinki University, located in Finland.

10   Q.     I would like to switch to the subject of the plaques

11   that are used in LG's refrigerators.  When you started at LG

12   in 1986, was LG using plaqued liners then?

13             MR. SPEARS:  Objection.  Confusing and

14   irrelevant.

15             THE COURT:  That is not real illuminating.  I

16   will speak with you at sidebar.

17             (The following took place at sidebar.)

18             THE COURT:  Why is it irrelevant and confusing?

19             MR. SPEARS:  Use in Korea is not prior art.  Use

20   in the United States is.

21             MR. COYNE:  The publication is a publication

22   from a catalog that a company was selling throughout the

23   world.  The catalog is 102(b).

24             THE COURT:  That is what he is saying.

25             MR. SPEARS:  He is not talking about the

1    catalog.

2                THE COURT:  Do you agree with him as to the

3    catalog potentially being 102(b)?

4                MR. SPEARS:  Potentially.

5                THE COURT:  You need to establish that

6    foundation.  Let's get to it.

7                (End of sidebar conference.)

8    BY MR. COYNE:

9    Q.    Dr. Lee, what is this?

10   A.    That would be a new product catalog for the model

11   years 1988-'89 for the Gold Star brand refrigerators.

12   Q.    This particular catalog, is that a printed

13   publication?

14               THE COURT:  You can ask another question.  What

15   do you mean?  That is a term of art, isn't it?

16   BY MR. COYNE:

17   Q.    How is this catalog used?

18   A.    After we develop a model, when we launch it into the

19   market we provide a catalog along with the product.

20   Q.    How is the catalog distributed?

21   A.    These catalogs get, say, distributed, basically by way

22   of each of our dealers or overseas-located branch offices,

23   once they are picked up by LG Electronics.

24   Q.    Where was this particular catalog distributed?

25   A.    As for this one, this mostly got distributed in Korea.

Ching Ho Lee - direct

1    The Asian markets, say the Middle Eastern markets, mostly.

2    Q.    And when was this catalog distributed?

3    A.    This here was distributed back in 1988.

4    Q.    So is that before October 19, 1989?

5    A.    Yes, that's right.

6    Q.    Mr. Brooks, can we turn to the page that shows the

7    interior of the refrigerator for the 602 photograph?

8              Yes.  Can we zone in on the right-hand side?

9    This portion.

10             Dr. Lee, what are these structures on the wall,

11   on the left wall of the refrigerator that we are looking at?

12   A.    Yes.  Those would be what's called the plaque within

13   the refrigerator.  Within LG Electronics, we typically refer

14   to those as beads.

15   Q.    Any difference between beads and plaques?

16   A.    No, there are no differences as to the meaning.  They

17   are one and the same thing.

18   Q.    The beads or plaques that we are looking at on the

19   side of the unit that is shown in Exhibit 403, how big are

20   they?

21             MR. SPEARS:  Objection.  Confusing and

22   irrelevant.

23             May I have a sidebar, Your Honor?

24             THE COURT:  Okay.

25             (The following took place at sidebar.)

1     MR. SPEARS:  The catalog is prior art for what's

2   in it.  What this testimony purports to do is to add

3   information that is not in the catalog itself.

4          THE COURT:  That's fair enough.  Mr. Coyne?

5          MR. COYNE:  It's foundation for the material

6   that is in the catalog, Your Honor.  Their expert is

7   saying --

8          THE COURT:  Mr. Coyne, how long have you been

9   doing this?  A long time.  You can't get to the point more

10  quickly than that?

11         MR. COYNE:  All right, Your Honor.

12         THE COURT:  I am addressing that generically

13  with you.  It is taking up time, your method of approaching

14  the examination of a witness, that I don't think we need to

15  take up.  Okay?

16         MR. COYNE:  Okay.

17         THE COURT:  I am going to sustain the objection

18  and allow you to elicit the information that you know is

19  proper to elicit by getting straight to the point with the

20  witness.  Okay?

21             (End of sidebar conference.)

22  BY MR. COYNE:

23  Q.    Dr. Lee, in the refrigerator that is shown in Exhibit

24  403, is the foam closely embracing the back of the liner?

25         MR. SPEARS:  Objection.  The --

Ching Ho Lee - direct

1    THE COURT:  Sustained.

2    BY MR. COYNE:

3    Q.    Was the refrigerator that is shown in this catalog

4    commercially acceptable?

5                 MR. SPEARS:  Objection.  Relevancy.

6                 MR. COYNE:  Your Honor, may we approach on this

7    one?

8                 (The following took place at sidebar.)

9                 MR. COYNE:  This goes directly to a

10   noninfringing alternative, as well as the prior art.  This

11   is what LG has available to it to go back to in the event

12   that the jury finds this is infringing.

13                 I think we should be able to establish that this

14   is a noninfringing alternative.  I have established already

15   that it is prior art.

16                 THE COURT:  He has agreed with you.

17                 MR. COYNE:  What I would like to establish is

18   the contours of it so we can establish it is commercially

19   acceptable to go back to it, its size, its performance, et

20   cetera.

21                 MR. SPEARS:  When he is talking about

22   commercially acceptable, he is not talking about a picture

23   in a catalog?  He is talking about a living, breathing, if

24   you will, refrigerator, that is not prior art.

25                 THE COURT:  You are saying the refrigerator

Ching Ho Lee - direct

1  itself is not prior art?

2         MR. SPEARS:  Right.  The catalog is prior art

3  for whatever is in it.

4         THE COURT:  Sustained.

5         (End of sidebar conference.)

6  BY MR. COYNE:

7  Q.   Sir, how big is the refrigerator that is shown in this

8  catalog?

9         MR. SPEARS:  Same objection.

10         THE COURT:  Sustained.

11  BY MR. COYNE:

12  Q.   Sir, how big is the refrigerator that is shown in this

13  catalog?

14         MR. SPEARS:  Same objection.

15         THE COURT:  Sustained.

16  BY MR. COYNE:

17  Q.   Would will go be able to go back, if it was required

18  to and use the --

19         THE COURT:  Sustained.  Don't push it, Mr.

20  Coyne.

21         MR. COYNE:  Thank you, Your Honor.

22  BY MR. COYNE:

23  Q.   Let me ask you, Dr. Lee, why was LG using plaques in

24  its refrigerator?

25  A.   The thing about that is, when you are making

1  refrigerators, and when you extrude the polyurethane foam,

2  basically, these plastic Tyron es tend to be a little

3  wobbly, you will see these wave-like phenomena, and in order

4  to basically disguise that from the naked eye, we built in

5  these plaques, actually, to cosmetically sort of hide these

6  defects.

7  Q.    Do the plaques prevent bowing?

8  A.    No.  That is not at all the case.

9  Q.    Do the plaques reduce bowing?

10            I will withdraw the question.

11            Prior to August of 2009, did you think the

12  plaques reduced bowing?

13  A.    No, because at that time, basically, we had not done

14  any, say, engineering type testing as to the plaque.  And we

15  had not contemplated as to whether or not the presence of

16  these plaques would reduce bowing.

17  Q.    What do you think now?

18  A.    Well, sometime thereafter, we did request that certain

19  computer simulations be performed by, what's that place, the

20  Korea Marine Engineering University or something.  And upon

21  receiving the results thereof, basically I came to learn

22  that plaque, any and all such things, have some inherent

23  properties, apparently, whereby which they help reduce

24  bowing, as it turns out.

25  Q.    Will you please bring up PTX-248, Mr. Brooks.

Ching Ho Lee - direct

1           Sir, is this the study that you were referring

2      to?

3      A.      Yes, that is right.

4      Q.      And does the -- what was done for this study?

5      A.      Yes, these present the results of certain computer

6      simulations that were run concerning what kind of effects,

7      impacts, if any, plaque may have on, say, bowing within a

8      refrigerator and also the same as to steel reinforcement.

9      Q.      And does this represent an accused LG refrigerator?

10     A.      No.  This is in reference to a general refrigerator.

11     Q.      Are the results of this study or this simulation

12     limited to any specific refrigerators?

13     A.      No, it's not anything like that.  It's just a general

14     sort of refrigerator.

15     Q.      What did the Korea Maritime University find with

16     respect to the relative effect of the steel reinforcements

17     relative to the plaques in this study?

18     A.      Yes.  The results of the maritime university's tests

19     were such that the impact or effects between the use of

20     plaque versus steel reinforcement was that the latter

21     resulted in something a whole lot more powerful.  So

22     relatively speaking, if the depth of the plaque is, oh,

23     about one millimeter or so, then in such an instance, the

24     use of steel reinforcements results in a sixfold effect in

25     comparison, in terms of the reduction as to bowing.

1   Q.    Mr. Brooks, could you please bring up PTX-546?

2         Dr. Lee, what is this?

3   A.    This is a depiction as to how steel reinforcement is

4   being applied, so to say, right there on the LG refrigerator

5   assembly lines.

6   Q.    If the plaques help reduce bowing to some extent, even

7   if it is less than the steel, why does LG need to use the

8   steel?

9   A.    Well, although all plaque does have some impact in

10  terms of bringing down the bowing phenomenon within

11  refrigerators, in actuality, the amount thereof as such is

12  insufficient.  Hence, LG's use of the steel reinforcements

13  so as to bring down the amount of bowing.

14  Q.    Sir, let's go back, if we could, for a moment to

15  PTX-403.

16        The refrigerator that is shown in this catalog,

17  was this ever made known to people in the United States

18  prior to October 19, 1989?

19  A.    Let's see.  1989, '89, you say, in actuality, although

20  this was not sold in the United States, we did -- we were

21  making preparations to sell this in the U.S.  And as part of

22  that, this refrigerator had been sent over here to the U.S.

23  to undergo UL laboratory testing.  As such, sometime around

24  that point in time or perhaps a little before that, its

25  existence had been made known.

1    Q.    Could you please bring up, Mr. Brooks, PTX-614.

2          Dr. Lee, while that is coming up, what does

3    Underwriters Laboratory do?

4    A.    Underwriters laboratory is an institution that does

5    essentially safety certification.  For instance, in order

6    for a refrigerator to be imported into and sold within the

7    U.S. it must undergo UL testing.  Upon passing the UL

8    certification will a refrigerator get to be sold.

9    Q.    Did UL in fact test this GFX 602 model in the U.S.?

10   A.    Yes, that's right.

11   Q.    Before October 19, 1989?

12   A.    Yes.

13         MR. SPEARS:  I may be a bit tardy with this

14   objection.  We have had this document on the screen in front

15   of the jury without any foundation or testimony from this

16   witness.  I have a hearsay objection or authentication

17   objection.  I assumed Mr. Coyne would get to the point.

18         MR. COYNE:  Your Honor, I have been laying the

19   foundation with the last two questions.

20         THE COURT:  Before you display a document, take

21   it down for now, go ahead.

22         MR. COYNE:  My next question is for the witness

23   to identify the document, Your Honor.

24         THE COURT:  Anything?

25         MR. SPEARS:  I would be surprised if he can.

Ching Ho Lee - direct

1    But if he can, let's let him try.

2               THE COURT:  Whether you would be surprised or

3    not doesn't matter a hoot to this jury.  Okay?

4    BY MR. COYNE:

5    Q.    Dr. Lee, what is PTX-164?

6    A.    This would be the certification that we obtained from

7    UL as to the 602 model.

8    Q.    When was this product, the GFX 602 product certified

9    by UL?

10              THE COURT:  Mr. Spears, I expect you are too old

11   to remember Gomer Pyle, aren't you:  "Surprise, surprise."

12              Go ahead.

13              THE WITNESS:  That would be August the 9th,

14   1988.

15   BY MR. COYNE:

16   Q.    That is before October 19, 1989.  Right?

17   A.    Of course, yes.

18   Q.    Let's go back to the PTX-403 catalog and display the

19   page with the interior refrigerator again.

20              Sir, let me ask you, what was the configuration

21   of the plaques that were in that refrigerator that was

22   shipped to the United States for testing by UL prior to

23   October 18, 1989?

24              MR. SPEARS:  Objection.  Confusing, Your Honor.

25              THE COURT:  I am going to sustain that.  I

Ching Ho Lee - direct

1    believe I sustained a similar objection before.

2              MR. COYNE:  Nothing further, Your Honor.

3              THE COURT:  Mr. Spears, your witness.

4                    CROSS-EXAMINATION

5    BY MR. SPEARS:

6    Q.    Dr. Lee, I believe you have indicated that the plaques

7    or beads were placed in LG's refrigerators for aesthetic

8    reasons.  Is that correct, sir?

9    A.    Yes.  They serve a certain aesthetic purpose as to the

10   cosmetic aspects.

11             MR. SPEARS:  May I approach the refrigerators,

12   Your Honor?

13             THE COURT:  You may.

14   BY MR. SPEARS:

15   Q.    Just so we are clear, what we are talking about, Dr.

16   Lee, are these indentations in the plastic inner liner of

17   the refrigerator.  Correct?

18   A.    Yes, that is correct.

19   Q.    It's your testimony that the reason these indentations

20   are in this liner is because they are pretty?

21   A.    Well, it's not pretty, so to say.  Again, in terms of

22   LG's refrigerators, in terms of the way the polyurethane

23   that forms the liner happens to be basically extruded, when

24   you do that on the surface, there tend to be these little

25   things, so you want to cover up those things.

Ching Ho Lee - direct

1    But if you are asking as to the beads themselves

2    being pretty, that's not quite it.

3    Q.    Could you turn to Defendant's Exhibit 430, which I

4    believe we have placed behind Tab 1 of your binder?

5    If we could have Page 55 from that exhibit, I am

6    interested in the upper right-hand corner.

7    Do you see in the upper right-hand corner where

8    it refers to side bead depth and then beneath it in

9    parentheses, one millimeter arrow 2.5 millimeters?  Are you

10   with me?

11   A.    Yes.

12   Q.    And that's a reference to a potential change in the

13   depth of the plaques in LG's refrigerators from one

14   millimeter to 2.5 millimeters, correct?

15   A.    Yes.

16   Q.    Could you turn with me to Page 66 of the same

17   document.  I am interested in a document and some supporting

18   text that appears in the upper portion near the middle.  Do

19   you see where the document says change the depth of the bead

20   used to support the I/Case's strength?  Do you see that in

21   the document, sir?

22   A.    Yes.

23   Q.    And I/Case is referring to the plastic inner liner of

24   the refrigerator.  Correct?

25   A.    Yes, that is correct.

1    Q.    So at least in this document we have an LG engineer

2    considering the possibility of increasing the depths of the

3    plaques in order to support or improve the strength of the

4    inner liner of the refrigerator?

5    A.    What this talks about here is the need to, let's say,

6    change things in this manner, as to the beads, in view or in

7    consideration of the impact vis-a-vis the styrofoam.

8    Q.    Okay.  Dr. Lee, from time to time in your career, have

9    you supervised the design of LG refrigerators that would be

10   sold in the United States under the GE brand?

11   A.    Yes.

12   Q.    And are you aware that from time to time, GE would

13   provide LG with what it referred to as branded product

14   change requests?

15   A.    Would you run that by me again, please?  Perhaps a

16   little more specific?

17   Q.    Maybe I could make it a little more specific.  If you

18   turn behind Tab 2 in your notebook, where, for the record,

19   you will find a document that bears LGKR production numbers

20   15197 through '98.  And the document there is titled Branded

21   Product Change Request.

22             THE INTERPRETER:  Counsel, there is no Tab 2 in

23   the binder.

24             THE COURT:  There is no Tab 2.

25             MR. SPEARS:  May I approach the witness, Your

1    Honor?

2                    THE COURT:  Yes.

3                    THE INTERPRETER:  Your Honor, may we have the

4    question repeated?

5                    THE COURT:  Does Mr. Coyne have a copy?

6                    MR. SPEARS:  I believe he does.

7    BY MR. SPEARS:

8    Q.    The document I am interested in should be behind Tab 2

9    that you were just handed.  Are you with me?

10   A.    Yes, I am there.

11   Q.    That document is Titled Branded Product Change

12   Request.  Correct?

13   A.    Yes, that's right.

14   Q.    And from time to time, would General Electric send LG

15   that sort of document?

16   A.    Yes, that's right.

17   Q.    And in this document, do you see that the brief

18   description of the change is the addition of four beads to

19   the inner wall of the inner case in the refrigerator?

20   A.    Yes, that is correct.

21   Q.    Do you see that the purpose of that change, of adding

22   beads to the inner wall of the inner case, was to remove the

23   generation of bending or flexion of the inner wall of the

24   inner case, which is caused by deep depth and flat form in

25   molding inner case.  Do you see that?

1   A.    Yes, that's right.

2   Q.    So the engineer who wrote this document, at least,

3   believed that by adding four beads to the inner wall with

4   these refrigerators, that this would remove the generation

5   of bending or flexion in the inner wall.  Correct?

6   A.    Yeah.  Basically, the gist here would seem to be that

7   there is some inherent properties of the beads, it has some

8   effect in terms of bringing down the amount of bending.

9   Q.    During your direct testimony, did Mr. Coyne show you a

10  single LG document in which it was suggested that the

11  plaques in LG liners aren't there to have some effect on

12  bending or flexion, but are really in LG's refrigerators for

13  aesthetic reasons?  Has he shown you a document that said

14  that?

15  A.    I am going to have to try to explain this to you from

16  two perspectives.

17          Generally, while the role of the plaque is such

18  that it does have some effect in terms of bringing down the,

19  what you call it, the amount of bending in the refrigerator,

20  in actuality, in LG's refrigerators, the thing that performs

21  that role is the steel reinforcement.  That is what I would

22  like to tell you.

23  Q.    Is that the end of your answer, sir?

24  A.    Yes.

25  Q.    Dr. Lee, the refrigerators that LG is currently

1    selling into the United States with plaqued wall liners, to

2    your knowledge, do those refrigerators have a problem with

3    the shelves popping loose from their mountings?

4    A.    No.  As I mentioned earlier, all plaques do, as part

5    of its inherent properties, does have some effect in

6    bringing down the amount of bowing, though limited it is,

7    the fact of the matter is that's insufficient and that's why

8    here we within LG use steel reinforcement to deal with that.

9    Q.    One last question.  Insofar as you know, do LG's

10   refrigerators with plaque wall liners have any problem with

11   the gasket engaging in sealing the door?

12   A.    There is no, say, major correlation between bowing per

13   se versus the gasket or there being some gap as to the

14   gasket.  There is no correlation.

15   Q.    But you are not having a problem with the gaskets in

16   your refrigerators, as far as you know?

17   A.    Negative.  On the contrary, there do happen to be

18   gasket-related problems.  But that is simply not on account

19   of bowing is what I am trying to tell you.  Basically, the

20   gasket consideration is something that take place as a

21   function of some, say, strength-related aspects, as to the

22   upper, say, structure of the refrigerator.  That's what I am

23   saying.

24             MR. SPEARS:  Pass the witness.

25             THE COURT:  Redirect.

Ching Ho Lee - direct

1     MR. COYNE:  No further questions.

2     THE COURT:  Thank you, Doctor.  You are excused.

3     (Witness excused.)

4     THE COURT:  Let's take our afternoon break.

5     (Juries leaves courtroom at 3:15 p.m.)

6     (Recess taken.)

7     THE COURT:  Ms. Walker.

8     (Jury enters courtroom at 3:38 p.m.)

9     THE COURT:  All right, ladies and gentlemen.

10    Please take your seats.  Counsel.

11    MR. ABRAHAM:  Good afternoon.  My name is Jeff

12    Abraham.  On behalf of LG, we call our next witness, Dr.

13    Donald Vannoy, an expert in structural engineering.

14    ... Donald W. Vannoy, having been duly sworn as

15    a witness, was examined and testified as follows ...

16                    DIRECT EXAMINATION

17    BY MR. ABRAHAM:

18    Q.    Good afternoon, Dr. Vannoy.

19    A.    Good afternoon.

20    Q.    Could you please tell the jury what your specialty is?

21    A.    My specialty is civil engineering, with a specialty in

22    structural engineering and material testing.

23    Q.    Can you please give the jury a sense of your

24    educational background?

25    A.    Yes.  I have a Bachelor's of science in civil

1  engineering from West Virginia Institute of Technology, a

2  Master's of engineering, and a Ph.D. in civil engineering

3  from the University of Virginia.

4  Q.   Could you please take a moment to describe your

5  professional career for the jury?

6  A.   Yes.   I have been a professor at the University of

7  Maryland Department of Civil Engineering for 33 years, and I

8  am currently professor emeritus.

9       I also am a licensed professional engineer in

10 five states.  And I am president and owner of two

11 engineering companies, Vannoy & Associates, which is

12 headquartered in Silver Springs, Maryland, and Trident

13 Engineering & Associates, which is headquartered in

14 Annapolis, Maryland.  And for the last 30 years I have been

15 practicing civil engineering, which uses various materials,

16 including composites, subjected to various types of loading,

17 which would include thermal loading.

18 Q.   As a professor at the University of Maryland, what

19 subject matter did you teach?

20 A.   At the University of Maryland I am responsible for

21 teaching courses that included various types of materials,

22 including composites subjected to various types of loading.

23 In this case, including, for example, thermal loading.

24      One of the classes that I was responsible for

25 was mechanics of materials.  That's a basic class, taken by

Vannoy - direct

1    all engineering students.  And we teach them basically to

2    calculate stretches, deflections, and all types of

3    engineering materials, including composites and being

4    subjected to all types of loading, dead load, live load,

5    shock, blast and thermal loading.

6              The second series of classes that I teach is

7    engineering materials.  That has a three-hour lecture and a

8    three-hour lab.  In that particular course, we teach the

9    engineering students how to conduct various testing of

10   engineering materials, which include composites.  That would

11   be tensile tests, flexure tests, subjected to various types

12   of loading, including thermal loading.  Also in that class

13   is where we would teach data acquisition testing protocol,

14   how you basically measure the stresses and deflections in

15   engineering components.

16             Then the third thing that I do is I teach

17   structural analysis and design.  That's basically teaching

18   the various techniques of structural analysis and how they

19   apply to engineering components built into structures.  And

20   in there I cover everything from classical to modern

21   techniques, and modern techniques would include such things

22   as matrix methods and also what is called finite element

23   analysis or FEA.

24             In addition to the responsibilities of teaching

25   for 33 years, I was very active in research and publication

1    at the University of Maryland and testing all types of

2    structures used in a building environment.  Those would

3    include composites subjected to thermal loading.

4    Q.    Are you a member of any professional organizations?

5    A.    Yes.  As I said, I am a Registered Professional

6    Engineer in five states, West Virginia, Virginia, D.C.,

7    Maryland and Louisiana.  I am also a fellow of the American

8    Society of Civil Engineers.

9              And I have served as past president of the

10   Maryland section of the American Society of Civil Engineers.

11   And currently I am the Region 2 Governor for the American

12   Society of Civil Engineers.  And that covers the states of

13   Pennsylvania, Delaware, Maryland and D.C.

14              I represent the 12,000 practicing civil

15   engineers in those states at the national level.

16              MR. ABRAHAM:  Your Honor, LG would like to offer

17   Dr. Vannoy as an expert in structural engineering and

18   materials testing.

19              MR. SPEARS:  No objection.

20              THE COURT:  The doctor is accepted.

21   BY MR. ABRAHAM:

22   Q.    What were you asked to do in this case?

23   A.    I was asked to take a look at the '601 patent, which

24   talks about the plaques in the liner of a refrigerator and

25   determine if the plaques have any influence on preventing

Vannoy - direct

1    bowing of the wall of the refrigerator.

2    Q.    Were you able to reach any conclusions about whether

3    the plaques influence wall bowing?

4    A.    Yes, I first.

5    Q.    What was that conclusion?

6    A.    Based on the testing that I did, I concluded that the

7    plaques in the liner of the refrigerator, that having

8    plaques of different sizes and shapes did not prevent the

9    walls from bowing.

10   Q.    What was the basis for your opinion?

11   A.    The basis of my opinion was I tested 11 full-fledged

12   sized refrigerators in a controlled environment.

13   Q.    Which refrigerators did you test?

14   A.    I tested 11 refrigerators, three LGs that were

15   manufactured in 2009, three Whirlpool that were manufactured

16   in 2009, three other Whirlpool's that were manufactured in

17   1991, 1993, and 1993, and two Montgomery Wards that were

18   manufactured in 1981 and 1987.

19   Q.    Can you please describe the tests that you performed?

20   A.    Yes.  Basically, all the testing was done at my

21   offices in Annapolis, Maryland.  Basically, we constructed a

22   room for temperature control.  And we take these units and

23   bring them into the room.

24         And around the unit, we built a frame.  This was

25   a structural frame built out of aluminum C-channels, because

1   we were going to measure 24 locations of wall bowing.  The

2   reason you want to build the frame is because you want to be

3   able to measure at the same locations every time, because

4   this test took three days.

5            So we built a room, put the unit inside the

6   room.  Built the frame around the room.  And then, this was

7   a temperature-controlled room.  So we initially did the test

8   at 90 degrees.

9   Q.    Why did you use 90 degrees?

10  A.    90 degrees we used because that is the temperature

11  that is used when you conduct tests for the refrigerator

12  according to the national standards.  So what happens is we

13  opened the fresh door and the freezer compartments.  And

14  this refrigerator would be in this room for four hours at 90

15  degrees.  That would basically get the unit to equilibrium.

16           Then we would take measurements at 24 locations

17  of the walls.  Then I plugged the refrigerator in.  And then

18  I would turn the temperature control inside the fresh food

19  and the freezer compartment to mid-mid-level.  There is a

20  dial inside each compartment where you can turn the

21  temperature.

22           So I turned it to mid-mid-level and ran the

23  refrigerator for a period of 24 hours.  At the end of 24

24  hours, that would allow the unit to become stabilized.

25           I took the measurements at the 24 locations that

Vannoy - direct

1    we had originally taken, at what is called the heat sell.

2    And we found that the walls bowed.

3              I then, after taking the measurements at 24

4    locations, I turned the controls to high-high, that a

5    consumer could do.  In other words, you take your

6    temperature controls and turn it up as high as you could.

7    So I turned it to high in the freezer, higher in the fresh

8    food.  Let it run again for 24 hours, and wanted to see if

9    the walls would continue to bow.  And we measured those and

10   found that the walls continued to bow.

11   Q.    If you turn to Tab 4 of your notebook, which is

12   Exhibit 234.  Dr. Vannoy, do you recognize this document?

13   A.    Yes, I do.

14   Q.    Can you explain what this is?

15             MR. SPEARS:  Can we have a sidebar, Your Honor?

16             (The following took place at sidebar.)

17             MR. SPEARS:  Woe don't have a foundation for

18   authentication of either of these Montgomery Ward

19   refrigerators as prior art.  In the context of what this

20   witness is about to say, that's not harmful from my

21   perspective.  But I don't want to be in a position of having

22   waived that objection should any of their future witnesses

23   begin to give testimony that actually is confusing on these

24   issues.

25             THE COURT:  With respect to this exhibit, you

Vannoy - direct

1    mean?

2              MR. SPEARS:  That's correct.

3              THE COURT:  Are any future witnesses going to be

4    utilizing this exhibit?

5              MR. ABRAHAM:  I believe we may, our next

6    expert --

7              MR. SHARMA:  There is a future witness, who is

8    Dr. Mellinger, who is going to give testimony on the

9    Montgomery Ward refrigerators that Mr. Spears is talking

10   about.  And he will lay the foundation as to why they are

11   prior art.

12             He also, I don't believe it will come out in his

13   direct testimony in any sort of detail, but he also relied

14   on the testing from Drs. Vannoy and Mr. Dapkanis.

15             MR. SPEARS:  Usually you put your fact witnesses

16   up to prove up your prior art and then you put up your

17   experts.

18             THE COURT:  We know what's what's coming.  So I

19   will overrule the objection.

20             (End of sidebar conference.)

21   BY MR. ABRAHAM:

22   Q.   Dr. Vannoy, can you explain what this is up here,

23   PTX-234?

24   A.   Yes, as I explained, I tested 11 refrigerators, and

25   down at the bottom right are the 11 units that I tested,

Vannoy - direct

1    color-coded, the LG 2 -- Whirlpool, 2009, this is 1991,

2    1991, and 1993.  This is Montgomery Ward '81 and '87.  And

3    they are color-coded, to give you a guide here.  This is a

4    schematic of the side-by-side refrigerators.  And you see

5    the points located on the freezer side here.  They are

6    points on this, they go, here, 16, 17 to 24.

7             If you noticed in the red line there, there is

8    points 19, 20 and 21.  So this data right here, that's the

9    plot, these are 11 curves of the deflection that occurs at

10   the center and in the vertical direction of that unit.

11   Q.    And what does that plot show?

12   A.    What the plot shows is, it shows all of the data just

13   for looking at it to show that it deflects.  It is not meant

14   to be comparing one curve to the other.  But it shows that

15   no matter who made -- no matter who made the unit or the

16   year it was made, the wall bowed and the plaques did not

17   prevent the wall from bowing.  They basically behaved all

18   the same.

19   Q.    Were you present in court when Whirlpool's expert, Dr.

20   Kelivarus, testified ?

21   A.    Yes, I was.

22   Q.    Were you aware that he also performed bowing tests?

23   A.    Yes.

24   Q.    Did you study the results of his tests?

25   A.    Yes, I did.

Vannoy - direct

1    Q.     How did the results from his tests compare with yours?

2    A.     He measured two LG refrigerators, and found that the

3    walls bowed.

4    Q.     So based on all the testing that you have seen in this

5    case, both yours and Dr. Kelivaris', did you form an opinion

6    as to the effect of plaques on the thermal bowing of

7    refrigerator walls?

8    A.     Yes, I have.

9    Q.     What is your opinion?

10   A.     As these graphs show, the presence of plaques in a

11   plastic liner refrigerator do not prevent the wall from

12   bowing.  It doesn't matter, like I said, about who makes the

13   unit or the year.  They all perform the same.  And the

14   plaques do not prevent the wall from bowing.

15              MR. ABRAHAM:  Pass the witness, Your Honor.

16              THE COURT:  Mr. Spears.

17                        CROSS-EXAMINATION

18   BY MR. SPEARS:

19   Q.     Dr. Vannoy, I take it it's your opinion that plaques

20   don't prevent bowing whether we are talking about the LG

21   refrigerators that are accused of infringement or the

22   current refrigerators that are manufactured by Whirlpool.

23   Correct?

24   A.     Correct.

25   Q.     Now, I would like to talk about the testing you did

Vannoy - direct

1    perform and the testing you didn't perform.  The testing you

2    did perform was to measure bowing in LG and Whirlpool

3    refrigerators that had plaqued wall liners.  Correct?

4    A.    Yes.

5    Q.    The testing you did not perform was to measure bowing

6    in LG or Whirlpool refrigerators that had smooth liners.

7    Correct?

8    A.    Yes.  In the refrigerators that we have --

9    Q.    I think you have answered my question, Dr. Vannoy.

10          The jury has heard from one witness in this case

11   who has tested refrigerators with plaque liners, tested

12   refrigerators with smooth liners, and determined how much

13   bowing the plaques prevented.  Right?

14   A.    I don't understand the question.

15   Q.    The jury has heard from one witness in this case, who

16   has measured bowing in refrigerator walls with plaqued

17   liners, measured bowing in refrigerator walls with smooth

18   liners, and determined how much bowing the plaques

19   prevented.

20          Steve Williams did that, didn't he?

21   A.    Yes.  In the '601 patent, they talked about doing some

22   testing.  I was unable to review that information.

23   Q.    But Mr. Williams certainly told the jury all about it,

24   didn't he?

25   A.    He basically -- if you look at the '601 patent, when I

1    look at it, they use the word prevent, I think it's 15

2    times.  But there was no data submitted that I could review

3    to look at the data.

4    Q.    Now, at the time that Mr. Williams did this work that

5    is reported in the patent, he had eight years of experience

6    in making, testing and designing refrigerators.  Do you

7    understand that, sir?

8    A.    I don't recall.

9    Q.    But you in contrast, you have no experience whatsoever

10   in manufacturing or designing refrigerators.  Right?

11   A.    Correct.

12   Q.    And the only experience you have in testing

13   refrigerators comes from the work that you have done in this

14   case?

15   A.    This is the first refrigerator I have tested, yes.

16   Q.    So sitting here today, you are in no position to doubt

17   or even question Mr. Williams' testimony that before

18   Whirlpool plaqued its door liners, Whirlpool was having

19   problems with the shelves popping out, with the gaskets

20   sealing, with the inner light cycling, you are not in a

21   position to question any of that testimony, are you?

22   A.    That is correct.

23   Q.    Likewise, you are in no position to question Steve

24   Williams' testimony that after the plaques were put in the

25   Whirlpool refrigerators, that enough bowing was prevented so

1    that these problems vanished?  You are not in a position to

2    question that testimony, are you, sir?

3    A.    I am only looking at reading the '601 patent.

4    Throughout there, they talk about the testing that they did,

5    and the conclusion was that they could actually prevent or

6    they would be without bowing of the wall.

7    Q.    I am not asking about the '601 patent.  You were in

8    the courtroom when Mr. Williams testified.  Correct?

9    A.    Yes.

10   Q.    And you heard him say that once Whirlpool plaqued its

11   door liners, that enough bowing was prevented that all these

12   problems went away.  You heard that testimony, didn't you?

13   A.    Yes, I did.

14   Q.    Sitting here today, you have had no reason to question

15   the truth of that testimony?

16   A.    That is correct.

17            MR. SPEARS:  Pass the witness.

18            THE COURT:  Redirect.

19                 REDIRECT EXAMINATION

20   BY MR. ABRAHAM:

21   Q.    Dr. Vannoy, were you able to review the data from the

22   testing from Mr. Williams that Mr. Spears was referring to?

23   A.    No, I was not.

24   Q.    Why not?

25   A.    It wasn't available.

Vannoy - cross

1   Q.    Do you have any understanding as to -- you referred a

2   couple times to the testing that was reported in the '601

3   patent.  Correct?

4   A.    Yes.

5   Q.    Do you have an understanding of what type of testing

6   that was?

7   A.    Well, they tested the -- they did testing on the

8   plastic liner.  They didn't do testing on a composite wall

9   or the complete unit.  It was just simply testing on a

10  plastic liner, and they had referred to a finite element

11  analysis that they had done.  But there was no test report

12  or anything I could review to look at that.

13  Q.    Finite element analysis, was that a mathematical

14  simulation?

15  A.    Yes.

16  Q.    Did Mr. Williams testify that the plaques he tested

17  reduced bowing?

18              THE COURT:  Counsel, let me see just for a

19  second.

20              (The following took place at sidebar.)

21              THE COURT:  What Mr. Williams said is for the

22  jury to decide, not to have this witness interpret what the

23  witness said.

24              MR. ABRAHAM:  I understand.

25              (End of sidebar conference.)

Vannoy - redirect

1    MR. ABRAHAM:  We have no further questions.

2    (Witness excused.)

3    MR. ABRAHAM:  As its next witness LG calls Mr.

4    Stanley Dapkunas.

5    ... Stanley Dapkunas, having been duly sworn as

6    a witness, was examined and testified as follows ...

7                    DIRECT EXAMINATION

8    BY MR. ABRAHAM:

9    Q.    Good afternoon, Mr. Dapkunas.

10   A.    Good afternoon.

11   Q.    Could you please give the jury a brief rundown of your

12   education after high school?

13   A.    I have a Bachelor's degree in metallurgical

14   engineering from the Virginia Polytechnic Institute and a

15   Master's degree in materials science from the George

16   Washington University.

17   Q.    What is your specialty?

18   A.    Material engineering.

19   Q.    Could you give a brief description of your

20   professional career, please?

21   A.    Yes.  I worked for 13 years as the U.S. that he was

22   engineering laboratory in Annapolis, Maryland, in their

23   metals lab, conducting tests and evaluations of various

24   types of materials, not just metal.

25                I spent ten years as a program manager in

1    materials evaluating and testing at the U.S. Department of

2    Energy's headquarters in Washington, D.C..  I then spent 16

3    years at the U.S. Government's National Bureau of Standards,

4    which became the National Institute of Standards and

5    technology.  I was there for 16 years in the materials lab.

6    And I was responsible for the volume of testing evaluation

7    and characterization techniques for a variety of materials.

8              I retired from the government in 2002, and I

9    went to work at Trident Engineering.  And I am spokesman

10   there for testing evaluation of materials for a variety of

11   applications, mostly mechanical of one sort or another.

12   Q.    What would you say you have spent the majority of your

13   professional career doing?

14   A.    I spent over 40 years in testing evaluation of

15   materials.

16             MR. ABRAHAM:  Your Honor, LG would like to offer

17   Dr. Dapkunas as an expert in materials testing.

18             MR. SPEARS:  No objection.

19             THE COURT:  He is accepted.

20   BY MR. ABRAHAM:

21   Q.    What were you asked to do in this case?

22   A.    I was asked to evaluate the effect of plaques, you are

23   familiar with now, on the behavior of the plastic liners out

24   of refrigerators, that is to say, how did the presence of

25   the plaques change a flat liner.

Dapkunas - direct

1    Q.    Is that what you did?

2    A.    Yes, that's what I did.

3    Q.    How did you go about doing that?

4    A.    I did it by conducting two kinds of tests, a tensile

5    test where you will pull the material, evaluate how much

6    stresses were given for a force and pull, much as Dr.

7    Karvelis described, and did flexion testing, where you bend

8    the material and see the cross-sectional geometry, how that

9    changes the flexure.  We did that in several different ways.

10   Q.    What did you test, what unit did you test?

11   A.    I tested liner material from ten different

12   refrigerators.  The earliest was a 1990 General Electric

13   HotPoint.  And the most recent was a 2009 LG refrigerator.

14   In between that the other eight refrigerators discussed

15   consisted of those built in the early nineties by Whirlpool

16   and KitchenAid.

17   Q.    When you refer to that you tested the liner, could you

18   please explain what you mean by that?

19   A.    We would remove a section of liner from the

20   refrigerators in question.  We would find portions of those

21   liners that had no plaques and portions that did have

22   plaques.

23            We would cut comparable samples from the plaqued

24   and unplaqued areas, and then conduct tensile tests and

25   flexure tests.

1    Q.    Were you able to come to any conclusions based on your

2    testing?

3    A.    Yes.

4    Q.    What were those conclusions?

5    A.    My conclusions were that the presence of the plaques

6    made the liner material more easily stretched, it elongated

7    more easily.

8              The flexure tests showed that the plaques made

9    the material stiffer in bending.  So for the plaque it was

10   more difficult to flex it.

11   Q.    If you could please turn to Tab 1 in your notebook,

12   which is PDX-19.

13             Mr. Brooks, if you could get PDX-19 on the

14   screen?

15             MR. SPEARS:  I have an objection to this.

16             THE COURT:  As to whether this witness has the

17   requisite knowledge?

18             MR. SPEARS:  Yes, that's right.

19             THE COURT:  Can you establish a foundation for

20   this witness?

21             MR. ABRAHAM:  I can try.

22             THE WITNESS:  I am sorry?  Did you say Tab 1?

23   BY MR. ABRAHAM:

24   Q.    Mr. Dapkunas, just a couple background questions.  You

25   referred to a GE HotPoint that you tested?

Dapkunas - direct

1    A.     Yes, sir.

2    Q.     Do you know what date that unit was manufactured?

3    A.     The label on the inside of it said that it was

4    manufactured in 1990.

5    Q.     So if you could please turn to PDX-19?

6              MR. SPEARS:  May we have a sidebar?

7              (The following took place at sidebar.)

8              THE COURT:  So, counsel, PDX-19 is a

9    demonstrative labeled tensile test results with and without

10   plaques.  This appears to be for a unit manufactured by GE.

11   Is that right?

12             MR. ABRAHAM:  That's correct.

13             THE COURT:  Mr. Spears objects that there is no

14   foundation that has been laid for the witness to discuss

15   this particular item.  Do you want to be more specific about

16   your objection?

17             MR. SPEARS:  The objection has to do with

18   whether this has been proven up as prior art.  Two problems

19   with it.  Manufacture is not a prior art event.  Public use,

20   public sale is a prior art event.  So simply saying that if

21   a refrigerator is manufactured at some time in 1990 does not

22   prove it up as prior art.

23             The other problem is we have chain of custody

24   issues.  From what I can tell, they can't track the chain of

25   custody for this refrigerator with its label back beyond the

1    summer of 2009.  So there is that authentication problem as

2    well.

3            Basically, two issues with respect to their

4    clear and convincing evidence burden on proving this up as

5    prior art.

6            MR. ABRAHAM:  With respect to the fact that it's

7    a 1990 GE HotPoint, at this point in time he is testifying

8    to the fact that that is the date he believes it was

9    manufactured, based on the label that is attached to the

10   inside of the liner.

11           THE COURT:  Mr. Sharma, it's his witness.

12           Would you react to Mr. Spears' comments about

13   whether or not, regardless of chain of custody, at the end

14   of the day this is prior art.

15           MR. ABRAHAM:  Well, aside from the facts -- this

16   witness won't be able to address whether or not this is

17   prior art.  That comes with a later witness who can lay that

18   foundation.

19           MR. SPEARS:  Then there should be an instruction

20   to disregard this witness' testimony.

21           THE COURT:  Let's get an offer of proof as to

22   who and what that witness would say on the question of

23   whether this particular unit is prior art.

24           MR. ABRAHAM:  This particular unit, the evidence

25   from that will come in from Dr. Mellinger, who was an

1    employee of GE at the time these units were being made and

2    sold into the United States.

3                THE COURT:  He would testify that these units

4    were sold?

5                MR. ABRAHAM:  Yes.

6                THE COURT:  If that were the case, you would

7    agree?

8                MR. SPEARS:  I would agree.  And if he could say

9    that the specific one that was tested by Dr. Dapkunas was

10   one of the units that was sold into the United States,

11   before the critical date, absolutely.

12               THE COURT:  When you say the specific one, do

13   you mean one with a manufacturing label of the type that's

14   been described?  You don't mean the actual label?

15               MR. SPEARS:  The one that he tested.

16               THE COURT:  That is what I was afraid you meant.

17   So there is a chain of custody.

18               I don't think we have an issue with regard to

19   prior art.  Because I am going to accept your representation

20   that you are going to establish that foundation with the

21   next witness or whenever he testifies.  But what about the

22   chain of custody?

23               MR. ABRAHAM:  We can trace it back to when we

24   purchased the unit from a supplier, I believe the summer of

25   2009.  I believe --

1    THE COURT:  Mr. Sharma, I am going to let you

2    weigh in here.

3    MR. SHARMA:  Unfortunately, Mr. Abraham did not

4    work with Dr. Mellinger.  Dr. Mellinger was the individual

5    at GE who was in charge of all the plastic liners, the

6    refrigerators.  One of the refrigerators is right here with

7    this model number.  He is going to be able to say that he

8    oversaw this production, he knows they were sold.  He knows

9    the units were this model number.

10    THE COURT:  Mr. Spears has a very technical

11    objection.  That is while he may be able to talk about

12    refrigerators that possess this model number, he is not, his

13    contention, Mr. Spears' contention, going to be able to

14    satisfy the chain of custody requirements that this

15    particular unit was sold by GE?

16    MR. SHARMA:  He can testify that as to this

17    model and how it compares to the other models that he knows

18    were sold and made.

19    THE COURT:  Do you think, Mr. Spears, it would

20    be inappropriate to allow him to adduce, Mr. Sharma or Mr.

21    Abraham, whoever is going to do it, testimony from that

22    witness we are talking about, chain of custody witness, and

23    leave it to the jury to determine circumstantially, that is,

24    whether there is an appropriate chain of custody?

25    Or are you saying this is something that I have

1   to do in my gatekeeping function before I let the jury

2   consider it?

3          MR. SPEARS:  I think it's an appropriate

4   gatekeeping issue, Your Honor, because they do have a clear

5   and convincing evidence burden.  They aren't talking about

6   these models in general.  They are talking about a specific

7   refrigerator tested.

8          THE COURT:  Yes.  But these are refrigerators

9   made I assume on an assembly line of some sort.  I can think

10  of some analogous circumstances where it would be

11  inappropriate for me to permit, absent a correctly

12  established chain of custody, technically, where one witness

13  could say I handed it off, the evidence from this witness to

14  the next, it was in the evidence room, I brought it here,

15  it's not been unsealed and all of that.  Maybe drugs or

16  something.

17          I am going to permit it.

18          (End of sidebar conference.)

19  BY MR. ABRAHAM:

20  Q.   Could you please look at PDX-19.  Mr. Dapkunas, could

21  you please describe what is shown here on PDX-19?

22  A.   Yes, I can.  Can I use a pointer.

23  Q.   Please do.

24  A.   What you see is a stress/strain curve for some

25  material that was removed from the GE HotPoint.  This is the

1    1990 model I was telling you about.

2           What you see in the solid line is the deflection

3    or the stretching, the strain, which is what strain is, it's

4    how much it's stressed for a given load.  You can see that

5    for a given amount of strain, six-tenths of a percent of

6    strain here, the solid line, that is the unplaqued material,

7    requires about 2000 psi.  For a material with plaque in it,

8    it requires about 500 psi, which is what I was saying

9    before, which is what I was saying before, the plaques make

10   the material stretchier.

11   Q.    Were you presented in the court when Dr. Kelvaris

12   testified?

13   A.    Yes, I was.

14   Q.    Are you aware that Dr. Kelvaris has done testing in

15   this case as well?

16   A.    He did similar testing.

17   Q.    How did Dr. Kelvaris' test results compare where

18   yours?

19   A.    He qualitatively found the same thing, that plaques

20   make the liner material stretchier, if you will.  More

21   easily elongated for the same stress.

22   Q.    Can you describe, explain a little further what you

23   referred to as your flexure testing?

24   A.    Several kinds of flexure testing, the most

25   straightforward kind was a cantilever test, so that I could

Dapkunas - direct

1    easily, efficiently compare the stiffness of material with

2    plaques and without plaques.  I did that by clamping pieces

3    of the same size to a bench and seeing how much they

4    dropped.

5             Pieces with the plaques in them dropped less

6    than the pieces without plaques.  Plaques stiffened the

7    material.

8             We also did three-point flexure test on one set

9    of materials out of a refrigerator.  We did a four-point

10   flexure test, much as Dr. Kelvaris did.  And I guess that

11   was it.

12   Q.   What samples did you perform the flexure testing on?

13   A.   We used the same materials that we did the tensile

14   testifying on.

15   Q.   Were you able to form any opinions about the behavior

16   of marked and unplaqued liners with regard to your flexure

17   testing?

18   A.   Yes.  The plaques increased the stiffness in bending

19   of the liner materials.  That is to say, if you put plaques

20   in it makes it more resistant to bending whether you get

21   cantilevered on the four-point point or three-point

22   Q.   Do you know if Dr. Kelvaris also did flexure testing?

23   A.   Yes, he did.

24   Q.   Do you know which units he tested?

25   A.   He tested the material, the liner materials from two

1    LG models.

2    Q.    Have you reviewed the results of his tests?

3    A.    Yes, I have.

4    Q.    How did his tests compare with yours?

5    A.    He also found that the plaques increased the stiffness

6    over the unplaqued material.

7    Q.    Doctor, with Dr. Karvelis' test results as well as

8    your own, were you able to come to a conclusion as to the

9    behavior of plaques in a plastic liner?

10   A.    Yes.  It seems to me that regardless of the age,

11   vintage of the liner, who made the liner, or the dimensions

12   of the plaques, the plaques increased the stiffness of the

13   liner material, increased the stiffness of the liner

14   material and make it less resistant to stretch, make it

15   stretchier and less bending.

16   Q.    Were those results surprising to you?

17   A.    No, they are not.

18        The effects that we are seeing are not unknown.

19   For instance, the stretching issue.  The plaques form

20   expansion joints.  Expansion joints -- in this case for

21   thermal applications, where you have got different

22   coefficients of thermal expansion and a different

23   temperature excursion on the inside and outside of the

24   refrigerator, which create thermal stresses on the liner.

25        Thermal expansion joints of different types are

1    put in all you kinds of machinery.  You see them in bridges,

2    buildings, you see them in mechanical equipment.  That is

3    not unusual.

4              So that is not an unknown phenomenon.  It is to

5    be expected.

6              The increase in stiffness for bending is also

7    not unexpected.

8              What's going on here is that you are changing

9    the cross-section of the material, or the geometry of the

10   cross-section of the material.  You are changing its moment

11   of inertia, that was something that Dr. Kelvaris touched on.

12             This is a phenomenon that has been understood,

13   analytically, probably for close to 200 years.  It's not a

14   new idea.  In fact, in your houses, if you live in a house

15   with more than one story, if you look underneath, you will

16   probably find a steel I-beam running the length of your

17   house.  A steel I-beam has a top, which is a flange, and an

18   upright portion, which is a bottom flange.  It is very stiff

19   because it has that material on the top and bottom.  They

20   are a lot wider than the material in the middle.  It

21   stiffens the structure.

22             It's a commonly used technique.

23             The way in which the moment of inertia is

24   applied varies.  But the phenomena is the same.  The science

25   is the same.  The science is the same for all the specimens.

1       MR. ABRAHAM:  Pass the witness, Your Honor.

2       THE COURT:  Mr. Spears.

3                    CROSS-EXAMINATION

4    BY MR. SPEARS:

5    Q.    Mr. Dapkunas, you told the jury about tensile testing

6    and flexure testing that you performed on various

7    refrigerators.  Correct?

8    A.    On liners, yes.

9    Q.    And in order to get access to the equipment you needed

10   to perform those tests, you had to travel from Annapolis,

11   Maryland, to Pittsfield, Massachusetts.  Correct?

12   A.    That's correct.

13   Q.    And I take it that you wouldn't have done that unless

14   you thought that the tests that you were going to perform in

15   Massachusetts would be important to the opinions that you

16   provided the jury today.  Correct?

17   A.    That's correct.

18   Q.    Now, you understand that LG contends, among other

19   things, that Whirlpool's '601 patent is invalid.  Correct?

20   A.    Yes.

21   Q.    And that for LG to prevail on this defense, it needs

22   to come forward with not just some evidence, but with clear

23   and convincing evidence that the invention is found in the

24   prior art?

25           Is that your understanding?

Dapkunas - cross

1  A.    I am not a lawyer.  My limited understanding is as you

2  said.

3  Q.    Now, if you wanted to clearly convince another

4  engineer that a structure, like a bridge or a refrigerator

5  door, had some specific property, I take it you wouldn't

6  just point to a picture of a bridge, you would actually

7  perform some tests, like the tests you did in Massachusetts

8  in this case?

9  A.    Well, yeah.  You would perform tests.  But typically,

10  for a complex structure, you would remove some portion of

11  the structure or isolate some portion of the problem that

12  you thought bore upon the total solution.

13          That in a sense is what we were doing with the

14  plaqued material.

15  Q.    I understand, sir.

16          Now, with respect to prior art refrigerators,

17  the only one that you actually believe was a prior art

18  refrigerator that you tested and that you discussed with Mr.

19  Abraham was this GE HotPoint refrigerator.  Correct?

20  A.    That's correct.

21  Q.    Now, that GE HotPoint refrigerator wasn't the only

22  refrigerator that GE provided you with.  Right?

23  A.    GE didn't provide us with a refrigerator.

24  Q.    I am sorry, that LG -- I am confused, I am sorry, late

25  in the day -- that GE HotPoint wasn't the only refrigerator

1    that LG provided you with.  Right?

2    A.    I am sorry, could you repeat that?

3    Q.    Well, let me ask a different question to you.

4          You are aware of a warehouse that LG set up in

5    Columbia, Maryland.  Correct?

6    A.    Yes.

7    Q.    That is just about 25 miles from Annapolis.  Right?

8    A.    That's correct.

9    Q.    And in that warehouse, LG placed about 75 or 80

10   different refrigerators.  Correct?

11   A.    Correct.

12   Q.    Were you aware that LG had essentially put out a

13   bounty, told the public, asked the public to come forward

14   with old refrigerators that had plaqued wall liners?  Are

15   you aware that LG did that?

16   A.    I don't know how they collected those refrigerators.

17   I have no knowledge of that.

18   Q.    Of all those refrigerators in that warehouse in

19   Columbia, the only prior art refrigerator that you tested

20   was the GE HotPoint refrigerator?

21          Correct?

22   A.    I would think that's right, because the date of

23   manufacture on it, to my understanding, constitutes prior

24   art.

25   Q.    Now, I would like to talk about the two tests that you

1    performed on that GE HotPoint refrigerator, and I would like

2    to begin with the tensile test.  All right?

3    A.    Yes.

4    Q.    That is the test to determine how stretchy the wall

5    liner is.  Right?

6    A.    Correct.

7    Q.    In your tensile testing, you related what you called

8    type 1 samples and type 2 samples.  Correct?

9    A.    I believe for the GE refrigerator we did the type 1

10   test.

11   Q.    That was going to be a question, Mr. Dapkunas.

12           Generally, with respect to the tensile tests

13   that you performed on GE, LG and other refrigerators, you

14   had type 1 samples.  Is that correct?

15   A.    That's correct.

16   Q.    The type 1 samples, these were strips that were what,

17   8 inches long?

18   A.    The type 1 specimens were fabricated and tested

19   according to an ASTM standard, D-638, which is a standard

20   test, developed for the evaluation of the properties of flat

21   plastics.  They have a two-inch gauge length with a

22   half-inch wide nominal width.

23   Q.    Your type 1 samples were two inches long and a

24   half-inch wide?

25   A.    Yes.

Dapkunas - cross

1    Q.    Your type 2 samples were larger?

2    A.    They were large because what we wanted to do in those

3    samples was include prior plaques.

4    Q.    When you did your tensile testing on the GE HotPoint

5    samples, the only samples that you tested from that

6    refrigerator were the little type 1 strips.  Correct?

7    A.    Yes.  And would you like me to tell you why?

8    Q.    I know you can explain that to Mr. Abraham when he

9    stands up for your redirect, sir.

10            Now I would like to talk some about the flexure

11   testing that you performed on the GE HotPoint samples.  To

12   begin our discussion, I would like for you to turn to Tab 1

13   in your notebook.  If we could have on the screen

14   photographs 1, 2 and 3 from what I believe were Mr.

15   Dapkunas' rebuttal report, let's have one and two up.

16            That's enough.  These three photographs

17   illustrate the apparatus that you used for the flexure

18   testing that you performed on certain refrigerator liner

19   samplings.  Correct?

20   A.    Yes.  It's the same design that Dr. Kelvaris had in

21   his report.

22   Q.    And this is called a four-point flexure testing

23   machine?

24   A.    Well, the machine itself is an Instron testing

25   machine.  The setup is a four-point flexure arrangement.

Dapkunas - cross

```
 1    Q.     And I believe that you put in this Instron testing

 2    machine an LG sample, a Whirlpool sample, a Kenmore sample

 3    and a KitchenAid sample.  Correct?

 4    A.     That's correct.

 5    Q.     Could you turn to Tab 2 in your notebook, if we could

 6    have that put up on the screen.  It's Exhibit H from -- if

 7    we could page through this.  I don't think that's it.  Okay.

 8    We are getting to it.  Next page.  Next page.  Next page.

 9                 Okay.  Here is what I am interested in, sir.

10                 This, what we see on the screen is the testing

11    arrangement that you set up for doing your flexure testing

12    on the samples from the GE HotPoint.  Correct?

13    A.     This is not the GE HotPoint.

14    Q.     But this is the same type of arrangement that you used

15    for the GE?

16    A.     That is the type of arrangement, yes.

17    Q.     You just clamped it to a bench.  Right?

18    A.     That's right.

19    Q.     So was there bench in your garage or did you have to

20    travel to Massachusetts to do that?

21    A.     We did this in the Trident office in Annapolis.  We

22    have a laboratory there that I did it in.

23                 MR. SPEARS:  Pass the witness.

24                 THE COURT:  Redirect, counsel.

25                        REDIRECT EXAMINATION
```

Dapkunas - cross

1    BY MR. ABRAHAM:

2    Q.    Mr. Dapkunas, Mr. Spears referred to type 1 testing

3    and type 2 testing.  Do you recall?

4    A.    Yes.

5    Q.    For the GE HotPoint, you performed type 1 tensile

6    tests, correct?

7    A.    That's correct, according to the ASTM D-638 protocol.

8    Q.    You did not perform the type 2 tensile tests?

9    A.    No.

10   Q.    Why not?

11   A.    The plaques out of the GE refrigerator, the section of

12   the refrigerator in which the plaques laid was about 24

13   inches wide and probably 26 or 28 inches high.

14             It contained three plaques, a narrow one in the

15   middle, two wide ones down the sides.

16             No, sir plaques extended just about to the side

17   walls.  And to get that back out of the refrigerator, the if

18   you cut specimens from it, we had almost nothing left,

19   because it was right up against the walls.

20             Whereas the Whirlpool, contingency Moore,

21   KitchenAid, and the LG refrigerators had plaques that were

22   isolated from one notice, and isolated from the ends of

23   those wall sections.

24             So it was very feasible to cut sections out of

25   those.

1           The refrigerator from which we had taken the

2   material to do these type 1 tensile tests, to show the

3   effect of plaques, essentially destroyed that section of the

4   refrigerator in cutting things out.

5           And that's why we didn't do more than we did in

6   terms of flexure.  It would have been nice to do more than

7   that.  That's what we could do for that piece of material

8   that we had.

9           MR. ABRAHAM:  No further questions.

10          THE COURT:  Thank you, sir.  You are excused.

11          (Witness excused.)

12          THE COURT:  All right, ladies and gentlemen.  We

13  have come to the end of the day.  We will see you tomorrow

14  morning at 9.

15          Please remember the instructions I gave at the

16  end of the day.

17          (Jury leaves courtroom at 4:30 p.m.)

18          (Recess taken.)

19          THE COURT:  Okay, counsel.  Please be seated.

20          I want you to pull out your Exhibit 1, your file

21  with the instructions.  Let's go through this.

22          We will do what we can do today, understanding

23  that there is still evidence that is going to be adduced in

24  this case.

25          Page 3, under the 1.3 instruction, evidence

1   defined.  Second paragraph, there is a typo, the second

2   line, under deposition transcript testimony, should the word

3   testimony be there?

4              MR. PARTRIDGE:  That is fine.

5              THE COURT:  Mr. Coyne, are you with me?

6              MR. COYNE:  Yes, Your Honor.

7              THE COURT:  Second paragraph, second line in

8   that paragraph?

9              MR. COYNE:  Yes, Your Honor.

10              THE COURT:  I have moved on to Page 1.6,

11   credibility of witness.

12              This is an instruction I used, this was Elan or

13   ETG, that I have -- do you have the civil action number?

14               We are going to provide you with a copy of a

15   credibility instruction that I am going to direct you to

16   use, in lieu of the proposed now rather dated 1993 uniform

17   Delaware patent instructions.

18              One day we will get around to convening a

19   committee.  But there are so many new folks involved in

20   proposing patent instructions, I don't know that we need to.

21              I have moved on to 1.9, burden of proof.  I

22   would like you to add the following to the end of the second

23   paragraph.  Are you with me, Mr. Coyne?

24              MR. COYNE:  Yes, Your Honor.

25              THE COURT:  "Proof by clear and convincing

 1   evidence is thus a higher burden than proof by a

 2   preponderance of the evidence."

 3          I am assuming there is no difficulty on the

 4   other side.

 5          MR. COYNE:  No, Your Honor.

 6          MR. SPEARS:  No, Your Honor.

 7          THE COURT:  We have moved on to 3.1, independent

 8   and dependent claims, Page 12.

 9          Have you taken a look at the Federal Circuit Bar

10   Association's instruction in this area?  I prefer it.

11          Moving on to Page 18, 3.2, DOE.

12          MR. SPEARS:  I don't mean to interrupt, Your

13   Honor.

14          THE COURT:  Page 15, I am sorry.  Was that what

15   you were going to call to my attention?

16          MR. SPEARS:  Yes, Your Honor.  In light of the

17   way the evidence has come in, Whir pool is perfectly

18   agreeable to LG's.

19          THE COURT:  Okay.  So the language that I

20   highlighted at the bottom of Page 15 is no longer in

21   controversy?

22          MR. SPEARS:  That is exactly right, Your Honor.

23   We have no objection to you submitting that.

24          THE COURT:  Just thinking about it, I am not

25   certain that I agree with either of you, frankly, that this

1    language isn't confusing.

2            Let's be specific about the language we are

3    talking about, so we are certain that we are talking about

4    the same language:  An accused device may be found to

5    infringe if it is reasonably capable of satisfying the claim

6    limitations, even though it may also be capable of

7    noninfringing modes of refrigeration.

8            Yes, Mr. Spears?  You don't think that language

9    is potentially confusing?

10           MR. SPEARS:  In the context of this case as the

11   evidence has come in, I believe it would be confusing.

12   Therefore, Whir pool no longer sees any need to have it

13   submitted.

14           MR. COYNE:  Your Honor, we agree it should not

15   be submitted.

16           THE COURT:  You are agreeing it should come out.

17           MR. SPEARS:  Absolutely.

18           THE COURT:  Fine.  I didn't understand.  Good.

19   So does the Court.

20           Now I am on to Page 18.  Counsel, I am not

21   certain that the Federal Circuit Bar Association's

22   instruction wouldn't be preferable, generally speaking.

23   Have you looked at that?

24           MR. SPEARS:  Yes, I have, Your Honor.  In fact,

25   there is a legal errors instruction.

1    THE COURT:  Where is that legal error?

2    MR. SPEARS:  The legal error, if you will, is in

3    the statement, the statement of function, way, result test.

4    And then the next statement is that in order for the

5    structure to be considered equivalent, it must have been

6    known at the time of the alleged infringement to a person

7    having ordinary skill in the field of technology of a

8    patent.

9    That is true, when you are talking about

10   equivalence under 112(6) of the Patent Statute.  It is

11   fundamentally not true when you are talking about the

12   doctrine of equivalents.  And the Federal Circuit has drawn

13   that very distinction in various cases, including the Jumana

14   (phonetic) case.  If this is in the Federal Circuit Bar

15   Association instruction, and I think that that instruction

16   is actually very close to this, it's wrong.

17   THE COURT:  We can take another look.  Go ahead,

18   Mr. Coyne.

19   MR. COYNE:  Yes, Your Honor.  There is a 1994

20   Federal Circuit case, AllSight (phonetic) Court v. VSI.  And

21   the Court lays out there the difference between 112 and

22   regular equivalence.  And it tends to say the opposite of

23   what Mr. Spears said.  In other words, an equivalents

24   analysis under 112 must have been conducted at the time the

25   patent issued while an opinion under the doctrine of

```
 1    equivalents may arise after or at the time of the

 2    infringement.  We have proffered this and we believe it

 3    accurately states the law.

 4              MR. SPEARS:  That is very important.  This

 5    language is talking about something existing -- I am sorry.

 6    It's at the time of the alleged infringement.  My mistake,

 7    Your Honor.  We have no problem with this.

 8              THE COURT:  So we are good.  Okay.

 9              3.3.3.  It's long, it's confusing.  I am not

10    sure what purposes it serves.

11              MR. SPEARS:  I agree with that.  In addition,

12    the second half of it dealing with prosecution history

13    estoppel is an issue for the Court.

14              THE COURT:  Yes.

15              MR. COYNE:  Yes, Your Honor.  We agree.

16              THE COURT:  So, willful infringement, 3.4, I

17    believe the controversy, or language is at the bottom of

18    Page 25, it reads:  You may also consider whether LG sought

19    a legal opinion as one factor in assessing whether, under

20    the totality of the circumstances, any infringement by LG

21    was willful.

22              I have used a similar instruction in the past,

23    counsel, under similar circumstances.

24              MR. COYNE:  Our concern is it essentially forces

25    us into a waiver proposition or at least telling the jury
```

1  that we have declined to waive, which I suppose we already

2  have.  But it does emphasize the lack of an opinion.

3                    THE COURT:  It doesn't emphasize anything but a

4  fact.

5                    MR. COYNE:  Yes, Your Honor.

6                    THE COURT:  I have written on this before.

7  While you may differ, it seems to me that, if -- are you

8  saying if you haven't sought an opinion of counsel, that

9  it's something that the jury may not consider?

10                    MR. COYNE:  No, Your Honor, I am not.

11                    THE COURT:  What are you saying?

12                    MR. COYNE:  We have in this case sought an

13  opinion.  We haven't waived privilege.  I guess we will

14  accept the language that the Court is suggesting, that that

15  stays in.

16                    THE COURT:  Yes.  I am assuming there is no

17  objection?

18                    MR. SPEARS:  No, Your Honor.

19                    THE COURT:  4 .3 is the next one I have.

20                    I think there is one typo I see at Page 31, the

21  first paragraph, after the semicolon, it says, and that the

22  89 patent, I don't think the 89 is any longer in the case.

23  Right?

24                    MR. COYNE:  That's correct, Your Honor.  It's

25  out.

1        THE COURT:  These are real similar instructions.

2   One based on the national patent jury instruction model, and

3   the other on the Federal Circuit Bar Association model,

4   counsel.  What do you want to do?

5        MR. SPEARS:  I think the first thing we need to

6   ask ourselves is whether we need to submit it at all.

7        I have the same question as to 4.12, written

8   description.  Whirlpool agreed to the form of that

9   instruction.  There were such defenses provided in Dr.

10  Bessler's expert report.  But since he didn't testify to

11  them this morning, I don't think we have written description

12  or enablement in the case anymore.

13       THE COURT:  Let's see if your opponent agrees.

14       MR. COYNE:  Your Honor, I don't know what I

15  missed.  I did put up that list with Dr. Lee and Dr. Bessler

16  specifically said there was no description in the '130

17  patent for any of them.

18       THE COURT:  So there is testimony.

19       MR. SPEARS:  The next step of that is whether a

20  person of ordinary skill in the art would have been capable

21  of doing that --

22       THE COURT:  And there is no testimony.

23       MR. SPEARS:  There is no testimony on that

24  point.

25       MR. COYNE:  Your Honor, I appreciate this is an

1   issue that is hotly contested in the circuit right now, in

2   the Aria en banc decision between written description and

3   enablement.  The enablement is whether someone of ordinary

4   skill could be enable it.  The written description has to be

5   there.  And what he testified is, there is no written

6   description.  It isn't a question of one of ordinary skill

7   in the art would be enabled.  Written description has to be

8   present.  Right now the circuit law is there are two

9   separate requirements.  Written description can't be

10  backfilled by the level of skill in the art.  There is no

11  written description.

12              MR. SPEARS:  In that case, we can agree to the

13  submission of the written instruction and a written

14  description, defense in the verdict form.  I think we are in

15  agreement that there is no enablement defense and we need

16  not submit enablement to the jury.

17              THE COURT:  Do you agree?

18              MR. COYNE:  Yes, Your Honor.  But there is

19  another issue whether enablement goes to Your Honor.

20              THE COURT:  I am talking about jury

21  instructions.

22              MR. COYNE:  For purposes of the jury

23  instructions, we are fine with written description going to

24  the jury.

25              THE COURT:  Indefiniteness.

```
 1              MR. SPEARS:  I don't know what the defense is.

 2    I don't know why the jury should hear it.

 3              THE COURT:  4.4.

 4              MR. COYNE:  Your Honor, there is circuit

 5    authority that says that it is an issue that is amenable to

 6    resolution by the jury where the issues are factual.  That

 7    is the B.J. Services Corporation v. Halliburton case.  This

 8    is part of the testimony we will be adducing tomorrow

 9    morning before we finish.

10              We believe --

11              THE COURT:  We will address it again further

12    later.

13              MR. COYNE:  Thank you, Your Honor.

14              THE COURT:  Yes.

15              MR. SPEARS:  It appears that Dr. Mellinger, from

16    whom this testimony is going to be adduced, has provided no

17    opinions on indefiniteness in his expert report.  As the

18    Court said, if he is allowed to testify --

19              THE COURT:  It is a different issue, counsel.

20    Let's not mix metaphors.  We are talking about jury

21    instructions.

22              4.5.1 is the next one I have.  Level of ordinary

23    skill.  I have the following language at the beginning of

24    the instruction:  Several times in these instructions I have

25    referred to a person of ordinary skill in the field of
```

1    invention.

2              Did you get that, Mr. Coyne?

3              MR. COYNE:  I am trying, Your Honor.

4              THE COURT:  The next is 4.5.3, I just see a

5    typo.  The second sentence, you must consider the claimed,

6    you need to add the "ed."

7              Claimed invention.  Do you see that?  By the

8    time we get to 4.6 I will be dizzy.  I am wondering whether

9    we really need 4.6.  But if you believe that we do, we do.

10             MR. SPEARS:  Yes.

11             THE COURT:  It was certainly talked about

12   earlier.

13             MR. SPEARS:  Yes, we believe we need this

14   instruction.

15             THE COURT:  Mr. Coyne.

16             MR. COYNE:  Yes, Your Honor.

17             THE COURT:  All right.  We will give it.

18             Counsel, 5.3, when damages begin.  Come on.  Or

19   I am going to submit it to the jury and let them decide?

20             MR. SPEARS:  This deals with the date of actual

21   notice.  The Patent Statute says we have the date of actual

22   notice as of the date that an action for patent infringement

23   was filed.

24             On January 23rd of 2008, an action for patent

25   infringement was filed in the International Trade

1    Commission.

2           In the summary judgment letter that was

3    submitted by LG, LG took the position that this was the date

4    of actual notice and from which damages under the '130

5    patent should run.

6           We think this is a simple issue, can be decided

7    as a matter of law right now, especially in light of LG's

8    submission, there is no reason to have the jury decide it.

9           THE COURT:  Why can't you two agree?

10          MR. COYNE:  I don't know why we can't agree.

11   It's date of institution.  We were not served with that

12   complaint.  In the ITC, you don't serve it when it's filed.

13   The ITC rules on it first and then --

14          THE COURT:  We have to get into the arcane rules

15   of the ITC in order to decide notice?

16          MR. COYNE:  No, Your Honor.

17          THE COURT:  If what appears in the summary

18   judgment letter is what Mr. Spears has represented you wrote

19   in the summary judgment letter, my clerk is going to check,

20   that is the date I am going to hold you to.

21          MR. COYNE:  Very well, Your Honor.  Thank you.

22          THE COURT:  Let's continue on while she is doing

23   that.  I am coming now to the end here.

24          Counsel, you need to make two additions here,

25   6.1, deliberation and verdict.  This is an old form,

1    wherever you got your form from, it's an old one.  So after

2    the first sentence, Mr. Coyne, add the following sentence:

3    After you hear the closing arguments of counsel, you will

4    return to the jury room to begin your deliberations.

5         Then in the next paragraph, please add the

6    following sentence after the first sentence, right after the

7    word case:  You should add, The first thing you should do is

8    select a foreperson.

9         That then necessitates the deletion of the last

10   sentence in that paragraph.  I no longer employ that

11   procedure.

12        I also traditionally use, it's a little

13   redundant, but I think it bears -- it should be used in this

14   case.  It's called duty to deliberate.  When Mr. Nerozzi

15   comes back I will have her duplicate this, so that it can be

16   distributed.

17        Finally, 6.2, unanimous verdict, the second

18   paragraph, last sentence, this is at Page 49.  Instead of

19   the word "of," I think it should be "from," your duty is to

20   seek the truth from the evidence in this case.  And then,

21   lastly, in the last paragraph, the second line, it should be

22   "intimation" rather than "limitations," intimation as to

23   what I think your verdict should be.

24        I think that covers and disposes of all the of

25   the issues except for the moment when damages begin.

1    MR. COYNE:  I believe that's correct, Your

2  Honor.

3    THE COURT:  As soon as Ms. Nerozzi comes back, I

4  will have her distribute the duty to deliberate addition.

5  Let's move on.

6    MR. SPEARS:  We have a copy of that, Your Honor.

7    THE COURT:  Do you?  That's fine.  Let's make

8  sure it's the same.

9    Do you have a copy?

10    MR. COYNE:  I do not, Your Honor.

11    THE COURT:  What Mr. Spears has handed me, for

12  the record, is a copy of your submission in support of your

13  request to move under Rule 56.

14    MR. COYNE:  Very well, Your Honor.

15    THE COURT:  It will be January 23.

16    Ms. Nerozzi, you can come back if you are

17  listening.

18    Then that brings us to the verdict forms.  I

19  think I have -- I am going to recommend, for purposes of our

20  discussion and actually the creation of a verdict form, that

21  we use Whirlpool's model and work from that.

22    Do you have both in front of you, counsel?

23    MR. SPEARS:  Yes, Your Honor.

24    THE COURT:  At Page 2, Mr. Coyne, there is the

25  following.  Under Question 2.  If you answered yes, which

1    references render the patent obvious?

2          I don't have a problem with that question.  I

3    just note there is a difference in the two forms.  Is there

4    an agreed upon list of prior art references between the

5    parties?

6          MR. PARTRIDGE:  Your Honor, there was a limited

7    amount of prior art that was introduced to the jury.  It's

8    not one of those cases where there is this long list and

9    various combinations.  But I am worried about creating some

10   inconsistency, given the lack of complexity that is

11   associated with each of the obviousness cases, insofar as

12   there is not a lot of prior art.  I just think it's risky to

13   ask this question and end up with something that's

14   inconsistent.

15         THE COURT:  Mr. Coyne.

16         MR. COYNE:  Your Honor, I don't have a problem

17   if we identify the specific references the parties have

18   relied upon in these questions.  What we are seeking here is

19   just clarity.  And I think it will help avoid jury

20   confusion.  What I am worried about is if they start getting

21   confused.

22         THE COURT:  I don't think it's confusion.  I

23   think it's an appellate issue for later on.  I don't think

24   it's a matter of confusion it may engender.

25         Talk about it some more.  I prefer you agree on

1    this.  If not, I will make the call.

2              On the other hand, Mr. Partridge, just as to the

3    reasons you have suggested, maybe it's not an issue and it

4    would be simple enough --

5              MR. PARTRIDGE:  Mr. Spears just reminded me that

6    we have this exercise we went through this afternoon about

7    what qualifies as prior art in terms of accessibility and

8    the like.

9              At the end of the day as to the plaques patent,

10   the '601 patent, there may be some confusion and lack of

11   resolution until after we finish the evidence tomorrow.

12             That sort of suggests to me that, again, I am

13   not sure we will reach agreement on what that is.  I would

14   prefer not to put this in.

15             But we will endeavor to work it out, Your Honor,

16   as you request.

17             THE COURT:  All right.  On Whirlpool's Page 2,

18   damages, the reasonable royalty, Question No. 3, I prefer

19   LG's proposal, for this reason:  I like the direction to the

20   jury, which reads, Answer this question only if you answered

21   yes to Question 1 and no to Question 2.  It is a clear

22   direction to the jury.

23             Counsel, why don't you both write down the

24   following.  I have moved on to No. 6 on Whirlpool's

25   proposed -- hold that for a second.  I am sorry.

1    I have had to work back and forth between the

2    forms.

3    Mr. Coyne, I prefer the order in which Whirlpool

4    has proposed the presentation of Question 5, the willfulness

5    question, they propose it later in the series of questions

6    to the jury.

7    In addition to that, I think the question that

8    you propose is rather argumentative, the way you propose it.

9    It's proposed as follows:

10   Has Whirlpool proven by clear and convincing

11   evidence that LG acted despite an objectively high

12   likelihood that its actions constituted infringement of a

13   valid patent ?

14   In contrast, Whirlpool's proposal reads:  Has

15   Whirlpool proven by clear and convincing evidence that LG

16   willfully infringed the '130 patent?

17   They are going to be instructed as to the

18   standard.  Again, as I said, the manner in which it's

19   proposed here smacks of spin to me, advocacy.

20   MR. COYNE:  Your Honor, there is a separate

21   issue on this.  We certainly accept that.

22   THE COURT:  Go ahead.

23   MR. COYNE:  There is a separate issue with

24   respect to the French doors and the side by side.

25   The evidence that has been submitted, there is a

1   different basis -- there is a factual basis for the jury to

2   reach different conclusions about the French door and the

3   side by side.

4           For example, they could find the side by side

5   infringed and the French door not.

6           THE COURT:  What is your point?

7           MR. COYNE:  That's why we had split it out as to

8   taking the willfulness verdict on each of the French door

9   and the side by side.

10          MR. PARTRIDGE:  Your Honor, a number of years

11  ago the Federal Circuit dealt with whether we split up time

12  periods with respect to willfulness, you know, if somebody

13  corrected and did this, that and the other thing, and the

14  bottom line is that the Judge considers, if there is a

15  willfulness verdict, all of this in determining enhancement.

16  In our case on willfulness, it is really the same for both

17  side by side and French door, because the applicable

18  structures are the same, the bin, ice maker, when you open

19  that thing up and you look behind that freezer, that inside

20  door on the French door unit, it looks the same as the one

21  on the side by side.

22          So it is a continuous willfulness from our point

23  of view.  That's the case we have been presenting.

24          If LG -- if we get a willfulness verdict, and LG

25  wants to argue that Your Honor should consider some

1  difference between the two as a factor in deciding whether

2  to enhance, you know, one and a half, two and a half or

3  whatever, I think that's for you to decide.  I think it's

4  confusing, particularly given the evidence as it has come

5  in, to now tell the jury that there is two different

6  willfulness cases when we presented it as one.

7        MR. COYNE:  The basic difference, Your Honor, is

8  on the French door model, both experts have testified that

9  the door to which this apparatus is mounted is a

10  refrigerator door.  So there is a very strong factual basis

11  in the record to distinguish.  If Your Honor has -- let's

12  say, if Your Honor gets a verdict that comes back and just

13  says we have been willful, it's going to be hard to parse

14  out which element of it it is.

15        There are factual differences.  I disagree,

16  respectfully, with Mr. Partridge on that.  Clearly, the door

17  is a freezer door on the side by side.  But there is a

18  genuine factual issue this jury is going to have to wrestle

19  with on the French door model.

20        MR. PARTRIDGE:  I just don't know of authority,

21  Your Honor, that goes product by product by product on

22  willfulness.  I haven't seen a case that does that.  I don't

23  think there is anything in the Federal Circuit that does

24  that sort of thing.  We have been looking to see if there is

25  some division of willfulness periods or willfulness by

1    products.  I haven't found it.  I am not saying it isn't out

2    there somewhere.

3              I think this would be somewhat of a new

4    direction and could be confusing.

5              I think the remedy is fixing it before our

6    posttrial briefing, should we get there, in terms of what

7    you do with respect to enhancement.

8              THE COURT:  Do you know of any authority?

9              MR. COYNE:  No, Your Honor.  I have already

10   spoken my piece.

11             THE COURT:  I am going to defer to Whirlpool on

12   this.

13             It seems to me it is a damages issue.  We can

14   discuss that at a later time.

15             I am going to suggest Mr. What Partridge has

16   offered.

17             MR. COYNE:  Okay, Your Honor.

18             THE COURT:  Looking at anticipation, I think

19   it's Question 9 for LG and Question 10 for Whirlpool.  The

20   distinction I see, I think it's one that causes me to favor

21   LG's, is that, Mr. Partridge, you leave out the word any,

22   any of the following claims, yours reads, Has LG proven by

23   clear and convincing evidence that the following claims...?

24             MR. PARTRIDGE:  That is a good point, Your

25   Honor.

1    MR. COYNE:  Yes, Your Honor.

2    THE COURT:  I think Question 12 of Whirlpool's

3    is consistent with the ruling I have just made.  And the

4    other matter is whether -- LG proposes that only the jury

5    foreperson sign the verdict form.  Whirlpool's instruction

6    is a little inconsistent in that you tell the presiding

7    juror to sign the form yet you provide signature lines for

8    each juror.  What do you want?

9    MR. PARTRIDGE:  I was a little confused when I

10   discussed this with Mr. Cottrell on the phone over the

11   weekend.  He thought you would want everyone to sign.  Then

12   I added the lines and I didn't fix the paragraph.  My

13   apologies.  Whichever way is the Court's preference.

14   THE COURT:  Mr. Coyne, do you have a preference?

15   MR. COYNE:  No, Your Honor.

16   MR. PARTRIDGE:  Just the presiding juror is fine

17   with us.

18   THE COURT:  Why don't we have the presiding

19   juror sign.  If either of you or both want to pole the jury,

20   you certainly can do that.

21   I think that covers the verdict form.  Any

22   issues there?

23   MR. COYNE:  The only other issue, Your Honor, is

24   the indefiniteness issue.  We also tabled that for the jury

25   instructions.  We can take that up tomorrow.

1    THE COURT:  LG has submitted a Rule 50 motion.

2    I thought I had brought it back out with me.  I have

3    misplaced it.  I read it while out here, during the course

4    of the day.  I am going to deny it.  I believe that it

5    doesn't, the assertions do not meet the Rule 50 standard.  I

6    think there is evidence from which a reasonable jury could

7    conclude -- unfortunately, I don't have each of the issues.

8    The record will reflect, I am denying each of your points.

9    MR. COYNE:  Yes, Your Honor.

10    THE COURT:  That's the Court's ruling.

11    Counsel, is there anything else before the jury

12    comes back tomorrow that we should talk about?

13    MR. PARTRIDGE:  I did want to talk a little bit

14    about closing arguments.  One of the things at the pretrial

15    conference, and I think it was the first one, that we tabled

16    was the appropriate structure, whether we have Mr. Coyne

17    just go and then I respond and that's it or whether he gets

18    a rebuttal or whether I get a rebuttal to his rebuttal,

19    given the nature of the case.  I want us to come to a

20    resolution on what we are doing in terms of closing

21    arguments.

22    I am fine with doing it the way we did for

23    closings that he argues, I argue, and we are done.  But I am

24    not, you know, adamant about --

25    THE COURT:  I haven't had the back-and-forth

1  that you just described a moment ago.  I haven't utilized

2  that format in the past.  I have gone the more, I guess,

3  tradition natural route, versus that which Judge Markey

4  recommended some time ago, which Judge Farnan experimented

5  with and dropped quickly, some years ago.

6            MR. PARTRIDGE:  Each side would do its thing and

7  that would be it.

8            THE COURT:  Yes.

9            MR. PARTRIDGE:  I am fine with that, Your Honor.

10           May I have a moment, with Mr. Coyne.

11           (Counsel confer.)

12           MR. COYNE:  Your Honor, the other issue we have

13  been discussing is the Bench issues.

14           At this point, we are contemplating dropping

15  several of the issues.  But there is a few issues that would

16  remain, prosecution history estoppel among them.  And we

17  would want -- if we can get all of the evidence in tomorrow,

18  and I think we might be able to, which is why I raised this

19  with Mr. Partridge earlier today, we would not see the need

20  for a further evidentiary hearing.  And what we were going

21  to suggest to the Court is that if -- we would like to

22  report back to you tomorrow whether we have achieved that

23  goal or not.

24           If we have, we would like to suggest that the

25  Court accept briefing from the parties on those Bench

1     issues, rather than keep everybody here for another day and

2     have an oral argument with you.  It seems it is less

3     efficient for your time.

4            THE COURT:  Is there any objection?

5            MR. PARTRIDGE:  No, Your Honor.  Our only Bench

6     issue, which is something normally done on another day

7     anyway, I raised it when we were talking about damages, we

8     do have, as part of our enhancement case, should we get a

9     verdict on willfulness, some additional damage information

10     we want to provide the Court, that goes from the willfulness

11     date, when they knew about the patent, up to the actual

12     notice date, with regard to the statute.  We think there is

13     authority for you to consider that.  We could do that by

14     declaration, if you decided you wanted an evidentiary

15     hearing on the issues, we could make the witnesses

16     available.

17            With that addition, I am fine putting off the

18     Bench trial.

19            THE COURT:  Is that acceptable, Mr. Coyne?

20            MR. COYNE:  Yes.

21            THE COURT:  Counsel, anything else?

22            (Court recessed at 5:18 p.m.)

23

24

25