<pre>
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3

 4                             -  -  -

 5   LG ELECTRONICS U.S.A., INC.,      :    Civil Action
     and LG ELECTRONICS, INC.,         :
 6                                      :
                  Plaintiffs,           :
 7                                      :
           v.                           :
 8                                      :
     WHIRLPOOL CORPORATION,             :
 9                                      :
                  Defendant.            :    08-234(GMS)
10   ─────────────────────────────────────

11   WHIRLPOOL CORPORATION,             :
     WHIRLPOOL PATENTS COMPANY,         :
12   WHIRLPOOL MANUFACTURING            :
     CORPORATION, and MAYTAG            :
13   CORPORATION,                       :
                                        :
14                Counterclaim          :
                  Plaintiffs,           :
15                                      :
           v.                           :
16                                      :
     LG ELECTRONICS U.S.A., INC.,       :
17   LG ELECTRONICS, INC., and LG       :
     ELECTRONICS MONTERREY MEXICO,      :
18   S.A., DE, CV,                      :
                                        :
19                Counterclaim          :
                  Defendants.           :
20                             -  -  -

21
                      Wilmington, Delaware
22                 Wednesday, March 10, 2010
                          9:30 a.m.
23                   Trial - Day Eight

24                             -  -  -

25   BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
                                     and a Jury
</pre>

1    APPEARANCES:

2              RICHARD K. HERRMANN, ESQ.
               Morris James
3                   -and-
               PATRICK J. COYNE, ESQ.,
4              ANAND K. SHARMA, ESQ.,
               JEFFREY W. ABRAHAM, ESQ., and
5              WALTER D. DAVIS, JR., ESQ.
               Finnegan, Henderson, Farabow,
6              Garrett & Dunner, L.L.P
               (Washington, D.C.)

7
                         Counsel for Plaintiffs and
8                        Counterclaim Defendant

9              FREDERICK L. COTTRELL, III, ESQ., and
               ANNE SHEA GAZA, ESQ.
10             Richards, Layton & Finger, P.A.
                    -and-
11             SCOTT F. PARTRIDGE, ESQ.,
               PAUL R. MORICO, ESQ.,
12             AMANDA M. WOODALL, ESQ.,
               GENE SPEARS, ESQ., and
13             ROBINSON VU, ESQ.
               Baker Botts L.L.P.
14             (Houston, TX)

15                       Counsel for Defendant and
                         Counterclaim Plaintiffs

16

17                       -   -   -

18

19

20

21

22

23

24

25

1    THE COURT:  Yesterday evening at the close of

2    the day, Mr. Coyne moved the Court to further instruct the

3    jury in light of argument that was made by Mr. Partridge to

4    the jury.

5    I am going to read into the record what I

6    believe to be the relevant passages from Mr. Partridge's

7    discussion with the jury, then I will tell you how I am

8    going to rule.

9    I don't know where this appears in the overall

10   transcript, so I can't identify its location.  Mr. Maurer

11   provided me with a separate couple pieces of paper.

12   Here we go.  This is Mr. Partridge:

13   "And when you see documents like those presented

14   to you from LG where 'a dispute is expected,' and you saw

15   that in a number of documents, 'a dispute is expected,'

16   those words were used in the first draft of the final

17   report, and both were dated December 2003.  We don't know

18   what the period of time was between those two drafts.  But

19   they were both intended for December of 2003, after about

20   one year and three months of total engineering work on the

21   Bics project.

22   "One year and three months later.

23   "So here we are with a dispute expected with

24   respect to the '130 patent.  What does your common sense

25   tell you a normal business would do in that circumstance?

1    What would you do if you thought you might be using

2    something that belonged to someone else without permission

3    and you thought there might be a legal dispute?  What would

4    you do?

5          "Well, one option is you wouldn't do it.

6    Another option is you would ask an attorney whether doing it

7    might get you in trouble.

8          "Would you simply paper over it by issuing a

9    second report that said, gee, we designed around the

10   creative genius of our engineers, overcame what was

11   previously -- I forget the word that was used -- the

12   impenetrable, I believe it was, patent of Whirlpool?  Is

13   that reasonable?  Is that an acceptable standard to be

14   employed, either personally, and in this case in business?

15   Do we have higher expectations of businesses when they are

16   faced with a dispute and have identified it as such?

17         "We asked LG whether or not they had any basis

18   for saying they did not infringe.  And you will remember the

19   testimony we received from one of LG's engineers, Mr. Eui

20   Yeop Chung.  He was instructed by his attorney not to

21   answer.  Well, LG can certainly stand on attorney-client

22   privilege.  You can also infer, if you so choose, that the

23   answer may not have been favorable to LG.  And that wasn't

24   the only occasion on which that occurred.  And you heard

25   evidence about those other occasions during the course of

1   this trial."

2           I read all that to give context to what I

3   think -- I am quite confident is the language about which

4   Mr. Coyne complains, and that is the next-to-last sentence

5   that I read, namely, "You can also infer, if you so choose,

6   that the answer may not have been favorable to LG."

7           So what that presents -- and this has been

8   addressed in many, many cases around the country, but

9   certainly first and foremost by Knorr-Bremse.  I addressed

10  this in my opinion in Telcordia, identifying cases in which

11  the defendant obtained an opinion of counsel but has

12  asserted the attorney-client privilege to withhold this

13  opinion, which I think is this case, and said the following:

14          "The Federal Circuit has stated that the

15  threshold showing a patentee must make in establishing

16  willful infringement 'cannot be satisfied merely by proof

17  that the accused is asserting the attorney-client privilege

18  to withhold an opinion of counsel,'" and I cite the Golden

19  Blount case.  "This also makes sense to the Court, because

20  it can envision only one inference that the jury will draw

21  from learning that the defendant has consulted counsel and

22  obtained advice, but has chosen to assert the

23  attorney-client privilege:  that the opinion received by the

24  defendant was unfavorable.  This is precisely the inference

25  that would run afoul of the Federal Circuit's reasoned

```
 1    opinion in Knorr-Bremse, and an inference that the Court

 2    would not permit the jury to draw."

 3              That is the situation we have.  It needs to be

 4    addressed.

 5              I invite you, Mr. Coyne, to craft a curative

 6    instruction, if you haven't already done that.

 7              MR. COYNE:  Our suggestion --

 8              THE COURT:  To say anything else you want to say

 9    in light of my comments.

10              MR. COYNE:  Your Honor, our suggestion would be

11    just to point out that the statement was made, and then

12    re-read the attorney-client instruction that you gave them

13    yesterday.  I think that's the simplest and least confusing

14    way for the jury.

15              THE COURT:  That's fine.

16              Do you agree with that, Mr. Partridge?

17              MR. PARTRIDGE:  That is fine, Your Honor.  I

18    think we are in a little bit of a gray area, based on how I

19    read the Broadcom-Qualcomm case, in which the Federal

20    Circuit actually approved specific language dealing with

21    this issue.

22              But we could either accept --

23              THE COURT:  What did they say there?

24              MR. PARTRIDGE:  They said, and this is in

25    connection with -- let me hand it up.
```

1    THE COURT:  Just read it.

2    MR. PARTRIDGE:  The Court said, this was the

3    instruction given by Judge Selna in the Central District of

4    California, that:

5    What the Federal Circuit said in the Broadcom

6    case comports with its holding in the Knorr case."

7    And here is the instruction:

8    In considering whether Qualcomm acted in good

9    faith, you should consider all the circumstances,

10   including whether or not Qualcomm obtained and

11   followed the advice of a competent lawyer with

12   regard to infringement.  The absence of a

13   lawyer's opinion by itself is insufficient to support

14   a finding of willfulness, and you may not assume that

15   merely because a party had not obtained an opinion of

16   counsel that that opinion would have been unfavorable.

17   However, you may consider whether Qualcomm sought a

18   legal opinion as one factor in assessing whether,

19   under the totality of the circumstances, any

20   infringement by Qualcomm was willful.

21   THE COURT:  Yes.  What was the context for the

22   reading of that instruction by the District Judge?

23   MR. PARTRIDGE:  It was a willful infringement

24   issue.

25   THE COURT:  Was it in response to a lawyer

1    making an inappropriate argument with respect to the jury?

2              MR. PARTRIDGE:  This was part of the regular --

3              THE COURT:  The general instructions.

4              MR. PARTRIDGE:  -- the general instruction that

5    the judge gave.

6              THE COURT:  You are not suggesting that the

7    Qualcomm Court, that is the Federal Circuit, in any way

8    watered down its holding and the previous panel's holding,

9    that is the en banc opinion, I believe it was an en banc

10   opinion in Knorr-Bremse?

11             MR. PARTRIDGE:  I am not, Your Honor.  I am

12   merely saying the Court after that case said here is an

13   example of an instruction that fits with that case.  That's

14   what I am saying.

15             I am fine if we just, you know, read the

16   instruction previously given, as Mr. Coyne suggested.  That

17   works for me, too.

18             THE COURT:  Mr. Partridge and Mr. Coyne, the

19   thing is, as you pointed out, Mr. Coyne, and as Mr.

20   Partridge agrees, we have already given a totality of the

21   circumstances willfulness instruction along that line.  Now

22   the Court is trying to address, it needs to cure a situation

23   where the jury has been invited to do exactly that which

24   they are not permitted.

25             So if you are content to merely have me read

```
 1      back that which I have already done, that's fine.  If you

 2      would want something stronger, I would be prepared to

 3      consider that.

 4              That's my point.  This is not that circumstance,

 5      Mr. Partridge, that you cited.

 6              MR. PARTRIDGE:  Understood.

 7              MR. COYNE:  Your Honor, I just have it in

 8      handwriting here.  What we would propose the Court say is,

 9      "During his closing argument yesterday Mr. Partridge made a

10      statement dealing with attorney-client privilege which was

11      inconsistent with my instructions to you.  So that there is

12      no confusion, I will re-read this instruction."

13              THE COURT:  That's what I had in mind.

14              MR. COYNE:  Thank you, Your Honor.

15              THE COURT:  If you don't mind, I will take that.

16      That is what we will do.

17              Ms. Walker, when we go back, you can get me the

18      jury instructions.

19              So that's how we will deal with that.

20              The jury has this question for us, I think among

21      a number of others.  They only provided this one.  It is as

22      follows:

23              "If one claim is judged to be invalid, does that

24      prevent infringement for any of the other claims of the

25      patent?"
```

1       Now, I guess the easy answer is, the short

2  answer is probably no.  But it may depend, I guess.  I

3  wanted to talk with counsel and get your views on how the

4  jury should be advised on this.

5       Mr. Coyne.

6       MR. COYNE:  Your Honor, I would say it does not,

7  but the relationship between the claims matters.  If it is

8  an independent claim, then none of the dependent claims from

9  it are infringed.

10       THE COURT:  That's the point.

11       Mr. Partridge.

12       I don't think the question is capable of just a

13  short yes or no response, was my initial -- remains my

14  thought on the subject.

15       MR. PARTRIDGE:  I agree that it depends on the

16  claim.

17       THE COURT:  Do you want to agree, see if you can

18  work on, agree on an instruction to the jury on this?

19       MR. PARTRIDGE:  Yes.

20       THE COURT:  Or refer back to the appropriate

21  place in the instructions we have already given.  Maybe we

22  can just do that.

23       What I wanted to do is see if you concurred with

24  my view, which you do, and give you a chance to talk to one

25  another and agree on something.

1           While you are doing that, I am going to go back

2      into chambers and collect the willfulness instruction, and

3      we will see if the jury has any other questions for us.  And

4      I will be back.

5           (Recess taken.)

6           THE COURT:  Okay.  I realize I misspoke when I

7      left the Bench.  We have the attorney-client privilege and

8      opinion of counsel instruction that I delivered in the final

9      instructions.

10          Have you agreed upon an answer to the jury's

11     question?

12          MR. COYNE:  We haven't yet, and we didn't bring

13     the copy of the instructions.  Mr. Herrmann ran back to the

14     office to grab them.

15          MR. PARTRIDGE:  I have them here.

16          THE COURT:  What are you thinking?

17          MR. COYNE:  As we started working through it,

18     it's a more nuanced problem than it presents at first,

19     because you have got one issue of an invalid claim can't be

20     infringed and you have also have the aspect that we are

21     asserting a dependent claim on 20 and 21 without asserting

22     the independent claim on which it depends.

23          I certainly don't want to encourage them to go

24     out and make findings on a claim that is not asserted in the

25     case or get confused by thinking claim 10 is invalid and it

1    therefore somehow implicates 20 and 21 of the '121 patent.

2              THE COURT:  Let's talk about that for a moment.

3              We don't know which patent they are looking at,

4    which claim, which patent they are looking at.  You have

5    honed in on your patent.  I understand that.

6              Do you have a thought?

7              MR. PARTRIDGE:  Yes, Your Honor.  Two answers we

8    can give them, from our point of view.  We think that the

9    simple answer is no.  In other words, they have to go look

10   at the claims.

11             But another way to do it is just simply say to

12   them you should answer all the questions on infringement and

13   validity.  And when you look at the verdict form, we have

14   separated the infringement and validity questions.  And we

15   have -- it's a fairly simple check-off on each claim,

16   check-off on each claim for each of infringement and

17   validity.  And I think if we just tell them you have to

18   answer all the questions, it probably deals with this.

19             But I do think the simple answer is, if we were

20   to give an answer as opposed to just telling them to go back

21   and answer all the questions, I think the answer is no.

22             MR. COYNE:  Your Honor, as I am wrestling with

23   this, I can't think of a simple way to phrase this.  I think

24   a no and answer all the questions is probably going to be

25   the simplest and least confusing for the jury.

1   THE COURT:  I will tell them, ladies and

2   gentlemen, the short answer is no, but by way of further

3   response, please -- well, you should answer each question on

4   the verdict form.

5   MR. SPEARS:  Each question dealing with

6   infringement and validity, because the damages question is

7   conditional.

8   THE COURT:  All right.  I don't think they have

9   passed out that, or resubmitted the sheet they gave us

10  yesterday, which had a number of questions on it, which I

11  didn't read, because when they reported to the jury officer

12  that they were going home, I just gave it back to the jury

13  officer and said we will deal with this tomorrow.

14  So let's get the jury out.

15  You may want to check first as to whether they

16  have any questions before you bring them out, have the jury

17  officer check that.

18  (Jury enters courtroom at 10:10 a.m.)

19  THE COURT:  Good morning, ladies and gentlemen.

20  Please take your seats.

21  All right.  We have two things to deal with, and

22  since you posed the question, I am going to deal with your

23  question first.  Then I need to give you a further

24  instruction.

25  Your question:  If one claim is judged to be

1  invalid, does that prevent infringement of any other claim

2  of the patent?

3         The short answer is no.  I will further instruct

4  you that you should answer each, on the verdict form, I am

5  referencing the verdict form right now, you should answer

6  each question that deals with infringement and validity on

7  that form.  I think this will give you further guidance.

8         Something occurred during the closing speech of

9  Mr. Partridge yesterday, and I am going to give you an

10 instruction on that issue.

11        During his closing argument yesterday, Mr.

12 Partridge made a statement dealing with the attorney-client

13 privilege which was inconsistent with my final instructions

14 to you.  In order to avoid any confusion, I am going to

15 re-read that instruction.  And you can certainly take

16 another look at it when you go back.

17        During the trial you heard the phrase

18 attorney-client privilege.  And you also saw documents that

19 were redacted by the parties.  The attorney-client privilege

20 protects clients, or a client's confidentiality, when

21 seeking legal advice from attorneys.  You should know that

22 it is perfectly proper for any witness to invoke the

23 attorney-client privilege, and you shouldn't draw any

24 conclusion adverse to either party simply because a witness

25 has invoked the privilege, nor should you speculate on what

1    the witness might have testified if the privilege had not

2    been raised.

3            You should also not draw any negative inference

4    from the redaction of the documents that were presented to

5    you throughout the trial.  These redactions were also made

6    to protect a claim of attorney-client privilege asserted by

7    LG, the plaintiff here, and you should not draw any negative

8    inference from these redactions or attempt to speculate what

9    information was contained in those redactions.  Confine your

10   deliberations to the testimony that you have heard and to

11   the documents that are in evidence.

12           Okay.  You may resume your deliberations.  Thank

13   you.

14           One other thing.  While you are here, I will

15   advise you in the presence of counsel, so if they see you

16   milling about the courtroom, it's because you have already

17   indicated that you want access to certain exhibits, physical

18   exhibits, namely, the three refrigerators that are here in

19   the courtroom, and all you need to do is let your jury

20   officer know that you want to come out.  The front door of

21   the courtroom is going to remain locked.  The jury officer

22   will protect the other entrances, so that you will be

23   undisturbed and you can deliberate in this room, is the

24   point.

25           Don't feel that you have to save a comment until

```
 1    you get back.  Nobody is going to listen to you here and you

 2    will be just fine.  Okay?

 3              You may return to the jury room.

 4              (Jury leaves courtroom at 10:13 a.m.)

 5              (Recess taken.)

 6              THE COURT:  Counsel, there is a request from the

 7    jury.  The way it is phrased -- and I don't remember, there

 8    are enough exhibits in this case that, frankly -- was Kim a

 9    patent or a patent application?

10              MR. PARTRIDGE:  Kim was a patent.

11              THE COURT:  They want Kim.  Do they have Kim?

12              MR. PARTRIDGE:  Yes, they do have Kim.

13              THE COURT:  Mr. Coyne?

14              MR. COYNE:  Your Honor, there is two Kims,

15    unfortunately.  The Kim patent --

16              THE COURT:  They say the Kim patent that has the

17    push-button spigot as mentioned by Karvelis.

18              MR. PARTRIDGE:  I think it's DX-569.  I don't

19    have the exhibits here.  But that is the only --

20              THE COURT:  That is in the box that they have,

21    one of the boxes?

22              MR. COYNE:  Yes, Your Honor.

23              MR. PARTRIDGE:  Yes.  If they go and look at the

24    exhibits we provided, they are arranged by patent, and it

25    should be in that set of exhibits.  I think they are in
```

1    numerical order for each patent, so they should be able to

2    find it in the '121 set of exhibits in numerical order.

3    DX-569.

4                   THE COURT:  Are the two sets of boxes clearly

5    marked, one LG and one Whirlpool?

6                   MR. PARTRIDGE:  I believe they are, Your Honor.

7    The easy way to tell is, one set I think is all DX's and I

8    think we put all the PTX's in the other binders.

9                   I believe on the notebooks our legal assistants

10   put labels.

11                  THE COURT:  Is it DTX?

12                  MR. PARTRIDGE:  DX.

13                  THE COURT:  And PTX?

14                  MR. PARTRIDGE:  Yes.

15                  THE COURT:  All right.

16                  "Members of the jury, you should be able to find

17   this patent in the box of exhibits with DX designations.

18   The Kim patent you seek may be found at DX-569."

19                  All right?

20                  MR. PARTRIDGE:  Very well, Your Honor.

21                  MR. COYNE:  Yes, Your Honor.

22                  (Recess taken at 12:35 p.m.)

23                        -  -  -

24                  (The following took place in chambers, by

25   teleconference, at approximately 3:00 p.m.)

1           THE COURT:  Hi, counsel.

2           (Counsel respond "Good afternoon.")

3           THE COURT:  Two things.  Let me put on the

4    record the conversation that I had in response to the

5    previous request from the jury, previous to the one I am

6    going to share with you, that I imagine by now was shared by

7    each side's respective Delaware counsel.

8           The jury asked whether we could tell them who

9    manufactured PTX-552.  The response that I hand-wrote on the

10   question was, "PTX-552 is a Whirlpool-manufactured Kenmore

11   refrigerator accused under the '121 patent."

12          That is now on the record.

13          We now have a request for a dictionary.  And I

14   wanted to get the parties' views on that.  That is why I

15   have asked to speak with you.

16          MR. PARTRIDGE:  Your Honor, I always hate to

17   turn a jury down, but I think that's a bad idea, to give

18   them a dictionary.  I think if we do so, we run a risk of

19   creating the potential for reversible error.

20          THE COURT:  Why do you say that?

21          MR. PARTRIDGE:  Because what will happen is that

22   they will pull out the dictionary and use it perhaps to

23   second-guess claim construction or to make claim

24   constructions.

25          It is really hard to know what they would do

```
1    with that dictionary.  And depending which dictionary you

2    choose, they can vary considerably.  So I am hesitant to

3    move in that direction.

4                 THE COURT:  Mr. Coyne.

5                 MR. COYNE:  Yes, Your Honor.  I share the same

6    concerns.  But if they have specific words that Your Honor

7    has not construed that they want a definition of, I guess I

8    am still even concerned, because I think they are going to

9    use the dictionary instead of the specification.  That is my

10   fear.

11                THE COURT:  Counsel, why don't we tell the

12   jurors that they can use the plain English meaning of words

13   that aren't construed by the Court?

14                MR. PARTRIDGE:  That is exactly right, Your

15   Honor.  We are on all fours with that.

16                MR. COYNE:  Without a dictionary, Your Honor?

17                THE COURT:  Maybe they need a dictionary to

18   determine the plain English meaning of a term that has not

19   been construed, and contrary to what you have suggested, Mr.

20   Partridge, they have no intention to stray from the Court's

21   claim construction.

22                MR. PARTRIDGE:  But I don't think you can give

23   them a dictionary.  I think you have to leave them to base

24   it on their collective knowledge and sense of whatever words

25   they are struggling with, to come up with their common sense
```

1       about what words mean, as opposed to giving them

2       dictionaries to do so.

3                    I think we do create the risk of error in doing

4       that.

5                    They ought to look at the specifications, as Mr.

6       Coyne indicated, and make their determination on the basis

7       of the record that is before them.

8                    THE COURT:  Perhaps purely as an academic

9       question, Mr. Partridge, you suggested it might create

10      reversible error for a variety of reasons.  How would you

11      know?  The jury's deliberations are secret.

12                   MR. PARTRIDGE:  That is true.

13                   THE COURT:  What argument would you be able to

14      articulate in the Federal Circuit to support that somehow

15      reversible error had been committed?

16                   MR. PARTRIDGE:  Judge, let me confer with my

17      group here for a moment.

18                   (Pause.)

19                   MR. PARTRIDGE:  Judge Sleet, the conversation we

20      just had was whether collectively we thought there might be

21      cases on this point.  Collectively, we do.  I can't cite a

22      case to you without going and looking.  But the problem is

23      that we are giving them something that is not part of the

24      trial record.

25                   I know you see this all the time, where parties

1    are arguing before you about what terms mean and various

2    dictionaries, and they will argue you ought to use this

3    dictionary or that to come up with a construction.

4              I just think it's risky business to go down this

5    path.

6              MR. COYNE:  Your Honor, we have caucused as

7    well, while they have been.

8              I am troubled by it, as I said before.  But I am

9    also sensitive to the jury's need for guidance on this.

10             I think it's fine, Your Honor.  We don't object

11   to you giving them a dictionary.

12             THE COURT:  Just as an example, this is part of

13   the Court's instructions to the jury under literal

14   infringement:  A claim limitation is literally present if it

15   exists in the product as it is described in the claim

16   language, either as I have explained that language to you

17   or, if I did not explain it, based on its plain English

18   meaning.

19             Where do you derive plain English meaning from,

20   Mr. Partridge, if it's not a lexicography issue or the Court

21   otherwise hasn't given the jury a definition?  Where do you

22   derive it from?  There may be a difference of view as to

23   which version of which dictionary or which dictionary you

24   want to provide.  But isn't the dictionary a common source

25   of plain English meaning?

1    MR. PARTRIDGE:  It is, Your Honor.

2    THE COURT:  What if the collective knowledge of

3    the jury isn't sufficient or adequate to address the plain

4    English meaning or know the plain English meaning of a

5    particular term that may be critical to the determination of

6    the case?  I don't know what that term might be or why there

7    should be one.  I cannot speculate on that, nor can you and

8    your team.  But I would be interested, because I don't think

9    you are going to find a case that says that it's reversible

10   error for a judge in a patent case to respond to a jury's

11   request, plain request, may we have a dictionary, by giving

12   that jury a dictionary.

13   But maybe, like Mr. Spears, I will be

14   "Surprised, surprised."  It's possible.

15   MR. SPEARS:  One thing to keep in mind about

16   dictionaries, Your Honor, is that they are sort of two

17   different types.  If you look --

18   THE COURT:  I know there are technical

19   dictionaries and there are nontechnical dictionaries.

20   MR. SPEARS:  There are two different types of

21   nontechnical dictionaries.

22   THE COURT:  There are unabridged and abridged.

23   MR. SPEARS:  That's right.  And unabridged

24   dictionaries give you every possible sense of a word's usage

25   in the English language.

1   THE COURT:  We could probably agree on a

2   dictionary, if I am determined to provide the jury with one.

3   Or maybe not.  Then we could propose, suggest -- I have two

4   types of dictionaries over here unabridged, and I think

5   there are some abridged dictionaries floating around as

6   well.

7   MR. PARTRIDGE:  If we are going to give them

8   one, probably the unabridged is better because it is at

9   least a compilation of what a broader base of what a term

10  means, as contrasted to the more popular subset of the

11  abridged dictionary.

12  THE COURT:  That would be my inclination.

13  Perhaps a midpoint, or suggestion, and I think it was -- I

14  won't take pride of authorship in this, but Mr. Coyne, I

15  think I heard you to say that perhaps -- at least something

16  you said suggested to me that maybe we should pose the

17  question to the jury as to what terms they need to find or

18  something along those lines.

19  What is your reaction to that, counsel?

20  MR. COYNE:  Your Honor, I think that might give

21  guidance.  Then you can just provide them the pages, so they

22  are not spending time sifting through synonyms.  That way

23  they have pretty clear guidance.

24  THE COURT:  Mr. Partridge.

25  MR. PARTRIDGE:  I think that is fine, Your

1   Honor.  As long as whatever definitions we give them are

2   from the unabridged version.

3           THE COURT:  That would give us a chance to

4   revisit the subject and discuss.  I can pull out the

5   unabridged version, and we can actually look up the words.

6   But I, as are Mr. Coyne and I know you, am sensitive to the

7   jury's need to have the tools it needs to resolve the

8   parties' disputes.

9           MR. PARTRIDGE:  Absolutely.

10          THE COURT:  So I will get back to you.  I am

11  going to write a note back to the jury to write a note to us

12  asking us for the terms that need defining.

13          (Recess taken.)

14          (The following took place in chambers, by

15  teleconference, at approximately 3:20 p.m.)

16          THE COURT:  There are two words, counsel, in

17  response to my question.  The words are "prevent" and

18  "reduce."  I will tell you, I have in front of me the

19  Webster's Third New International Unabridged Dictionary,

20  this is an older one, it is 1993.  But under the word

21  "prevent," the list of definitions is six and a half inches

22  long, and under the word "reduce," it's 11.  That's how long

23  the columns are defining these words.

24          I don't know what you want to do.  Why don't you

25  caucus, or, if you want to just jump into the fray here, go

1    right ahead.

2              MR. COYNE:  Your Honor, I think we are

3    comfortable with you sending, if you want to just copy the

4    pages for both definitions and send them to the jury, we are

5    fine with that.

6              THE COURT:  Mr. Partridge.

7              MR. PARTRIDGE:  Your Honor, that is okay with

8    us, too.  I think we ought to give the jury something so

9    they can reach their conclusion.

10             THE COURT:  Okay.  For the record, I have

11   identified the book from which I will have the definitions

12   copied.  "Prevent" occurs at Page 1798, and "reduce" occurs

13   at Page 1905.  Okay, counsel?

14             (Counsel respond "Thank you.")

15             (Court was recessed until the following day.)

16

17

18

19

20

21

22

23

24

25